# U.S. District Court
# Eastern District of Arkansas (Central Division)
# CRIMINAL DOCKET FOR CASE #: 4:97−cr−00243−KGB−2
## *Internal Use Only*

Case title: United States of America v. Kehoe et al

Other court case numbers: 4:06cv1608 USDC E/D AR

99−02897 USCA8

99−03199 USCA8

Related  Case:  4:18−cv−00649−KGB

Date Filed: 12/12/1997

Date Terminated: 05/13/2002

Assigned to: Judge Kristine G. Baker

Appeals court case numbers:
00−1975 8USCA, 02−2389 8USCA,
11−1380 USCA8, 14−2853 USCA8,
19−2432 USCA8, 19−3618 USCA8

**Defendant (2)**

| | | |
|---|---|---|
| **Daniel Lewis Lee** | represented by | **Cathleen V. Compton** |
| *TERMINATED: 05/13/2002* | | Arkansas Attorney General's Office |
| *also known as* | | Catlett−Prien Tower Building |
| Danny Lee | | 323 Center Street, Suite 200 |
| *also known as* | | Little Rock, AR 72201−2610 |
| D L Graham | | 501−682−2007 |
| *also known as* | | Fax: (501) 374−5118 |
| Daniel Lewis Graham | | Email: vicki@cathicomptonlaw.com |

*TERMINATED: 05/13/2002*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**David A. Ruhnke**
Ruhnke & Barrett
47 Park Street
Montclair, NJ 07042
973−744−1000
Email: davidruhnke@ruhnkeandbarrett.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**George G. Kouros**
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770

301−821−0855
Email: george_kouros@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or Community Defender Appointment*

**Jack T. Lassiter**
Lassiter & Cassinelli
813 West Third Street
Little Rock, AR 72201
501−370−9300
Fax: 501−370−9306
Email: jack@lcarklaw.com
*TERMINATED: 05/13/2002*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Laurence E. Komp**
Attorney at Law
Post Office Box 1785
Manchester, MO 63011
636−207−7330
Email: lekomp@swbell.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Morris H. Moon**
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
713−880−3556
Email: morris_moon@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or Community Defender Appointment*

**Jennifer A. Merrigan**
Federal Public Defender's Office
800 North King Street
Wilmington, DE 19801
302−573−6010
Email: jenmerrigan@gmail.com
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or Community Defender Appointment*

**Karl Schwartz**
Federal Public Defender's Office

800 North King Street
Wilmington, DE 19801
302–573–6010
Email: kdschwartzlaw@gmail.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

| **Pending Counts** | **Disposition** |
| --- | --- |
| 18:1962–0100.F RICO– MURDER, FIRST DEGREE LIFE/$250,000 (1s) | DEATH on each of Counts 3s, 4s, and 5s; and LIFE on Counts 1s and 2s to run concurrent with each other |
| 18:1962–0100.F RICO CONSPIRACY – MURDER, FIRST DEGREE LIFE/$250,000 (2s) | DEATH on each of Counts 3s, 4s, and 5s; and LIFE on Counts 1s and 2s to run concurrent with each other |
| 18:1959–0100.F MURDER, FIRST DEGREE DEATH/$250,000 (3s–5s) | DEATH on each of Counts 3s, 4s, and 5s; and LIFE on Counts 1s and 2s to run concurrent with each other |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| 18:1962–7471.F RACKETEERING – MURDER LIFE; NMT $250,000 (1) | dismissed due to filing of superseding indictment |
| 18:1959–7471.F CONSPIRACY RACKETEERING ACTIVITY, MURDER/KIDNAPPING NMT 10 yrs; NMT $250,000 (2) | dismissed due to filing of superseding indictment |
| 18:1959–7471.F MURDER IN AID OF RACKETEERING DEATH; NMT $250,000 (3–5) | dismissed due to filing of superseding indictment |
| 18:1951.F INTERFERENCE WITH COMMERCE BY THREAT OR VIOLENCE (HOBBS ACT) NMT 20 yrs; NMT $250,000 (6) | dismissed due to filing of superseding indictment |
| 18:1951.F HOBBS ACT CONSP. – INTERFERENCE WITH COMMERCE BY THREAT OR VIOLENCE NMT 20 YRS/$250,000 (6s) | dismissed on the motion of the govt |

18:924C.F VIOLENT
CRIME/DRUGS/MACHINE GUN
(Hobbs Act Consp.) DEATH; NMT
$250,000
(7)

dismissed due to filing of superseding indictment

18:924C.F USE OF FIREARM IN
HOBBS ACT ROBBERY
CONSPIRACY 5 YRS
CONSECUTIVE
(7s)

dismissed on the motion of the govt

**Highest Offense Level
(Terminated)**

Felony

| **Complaints** | **Disposition** |
|---|---|
| None | |

**Plaintiff**

| | | |
|---|---|---|
| **United States of America** | represented by | **Clarence Daniel Stripling** |

Social Security Administration
Office of Hearings & Appeals
700 West Capitol Avenue
Room 2405
Little Rock, AR 72201–3285
866–592–2549 ext 11747
*TERMINATED: 05/17/2012*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael S. Gordon**
U. S. Attorney's Office
Eastern District of Arkansas
Post Office Box 1229
Little Rock, AR 72203–1229
501–340–2600
Email: michael.gordon@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Robert A. De La Cruz**
U. S. Department of Justice –
Terrorism/Violent Crimes
601 D Street, N.W.
Suite 6500
Washington, DC 20530
(202) 563–6629

*TERMINATED: 05/13/2002*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexander D. Morgan**
U. S. Attorney's Office
Eastern District of Arkansas
Post Office Box 1229
Little Rock, AR 72203–1229
501–340–2635
Email: alex.morgan@usdoj.gov
*TERMINATED: 07/26/2019*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Ali Ahmad**
U. S. Attorney's Office
Eastern District of Arkansas
Post Office Box 1229
Little Rock, AR 72203–1229
501–340–2608
Email: ali.ahmad@usdoj.gov
*TERMINATED: 03/19/2020*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**John M. Pellettieri**
U. S. Department of Justice – Criminal
Division
Appellate Section
950 Pennsylvania Avenue, NW
Room 1264
Washington, DC 20530
202–307–3766
Email: john.pellettieri@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Jonathan Dean Ross**
U. S. Attorney's Office
Eastern District of Arkansas
Post Office Box 1229
Little Rock, AR 72203–1229
501–340–2607
Email: jonathan.d.ross@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Linda B. Lipe**
U. S. Attorney's Office
Eastern District of Arkansas
Post Office Box 1229

Little Rock, AR 72203–1229
501–340–2600
Email: Linda.Lipe@usdoj.gov
*TERMINATED: 10/03/2018*
*ATTORNEY TO BE NOTICED*

**Shannon S. Smith**
U. S. Attorney's Office
Eastern District of Arkansas
Post Office Box 1229
Little Rock, AR 72203–1229
501–340–2600
Fax: 501–340–2730
Email: Shannon.Smith@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

Email All Attorneys (Primary Address)
Email All Attorneys (Primary and Secondary Address)

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 12/12/1997 | 1 | | INDICTMENT by USA Dan Stripling. Counts filed against Chevie O;Brien Kehoe (1) count(s) 1, 2, 3–5, 6, 7, Daniel Lewis Lee (2) count(s) 1, 2, 3–5, 6, 7, Faron Earl Lovelace (3) count(s) 1 (rkc) Modified on 02/23/1998 (Entered: 12/15/1997) |
| 12/12/1997 | 2 | | CASE SUMMARY warrant / summons : WARRANT request for defendant Chevie O;Brien Kehoe, defendant Daniel Lewis Lee, defendant Faron Earl Lovelace (rkc) (Entered: 12/15/1997) |
| 12/12/1997 | | | ARREST Warrant issued for Chevie O;Brien Kehoe, Daniel Lewis Lee, Faron Earl Lovelace by Magistrate Judge John Forster Jr. (rkc) (Entered: 12/15/1997) |
| 12/15/1997 | 3 | | PETITION for Writ of Habeas Corpus Ad Prosequendum for Daniel Lewis Lee lej) (Entered: 12/16/1997) |
| 12/16/1997 | | | lej) (Entered: 12/16/1997) |
| 12/16/1997 | | | WRIT issued as to Daniel Lewis Lee lej) (Entered: 12/16/1997) |
| 12/22/1997 | 5 | | ORDER by Magistrate Judge John F. Forster Jr. appointing Jack T. Lassiter, and Cathleen V. Compton as to Daniel Lewis Lee (cc: all counsel and defendants) (rkc) (Entered: 12/22/1997) |
| 12/22/1997 | 12 | | Return on WRIT unexec. as to Daniel Lewis Lee [12–1] (rkc) (Entered: 12/23/1997) |
| 12/23/1997 | 11 | | NOTICE of hearing arraignment Mon. 1/5/98 at 11:00 a.m. as to Daniel Lewis Lee (rkc) (Entered: 12/23/1997) |
| 12/29/1997 | 14 | | PETITION for Writ of Habeas Corpus Ad Prosequendum by Daniel Lewis Lee (former empl) (Entered: 12/29/1997) |
| 12/29/1997 | | | WRIT issued as to Daniel Lewis Lee (former empl) (Entered: 12/29/1997) |

| | | | |
|---|---|---|---|
| 01/05/1998 | 20 | | MINUTES: court convened before Magistrate Judge John F. Forster Jr. first appearance of Daniel Lewis Lee on arraignment Attorney Jack Lassiter and Cathleen Compton present; entered plea of n/g; jury trial (5 weeks) Mon. 2/5/98 at 9:15 a.m.; 21 days to file pretrial motions as to Daniel Lewis Lee (rkc) (Entered: 01/06/1998) |
| 01/05/1998 | 21 | | ORDER of Detention pending Trial of Daniel Lewis Lee by Magistrate Judge John F. Forster Jr. (rkc) (Entered: 01/06/1998) |
| 01/05/1998 | 22 | | NOTICE of hearing jury trial Mon. 2/5/98 at 9:15 a.m. as to Daniel Lewis Lee (rkc) (Entered: 01/06/1998) |
| 01/05/1998 | 28 | | MOTION for release of Brady materials by Daniel Lewis Lee (rkc) (Entered: 01/06/1998) |
| 01/05/1998 | 29 | | MOTION to produce alleged co−conspirator statements , and to suppress any such statements which fail to meet the criteria of F.R.of Evid. Rule 801(D)(2)(e) by Daniel Lewis Lee (rkc) (Entered: 01/06/1998) |
| 01/05/1998 | 30 | | MOTION to produce alleged section 404(b) evidence and Memorandum of Law in support thereof by Daniel Lewis Lee (rkc) (Entered: 01/06/1998) |
| 01/05/1998 | 31 | | MEMORANDUM by defendant Daniel Lewis Lee in support of motion for release of Brady materials [28−1] (rkc) (Entered: 01/06/1998) |
| 01/05/1998 | 32 | | MEMORANDUM by defendant Daniel Lewis Lee in support of motion to produce alleged co−conspirator statements [29−1], of motion to suppress any such statements which fail to meet the criteria of F.R.of Evid. Rule 801(D)(2)(e) [29−2] (rkc) (Entered: 01/06/1998) |
| 01/05/1998 | 33 | | MOTION for disclosure of Rule 16 materials by Daniel Lewis Lee (rkc) (Entered: 01/06/1998) |
| 01/05/1998 | 34 | | MOTION for disclosure of Jencks Act Material and Memorandum of Law in Support Thereof by Daniel Lewis Lee (rkc) (Entered: 01/06/1998) |
| 01/05/1998 | 35 | | MOTION to compel disclosure of the existence and substance of promises of immunity, leniency, or preferential treatment and Memorandum of Law in support thereof by Daniel Lewis Lee (rkc) (Entered: 01/06/1998) |
| 01/06/1998 | 25 | | CJA Frm 20Cp4 (Apt Cnsl) appointing Cathleen V Compton #D37211 as to Daniel Lewis Lee lej) (Entered: 01/06/1998) |
| 01/06/1998 | 26 | | CJA Frm 20Cp4 (Apt Cnsl) appointing Jack T Lassiter #D37210 as to Daniel Lewis Lee lej) (Entered: 01/06/1998) |
| 01/09/1998 | 41 | | MOTION to continue trial by Daniel Lewis Lee (rkc) (Entered: 01/13/1998) |
| 01/09/1998 | 42 | | MOTION for order to adopt by silence all relevant pretrial motions and trial objections of co−dfts by Daniel Lewis Lee (rkc) (Entered: 01/13/1998) |
| 01/09/1998 | 43 | | MOTION to extend time to file pretrial motions by Daniel Lewis Lee (rkc) (Entered: 01/13/1998) |
| 01/23/1998 | 49 | | Return on WRIT executed 1/5/97 as to Daniel Lewis Lee [49−1] (former empl) (Entered: 01/23/1998) |
| 01/23/1998 | 50 | | |

July 3 2020 p7

Appellate Case: 20-2351    Page: 7    Date Filed: 07/04/2020 Entry ID: 4930235

| | | | |
|---|---|---|---|
| | | | RESPONSE by plaintiff USA to motion to extend time to file pretrial motions [43–1] (former empl) Modified on 01/26/1998 (Entered: 01/26/1998) |
| 01/23/1998 | 51 | | RESPONSE by plaintiff USA to motion for order to adopt by silence all relevant pretrial motions and trial objections of co–dfts [42–1] (former empl) Modified on 01/26/1998 (Entered: 01/26/1998) |
| 01/23/1998 | 52 | | RESPONSE by plaintiff USA to motion to continue trial [41–1] (former empl) Modified on 01/26/1998 (Entered: 01/26/1998) |
| 01/23/1998 | 53 | | RESPONSE by plaintiff USA to motion to compel disclosure of the existence and substance of promises of immunity, leniency, or preferential treatment and Memorandum of Law in support thereof [35–1] (former empl) Modified on 01/26/1998 (Entered: 01/26/1998) |
| 01/23/1998 | 54 | | RESPONSE by plaintiff USA to motion for disclosure of Jencks Act Material and Memorandum of Law in Support Thereof [34–1] (former empl) Modified on 01/26/1998 (Entered: 01/26/1998) |
| 01/23/1998 | 55 | | RESPONSE by plaintiff USA to motion for disclosure of Rule 16 materials [33–1] (former empl) Modified on 01/26/1998 (Entered: 01/26/1998) |
| 01/23/1998 | 56 | | RESPONSE by plaintiff USA to motion to produce alleged section 404(b) evidence and Memorandum of Law in support thereof [30–1] (former empl) Modified on 01/26/1998 (Entered: 01/26/1998) |
| 01/23/1998 | 57 | | RESPONSE by plaintiff USA to motion to produce alleged co–conspirator statements [29–1], motion to suppress any such statements which fail to meet the criteria of F.R.of Evid. Rule 801(D)(2)(e) [29–2] (former empl) (Entered: 01/26/1998) |
| 01/23/1998 | 59 | | RESPONSE by plaintiff USA to motion for release of Brady materials (require govt agents to retain rough notes) [28–1] (former empl) (Entered: 01/26/1998) |
| 01/23/1998 | 60 | | RESPONSE by plaintiff USA to motion for disclosure of Jencks Act Material and Memorandum of Law in Support Thereof [34–1] (former empl) (Entered: 01/26/1998) |
| 01/26/1998 | 58 | | MEMORANDUM by plaintiff USA in support of motion response for production of alleged co–conspirator statements and for suppression of any such statements which fail to meet the criteria of Fed Rules of Evid., Rule 801 (D)(2)(e)[57–1] (former empl) (Entered: 01/26/1998) |
| 01/27/1998 | 499 | | SUPPLEMENTAL CJA Form 20Cp4 (Appointment of Counsel) for Cathleen V. Compton as to Daniel Lewis Lee (rkc) (Entered: 01/28/1999) |
| 01/28/1998 | 61 | | MINUTES: Telephone conference held before Magistrate Judge Jerry W. Cavaneau with Dan Stripling, John Hall and Jack Lassiter as to Chevie O'Brien Kehoe and Daniel Lewis Lee regarding motion for blood sample from Kehoe and Lee. ERO – Donna Jackson (dmj) (Entered: 01/29/1998) |
| 01/30/1998 | 74 | | MINUTES: CONFERENCE as to all defts. held before Judge G. T. Eisele. Supplemental hearing set for 2/9/98. (Ct. Rep. –– Elaine Hinson) (mah) (Entered: 02/15/1998) |

| | | | |
|---|---|---|---|
| 02/04/1998 | 62 | | MOTION to allow individual sequestered voir dire by Daniel Lewis Lee lej) (Entered: 02/04/1998) |
| 02/05/1998 | 64 | | ORDER by Judge G. T. Eisele pretrial conference Mon. 2/9/98 at 9:00 a.m. as to Chevie O'Brien Kehoe, Daniel Lewis Lee, Faron Earl Lovelace (cc: all counsel and defendants) (rkc) (Entered: 02/06/1998) |
| 02/06/1998 | 65 | | MOTION to sever by Daniel Lewis Lee (rkc) (Entered: 02/09/1998) |
| 02/06/1998 | 66 | | MEMORANDUM by defendant Daniel Lewis Lee in support of motion to sever [65–1] (rkc) (Entered: 02/09/1998) |
| 02/09/1998 | 67 | | ORDER by Judge G. T. Eisele that compensation for counsel for Mr. Kehoe and Mr. Graham should be fixed at $125 for in–court and out–of–court time. The Court encourages counsel to conduct their own research and the Court directs counsel to advise it of any authority or analysis that would change the court's tentative conclusions. (cc: all counsel and defendants) (rkc) (Entered: 02/09/1998) |
| 02/09/1998 | 69 | | TRANSCRIPT of excerpted testimony of Attorney conference of 2/9/98 as to Chevie O'Brien Kehoe, Daniel Lewis Lee, Faron Earl Lovelace (rkc) (Entered: 02/09/1998) |
| 02/09/1998 | 70 | | TRANSCRIPT of excerpted testimony of Attorney Conference of 1/30/98 as to Chevie O'Brien Kehoe, Daniel Lewis Lee, Faron Earl Lovelace (rkc) (Entered: 02/09/1998) |
| 02/09/1998 | 103 | | MINUTES: CONFERENCE held before Judge G. T. Eisele to discuss scheduling matters. Court directs parties to file briefs by 2/23/98 on issue of compensation cap. (Ct. Rep. –– Elaine Hinson) lej) (Entered: 03/03/1998) |
| 02/12/1998 | 73 | | RESPONSE by plaintiff USA to motion to allow individual sequestered voir dire [62–1] as to Daniel Lewis Lee lej) (Entered: 02/12/1998) |
| 02/19/1998 | 77 | | RESPONSE by plaintiff USA to motion to sever [65–1] as to Danny Lewis Lee lej) (Entered: 02/19/1998) |
| 02/19/1998 | 78 | | MEMORANDUM by plaintiff USA in support of motion to sever response [77–1] as to Danny Lewis Lee lej) (Entered: 02/19/1998) |
| 02/19/1998 | 79 | | MOTION for travel expense No. 1 by Daniel Lewis Lee lej) (Entered: 02/19/1998) |
| 02/20/1998 | 81 | | ORDER by Judge G. T. Eisele granting an oral motion to extend the deadline for briefs addressing the compensation of Court–appointed counsel. The Court directs counsel for dfts Chevie O'Brien Kehoe and Daniel Lewis Lee to submit any appropriate briefs on the issue of compensation on or before Wed., 2/25/98. (cc: all counsel) lej) (Entered: 02/23/1998) |
| 02/23/1998 | 91 | | ORDER by Magistrate Judge John F. Forster Jr. granting motion for travel expense No. 1 [79–1] as to Daniel Lewis Lee (cc: all counsel defendants) lej) Modified on 02/23/1998 (Entered: 02/23/1998) |
| 02/24/1998 | 96 | | MOTION for order to set attorney's fees by Daniel Lewis Lee (former empl) (Entered: 02/25/1998) |
| 02/26/1998 | 100 | | |

| | | | |
|---|---|---|---|
| | | | MOTION for payment of reasonable attys fees by defts Chevie O'Brien Kehoe and Daniel Lewis Lee lej) (Entered: 02/27/1998) |
| 03/02/1998 | 102 | | ORDER by Judge G. T. Eisele directing counsel for defts Kehoe and Graham to advise the Court as soon as possible as to whether they will move to withdraw as counsel in the event that the Court denies the motion and sets compensation at $125 per hour (cc: all counsel and defendants) lej) (Entered: 03/02/1998) |
| 03/03/1998 | 104 | | RESPONSE by plaintiff USA to [103−1] court order of 2/9/98 lej) (Entered: 03/03/1998) |
| 03/04/1998 | 106 | | SEALED document by defendant Daniel Lewis Lee (motion) lej) (Entered: 03/05/1998) |
| 03/06/1998 | 107 | | SEALED document by defendant Daniel Lewis Lee (rkc) (Entered: 03/06/1998) |
| 03/06/1998 | 111 | | ARREST Warrant returned executed as to Daniel Lewis Lee 2/24/98 lej) (Entered: 03/11/1998) |
| 03/09/1998 | 109 | | RESPONSE by defendant Daniel Lewis Lee to Court's order dated 3/2/98 [102−1] lej) (Entered: 03/10/1998) |
| 03/10/1998 | 110 | | MEMORANDUM, Opinion and Order: by Judge G. T. Eisele directing the govt to file a notice by 3/30/98 of its intent to seek the death penalty against defts Kehoe and/or Graham and further order directing the govt to file an extension of time to comply if necessary by 3/24/98. (cc: all counsel) lej) (Entered: 03/10/1998) |
| 03/11/1998 | | | Docket Modification (Utility Event) stop XM excludable as to Daniel Lewis Lee lej) (Entered: 03/11/1998) |
| 03/16/1998 | 114 | | PETITION for Writ of HABEAS CORPUS AD PROSEQUENDUM as to Chevie O'Brien Kehoe lej) (Entered: 03/16/1998) |
| 03/17/1998 | 115 | | RESPONSE by defendant Daniel Lewis Lee to motion for order to prevent distribution [112−1] (former empl) (Entered: 03/17/1998) |
| 03/20/1998 | 119 | | NOTICE by plaintiff USA of intent to seek the death penalty as to Daniel Lewis Lee (rkc) (Entered: 03/20/1998) |
| 03/24/1998 | 122 | | ORDER by Judge G. T. Eisele denying motion to sever [65−1] of Lee and dft. Faron Earl Lovelace's sealed Motion for Severance (cc: all counsel and defendants) (rkc) (Entered: 03/24/1998) |
| 03/26/1998 | | | Docket Modification (Utility Event) stopping XM excludable for dfts Kehoe and Lovelace (rkc) (Entered: 03/26/1998) |
| 03/26/1998 | | | Docket Modification (Utility Event) starting XE excludable as to all dfts (rkc) (Entered: 03/26/1998) |
| 03/26/1998 | 133 | | NOTICE of hearing pretrial conference Thurs. 4/9/98 at 10:00 a.m. as to Chevie O'Brien Kehoe, Daniel Lewis Lee, Faron Earl Lovelace (rkc) (Entered: 03/26/1998) |
| 03/31/1998 | 136 | | |

July 3 2020 p10

Appellate Case: 20-2351   Page: 10   Date Filed: 07/04/2020 Entry ID: 4930235

| | | | |
|---|---|---|---|
| | | | ORDER by Judge G. T. Eisele addressing the April 9 pretrial conference; the parties are directed to advise the court of those motions that need to be acted upon; The Gov't is directed upon receipt of this order to submit a response or advise the Court that it does not intend to respond to the Motion for Payment of Reasonable Attorneys Fees; the parties are to advise the Court by 4/6/98 of any other issues which they want to discuss at the 4/9 conference (cc: all counsel and defendants) (rkc) (Entered: 03/31/1998) |
| 04/09/1998 | 139 | | MEMORANDUM, Opinion and Order: by Judge G. T. Eisele denying motion for payment of reasonable attys fees granting motion for order to set attorney's fees [96–1] It is ordered that counsel for Mr. Kehoe and Mr. Graham (Lee) be compensated at the maximum legal rate of $125 per hour for in–court and out–of–court time (cc: all counsel and defendants) (rkc) (Entered: 04/09/1998) |
| 04/09/1998 | 140 | | MINUTES: HEARING as to ALL DEFTS. on all pending motions/scheduling held before Judge G. T. Eisele. (Ct. Rep. –– Elaine Hinson) (mah) (Entered: 04/09/1998) |
| 04/10/1998 | 142 | | SEALED document as to Daniel Lee (rkc) (Entered: 04/10/1998) |
| 04/16/1998 | 144 | | CJA Frm 30Cp4 (Apt Cnsl) as to Daniel Lewis Lee appointing Cathleen Compton #D37211 (rkc) Modified on 04/23/1998 (Entered: 04/17/1998) |
| 04/17/1998 | 145 | | ORDER by Judge G. T. Eisele Ruling on motion to allow individual, sequestered voir dire [94–1] is deferred, on motion to allow individual sequestered voir dire [62–1] is deferred finding the motion for disclosure of JENCKS ACT MATERIAL [89–1] moot., finding the motion to preserve field notes of any interview conducted by any govt agent [88–1] moot., finding the motion for disclosure of LENIENCY or PLEA BARGAIN between the US and any state/govt witness [87–1] moot., finding the motion for disclosure of ELECTRONIC SURVEILLANCE [86–1] moot., finding the motion for disclosure of RULE 404(B) EVIDENCE [85–1] moot., finding the motion for release of Brady materials [84–1] moot., finding the motion for disclosure of GRAND JURY TESTIMONY [82–1] moot. finding the motion to compel disclosure of the existence and substance of promises of immunity, leniency, or preferential treatment and Memorandum of Law in support thereof [35–1] moot., finding the motion for disclosure of Jencks Act Material and Memorandum of Law in Support Thereof [34–1] moot., finding the motion for disclosure of Rule 16 materials [33–1] moot., finding the motion to produce alleged section 404(b) evidence and Memorandum of Law in support thereof [30–1] moot., finding the motion to produce alleged co–conspirator statements [29–1] moot., finding the motion to suppress any such statements which fail to meet the criteria of F.R.of Evid. Rule 801(D)(2)(e) [29–2] moot., finding the motion for release of Brady materials [28–1] moot., finding the motion for Rule 16 discovery [13–1] moot. The gov't is directed to provide dfts or their attorneys on o r before 5/11/98 all discovery to which they are at this time entitled, except for that discovery whose production would endanger the safety of any individual. The court directs counsel to brief the issue of severance in the light of Mr. Lovelace's self–representation on or before 4/23/98. The gov't is to advise the Court on the status of discovery. The Court appoints the FPD to serve as standby counsel for Mr. Lovelace. Her sole responsibility in this matter is to be |

July 3 2020 p11

Appellate Case: 20-2351    Page: 11    Date Filed: 07/04/2020 Entry ID: 4930235

| | | | |
|---|---|---|---|
| | | | available to consult w/Mr. Lovelace in the event that he seeks her assistance. (cc: all counsel and defendants) (rkc) (Entered: 04/17/1998) |
| 04/17/1998 | 146 | | MEMORANDUM by plaintiff USA in opposition to motion for severance of Faron Lovelace (rkc) (Entered: 04/17/1998) |
| 04/28/1998 | 155 | | ORDER by Judge G. T. Eisele that the Court has ocnsidered asking the Government to provide Ms. Horan, Mr. Lovelace's standby counsel, with a copy of the relevant materials in an effort to provide Mr. Lovelace greater access. It appears to the court that this procedure could accommodate everyone's interests as well as possible. Therefore, the Court hereby directs counsel to advise by the end of the week whether they believe that this solution is appropriate. (cc: all counsel and defendants) (rkc) (Entered: 04/28/1998) |
| 05/06/1998 | | | Docket Modification (Utility Event) granting motion to extend time to file pretrial motions [80−1] pursuant to order of 5/5/98 (rkc) (Entered: 05/06/1998) |
| 05/06/1998 | 159 | | PROPOSED Order to prevent distribution by plaintiff USA regarding [155−1] order of 4/28/98 (rkc) (Entered: 05/06/1998) |
| 05/07/1998 | 162 | | STIPULATION by USA re [161−1] motion to compel issuance of subpoena under Rule 17 (c) (former empl) (Entered: 05/08/1998) |
| 05/08/1998 | 163 | | ORDER by Judge G. T. Eisele that copies of photographs, audiotapes, and videotapes that are provided to the dfts. herein by the Gov't may not be copies by the dfts and may not be distributed by the dfts to any other person or entity w/o the prior approval of the Court. The Court further orders the Govt to provide copies of such materials to the Federal Public Defender, Lovelace's stand by counsel The Court orders the Federal Public Defender not to leave such copies in Mr. Lovelace's possession or to distribute them to any third party. The Court finally orders that all copies of all photographs, audiotapes, and videotapes provided by the Gov't to the dfts. be returned to the Gov't for storage or distruction. The Court directs the Gov't to retain for possible future use the originals of all photographs, audiotapes, and videotapes. (cc: all counsel and defendants) (rkc) (Entered: 05/11/1998) |
| 05/15/1998 | 165 | | MEMORANDUM, Opinion and Order: by Judge G. T. Eisele that on or before 6/1/98, Paramount Pictures submit to the court for review IN CAMERA the outtakes at issue in the stipulation between the gov't and paramount Pictures filed on 5/7/98 in the above styled matter. (cc: all counsel and defendants) (rkc) (Entered: 05/15/1998) |
| 06/01/1998 | 174 | | ORDER by Judge G. T. Eisele granting motion to extend time to file pretrial motions [43−1], motions should be filed by 9/15/98; granting motion to continue trial [41−1] jury trial Tuesday, 2/16/99 at 9:00 am as to Chevie O'Brien Kehoe, Daniel Lewis Lee , XT excludable started pursuant to Speedy Trial Act 18 USC 3161 (h)(8)(A) & (h)(7) as to Chevie O'Brien Kehoe, Daniel Lewis Lee (cc: all counsel and defendants) lej) (Entered: 06/02/1998) |
| 06/03/1998 | 178 | | CJA Frm 20Cp4 (Apt Cnsl) as to Daniel Lewis Lee supplemental voucher #37211 for Cathleen Compton (rkc) (Entered: 06/04/1998) |
| 06/03/1998 | 179 | | |

July 3 2020 p12

Appellate Case: 20-2351   Page: 12   Date Filed: 07/04/2020 Entry ID: 4930235

| | | | |
|---|---|---|---|
| | | | ORDER by Mag. Judge John F. Forster Jr. that Ms. Coleman's time shall be reflected separate from that of Mr. Lassiter on vouchers submitted for payment. Entered NUNC PRO TUNC 12/24/97 (cc: all counsel and defendants) (rkc) (Entered: 06/04/1998) |
| 06/03/1998 | 180 | | ORDER by Judge G. T. Eisele granting motion to compel issuance of subpoena under Rule 17 (c) [161−1] The court hereby directs the Gov't to copy the outtakes and distribute them to defense counsel upon receipt. (cc: all counsel and defendants) (rkc) (Entered: 06/04/1998) |
| 06/03/1998 | 183 | | MINUTES: HEARING (Ph.Cf.) as to Chevie Kehoe on govt's. motion to compel issuance of a subpoena to Paramount Pictures held before Judge G. T. Eisele. (Ct. Rep. −− Elaine Hinson) (mah) (Entered: 06/04/1998) |
| 06/22/1998 | 188 | | Supplemental CJA Frm 30 (Apt Cnsl) as to Daniel Lewis Lee attorney Cathleen V. Compton voucher #37211 lej) (Entered: 06/23/1998) |
| 06/22/1998 | 189 | | Supplemental CJA Frm 30 (Apt Cnsl) as to Daniel Lewis atty Jack T. Lassiter voucher #37210 lej) (Entered: 06/23/1998) |
| 06/23/1998 | 190 | | SEALED document (order JFF) as to Daniel Lewis Lee lej) (Entered: 06/23/1998) |
| 07/07/1998 | 195 | | SUPERSEDING indictment Chevie O'Brien Kehoe (1) count(s) 1s, 2s, 3s−5s, 6s, 7s, Daniel Lewis Lee (2) count(s) 1s, 2s, 3s−5s, 6s, 7s, Kirby Keith Kehoe (4) count(s) 1, 2, 6 (rkc) (Entered: 07/08/1998) |
| 07/07/1998 | 197 | | CASE SUMMARY warrant / summons : NONE request for defendant Chevie O'Brien Kehoe, defendant Daniel Lewis Lee (rkc) (Entered: 07/08/1998) |
| 07/08/1998 | 198 | | LETTER to Counsel Mark Hampton, John Wesley Hall, Cathleen V Compton and Jack T Lassiter re Waiver of Superseding Indictment as to Chevie O'Brien Kehoe and Daniel Lewis Lee (former empl) (Entered: 07/08/1998) |
| 07/15/1998 | 205 | | LETTER RESPONSE by defendant Daniel Lewis Lee regarding [201−1] waiver of arraignment on superseding indictment (rkc) (Entered: 07/23/1998) |
| 07/20/1998 | 201 | | LETTER by Counsel as to defendant Daniel Lewis Lee regarding waiver of superceding indictment [198−1] (former empl) Modified on 07/20/1998 (Entered: 07/20/1998) |
| 07/20/1998 | 204 | | CJA Frm 30 (Apt Cnsl) voucher #D37211 for atty Cathleen V. Compton as to Daniel Lewis Lee lej) (Entered: 07/20/1998) |
| 07/28/1998 | 207 | | MOTION for disclosure of Grand Jury information in support of government's motion for admission of hearsay evidence by USA as to Chevie O'Brien Kehoe, Daniel Lewis Lee (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/26/2002) |
| 08/20/1998 | 224 | | MOTION to amend notice of intent to seek a sentence of death by USA as to Chevie O'Brien Kehoe, Daniel Lewis Lee lej) (Entered: 08/20/1998) |
| 08/27/1998 | 238 | | RESPONSE by defendant Daniel Lewis Lee to motion for disclosure of Grand Jury information in support of government's motion for admission of hearsay evidence [207−1] (Unsealed pursuant to Order dated 06/25/02) (cdw) |

July 3 2020 p13

Appellate Case: 20-2351     Page: 13     Date Filed: 07/04/2020 Entry ID: 4930235

| | | | |
|---|---|---|---|
| | | | Modified on 06/27/2002 (Entered: 06/26/2002) |
| 08/28/1998 | 241 | | RESPONSE by defendant Daniel Lewis Lee to the Motion of Notice to amend the Notice to seek the Death Penalty. (Unsealed per order of 10/2/98) (rkc) (Entered: 10/20/1998) |
| 09/01/1998 | 243 | | CJA Form 30 (Appointment of Counsel) appointing Cathleen V Compton #D37211 (NPT 12/18/97) as to Daniel Lewis Lee (former empl) (Entered: 09/01/1998) |
| 09/14/1998 | 253 | | ORDER by Judge G. T. Eisele granting motion for disclosure of Grand Jury information in support of government's motion for admission of hearsay evidence [207–1] (cc: all counsel and defendants) (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/26/2002) |
| 09/14/1998 | 254 | | BRIEF by plaintiff USA regarding order [237–1] (former empl) (Entered: 09/14/1998) |
| 09/14/1998 | 255 | | MOTION for discovery pursuant to Rule 16(b) by USA as to Daniel Lewis Lee lej) (Entered: 09/14/1998) |
| 09/15/1998 | 263 | | MOTION in limine to foreclose suppression of evidence pursuant to 18:201(c) theories by USA as to Chevie O'Brien Kehoe, Daniel Lewis Lee, Kirby Keith Kehoe (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/26/2002) |
| 09/15/1998 | 264 | | NOTICE of intent to use Federal Corpus Delicti law by plaintiff USA (Unsealed pursuant to Order dated 06/25/02) (cdw) Modified on 06/27/2002 (Entered: 06/26/2002) |
| 09/15/1998 | 264 | | MOTION for admission of hearsay evidence and memorandum of law in support by USA as to Chevie O'Brien Kehoe, Daniel Lewis Lee, Kirby Keith Kehoe (Unsealed pursuant to Order dated 06/25/02) (cdw) Modified on 06/27/2002 (Entered: 06/26/2002) |
| 09/15/1998 | 258 | | MOTION for discovery , to inspect information and evidence in aggravation by Chevie O'Brien Kehoe, Daniel Lewis Lee, Kirby Keith Kehoe (rkc) (Entered: 09/16/1998) |
| 09/15/1998 | 258 | | MOTION for discovery , to inspect information and evidence in aggravation by Daniel Lewis Lee (rkc) (Entered: 09/16/1998) |
| 09/15/1998 | 259 | | MEMORANDUM by Daniel Lewis Lee in support of motion for discovery [258–1], of motion to inspect information and evidence in aggravation [258–2] (rkc) (Entered: 09/16/1998) |
| 09/15/1998 | 260 | | MOTION for discovery on sentencing issues by Daniel Lewis Lee (rkc) (Entered: 09/16/1998) |
| 09/15/1998 | 261 | | MOTION to extend time in which to file penalty phase motions by Daniel Lewis Lee (rkc) (Entered: 09/16/1998) |
| 09/15/1998 | 262 | | ORDER by Judge G. T. Eisele granting motion to extend time for filing pretrial motions [252–1], granting motion for leave to file additional motions beyond the pretrial motion deadline [252–2] until 9/30/98. The Court directs dfts. Chevie O'Brien Kehoe and Daniel Lewis Lee to file all pre–trial motions on or before Sept. 30, 1998. (cc: all counsel and defendants) (rkc) (Entered: |

July 3 2020 p14

Appellate Case: 20-2351     Page: 14     Date Filed: 07/04/2020 Entry ID: 4930235

| | | | |
|---|---|---|---|
| | | | 09/16/1998) |
| 09/17/1998 | 266 | | MINUTES: HEARING (Ph.Cf.) as to Faron Earl Lovelace held before Judge G. T. Eisele on motions. (Ct. Rep. – Elaine Hinson) dfts.) (mah) (Entered: 09/17/1998) |
| 09/17/1998 | 267 | | MOTION to extend time to respond to govt's motions by Daniel Lewis Lee lej) (Entered: 09/18/1998) |
| 09/21/1998 | 269 | | OBJECTIONS under Fed.R.Evid 403 to hair comparison evidence by Daniel Lewis Lee (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/26/2002) |
| 09/21/1998 | 270 | | ORDER by Judge G. T. Eisele granting motion to extend time to respond to govt's motions [267−1] until on or before 9/30/98 (cc: all counsel and defendants) (rkc) (Entered: 09/22/1998) |
| 09/21/1998 | | | Docket Modification (Utility Event) starting an XE excludable for filing of pretrial motions as to Chevie O'Brien Kehoe, Daniel Lewis Lee, Faron Earl Lovelace, Kirby Keith Kehoe (sealed) (Entered: 09/23/1998) |
| 09/21/1998 | 268 | | MOTION to strike all aliases from the indictment by Daniel Lewis Lee (rkc) (Entered: 01/13/1999) |
| 09/22/1998 | 286 | | SUPPLEMENTAL MOTION to sever by Daniel Lewis Lee (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/26/2002) |
| 09/22/1998 | 287 | | BRIEF in support of supplemental motion to sever [286−1] by Daniel Lewis Lee (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/26/2002) |
| 09/23/1998 | 289 | | MOTION to strike notice of intention to seek the death penalty and to hold the death penalty unconstitutional by Daniel Lewis Lee (rkc) (Entered: 09/24/1998) |
| 09/23/1998 | 288 | | RESPONSE by plaintiff USA to motion for discovery and inspection of information and evidence in aggravation [258−1] of Daniel Lee (rkc) (Entered: 10/16/1998) |
| 09/23/1998 | 288 | | MOTION for reciprocal discovery of mental health defenses to be raised during penalty phase by USA as to Daniel Lewis Lee (rkc) (Entered: 10/16/1998) |
| 09/28/1998 | 291 | | TRANSCRIPT ( 1 volumes) of proceedings for the following date(s): 9/17/98 (telephone conference) (rkc) (Entered: 09/28/1998) |
| 09/30/1998 | 295 | | RESPONSE by defendant Daniel Lewis Lee to motion in limine to foreclose suppression of evidence pursuant to 18:201(c) theories [263−1] (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/26/2002) |
| 09/30/1998 | 295 | | MOTION to suppress evidence procured by prosecutorial promises by Daniel Lewis Lee (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/26/2002) |
| 09/30/1998 | 296 | | RESPONSE by defendant Daniel Lewis Lee to motion for reciprocal discovery of mental health defenses to be raised during penalty phase [288−1] (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: |

Appellate Case: 20-2351    Page: 15    Date Filed: 07/04/2020 Entry ID: 4930235

| | | | |
|---|---|---|---|
| | | | 06/26/2002) |
| 09/30/1998 | 306 | | MOTION for order directing government to provide notice of intention to use residual hearsay exception under Rule 807 by Daniel Lewis Lee (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/26/2002) |
| 09/30/1998 | 308 | | RESPONSE by Daniel Lewis Lee to [255−1] motion for discovery pursuant to Rule 16(b) (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/26/2002) |
| 09/30/1998 | 309 | | RESPONSE by Daniel Lewis Lee to government's notice of intent to use federal corpus delicti law and motion for admission of hearsay evidence and memorandum of law in support [264−1] (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/26/2002) |
| 09/30/1998 | 310 | | MOTION to suppress statement by Daniel Lewis Lee (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/26/2002) |
| 09/30/1998 | 311 | | BRIEF by defendant Daniel Lewis Lee in support of motion to suppress statement [310−1] (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/26/2002) |
| 09/30/1998 | 304 | | MOTION for order for dft. to appear at all court appearances in civilian clothing and w/o restraint and request for hearing by Daniel Lewis Lee (rkc) (Entered: 10/01/1998) |
| 09/30/1998 | 305 | | NOTICE of intent to offer an alibi defense by defendant Daniel Lewis Lee (rkc) (Entered: 10/01/1998) |
| 09/30/1998 | 307 | | MOTION for order to allow dft. to file additional pretrial motions (Unsealed per Order (344) of 10/9/98) by Daniel Lewis Lee (rkc) (Entered: 10/15/1998) |
| 09/30/1998 | 303 | | MOTION for order to permit counsel to participate in voir dire (Unsealed per order (428) of 12/11/98) by Daniel Lewis Lee (rkc) (Entered: 12/14/1998) |
| 10/01/1998 | 313 | | MEMORANDUM by USA in opposition to deft Lee's supplemental motion to sever [286−1] (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/26/2002) |
| 10/02/1998 | 325 | | BRIEF in support of government's response to deft Lee's objection to hair comparison evidence [269−1] by plaintiff USA (Unsealed pursuant to Order dated 06/25/02) (cdw) Modified on 06/28/2002 (Entered: 06/26/2002) |
| 10/02/1998 | 327 | | RESPONSE by USA to [260−1] motion for discovery on sentencing issues (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/26/2002) |
| 10/02/1998 | 329 | | RESPONSE by USA to deft Lee's Federal Rules of Evidence 403 objection to hair comparison evidence [269−1] (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/26/2002) |
| 10/02/1998 | 318 | | ORDER by Judge G. T. Eisele granting motion to amend notice of intent to seek a sentence of death [224−1] It is further ordered that dft. Lee's Response to the Motion of Notice to Amend the Notice to Seek the Death Penalty shall be unsealed by the Clerk (cc: all counsel and defendants) (rkc) (Entered: 10/05/1998) |
| 10/02/1998 | 342 | | |

Appellate Case: 20-2351   Page: 16   Date Filed: 07/04/2020 Entry ID: 4930235

| | | | |
|---|---|---|---|
| | | | NOTICE of hearing pretrial conference Tues. 10/13/98 at 2:00 p.m. as to Chevie O'Brien Kehoe, Daniel Lewis Lee, Kirby Keith Kehoe (rkc) (Entered: 10/06/1998) |
| 10/05/1998 | 337 | | MOTION to extend time in which to reply to deft. Lee's motion and memorandum brief to strike notice of intention to seek the death penalty and to hold the death penalty unconstitutional by USA as to Chevie O'Brien Kehoe, Daniel Lewis Lee, Kirby Keith Kehoe (rkc) (Entered: 06/16/1999) |
| 10/05/1998 | 339 | | RESPONSE by USA to [304–1] motion for order for deft to appear at all court appearances in civilian clothing and restraint and request for hearing (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/26/2002) |
| 10/05/1998 | 333 | | RESPONSE by plaintiff USA to motion for order to allow dft. to file additional pretrial motions of Danny Lewis Lee (Unsealed per Order (344) of 10/9/98) [307–1] (rkc) (Entered: 10/15/1998) |
| 10/05/1998 | 336 | | RESPONSE by plaintiff USA to motion to strike all aliases from the indictment [268–1] of dft. Lee (rkc) (Entered: 01/13/1999) |
| 10/09/1998 | 345 | | ORDER by Judge G. T. Eisele granting motion to extend time in which to reply to deft. Lee's motion and memorandum brief to strike notice of intention to seek the death penalty and to hold the death penalty unconstitutional [337–1] The government will have until 10/19/98 to respond. (cc: all counsel and defendants) (rkc) (Entered: 06/16/1999) |
| 10/09/1998 | 351 | | RESPONSE by USA to [303–1] motion for order to permit counsel to participate in voir dire (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/26/2002) |
| 10/09/1998 | 344 | | ORDER by Judge G. T. Eisele granting motion to extend time in which to file penalty phase motions [261–1], granting motion for discovery on sentencing issues [260–1], granting motion for discovery pursuant to Rule 16(b) [257–1], granting motion for discovery pursuant to Rule 16(b) [256–1], granting motion for discovery pursuant to Rule 16(b) [255–1], granting motion for Rule 16 discovery [240–1], granting motion for disclosure of any offer of leniency or plea bargains between the US or the State of Arkansas and any govt witness and brief in support [239–1], granting motion for disclosure of any offer of leniency or plea bargains between the United States or the State of Arkansas and any Government witness and brief in support [222–1], granting in part and denying in part motion for disclosure of Jencks Act Material [221–1], granting motion for Rule 16 discovery [220–1], granting in part and denying in part motion for disclosure of Jencks Act Material and brief in support [217–1] granting in part and denying in part motion of C. Kehoe to compel disclosure of evidence subject to suppression under F.R.Cr.P. 12(b)(3)(277–1) The Clerk is directed to unseal C. Kehoe's motion to compel discl. of evidence subject to suppression and the Govt's response thereto; motion of Lee to file additional pretrial motions is granted (307–1) The Clerk is directed to unseal Lee's motion to allow dft. to file additional pretrial motions (cc: all counsel and defendants) (rkc) (Entered: 10/13/1998) |
| 10/09/1998 | | | Docket Modification (Utility Event) granting in part and denying in part motion to compel disclosure of evidence subject to suppression under F.R.Cr.P. 12(b)(3) [277–1] granting motion for order to allow dft. to file |

July 3 2020 p17

Appellate Case: 20-2351    Page: 17    Date Filed: 07/04/2020 Entry ID: 4930235

| | | | |
|---|---|---|---|
| | | | additional pretrial motions per Order (344) of 10/9/98 (rkc) (Entered: 10/15/1998) |
| 10/13/1998 | 359 | | RESPONSE in opposition by plaintiff USA to motion to strike notice of intention to seek the death penalty and to hold the death penalty unconstitutional [289−1] (rkc) (Entered: 06/16/1999) |
| 10/13/1998 | <u>356</u> | | RESPONSE by plaintiff USA to motion for order directing government to provide notice of intention to use residual hearsay exception under Rule 807 [306−1] (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/26/2002) |
| 10/13/1998 | | | Docket Modification (Utility Event) granting in part and denying in part motion of Kirby Kehoe for discovery [216−1] pursuant to order of 10/9/98 by Judge Eisele (rkc) (Entered: 10/13/1998) |
| 10/13/1998 | 350 | | RESPONSE by plaintiff USA to motion of Lee to allow dft. to file additional pretrial motions (307−1) (rkc) (Entered: 10/13/1998) |
| 10/13/1998 | 372 | | MINUTES: HEARING held before Judge G. T. Eisele on certain motions. Court to enter order with rulings. (Ct. Rep. −− Elaine Hinson) (mah) (Entered: 10/19/1998) |
| 10/15/1998 | 361 | | ORDER by Judge G. T. Eisele granting motion for ext. of time in which to reply to Lee's motion to suppress statemsnts until 10/19/98 (cc: all counsel and defendants) (rkc) (Entered: 10/15/1998) |
| 10/15/1998 | 367 | | ORDER by Judge G. T. Eisele granting motion for order for additional peremptory challenges [353−1], granting motion for order for dft. to appear at all court appearances in civilian clothing and w/o restraint and request for hearing [304−1], denying motion for discovery and inspection information and evidence in aggravation [299−1], denying motion for disclosure of post conspiracy statements of co−dfts [281−1], denying motion for discovery of statements of codefts. and co−conspirators and Memorandum in support [283−1], Ruling on motion to compel examination or production of the personnel files of testifying agents and gov't employees and Memorandum in support [284−1] is deferred Ruling on motion for reciprocal discovery of mental health defenses to be raised during penalty phase [288−1] is deferred The Clerk is directed to unseal each of these motions and responses to the motions. (cc: all counsel and defendants) (rkc) (Entered: 10/16/1998) |
| 10/16/1998 | 369 | | AMENDED NOTICE of intent to seek a sentence of death by plaintiff USA (rkc) (Entered: 10/16/1998) |
| 10/19/1998 | 370 | | RESPONSE by plaintiff USA to motion to suppress statement (rkc) (Entered: 10/19/1998) |
| 10/19/1998 | 371 | | MEMORANDUM by USA in support of motion response [370−1] as to Daniel Lewis Lee (rkc) (Entered: 10/19/1998) |
| 10/22/1998 | | | APPEARANCE of Attorney for USA by Robert A. De La Cruz (rkc) (Entered: 10/22/1998) |
| 10/22/1998 | 373 | | NOTICE of hearing on Motions to Sever Tues. 11/10/98 at 10:00 a.m. as to Chevie O'Brien Kehoe, Daniel Lewis Lee, Kirby Keith Kehoe (rkc) (Entered: 10/22/1998) |

| | | | |
|---|---|---|---|
| 10/27/1998 | 376 | | MEMORANDUM of law in aid of this Court's authority to control voir dire and petit jury selection by plaintiff USA (Unsealed pursuant to Order dated 06/25/02) (cdw) Modified on 06/27/2002 (Entered: 06/26/2002) |
| 10/27/1998 | 378 | | SUPPLEMENTALCJA Form 30 (Appointment of Counsel) appointing Jack Lassiter #D37210 as to Daniel Lewis Lee (rkc) (Entered: 10/27/1998) |
| 10/30/1998 | 393 | | REPLY by defendant Daniel Lewis Lee to response in opposition to supplemental motion to sever [286–1] (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/26/2002) |
| 10/30/1998 | 383 | | NOTICE of hearing on motions to suppress on 12/7,8/98 at 9:00 a.m. as to Chevie O'Brien Kehoe, Daniel Lewis Lee, Faron Earl Lovelace, Kirby Keith Kehoe (rkc) (Entered: 11/02/1998) |
| 11/04/1998 | 396 | | SEALED MOTION (rkc) (Entered: 11/05/1998) |
| 11/10/1998 | 400 | | MINUTES: IN CAMERA HEARING before Judge G. T. Eisele on motions to sever; Court Reporter Carolyn Fant (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/26/2002) |
| 11/12/1998 | 402 | | ORDER by Judge G. T. Eisele granting motion to extend time to file pretrial motions [384–1] until 11/30/98 (cc: all counsel and defendants) (rkc) (Entered: 11/12/1998) |
| 11/19/1998 | 408 | | SEALED MOTION (rkc) (Entered: 11/19/1998) |
| 11/19/1998 | 413 | | MINUTES: HEARING (In Camera) held before Judge G. T. Eisele (by Ph.) (Ct. Rep. –– Elaine Hinson) (UNSEALED pursuant to Order of 09/24/02) (mah) Modified on 09/25/2002 (Entered: 11/23/1998) |
| 11/23/1998 | 414 | | BRIEF in supplement to oral argument by defendant Daniel Lewis Lee regarding motion to sever [286–1] (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/26/2002) |
| 11/24/1998 | 415 | | SEALED ORDER by Judge James M. Moody granting motion [408–1] (rkc) (Entered: 11/24/1998) |
| 12/01/1998 | 418 | | SUPPLEMENTAL MEMORANDA of LAW to the government's opposition to deft Lee's motion to suppress statement by USA (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/26/2002) |
| 12/03/1998 | 420 | | RESPONSE by USA to deft Lee's brief in supplement to oral argument [414–1] (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/26/2002) |
| 12/07/1998 | 426 | | MINUTES before Judge G. T. Eisele on hearing on motions to suppress – dates 12/07/98 – 12/08/98; Court Reporter Carolyn Fant (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/26/2002) |
| 12/07/1998 | | | MINUTES: IN CAMERA HEARING held before Judge G. T. Eisele as to Chevie O'Brien Kehoe, Daniel Lewis Lee and Kirby Keith Kehoe on motions to suppress. (Ct. Rep. –– Elaine Hinson) (mah) Modified on 06/25/2002 (Entered: 12/08/1998) |
| 12/08/1998 | 425 | | PETITION for Writ of habeas corpus ad testificandum for John Albert Shults and John David Patton as to Chevie O'Brien Kehoe, Daniel Lewis Lee, Kirby |

July 3 2020 p19

Appellate Case: 20-2351     Page: 19     Date Filed: 07/04/2020 Entry ID: 4930235

| | | | |
|---|---|---|---|
| | | | Keith Kehoe (rkc) (Entered: 12/08/1998) |
| 12/08/1998 | | | WRIT issued for John Albert Shults and John David Patton as to Chevie O'Brien Kehoe, Daniel Lewis Lee, Kirby Keith Kehoe (rkc) (Entered: 12/08/1998) |
| 12/08/1998 | | | Docket Modification (Utility Event) dft Chevie O'Brien Kehoe, Daniel Lewis Lee arraigned; n/g plea entered to superseding indictment; Attorney present; as to Chevie O'Brien Kehoe, Daniel Lewis Lee (rkc) (Entered: 12/09/1998) |
| 12/11/1998 | 428 | | ORDER by Judge G. T. Eisele granting motion to allow individual sequestered voir dire [62–1] granting documents [274–1] granting documents [303–1] granting documents [285–1] (cc: all counsel and defendants) (rkc) (Entered: 12/11/1998) |
| 12/11/1998 | | | Docket Modification (Utility Event) granting motion for order to permit counsel to participate in voir dire (Unsealed per order (428) of 12/11/98) [303–1], granting motion for order to instruct jury on reasonable doubt during voir dire (Unsealed per Order (428) of 12/11/98) [285–1], granting motion for order to permit counsel to participate in voir dire (Unsealed per Order (428) of 12/11/98) [274–1] (rkc) (Entered: 12/14/1998) |
| 12/15/1998 | 433 | | PETITION for order to remove death penalty as a potential punishment by Daniel Lewis Lee (rkc) (Entered: 12/16/1998) |
| 12/15/1998 | 434 | | MOTION for order to require the Gov't to disclose specific institutional mechanisms designed to screen the disqualified attorney by Daniel Lewis Lee (rkc) (Entered: 12/17/1998) |
| 12/16/1998 | 437 | | SEALED ORDER by Mag. Judge John F. Forster Jr. granting motion [423–1] (rkc) (Entered: 12/16/1998) |
| 12/16/1998 | 438 | | SEALED ORDER by Mag. Judge John F. Forster Jr. granting motion [410–1] (rkc) (Entered: 12/16/1998) |
| 12/16/1998 | 439 | | SEALED ORDER by Mag. Judge John F. Forster Jr. granting motion [409–1] (rkc) (Entered: 12/16/1998) |
| 12/16/1998 | 443 | | MINUTES: HEARING as to Defts. C. Kehoe, D. Lee and K. Kehoe on jury questionaire held before Judge G. T. Eisele (Ct. Rep. –– Elaine Hinson) (mah) (Entered: 12/17/1998) |
| 12/17/1998 | 444 | | MINUTES: CONFERENCE (Ph.) held before Judge G. T. Eisele to discuss information to be provided regarding K. Coleman billing. (Ct. Rep. –– Elaine Hinson) (mah) (Entered: 12/17/1998) |
| 12/21/1998 | 452 | | SEALED ORDER by Mag. Judge John F. Forster Jr. granting motion [422–1] (rkc) (Entered: 12/23/1998) |
| 12/22/1998 | 450 | | MINUTES: HEARING as to Chevie Kehoe, Danny Lee and Kirby Kehoe held before Judge G. T. Eisele on motions to disqualify U.S. Atty. (Ct. Rep. –– Carolyn Fant) (mah) Modified on 06/25/2002 (Entered: 12/22/1998) |
| 12/28/1998 | 454 | | ORDER by Judge G. T. Eisele denying motion for order to remove death penalty as a potential punishment [433–1], denying motion to sever [429–1], denying motion to dismiss indictment due to prosecutorial misconduct [429–2], denying motion for order to disqualify U.S. Attorney, to strike death |

Appellate Case: 20-2351    Page: 20    Date Filed: 07/04/2020 Entry ID: 4930235

| | | | |
|---|---|---|---|
| | | | penalty, and for alternative relief [435−1], denying motion to sever dfts at penalty phase (unsealed per order of 12/28/98) [275−1] for the reasons stated during the hearing on 12/22/98 Documents 275 and 312 are to be unsealed. (cc: all counsel and defendants) (rkc) (Entered: 12/28/1998) |
| 01/05/1999 | 465 | | MOTION to continue by Daniel Lewis Lee (rkc) (Entered: 01/05/1999) |
| 01/05/1999 | 466 | | ORDER by Judge G. T. Eisele finding the motion for order to require the Gov't to disclose specific institutional mechanisms designed to screen the disqualified attorney [434−1] dismissed as moot. (cc: all counsel and defendants) (rkc) (Entered: 01/05/1999) |
| 01/06/1999 | 468 | | ORDER by Judge G. T. Eisele granting motion to continue [465−1], granting motion to continue trial [456−1] jury trial reset 3/1/99 at 9:30 a.m. as to Chevie O'Brien Kehoe, Daniel Lewis Lee, Kirby Keith Kehoe , delay is excludable pursuant to 18:3161(h)(8)(A) & (h)(7) as to Chevie O'Brien Kehoe, Daniel Lewis Lee, Kirby Keith Kehoe (cc: all counsel and defendants) (rkc) (Entered: 01/07/1999) |
| 01/12/1999 | 472 | | SEALED ORDER by Mag. Judge John F. Forster Jr. granting motion [460−1] (rkc) (Entered: 01/12/1999) |
| 01/13/1999 | 478 | | ORDER by Judge G. T. Eisele granting in part and denying in part motion for order to strike aliases from the indictment [380−1] the aliases "Kirby Kehoe" and "Keith Kehoe" are to be stricken from the Superseding Indictment, granting in part and denying in part motion to strike surplusage from the indictment [276−1] the aliases "Chevie Kehoe", "Chevie Collins", and "Jonathan Collins" are to be stricken from the Superseding Indictment, the Clerk is directed to UNSEAL this motion and the Govt's response thereto, granting in part and denying in part motion to strike all aliases from the indictment [268−1] the aliases "Daniel Lewis Lee", "Danny Lee", "D.L. Graham", "Daniel L. Lee", "D Man", and "David" are to be stricken from the Superseding Indictment, the Clerk is directed to UNSEAL this motion ad the Government's response thereto. (cc: all counsel and defendants) (rkc) (Entered: 01/14/1999) |
| 01/15/1999 | 479 | | ORDER by Judge G. T. Eisele that the jury questionaire reviewing process be as follows: All attorneys will be provided copies of all questionaires . Accompanying siad copies will b a list of approximately 1/3 of the questionnaires, indicated by juror #, selected by randomized draw. Initially, the Court asks that the parties review only these selected questionnaires. In the event the initial randomized subset drops below the deisred number of 200 to 250, the Court will notify the parties of additional randomized questionnaires for review. The Court directs all parties to file all motions to strike potential jurors for cause based upon the answers in the questionnaires on or before 2/8/99. A hearing on all such motions to strike, to be formally set at a later date, is anticipated to occur on 2/16/99. (cc: all counsel and defendants) (rkc) (Entered: 01/15/1999) |
| 01/16/1999 | 644 | | ORDER by Mag. Judge John F. Forster Jr. directing the Clerk to issue a check to Kay Quinn, Transcriber, in the amount of $730.00 for the transcript submitted the on 10th day of March, 1999. (cc: all counsel and defendants) (rkc) (Entered: 03/22/1999) |
| 01/19/1999 | 485 | | |

July 3 2020 p21

Appellate Case: 20-2351    Page: 21    Date Filed: 07/04/2020 Entry ID: 4930235

| | | | |
|---|---|---|---|
| | | | MOTION for order for videotaped deposition and that the costs of such deposition be borne by the Government by Daniel Lewis Lee (rkc) (Entered: 01/19/1999) |
| 01/19/1999 | 487 | | SEALED MOTION (rkc) (Entered: 01/19/1999) |
| 01/25/1999 | 490 | | RESPONSE in opposition by plaintiff USA to motion for order for videotaped deposition and that the costs of such deposition be borne by the Government [485–1] (rkc) (Entered: 01/25/1999) |
| 01/25/1999 | 491 | | ORDER by Judge G. T. Eisele As to the 81 potential jurors the Court has tentatively decided to excuse for hardship, the Court directs the parties to submit all objections to their exclusion on or before 1/29/99. If the Court does not receive any objections by that date, said potential jurors will be excused. The Court has replaced those jurors with 82 new potential jurors selected at random of those the Court intends to excuse 26 potential jurors contained in this secondsubset for hardship. Again, the Court directs the praties to submit all objections to the exclusion of these 26 potential jurors on or before 1/29/99. The Court has replaced those 26 with a new set of 26 potential jurors selected at random from the remaining questionaires. The Court intends to excuse 9 potential jurors in the third subset for hardship and the parties are directed to submit all objections to the exclusion of these 9 potential jurors by 1/29/99. On Juror Tables Page 11, the Court has listed 1 potential juror that the Court has excused because he was not qualified to serve. On Juror Tables Page 12, the Court has listed 3 potential jurors that it has concluded must be added to the potential disqualification list. It is therefore ordered that the parties are directed to file all objections to the Court's aforementioned intended exclusion of potential jurors for hardship on or before 1/29/99. (cc: all counsel and defendants) (rkc) (Entered: 01/25/1999) |
| 01/26/1999 | 493 | | SEALED ORDER by Mag. Judge John F. Forster Jr. (rkc) (Entered: 01/26/1999) |
| 01/26/1999 | 494 | | SEALED ORDER by Mag. Judge John F. Forster Jr. of motion [487–1] (rkc) (Entered: 01/26/1999) |
| 01/26/1999 | 495 | | SEALED ORDER by Mag. Judge John F. Forster Jr. of motion [488–1] (rkc) (Entered: 01/26/1999) |
| 01/26/1999 | 496 | | SEALED ORDER by Mag. Judge John F. Forster Jr. granting motion [486–1] (rkc) (Entered: 01/26/1999) |
| 01/27/1999 | 498 | | REPLY by defendant Daniel Lewis Lee to response to motion for order for videotaped deposition and that the costs of such deposition be borne by the Government [485–1] (rkc) (Entered: 01/28/1999) |
| 01/28/1999 | 501 | | SUPPLEMENT TO RESPONSE in opposition by plaintiff USA to deft Lee's supplemental motion to sever [286–1] (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/27/2002) |
| 01/28/1999 | 500 | | ORDER by Judge G. T. Eisele finding the motion for order for videotaped deposition and that the costs of such deposition be borne by the Government [485–1] moot due to death of dft's father. (cc: all counsel and defendants) (rkc) (Entered: 01/28/1999) |

| | | | |
|---|---|---|---|
| 01/29/1999 | 509 | | MINUTES: HEARING as to defts. C. Kehoe, Lee and K. Kehoe held before Judge G. T. Eisele on objections to certain juror excuses. (Ct. Rep. –– Elaine Hinson) (mah) (Entered: 02/01/1999) |
| 01/29/1999 | 586 | | SEALED RESPONSE document (rkc) (Entered: 02/24/1999) |
| 02/01/1999 | 505 | | SEALED ORDER by Judge G. T. Eisele granting motion [503–1] (rkc) (Entered: 02/01/1999) |
| 02/02/1999 | 512 | | PETITION for Writ of HABEAS CORPUS AD TESTIFICANDUM lej) (Entered: 02/03/1999) |
| 02/02/1999 | 513 | | MOTION for order to strike potential jurors by USA as to Chevie O'Brien Kehoe, Daniel Lewis Lee, Kirby Keith Kehoe lej) (Entered: 02/03/1999) |
| 02/03/1999 | | | WRIT of Habeas Corpus Ad Testificandum issued for Chris Tolley to appear 3/1/99 @ 9:30 am lej) (Entered: 02/03/1999) |
| 02/04/1999 | 516 | | SUPPLEMENTAL NOTICE OF INTENT to offer an alibi defense by defendant Daniel Lewis Lee lej) (Entered: 02/04/1999) |
| 02/05/1999 | <u>518</u> | | ORDER by Judge G. T. Eisele that under no circumstances shall any juror (including members of the jury panel as well as those ultimately selected for the trial of this case) be contacted by any attorney, investigator, staff member, or anyone else identified with the parties in this matter; any individual who obtains information regarding the residence, place of employment, or other identifying characteristics about a juror is directed to keep such information confidential; anyone found to have violated this Order will face appropriate sanctions (cc: all counsel and defendants) (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/27/2002) |
| 02/05/1999 | 519 | | ORDER by Judge G. T. Eisele that the jurors, numbering one hundred twenty seven (127) in total, be and they are hereby, excused. Two hundred ninety six (296) jurors remain for initial consideration for service in this case. (cc: all counsel and defendants) (rkc) (Entered: 02/05/1999) |
| 02/05/1999 | 522 | | ORDER by Judge G. T. Eisele directing that the following rules be enforced during the jury trial for the defts. a) Except for court personnel, no one will bring into the courtroom or possess or operate in the courtroom any laptop computers, beepers, walkie–talkies, cellular telephones, electronic transmitting or recording equipment, or any other noise–generating electronic or mechanical devices. Separate arrangements will be made for attys of record. b) Members of the public and of the media will only be permitted to enter the courtroom before Court convenes in the morning and during any recess in the proceedings. Once Court convenes, no one may leave the courtroom until the Court declares a recess and the Judge has exited the courtroom. This rule is designed to retain and preserve appropriate courtroom decorum at all times. This rule will also help obviate the possibility that members of the media will rush out of the courtroom following evidence they deem newsworthy. Although circumstances may require departures from time to time, it is the intention of the Court to adhere to a schedule as closely as reasonable on the trial days Mondays through Thursdays. (cc: all counsel and defendants) lej) (Entered: 02/05/1999) |
| 02/08/1999 | 527 | | SEALED MOTION (rkc) (Entered: 02/08/1999) |

| | | | |
|---|---|---|---|
| 02/10/1999 | 531 | | MOTION to dismiss count(s) 6 and 7 of the superseding indictment by USA as to Chevie O'Brien Kehoe, Daniel Lewis Lee (former empl) (Entered: 02/10/1999) |
| 02/10/1999 | 532 | | SEALED document by plaintiff USA (former empl) (Entered: 02/10/1999) |
| 02/11/1999 | 533 | | SEALED RESPONSE document lej) (Entered: 02/12/1999) |
| 02/12/1999 | 540 | | MOTION for order to obtain photographs of deft Daniel Lee's tatoos by USA as to Daniel Lewis Lee (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/27/2002) |
| 02/12/1999 | 534 | | PETITION for Writ of HABEAS CORPUS AD TESTIFICANDUM for Kirby Kehoe lej) (Entered: 02/12/1999) |
| 02/12/1999 | 536 | | SEALED ORDER by Mag. Judge John F. Forster Jr. lej) (Entered: 02/12/1999) |
| 02/12/1999 | 537 | | SUPPLEMENTAL SEALED MOTION lej) (Entered: 02/12/1999) |
| 02/12/1999 | 538 | | SEALED RESPONSE document lej) (Entered: 02/12/1999) |
| 02/12/1999 | 539 | | MEMORANDUM by USA OF LAW in anticipation of issues arising at trial as to Chevie O'Brien Kehoe, Daniel Lewis Lee lej) (Entered: 02/16/1999) |
| 02/16/1999 | 542 | | SEALED MOTION lej) (Entered: 02/16/1999) |
| 02/17/1999 | 549 | | ORDER by Judge G. T. Eisele granting motion for order to obtain photographs of deft Daniel Lee's tatoos [540–1], granting motion to obtain photographs of deft Chevie Kehoe's tatoo [542–1] (cc: all counsel and defendants) (Unsealed pursuant to Order dated 06/25/02) (cdw) Modified on 06/28/2002 (Entered: 06/27/2002) |
| 02/17/1999 | 553 | | MEMORANDUM, Opinion and Order by Judge G. T. Eisele denying deft Chevie Kehoe's motion to sever counts [300–1]; denying deft Chevie Kehoe's motion to exclude evidence of extrinsic offenses [272–1], directing the Clerk to unseal this motion and the government's response thereto; denying deft Lee's supplemental motion to sever [286–1]; deft Lee's amendment to motion to sever [147–1] is dismissed as moot; deft Chevie Kehoe's motion to adopt co–defendant's motion to sever defts [302–1] is dismissed as moot, the Clerk is directed to unseal this motion and the government's response thereto; denying deft Kirby Kehoe's motion to sever [388–1], the Clerk is directed to unseal this motion, the brief in support thereof, and the government's response thereto; denying deft Chevie Kehoe's supplemental motion to sever defts [457–1] (cc: all counsel and defendants) (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/27/2002) |
| 02/17/1999 | 546 | | ORDER by Judge G. T. Eisele granting motion to dismiss count(s) 6 and 7 of the superseding indictment [531–1] as to Chevie O'Brien Kehoe and Daniel Lewis Lee (cc: all counsel and defendants) lej) (Entered: 02/17/1999) |
| 02/17/1999 | 548 | | SEALED MOTION lej) (Entered: 02/17/1999) |
| 02/17/1999 | 555 | | ORDER by Judge G. T. Eisele granting in part and holding in abeyance in part the motion for order to strike potential jurors [513–1]; ruling the same for documents [535–1] and [527–1] (cc: all counsel) lej) (Entered: 02/17/1999) |

| | | | |
|---|---|---|---|
| 02/17/1999 | 556 | | MEMORANDUM, Opinion and Order: by Judge G. T. Eisele overruling Chevie Kehoe's objection to exclusion of certain citizens from jury service and denying his motion for an expanded jury pool [463–1] (cc: all counsel) lej) (Entered: 02/17/1999) |
| 02/18/1999 | 565 | | MOTION by movant Bobby Hulse to quash subpoena (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/27/2002) |
| 02/18/1999 | 558 | | ORDER by Judge G. T. Eisele excusing juror #165 and #568 on hardship grounds (cc: all counsel) lej) (Entered: 02/18/1999) |
| 02/18/1999 | | | Docket Modification (Utility Event), denying motion to exclude evidence of extrinsic offenses [272–1], finding the motion for order to adopt co–deft's motion to sever defts [302–1] moot per the order by Judge Eisele filed 2/17/99 under seal. lej) (Entered: 02/18/1999) |
| 02/18/1999 | 563 | | SEALED ORDER by Mag. Judge John F. Forster Jr. lej) (Entered: 02/18/1999) |
| 02/18/1999 | 567 | | ORDER by Judge G. T. Eisele granting in part and denying in part the motion for order to strike potential jurors [513–1] and sealed motions [535–1], [527–1]; granting sealed motion [537–1] (cc: counsel) lej) Modified on 02/18/1999 (Entered: 02/18/1999) |
| 02/19/1999 | | | CORRESPONDENCE from Judge G.T. Eisele to attorneys regarding proposed statement of case & jury selection procedures (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/27/2002) |
| 02/19/1999 | 568 | | ORDER by Judge G. T. Eisele excusing juror #573 due to hardship (cc: all counsel) lej) (Entered: 02/19/1999) |
| 02/19/1999 | 569 | | ORDER by Judge G. T. Eisele excusing juror #787 due to hardship (cc: all counsel) lej) (Entered: 02/19/1999) |
| 02/19/1999 | 570 | | CJA Form 30 (Appointment of and authority to pay court appointed counsel) voucher #D37211 appointing Cathleen Compton as to Daniel Lewis Lee lej) Modified on 02/19/1999 (Entered: 02/19/1999) |
| 02/19/1999 | 571 | | MOTION for daily transcript copy by Daniel Lewis Lee lej) (Entered: 02/19/1999) |
| 02/22/1999 | 575 | | REPLY by plaintiff USA to deft Kehoe's supplemental response to motion to use corpus delicti and use of residual and other hearsay re alleged murder of Jon Cox [264–1] (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/27/2002) |
| 02/22/1999 | 572 | | MINUTES: Ex–parte hrg before Mag. Judge John F. Forster Jr. (mcn) (Entered: 02/22/1999) |
| 02/22/1999 | 574 | | SEALED MOTION lej) (Entered: 02/23/1999) |
| 02/23/1999 | 580 | | RESPONSE by plaintiff USA to motion of Bobby Hulse to quash subpoena [565–1] (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/27/2002) |
| 02/23/1999 | 581 | | ORDER by Judge G. T. Eisele denying motion to quash subpoena [565–1] (cc: all counsel and defendants) (Unsealed pursuant to Order dated 06/25/02) |

July 3 2020 p25

Appellate Case: 20-2351    Page: 25    Date Filed: 07/04/2020 Entry ID: 4930235

| | | | |
|---|---|---|---|
| | | | (cdw) (Entered: 06/27/2002) |
| 02/23/1999 | | | CORRESPONDENCE from Judge G.T. Eisele to attorneys regarding finding by the Court that the identity of eight witnesses withheld from defts justified (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/27/2002) |
| 02/23/1999 | 578 | | SEALED ORDER by Mag. Judge John F. Forster Jr. lej) (Entered: 02/23/1999) |
| 02/23/1999 | 579 | | SEALED ORDER by Mag. Judge John F. Forster Jr. lej) (Entered: 02/23/1999) |
| 02/23/1999 | 582 | | ORDER by Judge G. T. Eisele excusing Juror No. 739 for cause now without allowing the parties the opportunity to respond. (cc: all counsel and defendants) (rkc) (Entered: 02/24/1999) |
| 02/23/1999 | 583 | | ORDER by Judge G. T. Eisele that the remaining jurors not contained in the initial four subsets, numbering 331 in total, should be excused because they will not be needed for the trial of this matter. The Court has further determined that 2 jurors contained in the initial four subsets must be excused for cause. The Court does hereby excuse the jurors now without allowing the parties the opportunity to respond. The jurors are Nos. 382 and 705. (cc: all counsel and defendants) (rkc) (Entered: 02/24/1999) |
| 02/24/1999 | 585 | | PETITION for Writ of habeas corpus ad testificandum for Larry Gene McPheron as to Chevie O'Brien Kehoe, Daniel Lewis Lee (rkc) (Entered: 02/24/1999) |
| 02/25/1999 | 591 | | ORDER by Judge G. T. Eisele that fourt (4) jurors contained in the initial four subsets must be excused for cause and they are Nos. 995, 152, 365, 381. (cc: all counsel and defendants) (rkc) (Entered: 02/25/1999) |
| 02/25/1999 | 588 | | MEMORANDUM, Opinion and Order by Judge G. T. Eisele denying deft Kehoe's motion to suppress search and seizure of motorhome in Casper, Wyoming [279−1]; denying deft Kehoe's motion to suppress evidence from Bonner County, Idaho [273−1]; granting deft Kehoe's motion to suppress photo identification and in−court identification [278−1], the photo identifications made by Patricia Young, Roger Young, and Charles Rose, the in−court identification by Patricia Young, and any attempted in−court identification by Patricia Young, Roger Young, Charles Rose, or Regina Clark are thereby suppressed; denying deft Kehoe's motion to suppress search and seizure of storage unit in Old Town, Idaho [280−1]; denying deft Lee's motion to suppress statement [310−1] (cc: all counsel and defendants) (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/27/2002) |
| 02/26/1999 | 597 | | SEALED RESPONSE document (rkc) (Entered: 02/26/1999) |
| 02/26/1999 | 598 | | SEALED RESPONSE document (rkc) (Entered: 02/26/1999) |
| 02/26/1999 | 600 | | ORDER by Mag. Judge John F. Forster Jr. that the United States Marshal shall permit each defendant to shave just prior to commencement of court each morning, and shall provide razors and shaving cream for that purpose, commensurate with good security practices. (cc: all counsel and defendants) (rkc) (Entered: 02/26/1999) |
| 02/26/1999 | | | |

July 3 2020 p26

Appellate Case: 20-2351    Page: 26    Date Filed: 07/04/2020 Entry ID: 4930235

| | | | |
|---|---|---|---|
| | | | MINUTES: JURY TRIAL as to Chevie Kehoe and Danny Lee begun before Judge G. T. Eisele. Jury selection begun. Day 1. (Ct. Rep. –– Elaine Hinson) (mah) (Entered: 03/07/1999) |
| 02/26/1999 | 599 | | ORDER by Judge G. T. Eisele denying motion for order to remove metal detectors and x–ray machine from fourth floor hallway [593–1] (cc: all counsel and defendants) (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/27/2002) |
| 02/26/1999 | 602 | | MEMORANDUM, Opinion and Order by Judge G. T. Eisele denying deft Kehoe's motion for change of venue based on pretrial disclosure of material evidence [543–1] (cc: all counsel and defendants) (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/27/2002) |
| 03/01/1999 | 603 | | ORDER by Judge G. T. Eisele excusing jurors 038 and 567 from the initial four subsets (cc: all counsel and defendants) (rkc) (Entered: 03/01/1999) |
| 03/01/1999 | | | MINUTES: JURY TRIAL as to Chevie Kehoe and Danny Lee resumed before Judge G. T. Eisele. Day 2. Voir dire begun. (Ct. Rep. –– Elaine Hinson) (mah) (Entered: 03/07/1999) |
| 03/01/1999 | 604 | | ORDER by Judge G. T. Eisele overruling with prejudice deft Lee's Fed.R.Evid. 403 Objection to hair comparison evidence [269–1] (cc: all counsel and defendants) (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/27/2002) |
| 03/02/1999 | 606 | | CJA Form 30Cp4 (Appointment of Counsel) supplemental voucher #37210 appointing Cathleen Compton as to Daniel Lewis Lee (rkc) (Entered: 03/02/1999) |
| 03/02/1999 | | | MINUTES: JURY TRIAL as to Chevie Kehoe and Danny Lee resumed before Judge G. T. Eisele. Day 3. Voir dire resumed. (Ct. Rep. –– Elaine Hinson) (mah) (Entered: 03/07/1999) |
| 03/03/1999 | 607 | | ORDER by Judge G. T. Eisele granting motion for daily transcript copy [573–1], [571–1] pursuant to 18:3006A (cc: all counsel and defendants) (rkc) (Entered: 03/03/1999) |
| 03/03/1999 | | | MINUTES: JURY TRIAL as to Chevie Kehoe and Danny Lee resumed before Judge G. T. Eisele. Day 4. Voir dire resumed. (A.M. Ct. Rep. –– Elaine Hinson) (P.M. Ct. Rep. –– Christa Newberg) (mah) (Entered: 03/07/1999) |
| 03/04/1999 | 611 | | SEALED ORDER by Mag. Judge John F. Forster Jr. (rkc) (Entered: 03/04/1999) |
| 03/04/1999 | | | MINUTES: JURY TRIAL resumed as to Chevie Kehoe and Danny Lee resumed before Judge G. T. Eisele. Day 5. Voir dire resumed. (A.M. Ct. Rep. –– Carolyn Fant) (P.M. Ct. Rep. –– Genie Power) (mah) (Entered: 03/07/1999) |
| 03/05/1999 | 614 | | ORDER by Judge G. T. Eisele modifying the Order filed 2/5/99 to permit persons to bring into the courtroom, possess, or operate in the courtroom beepers if they are set to operate without making any noise. In the event that the courtroom is interrupted by a beeper making noise, the Court will rescind the instant order and return to its original rule disallowing all beepers. (cc: all |

July 3 2020 p27

Appellate Case: 20-2351    Page: 27    Date Filed: 07/04/2020 Entry ID: 4930235

| | | | |
|---|---|---|---|
| | | | counsel and defendants) (rkc) (Entered: 03/05/1999) |
| 03/05/1999 | | | MINUTES: JURY TRIAL as to Chevie Kehoe and Danny Lee resumed before Judge G. T. Eisele. Day 6. Voir dire concluded. (A.M. Ct. Rep. –– Elaine Hinson) (P.M. Ct. Rep. –– Carolyn Fant) (Late P.M. Ct. Rep. –– Elaine Hinson) (mah) (Entered: 03/07/1999) |
| 03/08/1999 | 617 | | CJA Form 30 (Appointment of and Authority to pay Court appointed Counsel), voucher #D37211 appointing Cathleen Compton as to Daniel Lewis Lee lej) (Entered: 03/08/1999) |
| 03/08/1999 | 618 | | SEALED MOTION (rkc) (Entered: 03/08/1999) |
| 03/08/1999 | | | MINUTES: JURY TRIAL as to Chevie Kehoe and Danny Lee resumed before Judge G. T. Eisele. Day 7. (A.M. Ct. Rep –– Elaine Hinson)(P.M. Ct. Rep. –– Carolyn Fant)(Late P.M. Ct. Rep. –– Christa Newberg) (mah) (Entered: 03/09/1999) |
| 03/09/1999 | | | MINUTES: JURY TRIAL as to Chevie Kehoe and Danny Lee resumed before Judge G. T. Eisele. Day 8. (A.M. Ct. Rep. –– Christa Newberg)(AM/PM Ct. Rep. –– Carolyn Fant)(Late P.M. Ct. Rep. –– Elaine Hinson) (mah) (Entered: 03/09/1999) |
| 03/10/1999 | 620 | | SEALED document (former empl) (Entered: 03/10/1999) |
| 03/10/1999 | 621 | | SEALED ORDER by Mag. Judge John F. Forster Jr. granting motion [618–1] (former empl) (Entered: 03/10/1999) |
| 03/10/1999 | 622 | | SEALED ORDER by Mag. Judge John F. Forster Jr. (former empl) (Entered: 03/10/1999) |
| 03/10/1999 | 623 | | SEALED ORDER by Mag. Judge John F. Forster Jr. (former empl) (Entered: 03/10/1999) |
| 03/10/1999 | 624 | | SEALED ORDER by Mag. Judge John F. Forster Jr. (former empl) (Entered: 03/10/1999) |
| 03/10/1999 | 626 | | SEALED ORDER by Mag. Judge John F. Forster Jr. granting motion [625–1] (former empl) (Entered: 03/10/1999) |
| 03/10/1999 | | | MINUTES: JURY TRIAL as to Chevie Kehoe and Danny Lee resumed before Judge G. T. Eisele. Day 9. (AM Ct. Rep. –– Elaine Hinson)(PM Ct. Rep. –– Carolyn Fant)(Late PM Ct. Rep. –– Elaine Hinson) (mah) (Entered: 03/10/1999) |
| 03/10/1999 | 630 | | TRIAL BRIEF regarding Fed. R. Evid. 609 by plaintiff USA (rkc) (Entered: 03/11/1999) |
| 03/10/1999 | 627 | | MOTION for discovery of mental health evidence regarding deft Lee by USA as to Daniel Lewis Lee (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/27/2002) |
| 03/11/1999 | 631 | | SEALED ORDER by Mag. Judge John F. Forster Jr. (former empl) (Entered: 03/11/1999) |
| 03/11/1999 | 632 | | SEALED MOTION (former empl) (Entered: 03/11/1999) |
| 03/11/1999 | | | |

July 3 2020 p28

Appellate Case: 20-2351     Page: 28     Date Filed: 07/04/2020 Entry ID: 4930235

| | | | |
|---|---|---|---|
| | | | MINUTES: JURY TRIAL as to Chevie Kehoe and Danny Lee resumed before Judge G. T. Eisele. Day 10. (AM Ct. Rep. –– Christa Newberg)(PM Ct. Rep. –– Elaine Hinson)(PM Ct. Rep. –– Carolyn Fant) (mah) (Entered: 03/11/1999) |
| 03/11/1999 | 633 | | RESPONSE by defendant Daniel Lewis Lee to motion for discovery of mental health evidence regarding deft Lee [627–1] (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/27/2002) |
| 03/15/1999 | 634 | | SEALED clerk's minutes before Judge Forster; ERO Cecilia Norwood/tapes and notes sealed and placed in vault (mcn) Modified on 03/15/1999 (Entered: 03/15/1999) |
| 03/15/1999 | 635 | | SEALED ORDER by Mag. Judge John F. Forster Jr. (rkc) (Entered: 03/15/1999) |
| 03/15/1999 | | | MINUTES: JURY TRIAL as to Chevie Kehoe and Danny Lee resumed before Judge G. T. Eisele. Day 11. (AM Ct. Rep. –– Christa Newberg)(AM/PM Ct. Rep. –– Carolyn Fant)(PM Ct. Rep. –– Elaine Hinson) (mah) (Entered: 03/15/1999) |
| 03/16/1999 | 636 | | SEALED ORDER by Mag. Judge John F. Forster Jr. granting motion [508–1] (rkc) (Entered: 03/16/1999) |
| 03/16/1999 | | | MINUTES: JURY TRIAL as to Chevie Kehoe and Danny Lee resumed before Judge G. T. Eisele. Day 12. (AM Ct. Rep. –– Christa Newberg)(AM/PM Ct. Rep. –– Carolyn Fant)(PM Ct. Rep. –– Christa Newberg) (mah) (Entered: 03/19/1999) |
| 03/17/1999 | | | MINUTES: JURY TRIAL as to Chevie Kehoe and Danny Lee resumed before Judge G. T. Eisele. Day 13. (AM Ct. Rep. –– Carolyn Fant)(PM Ct. Rep. –– Elaine Hinson)(PM Ct. Rep. –– Christa Newberg) (mah) (Entered: 03/19/1999) |
| 03/18/1999 | | | MINUTES: JURY TRIAL as to Chevie Kehoe and Danny Lee resumed before Judge G. T. Eisele. Day 14. (AM Ct. Rep. –– Genie Power)(AM/PM Ct. Rep. –– Carolyn Fant)(PM Ct. Rep. –– Elaine Hinson) (mah) (Entered: 03/19/1999) |
| 03/19/1999 | 643 | | REPLY by plaintiff USA to response to motion for discovery of mental health evidence regarding deft Lee [627–1] (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/27/2002) |
| 03/22/1999 | 645 | | MOTION for order for guidance from the Courts with regard to the denial of a continuance of the 4/26/99 trial date for Mr. Infinger by counsel for Daniel Lewis Lee (rkc) (Entered: 03/22/1999) |
| 03/22/1999 | | | MINUTES: JURY TRIAL as to Chevie Kehoe and Danny Lee resumed before Judge G. T. Eisele. Day 15. ( AM Ct. Rep. –– Elaine Hinson)(PM Ct. Rep. –– Christa Newberg) (mah) (Entered: 03/22/1999) |
| 03/22/1999 | 646 | | REPLY by Daniel Lewis Lee to government's reply to deft's response to motion for discovery of mental health evidence of deft Lee [643–1] (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/27/2002) |
| 03/23/1999 | 647 | | |

July 3 2020 p29

Appellate Case: 20-2351     Page: 29     Date Filed: 07/04/2020 Entry ID: 4930235

| | | | |
|---|---|---|---|
| | | | ORDER by Judge G. T. Eisele that Integris Hospital through its representative provide the medical records of witness Debra Lee Graham. Entered NUNC PRO TUNC to 3/18/99. (cc: all counsel and defendants) (rkc) (Entered: 03/23/1999) |
| 03/23/1999 | | | MINUTES: JURY TRIAL as to Chevie Kehoe and Danny Lee resumed before Judge G. T. Eisele. Day 16. (AM Ct. Rep. −− Elaine Hinson)(PM Ct. Rep. −− Genie Power)(PM Ct. Rep. −− Carolyn Fant) (mah) (Entered: 03/25/1999) |
| 03/24/1999 | 650 | | SEALED ORDER by Mag. Judge John F. Forster Jr. [649−1] (rkc) (Entered: 03/24/1999) |
| 03/24/1999 | 651 | | SEALED MOTION (rkc) (Entered: 03/24/1999) |
| 03/24/1999 | 652 | | SEALED ORDER by Mag. Judge John F. Forster Jr. [651−1] (rkc) (Entered: 03/24/1999) |
| 03/24/1999 | | | MINUTES: JURY TRIAL as to Chevie Kehoe and Danny Lee resumed before Judge G. T. Eisele. Day 17. (AM Ct. Rep. −− Elaine Hinson)(PM Ct. Rep. −− Carolyn Fant)(PM Ct. Rep. −− Christa Newberg) (mah) (Entered: 03/25/1999) |
| 03/25/1999 | | | MINUTES: JURY TRIAL as to Chevie Kehoe and Danny Lee resumed before Judge G. T. Eisele. Day 18. (AM Ct. Rep. −− Elaine Hinson)(PM Ct. Rep. −− Genie Power) (mah) (Entered: 03/25/1999) |
| 03/26/1999 | 655 | | SEALED ORDER by Mag. Judge John F. Forster Jr. (rkc) (Entered: 03/26/1999) |
| 03/29/1999 | | | MINUTES: JURY TRIAL as to Chevie Kehoe and Danny Lee resumed before Judge G. T. Eisele. Day 19. (AM Ct. Rep. −− Christa Newberg)(AM/PM Ct. Rep. −− Carolyn Fant)(PM Ct. Rep. −− Christa Newberg) (mah) (Entered: 03/30/1999) |
| 03/29/1999 | 657 | | AGREED DISCOVERY ORDER regarding BOP information as to deft Lee approved by Judge G. T. Eisele (cc: all counsel and defendants) (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/27/2002) |
| 03/30/1999 | 658 | | SEALED MOTION (rkc) (Entered: 03/30/1999) |
| 03/30/1999 | 659 | | SEALED MOTION (rkc) (Entered: 03/30/1999) |
| 03/30/1999 | 660 | | SEALED MOTION (rkc) (Entered: 03/30/1999) |
| 03/30/1999 | | | MINUTES: JURY TRIAL as to Chevie Kehoe and Danny Lee resumed before Judge G. T. Eisele. Day 20. (AM Ct. Rep. −− Christa Newberg)(PM Ct. Rep. −− Carolyn Fant)(PM Ct. Rep. −− Christa Newberg) (mah) Modified on 02/18/2003 (Entered: 02/17/2003) |
| 03/31/1999 | 661 | | SEALED document (rkc) Modified on 06/28/2002 (Entered: 03/31/1999) |
| 03/31/1999 | 663 | | ORDER by Judge G. T. Eisele granting motion MOTION [660−1], granting motion MOTION [659−1] (cc: all counsel and defendants) (rkc) (Entered: 03/31/1999) |
| 03/31/1999 | | | |

| | | | |
|---|---|---|---|
| | | | MINUTES: JURY TRIAL as to Chevie Kehoe and Danny Lee resumed before Judge G. T. Eisele. Day 21. (AM Ct. Rep. –– Carolyn Fant)(PM Ct. Rep. –– Christa Newberg) (mah) (Entered: 03/31/1999) |
| 03/31/1999 | 662 | | AGREED DISCOVERY ORDER regarding USP videotape(s) as to deft Lee approved by Judge G. T. Eisele (cc: all counsel and defendants) (Unsealed pursuant to Order dated 06/25/02) (cdw) Modified on 06/28/2002 (Entered: 06/27/2002) |
| 03/31/1999 | 665 | | ORDER by Judge G. T. Eisele regarding motion for discovery of mental health evidence as to deft Lee [627–1] (cc: all counsel and defendants) (Unsealed pursuant to Order dated 06/25/02) (cdw) Modified on 06/28/2002 (Entered: 06/27/2002) |
| 04/01/1999 | | | MINUTES: JURY TRIAL as to Chevie Kehoe and Danny Lee resumed before Judge G. T. Eisele. Day 22. (AM Ct. Rep. –– Carolyn Fant)(PM Ct. Rep. –– Christa Newberg) (mah) (Entered: 04/03/1999) |
| 04/05/1999 | 675 | | CJA Form 30Cp4 (Appointment of Counsel) appointing Jack T. Lassiter as to Daniel Lewis Lee (rkc) (Entered: 04/05/1999) |
| 04/05/1999 | | | MINUTES: JURY TRIAL as to Chevie Kehoe and Danny Lee resumed before Judge G. T. Eisele. Day 23. (AM Ct. Rep. –– Elaine Hinson)(PM Ct. Rep. –– Christa Newberg)((PM Ct. Rep. –– Carolyn Fant) (mah) (Entered: 04/06/1999) |
| 04/05/1999 | 672 | | RESPONSE by plaintiff USA to deft Lee's motion to exclude certain evidence at penalty phase (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/27/2002) |
| 04/05/1999 | | | CORRESPONDENCE to Judge G.T. Eisele from Buford McDonald and 04/08/99 reply to Buford McDonald from Eva Madison (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/27/2002) |
| 04/06/1999 | 676 | | SEALED ORDER by Mag. Judge John F. Forster Jr. (rkc) (Entered: 04/06/1999) |
| 04/06/1999 | 678 | | AMENDED AND SUBSTITUTED ORDER by Judge G. T. Eisele dismissing the MOTION [659–1] and granting MOTION [660–1] (cc: all counsel and defendants) (rkc) (Entered: 04/06/1999) |
| 04/06/1999 | 681 | | SEALED MOTION (rkc) (Entered: 04/06/1999) |
| 04/06/1999 | 682 | | SEALED ORDER by Mag. Judge John F. Forster Jr. granting MOTION [681–1] (rkc) (Entered: 04/06/1999) |
| 04/06/1999 | | | MINUTES: JURY TRIAL as to Chevie Kehoe and Danny Lee resumed before Judge G. T. Eisele. Day 24. (AM Ct. Rep. –– Carolyn Fant)(AM/PM Ct. Rep. –– Elaine Hinson)(PM Ct. Rep. Christa Newberg) (mah) (Entered: 04/07/1999) |
| 04/06/1999 | 683 | | ORDER by Judge G. T. Eisele dismissing as moot deft Lee's motion to exclude certain evidence at penalty phase, if same occurs [632–1] (cc: all counsel and defendants) (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/27/2002) |
| 04/07/1999 | | | |

July 3 2020 p31

Appellate Case: 20-2351    Page: 31    Date Filed: 07/04/2020 Entry ID: 4930235

| | | | |
|---|---|---|---|
| | | | MINUTES: JURY TRIAL as to Chevie Kehoe and Danny Lee resumed before Judge G. Thomas Eisele. Day 25. (AM Ct. Rep. –– Elaine Hinson)(PM Ct. Rep. –– Christa Newberg)(PM Ct. Rep. –– Genie Power) (mah) (Entered: 04/07/1999) |
| 04/08/1999 | 686 | | SEALED MOTION (rkc) (Entered: 04/08/1999) |
| 04/08/1999 | 687 | | ORDER by Judge G. T. Eisele that all subpoenas issued for the appearance date of 5/3/99 are now effective for 4/20/99 or when directed by the subpoenaing party and shall remain in full force and effect for the new date. No new subpoenas or fees are required to be issued. (cc: all counsel and defendants) (rkc) (Entered: 04/08/1999) |
| 04/08/1999 | | | MINUTES: JURY TRIAL as to Chevie Kehoe and Danny Lee resumed before Judge G. T. Eisele. Day 26. (AM Ct. Rep. –– Elaine Hinson)(PM Ct. Rep. –– Genie Power) (mah) (Entered: 02/17/2003) |
| 04/09/1999 | 689 | | SEALED doc (mcn) Modified on 04/12/1999 (Entered: 04/09/1999) |
| 04/09/1999 | 690 | | SEALED document as to defendant Chevie O'Brien Kehoe, defendant Daniel Lewis Lee (rkc) (Entered: 04/09/1999) |
| 04/09/1999 | 691 | | SEALED document (rkc) (Entered: 04/09/1999) |
| 04/09/1999 | 692 | | SEALED document (rkc) (Entered: 04/09/1999) |
| 04/09/1999 | 693 | | SEALED document (rkc) (Entered: 04/09/1999) |
| 04/09/1999 | 694 | | TRANSCRIPT (volume 1) of proceedings for the following date: 2/26/99 (jury trial before the Honorable G Thomas Eisele) CRR: Elaine Hinson (former empl) Modified on 04/12/1999 (Entered: 04/12/1999) |
| 04/09/1999 | 695 | | TRANSCRIPT (volume 2) of proceedings for the following date: 3/1/99 (jury trial before the Honorable G. Thomas Eisele) CRR: Elaine Hinson (former empl) Modified on 04/12/1999 (Entered: 04/12/1999) |
| 04/09/1999 | 696 | | TRANSCRIPT (volume 3) of proceedings for the following date: 3/2/99 (jury trial before the Honorable G. Thomas Eisele) CRR: Elaine Hinson (former empl) Modified on 04/12/1999 (Entered: 04/12/1999) |
| 04/09/1999 | 697 | | TRANSCRIPT (volume 4) of proceedings for the following date: 3/3/99 (jury trial before the Honorable G. Thomas Eisele) CRR: Elaine Hinson (former empl) Modified on 04/12/1999 (Entered: 04/12/1999) |
| 04/09/1999 | 698 | | TRANSCRIPT (volume 5) of proceedings for the following date: 3/4/99 (jury trial before the Honorable G. Thomas Eisele) CRR Carolyn S Fant (former empl) Modified on 04/12/1999 (Entered: 04/12/1999) |
| 04/09/1999 | 699 | | TRANSCRIPT (volume 6) of proceedings for the following date: 3/5/99 (jury trial before the Honorable G. Thomas Eisele) CRR Elaine Hinson (former empl) (Entered: 04/12/1999) |
| 04/09/1999 | 700 | | TRANSCRIPT (volume 7) of proceedings for the following date: 3/8/99 (jury trial before the Honorable G. Thomas Eisele) CRR: Elaine Hinson (former empl) (Entered: 04/12/1999) |
| 04/09/1999 | 701 | | |

Appellate Case: 20-2351     Page: 32     Date Filed: 07/04/2020 Entry ID: 4930235

| | | | |
|---|---|---|---|
| | | | TRANSCRIPT (volume 8) of proceedings for the following date: 3/9/99 (jury trial before the Honorable G. Thomas Eisele) CRR: Christa R Newburg (former empl) (Entered: 04/12/1999) |
| 04/09/1999 | 702 | | TRANSCRIPT (volume 9) of proceedings for the following date: 3/10/99 (jury trial before the Honorable G. Thomas Eisele) CRR: Elaine Hinson (former empl) (Entered: 04/12/1999) |
| 04/09/1999 | 703 | | TRANSCRIPT (volume 10) of proceedings for the following date: 3/11/99 (jury trial before the Honorable G. Thomas Eisele) CRR: Christa R. Newburg (former empl) (Entered: 04/12/1999) |
| 04/09/1999 | 704 | | TRANSCRIPT (volume 11) of proceedings for the following date: 3/15/99 (jury trial before the Honorable G. Thomas Eisele) CRR Christa R. Newburg (former empl) (Entered: 04/12/1999) |
| 04/09/1999 | 705 | | TRANSCRIPT (volume 12) of proceedings for the following date: 3/16/99 (jury trial before the Honorable G. Thomas Eisele) CRR: Christa R Newburg (former empl) (Entered: 04/12/1999) |
| 04/09/1999 | 706 | | TRANSCRIPT (volume 13) of proceedings for the following date: 3/17/99 (jury trial before the Honorable G. Thomas Eisele) CRR: Carolyn S. Fant (former empl) (Entered: 04/12/1999) |
| 04/09/1999 | 707 | | TRANSCRIPT (volume 14) of proceedings for the following date: 3/18/99 (jury trial before the Honorable G. Thomas Eisele) CRR: Eugenie M Power (former empl) (Entered: 04/12/1999) |
| 04/09/1999 | 708 | | TRANSCRIPT (volume 15) of proceedings for the following date: 3/22/99 (jury trial before the Honorable G. Thomas Eisele) CRR Elaine Hinson (former empl) (Entered: 04/12/1999) |
| 04/09/1999 | 709 | | TRANSCRIPT (volume 16) of proceedings for the following date: 3/23/99 (jury trial before the Honorable G. Thomas Eisele) CRR: Elaine Hinson (former empl) (Entered: 04/12/1999) |
| 04/09/1999 | 710 | | TRANSCRIPT (volume 17) of proceedings for the following date: 3/24/99 (jury trial before the Honorable G. Thomas Eisele) CRR: Elaine Hinson (former empl) (Entered: 04/12/1999) |
| 04/09/1999 | 711 | | TRANSCRIPT (volume 18) of proceedings for the following date: 3/25/99 (jury trial before the Honorable G. Thomas Eisele) CRR: Elaine Hinson (former empl) (Entered: 04/12/1999) |
| 04/09/1999 | 712 | | TRANSCRIPT (volume 19) of proceedings for the following date: 3/29/99 (jury trial before the Honorable G. Thomas Eisele) CRR: Christa R. Newburg (former empl) (Entered: 04/12/1999) |
| 04/09/1999 | 713 | | TRANSCRIPT (volume 20) of proceedings for the following date: 3/30/99 (jury trial before the Honorable G. Thomas Eisele) CRR: Christa R. Newburg (former empl) (Entered: 04/12/1999) |
| 04/09/1999 | 714 | | TRANSCRIPT (volume 21) of proceedings for the following date: 3/31/99 (jury trial before the Honorable G. Thomas Eisele) CRR: Carolyn S. Fant (former empl) (Entered: 04/12/1999) |
| 04/09/1999 | 715 | | |

Appellate Case: 20-2351    Page: 33    Date Filed: 07/04/2020 Entry ID: 4930235

| | | | |
|---|---|---|---|
| | | | TRANSCRIPT (volume 22) of proceedings for the following date: 4/1/99 (jury trial before the Honorable G. Thomas Eisele) CRR: Carolyn S Fant (former empl) (Entered: 04/12/1999) |
| 04/09/1999 | 716 | | TRANSCRIPT (volume 23) of proceedings for the following date: 4/5/99 (jury trial before the Honorable G. Thomas Eisele) CRR: Elaine Hinson (former empl) (Entered: 04/12/1999) |
| 04/09/1999 | 717 | | TRANSCRIPT (volume 24) of proceedings for the following date: 4/6/99 (jury trial before the Honorable G. Thomas Eisele) CRR: Carolyn S Fant (former empl) (Entered: 04/12/1999) |
| 04/09/1999 | 718 | | TRANSCRIPT (volume 25) of proceedings for the following date: 4/7/99 (jury trial before the Honorable G. Thomas Eisele) CRR: Elaine Hinson (former empl) (Entered: 04/12/1999) |
| 04/09/1999 | 719 | | TRANSCRIPT (volume 26) of proceedings for the following date: 4/8/99 (jury trial before the Honorable G. Thomas Eisele) CRR: Elaine Hinson (former empl) (Entered: 04/12/1999) |
| 04/12/1999 | | | MINUTES: JURY TRIAL as to Chevie Kehoe and Danny Lee resumed before Judge G. T. Eisele. Day 27. (AM Ct. Rep. –– Elaine Hinson)(PM Ct. Rep. Genie Power)(PM Ct. Rep. –– Christa Newberg) (mah) (Entered: 04/12/1999) |
| 04/13/1999 | 721 | | SEALED MOTION (rkc) (Entered: 04/13/1999) |
| 04/13/1999 | 722 | | ORDER by Mag. Judge John F. Forster Jr. (rkc) (Entered: 04/13/1999) |
| 04/13/1999 | 723 | | SEALED MOTION (rkc) (Entered: 04/13/1999) |
| 04/13/1999 | 724 | | SEALED ORDER by Mag. Judge John F. Forster Jr. (rkc) (Entered: 04/13/1999) |
| 04/13/1999 | 725 | | SEALED MOTION (rkc) (Entered: 04/13/1999) |
| 04/13/1999 | 726 | | SEALED MOTION (rkc) (Entered: 04/13/1999) |
| 04/13/1999 | 727 | | SEALED ORDER by Judge G. T. Eisele (rkc) (Entered: 04/13/1999) |
| 04/13/1999 | 728 | | SEALED ORDER by Judge G. T. Eisele (rkc) (Entered: 04/13/1999) |
| 04/13/1999 | 729 | | MEMORANDUM of law by USA regarding lesser included offense instructions applicable to RICO predicates applying Idaho murder law as to Chevie O'Brien Kehoe, Daniel Lewis Lee (rkc) (Entered: 04/13/1999) |
| 04/13/1999 | | | MINUTES: JURY TRIAL as to Chevie Kehoe and Danny Lee resumed before Judge G. T. Eisele. Day 28. Govt. rests. Defts' motion for directed verdict denied. (AM Ct. Rep. –– Elaine Hinson)(PM Ct. Rep. –– Carolyn Fant) (mah) (Entered: 04/13/1999) |
| 04/15/1999 | 731 | | CJA Form 30 (Appointment of and authority to pay Court appointed counsel) voucher #D37210 appointing attorney Jack Lassiter as to Daniel Lewis Lee lej) (Entered: 04/16/1999) |
| 04/15/1999 | 733 | | SEALED ORDER by Mag. Judge John F. Forster Jr. (rkc) (Entered: 04/19/1999) |

July 3 2020 p34

Appellate Case: 20-2351    Page: 34    Date Filed: 07/04/2020 Entry ID: 4930235

| 04/16/1999 | 735 | | SEALED MOTION (rkc) (Entered: 04/19/1999) |
|---|---|---|---|
| 04/16/1999 | 738 | | SEALED ORDER by Mag. Judge John F. Forster Jr. (rkc) (Entered: 04/19/1999) |
| 04/16/1999 | 740 | | ORDER by Mag. Judge John F. Forster Jr. entered nunc pro tunc to 2/26/99 (rkc) (Entered: 04/19/1999) |
| 04/16/1999 | 742 | | SEALED ORDER by Mag. Judge John F. Forster Jr. (rkc) (Entered: 04/20/1999) |
| 04/16/1999 | <u>734</u> | | MOTION to preclude use of polygraph test results or testimony by USA as to Chevie O'Brien Kehoe, Daniel Lewis Lee (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/27/2002) |
| 04/19/1999 | 741 | | SEALED document (rkc) (Entered: 04/19/1999) |
| 04/19/1999 | | | CORRESPONDENCE from Judge G.T. Eisele to attorneys regarding opening statements (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/27/2002) |
| 04/20/1999 | 743 | | SEALED MOTION (rkc) (Entered: 04/20/1999) |
| 04/20/1999 | 744 | | SEALED ORDER by Mag. Judge John F. Forster Jr. (rkc) (Entered: 04/20/1999) |
| 04/20/1999 | 746 | | SEALED ORDER by Mag. Judge John F. Forster Jr. (rkc) (Entered: 04/20/1999) |
| 04/20/1999 | | | MINUTES: JURY TRIAL as to Chevie Kehoe and Danny Lee resumed before Judge G. T. Eisele. Day 29. (AM Ct. Rep. Elaine Hinson)(PM Ct. Rep. –– Carolyn Fant) (mah) (Entered: 04/23/1999) |
| 04/21/1999 | 748 | | ORDER by Judge G. T. Eisele denying deft's motion for compelled psychiatric examination of witness. (cc: all counsel and defendants) (rkc) (Entered: 04/21/1999) |
| 04/21/1999 | | | MINUTES: JURY TRIAL as to Chevie Kehoe and Danny Lee resumed before Judge G. T. Eisele. Day 30. (AM Ct. Rep. –– Christa Newberg)(PM Ct. Rep. –– Carolyn Fant) (mah) (Entered: 04/23/1999) |
| 04/22/1999 | | | MINUTES: JURY TRIAL as to Chevie Kehoe and Danny Lee resumed before Judge G. T. Eisele. Day 31. (AM Ct. Rep. –– Genie Power)(PM Ct. Rep. –– Carolyn Fant) (mah) (Entered: 04/23/1999) |
| 04/22/1999 | 753 | | SEALED ORDER by Mag. Judge John F. Forster Jr. (rkc) (Entered: 04/23/1999) |
| 04/23/1999 | | | MINUTES: JURY TRIAL as to Chevie Kehoe and Danny Lee resumed out of the presence of the jury for proffered testimony before Judge G. T. Eisele. Day 32. (AM Ct. Rep. –– Genie Power) (mah) (Entered: 04/23/1999) |
| 04/23/1999 | 754 | | CJA Form 20Cp4 (Appointment of Counsel) appointing Robert E. Irwin for Paul Humphrey a witness testifying for the defendants. (rkc) (Entered: 04/23/1999) |
| 04/26/1999 | | | MINUTES: JURY TRIAL as to Chevie Kehoe and Danny Lee resumed before Judge G. T. Eisele. Day 33. (AM Ct. Rep. –– Elaine Hinson)(PM Ct. |

Appellate Case: 20-2351     Page: 35     Date Filed: 07/04/2020 Entry ID: 4930235

| | | | |
|---|---|---|---|
| | | | Rep. –– Carolyn Fant) (mah) (Entered: 04/26/1999) |
| 04/26/1999 | 755 | | ORDER by Mag. Judge John F. Forster Jr. directing the clerk to issue a check to Kay Quinn in the amt. of $239.87 for the transcript submitted on 19th of April 1999. (cc: all counsel and defendants) (rkc) (Entered: 04/27/1999) |
| 04/27/1999 | | | MINUTES: JURY TRIAL as to Chevie Kehoe and Danny Lee resumed before Judge G. T. Eisele. Day 34. (AM Ct. Rep. –– Elaine Hinson)(PM Ct. Rep. –– Carolyn Fant) (mah) (Entered: 04/28/1999) |
| 04/28/1999 | | | MINUTES: JURY TRIAL as to Chevie Kehoe and Danny Lee resumed before Judge G. T. Eisele and out of the presence of the jury. Day 35. Jury instructions discussed and objections stated. (AM Ct. Rep. –– Elaine Hinson)(PM Ct. Rep. –– Carolyn Fant) (mah) (Entered: 04/28/1999) |
| 04/29/1999 | 760 | | SEALED ORDER by Mag. Judge John F. Forster Jr. (rkc) (Entered: 04/29/1999) |
| 04/29/1999 | 761 | | CJA Form 20Cp4 (Appointment of Counsel) supplemental voucher D37211 appointing Cathleen Compton as to Daniel Lewis Lee (rkc) (Entered: 04/29/1999) |
| 04/29/1999 | | | MINUTES: JURY TRIAL as to Chevie Kehoe and Danny Lee resumed before Judge G. T. Eisele. Day 36. Closing Arguments commenced. (AM Ct. Rep. –– Carolyn Fant)(PM Ct. Rep. –– Genie Power)(PM Ct. Rep. –– Christa Newberg) (mah) (Entered: 05/03/1999) |
| 04/30/1999 | | | MINUTES: JURY TRIAL as to Chevie Kehoe and Danny Lee resumed before Judge G. T. Eisele. Day 37. Closing arguments resumed. (AM Ct. Rep. –– Elaine Hinson)(AM/PM Ct. Rep. –– Carolyn Fant) (mah) Modified on 05/03/1999 (Entered: 05/03/1999) |
| 05/03/1999 | | | MINUTES: JURY TRIAL as to Chevie Kehoe and Danny Lee resumed before Judge G. T. Eisele. Day 38. Jury deliberation commenced. (Ct. Rep. –– Elaine Hinson) (mah) (Entered: 05/03/1999) |
| 05/04/1999 | 762 | | SEALED document by plaintiff USA lej) (Entered: 05/04/1999) |
| 05/04/1999 | 763 | | SEALED ORDER by Mag. Judge John F. Forster Jr. (rkc) (Entered: 05/04/1999) |
| 05/04/1999 | 764 | | SEALED MOTION lej) (Entered: 05/04/1999) |
| 05/04/1999 | 765 | | SEALED ORDER by Mag. Judge John F. Forster Jr. granting motion [764–1] lej) (Entered: 05/04/1999) |
| 05/04/1999 | 766 | | SEALED ORDER by Mag. Judge John F. Forster Jr. lej) (Entered: 05/04/1999) |
| 05/04/1999 | 808 | | Jury instructions on the guilt/innocence phase given to the jury by the court. (mah) (Entered: 05/16/1999) |
| 05/04/1999 | 810 | | VERDICTS as to Daniel Lewis Lee of Guilty to Cts. 1s thru 5s. (Original placed under seal in vault.) (mah) Modified on 05/16/1999 (Entered: 05/16/1999) |
| 05/04/1999 | | | |

| | | | |
|---|---|---|---|
| | | | MINUTES: JURY TRIAL as to Chevie Kehoe and Danny Lee resumed before Judge G. T. Eisele. Day 39. Jury returns verdicts of Guilty as to both defts. on Cts. 1s thru 5s. Jury excused until 5/6/99. (Ct. Rep. –– Elaine Hinson) (mah) (Entered: 05/16/1999) |
| 05/05/1999 | 768 | | SEALED TRANSCRIPT (Ct. Rep. –– Carolyn Fant) (former empl) Modified on 11/08/2002 (Entered: 05/05/1999) |
| 05/05/1999 | 769 | | SEALED document (former empl) (Entered: 05/05/1999) |
| 05/05/1999 | 770 | | SEALED document (former empl) (Entered: 05/05/1999) |
| 05/05/1999 | 771 | | SEALED document (former empl) (Entered: 05/05/1999) |
| 05/05/1999 | 772 | | SEALED document (former empl) (Entered: 05/05/1999) |
| 05/05/1999 | 773 | | TRANSCRIPT (Volume 27) of proceedings for the following date: 4/12/99 (Jury Trial before the Honorable G. Thomas Eisele) CRR: Elaine Hinson (former empl) Modified on 05/05/1999 (Entered: 05/05/1999) |
| 05/05/1999 | 774 | | TRANSCRIPT (Volume 28) of proceedings for the following date: 4/13/99 (Jury Trial before the Honorable G. Thomas Eisele) CRR: Elaine Hinson (former empl) Modified on 05/05/1999 (Entered: 05/05/1999) |
| 05/05/1999 | 775 | | TRANSCRIPT (Volume 29) of proceedings for the following date: 4/20/99 (Jury Trial before the Honorable G. Thomas Eisele) CRR: Elaine Hinson (former empl) Modified on 05/05/1999 (Entered: 05/05/1999) |
| 05/05/1999 | 776 | | TRANSCRIPT (Volume 30) of proceedings for the following date: 4/21/99 (Jury Trial before the Honorable G. Thomas Eisele) CRR: Christa R Newburg (former empl) Modified on 05/05/1999 (Entered: 05/05/1999) |
| 05/05/1999 | 777 | | TRANSCRIPT (Volume 31) of proceedings for the following date: 4/22/99 (Jury trial before the Honorable G. Thomas Eisele) CRR: Eugenie M Power (former empl) Modified on 05/05/1999 (Entered: 05/05/1999) |
| 05/05/1999 | 778 | | TRANSCRIPT (Volume 32) of proceedings for the following date: 4/23/99 (Jury Trial before the Honorable G. Thomas Eisele) CRR: Eugenie M Power (former empl) Modified on 05/05/1999 (Entered: 05/05/1999) |
| 05/05/1999 | 779 | | TRANSCRIPT (Volume 33) of proceedings for the following date: 4/26/99 (Jury Trial before the Honorable G. Thomas Eisele) CRR: Elaine Hinson (former empl) Modified on 05/05/1999 (Entered: 05/05/1999) |
| 05/05/1999 | 780 | | TRANSCRIPT (Volume 34) of proceedings for the following date: 4/27/99 (Jury Trial before the Honorable G. Thomas Eisele) CRR: Elaine Hinson (former empl) Modified on 05/05/1999 (Entered: 05/05/1999) |
| 05/05/1999 | 781 | | TRANSCRIPT (Volume 35) of proceedings for the following date: 4/28/99 (Jury Trial before the Honorable G. Thomas Eisele) CRR: Elaine Hinson (former empl) Modified on 05/05/1999 (Entered: 05/05/1999) |
| 05/05/1999 | 782 | | TRANSCRIPT (Volume 36) of proceedings for the following date: 4/29/99 (Jury Trial before the Honorable G. Thomas Eisele) CRR: Carolyn S Fant (former empl) Modified on 05/05/1999 (Entered: 05/05/1999) |
| 05/05/1999 | 783 | | |

Appellate Case: 20-2351    Page: 37    Date Filed: 07/04/2020 Entry ID: 4930235

| | | | |
|---|---|---|---|
| | | | TRANSCRIPT (Volume 37) of proceedings for the following date: 4/30/99 (Jury Trial before the Honorable G. Thomas Eisele) CRR: Elaine Hinson (former empl) Modified on 05/05/1999 (Entered: 05/05/1999) |
| 05/05/1999 | 784 | | TRANSCRIPT (Volume 38) of proceedings for the following date: 5/3/99 (Jury Trial before the Honorable G. Thomas Eisele) CRR: Elaine Hinson (former empl) Modified on 05/05/1999 (Entered: 05/05/1999) |
| 05/05/1999 | 785 | | CJA Form 30 (Appointment of Counsel) appointing Cathleen V Compton #D37211 as to Daniel Lewis Lee (former empl) (Entered: 05/05/1999) |
| 05/05/1999 | 788 | | SEALED MOTION (former empl) (Entered: 05/06/1999) |
| 05/05/1999 | | | MINUTES: JURY TRIAL as to Chevie Kehoe and Danny Lee resumed before Judge G. T. Eisele. Day 40. Motions argued, objections to instructions stated. (Ct. Rep. –– Elaine Hinson) dfts.) (mah) (Entered: 05/16/1999) |
| 05/05/1999 | 767 | | TRANSCRIPT (1 volume) of proceedings for the following date: Tuesday, 04/20/99 (hearing before the Honorable G. Thomas Eisele on Chevie Kehoe's motion for psychiatric exam and USA's motion to preclude use of polygraph exam) (Unsealed pursuant to Order dated 06/25/02) (cdw) Modified on 06/27/2002 (Entered: 06/27/2002) |
| 05/06/1999 | 787 | | SEALED ORDER by Mag. Judge John F. Forster Jr. (rkc) (Entered: 05/06/1999) |
| 05/06/1999 | 791 | | SEALED ORDER by Judge G. T. Eisele (former empl) (Entered: 05/06/1999) |
| 05/06/1999 | 792 | | SEALED MOTION (rkc) (Entered: 05/06/1999) |
| 05/06/1999 | 793 | | SEALED ORDER by Mag. Judge John F. Forster Jr. (rkc) (Entered: 05/06/1999) |
| 05/06/1999 | 795 | | SEALED ORDER by Mag. Judge John F. Forster Jr. (rkc) (Entered: 05/06/1999) |
| 05/06/1999 | | | MINUTES: JURY TRIAL on the penalty phase as to Chevie Kehoe resumed before Judge G. T. Eisele. Day 41. (Ct. Rep. –– AM Ct. Rep. –– Elaine Hinson)(AM/PM Ct. Rep. –– Carolyn Fant) (mah) (Entered: 05/16/1999) |
| 05/06/1999 | 796 | | ORDER by Mag. Judge John F. Forster Jr. that Dr Mark Cunningham and Dr Thomas Ryan shall be permitted to be present in the courtroom during the penalty phase of the trial involving deft Lee (cc: all counsel and defendants) (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/27/2002) |
| 05/07/1999 | 797 | | Return on WRIT of John L Fryman [797–1] (former empl) (Entered: 05/07/1999) |
| 05/07/1999 | 798 | | Return on WRIT of Gregg H Vieira [798–1] (former empl) (Entered: 05/07/1999) |
| 05/07/1999 | 799 | | SEALED MOTION (former empl) (Entered: 05/07/1999) |
| 05/07/1999 | 800 | | ORDER by Mag. Judge John F. Forster Jr. granting SEALED MOTION [799–1] (cc: all counsel and defendants) (former empl) (Entered: 05/07/1999) |
| 05/07/1999 | | | |

| | | | |
|---|---|---|---|
| | | | MINUTES: JURY TRIAL on the Penalty Phase as to Chevie Kehoe resumed before Judge G. T. Eisele. Day 42. (Ct. Rep. –– Carolyn Fant) (mah) (Entered: 05/16/1999) |
| 05/07/1999 | 811 | | Jury instructions (Preliminary) on the Penalty Phase as to Chevie Kehoe given to the jury by the court. (mah) Modified on 05/16/1999 (Entered: 05/16/1999) |
| 05/07/1999 | 812 | | Jury instructions (Final) on the Penalty Phase as to Chevie Kehoe given to the jury by the court. (mah) (Entered: 05/16/1999) |
| 05/10/1999 | | | MINUTES: JURY TRIAL on the Penalty Phase as to Chevie Kehoe resumed before Judge G. T. Eisele. Day 43. Jury deliberation resumed and jury returns verdict of life imprisonment without possibility of release on Cts. 3s thru 5s. Jury excused until 5/11/99. (Ct. Rep. –– Elaine Hinson) dfts.) (mah) (Entered: 05/16/1999) |
| 05/11/1999 | 803 | | Return on WRIT unexecuted for Isaac May as to Daniel Lewis Lee [803–1] (former empl) Modified on 05/11/1999 (Entered: 05/11/1999) |
| 05/11/1999 | 804 | | Return on WRIT [804–1] unexecuted for Alfred Ray Taylor as to Chevie Kehoe (former empl) Modified on 05/11/1999 (Entered: 05/11/1999) |
| 05/11/1999 | 805 | | Return on WRIT [805–1] unexecuted for Isaac May as to Chevie Kehoe (former empl) Modified on 05/11/1999 (Entered: 05/11/1999) |
| 05/11/1999 | | | MINUTES: JURY TRIAL on the Penalty Phase as to Danny Lee resumed before Judge G. T. Eisele. Day 44. Deft. Lee's motion to suppress denied. (AM Ct. Rep. –– Elaine Hinson)(PM Ct. Rep. –– Genie Power)(PM Ct. Rep. –– Carolyn Fant) (mah) (Entered: 05/16/1999) |
| 05/11/1999 | 814 | | Jury instructions (Preliminary) as to Danny Lee given to the jury by the court. (mah) (Entered: 05/16/1999) |
| 05/12/1999 | | | MINUTES: JURY TRIAL on the Penalty Phase as to Danny Lee resumed before Judge G. T. Eisele. Day 45. (AM Ct. Rep. –– Elaine Hinson)(AM/PM Ct. Rep. –– Carolyn Fant)(PM Ct. Rep. –– Elaine Hinson) (mah) (Entered: 05/16/1999) |
| 05/13/1999 | 806 | | SEALED MOTION (rkc) (Entered: 05/13/1999) |
| 05/13/1999 | | | MINUTES: JURY TRIAL on the Penalty Phase as to Danny Lee resumed before Judge G. T. Eisele. Day 46. (AM Ct. Rep. –– Peggy Merkle)(PM Ct. Rep. –– Elaine Hinson)(PM Ct. Rep. –– Christa Newberg) (mah) (Entered: 05/16/1999) |
| 05/14/1999 | 807 | | MINUTES: JURY TRIAL on the Penalty Phase as to Danny Lee resumed before Judge G. T. Eisele. Day 47. Jury deliberation commenced and verdict of death returned on Cts. 3s thru 5s. Jury excused. (Original Juror Notes to Court placed under seal in vault) (AM Ct. Rep. –– Elaine Hinson)(AM/PM Ct. Rep. –– Carolyn Fant) (mah) Modified on 05/16/1999 (Entered: 05/16/1999) |
| 05/14/1999 | 815 | | Jury instructions (Final) on the Penalty Phase as to Danny Lee given to the jury by the court. (mah) (Entered: 05/16/1999) |
| 05/14/1999 | 816 | | |

Appellate Case: 20-2351    Page: 39    Date Filed: 07/04/2020 Entry ID: 4930235

| | | | |
|---|---|---|---|
| | | | VERDICTS on the penalty as to Daniel Lewis Lee of death on Cts. 3s thru 5s. (Original placed under seal in vault.) (mah) Modified on 05/16/1999 (Entered: 05/16/1999) |
| 05/17/1999 | 817 | | MOTION for order to impose restitution and memorandum of law regarding payment of restitution by USA as to Chevie O'Brien Kehoe and Daniel Lewis Lee lej) (Entered: 05/17/1999) |
| 05/17/1999 | 819 | | Return on WRIT unexecuted as to Daniel Lewis Lee [819−1] (former empl) (Entered: 05/18/1999) |
| 05/17/1999 | 823 | | ORDER by Judge G. T. Eisele that the transcripts of the hearings held on Monday, May 10, 1999 at 9:45 a.m. and 10:45 a.m., Volume 43−A and Volume 43−C respectively, will be and they are hereby, UNSEALED. (cc: all counsel and defendants) (rkc) (Entered: 05/19/1999) |
| 05/17/1999 | 824 | | TRANSCRIPT (volume 43−A) of proceedings for the following date: Monday, 05/10/99 (in−camera hearing before the Honorable G Thomas Eisele regarding Court's discussions with attorneys prior to receiving jury verdict for C Kehoe) (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/27/2002) |
| 05/17/1999 | 825 | | TRANSCRIPT (volume 43−C) of proceedings for the following date: Monday, 05/10/99 (in−camera hearing before the Honorable G. Thomas Eisele regarding Court's continued discussions with attorneys after receiving jury verdict for C. Kehoe regarding further proceedings for D. Lee) (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/27/2002) |
| 05/19/1999 | 822 | | MOTION for order for correction of sentence, for a new sentencing phase of the trial, or for enforcement of a plea agreement by Daniel Lewis Lee (rkc) (Entered: 05/19/1999) |
| 05/19/1999 | 826 | | TRANSCRIPT (39 volume) of proceedings for the following date(s): Tues. 5/4/99 (rkc) (Entered: 05/19/1999) |
| 05/19/1999 | 828 | | TRANSCRIPT ( 41−43 volumes) of proceedings for the following date(s): Thurs 5/6/99, Fri. 5/7/99, Mon. 5/10/99 (rkc) (Entered: 05/19/1999) |
| 05/19/1999 | 830 | | TRANSCRIPT (volumes 44,45) of proceedings for the following date(s): Tues. 5/11/99, Wed. 5/12/99 (rkc) (Entered: 05/19/1999) |
| 05/19/1999 | 832 | | TRANSCRIPT (Volume 47) of proceedings for the following date(s): Fri. 5/14/99 (rkc) (Entered: 05/19/1999) |
| 05/19/1999 | 833 | | MOTION for order for subpoena to KTHV−TV by Daniel Lewis Lee (rkc) (Entered: 05/19/1999) |
| 05/19/1999 | 834 | | MOTION to produce minutes or other records of meeting of death penalty committee by Daniel Lewis Lee (rkc) (Entered: 05/19/1999) |
| 05/19/1999 | 835 | | MINUTES: PRESENTENCE HEARING as to Chevie Kehoe held before Judge G. T. Eisele. Court advises parties that the sentence will be postponed until after the ruling on the motion for new trial. (Ct. Rep. −− Elaine Hinson) (mah) (Entered: 05/19/1999) |
| 05/19/1999 | 836 | | MINUTES: HEARING as to Danny Lee held before Judge G. T. Eisele. Court discusses motion to enforce plea agreement and other issues. (Ct. Rep. |

July 3 2020 p40

Appellate Case: 20-2351    Page: 40    Date Filed: 07/04/2020 Entry ID: 4930235

| | | | |
|---|---|---|---|
| | | | –– Elaine Hinson) (mah) (Entered: 05/19/1999) |
| 05/19/1999 | 827 | | TRANSCRIPT (volume 40) of proceedings for the following date: Wednesday, 05/05/99 (telephone conference before the Honorable G.Thomas Eisele regarding USA's brief concerning deft's expert testimony in penalty phase regarding Levin; USA's request regarding future dangerousness; and deft Kehoe's motion to make statement of allocution) (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/27/2002) |
| 05/19/1999 | 829 | | TRANSCRIPT (volume 43–B) of proceedings for the following date: Monday, 05/10/99 (in–camera hearing before the Honorable G. Thomas Eisele regarding concerns regarding verdict forms for Kehoe & Lee) (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/27/2002) |
| 05/19/1999 | 831 | | TRANSCRIPT (volume 46) of proceedings for the following date: Thursday, 05/13/99 (hearing before Judge G. Thomas Eisele regarding USA's cross–examination of Dr Cunningham) (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/27/2002) |
| 05/24/1999 | 837 | | ORDER by Mag. Judge John F. Forster Jr. granting motion for order for subpoena to KTHV–TV [833–1] (cc: all counsel and defendants) (rkc) (Entered: 05/24/1999) |
| 05/24/1999 | 838 | | ORDER by Mag. Judge John F. Forster Jr. directing the U.S. Marshal to serve subpoena free of costs pursuant to 18:3005–3006A. (cc: all counsel and defendants) (rkc) (Entered: 05/24/1999) |
| 05/25/1999 | 839 | | TRANSCRIPT (1 volume) of proceedings for the following date: 5/19/99 (hearing) as to Chevie Kehoe lej) (Entered: 05/25/1999) |
| 05/25/1999 | 840 | | TRANSCRIPT (1 volume) of proceedings for the following date: 5/19/99 (hearing) as to Daniel Lee lej) (Entered: 05/25/1999) |
| 05/27/1999 | 841 | | RESPONSE by plaintiff USA to deft Lee's motion for production of records (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/27/2002) |
| 05/27/1999 | 842 | | BRIEF in support of motion for correction of sentence, for a new sentencing phase of the trial of Daniel Lewis Lee, or for enforcement of a plea agreement, which motion was filed on 05/19/99 by defendant Daniel Lewis Lee (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/27/2002) |
| 06/01/1999 | 845 | | SEALED ORDER by Mag. Judge John F. Forster Jr. (rkc) (Entered: 06/01/1999) |
| 06/01/1999 | 846 | | SEALED document (rkc) (Entered: 06/01/1999) |
| 06/07/1999 | 847 | | ORDER by Judge G. T. Eisele dismissing as moot the following motions: C. Kehoe's motion for order directing government to provide notice of intent to use residual hearsay exception under Rule 807 [282–1], C. Kehoe's motion to compel examination or production of the personnel files of testifying agents and government employees [284–1], C. Kehoe's motion for discovery [290–1], motion for inspection concerning government's use of informants, operatives and cooperating individuals [290–2], motion for disclosure of exculpatory evidence [290–3], C. Kehoe's motion for evidentiary hearing [458–1], C. Kehoe's motion to suppress statements [459–1], C. Kehoe's |

July 3 2020 p41

Appellate Case: 20-2351    Page: 41    Date Filed: 07/04/2020 Entry ID: 4930235

| | | | |
|---|---|---|---|
| | | | motion for leave for deft to present unsworn plea for mercy [544–1], C. Kehoe's motion for additional questions and subjects for general voir dire [584–1], C. Kehoe's motion for change of venue based on pretrial disclosure of material evidence [601–1], C. Kehoe's motion for Daubert and relevance hearing on government's witness Mewborn [671–1], C. Kehoe's motion for compelled psychiatric examination of witness [732–1], C. Kehoe's motion in limine [757–1], D. Lee's motion for order to adopt by silence all relevant pretrial motions and trial objections of co–defts [42–1], D. Lee's motion for discovery [258–1], motion to inspect information and evidence in aggravation [258–2], D. Lee's motion for order directing government to provide notice of intention to use residual hearsay exception under Rule 807 [306–1], D. Lee's supplemental motion to strike potential jurors for cause based upon a review of questionnaires [548–1], D. Lee's motion to include the following questions for death qualification of jurors [574–1], D. Lee's motion for order for guidance from the Courts with regard to the denial of a continuance of the 04/26/99 trial date for Mr. Infinger [645–1], D. Lee's motion in limine [806–1], K. Kehoe's motion for order for payment of reasonable attorney's fee [234–1], K. Kehoe's motion for order to permit counsel to participate in voir dire [379–1], government's motion in limine to foreclose suppression of evidence pursuant to 18:201(c) theories [263–1], government's motion for admission of hearsay evidence [264–1], government's motion for reciprocal discovery of mental health defenses to be raised during penalty phase [288–1], government's motion for additional time in which to respond to K. Kehoe's motion to suppress evidence of the Thompson Falls search [405–1], government's motion for discovery of mental health evidence regarding deft Lee [627–1], government's motion for discovery of mental health evidence regarding deft Chevie Kehoe [628–1], government's motion to preclude inquiry into irrelevant and immaterial matters [686–1], government's motion to preclude use of polygraph test results or testimony [734–1], government's motion to preclude impeachment of government witness on collateral matters [735–1], government's motion in limine regarding testimony of defense expert in penalty phase [788–1], government's motion for order to impose restitution [817–1], motion of Michael Tigar to quash, or in the alternative, to modify subpoena issued by deft Kehoe pursuant to Rule 17(c) [658–1] (cc: all counsel and defendants) (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/27/2002) |
| 06/08/1999 | 848 | | ORDER by Mag. Judge John F. Forster Jr. finding the following motions moot, [759–1] [667–1] [525–1] [489–1] [477–1] [461–1] [431–1] [396–1] (cc: all counsel and defendants) (rkc) (Entered: 06/08/1999) |
| 06/10/1999 | 849 | | RESPONSE & Brief by plaintiff USA to motion to produce minutes or other records of meeting of death penalty committee [834–1] (rkc) (Entered: 06/11/1999) |
| 06/10/1999 | 850 | | RESPONSE by plaintiff USA to motion for order for correction of sentence, for a new sentencing phase of the trial, or for enforcement of a plea agreement [822–1] (rkc) (Entered: 06/11/1999) |
| 06/11/1999 | | | Docket Modification (Utility Event) terminating the motion [601–1] pursuant to order of 2/26/99, and terminating the motion for order for payment of reasonable atty's fee [234–1] pursuant to order of 4/9/98. (rkc) (Entered: 06/11/1999) |

Appellate Case: 20-2351     Page: 42     Date Filed: 07/04/2020 Entry ID: 4930235

| 06/11/1999 | 851 | | CJA Form 30Cp4 (Appointment of Counsel) appointing Cathleen Compton #37211 as to Daniel Lewis Lee (sealed) (Entered: 06/11/1999) |
|---|---|---|---|
| 06/14/1999 | 853 | | ORDER by Judge G. T. Eisele approving and adopting the attached document as the jury questionnaire to be used in this case. Entered nunc pro tunc to 1/12/99. (cc: all counsel and defendants) (rkc) (Entered: 06/15/1999) |
| 06/15/1999 | 854 | | MEMORANDUM, Opinion and Order: by Judge G. T. Eisele denying motion to dismiss notice of intent to seek the death penalty [297–1], and denying motion to strike notice of intention to seek the death penalty and to hold the death penalty unconstitutional [289–1]. The following documents are hereby unsealed Nos. 297, 298, 337, 345, 357, 359. Entered NUNC PRO TUNC to 5/5/99. (cc: all counsel and defendants) (rkc) (Entered: 06/16/1999) |
| 06/16/1999 | 856 | | REPLY by defendant Daniel Lewis Lee to response to motion for order for correction of sentence, for a new sentencing phase of the trial, or for enforcement of a plea agreement [822–1] (rkc) (Entered: 06/17/1999) |
| 06/21/1999 | 858 | | MOTION for order for subpoena by Daniel Lewis Lee (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/27/2002) |
| 06/21/1999 | 859 | | ORDER by Mag. Judge John F. Forster Jr. granting motion for order for subpoena [858–1] (cc: all counsel and defendants) (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/27/2002) |
| 06/24/1999 | 874 | | MINUTES: HEARING (Ph.Cf.) as to Danny Lee held before Judge G. T. Eisele regarding subpoenas issued to Janet Reno & Eric Holder. (Ct. Rep. –– Elaine Hinson) (mah) (Entered: 06/30/1999) |
| 06/24/1999 | 861 | | CORRESPONDENCE by defendant Daniel Lewis Lee regarding testimony sought at hearing (Unsealed pursuant to Order dated 06/25/02) (cdw) Modified on 06/27/2002 (Entered: 06/27/2002) |
| 06/25/1999 | 863 | | ORDER by Judge G. T. Eisele clarifying sealed order filed June 7, 1999 as mooting motions decided in rulings from the bench to clear up the Court's docket (cc: all counsel and defendants) (former empl) (Entered: 06/25/1999) |
| 06/25/1999 | 865 | | MEMORANDUM of LAW in support of Deliberative Process Privilege as to Daniel Lewis Lee (former empl) (Entered: 06/28/1999) |
| 06/28/1999 | 866 | | TRANSCRIPT (1 volume) of proceedings for the following date: 6/25/99 (Sentencing before the Honorable G Thomas Eisele) (former empl) (Entered: 06/28/1999) |
| 06/28/1999 | 868 | | BRIEF regarding the deliberative process privilege, attorney work–product privilege, and touch regulations by plaintiff USA (former empl) (Entered: 06/28/1999) |
| 06/28/1999 | 869 | | ADDITIONAL BRIEF re authority of the Deputy Attorney General to act on behalf of the Attorney General by plaintiff USA (former empl) (Entered: 06/28/1999) |
| 06/28/1999 | 867 | | TRANSCRIPT ( 1 volumes) of proceedings for the following date(s): 6/24/99 (telephone conference) (rkc) (Entered: 06/30/1999) |
| 06/29/1999 | 870 | | MEMORANDUM OF LAW absence of the Attorney General and the Deputy Attorney General's authority to act in her absence by defendant Daniel Lewis |

July 3 2020 p43

Appellate Case: 20-2351     Page: 43     Date Filed: 07/04/2020 Entry ID: 4930235

| | | | |
|---|---|---|---|
| | | | Lee (rkc) (Entered: 06/29/1999) |
| 06/29/1999 | 871 | | MOTION to quash subpoenas , and to continue appearances by USA as to Daniel Lewis Lee (rkc) (Entered: 06/29/1999) |
| 06/29/1999 | 872 | | ORDER by Judge G. T. Eisele granting motion to continue appearances [871–2] for further hearing on this subpoena until July 29, 1999, 10:00 a.m. (cc: all counsel and defendants) (rkc) (Entered: 06/29/1999) |
| 06/29/1999 | 873 | | ORDER by Judge G. T. Eisele that the transcript of the telephone conference held on Thursday, June 24, 1999, at 2:00 p.m. will be, and it is hereby, UNSEALED. (cc: all counsel and defendants) (rkc) (Entered: 06/30/1999) |
| 06/30/1999 | 877 | | ORDER by Judge G. T. Eisele denying motion for enforcement of a plea agreement and the other issues raised in the motion for order for correction of sentence, for new sentencing phase of the trial [822–1] will be dealt with in due course. (cc: all counsel and defendants) (rkc) (Entered: 07/01/1999) |
| 07/02/1999 | 878 | | TRANSCRIPT (1 volumes) of proceedings for the following date(s): 6/29/99 (Hearing before Judge Eisele) (rkc) (Entered: 07/02/1999) |
| 07/02/1999 | 879 | | SUPPLEMENT TO MEMORANDUM by Daniel Lewis Lee in support of brief [870–1] regarding the absence of the Attorney General and the Deputy Attorney General's authority to act in her absence as to Daniel Lewis Lee (rkc) (Entered: 07/02/1999) |
| 07/02/1999 | 880 | | SUPPLEMENTAL BRIEF by defendant Daniel Lewis Lee regarding future dangerousness (rkc) (Entered: 07/02/1999) |
| 07/02/1999 | 881 | | RESPONSE by defendant Daniel Lewis Lee to motion to quash subpoenas [871–1] (rkc) (Entered: 07/02/1999) |
| 07/12/1999 | | | DOCKETING LETTER: 8 USCA Number 99–2897 ; court reporter's transcripts due 8/9/99 ; clerk's record on appeal due 8/11/99 appeal of KEHOE (dac) (Entered: 07/12/1999) |
| 07/13/1999 | 882 | | CJA Form 30Cp4 (Appointment of Counsel) appointing Cathleen Compton #37211 as to Daniel Lewis Lee (rkc) (Entered: 07/14/1999) |
| 07/14/1999 | 883 | | RESPONSE to letter form court dated 7/2/99 by Daniel Lewis Lee (rkc) (Entered: 07/14/1999) |
| 07/16/1999 | 884 | | REPLY by plaintiff USA to response to motion to quash subpoenas [871–1] (rkc) (Entered: 07/16/1999) |
| 07/20/1999 | 887 | | AFFIDAVIT of Kevin V. DiGregory as to Daniel Lewis Lee case (rkc) (Entered: 07/23/1999) |
| 07/22/1999 | 885 | | ORDER by Judge G. T. Eisele denying motion to quash subpoenas [871–1] (cc: all counsel and defendants) (sealed) (Entered: 07/22/1999) |
| 07/23/1999 | 886 | | MOTION for order to stay subpoenas and supporting memorandum by USA as to Daniel Lewis Lee (rkc) (Entered: 07/23/1999) |
| 07/26/1999 | 888 | | ORDER by Judge G. T. Eisele granting motion for order to stay subpoenas and supporting memorandum [886–1] The subpoenas are hereby stayed until the Government has exhausted any appeal or petition for writ of mandamus |

Appellate Case: 20-2351    Page: 44    Date Filed: 07/04/2020 Entry ID: 4930235

| | | | concerning the subpoenas. The hearing previously set for 7/29/99 is hereby canceled. (cc: all counsel and defendants) (rkc) (Entered: 07/26/1999) |
|---|---|---|---|
| 08/13/1999 | 890 | | CJA Form 30Cp4 (Appointment of Counsel) appointing Cathleen V. Compton (supplement D37211) as to Daniel Lewis Lee (rkc) (Entered: 08/16/1999) |
| 08/17/1999 | 891 | | CJA Form 30Cp4 (Appointment of Counsel) appointing Jack T. Lassiter (supplemental voucher D37210) as to Daniel Lewis Lee (rkc) (Entered: 08/17/1999) |
| 08/23/1999 | | | DOCKETING LETTER: 8 USCA Number 99–3199; petition for writ of mandamus has been filed as to deft Daniel Lewis Lee. (dac) (Entered: 08/23/1999) |
| 08/25/1999 | 897 | | TRANSCRIPT ( 1 volumes) of proceedings for the following date(s): 2/8/99 (chg. of plea of Kirby Kehoe) (rkc) (Entered: 08/26/1999) |
| 09/02/1999 | 900 | | SEALED MOTION (rkc) (Entered: 09/02/1999) |
| 09/03/1999 | 905 | | RESPONSE by defendant Daniel Lewis Lee to motion for order to lift gag order [904–1] and regarding security and distribution of exhibits (rkc) (Entered: 09/07/1999) |
| 09/07/1999 | 904 | | MOTION for order to lift gag order by USA as to Chevie O'Brien Kehoe, Daniel Lewis Lee, Kirby Keith Kehoe (rkc) (Entered: 09/07/1999) |
| 09/08/1999 | 906 | | ORDER by Judge G. T. Eisele granting motion for order to lift gag order [904–1] The gag order previously entered in this case with respect to the attorneys for the Government be, and it is hereby lifted, rescinded and set aside. (cc: all counsel and defendants) (rkc) (Entered: 09/08/1999) |
| 09/08/1999 | 908 | | SEALED ORDER by Mag. Judge John F. Forster Jr. (rkc) (Entered: 09/08/1999) |
| 09/13/1999 | 910 | | MOTION by movant New York Times Co for leave to intervene for the purpose of responding to the Government's motion regarding exhibits, and brief in support as to deft KEHOE (dac) Modified on 09/14/1999 (Entered: 09/14/1999) |
| 09/13/1999 | 911 | | CJA Form 30Cp4 (Appointment of Counsel) supplemental voucher #D37210 for Jack T. Lassiter as to Daniel Lewis Lee (rkc) (Entered: 09/14/1999) |
| 09/15/1999 | 913 | | TRANSCRIPT ( 1 volumes) of proceedings for the following date(s): 8/24/99 (sentencing before Judge Eisele) (rkc) (Entered: 09/15/1999) |
| 09/17/1999 | 916 | | RESPONSE by defendant Daniel Lewis Lee to motion for leave to intervene for the purpose of responding to the Government's motion regarding exhibits, and brief in support as to deft KEHOE [910–1] (dac) (Entered: 09/17/1999) |
| 09/20/1999 | 917 | | CJA Form 30Cp4 (Appointment of Counsel) supplemental appointment voucher #D37211 for Cathleen V. Compton as to Daniel Lewis Lee (rkc) (Entered: 09/21/1999) |
| 09/21/1999 | 919 | | ORDER by Judge G. T. Eisele granting motions for leave to intervene of MGA Films Inc. and New York Times Corp. for the purpose of responding to the Government's motion regarding exhibits, and brief in support as to deft |

Appellate Case: 20-2351    Page: 45    Date Filed: 07/04/2020 Entry ID: 4930235

| | | | |
|---|---|---|---|
| | | | KEHOE [910–1] (cc: all counsel and defendants) (rkc) (Entered: 09/21/1999) |
| 09/21/1999 | 920 | | ORDER by Judge G. T. Eisele directing the parties to attempt to reach a consent order that is consistent with th erulings and establishes procedures for public access to the exhibits in this case. The parties shall submit a proposed consent order to this Court for its consideration on or before 10/12/99. If the parties are unable to reach an agreement, they should so notify the Court in writing by 10/12/99, in which event each shall offer suggestions as to the appropriate procedures that the Court should impose. The Court will then proptly resolve the issue. (cc: all counsel and defendants) (rkc) (Entered: 09/21/1999) |
| 10/06/1999 | 922 | | ORDER by Judge G. T. Eisele denying motion to produce minutes or other records of meeting of death penalty committee [834–1] (cc: all counsel and defendants) (rkc) (Entered: 10/07/1999) |
| 10/13/1999 | 923 | | ORDER by Judge G. T. Eisele granting motion for order to be entered regarding security and distribution of exhibits It Is Therefore Ordered the New York Times and MGA Films shall be permitted to view the trial exhibits on 10/18 & 19/99 between 9:00 a.m. and 5:00 p.m. An agent of the ATF, or some other governmental employee who is familiar with the exhibits and their storage, will be present during all viewing. The New York Times and MGA Films will each pay its proportionate share of the $100 per hr fee needed to help defray the cost of having an ATF agent and or and another U S employee present during the review of the exhibits. The money will be paid to the U S Treasury through the Clerk of the District Court. No exhibits will leave the area where they are stored or the immediate vicinity of the area where they are stored and such exhibits will at all times remain under the control of the said governmental agents. The New York Times and MGA Films will provide scanners or other suitable equipment for the purpose of copying photographs, documents, audiotapes and videotapes. Filming equipment will be permitted. The U S will photocopy exhibits if request to do so using photocopy equipment provided by the Clerk of the District Court at $.50 per page payable to the Clerk of the District Court. [899–1] (cc: all counsel) (dac) (Entered: 10/14/1999) |
| 10/18/1999 | 924 | | CJA Form 30Cp4 (Appointment of Counsel) supplemental voucher D37211 for Cathleen Compton as to Daniel Lewis Lee (rkc) (Entered: 10/18/1999) |
| 11/04/1999 | 926 | | CJA Form 30Cp4 (Appointment of Counsel) supplemental voucher #D37211 for Cathleeen Compton as to Daniel Lewis Lee (rkc) (Entered: 11/04/1999) |
| 12/07/1999 | 929 | | CJA Form 30Cp4 (Appointment of Counsel) supplemental voucher #D37210 for Jack T. Lassiter as to Daniel Lewis Lee (rkc) (Entered: 12/07/1999) |
| 12/13/1999 | 930 | | CJA Form 30Cp4 (Appointment of Counsel) supplemental voucher D37211 for Cathleen Compton as to Daniel Lewis Lee (rkc) (Entered: 12/13/1999) |
| 12/13/1999 | 931 | | Opinion (8USCA) as to petition for writ of mandamus as to defendants' Kehoe and Lee (dac) (Entered: 12/13/1999) |
| 12/13/1999 | 932 | | MANDATE from Circuit Court of Appeals petition for a writ of mandamus is granted; remanding the matter back to District Court for proceedings consistent with the opinion of this court as to defendants Kehoe and Lee (dac) (Entered: 12/13/1999) |

| | | | |
|---|---|---|---|
| 01/14/2000 | 933 | | CJA Form 30Cp4 (Appointment of Counsel) supplemental voucher D37211 for Cathleen V. Compton as to Daniel Lewis Lee (rkc) (Entered: 01/14/2000) |
| 02/10/2000 | 934 | | MINUTES: HEARING (Ph. Cf.) as to Danny Lee to determine status of motions held before Judge G. Thomas Eisele. (Ct. Rep. –– Elaine Hinson) (mah) Modified on 02/10/2000 (Entered: 02/10/2000) |
| 02/16/2000 | 935 | | CJA Form 20Cp4 (Appointment of Counsel) supplemental voucher #D37211 for Cathleen Compton as to Daniel Lewis Lee (rkc) (Entered: 02/16/2000) |
| 02/18/2000 | 936 | | SUPPLEMENTAL MEMORANDUM by Daniel Lewis Lee in support of motion for order for correction of sentence, for a new sentencing phase of the trial, or for enforcement of a plea agreement [822–1] (former empl) Modified on 02/24/2000 (Entered: 02/18/2000) |
| 02/18/2000 | 937 | | MEMORANDUM by USA in support of response [850–1] to deft's motion for correction of sentence, for a new sentencing phase of the trial, or for enforcement of a plea agreement as to Daniel Lewis Lee (former empl) (Entered: 02/22/2000) |
| 02/18/2000 | 938 | | ADDITIONAL BRIEF IN RESPONSE by USA to [834–1] govt's violation of its death penalty protocol (former empl) (Entered: 02/22/2000) |
| 03/01/2000 | 939 | | SUPPLEMENTAL BRIEF by USA (received by Judge Eisele 6/24/99) in support of government's response to defendant Lee's motion for new sentencing phase of the trial (#822) [850–1]. (mah) (Entered: 03/03/2000) |
| 03/09/2000 | 940 | | CJA Form 30Cp4 (Appointment of Counsel) supplemental voucher #37211 appointing Cathleen Compton as to Daniel Lewis Lee (rkc) (Entered: 03/09/2000) |
| 03/21/2000 | 941 | | MEMORANDUM, Opinion and Order: That the Department of Justice and the Attorney General are ordered to properly review and act upon the U.S. Attorney's request to decertify or withdraw the death penalty notice in Deft Lee's case in accordance with the procedures mandated by the Death Penalty Protocol before the Attorney General, herself, makes the final decision whether to grant or deny that request. It is further ordered that deft. Lee's Motion for a New Penalty Phase Trial be granted. Accordingly if the Attorney General denies the request to decertify or withdraw the death penalty notice, then the Court will hold a new penalty phase trial for deft. Lee. If the Attorney General grants the request to decertify or withdraw the death penalty notice, then the Order for a new penalty phase trial will be moot, and the Court will sentence deft. Lee to life imprisonment without the possibility of release. by Judge G. T. Eisele (cc: all counsel and defendants) (rkc) (Entered: 03/21/2000) |
| 04/14/2000 | 942 | | NOTICE of Appeal to Circuit Court by plaintiff USA [941–1] (2 certified copies to Clerk USCA8)(cc: all counsel and defendant) (dac) (Entered: 04/14/2000) |
| 04/14/2000 | | | Docket Modification (Utility Event) exculdable start as to Daniel Lewis Lee (dac) (Entered: 04/14/2000) |
| 04/19/2000 | | | DOCKETING LETTER: 8 USCA Number 00–1975; court reporter's transcripts due 5/30/00; counsel to proceed on appendix as defendant Lee's appeal by USA (dac) (Entered: 04/19/2000) |

Appellate Case: 20-2351     Page: 47     Date Filed: 07/04/2020 Entry ID: 4930235

| | | | |
|---|---|---|---|
| 04/20/2000 | 943 | | ORDER by Mag. Judge John F. Forster Jr. granting motion to appoint Dr. Cunningham as an expert to assist counsel for Daniel Lewis Lee. (cc: all counsel and defendants) (rkc) (Entered: 04/20/2000) |
| 04/20/2000 | 944 | | CJA Form 31 (Expert Services) as to Daniel Lewis Lee (rkc) (Entered: 04/20/2000) |
| 05/01/2000 | 945 | | DESIGNATION for Record on Appeal by USA as to defendant LEE (dac) (Entered: 05/01/2000) |
| 05/02/2000 | 946 | | AMENDED DESIGNATION of Record on Appeal by USA as to defendant Danny Lee (dac) (Entered: 05/04/2000) |
| 05/09/2000 | 947 | | TRANSCRIPT (1 volume) of proceedings for the following date: Tuesday, 11/10/98 (arguments on motions to sever before the Honorable G. Thomas Eisele) (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/27/2002) |
| 05/09/2000 | 948 | | TRANSCRIPT (1 volume) of proceedings for the following date: Monday, 12/07/98 (motions hearing before the Honorable G. Thomas Eisele) (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/27/2002) |
| 05/09/2000 | 949 | | TRANSCRIPT (volume 2) of proceedings for the following date: Tuesday, 12/08/98 (motions hearing before the Honorable G. Thomas Eisele) (Unsealed pursuant to Order dated 06/25/02) (cdw) (Entered: 06/27/2002) |
| 05/10/2000 | | | CERTIFICATE of Record (15 vols transcripts 1–15) transmitted to USCA re appeal of Lee [942–1] (dac) (Entered: 05/25/2000) |
| 05/12/2000 | 951 | | SEALED MOTION by deft. Lee (mah) (Entered: 05/12/2000) |
| 05/12/2000 | 952 | | SEALED MOTION by deft. Lee (mah) (Entered: 05/12/2000) |
| 05/12/2000 | 953 | | SEALED RESPONSE by USA (mah) (Entered: 05/12/2000) |
| 05/12/2000 | | | Docket Modification (Utility Event) finding the sealed MOTION by deft. Lee [951–1] moot due to entry of 4/15/99 order by Magistrate Judge Forster. (mah) (Entered: 05/12/2000) |
| 05/12/2000 | | | Docket Modification (Utility Event) finding the sealed MOTION by deft. Lee [952–1] moot due to entry of 4/15/99 order by Magistrate Judge Forster. (mah) (Entered: 05/12/2000) |
| 05/12/2000 | 954 | | DESIGNATION for Record on Appeal by Daniel Lewis Lee (dac) (Entered: 05/18/2000) |
| 05/17/2000 | | | CERTIFICATE of Record (33 vols of trial transcripts) (16–39 & 41 – 47)transmitted to USCA re appeal of Lee [942–1] (dac) (Entered: 05/25/2000) |
| 05/25/2000 | | | CERTIFICATE of Clerk's Record; 3 volumes transcripts; and 25 in camera envelopes transmitted to USCA re appeal of LEE [942–1] (dac) (Entered: 05/25/2000) |
| 05/11/2001 | | | MINUTES: PHONE CONF. before Judge G. Thomas Eisele regarding recent motion filed by defendant Kehoe. Attorneys Hampton, Sullivan and Stripling present. Discussion of correspondence from Buford McDonald. Discussion of |

Appellate Case: 20-2351    Page: 48    Date Filed: 07/04/2020 Entry ID: 4930235

| | | | |
|---|---|---|---|
| | | | remand. (Court reporter, Christa Newburg) (cjw) (Entered: 05/11/2001) |
| 06/05/2001 | 958 | | ORDER (8 USCA) on the Court's own motion, it is ordered that the appeal of Chevie Kehoe shall proceed; Clerk's record due 7/6/01, transcripts due 7/3/01 (dac) (Entered: 06/05/2001) |
| 08/22/2001 | 960 | | DESIGNATION for Record on Appeal by USA as to Kehoe appeal (dac) (Entered: 08/22/2001) |
| 08/28/2001 | | | CERTIFICATE of Clerk's Record; transcript of 6/15/99 sentencing transmitted to USCA re appeal of Kehoe [942–1] (dac) (Entered: 08/28/2001) |
| 10/19/2001 | | | MINUTES: PHONE CONF. before Judge G. Thomas Eisele with the parties to discuss Motion for New Trial and Request for Hearing on Motion for New Trial. Hearing set for December 18, 2001, at 9:30 a.m. (Court reporter, Carolyn Fant) (cjw) (Entered: 10/19/2001) |
| 11/16/2001 | 973 | | Return on WRIT as to Daniel Lewis Lee unexecuted ASR received from U S Attorney's office [973–1] (dac) (Entered: 11/16/2001) |
| 11/16/2001 | 974 | | Return on WRIT as to Bufford McDonald, unexecuted previous writ received [974–1] (dac) (Entered: 11/16/2001) |
| 12/18/2001 | 975 | | MINUTES: HEARING as to Chevie O'Brien Kehoe and Daniel Lewis Lee held before Judge G. T. Eisele on C. Kehoe's motion and D. Lee's oral motion for new trial based of newly discovered evidence. Court grants D. Lee's oral motion to join, in part, Kehoe's motion for new trial. Defts. directed to file supplemental briefs by 1/15/02; govt. shall file response by 1/25/02. The Court finds the motion for hearing on motion for new trial based on newly discovered evidence and prosecutorial misconduct [961–1] moot. (Ct. Rep. –– Elaine Hinson) (mah) (Entered: 12/18/2001) |
| 12/24/2001 | 977 | | CJA Form 20Cp4 (Appointment of Counsel) appointing James W. Wyatt #1002587 for witness Buford McDonald (rkc) Modified on 12/26/2001 (Entered: 12/24/2001) |
| 01/07/2002 | 981 | | RESPONSE by defendant Daniel Lewis Lee to motion to unseal record [979–1] (cdw) (Entered: 01/07/2002) |
| 01/08/2002 | 982 | | MOTION for order to join in Chevie Kehoe's motion for a new trial based on newly discovered evidence and prosecutorial misconduct by Daniel Lewis Lee (cdw) (Entered: 01/08/2002) |
| 01/23/2002 | 985 | | TRANSCRIPT (1 volume) of proceedings for the following date(s): Tuesday, 12/18/01 (hearing on motion for new trial before the Honorable G Thomas Eisele) (cdw) (Entered: 01/23/2002) |
| 02/11/2002 | 987 | | TRANSCRIPT (1 volume) excerpted testimony from proceedings held on 12/22/98: Ct. Rep. –– Carolyn Fant. (Hearing on Motion to Disqualify U.S. Atty [435–1] ) (mah) (Entered: 02/11/2002) |
| 02/13/2002 | | | DOCKET NOTE: 49 volumes of transcripts and 25 envelopes of in camera documents returned from Clerk USCA8 (dac) Modified on 04/24/2002 (Entered: 02/13/2002) |
| 02/19/2002 | 989 | | |

Appellate Case: 20-2351    Page: 49    Date Filed: 07/04/2020 Entry ID: 4930235

| | | | |
|---|---|---|---|
| | | | Opinion (8USCA) the order of the district court for a new penalty hearing as to Lee is reversed, and the sentence of death is reinstated. (dac) (Entered: 02/19/2002) |
| 02/19/2002 | 990 | | MANDATE from Circuit Court of Appeals reversing decision of the District Court [Appeal as to defendant Lee [942−1] (dac) (Entered: 02/19/2002) |
| 03/04/2002 | 992 | | NOTICE of sentencing hearing Monday, 05/13/02 at 11:00 a.m. as to Daniel Lewis Lee before Judge G. T. Eisele (cdw) (Entered: 03/04/2002) |
| 05/13/2002 | 995 | | ORDER by Judge G. T. Eisele denying defts Chevie Kehoe & Danny Lee's motion for new trial based on newly discovered evidence and prosecutorial misconduct [982−1], [955−1] (cc: all counsel and defendants) (cdw) (Entered: 05/13/2002) |
| 05/13/2002 | 996 | | JUDGMENT and Commitment by Judge G. T. Eisele issued to U.S. Marshal sentencing Daniel Lewis Lee (2) count(s) 1s, 2s, 3s−5s to DEATH on each of Counts 3s, 4s, and 5s; and LIFE imprisonment on Counts 1s and 2s to run concurrent with each other ; dismissing counts 6s, 7s on the motion of the govt as to Daniel Lewis Lee (cc: all counsel) (cdw) (Entered: 05/13/2002) |
| 05/13/2002 | 997 | | MINUTES: SENTENCE as to Daniel Lewis Lee held before Judge G. Thomas Eisele. Sentence imposed. Deft. remanded to custody of U. S. Marshal. (Ct. Rep. −− Elaine Hinson) (mah) (Entered: 05/13/2002) |
| 05/13/2002 | | | Docket Modification (Utility Event) the following motions were untermed due to the unsealing of various orders pursuant to the Order of 06/25/02, and thus are moot: motion for order to lift gag order [892−1], motion to suppress evidence [390−1], motion for review of disputed materials [343−1], motion to suppress evidence procured by prosecutorial promises [295−1], motion for hearing [278−2], motion to inspect information and evidence in aggravation [258−2], motion to compel government to protect/relocate witness or excuse witness [171−1], motion for order for the Court to retain jurisdiction [170−1], motion to sever [149−1], motion to dismiss case [149−2], motion to dismiss appointed counsel [121−1], motion for leave to proceed pro se [121−2], motion for severance [95−1] (cdw) (Entered: 06/27/2002) |
| 05/16/2002 | 998 | | NOTICE of Appeal to Circuit Court by defendant Daniel Lewis Lee, [996−6] (2 certified copies to Clerk USCA8 (cc: all counsel) (dac) (Entered: 05/16/2002) |
| 05/16/2002 | 999 | | MOTION for order to provide defendant with all transcripts requested by defendant at his sentencing hearing by Daniel Lewis Lee (dac) (Entered: 05/16/2002) |
| 05/17/2002 | 1000 | | RESPONSE by plaintiff USA to motion for order to provide defendant with all transcripts requested by defendant at his sentencing hearing [999−1] (dac) (Entered: 05/17/2002) |
| 05/23/2002 | 1001 | | ORDER by Judge G. T. Eisele granting motion for order to provide defendant with all transcripts requested by defendant at his sentencing hearing [999−1] Mr Lee's counsel−both his current counsel and any newly appointed counsel may provide him with copies of the transcripts of the trial testimony of FBI & ATF agents as well as copies of any other unsealed testimony. The Court emphasizes that Mr. Lee is responsible for paying the |

July 3 2020 p50

Appellate Case: 20-2351     Page: 50     Date Filed: 07/04/2020 Entry ID: 4930235

| | | | |
|---|---|---|---|
| | | | costs associated with producing such transcripts (cc: all counsel and defendant) (dac) (Entered: 05/23/2002) |
| 06/04/2002 | | | DOCKETING LETTER: 8 USCA Number 02–2389 ; court reporter's transcripts due 6/25/02 ; clerk's record on appeal due 6/27/02 as to Daniel Lee (dac) (Entered: 06/04/2002) |
| 06/21/2002 | 1002 | | JUDGMENT and Commitment returned executed 5/30/02 , Daniel Lewis Lee (2) count(s) 3s–5s, 2s, 1s; defendant delivered to U. S. Penitentiary, Terre Haute, IN (dac) (Entered: 06/21/2002) |
| 06/25/2002 | 1003 | | TRANSCRIPT ( 1 volume) of proceedings for the following date: 5/13/02 sentencing of Daniel Lee ( [998–1] ) (dac) (Entered: 06/25/2002) |
| 06/25/2002 | 1004 | | ORDER by Judge G. T. Eisele granting in part and denying in part deft Chevie Kehoe's motion to unseal record [979–1]; the following documents shall be unsealed: document nos. 95, 113, 120–121, 149, 170–172, 191, 194, 207, 213, 238, 244, 246, 253, 263–264, 269, 273, 278–280, 282, 286–287, 290, 294–296, 300–301, 306, 308–311, 313, 316, 320–322, 325, 327, 329, 331–332, 339, 343, 346–348, 351, 354, 356, 374, 376, 388–393, 398, 400, 405–407, 414, 418, 420–421, 426, 436, 440, 445–446, 457–459, 501, 518, 523, 529, 540, 543–545, 549, 553–554, 557, 559–561, 564–566, 02/18/99 correspondence, 575, 580, 581, 02/23/99 correspondence, 588, 590, 592–596, 599, 602, 604–605, 608, 627–628, 633, 643, 646, 657, 662, 664–665, 671–672, 683, 04/05/99 correspondence, 732, 734, 736, 04/19/99 correspondence, 767, 796, 824–825, 827, 829, 831, 841–842, 847, 858–859, 861, 892, 898, 902, 947–949; all other documents will remain sealed until the resolution of the appeals at which time the Court will consider unsealing the remaining documents upon the filing of an appropriate motion (cc: all counsel and defendants) (cdw) Modified on 06/28/2002 (Entered: 06/26/2002) |
| 06/27/2002 | 1005 | | DESIGNATION for Record on Appeal by Daniel Lewis Lee (dac) (Entered: 06/28/2002) |
| 06/27/2002 | | | CERTIFICATE of Record 45 vols of jury trial transcripts transmitted to USCA re appeal of Daniel Lee [998–1] (dac) (Entered: 06/28/2002) |
| 07/01/2002 | 1006 | | NOTICE of filing a petition for writ of certiorari with the Supreme Court as to Daniel Lee, Supreme Court #01–10510 (dac) (Entered: 07/01/2002) |
| 07/16/2002 | 1007 | | CJA Form 30Cp4 (Appointment of Counsel) supplemental voucher #37211 appointing Cathleen Compton as to Daniel Lewis Lee (rkc) (Entered: 07/16/2002) |
| 07/24/2002 | | | CERTIFICATE of Clerk's Record; in camera document #806; transcripts of 5/19/99; 6/24/99; 6/29/99; 12/18/01; 5/13/02 transmitted to USCA re appeal of Daniel Lee [998–1] (dac) (Entered: 07/24/2002) |
| 07/30/2002 | 1008 | | CJA Form 20 (Attorney Payment Voucher #000613000013 D37210) by Daniel Lewis Lee (cdw) (Entered: 07/30/2002) |
| 09/24/2002 | 1011 | | ORDER by Judge G. T. Eisele directing that the Clerk's Minutes [413–1] of the 11/19/98 ex parte In Camera hearing on the government's motion for protective order be unsealed; directing that the transcript of the 11/19/98 telephone conference regarding the In Camera hearing be filed unsealed and |

| | | | |
|---|---|---|---|
| | | | furnished to deft Lee's counsel, Cheryl Pilate (cc: all counsel and defendants) (cdw) (Entered: 09/25/2002) |
| 09/24/2002 | 1012 | | TRANSCRIPT (1 volume) of proceedings for the following date: Thursday, 11/19/98 (telephone conference before the Honorable G Thomas Eisele) (filed unsealed pursuant to Order of 09/24/02) (cdw) (Entered: 09/25/2002) |
| 11/07/2002 | 1013 | | TRANSCRIPT ( 1 volume) of proceedings for the following date: 1/30/98 attorney conference ( [998–1] ) (dac) (Entered: 11/08/2002) |
| 11/07/2002 | 1014 | | TRANSCRIPT ( 1 volume) of proceedings for the following date: 2/9/98 attorney conference ( [998–1] ) (dac) (Entered: 11/08/2002) |
| 11/07/2002 | 1015 | | TRANSCRIPT ( 1 volume) of proceedings for the following date: 4/9/98 pretrial conference ( [998–1] ) (dac) (Entered: 11/08/2002) |
| 11/07/2002 | 1016 | | TRANSCRIPT ( 1 volume) of proceedings for the following date: 6/3/98 telephone conference ( [998–1] ) (dac) (Entered: 11/08/2002) |
| 11/07/2002 | 1017 | | TRANSCRIPT ( 1 volume) of proceedings for the following date: 10/13/98 pretrial conference ( [998–1] ) (dac) (Entered: 11/08/2002) |
| 11/07/2002 | 1018 | | TRANSCRIPT ( 1 volume) of proceedings for the following date: 12/16/98 attorney conference ( [998–1] ) (dac) (Entered: 11/08/2002) |
| 11/07/2002 | 1019 | | TRANSCRIPT ( 1 volume) of proceedings for the following date: 12/17/98 telephone conference ( [998–1] ) (dac) (Entered: 11/08/2002) |
| 11/07/2002 | 1020 | | TRANSCRIPT ( 1 volume) of proceedings for the following date: 1/12/99 juror questionnaire ( [998–1] ) (dac) (Entered: 11/08/2002) |
| 11/07/2002 | 1021 | | TRANSCRIPT ( 1 volume) of proceedings for the following date: 1/29/99 attorney conference ( [998–1] ) (dac) (Entered: 11/08/2002) |
| 11/07/2002 | 1022 | | TRANSCRIPT ( 1 volume) of proceedings for the following date: 2/24/99 attorney conference ( [998–1] ) (dac) (Entered: 11/08/2002) |
| 11/07/2002 | 1023 | | SEALED document: transcript of 2/9/98 in camera conference (dac) (Entered: 11/08/2002) |
| 11/07/2002 | 1024 | | SEALED document: transcript of 2/24/99 in camera conference (dac) (Entered: 11/08/2002) |
| 11/08/2002 | 1025 | | TRANSCRIPT ( 1 volume) of proceedings for the following date: 2/10/00 telephone conference ( [998–1] ) (dac) (Entered: 11/08/2002) |
| 11/12/2002 | 1026 | | TRANSCRIPT ( 1 volume) of proceedings for the following date: 5/11/01 ( [998–1] ) (dac) (Entered: 11/12/2002) |
| 11/12/2002 | | | CERTIFICATE of Record: 12 volumes transcripts and 2 volumes transcripts of 2/9/98 & 2/24/99 in camera proceedings transmitted to USCA re Lee appeal [998–1] (dac) (Entered: 11/12/2002) |
| 11/18/2002 | 1027 | | LETTER to court from Supreme Court, petition for a writ of certiorari is denied as to Daniel Louis Lee (dac) (Entered: 11/18/2002) |
| 11/20/2002 | | | DOCKET NOTE: sentencing transcript of Kehoe returned from USCA8 (dac) (Entered: 11/20/2002) |

Appellate Case: 20-2351    Page: 52    Date Filed: 07/04/2020 Entry ID: 4930235

| | | | |
|---|---|---|---|
| 01/22/2003 | 1028 | | Opinion (8USCA) as to appeal of Chevie Kehoe (dac) (Entered: 01/22/2003) |
| 01/22/2003 | 1029 | | MANDATE from Circuit Court of Appeals judgment is affirmed as to appeal of Chevie Kehoe (dac) (Entered: 01/22/2003) |
| 01/27/2003 | 1030 | | TRANSCRIPT ( 1 volume) of proceedings for the following date: 12/22/98 motions hearing ( [998–1] ) (dac) (Entered: 01/27/2003) |
| 01/27/2003 | | | CERTIFICATE of Record: transcript of 12/22/98 transmitted to USCA re appeal of Daniel Lee [998–1] (dac) (Entered: 01/27/2003) |
| 05/01/2003 | 1031 | | NOTICE of filing a petition for writ of certiorari with Supreme Court #02–10091 as to Chevie Kehoe (dac) (Entered: 05/01/2003) |
| 06/02/2003 | 1032 | | LETTER to court from Supreme Court, the petition for a writ of certiorari is denied as to Chevie Kehoe (dac) (Entered: 06/02/2003) |
| 10/15/2004 | | | DOCKET NOTE: 64 volumes of transcripts and sealed documents #806, 1023 & 1024; transcript #867 returned from USCA8 as to the appeal of Lee (dac) (Entered: 10/15/2004) |
| 11/30/2004 | 1048 | | RESPONSE by Chevie O'Brien Kehoe to pltf's motion for discovery [1043–1] (lej) (Entered: 11/30/2004) |
| 12/16/2004 | 1049 | | MINUTES: HEARING (Ph.Cf.) on Govt's. motion for discovery to be conducted in relation to defendant Chevie Kehoe's 2255 petition held before Judge G. T. Eisele. Craig Lambert and Patrick Benca appeared for defendant, Chevie Kehoe; Mark Hampton and Tom Sullivan appeared as defendant, Chevie Kehoe's former counsel; Dan Stripling appeared for government. Court finds that defendant/petitioner Chevie Kehoe waived the attorney–client privilege as to any communications in reference to specific ineffective assistance of counsel allegations. Court finds that former counsel may voluntarily meet with government's atty., or they may require the government to proceed formally. The Court further finds that a conflict of representation by atty. Patrick Benca exists and directs that he file a motion to withdraw forthwith. The Court grants the oral motion by atty. Lambert for appointment of co–counsel to replace Mr. Benca; further directs Mr. Lambert to notify the Court within ten days if successor is found; otherwise the Court will appoint someone. Court directs that Amended 2255 Petition be filed no later than 3/31/05; deadline for completion of discovery set for 7/1/05. (Ct. Rep. –– Elaine Hinson) (mah) (Entered: 12/16/2004) |
| 03/03/2005 | 1055 | | NOTICE of filing a petition for writ of certiorari with Supreme Court as to Daniel Lee, Supreme Court #04–8773 (dac) Modified on 03/04/2005 (Entered: 03/03/2005) |
| 07/08/2005 | 1070 | | TRANSCRIPT of Proceedings as to Chevie O'Brien Kehoe, Daniel Lewis Lee held on 4/7/99 before Judge G Thomas Eisele. Court Reporter: Power. FILED UNDER SEAL (dac ) (Entered: 07/08/2005) |
| 07/12/2005 | 1072 | | MANDATE of USCA (certified copy of opinion & judgmnet) as to Daniel Lewis Lee re 998 Notice of Appeal – Final Judgment of the district court is affirmed (dac ) (Entered: 07/13/2005) |
| 07/12/2005 | 1073 | | Letter from Supreme Court petition for writ of certiorari is denied as to Daniel Lee (dac, ) (Entered: 07/13/2005) |

Appellate Case: 20-2351     Page: 53     Date Filed: 07/04/2020 Entry ID: 4930235

| 08/17/2005 | 1078 | | MOTION to Appoint Counsel and Memorandum in Support by Daniel Lewis Lee. (jph, ) (Entered: 08/18/2005) |
|---|---|---|---|
| 08/26/2005 | 1079 | | ORDER granting 1078 Motion to Appoint Counsel David A. Ruhnke and Laurence E. Komp for Daniel Lewis Lee (2). Signed by Judge G. Thomas Eisele on 8/26/05. (jph, ) (Entered: 08/30/2005) |
| 08/30/2005 | 1080 | | Certificate of Mailing by the Clerk re 1079 Order on Motion to Appoint Counsel (jph, ) (Entered: 08/30/2005) |
| 08/30/2005 | 1081 | | Certificate of Mailing by the Clerk re 1079 Order on Motion to Appoint Counsel. Copies mailed to Atty: David Ruhnke and Larry Komp. (jph, ) (Entered: 08/30/2005) |
| 09/09/2005 | | | ***Clear Appeal Flag (dac ) (Entered: 09/09/2005) |
| 01/17/2006 | 1094 | | SEALED MOTION by Daniel Lewis Lee. (jph, ) (Entered: 01/17/2006) |
| 01/19/2006 | 1095 | | SEALED MOTION by Daniel Lewis Lee. (jph, ) (Entered: 01/19/2006) |
| 01/19/2006 | 1096 | | SEALED ORDER (Hard copies sent to defense attorneys) (ade) Modified on 1/19/2006 to correct text(ade). (Entered: 01/19/2006) |
| 01/19/2006 | 1097 | | CJA 30 as to Daniel Lewis Lee: Appointment of Attorney Laurence E. Komp for Daniel Lewis Lee. Signed by Judge G. Thomas Eisele on 1/18/06. Signed Nunc Pro Tunc 8/26/05. (jph, ) (Modified entry on 5/8/2006 to correct text – incorrect event entered) (bfw). (Entered: 01/19/2006) |
| 01/19/2006 | 1098 | | CJA 30 as to Daniel Lewis Lee: Appointment of Attorney David A. Ruhnke for Daniel Lewis Lee. Signed by Judge G. Thomas Eisele on 1/18/06. Signed Nunc Pro Tunc 8/26/05 (jph) (Modified entry on 5/8/2006 to correct text – incorrect event entered) (bfw). (Entered: 01/19/2006) |
| 01/19/2006 | 1099 | | Sealed ORDER granting 1095 Sealed Motion as to Daniel Lewis Lee (2). Signed by Judge G. Thomas Eisele on 1/19/06. Hard Copies mailed to Defendant's Counsel (jph, ) (Entered: 01/23/2006) |
| 01/31/2006 | 1100 | | SEALED MOTION by Daniel Lewis Lee. (jph, ) (Entered: 01/31/2006) |
| 02/02/2006 | 1102 | | CJA 30: Appointment of Attorney (Sealed). Signed by Judge G. Thomas Eisele on 2/2/06. (jph, ) (Entered: 02/03/2006) |
| 02/03/2006 | 1103 | | SEALED ORDER as to Daniel Lewis Lee (2). Signed by Judge G. Thomas Eisele on 2/3/06. (jph, ) (Entered: 02/03/2006) |
| 04/21/2006 | | | Staff Note: CJA 30 voucher no. 06012700003–2 for $21,799.23 paid to David Ruhnke for work from 1/1/06 to 3/31/06 on behalf of Daniel Lewis Lee. (mar) (Entered: 04/28/2006) |
| 05/08/2006 | | | NOTICE OF DOCKET CORRECTION: 1097 CJA 20 – Appointment; 1098 CJA 20 – Appointment – (modified entries to correct text; incorrect event entered) (bfw) (Entered: 05/08/2006) |
| 05/23/2006 | 1112 | | SEALED MOTION (lmr, ) (Entered: 05/23/2006) |
| 05/24/2006 | 1113 | | SEALED ORDER granting 1112 SEALED MOTION. Signed by Judge G. Thomas Eisele on 5/24/2006. (lmr, ) (Entered: 05/25/2006) |

| Date | No. | | Description |
|---|---|---|---|
| 05/24/2006 | | | Staff Note: CJA Voucher NO. 06030300023–2 for $22,726.87 paid to Laurence Komp for work from 1/1/06 to 4/30/06 on behalf of Daniel Lewis Lee habeas petition. (mar) (Entered: 05/26/2006) |
| 05/24/2006 | | | ***Motions terminated as to Daniel Lewis Lee: 1112 SEALED MOTION, pursuant to order 1113 (lmr, ) (Entered: 05/26/2006) |
| 05/25/2006 | 1114 | | CERTIFICATE OF MAILING by the Clerk re 1113 Order (lmr, ) (Entered: 05/25/2006) |
| 06/06/2006 | 1116 | | SEALED MOTION. (lmr, ) (Entered: 06/06/2006) |
| 06/12/2006 | 1117 | | SEALED ORDER as to 1116 SEALED MOTION . Signed by Judge G. Thomas Eisele on 6/12/2006. (lmr, ) Modified on 6/12/2006 to add descriptor, Sealed (lmr). (Entered: 06/12/2006) |
| 06/26/2006 | 1118 | | MOTION to Set Aside Judgment by Daniel Lewis Lee. (Attachments: # 1 Affidavit of Movant)(Ruhnke, David) (Entered: 06/26/2006) |
| 06/29/2006 | | | ***Motions terminated as to Chevie O'Brien Kehoe, Daniel Lewis Lee, Faron Earl Lovelace, Kirby Keith Kehoe: 1112 SEALED MOTION moot due to 1113 , 1116 SEALED MOTION moot due to 1117 . (cjw, ) (Entered: 06/29/2006) |
| 07/14/2006 | | | Staff Note: CJA 20 voucher no. 05ARE600627 for $5,004.00 paid to Patrick Benca for work from 4/15/04 to 12/20/04 on behalf of Daniel Lewis Lee (mar) (Entered: 08/04/2006) |
| 08/07/2006 | | | Staff Note: CJA 30 voucher no. 0601270003–3 for $18,600.30 paid to David Ruhnke for work from 4/1/06 to 6/30/06 on behalf of Daniel Lewis Lee (mar ) (Entered: 08/18/2006) |
| 09/26/2006 | 1119 | | ORDER directing the government to file a response by November 17, 2006 re 1118 MOTION to Set Aside Judgment filed by Daniel Lewis Lee. Signed by Judge G. Thomas Eisele on 9/26/2006. (lmr, ) (Entered: 09/26/2006) |
| 10/26/2006 | 1120 | | MOTION for Order by United States of America as to Daniel Lewis Lee. (Stripling, Clarence) (Entered: 10/26/2006) |
| 10/26/2006 | 1121 | | ORDER granting 1120 Motion for Order as to Daniel Lewis Lee (2). Signed by Judge G. Thomas Eisele on 10/26/2006. (lmr) (Entered: 10/26/2006) |
| 11/13/2006 | 1122 | | MOTION for Extension of Time to File Response/Reply as to 1118 MOTION to Set Aside Judgment *2255 motion* by United States of America as to Daniel Lewis Lee. (Stripling, Clarence) (Entered: 11/13/2006) |
| 11/16/2006 | 1123 | | (This is a TEXT ENTRY ONLY. There is no pdf document associated with this entry.) ORDER as to Daniel Lewis Lee GRANTING 1122 MOTION for Extension of Time to File Response/Reply as to 1118 MOTION to Set Aside Judgment *2255 motion* filed by United States of America. USA has up to and including 12/8/06 . Signed by Judge G. Thomas Eisele on 11/16/06. (cjw, ) (Entered: 11/16/2006) |
| 11/20/2006 | 1124 | | NOTICE of Change of Address by Laurence E. Komp (Komp, Laurence) (Entered: 11/20/2006) |
| 12/06/2006 | 1126 | | |

Appellate Case: 20-2351    Page: 55    Date Filed: 07/04/2020 Entry ID: 4930235

| | | | |
|---|---|---|---|
| | | | RESPONSE to Motion by United States of America as to Daniel Lewis Lee re 1118 MOTION to Set Aside Judgment (Attachments: # 1 # 2 # 3 # 4 # 5)(Stripling, Clarence) (Entered: 12/06/2006) |
| 12/15/2006 | 1127 | | Consent MOTION to Extend Time *and set date for reply* by Daniel Lewis Lee. (Ruhnke, David) (Entered: 12/15/2006) |
| 12/18/2006 | 1128 | | (This is a TEXT ENTRY ONLY. There is no pdf document associated with this entry.) ORDER as to Daniel Lewis Lee GRANTING 1127 Consent MOTION to Extend Time *and set date for reply* to the response to the Motion to vacate filed by Daniel Lewis Lee. Movant has up to and including March 19, 2007 . Signed by Judge G. Thomas Eisele on 12/18/06. (cjw, ) (Entered: 12/18/2006) |
| 12/18/2006 | 1129 | | CERTIFICATE OF MAILING by the Clerk re 1128 Order, Terminate Motions, (cjw, ) (Entered: 12/18/2006) |
| 03/13/2007 | 1130 | | Consent MOTION for Extension of Time to File Response/Reply as to 1126 Response to Motion *Up to and Including April 2, 2007* by Daniel Lewis Lee (Komp, Laurence) (Entered: 03/13/2007) |
| 03/19/2007 | 1131 | | (This is a TEXT ENTRY ONLY. There is no pdf document associated with this entry.) ORDER as to Daniel Lewis Lee GRANTING 1130 Consent MOTION for Extension of Time to File Response/Reply as to 1126 Response to Motion *Up to and Including April 2, 2007* filed by Daniel Lewis Lee. Signed by Judge G. Thomas Eisele on 3/19/07. (cjw) (Entered: 03/19/2007) |
| 03/29/2007 | 1132 | | Consent MOTION for Extension of Time to File Response/Reply as to 1126 Response to Motion *Up to and Including April 9, 2007* by Daniel Lewis Lee (Komp, Laurence) (Entered: 03/29/2007) |
| 03/30/2007 | 1133 | | (This is a TEXT ENTRY ONLY. There is no pdf document associated with this entry.) ORDER GRANTING RE 1132 Consent MOTION for Extension of Time to File Response/Reply as to 1126 Response to Motion *Up to and Including April 9, 2007* filed by Daniel Lewis Lee. Signed by Judge G. Thomas Eisele on 3/30/07. (cjw) (Entered: 03/30/2007) |
| 04/09/2007 | 1134 | | REPLY TO RESPONSE to Motion by Daniel Lewis Lee re 1118 MOTION to Set Aside Judgment (Komp, Laurence) (Entered: 04/09/2007) |
| 04/10/2007 | 1135 | | APPENDIX TO BRIEF 1134 by Daniel Lewis Lee; Compact Disk of verdict sheets in federal capital cases, referred to in Footnote 22 of Defendant's Brief. (lmr) (Entered: 04/10/2007) |
| 06/11/2007 | 1136 | | SEALED MOTION. (lmr) (Entered: 06/11/2007) |
| 06/11/2007 | 1137 | | SEALED ORDER. Signed by Judge G. Thomas Eisele on 6/11/2007. (lmr) (Entered: 06/11/2007) |
| 06/12/2007 | 1138 | | RESPONSE in Support by Daniel Lewis Lee re 1118 MOTION to Set Aside Judgment , *supplemental submisssion re mtDNA results* (Attachments: # 1 Attachment A – mtDNA report)(Ruhnke, David) (Entered: 06/12/2007) |
| 07/18/2007 | 1139 | | BRIEF in Support by Daniel Lewis Lee re 1118 MOTION to Set Aside Judgment *Related to DNA Exclusion* (Komp, Laurence) (Entered: 07/18/2007) |

| | | | |
|---|---|---|---|
| 08/01/2007 | 1140 | | (This is a TEXT ENTRY ONLY. There is no pdf document associated with this entry.) ORDER GRANTING oral motion by the Government for extension of time to file a supplemental reply to the supplement filed by Petitioner Lee Doc.# 1138 as to Daniel Lewis Lee. The Government has up to and including August 14, 2007 to file its supplemental reply. Signed by Judge G. Thomas Eisele on 8/1/07. (cjw) (Entered: 08/01/2007) |
| 08/14/2007 | 1141 | | MOTION for Extension of Time to File Response/Reply *to Petitioner's Supplement* by United States of America as to Daniel Lewis Lee (Stripling, Clarence) (Entered: 08/14/2007) |
| 08/15/2007 | 1142 | | (This is a TEXT ENTRY ONLY. There is no pdf document associated with this entry.)ORDER granting 1141 Motion for Extension of Time to File Response/Reply as to Daniel Lewis Lee. The Government has up to and including August 21, 2007, to file its supplemental reply in response to petitioner Lee's supplement. Signed by Judge G. Thomas Eisele on 8/15/07.(sgm) (Entered: 08/15/2007) |
| 08/21/2007 | 1144 | | BRIEF in Opposition by United States of America as to Daniel Lewis Lee re 1118 MOTION to Set Aside Judgment – *United States' Supplemental Memorandum in Opposition to Motion Pursuant to 28 U.S.C.§ 2255 to Vacate Conviction and Sentence* (Attachments: # 1 Exhibit Exhibit B# 2 Exhibit Exhibit C# 3 Exhibit Exhibit D# 4 Exhibit Exhibit E)(Stripling, Clarence) (Entered: 08/21/2007) |
| 08/29/2007 | 1145 | | Government's Supplement to Its Supplemental Memorandum 1144 in Opposition to Motion Pursuant to 28 USC 2255 to Vacate Conviction and Sentence.(lmr) (Entered: 08/29/2007) |
| 09/04/2007 | 1146 | | Unopposed MOTION for Extension of Time to File Response/Reply *to United States' Reply and Additional Authority* by Daniel Lewis Lee (Komp, Laurence) (Entered: 09/04/2007) |
| 09/05/2007 | 1147 | | (This is a TEXT ENTRY ONLY. There is no pdf document associated with this entry.)ORDER granting 1146 Motion for Extension of Time to File Response/Reply as to Daniel Lewis Lee. Mr. Lee shall have until September 24, 2007, to file a reply to the United States' response regarding the mtDNA. Signed by Judge G. Thomas Eisele on 9/5/2007. (ere) (Entered: 09/05/2007) |
| 09/24/2007 | 1149 | | MOTION for Extension of Time to File Response/Reply *(Agreed Upon By Government)* by Daniel Lewis Lee (Komp, Laurence) (Entered: 09/24/2007) |
| 09/25/2007 | 1150 | | (This is a TEXT ENTRY ONLY. There is no pdf document associated with this entry.) ORDER granting 1149 Motion for Extension of Time to File Response/Reply as to Daniel Lewis Lee (2). Movant Lee shall have until October 8, 2007, to file a reply to the USA's response regarding the mtDNA. Signed by Judge G. Thomas Eisele on 9/25/2007. (ere) (Entered: 09/25/2007) |
| 10/08/2007 | 1151 | | BRIEF in Support by Daniel Lewis Lee re 1118 MOTION to Set Aside Judgment *(Reply in Support of mtDNA Supplemental Memorandum)* (Attachments: # 1 Affidavit # 2 Exhibit Wraxall C.V.)(Komp, Laurence) (Entered: 10/08/2007) |
| 11/01/2007 | 1152 | | Unopposed MOTION for Hearing *re status conference* by Daniel Lewis Lee (Ruhnke, David) (Entered: 11/01/2007) |

| | | | |
|---|---|---|---|
| 02/29/2008 | 1153 | | ORDER denying 1152 Motion for Hearing (Status Conference) as to Daniel Lewis Lee (2). Signed by Judge G. Thomas Eisele on 2/29/2008. (lmr) (Entered: 02/29/2008) |
| 05/15/2008 | 1154 | | ORDER as to Chevie O'Brien Kehoe and Daniel Lewis Lee re pending 28 USC 2255 motions, and directing Petitioners to respond to this order no later than June 2, 2008. Signed by Judge G. Thomas Eisele on 5/15/2008. (lmr) (Entered: 05/15/2008) |
| 05/22/2008 | 1156 | | ORDER as to Daniel Lewis Lee re 1118 MOTION to Vacate (2255) filed by Daniel Lewis Lee. Signed by Judge G. Thomas Eisele on 5/22/2008. (lmr) (Entered: 05/22/2008) |
| 06/02/2008 | 1157 | | RESPONSE re 1154 May 15, 2008 Order, by Chevie O'Brien Kehoe (Attachments: # 1 Document Transcript: Gloria Louise Kehoe 3/31/1998) NOTE: Original certified transcript on file in Clerk's Office.(lmr) (Entered: 06/02/2008) |
| 06/02/2008 | 1158 | | NOTICE *of Filing of Transcript of Gloria Kehoe 3/31/98 Interview* by Daniel Lewis Lee re 1154 Order (Attachments: # 1 Exhibit Transcript of 3/21/98 Gloria Kenoe Interview)(Komp, Laurence) (Entered: 06/02/2008) |
| 06/09/2008 | 1160 | | RESPONSE re 1157 Response (Non Motion) – *Reply to Petitioner's Response to the Court's Order of May 15, 2008 (doc. 1154)* by United States of America (Stripling, Clarence) (Entered: 06/09/2008) |
| 06/20/2008 | 1161 | | MEMORANDUM re 1118 Motion to Set Aside Judgment, by Daniel Lewis Lee (Komp, Laurence) (Entered: 06/20/2008) |
| 08/28/2008 | 1163 | | ORDER denying 1118 Motion to Vacate (2255) as to Daniel Lewis Lee (2). Signed by Judge G. Thomas Eisele on 8/28/08. (cby) (Entered: 08/28/2008) |
| 09/18/2008 | 1165 | | MOTION to Amend/Correct *pursuant to F.R.Civ.P. 59* by Daniel Lewis Lee (Attachments: # 1 Affidavit Clark, # 2 Affidavit McNally, # 3 Affidavit Ryan, # 4 Exhibit Ryan ethics complaint, # 5 Affidavit Edens, # 6 Affidavit US v. Haynes, # 7 Affidavit Stetler)(Ruhnke, David) (Entered: 09/18/2008) |
| 09/22/2008 | 1166 | | MOTION for Extension of Time to File Response/Reply as to 1164 MOTION to Amend/Correct, 1165 MOTION to Amend/Correct *pursuant to F.R.Civ.P. 59* by United States of America as to Chevie O'Brien Kehoe, Daniel Lewis Lee (Stripling, Clarence) Modified on 10/27/2008 to correct docket text (lmr). (Entered: 09/22/2008) |
| 09/23/2008 | 1167 | | (This is a TEXT ENTRY ONLY. There is no pdf document associated with this entry.)ORDER granting Government's Motion for Extension of Time to File Response/Reply 1166 as to Motions to Correct or Amend Judgment filed by Chevie O'Brien Kehoe(1) and Daniel Lewis Lee(2). Responses to both motions are due on October 20, 2008. Signed by Judge G. Thomas Eisele on 9/23/2008. (ere) (Entered: 09/23/2008) |
| 10/08/2008 | 1168 | | BRIEF in Support by Daniel Lewis Lee re 1165 MOTION to Amend/Correct *pursuant to F.R.Civ.P. 59*. (cby) (Entered: 10/08/2008) |
| 10/20/2008 | 1170 | | RESPONSE in Opposition by United States of America as to Daniel Lewis Lee re 1165 MOTION to Amend/Correct *pursuant to F.R.Civ.P. 59* (Stripling, Clarence) (Entered: 10/20/2008) |

Appellate Case: 20-2351    Page: 58    Date Filed: 07/04/2020 Entry ID: 4930235

| | | | |
|---|---|---|---|
| 10/21/2008 | 1171 | | LETTER ORDER as to Daniel Lewis Lee re 1168 Brief in Support of Motion. Signed by Judge G. Thomas Eisele on 10/21/08. (cby) (Entered: 10/21/2008) |
| 10/25/2008 | 1172 | | REPLY TO RESPONSE to Motion by Daniel Lewis Lee re 1165 MOTION to Amend/Correct *pursuant to F.R.Civ.P. 59* (Ruhnke, David) Modified on 10/27/2008 to correct docket text as to party and correct linkage to motion. (lmr). (Entered: 10/25/2008) |
| 10/27/2008 | 1173 | | NOTICE OF APPEAL by Daniel Lewis Lee re: 1163 Order (Attachments: # 1 Memorandum re protective notice of appeal)(Ruhnke, David) (Docket entry modified on 10/27/2008 to establish linkage.) (thd) (Entered: 10/27/2008) |
| 10/27/2008 | | | NOTICE OF DOCKET CORRECTION 1172 Reply to Response, filed by Daniel Lewis Lee (2). CORRECTION: Docket entry modified on 10/27/2008 to correct docket text as to party and create linkage to correct motion 1165 . (lmr) (Entered: 10/27/2008) |
| 10/27/2008 | | | NOTICE OF DOCKET CORRECTION re: 1173 Notice of Appeal – Final Judgment. CORRECTION: The docket entry was modified to establish linkage to 1163 Order. (thd) (Entered: 10/27/2008) |
| 11/11/2008 | 1174 | | MOTION SUPPLEMENT THE RECORD WITH THE MATERIALS FILED WITH THE COURT IN RESPONSE TO THE OCTOBER 21, 2008 LETTER ORDER re 1171 Order by Daniel Lewis Lee (Komp, Laurence) (Entered: 11/11/2008) |
| 11/17/2008 | 1175 | | ORDER granting 1174 Motion as to Daniel Lewis Lee (2). Signed by Judge G. Thomas Eisele on 11/17/08. (cby) (Entered: 11/18/2008) |
| 11/17/2008 | 1176 | | RESPONSE to Letter Order by USA as to Daniel Lewis Lee. (cby) (Entered: 11/18/2008) |
| 11/17/2008 | 1177 | | Sealed Document. (cby) (Entered: 11/18/2008) |
| 12/15/2008 | 1178 | | AFFIDAVIT in Support of Motion for Reconsideration by Daniel Lewis Lee. (cby) (Entered: 12/15/2008) |
| 12/17/2008 | 1179 | | (This is a TEXT ENTRY ONLY. There is no pdf document associated with this entry.) ORDER directing the Government to respond to Lee's Affidavit in Support of Motion [Doc. 1178] not later than January 6, 2009. Signed by Judge G. Thomas Eisele on 12/17/08. (cjw) (Entered: 12/17/2008) |
| 01/05/2009 | 1181 | | RESPONSE re 1178 affidavit in Support of Motion – *Government's Response to Sworn Statement/Declaration of Daniel Louis Lee in Support of Movant's Motion for Reconsideration* by United States of America (Attachments: # 1 Exhibit Motion to Alter or Amend Judgment, Or, In The Alternative, For Relief From Judgment)(Stripling, Clarence) (Entered: 01/05/2009) |
| 02/03/2009 | 1182 | | NOTICE *of Additional Authority in Support of Rule 59 Motion* by Daniel Lewis Lee (Attachments: # 1 Exhibit Nelson Opinion)(Komp, Laurence) (Entered: 02/03/2009) |
| 12/22/2010 | 1189 | | ORDER denying 1165 Motion to Amend/Correct pursuant to F.R.Civ.P. 59 as to Daniel Lewis Lee (2). Signed by Judge G. Thomas Eisele on |

| | | | |
|---|---|---|---|
| | | | 12/22/2010. (cby) (Entered: 12/22/2010) |
| 01/13/2011 | 1192 | | SEALED ORDER. Signed by Judge G. Thomas Eisele on 1/13/2011. (cby) (Entered: 01/14/2011) |
| 01/14/2011 | 1191 | | SEALED MOTION.(cby) (Entered: 01/14/2011) |
| 02/09/2011 | 1194 | | MOTION for Certificate of Appealability *(reconsideration of denial)* by Daniel Lewis Lee (Ruhnke, David) (Entered: 02/09/2011) |
| 02/14/2011 | 1195 | | NOTICE OF APPEAL by Daniel Lewis Lee re 1163 Order and 1189 Order. (Ruhnke, David) (Docket entry modified on 2/15/2011 to establish linkage.)(thd) (Entered: 02/14/2011) |
| 02/15/2011 | | | NOTICE OF DOCKET CORRECTION re: 1195 Notice of Appeal by Daniel Lewis Lee. CORRECTION: The docket entry was modified to establish linkage to 1163 Order and 1189 Order. (thd) (Entered: 02/15/2011) |
| 02/16/2011 | 1198 | | NOTIFICATION OF APPEAL and NOA SUPPLEMENT as to 1173 1195 Notice of Appeal – Final Judgment filed by Daniel Lewis Lee 1189 Order on Motion to Amend 1163 Order on Motion to Set Aside Judgment. (dac) (Entered: 02/16/2011) |
| 02/17/2011 | 1199 | | USCA Docket Letter as to 1173 1195 Notice of Appeal – Final Judgment filed by Daniel Lewis Lee. USCA Case Number 11–1380 (dac) (Entered: 02/17/2011) |
| 02/17/2011 | 1200 | | ORDER of USCA Clerk of the United States District Court is requested to forward to this Court any portions of the original record which are not available in an electronic format as to Daniel Lewis Lee re 1173 1195 Notice of Appeal – Final Judgment (dac) (Entered: 02/17/2011) |
| 03/01/2011 | 1203 | | ORDER of USCA Appellant's motion to hold this case in abeyance pending a ruling by the district court on a motion for reconsideration is granted as to Daniel Lewis Lee re 1195 Notice of Appeal – Final Judgment (dac) (Entered: 03/01/2011) |
| 03/09/2011 | 1204 | | ORDER granting in part and denying in part 1194 Motion for Reconsideration of Denial of a Certificate of Appealability as to Daniel Lewis Lee (2; A Certificate of Appealability is granted soley as to the issue of whether the death penalty is being unconstitutionally applied. Signed by Judge G. Thomas Eisele on 3/9/11. (dac) (Entered: 03/09/2011) |
| 03/10/2011 | 1205 | | ORDER of USCA Appellant is granted 60 days to file a motion to expand the certificate of appealability as to Daniel Lewis Lee re 1173 1195 Notice of Appeal – Final Judgment (dac) (Entered: 03/10/2011) |
| 05/16/2012 | 1212 | | ORDER REASSIGNING CASE to Chief Judge J. Leon Holmes for all further proceedings. (bfw) (Entered: 05/16/2012) |
| 05/17/2012 | 1213 | | ORDER granting 1211 Motion to Substitute Attorney. Linda Lipe is substituted for Daniel Stripling as to Chevie O'Brien Kehoe (1). Signed by Chief Judge J. Leon Holmes on 5/17/2012. (cby) (Entered: 05/17/2012) |
| 04/29/2013 | 1224 | | OPINION of USCA as to Daniel Lewis Lee re 1195 Notice of Appeal. (mcz) (Entered: 04/29/2013) |

Appellate Case: 20-2351    Page: 60    Date Filed: 07/04/2020 Entry ID: 4930235

| | | | |
|---|---|---|---|
| 04/29/2013 | 1225 | | JUDGMENT of USCA: The judgment of the district court in this cause is affirmed in accordance with the opinion of this Court as to Daniel Lewis Lee re 1195 Notice of Appeal. (mcz) (Entered: 04/29/2013) |
| 09/27/2013 | 1228 | | NOTICE OF ATTORNEY APPEARANCE: Karl Schwartz appearing for Daniel Lewis Lee. (fcd) (Entered: 09/27/2013) |
| 09/27/2013 | 1229 | | NOTICE OF ATTORNEY APPEARANCE: Jennifer A. Merrigan appearing for Daniel Lewis Lee. (fcd) (Entered: 09/27/2013) |
| 09/27/2013 | 1230 | | Movant's MOTION for Relief from Judgment or Order re 1189 Order on Motion to Amend/Correct by Daniel Lewis Lee. (also re: 3 Judgment of 9/4/2008 in Civil case 4:06−cv−1608−GTE). (fcd) (Entered: 09/30/2013) |
| 09/27/2013 | 1231 | | MOTION for Indicative Ruling by Daniel Lewis Lee. (fcd) (Entered: 09/30/2013) |
| 09/30/2013 | 1232 | | ORDER re 1231 MOTION for Indicative Ruling filed by Daniel Lewis Lee. The United States is directed to respond on or before 10/14/2013. Signed by Judge J. Leon Holmes on 9/30/2013. (fcd) (Entered: 09/30/2013) |
| 10/09/2013 | 1233 | | MOTION for Extension of Time to File Response/Reply by United States of America as to Daniel Lewis Lee (Lipe, Linda) (Entered: 10/09/2013) |
| 10/10/2013 | 1234 | | ORDER granting 1233 Motion for Extension of Time to File Response/Reply as to Daniel Lewis Lee (2). Signed by Judge J. Leon Holmes on 10/10/2013. (fcd) (Entered: 10/10/2013) |
| 10/30/2013 | 1235 | | NOTICE OF ATTORNEY APPEARANCE John M. Pellettieri appearing for USA. (cby) (Entered: 10/30/2013) |
| 11/15/2013 | 1236 | | RESPONSE to Motion by United States of America as to Daniel Lewis Lee re 1231 MOTION for Order (Pellettieri, John) (Entered: 11/15/2013) |
| 11/18/2013 | 1237 | | MOTION for Extension of Time to File Response/Reply by Daniel Lewis Lee (Merrigan, Jennifer) (Entered: 11/18/2013) |
| 11/19/2013 | 1238 | | ORDER granting 1237 Motion for Extension of Time to File Response/Reply as to Daniel Lewis Lee (2). Signed by Judge J. Leon Holmes on 11/19/2013. (fcd) (Entered: 11/19/2013) |
| 12/06/2013 | 1239 | | REPLY TO RESPONSE to Motion by Daniel Lewis Lee re 1231 MOTION for Order *for Indicative Ruling* (Schwartz, Karl) (Entered: 12/06/2013) |
| 01/06/2014 | 1240 | | NOTICE OF HEARING in case as to Daniel Lewis Lee on 1231 MOTION for Order, 1230 MOTION re 1189 Order on Motion to Amend/Correct: Oral Argument on motions set for Friday, 1/31/2014 at 9:30 AM in Little Rock, Courtroom #4D before Judge J. Leon Holmes (cdw) (Entered: 01/06/2014) |
| 01/08/2014 | 1241 | | ORDER of USCA as to Daniel Lewis Lee re 1173 , 1195 Notices of Appeal. The petition for rehearing en banc is denied. The petition for rehearing by the panel is also denied. (fcd) (Entered: 01/08/2014) |
| 01/15/2014 | 1243 | | MANDATE of USCA in accordance with the Opinion and Judgment of 4/29/2013 as to Daniel Lewis Lee re 1195 Notice of Appeal. (fcd) (Entered: 01/15/2014) |

| | | | |
|---|---|---|---|
| 01/31/2014 | 1244 | | (This is a TEXT ENTRY ONLY. There is no pdf document associated with this entry.) Minute Entry for proceedings held before Judge J. Leon Holmes: ORAL ARGUMENT re defendant Lee's 1230 MOTION re 1189 Order on Motion to Amend/Correct, 1231 MOTION for Order as to Daniel Lewis Lee held on Friday, 1/31/2014; John Pellettieri present for government; Karl Schwartz, Jennifer Merrigan present for defendant Lee; following argument from counsel, Court takes matter under advisement. (Court Reporter G. Power) (cdw) (Entered: 01/31/2014) |
| 02/06/2014 | 1245 | | NOTICE *of Agreement to Supplemental Letter* by Daniel Lewis Lee (Attachments: # 1 Document Certification)(Schwartz, Karl) (Entered: 02/06/2014) |
| 02/13/2014 | 1246 | | BRIEF in Support by Daniel Lewis Lee re 1230 MOTION re 1189 Order on Motion to Amend/Correct *Letter Brief* (Attachments: # 1 Certificate of Service)(Schwartz, Karl) (Entered: 02/13/2014) |
| 03/06/2014 | 1247 | | RESPONSE in Opposition by United States of America as to Daniel Lewis Lee re 1230 MOTION re 1189 Order on Motion to Amend/Correct *Response to Letter Brief 1246* (Pellettieri, John) (Entered: 03/06/2014) |
| 03/17/2014 | 1248 | | REPLY TO RESPONSE to Motion by Daniel Lewis Lee re 1230 MOTION re 1189 Order on Motion to Amend/Correct *in reply to gov't's 3/6/14 letter.* (Attachments: # 1 Exhibit Certification)(Schwartz, Karl) (Entered: 03/17/2014) |
| 03/18/2014 | 1249 | | MEMORANDUM OPINION as to Daniel Lewis Lee. Signed by Judge J. Leon Holmes on 3/18/2014. (kbc) (Entered: 03/18/2014) |
| 03/18/2014 | 1250 | | JUDGMENT denying 1230 Movant's MOTION for Relief from Judgment or Order re 1189 Order on Motion to Amend/Correct and denying 1231 Motion for Indicative Ruling as to Daniel Lewis Lee. Signed by Judge J. Leon Holmes on 3/18/2014. (kbc) (Entered: 03/18/2014) |
| 04/15/2014 | 1251 | | MOTION for Reconsideration re 1249 Memorandum Opinion, 1250 Order on Motion for Miscellaneous Relief, Order on Motion for Order by Daniel Lewis Lee (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Schwartz, Karl) (Entered: 04/15/2014) |
| 04/16/2014 | 1252 | | ORDER denying 1251 Motion for Reconsideration as to Daniel Lewis Lee. Signed by Judge J. Leon Holmes on 4/16/2014. (kbc) (Entered: 04/16/2014) |
| 05/02/2014 | 1253 | | MOTION to Appoint Counsel *(i.e., co−counsel)* by Daniel Lewis Lee (Attachments: # 1 Exhibit 1 – Proposed Order, # 2 Exhibit 2 – Cert. of Service)(Schwartz, Karl) (Entered: 05/02/2014) |
| 05/05/2014 | 1254 | | ORDER granting 1253 MOTION to Appoint Counsel *(i.e., co−counsel)* filed by Daniel Lewis Lee. Morris H. Moon appointed as co−counsel pursuant to 18 U.S.C. § 3599(a)(2) to assist with defendants post−conviction representation. Signed by Judge J. Leon Holmes on 5/5/2014. (fcd) (Entered: 05/05/2014) |
| 05/20/2014 | 1257 | | Letter from USCA Clerk: Notice of certiorari filed in the Supreme Court as case No. 13−10085. (fcd) (Entered: 05/20/2014) |
| 06/10/2014 | 1258 | | |

July 3 2020 p62

Appellate Case: 20-2351    Page: 62    Date Filed: 07/04/2020 Entry ID: 4930235

| | | | |
|---|---|---|---|
| | | | Unopposed MOTION for Extension of Time to File *Mr. Lee's Notice of Appeal and Request for Certificate of Appealability* by Daniel Lewis Lee (Attachments: # 1 Document Proposed Order)(Schwartz, Karl) (Entered: 06/10/2014) |
| 06/11/2014 | 1259 | | ORDER granting 1258 Motion for Extension of Time to File a Notice of Appeal as to Daniel Lewis Lee. Signed by Judge J. Leon Holmes on 6/11/2014. (kbc) (Entered: 06/11/2014) |
| 07/14/2014 | 1261 | | MOTION for Certificate of Appealability by Daniel Lewis Lee (Attachments: # 1 Proposed Order)(Moon, Morris) (Entered: 07/14/2014) |
| 07/14/2014 | 1262 | | NOTICE OF APPEAL by Daniel Lewis Lee re 1249 Memorandum Opinion, 1252 Order on Motion for Reconsideration, 1250 Order on Motion for Miscellaneous Relief, Order on Motion for Order (Moon, Morris) (Entered: 07/14/2014) |
| 08/01/2014 | 1263 | | ORDER granting 1261 Motion for Certificate of Appealability as to Daniel Lewis Lee (2). Signed by Judge J. Leon Holmes on 8/1/2014. (fcd) (Entered: 08/01/2014) |
| 08/01/2014 | 1264 | | NOTIFICATION OF APPEAL and NOA SUPPLEMENT as to Daniel Lewis Lee re 1262 Notice of Appeal, 1249 Memorandum Opinion, 1252 Order on Motion for Reconsideration, 1250 Order on Motions. NOTIFICATION TO COUNSEL: REQUEST FOR TRANSCRIPTS SHOULD BE FILED WITH THE DISTRICT COURT CLERK. (fcd) (Entered: 08/01/2014) |
| 08/07/2014 | 1265 | | USCA Docket Letter and Briefing Schedule as to 1262 Notice of Appeal filed by Daniel Lewis Lee. USCA Case Number 14–2853. (fcd) (Entered: 08/07/2014) |
| 08/26/2014 | 1266 | | MOTION for Order *to Produce Transcripts* by Daniel Lewis Lee (Attachments: # 1 Document Proposed Order)(Schwartz, Karl) (Entered: 08/26/2014) |
| 09/02/2014 | 1267 | | TRANSCRIPT of Oral Argument as to Daniel Lewis Lee filed for the date of January 31, 2014, before Judge J. Leon Holmes, re 1262 Notice of Appeal. Court Reporter – Eugenie M. Power. Transcript may be viewed only at the public terminals in the Clerk's office. Copies of transcript are only available through the Official Court Reporter before the deadline for Release of Transcript Restriction. Notice of Intent to Request Redaction due 9/12/2014. Redaction Request due 9/23/2014. Redacted Transcript Deadline set for 10/3/2014. Release of Transcript Restriction set for 12/1/2014. (mcz) (Entered: 09/02/2014) |
| 09/03/2014 | 1268 | | Transmitted Record on Appeal as to Daniel Lewis Lee to US Court of Appeals re 1262 Notice of Appeal: Copy of 1267 Transcript of Oral Argument. (fcd) (Entered: 09/03/2014) |
| 09/24/2014 | 1269 | | SEALED MOTION.(cby) (Entered: 09/24/2014) |
| 09/24/2014 | 1270 | | SEALED ORDER. Signed by Judge J. Leon Holmes on 9/24/2014. (cby) (Entered: 09/25/2014) |
| 11/03/2014 | 1272 | | Letter from USCA Clerk: United States Supreme Court order filed denying certiorari in the above case. (fcd) (Entered: 11/03/2014) |

Appellate Case: 20-2351     Page: 63     Date Filed: 07/04/2020 Entry ID: 4930235

| | | | |
|---|---|---|---|
| 11/06/2014 | 1273 | | ORDER granting 1266 Motion for Order to Produce Transcripts as to Daniel Lewis Lee (2). Signed by Judge J. Leon Holmes on 11/6/2014. (fcd) (Entered: 11/06/2014) |
| 07/13/2015 | 1276 | | OPINION of USCA as to Daniel Lewis Lee re 1262 Notice of Appeal. (fcd) (Entered: 07/13/2015) |
| 07/13/2015 | 1277 | | JUDGMENT of USCA as to Daniel Lewis Lee re 1262 Notice of Appeal. The judgment of the district court in this cause is affirmed in accordance with the opinion of this Court. (fcd) (Entered: 07/13/2015) |
| 12/14/2015 | 1291 | | Corrected OPINION of USCA as to Daniel Lewis Lee re 1262 Notice of Appeal. (fcd) (Entered: 12/14/2015) |
| 12/14/2015 | 1292 | | ORDER of USCA as to Daniel Lewis Lee re 1262 Notice of Appeal. The petition for rehearing by the panel is denied. Judge Kelly dissents from the denial of the petition for rehearing by the panel. (fcd) (Entered: 12/14/2015) |
| 12/23/2015 | 1293 | | MANDATE of USCA in accordance with the judgment of 7/13/2015 and the opinion of 12/14/2015 as to Daniel Lewis Lee re 1262 Notice of Appeal. (fcd) (Entered: 12/23/2015) |
| 05/03/2016 | 1295 | | Letter from USCA Clerk: petition for a writ of certiorari filed in the Supreme Court as No. 15–8942. (fcd) (Entered: 05/03/2016) |
| 04/26/2017 | 1296 | | Letter from USCA Clerk: Supreme Court order filed denying certiorari in this case. (fcd) (Entered: 04/26/2017) |
| 09/10/2018 | 1297 | | MOTION to Vacate, Set Aside or Correct Sentence under 28 U.S.C. 2255 *or Alternatively Relief Pursuant to Fed. R. Civ. P. Rule 60* by Daniel Lewis Lee (Attachments: # 1 Document Index of Exhibits, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K, # 13 Exhibit L, # 14 Exhibit M, # 15 Exhibit N, # 16 Exhibit O, # 17 Exhibit P, # 18 Exhibit Q, # 19 Exhibit R, # 20 Exhibit S, # 21 Exhibit T)(Moon, Morris) Civil case 4:18–cv–00649–JLH opened. (Entered: 09/10/2018) |
| 09/12/2018 | 1298 | | ORDER directing the United States to respond to 1297 MOTION to Vacate, Set Aside or Correct Sentence under 28 U.S.C. 2255 *or Alternatively Relief Pursuant to Fed. R. Civ. P. Rule 60* filed by Daniel Lewis Lee. Signed by Judge J. Leon Holmes on 9/12/2018. (fcd) (Entered: 09/12/2018) |
| 09/17/2018 | 1300 | | NOTICE OF ATTORNEY APPEARANCE: George G. Kouros appearing for Daniel Lewis Lee. (fcd) (Entered: 09/17/2018) |
| 09/28/2018 | 1301 | | MOTION for Extension of Time to File Response/Reply as to 1297 MOTION to Vacate, Set Aside or Correct Sentence under 28 U.S.C. 2255 *or Alternatively Relief Pursuant to Fed. R. Civ. P. Rule 60* , MOTION Permission to Address Jurisdiction Only re 1297 MOTION to Vacate, Set Aside or Correct Sentence under 28 U.S.C. 2255 *or Alternatively Relief Pursuant to Fed. R. Civ. P. Rule 60* () by United States of America as to Daniel Lewis Lee (Pellettieri, John) (Entered: 09/28/2018) |
| 10/01/2018 | 1302 | | ORDER granting 1301 Motion for Extension of Time to File Response/Reply as to Daniel Lewis Lee (2). The government's response is due on or before 11/12/2018. Signed by Judge J. Leon Holmes on 10/1/2018. (fcd) (Entered: |

| | | | |
|---|---|---|---|
| | | | 10/01/2018) |
| 10/02/2018 | 1303 | | MOTION to Substitute Attorney by United States of America as to Chevie O'Brien Kehoe, Daniel Lewis Lee, Faron Earl Lovelace, Kirby Keith Kehoe (Ahmad, Ali) (Entered: 10/02/2018) |
| 10/03/2018 | 1304 | | ORDER granting 1303 Motion to Substitute Attorney. AUSA Ali Ahmad substituted for Linda Lipe as counsel of record for the United States. Signed by Judge J. Leon Holmes on 10/3/2018. (fcd) (Entered: 10/03/2018) |
| 11/07/2018 | 1305 | | Unopposed MOTION for Extension of Time to File Response/Reply as to 1297 MOTION to Vacate, Set Aside or Correct Sentence under 28 U.S.C. 2255 *or Alternatively Relief Pursuant to Fed. R. Civ. P. Rule 60* by United States of America as to Daniel Lewis Lee (Pellettieri, John) (Entered: 11/07/2018) |
| 11/08/2018 | 1306 | | ORDER granting 1305 Motion for Extension of Time to File Response/Reply re 1297 MOTION to Vacate, Set Aside or Correct Sentence under 28 U.S.C. 2255 as to Daniel Lewis Lee (2). Signed by Judge J. Leon Holmes on 11/8/2018. (fcd) (Entered: 11/08/2018) |
| 11/26/2018 | 1307 | | RESPONSE to Motion by United States of America as to Daniel Lewis Lee re 1297 MOTION to Vacate, Set Aside or Correct Sentence under 28 U.S.C. 2255 *or Alternatively Relief Pursuant to Fed. R. Civ. P. Rule 60* (Pellettieri, John) (Entered: 11/26/2018) |
| 11/26/2018 | 1308 | | Unopposed MOTION to Fix Time for Reply by Daniel Lewis Lee (Kouros, George) (Entered: 11/26/2018) |
| 11/27/2018 | 1309 | | ORDER granting 1308 Motion to Fix Time for Reply as to Daniel Lewis Lee (2). Defendant has until 1/25/2019 to file his reply to the government's response. Signed by Judge J. Leon Holmes on 11/27/2018. (fcd) (Entered: 11/27/2018) |
| 01/09/2019 | 1310 | | Unopposed MOTION for Extension of Time to File Response/Reply as to 1307 Response to Motion, by Daniel Lewis Lee (Kouros, George) (Entered: 01/09/2019) |
| 01/10/2019 | 1311 | | ORDER granting 1310 Motion for Extension of Time to File Response/Reply as to Daniel Lewis Lee (2). Lee's reply must be filed on or before 2/8/2019. Signed by Judge J. Leon Holmes on 1/10/2019. (fcd) (Entered: 01/10/2019) |
| 02/08/2019 | 1312 | | REPLY TO RESPONSE to Motion by Daniel Lewis Lee re 1297 MOTION to Vacate, Set Aside or Correct Sentence under 28 U.S.C. 2255 *or Alternatively Relief Pursuant to Fed. R. Civ. P. Rule 60* (Attachments: # 1 Exhibit Index of Exhibits, # 2 Exhibit U, # 3 Exhibit V, # 4 Exhibit W)(Moon, Morris) (Entered: 02/08/2019) |
| 02/26/2019 | 1313 | | OPINON AND ORDER denying 1297 Motion to Vacate (2255) as to Daniel Lewis Lee (2). Signed by Judge J. Leon Holmes on 2/26/2019. (fcd) Civil Case 4:18−cv−00649−JLH closed. (Entered: 02/26/2019) |
| 03/21/2019 | 1314 | | MOTION Request for entry of judgment pursuant to Fed.R.Civ.P. 58 by Daniel Lewis Lee (Kouros, George) (Entered: 03/21/2019) |
| 03/22/2019 | 1315 | | |

Appellate Case: 20-2351    Page: 65    Date Filed: 07/04/2020 Entry ID: 4930235

| | | | |
|---|---|---|---|
| | | | ORDER granting 1314 Motion for entry of judgment pursuant to Fed.R.Civ.P. 58 as to Daniel Lewis Lee (2). Signed by Judge J. Leon Holmes on 3/22/2019. (fcd) (Entered: 03/22/2019) |
| 03/22/2019 | 1316 | | JUDGMENT re 1313 Opinion and Order on Motion to Vacate (2255) as to Daniel Lewis Lee. Signed by Judge J. Leon Holmes on 3/22/2019. (fcd) (Entered: 03/22/2019) |
| 04/19/2019 | 1317 | | MOTION to Amend/Correct 1316 Order *Pursuant to F.R.Civ.P. 59(e)* by Daniel Lewis Lee (Moon, Morris) (Entered: 04/19/2019) |
| 05/07/2019 | 1318 | | ORDER denying 1317 MOTION to Amend/Correct 1316 Order Pursuant to F.R.Civ.P. 59(e) as to Daniel Lewis Lee (2). Signed by Judge J. Leon Holmes on 5/7/2019. (cby) (Entered: 05/07/2019) |
| 07/05/2019 | 1319 | | NOTICE OF APPEAL by Daniel Lewis Lee re 1313 Order on Motion to Vacate (2255), 1318 Order on Motion to Amend/Correct (Kouros, George) (Entered: 07/05/2019) |
| 07/05/2019 | 1320 | | NOTIFICATION OF APPEAL and NOA SUPPLEMENT as to 1319 Notice of Appeal re 1313 Order on Motion to Vacate (2255) and 1318 Order on Motion to Amend/Correct. NOTIFICATION TO COUNSEL: REQUEST FOR TRANSCRIPTS SHOULD BE FILED WITH THE DISTRICT COURT CLERK. (cmn) (Entered: 07/05/2019) |
| 07/08/2019 | 1321 | | USCA Docket Letter as to 1319 Notice of Appeal filed by Daniel Lewis Lee. USCA Case Number 19–2432. (fcd) (Entered: 07/08/2019) |
| 07/24/2019 | 1322 | | NOTICE OF ATTORNEY APPEARANCE Alexander D. Morgan appearing for USA. (Morgan, Alexander) (Entered: 07/24/2019) |
| 07/25/2019 | 1323 | | MOTION to Substitute Attorney by United States of America as to Daniel Lewis Lee (Gordon, Michael) (Entered: 07/25/2019) |
| 07/26/2019 | 1324 | | ORDER granting 1323 Motion to Substitute Attorney. AUSA Michael Gordon substituted for Alexander Morgan as counsel for the United States. Signed by Judge J. Leon Holmes on 7/26/2019. (fcd) (Entered: 07/26/2019) |
| 07/26/2019 | 1325 | | ORDER directing the Clerk of Court to reassign this case as to all defendants. Signed at the direction of the Court on 7/26/2019. (fcd) (Entered: 07/26/2019) |
| 07/26/2019 | 1326 | | (This is a TEXT ENTRY ONLY. There is no pdf document associated with this entry.) NOTICE OF REASSIGNMENT. Based on 1325 Order, the Clerk's office has reassigned the case to Judge Kristine G. Baker. Signed at the Direction of the Court on 7/26/2019. (thd) (Entered: 07/26/2019) |
| 08/16/2019 | 1327 | | SEALED MOTION by Daniel Lewis Lee. (kbc) (Entered: 08/16/2019) |
| 08/16/2019 | 1328 | | SEALED ORDER. Signed by Judge Kristine G. Baker on 8/16/2019. (fcd) (Entered: 08/16/2019) |
| 08/20/2019 | 1330 | | SEALED MOTION. (fcd) (Entered: 08/20/2019) |
| 08/20/2019 | 1331 | | SEALED REPLY. (fcd) (Entered: 08/20/2019) |
| 08/20/2019 | 1332 | | |

Appellate Case: 20-2351   Page: 66   Date Filed: 07/04/2020 Entry ID: 4930235

| | | | |
|---|---|---|---|
| | | | SEALED ORDER. Signed by Judge Kristine G. Baker on 8/20/2019. (fcd) (Entered: 08/20/2019) |
| 08/22/2019 | 1334 | | SEALED RESPONSE. (fcd) (Entered: 08/22/2019) |
| 08/23/2019 | 1335 | | SEALED REPLY. (cmn) (Entered: 08/23/2019) |
| 08/26/2019 | 1336 | | SEALED ORDER. Signed by Judge Kristine G. Baker on 8/26/2019. (fcd) (Entered: 08/26/2019) |
| 08/27/2019 | 1338 | | SEALED NOTICE. (fcd) (Entered: 08/27/2019) |
| 09/03/2019 | 1339 | | SEALED ORDER. Signed by Judge Kristine G. Baker on 9/3/2019. (fcd) (Entered: 09/03/2019) |
| 09/03/2019 | 1340 | | SEALED ORDER. Signed by Judge Kristine G. Baker on 9/3/2019. (fcd) (Entered: 09/03/2019) |
| 09/04/2019 | 1342 | | SEALED MOTION. (fcd) (Entered: 09/04/2019) |
| 09/05/2019 | 1343 | | SEALED RESPONSE. (fcd) (Entered: 09/05/2019) |
| 09/05/2019 | 1344 | | SEALED REPLY. (fcd) (Entered: 09/05/2019) |
| 09/06/2019 | 1345 | | SEALED ORDER. Signed by Judge Kristine G. Baker on 9/6/2019. (fcd) (Entered: 09/06/2019) |
| 10/01/2019 | 1347 | | SEALED DOCUMENT. (fcd) (Entered: 10/01/2019) |
| 10/03/2019 | 1348 | | SEALED ORDER as to Daniel Lewis Lee. Signed by Judge Kristine G. Baker on 10/3/2019. (fcd) (Entered: 10/03/2019) |
| 10/22/2019 | 1350 | | SEALED DOCUMENT. (fcd) (Entered: 10/22/2019) |
| 11/04/2019 | 1351 | | JUDGMENT of USCA as to Daniel Lewis Lee re 1319 Notice of Appeal. The application for a certificate of appealability has been considered by the court and is denied. (fcd) (Entered: 11/04/2019) |
| 12/06/2019 | 1352 | | MOTION for Relief from Judgment or Order re 1189 Order on Motion to Amend/Correct by Daniel Lewis Lee (Kouros, George) (Entered: 12/06/2019) |
| 12/06/2019 | 1353 | | Emergency MOTION to stay execution and hold proceedings in abeyance re 1352 MOTION for Relief from Judgment or Order re 1189 Order on Motion to Amend/Correct by Daniel Lewis Lee (Attachments: # 1 Exhibit Index of Exhibits, # 2 Exhibit A: Eisele Letter, # 3 Exhibit B: Stripling Letter, # 4 Exhibit C: Gurel Letter, # 5 Exhibit D: Veillette Letter)(Kouros, George) (Entered: 12/06/2019) |
| 12/06/2019 | 1354 | | ORDER directing the Government to respond to 1353 Emergency MOTION to stay execution and hold proceedings in abeyance as to Daniel Lewis Lee by 4:00 p.m., Central Standard Time, on Friday, 12/6/2019. Signed by Judge Kristine G. Baker on 12/6/2019. (cmn) (Entered: 12/06/2019) |
| 12/06/2019 | 1355 | | RESPONSE in Opposition by United States of America as to Daniel Lewis Lee re 1353 Emergency MOTION to stay execution and hold proceedings in abeyance re 1352 MOTION for Relief from Judgment or Order re 1189 Order on Motion to Amend/Correct (Pellettieri, John) (Entered: 12/06/2019) |

| | | | |
|---|---|---|---|
| 12/06/2019 | 1356 | | ORDER granting 1353 motion to stay the execution as to Daniel Lewis Lee (2); and directing that the sentence of death as to Daniel Lewis Lee not be carried out until further order of this Court, the Eighth Circuit, or the Supreme Court. Signed by Judge Kristine G. Baker on 12/6/2019 at 4:50 p.m. (cmn) (Entered: 12/06/2019) |
| 12/06/2019 | 1357 | | NOTICE OF APPEAL by United States of America as to Daniel Lewis Lee re 1356 Order on Motion for Miscellaneous Relief, (Gordon, Michael) (Entered: 12/06/2019) |
| 12/06/2019 | 1358 | | NOTIFICATION OF APPEAL and NOA SUPPLEMENT as to Daniel Lewis Lee re 1357 Notice of Appeal and 1356 Order. NOTIFICATION TO COUNSEL: REQUEST FOR TRANSCRIPTS SHOULD BE FILED WITH THE DISTRICT COURT CLERK. (thd) (Entered: 12/06/2019) |
| 12/09/2019 | 1359 | | USCA Docket Letter as to 1357 Notice of Appeal filed by United States of America as to Daniel Lewis Lee. USCA Case Number 19–3618. (fcd) (Entered: 12/09/2019) |
| 12/10/2019 | 1360 | | USCA Scheduling Order as to 1357 Notice of Appeal filed by United States of America as to Daniel Lewis Lee. (fcd) (Entered: 12/10/2019) |
| 12/27/2019 | 1361 | | Transmitted Record on Appeal as to Daniel Lewis Lee to US Court of Appeals re 1357 Notice of Appeal: Original volumes of transcripts 694 – 719 , 773 – 784 , and 824 – 832 . (fcd) (Entered: 12/27/2019) |
| 12/30/2019 | 1362 | | MANDATE of USCA in accordance with the judgment of 11/4/2019 as to Daniel Lewis Lee re 1319 Notice of Appeal. (fcd) (Entered: 12/30/2019) |
| 01/29/2020 | 1363 | | MOTION for Relief from Judgment or Order re 1163 Order on Motion to Set Aside Judgment by Daniel Lewis Lee (Attachments: # 1 Exhibit Index of Exhibits, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K, # 13 Exhibit L, # 14 Exhibit M, # 15 Exhibit N, # 16 Exhibit O, # 17 Exhibit P, # 18 Exhibit Q, # 19 Exhibit R, # 20 Exhibit S, # 21 Exhibit T, # 22 Exhibit U, # 23 Exhibit V, # 24 Exhibit W, # 25 Exhibit X, # 26 Exhibit Y, # 27 Exhibit Z)(Kouros, George) (Entered: 01/29/2020) |
| 02/04/2020 | 1364 | | ORDER directing the government to respond to 1363 MOTION for Relief from Judgment filed by Daniel Lewis Lee. Signed by Judge Kristine G. Baker on 2/4/2020. (fcd) (Entered: 02/04/2020) |
| 02/07/2020 | 1365 | | Unopposed MOTION for Extension of Time to File Response/Reply as to 1363 MOTION for Relief from Judgment or Order re 1163 Order on Motion to Set Aside Judgment by United States of America as to Daniel Lewis Lee (Pellettieri, John) (Entered: 02/07/2020) |
| 02/10/2020 | 1366 | | ORDER granting 1365 Motion for Extension of Time to File Response/Reply as to Daniel Lewis Lee (2). Signed by Judge Kristine G. Baker on 2/10/2020. (fcd) (Entered: 02/10/2020) |
| 03/13/2020 | 1367 | | RESPONSE to Motion by United States of America as to Daniel Lewis Lee re 1363 MOTION for Relief from Judgment or Order re 1163 Order on Motion to Set Aside Judgment (Pellettieri, John) (Entered: 03/13/2020) |
| 03/16/2020 | 1368 | | |

| | | | |
|---|---|---|---|
| | | | Unopposed MOTION to Extend Time *to Reply to USA Response to Motion for Relief from Judgment or Order* by Daniel Lewis Lee (Kouros, George) (Entered: 03/16/2020) |
| 03/17/2020 | 1369 | | MOTION to Withdraw as Attorney by Ali Ahmad, by United States of America as to Daniel Lewis Lee (Gordon, Michael) (Entered: 03/17/2020) |
| 03/17/2020 | 1370 | | ORDER granting 1368 Motion to Extend Time as to Daniel Lewis Lee (2). Mr. Lee's reply to the government's response to Mr. Lees motion for relief from judgment or order pursuant to Federal Rule of Civil Procedure 60 will be due by the close of business on 4/10/2020. Signed by Judge Kristine G. Baker on 3/17/2020. (fcd) (Entered: 03/17/2020) |
| 03/19/2020 | 1371 | | ORDER granting 1369 Motion to Withdraw as Attorney. AUSA Ali Ahmad removed as counsel of record in this matter. Signed by Judge Kristine G. Baker on 3/19/2020. (fcd) (Entered: 03/19/2020) |
| 04/02/2020 | 1372 | | Unopposed MOTION for Extension of Time to File Response/Reply as to 1367 Response to Motion *for Relief from Judgment Pursuant to Rule 60* by Daniel Lewis Lee (Kouros, George) (Entered: 04/02/2020) |
| 04/03/2020 | 1373 | | ORDER granting 1372 Motion for Extension of Time to File Response/Reply as to Daniel Lewis Lee (2). Signed by Judge Kristine G. Baker on 4/3/2020. (cmn) (Entered: 04/03/2020) |
| 05/01/2020 | 1374 | | REPLY TO RESPONSE to Motion by Daniel Lewis Lee re 1363 MOTION for Relief from Judgment or Order re 1163 Order on Motion to Set Aside Judgment (Attachments: # 1 Exhibit Index of Exhibits, # 2 Exhibit 1: FBI Letters, # 3 Exhibit 2: FBI Memo, # 4 Exhibit 3: ATF Report, # 5 Exhibit 4: Excerpt of joint interview, # 6 Exhibit 5: Excerpt of joint interview, # 7 Exhibit 6: Excerpt of joint interview, # 8 Exhibit 7: Arkansas State Police case file log sheet, # 9 Exhibit 8: FBI Memo, # 10 Exhibit 9: FBI Letter, # 11 Exhibit 10: FBI Memo, # 12 Exhibit 11: USA discovery letter)(Kouros, George) (Entered: 05/01/2020) |
| 06/01/2020 | 1375 | | OPINION of USCA as to Daniel Lewis Lee re 1357 Notice of Appeal. (fcd) (Entered: 06/01/2020) |
| 06/01/2020 | 1376 | | JUDGMENT of USCA as to Daniel Lewis Lee re 1357 Notice of Appeal. The District Court's order of 12/6/2019 is vacated in accordance with the opinion of this Court. (fcd) (Entered: 06/01/2020) |
| 06/04/2020 | 1377 | | Supplemental MOTION motion for relief from judgment or order re 1352 MOTION for Relief from Judgment or Order re 1189 Order on Motion to Amend/Correct by Daniel Lewis Lee (Kouros, George) (Entered: 06/04/2020) |
| 06/09/2020 | 1378 | | MOTION for Disclosure *and Transmission of Communications Pursuant to Local Rule 83.8* by Daniel Lewis Lee (Attachments: # 1 Document Proposed Order)(Kouros, George) (Entered: 06/09/2020) |
| 06/15/2020 | 1379 | | NOTICE *Regarding Execution Date* by United States of America as to Daniel Lewis Lee (Pellettieri, John) (Entered: 06/15/2020) |
| 06/16/2020 | 1380 | | SEALED MOTION. (fcd) (Entered: 06/16/2020) |

| 06/16/2020 | 1381 | | SEALED MOTION. (fcd) (Entered: 06/16/2020) |
|---|---|---|---|
| 06/16/2020 | 1382 | | NOTICE OF ATTORNEY APPEARANCE Jonathan Dean Ross appearing for USA. (Ross, Jonathan) (Entered: 06/16/2020) |
| 06/17/2020 | 1383 | | SEALED MOTION. (fcd) (Entered: 06/18/2020) |
| 06/18/2020 | 1384 | | NOTICE OF ATTORNEY APPEARANCE Shannon S. Smith appearing for USA. (Smith, Shannon) (Entered: 06/18/2020) |
| 06/18/2020 | 1385 | | RESPONSE to Motion by United States of America as to Daniel Lewis Lee re 1378 MOTION for Disclosure *and Transmission of Communications Pursuant to Local Rule 83.8* (Smith, Shannon) (Entered: 06/18/2020) |
| 06/18/2020 | 1386 | | RESPONSE in Opposition by United States of America as to Daniel Lewis Lee re 1352 MOTION for Relief from Judgment or Order re 1189 Order on Motion to Amend/Correct , 1377 Supplemental MOTION motion for relief from judgment or order re 1352 MOTION for Relief from Judgment or Order re 1189 Order on Motion to Amend/Correct (Pellettieri, John) (Entered: 06/18/2020) |
| 06/19/2020 | 1387 | | MOTION to Order Comparison of DNA by Daniel Lewis Lee (Attachments: # 1 Exhibit Index of Exhibits, # 2 Exhibit 1: DNA Testing Results, # 3 Exhibit 2: Search Warrant Affidavit, # 4 Exhibit 3: Humphrey Interview Excerpt, # 5 Exhibit 4: ATF Report, # 6 Exhibit 5: Pope County Sheriff's Office Report, # 7 Exhibit 6: ATF Handwriting Analysis Report, # 8 Exhibit 7: Turners Interviews, # 9 Exhibit 8: Humphrey Polygraph Report, # 10 Exhibit 9: Arkansas State Crime Lab Report, # 11 Exhibit 10: Humphrey Hair Sample, # 12 Exhibit 11: ATF Report from CI, # 13 Exhibit 12: Lovelace Interview)(Kouros, George) (Entered: 06/19/2020) |
| 06/19/2020 | 1388 | | ORDER directing the government to provide communications subject to Local Rule 83.8 to the Court ex parte and under seal by 6/22/2020 for the Court's in camera review and holding under advisement 1378 MOTION for Disclosure filed by Daniel Lewis Lee. Signed by Judge Kristine G. Baker on 6/19/2020. (fcd) (Entered: 06/19/2020) |
| 06/19/2020 | 1389 | | SEALED RESPONSE. (fcd) (Entered: 06/19/2020) |
| 06/22/2020 | 1390 | | SEALED REPLY. (cmn) (Entered: 06/22/2020) |
| 06/22/2020 | 1391 | | NOTICE *OF FILING COMMUNICATIONS* by United States of America as to Daniel Lewis Lee (Smith, Shannon) (Entered: 06/22/2020) |
| 06/23/2020 | 1392 | | DOCUMENT FILED IN ERROR – DISREGARD. (wrong image file) (Kouros, George) Docket text modified on 6/24/2020 to indicate the document was filed in error. (kbc) (Entered: 06/23/2020) |
| 06/24/2020 | 1393 | | REPLY TO RESPONSE to Motion by Daniel Lewis Lee re 1377 Supplemental MOTION motion for relief from judgment or order re 1352 MOTION for Relief from Judgment or Order re 1189 Order on Motion to Amend/Correct *CORRECTED PLEADING* (Kouros, George) (Entered: 06/24/2020) |
| 06/24/2020 | | | NOTICE OF DOCKET CORRECTION re 1392 Reply to Response. CORRECTION: The docket text was modified to indicate the document was |

| | | | |
|---|---|---|---|
| | | | filed in error – wrong image file. (kbc) (Entered: 06/24/2020) |
| 06/26/2020 | 1394 | | SEALED ORDER. Signed by Judge Kristine G. Baker on 6/26/2020. (cmn) (Entered: 06/26/2020) |
| 06/26/2020 | 1395 | | SEALED MOTION. (cmn) (Entered: 06/26/2020) |
| 06/26/2020 | 1396 | | SEALED RESPONSE. (cmn) (Entered: 06/26/2020) |
| 06/26/2020 | 1398 | | RESPONSE in Opposition by United States of America as to Daniel Lewis Lee re 1387 MOTION to Order Comparison of DNA (Pellettieri, John) (Entered: 06/26/2020) |
| 06/30/2020 | 1399 | | REPLY TO RESPONSE to Motion by Daniel Lewis Lee re 1387 MOTION to Order Comparison of DNA (Attachments: # 1 Exhibit Index of Exhibits, # 2 Exhibit A: Cheyne Kehoe Declaration, # 3 Exhibit B: Kirby Kehoe Declaration, # 4 Exhibit C: Kirby Kehoe Transcript Excerpt (Arkansas), # 5 Exhibit D: Kirby Kehoe Transcript Excerpt (Arizona), # 6 Exhibit E: Lovelace Transcript Excerpt, # 7 Exhibit F: James Wanker Declaration, # 8 Exhibit G: Batchelor Court Order)(Kouros, George) (Entered: 06/30/2020) |
| 07/01/2020 | 1400 | | MOTION to Order Execution Date Null and Void by Daniel Lewis Lee (Attachments: # 1 Document Proposed Order, # 2 Exhibit Index of Exhibits, # 3 Exhibit 1: Notice of Execution Date, # 4 Exhibit 2: Docket for Victor Feguer Execution, # 5 Exhibit 3: Fulks Proposed Order and Judgment, # 6 Exhibit 4: Fulks Signed Order and Judgment)(Kouros, George) (Entered: 07/01/2020) |
| 07/02/2020 | 1401 | | MOTION to Set or Modify Execution Date in Light of COVID–19 Pandemic by Daniel Lewis Lee (Attachments: # 1 Document Proposed Order, # 2 Exhibit Index of Exhibits, # 3 Exhibit A: Beyrer Declaration, # 4 Exhibit B: Feguer Docket, # 5 Exhibit C: Cushing Opinion, # 6 Exhibit D: BOP Manual Excerpts, # 7 Exhibit E: USA v. Hammer Order, # 8 Exhibit F: USA v. Hammer Memo (9/20/00), # 9 Exhibit G: USA v. Hammer Memo (10/10/00), # 10 Exhibit H: US Fleet Forces Order, # 11 Exhibit I: Kendall Declaration, # 12 Exhibit J: Green Declaration, # 13 Exhibit K: Sealed Exhibit)(Kouros, George) (Additional attachment(s) added on 7/2/2020: # 14 Exhibit A – Correct (submitted 7/2/2020), # 15 Exhibit I – Correct (submitted 7/2/2020), # 16 Exhibit J – Correct (submitted 7/2/2020)) (jak). (Entered: 07/02/2020) |
| 07/02/2020 | 1402 | | SEALED MOTION. (cmn) (Entered: 07/02/2020) |
| 07/02/2020 | 1403 | | OPINION AND ORDER denying 1363 Motion for Relief from Judgment or Order as to Daniel Lewis Lee (2). Signed by Judge Kristine G. Baker on 7/2/2020. (fcd) (Entered: 07/02/2020) |
| 07/02/2020 | 1404 | | OPINION AND ORDER denying 1352 and 1377 Motions for Relief from Judgment or Order as to Daniel Lewis Lee (2). Signed by Judge Kristine G. Baker on 7/2/2020. (fcd) (Entered: 07/02/2020) |
| 07/02/2020 | 1405 | | NOTICE OF DOCKET CORRECTION re 1401 MOTION to Set or Modify as to Daniel Lewis Lee. CORRECTION: The exhibits A, I, and J were submitted with docket entry 1401 in error (wrong image files). The correct exhibits were added to docket entry 1401 based on the attached correspondence. (jak) (Entered: 07/02/2020) |

| | | | |
|---|---|---|---|
| 07/03/2020 | 1406 | | NOTICE OF APPEAL by Daniel Lewis Lee re 1403 Order on Motion for Miscellaneous Relief (Kouros, George) (Entered: 07/03/2020) |
| 07/03/2020 | 1407 | | NOTIFICATION OF APPEAL and NOA SUPPLEMENT as to Daniel Lewis Lee re 1406 Notice of Appeal and 1403 OPINION AND ORDER denying 1363 Motion for Relief from Judgment. NOTIFICATION TO COUNSEL: REQUEST FOR TRANSCRIPTS SHOULD BE FILED WITH THE DISTRICT COURT CLERK. (thd) (Entered: 07/03/2020) |

# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

**DANIEL LEWIS LEE,**
    **Movant**

vs.

**UNITED STATES OF AMERICA,**
    **Respondent.**

**Criminal Case No. 4:97-cr-00243-KGB-2**

**CAPITAL CASE**

---

## MOTION FOR RELIEF FROM JUDGMENT OR ORDER
## PURSUANT TO FED. R. CIV. P. 60

---

MORRIS H. MOON
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(713) 880-3556
Morris_Moon@fd.org

GEORGE G. KOUROS
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 821-0855
George_Kouros@fd.org

Counsel for Daniel Lee

*Oral Argument Requested*

**TABLE OF CONTENTS**

Introduction…………………………………………………………………...............2

I.    A Case Shaped to Fit Two Witnesses: Relevant Factual Background and
      Procedural History…………………………………………………………………...7

      A.  The Trial Proceeding…………………………………………………………7
          1.  The questionable case against Mr. Lee…………………………………………9
          2.  Mr. Lee's defense theory at trial……………………………………………11

      B.  Relevant Post-Trial Proceedings……………………………………………..………12

II.   The Case Begins to Unravel: A Cumulative Review of the Case……………….………15

      A.  Gloria and Cheyne Kehoe were Inherently Unreliable Witnesses………………….....16
          1.  The Kehoes' credibility problems……………………………………………… 16
          2.  The trial evidence corroborating the Kehoes, and its subsequent unraveling…………21
          3.  Absent corroborating evidence, the jury could not have convicted Mr. Lee………….25

      B.  The Conviction of Mr. Lee was Dependent on the Validity of a Deeply Problematic
          Timeline……………………………………………………………………..........27
          1.  The Kehoes' timeline depends on a series of dubious assumptions………..………..29
          2.  The evidence indicates that Mr. Lee was observed back in Spokane as early as
              January 12, 1996, which would render the Government's timeline—and the
              Kehoes' testimony—impossible to accept…………………………………...…32
          3.  The jury would have evaluated the defense witnesses differently if it had known
              that the Kehoes' testimony was uncorroborated and that there was credible
              evidence implicating an alternate suspect…………………………………………33

III.  The Government's Fraud, Misrepresentation, or Misconduct Precluded Mr. Lee from
      Fully and Fairly Presenting Viable Claims of Prosecutorial Misconduct in his Original
      § 2255 Proceedings…………………………………………………………………35

      A.  First Ground for Relief: Mr. Lee's conviction was obtained in violation of *Brady v.
          Maryland* because the Government suppressed material impeachment information
          about Gloria Kehoe's mental instability………………………….....................................35
          1.  The centrality of Gloria Kehoe's testimony to Mr. Lee's conviction………………..36
          2.  The evidence was favorable to Mr. Lee…………………………………………...38
          3.  The evidence was suppressed……………………………………..……………39
          4.  The suppressed evidence was material……………………………………………40

      B.  Second Ground for Relief: Mr. Lee's conviction was obtained in violation of *Brady v.
          Maryland* because the Government suppressed material exculpatory and impeachment
          evidence concerning Paul Humphrey's involvement in the Mueller murders…………..43
          1.  Paul Humphrey was the Government's initial suspect in the Mueller case…………43

i

2. The undisclosed evidence about suspect Paul Humphrey……………………………47

3. The evidence was favorable to Mr. Lee……………………………………..49

4. The evidence was suppressed……………………………………………51

5. The suppressed evidence was material……………………………………..52

C. Third Ground for Relief: Mr. Lee's conviction was obtained in violation of *Napue v. Illinois* and *Giglio v. United States* because the Government presented false and misleading testimony about Mr. Humphrey's involvement in the Mueller murders. …...56

1. Paul Humphrey's testimony was false and misleading………………………57

2. The Government knew or should have known Mr. Humphrey's testimony was false and misleading………...……………………………………………..58

3. Mr. Humphrey's testimony was material…………………………………….59

D. The materiality of the *Giglio/Napue* violation must also be considered *in toto* as well as collectively with the *Brady* violations.………………………………………..60

IV. The Original § 2255 Proceeding Should be Reopened Pursuant to Fed. R. Civ. P 60 Due to the Government's Fraud, Misrepresentation, or Misconduct……………………61

A. Rule 60(b)(3)……………………………………………………………..…62

B. Rule 60(b)(6)……………………………………………………………..67

C. Rule 60(d)(1)……………………………………………………………..70

D. Rule 60(d)(3)……………………………………………………………..73

Conclusion………………………………………………………………………75

July 3 2020 p75

Appellate Case: 20-2351   Page: 75   Date Filed: 07/04/2020 Entry ID: 4930235

**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

**DANIEL LEWIS LEE,**
      **Movant**
                                    **Criminal Case No. 4:97-cr-00243-KGB-2**

                                             **CAPITAL CASE**

**vs.**

**UNITED STATES OF AMERICA,**
      **Respondent.**

## MOTION FOR RELIEF FROM JUDGMENT OR ORDER
## PURSUANT TO FED. R. CIV. P. 60

COMES NOW Daniel Lee ("Mr. Lee"), by his undersigned counsel, and hereby moves the Court, pursuant to Fed. R. Civ. P. 60, for relief from its Judgment issued August 28, 2008, denying Mr. Lee's motion for post-conviction relief pursuant to 28 U.S.C. § 2255. Mr. Lee alleges that the Government made material misrepresentations during the original § 2255 proceeding that prevented him from fully and fairly presenting claims that his convictions were obtained in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny because the Government suppressed favorable and material impeachment evidence in its case against Mr. Lee for the murders of William Mueller, Nancy Mueller, and Sarah Powell. Mr. Lee also alleges that these same misrepresentations prevented him from fully and fairly presenting claims that his convictions were obtained in violation of *Napue v. Illinois*, 360 U.S. 264 (1959) and *Giglio v. United States*, 405 U.S. 150 (1972), because the Government introduced misleading, inaccurate, and prejudicial evidence at his trial. Mr. Lee further alleges that the Government's conduct during the § 2255 proceedings impeded this Court's impartial task of adjudicating his § 2255 motion, thereby constituting a fraud on the court.

Appellate Case: 20-2351   Page: 76   Date Filed: 07/04/2020 Entry ID: 4930235

**INTRODUCTION**

Over twenty years. That's how long it's been since the jurors who assembled at the federal courthouse in Little Rock chose to sentence Daniel Lee to death for the murders of William Mueller, Nancy Mueller, and Sarah Powell. That's how long it's been since they selected a harsher sentence for him than for the far more culpable co-defendant Chevie Kehoe, whose criminality, twisted charisma, and alleged objective of creating a revolutionary white supremacist organization were the overwhelming focus of the prosecution's evidence at trial. It has certainly been a long time since defense counsel sought to undermine the credibility of the Government's star witness (and Mr. Kehoe's mother), Gloria Kehoe, calling on jurors to find her testimony "unworthy of belief," Tr. 6937[1]; and since the Government denigrated the defense's case, taking counsel to task for spending "a bunch of time during the trial trying to convince everybody that Paul Humphrey," the initial suspect in the investigation of the Mueller murders, "did it." Tr. 6959. Over those many years, perceptions have no doubt taken root about the strength of the case the jurors considered and about the adequacy of the review process Mr. Lee received. Yet, the truth is unsettling: the Government has, for decades, effectively been reaping the benefits of its misconduct at Mr. Lee's and the justice system's expense.

Documents recently obtained through an Arkansas Freedom of Information Act request show that the Government buried an explosive piece of evidence: Mr. Humphrey flunked a polygraph exam administered by the Arkansas State Police that showed he was involved in the

---

[1] Throughout this motion, "Mr. Kehoe" refers to Chevie Kehoe. To avoid confusion, the pleading refers to other members of the Kehoe family (primarily, Kirby, Gloria and Cheyne Kehoe) by either their full names or their first names only.

Citations to the consecutively-paginated trial transcript are designated as "Tr." Citations to documents filed in the district court criminal docket in this case are designated as "Dkt." Citations to the attached exhibits are designated as "Exh."

2

murders.[2] Not only did the Government—which took over the investigation of the case from local authorities—hide this report from the defense, it then also allowed Mr. Humphrey to take the stand and deny any involvement in the crimes. It even told the jury that the Government's thorough investigation had turned up no evidence connecting him to the murders. The prosecution's case was, as explained in detail below, problematic as to Mr. Lee to begin with, and in light of its weaknesses, the suppressed information about Paul Humphrey's failed polygraph is enough by itself to undermine confidence in the verdict.

But that wasn't all. The Government also successfully concealed evidence that prime witness Gloria Kehoe was mentally unstable, and suffered from paranoia and hallucinations, both visual and auditory. Mrs. Kehoe's husband, Kirby Kehoe, and son, Cheyne Kehoe, both implicated in the offense and interviewed by case agents, advised them repeatedly about her affliction.[3] Information about her long-standing symptoms, including her impaired ability to perceive, remember, and narrate perceptions accurately, would have destroyed her credibility in the eyes of jurors. The prosecution's case against Mr. Lee rested squarely on that credibility: Gloria without question provided the prosecution's most damning evidence, as she alone claimed he confessed his involvement to her.

This suppressed evidence matters. Daniel Lee was implicated in the Mueller murders only after Gloria and Cheyne began cooperating with federal authorities, and the case that went to jurors was built on the inherently suspect testimony of these two witnesses. Both were facing the prospect of significant prison time. Gloria was paid thousands of dollars in exchange for her

---

[2] *See* Exh. A (1/21/97 Humphrey Interview and Polygraph Examination Report).

[3] *See* Exh. B (11/1/19 Declaration of Cheyne Kehoe); *see also* Exh. C (11/3/19 Declaration of Kirby Kehoe).

cooperation. Their several statements to law enforcement were riddled with inconsistencies. And their testimony blatantly conflicted with physical evidence at trial. Jurors were skeptical of their testimony, as indicated by their refusal to convict the defendants on any charges that were based solely on Gloria and Chevie's representations. It was independent, unbiased evidence corroborating their accounts that persuaded the jury that Mr. Lee was guilty of the Mueller murders; but, in the years since the trial, that necessary corroboration has, bit by bit, been whittled away from the case, unsettling what may have once seemed to be a "verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 534 (1995). The impact of this newly discovered evidence is, thus, huge.

Ordinarily, Mr. Lee would have presented these prosecutorial misconduct claims in his original § 2255 proceedings. In fact, he made a formal request at that time that the Government, pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), disclose any material exculpatory evidence in its possession; and he reserved the right to amend his § 2255 motion, which alleged generally that the Government had withheld exculpatory and impeachment information, with more specific *Brady* claims based on any information that the Government produced. In light of that demand the Government should have disclosed the information about Gloria's troubling symptoms of mental illness and Mr. Humphrey's polygraph failure. Had it done so, Mr. Lee would have amended his § 2255 motion accordingly, and this Court would have been able to adjudicate the relevant *Brady* claims, and a new trial could have and would have been ordered.

But that's not what the Government did.

Instead, it misled counsel and the Court in the § 2255 proceedings into believing that it had already fully complied with its *Brady* obligations at the time of trial, and it made no additional disclosures. Consequently, its response rendered Mr. Lee's general *Brady* claim moot,

4

and this Court did not even address the claim in its order of August 28, 2008, denying § 2255 relief.

That is the premise of this motion for relief under Fed. R. Civ. P. 60: The Government's misrepresentations in the § 2255 proceedings unfairly precluded Mr. Lee from marshaling evidence and facts in support of cognizable claims pled during the post-conviction process. To be crystal clear, this Court need not determine the merits of the underlying claims at this juncture; rather, its task is to consider whether the Government made misrepresentations that resulted in a defect in the integrity of Mr. Lee's § 2255 proceedings, and if so, whether that defect warrants reopening the § 2255 judgment to allow his prosecutorial misconduct claims to be properly considered. A number of courts have rightly held[4] that under such circumstances the prior judgment denying § 2255 relief should be reopened so that the federal prisoner can have a "fair shot" at having his or her § 2255 claims considered.[5] To do otherwise would allow the Government to profit off its own misconduct.[6] *See infra* at Section IV (discussing avenues to reopen the judgment pursuant to Rule 60(b)(3), (b)(6), (d)1), and (d)(3)).

And the Government has profited to date. In the many years since Mr. Lee was tried, convicted, and sentenced to death, the Government has gone to great lengths to insulate its

---

[4] *See*, *e.g.*, *In re Pickard*, 681 F.3d 1201 (10th Cir. 2012); *United States v. Williams*, 753 Fed. Appx. 176 (4th Cir. 2019); *Scott v. United States*, 81 F. Supp. 3d 1326 (M.D. Fla. 2015), *aff'd*, 890 F.3d 1239 (11th Cir. 2018).

[5] *In re Pickard*, 681 F.3d at 1206.

[6] *Id.* at 1207 ("If Defendants' claim of prosecutorial deceit during the § 2255 proceedings must be treated as a second-or-successive § 2255 motion, then the government's alleged misconduct during that proceeding could compound a substantial injustice to Defendants. . . . We doubt that the governing procedural rules permit the government to gain such an advantage by its own fraudulent conduct.")

5

transgressions in this case from judicial scrutiny. As discussed below, Mr. Lee has uncovered other instances of prosecutorial misconduct and other favorable evidence at different points, which he has brought to the Court's attention, piece by piece, on the Government's terms and to its enormous advantage. The compelling new evidence relating to Mr. Humphrey's failed polygraph and Gloria Kehoe's mental instability is, in that sense, part of a disturbing pattern that cuts through the notion that the length of time that has passed since trial can somehow serve as an adequate substitute for a fair process. The Government trampled Daniel Lee's basic trial rights repeatedly in order to secure his conviction and death sentence in 1999. Then, in his post-conviction proceedings, it represented to this Court that the favorable evidence he sought did not exist or was turned over previously. After running out the clock in those proceedings, it has, ever since, effectively used procedural and jurisdictional roadblocks to keep that evidence concealed, thereby preventing the courts from reviewing his claims of prosecutorial misconduct. Perhaps tellingly, the Government has not once denied the allegations; rather, it has repeatedly returned to the same playbook, claiming Mr. Lee took too long to uncover the buried evidence.

The Government's attempt to short-circuit post-conviction review of Mr. Lee's claims by hiding evidence of its misconduct throughout the trial and § 2255 process cannot stand. This motion sets forth the facts, circumstances, and various sound legal bases for the requested relief, focusing on the claims he could have raised in his § 2255 proceedings but for the Government's misrepresentations. A detailed cumulative review of the totality of evidence demonstrating the infirmity of the jury's verdict in light of his newly discovered evidence is also provided—although, as noted, because determination of the merits is premature at this point, the analysis is meant to convey to the Court the grave implications of the Government's misrepresentations. Mr. Lee respectfully requests only that the prior judgment be reopened so that he can remedy this

6

defect in the integrity of the proceedings and fully and fairly present his claims for this Court's review.

**I.      A Case Shaped to Fit Two Witnesses: Relevant Factual Background and Procedural History**

The Government built its case against Danny Lee on the statements provided by its cooperating witnesses, Gloria and Cheyne Kehoe. Once Cheyne provided his account of the crime, and Gloria claimed Mr. Lee confessed to her (a rather important detail missing from her original story), the rest of the trial evidence was made to conform.

**A.      The Trial Proceeding**

The substance of the 1999 proceeding, in which Daniel Lee and co-defendant Chevie Kehoe were jointly tried and convicted by an Eastern District of Arkansas jury of participating in a pattern of racketeering activity, centered on Mr. Kehoe. The Government alleged that Chevie Kehoe, his father Kirby Kehoe, his brother Cheyne Kehoe, Faron Lovelace, and Daniel Lee participated in a variety of criminal activities to promote and fund a white supremacist organization. *See United States v. Lee*, 374 F.3d 637, 641 (8th Cir. 2004). According to the Government, Mr. Kehoe was the leader of the racketeering enterprise, recruited Mr. Lee to join the group some time in 1995, and directed him to participate in various crimes in furtherance of the enterprise. Although the jury acquitted both codefendants of numerous alleged racketeering acts—including a bombing of the Spokane City Hall in 1996, the 1995 murder of Jeremy Scott in Idaho, and the 1996 murder of John Cox in Idaho—it convicted them of the 1996 robbery and murders of William Mueller, Nancy Mueller, and Sarah Powell in Tilly, Arkansas ("the Mueller murders"). In separate penalty phase hearings, despite their disparate alleged roles, the jury

7

sentenced Mr. Kehoe to life without possibility of release and sentenced Mr. Lee to death for each of the three murders.[7]

The Kehoes first met William Mueller on the gun show circuit where they bonded over their shared extremist beliefs. Mr. Mueller was a federally licensed gun dealer who frequently traveled the circuit, selling firearms, ammunition, and various books and materials about "survivalist" practices. He was known to espouse antigovernment views similar to the Kehoes' and he often talked about going "sovereign" and getting "off paper"—that is, renouncing his United States citizenship, exchanging his currency for gold and silver coins, and amassing a stockpile of food, weapons, and supplies to allow him and his family to live "off the grid" and unconnected to the rest of society. Tr. 1977-81, 2027-29, 2228-31, 2235-37, 2497, 5910.[8] He also kept a large collection of weapons, ammunition, and valuable coins at his home in Tilly, Arkansas. Chevie Kehoe and his father Kirby had previously burglarized the Mueller residence in February 1995; they broke in and stole weapons and cash. According to the Government, Mr. Kehoe believed there was additional valuable property at the Mueller home and convinced Mr. Lee to join him in a plan to steal these goods.

---

[7] The local prosecutors were compelled by Main Justice to proceed with a penalty phase for Mr. Lee despite their attempt to drop death after Chevie Kehoe, whom all agreed was the patently more culpable of the two men, was sentenced to life imprisonment. Dkt. 824 (Tr. May 10, 1999); Dkt. 827 (Tr. June 29, 1999). Main Justice's overruling of the United States Attorney's decision itself became a point of litigation in the case. As Mr. Lee has pointed out elsewhere, the Government then relied on junk science and false claims to secure a death sentence for the less culpable actor. See *Lee v. Warden*, No. 2:19-cv-00468-JPH-DLP, Dkt. 1 (S.D. Ind. Sept. 26, 2019).

[8] Mr. Mueller had, similar to Kirby Kehoe, adopted Christian Identity teachings and "believed that the white race was superior and all others were there for the purpose of serving the white race." Tr. 2232-33.

### 1.     The questionable case against Mr. Lee

The bodies of the Muellers were recovered from Lake Dardanelle in Russellville, Arkansas in June 1996. The Government alleged that Mr. Kehoe and Mr. Lee carried out their murders on January 11, 1996,[9] a point in time it had difficulty establishing. According to the prosecution's theory, the Muellers were not home when Mr. Kehoe and Mr. Lee arrived. Rather than burglarize the house and leave, as Chevie and Kirby Kehoe had done in 1995, the Government contended that Mr. Kehoe and Mr. Lee dressed in FBI raid gear, broke into the home, and laid in wait for the Muellers to return. The prosecution's theory was that when the family arrived, Mr. Kehoe and Mr. Lee pretended that they were FBI agents conducting a raid. After finding $50,000 in cash, guns, and ammunition, they were alleged to have incapacitated the Muellers with a stun gun, placed sealed plastic bags over their heads, killed the family,[10] driven nearly 50 miles to abandon the Muellers' Jeep and trailer then another 20 miles to dump the victims' bodies over a bridge into Lake Dardanelle, before taking off with the stolen property and driving another 2,000 miles nonstop to Spokane, Washington.

---

[9] According to the prosecution, the last time the Muellers were ever seen or heard from was on January 11. Mr. Mueller did some electrical work at the home of a friend that morning and then went to an electronics store that same day. Tr. 1794-95; 1802-04; 1810. Another witness testified to receiving a phone call from Mrs. Mueller the morning of the 11th, Tr. 2139, and phone records showed that the last outgoing call made from the Mueller home was on January 11. Tr. 1837. As discussed below, however, the Government's timeline was problematic, both because witnesses saw the Muellers alive after January 11, and Mr. Lee was back in Spokane by January 13. *See* Section II.B, *infra.*

[10] The Government's case, based again on these two witnesses, has always been that Chevie Kehoe alone was responsible for killing the child, 8-year-old Sarah Powell. Although part of their own case, this is a fact the Government tends to ignore in current proceedings, especially as it maintains it chose Daniel Lee for execution over others because he killed a child. *Federal Government to Resume Capital Punishment after Nearly Two Decade Lapse*, Office of Public Affairs, Dept. of Justice (July 25, 2019).

This narrative of what happened came solely from Cheyne and Gloria Kehoe, who claimed that they learned about the Mueller murders from Chevie Kehoe. Gloria, however, also claimed that *Mr. Lee* confessed his involvement to her. *Lee*, 374 F.3d at 642. Of significance for purposes of this motion, during cross-examination by Mr. Kehoe's counsel, Gloria unexpectedly got off the witness stand and left the courtroom, causing the trial to come to a halt. *See* 4/7/99 Bench Conference Tr. 7, 10 (Judge Eisele noting that Gloria Kehoe "left the witness stand" and "I think, as I understand it, the witness has broken down and is not going to be able to finish this afternoon. I think we'll bring [the jury] back in and recess right now.") After her testimony, Mr. Kehoe's counsel filed a motion to compel Gloria to undergo a psychiatric examination, Dkt. 732, but it was denied. Dkt. 748.[11]

To shore up the Kehoes' account of the crime, the Government relied on two sources of corroborative evidence. The first was the testimony of James Wanker, a resident of the Shadows Motel in Spokane where Mr. Lee and the Kehoes occasionally stayed. According to Mr. Wanker, sometime between July and September of 1996, Danny Lee told him that he committed a crime that involved facts similar to those of the Mueller murders. Tr. 4082-83.[12] The Government

---

[11] Additionally, during Gloria's testimony, Mr. Kehoe's counsel requested a bench conference to determine whether there was any outstanding discovery material that the Government had not provided. Tr. 5063-66. Counsel noted that Gloria testified she had been interviewed on a dozen or more occasions by investigating agents or prosecutors, but the Government turned over substantially fewer materials. *Id.* at 5063-65. Lead counsel for the Government stated that although he had personally conducted some interviews with Gloria and had not disclosed his notes because they constituted attorney work product, all other materials had been disclosed. *Id.* at 5063-64. *See also id.* at 5064 ("I can't believe we've not given up everything.").

[12] The Government also introduced testimony from Dalvine Wanker, James Wanker's then-wife, that sometime in August of 1996, she told Danny Lee that she was concerned about a new tenant at the Shadows Motel, and that in response Mr. Lee "went into [his] trailer and came out and he had a firearm and said that he wasn't afraid to use it and that when he had gone down south and that some people had fucked with him, and that he had taken care of it." Tr. 4093. As

emphasized in its argument to the jury that Mr. Wanker was an unbiased witness who received

nothing in exchange for his testimony, and that his only incentive for coming forward was to tell

the truth:

> Nobody has paid Mr. Wanker anything. There is no reason for him to come in here and tell you that story unless it's the truth. And it's the truth because Danny Lee told him that. And there he told what happened. It's not detailed and it's not involved, but it's real and that's what they did.

Tr. 7002.

The second source was a piece of physical evidence. During a search of one of Mr.

Kehoe's vehicles, the Government seized the FBI raid gear that it alleged the two wore during

the Mueller murders. A hair was recovered from one of the caps, and according to an expert from

the Arkansas State Crime Laboratory, this hair was microscopically similar to Mr. Lee's hair. Tr.

4722. In its closing argument, the Government forcefully argued that "the evidence establishes

that *that was Danny Lee's hair*." Tr. 7000-01 (emphasis added).[13]

### 2.      Mr. Lee's defense theory at trial

The defense theory was that Cheyne's and Gloria's account of the murders was false and

motivated by a desire to curry favor with the Government and avoid lengthy prison sentences.

---

even the Government conceded at trial, this "isn't a detailed statement," Tr. 7003, and provides no connection to the Muellers or even to Arkansas. The Government needed James Wanker's testimony.

[13] As is discussed below, we now know based on DNA evidence that that was not, in fact. Mr. Lee's hair. *See* Exh. L. The prosecution also attempted to link Mr. Lee to the crime via a fingerprint lifted from a display case belonging to the Muellers that was recovered in a storage unit at the Shadows Motel. Tr. 7001. But as was pointed out at trial, Mr. Lee frequently *slept* in that storage unit and had multiple opportunities to come into contact with the display case. Tr. 2856-57; 2915; 4815; 5312; 6878; 6946-47. Even the Government's own fingerprint expert testified there was no way to determine the age of a print or when it might have been deposited on the display case. Tr. 3716. This evidence therefore had no probative value as to whether Danny Lee was at the crime scene.

Tr. 6937, 6941-42. Trial counsel argued that the Government's timeline was implausible, Tr. 6948-55, and that other individuals had a motive and opportunity to kill the Muellers, including Paul Humphrey. Tr. 6948. Mr. Kehoe's counsel, in fact, called Mr. Humphrey as a witness. After defense counsel for both defendants questioned him about evidence that implicated him in the crime -- such as his possession of forged titles to the Muellers' vehicles and his familiarity as a skin diver with Lake Dardanelle, where the victims' bodies were recovered -- the Government stepped in and elicited testimony from him that he was not "in any way involved in the death of Bill Mueller, Nancy Mueller or Sarah Powell[.]" Tr. 6204. In closing arguments, the Government took pains to assure the jury that both local and federal authorities thoroughly investigated Mr. Humphrey and turned up no evidence connecting him to the crime. Tr. 6959-60 ("[The defense] spent a bunch of time during the trial trying to convince everybody that Paul Humphrey did it. . . . There's no evidence against Mr. Humphrey.")

The jury ultimately convicted Mr. Lee of the three racketeering acts concerning the Mueller murders, as well as three capital counts of Violent Crimes in Aid of Racketeering ("VICAR") for each of the three murders.

### B.      Relevant Post-Trial Proceedings

Mr. Lee's conviction and sentence were affirmed on direct appeal. *United States v. Lee*, 374 F.3d 637 (8th Cir. 2004), *cert. denied*, 545 U.S. 1141 (2005). He filed a motion to vacate under 28 U.S.C. § 2255 on June 26, 2006, raising numerous grounds for relief, including a general allegation that the Government had improperly withheld information favorable to the defense in violation of its constitutional *Brady* obligations. Dkt. 1118-1 at 7. As part of that motion, he specifically requested "that the Government review its files and the files of its investigating agencies for any information favorable to the defense bearing on guilt or

July 3 2020 p87
Appellate Case: 20-2351    Page: 87    Date Filed: 07/04/2020 Entry ID: 4930235

punishment, including – but not limited to – any evidence that other members of white supremacist or Christian Identity groups, or other like groups, were responsible for the murders of the Mueller family or otherwise played a role in the crimes charged in, or related to, this case." *Id*. at 7, n.3. Mr. Lee further noted that in the event the Government turned over such *Brady* material, he would "amend the petition and seek relief appropriate to the nature of the material newly-disclosed or uncovered." *Id*.

In its response, the Government did not come forward with any *Brady* material but simply noted that it had previously provided a "huge amount" of discovery to trial counsel.[14] Dkt. 1126-1 at 45 n.16. It made no further disclosures, and consequently, Mr. Lee made no amendments to his § 2255 motion. In its order denying the § 2255 motion, Dkt. 1163, the Court did not address the *Brady* issue, which had been rendered moot by the Government's response.

Notably, before Mr. Lee's § 2255 motion was filed, the Government made representations during Chevie Kehoe's § 2255 proceedings that are relevant here. Mr. Kehoe alleged that trial counsel were ineffective for failing to adequately investigate third parties, such as Paul Humphrey, and that the Government had improperly withheld exculpatory evidence implicating these third parties in the Mueller murders. Dkt. 1039 at 40 (Kehoe § 2255 motion);

---

[14] Shortly after their appointment, trial counsel for Mr. Lee filed several pre-trial motions requesting that the Government reveal all information and material known to it that might be favorable to Mr. Lee pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. Dkt. 28, 31, 33, 35. The Government responded that it "recognize[d] its obligation under *Brady v. Maryland*," and would "provide all *Brady* material as required by law." Dkt. 55 at 2. The prosecutors further stated that they would "treat this motion as continuing." *Id.*

During a pretrial conference on April 9, 1998, the prosecution represented that the "bulk" of the *Brady* material had already been disclosed to the defense. 4/9/98 Tr. at 32. The Court thereafter entered an order dismissing Mr. Lee's *Brady* motion as moot "[f]or the reasons set forth on the record and in open court" at the hearing, while also directing the Government to provide defense counsel with any discovery to which Mr. Lee was entitled "on a continuing basis as it is received." Dkt. 145 at 1, 3.

July 3 2020 p88
Appellate Case: 20-2351   Page: 88   Date Filed: 07/04/2020 Entry ID: 4930235

Dkt. 1067 at 34-35, 39-40, 45 (amended Kehoe § 2255 motion). In its response, which was filed prior to Mr. Lee's § 2255 motion, the Government unambiguously stated: "All documents relating to Mr. Humphrey were provided to trial counsel." Dkt. 1087 at 32. It further stated: "Despite trial counsel's best efforts, no tie was ever made between Paul Humphrey and the named individuals [who were alternate suspects] which could establish that Paul Humphrey or one of the named individuals was in fact responsible for the Mueller deaths. In his argument Movant identifies no connection. Even should the Court review the issue, Movant's allegations are meritless on their face." *Id.* at 32-33. Any such evidence disclosed to Mr. Kehoe could also have benefitted Mr. Lee, but the Government asserted there was none.

Mr. Lee initiated other collateral litigation when other evidence of the Government's misconduct came to light.  On September 10, 2018, he filed a second-in-time § 2255 motion alleging, in pertinent part, prosecutorial misconduct for suppressing exculpatory and impeachment evidence concerning Mr. Wanker's testimony about Mr. Lee's purported confession, as well as for presenting substantially misleading and false testimony about the same. Dkt. 1297. Mr. Lee argued that under prevailing Eighth Circuit law, material second-in-time *Brady* claims are not subject to the pre-authorization requirement under 28 U.S.C. § 2255(h), and therefore this Court had jurisdiction to consider the claims in the first instance. *Id*. at 23-29. This Court disagreed and dismissed the motion for failing to obtain such pre-authorization and denied a Certificate of Appealability ("COA"). Dkt. 1313.[15]

---

[15] It is important to note that the Government's misconduct in this case is not limited to suppressing the Wanker evidence; in fact, Mr. Lee has uncovered a pattern of *Brady* and *Napue/Giglio* violations that infected both the guilt and penalty phases of his trial. He is currently litigating claims concerning the Government's presentation of false and misleading evidence that Mr. Lee had committed a prior murder as a juvenile. *See Lee v. Warden*, No. 2:19-cv-468-JPH-DLP (S.D. IN). (That claim was first raised in this Court in September 2018. Dkt. 1297. Although concluding that "the outcome at sentencing would have been different" but for

14

Mr. Lee's COA Application to the Eighth Circuit was denied on November 4, 2019, over the dissent of the Hon. Jane L. Kelly. Although the district court had made a threshold determination that the *Brady* claim concerning Mr. Wanker was not material, Judge Kelly stated that she would have granted a COA on that issue because "jurists of reason could disagree about whether Lee's newly discovered evidence is material for purposes of *Brady*." *See* Judgment, *United States v. Lee*, No. 19-2432 (8th Cir. Nov. 4, 2019) (Kelly, J., dissenting).[16]

## II.      The Case Begins to Unravel: A Cumulative Review

There is a mantra that has been attached to this case for some time: that the evidence of Daniel Lee's involvement in the Mueller murders was "overwhelming."[17] But anyone looking at that trial record now in light of the many developments that have since transpired would be hard pressed to agree.[18] This series of revelations and intervening events, which further undermine the

---

the Government's misconduct, this Court determined it lacked jurisdiction to grant relief. Dkt. 1313 at 14, 16-17.) Mr. Lee subsequently learned that the Government suppressed exculpatory evidence that undermined the fundamental basis for federal capital murder charges under 18 U.S.C. § 1959. *See Lee v. United States,* No. 19-3576 (8th Cir. Dec. 4, 2019). On January 7, 2020, the 8th Circuit denied Mr. Lee's motion for authorization to file a successive § 2255 motion based on this *Brady* claim over the dissent of Judge Kelly, who observed that the Government failed to respond to the underlying allegations of misconduct. *See* Exh. D. Indeed, the Government has never unequivocally denied any of the factual allegations concerning its suppression of evidence raised in any of Mr. Lee's *Brady* pleadings; rather, it has successfully relied on procedural or jurisdictional grounds to evade review of its misconduct. *See* Section IV.D, *infra*.

[16] Judge Kelly also stated that "jurists of reason could disagree about whether a material *Brady* claim in a second habeas motion qualifies as a "second or successive motion" subject to the gatekeeping requirements of 28 U.S.C. § 2255(h)." For the Court's convenience, Judge Kelly's dissent is attached as Exh. E.

[17] *See* Dkt. 1163 at 22, 31, 49; Dkt. 1313 at 13.

[18] Even back in 1999, observers raised concerns about the strength of the evidence used to convict Daniel Lee. *See*, *e.g.*, Exh. F, "But Here's A Dissenting Opinion," The Courier News (Russellville, AR), May 6, 1999.

Government's theory of the case, are all relevant to assessing the effect that the newly discovered evidence concerning Gloria Kehoe and Paul Humphrey would have had on the case as whole. *See Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2016) (*per curiam*) (materiality determination under *Brady* must be made by considering all the evidence cumulatively, not in isolation). Mr. Lee therefore describes these developments below along with the evidence in the Government's trial case. He sets out Cheyne and Gloria's glaring credibility deficits; the evidence presented at trial to shore up their account; and an inescapable problem the prosecution faced relying on their narrative.

### A.   Gloria and Cheyne Kehoe were inherently unreliable witnesses.

There can be no question but that the central evidence in the case against Mr. Lee came from Gloria and Cheyne Kehoe. What was questionable, from the start, was their credibility. The prosecution thus needed other evidence to shore up their account, both for the jurors to credit the Kehoes' story and as a matter of law.

### 1.   The Kehoes' credibility problems.

Before Gloria and Cheyne decided to cooperate, the Government had no evidence connecting Mr. Lee to the Mueller murders; at best, he was a person of interest solely because he was a "known associate" of Chevie Kehoe. The prosecution's case against Mr. Lee was quite literally built on the word of these two witnesses. But Gloria and Cheyne each had significant credibility problems.

#### a.   Benefits given to the Kehoes

First, the Kehoes were not disinterested witnesses. They testified in direct exchange for lenience for their own crimes. When Cheyne decided to cooperate, he had a significant incentive to curry favor with the Government: He was a fugitive from the attempted murder of two Ohio

16

police officers in a brazen daylight shoot-out that had been nationally televised and that had landed him onto the FBI's "most wanted" list.[19] As is clear from his earliest interviews with authorities, he knew that his only hope of reducing the prison time he was facing was to cut a deal in exchange for information about an even bigger crime, the Mueller murders. Indeed, his gamble paid off. After Cheyne testified at Mr. Lee's trial, his 24-year Ohio sentence was reduced by more than half.[20] But that was not the only benefit he received. As a member of Mr. Kehoe's racketeering enterprise, Cheyne was exposed to federal charges that carried a potential life sentence. As part of his cooperation agreement, he received a grant of immunity and escaped liability for *any* of the charged activities of the enterprise.[21]

Gloria Kehoe also received substantial benefits in exchange for her testimony. In addition to immunity from prosecution for any offenses related to the racketeering counts, as well as for various tax and Social Security offenses,[22] which potentially exposed her to 30 years'

---

[19] *White supremacists arrests conjure memories of Kehoe shooting rampage*, Dayton Daily News, Oct. 16, 2013, https://www.daytondailynews.com/news/crime--law/white-supremacists-arrest-conjure-memories-kehoe-shooting-rampage/gGMyTxJv1Dz5s7El3ExwlK/ (last visited Jan. 28, 2020).

[20] Cheyne was originally sentenced to 24 years and 5 months. Tr. 5283. His agreement with federal prosecutors included notifying the Ohio authorities about his cooperation. Tr. 5281. In December 2000, a year after Mr. Lee was sentenced to death, Cheyne's sentence was reduced to 11 years. *White supremacists arrests conjure memories of Kehoe shooting rampage*, Dayton Daily News, Oct. 16, 2013, https://www.daytondailynews.com/news/crime--law/white-supremacists-arrest-conjure-memories-kehoe-shooting-rampage/gGMyTxJv1Dz5s7El3ExwlK/ (last visited Jan. 28, 2020); Tr. 5283. He was released in June 2008.

[21] Cheyne also received the benefit of placement in the Federal Witness Protection Program in exchange for his testimony, but it appears he squandered that opportunity. He was arrested again in 2013, along with his father, Kirby Kehoe, on federal firearms and drug charges. He pled guilty in 2014 to one count of being a felon in possession of a firearm and was sentenced to 41 months' imprisonment. He got out in September 2016.

[22] *See* Tr. 4949, 4987-89. Gloria admitted on the stand that she assisted Mr. Kehoe in fleeing from Ohio after his shootout with police officers, that she had not filed federal income

July 3 2020 p92

Appellate Case: 20-2351   Page: 92   Date Filed: 07/04/2020 Entry ID: 4930235

imprisonment,[23] Gloria received large cash payments during the course of her cooperation with authorities—$2,250 per month, totaling roughly $27,000 by the time of her testimony. Tr. 3522-23. As a single mother[24] with no job and six children to feed, clothe and shelter,[25] she had every incentive to stay in the Government's good graces to stay out of prison and provide for her family.

### b.   Conflicts with other evidence

In addition to the huge benefits they received for cooperating, the reliability of the Kehoes' testimony was suspect due to discrepancies between their story and the physical evidence.  For example, Cheyne repeatedly told authorities that he had a detail about how the murders occurred that would independently corroborate his account—namely, that Mr. Mueller's skull was fractured during the incident. Tr. 5328, 5442, 6876. According to Cheyne, his brother struck Mr. Mueller in the head with the butt of his rifle with a blow so forceful that it broke the

---

taxes in at least 10 years, and that she used a fake Social Security Number during a real estate transaction. Criminal charges had been filed against her in the Western District of Arkansas with respect to the use of the false Social Security Number, and those charges were dismissed as a result of her cooperation in this case.

[23] *See* 42 U.S.C. § 408(a)(7)(B) (maximum 5 years' imprisonment for use of false Social Security Number); 18 U.S.C. § 3 (maximum 15 years' imprisonment for being an accessory after the fact to a crime punishable by life imprisonment); 28 U.S.C. § 7203 (maximum 1 year imprisonment for each instance of willful failure to file tax return).

[24] Gloria's husband, Kirby Kehoe, was indicted and arrested in connection with this case. He was charged in Count One as a principal of the racketeering enterprise, in Count Two as a RICO co-conspirator, and in Count Six as a co-conspirator in the Hobbs Act robbery of the Muellers. He faced a potential life sentence on these charges. He entered a plea of guilty to the first count of the indictment (RICO) on February 8, 1999, prior to the start of Mr. Lee's trial. He was sentenced to 44 ½ months' imprisonment, to run consecutive to a 51 month prison sentence he was already serving on federal weapons violations, leaving Gloria alone to take care of their six youngest children, which at that time included an infant and a toddler.

[25] Tr. 5205.

18

walnut stock and Chevie saw the skull cave in. *Id.* This corroborative detail was horribly gruesome, but also a fabrication. As the medical examiner testified at trial, there was no evidence of a skull fracture, hemorrhage or other injury to Mr. Mueller's skull. Tr. 3563, 3579-80, 3587-88.

Similarly, both Gloria and Cheyne claimed that Mr. Kehoe told them that Mr. Mueller bled onto the carpet after being struck in the head. Tr. 5422; 5188-89. This was another grisly "fact" contradicted by the physical evidence. The Arkansas State Police conducted a luminol examination of the carpet and sent multiple samples to the Serology Section of the Arkansas State Crime laboratory for further analysis. Every single sample tested negative for the presence of blood. *See* Exh. G.[26]

Additionally, both Gloria's and Cheyne's accounts of the murder included the detail that Mr. Lee wore an FBI costume while committing the crime. Although that part of their story was seemingly corroborated by forensic evidence at trial, we now know definitively, based on DNA testing, that the hair found in the FBI cap was not Mr. Lee's.

Finally, not only had they each given prior inconsistent statements, but their statements conflicted with each other, as well as with the testimony of disinterested witnesses in significant ways:

- *The required timeline.* In Gloria's earliest statement to authorities, she claimed that Mr. Kehoe and Mr. Lee stayed in Arkansas or Oklahoma for a few days after they committed the murders in order to see if the local media would report that the Muellers were missing. *See* Exh. H.  At the time she made that statement, neither she nor the authorities knew that Mr. Lee had been seen in Spokane on January 13. Perhaps aware that her original account would have destroyed the

---

[26] It is highly implausible that Mr. Kehoe and Mr. Lee could have cleaned the Muellers' home so thoroughly as to withstand a forensic examination for trace amounts of blood. This is especially so considering the Government's timeline; every additional moment of time spent in Arkansas would have made it that much more improbable for Mr. Lee to have made it back to Spokane by January 13.

July 3 2020 p94
Appellate Case: 20-2351     Page: 94     Date Filed: 07/04/2020 Entry ID: 4930235

Government's necessary timeline, Gloria conspicuously omitted that part of her story when she took the stand.

- *Gloria's sudden recollection of Lee's confession.* In her initial statement to the ATF, Gloria said that Mr. Kehoe confessed to her but did not say the same of Mr. Lee. *See* Exh. I. Two weeks later, Gloria was once again interviewed by the ATF; this time she claimed that Mr. Lee had made inculpatory statements, but she could not recall *any* details of what he said. *See* Exh. J. By the time of trial a year later, she purportedly had a clearer memory of what he had said (that Mr. Mueller had fought back, and that Mrs. Mueller had put a bag over her own head because she believed it was a legitimate FBI raid. Tr. 4975.) But when she was first interviewed by the ATF, she said she had learned all these details from her son Chevie. *See* Exh. I.

- *Cheyne Kehoe's knowledge of the crime.* Gloria and Cheyne gave conflicting accounts of when Cheyne first learned of Mr. Kehoe's involvement in the Mueller murders. Gloria testified that she begged Cheyne not to accompany his brother on a cross-country trip in December of 1996, specifically because Chevie had confessed to her that he had committed the Mueller murders. She swore she even provided details such as Chevie's admission that he was the one that killed the little girl. Tr. 5167-68. Cheyne, however, insisted that when he left with Mr. Kehoe for that trip, he knew nothing about Mr. Kehoe's involvement in the Mueller murders, and that it was only months later after they arrived in Galveston, Texas that he learned, from Mr. Kehoe himself, that he was involved in the offense. Tr. 5326-27. At least one of the two Kehoe witnesses was not telling the truth.

- *Cheyne's mistakes about the evidence.* Cheyne maintained that Mr. Kehoe showed him a Benelli 90 shotgun while they were on the lam in 1997 and told him that he needed to get rid of it because it had belonged to the Muellers. Tr. 5323. An uninvolved witness, Carl MacDonald, however, testified that he was the person who had given that gun to Mr. Kehoe; he had traded it to Mr. Kehoe in exchange for a Colt .45 at a gun show in Spokane in the previous year. Tr. 2698-99.

- *Kirby's alibi.* Kirby Kehoe was initially a suspect in the murders due to his involvement in the Mueller burglary in 1995. Despite admitting that she had overheard Kirby discuss plans with Mr. Kehoe in January of 1996 to rob the Muellers again, Tr. 5134, Gloria testified that Kirby was with her in Arizona in January of 1996 and never travelled to Arkansas. Tr. 5137-38. However, before she began cooperating in this case and pinned the blame on Mr. Lee, Gloria told a confidential informant of the ATF that Kirby had, in fact, been in Arkansas that January. *See* Exh. K at 1.

20

Appellate Case: 20-2351     Page: 95     Date Filed: 07/04/2020 Entry ID: 4930235

In short, Gloria and Cheyne had clear motives to lie in order to curry favor with the Government, and the numerous inconsistencies in their respective accounts of the crime rendered their stories even more suspect.

### 2.   The trial evidence corroborating the Kehoes, and its subsequent unraveling.

The jury's mixed verdicts on the racketeering acts charged in Count One demonstrate its reluctance to credit the Kehoes' testimony absent independent corroborative evidence. Specifically, there were three charged racketeering acts predicated entirely on the testimony of Gloria and Cheyne, *and the jury returned not guilty verdicts as to all three*:

- Racketeering Act 3, which alleged that Mr. Kehoe committed the murder of Jeremy Scott;

- Racketeering Act 7, which alleged that Mr. Lee and Mr. Kehoe set off a bomb at the Spokane City Hall;

- Racketeering Act 8, which alleged that Mr. Kehoe committed the murder of Jon Cox.

Unlike for these three acts, for the Mueller murder counts the jury could rely on two pieces of evidence to assuage any concerns that the Kehoes' account was not credible: the matching hair and James Wanker's testimony. This is no longer the case.

### a.   The hair.

DNA testing conducted after the trial conclusively established that the hair found in the FBI raid cap did not come from Mr. Lee. *See* Exh. L. This was the only physical evidence that directly tied him to the crime. Although the Government has attempted to downplay the importance of the hair evidence to its case ever since it was debunked, its contemporaneous arguments to the jury demonstrate that it treated it as a crucial piece of corroborative evidence that "proved" its theory of the offense. Tr. 7000-01.

21

Appellate Case: 20-2351   Page: 96   Date Filed: 07/04/2020 Entry ID: 4930235

*b. The admission to the unbiased witness.*

As for Mr. Wanker, he has since provided a sworn declaration that puts his trial testimony in a very different light. What the jury heard from him at trial was that in July or August of 1996, a group of people were having beers in the parking lot at the Shadows Motel when Mr. Lee, unprompted, told Mr. Wanker that "somebody had fucked with him and so he wrapped them up, taped them, and through (sic) them in the swamp." Tr. 4082. The testimony was offered at the capital murder trial as straight fact, with the Government asking no questions about Mr. Lee's demeanor when the statement was made or whether he appeared credible. In its closing argument, the Government argued that this evidence of Mr. Lee's alleged confession was especially reliable because it came from an unbiased witness with "no reason … to come in here and tell you that story unless it's the truth," Tr. 7002, an implicit recognition that the other witnesses were not similarly situated.[27]

The jury was given the impression that James Wanker decided to alert authorities because he believed he had important evidence about Mr. Lee's guilt. This was not true. In fact, Mr. Wanker's testimony was carefully choreographed to omit the facts and circumstances that would have led jurors to question the veracity of Mr. Lee's purported admission. As detailed in the attached sworn declaration by Mr. Wanker, if a complete account of what he had told authorities had been disclosed at the time of trial, it would have revealed instead that he had a well-founded basis to discount the statement Mr. Lee made to him – and that he continued to do so even after Mr. Lee was charged and prosecuted.

---

[27] *See also* Tr. 7002 (arguing that people like Mr. Wanker were "salt of the earth," and that he was "not only a hard working guy; he's a mannerly guy").

James Wanker met Mr. Lee in 1996 at the Shadows Motel in Spokane. Tr. 4078-79; Exh. M at ¶ 4. Mr. Wanker lived in the motel, and Chevie Kehoe and his family lived in a trailer in the RV section of the property. Tr. 4079. Danny Lee would often sleep on a couch outside the Kehoe trailer. Tr. 4080-81. Mr. Wanker recalled that he "really seemed like he was just looking for somewhere to belong. He wanted to look badass like the Kehoes but you could tell he didn't really fit in with them." Exh. M at ¶ 5. Over time, Mr. Wanker saw that Mr. Lee routinely made up stories to make himself seem tough and fit in better with those around him, including the Kehoes:

> Danny was a follower who tried to sound like a big guy. He was always trying to blow smoke up my ass; trying to impress me by sounding tough. He would spout off about different fights and crazy situations that were not true just to look tough and try to fit in.

Exh. M at ¶ 6.

One summer afternoon in 1996, after Mr. Lee had been drinking beers, he started bragging again about how tough he was and about all the things he had done, including that he had once killed somebody "in the south." Tr. 4082. These assertions were consistent with the empty bragging that Mr. Wanker had seen him exhibit in the past:

> When Danny made these comments about this trip, I didn't believe him. I knew him to be a braggart and that he would try to claim responsibility for criminal actions in order to fit in with the Kehoes. It still cracks me up that Danny was trying to be a tough guy.

Exh. M at ¶ 7.

Almost a year later, in the spring of 1997, a local Spokane officer came to the Shadows Motel asking questions about the Kehoes. Exh. M at ¶ 8. At the time, Chevie and Cheyne Kehoe were wanted for the shoot-out with police officers in Wilmington, Ohio; they had fled the shooting and their whereabouts were unknown. While chatting with the officer, Mr. Wanker

July 3 2020 p98
Appellate Case: 20-2351     Page: 98     Date Filed: 07/04/2020 Entry ID: 4930235

mentioned that he had heard Mr. Lee brag about committing various crimes, including an unspecified murder, but made clear that he did not believe any of it to be true. *Id*.

On June 16, 1997, Cheyne turned himself in for the Ohio shooting. In exchange for leniency, he gave a statement to authorities implicating Chevie and Chevie's friend Danny Lee in the Mueller murders. It was after Cheyne's statement that authorities showed a renewed interest in Mr. Wanker. *Id*. at ¶ 9. An officer from Arkansas then contacted Mr. Wanker by phone on June 26 and asked him about what he had heard Mr. Lee say. *Id*. Mr. Wanker told him what he had told the Spokane officer, noting again that the statement Mr. Lee made did not appear credible. *Id*. About a week later, an ATF agent from the Spokane field office interviewed Mr. Wanker. *Id*. at ¶ 10. Once again, Mr. Wanker stated what he had heard and how it was of a piece with Mr. Lee's prior phony boasts. *Id*. Notably, the ATF agent similarly appeared to be dismissive of Mr. Lee's story. *Id*. However, when the agents memorialized their interviews, they did not include any of the context or warnings Mr. Wanker had given them. *See* Exhs. N & O.[28]

In subsequent interviews with the Government prior to trial, Mr. Wanker repeated his observations and caveats to the case agent and the prosecutors: Mr. Lee had a known history of claiming "credit" for misdeeds that were not his. Exh. M at ¶ 11. In preparation for his

---

[28] The Government used a similar tactic with Mr. Wanker at the grand jury proceeding. It instructed him to omit certain details from his written statement that undermined the trustworthiness of Mr. Lee's alleged statement against penal interest. Exh. M at ¶12. In his July 2, 1997 statement to ATF Agent Sprenger, Mr. Wanker stated that Mr. Lee said there was a third individual who had accompanied him and Mr. Kehoe to Arkansas: Sean Haines. Exh. O at 2. But as the Government knew, Mr. Haines was in Spokane throughout January 1996 when the alleged trip to Arkansas took place. The fact that Mr. Lee's story contained a demonstrably false detail lends credence to Mr. Wanker's warning to law enforcement that the story was made up and not to be believed. The fact that the Government instructed Mr. Wanker to omit that detail about Mr. Haines from his written statement to the grand jury is also telling. It is consistent with a pattern of behavior to suppress any information that undermined the credibility of Mr. Lee's alleged confession, and, in turn, the corroborative value of Mr. Wanker's testimony.

testimony, Mr. Wanker was told that he should stick to just answering the questions posed to him about it and not volunteer any other details. *Id.* at ¶ 12.

The Government thus sanitized Mr. Wanker's statements and shaped his testimony, enabling it to present the evidence in a distorted and misleading manner. Contrary to the specific impression the prosecution created at trial, Mr. Wanker was not a concerned witness who initiated contact with authorities because he believed he had valuable, credible information to share about the Mueller murders. Instead, Mr. Wanker had well-founded doubts about the veracity of what he had heard, doubts that persisted despite the fact that Danny Lee was on trial. The jury never learned this because the Government worked to present him as a persuasive and compelling witness who could corroborate Cheyne's and Gloria's claim that Mr. Lee was involved in the killing of the Mueller. The jurors never heard that in reality Mr. Wanker had warned authorities from the start that Danny Lee's statement fit a pattern of "empty bragging" by a young man desperate to seem tough and fit in, and that Mr. Wanker found it no more credible at the time of his capital murder trial than he did when it was made. *Id*. at ¶ 13.

Had the jurors known that neither the hair evidence nor the Wanker testimony truly corroborated the Government's theory of the case, there is a reasonable probability that the outcome of the proceeding would have been different.

### 3. Absent corroborating evidence, the jury could not have convicted Mr. Lee.

The fact that the hair evidence has now been eliminated and the truth behind the Wanker testimony has been revealed has additional serious implications for the case against Daniel Lee—and for the issues now before this Court.

Because Arkansas crimes were alleged as several of the predicate offenses supporting the federal RICO charges, Mr. Lee's jury was instructed under Arkansas procedural rules. Pursuant

25

to Arkansas law, the testimony of an accomplice (i.e., Gloria and Cheyne) must be corroborated with substantive evidence "directed toward proving the connections of the accused with the crime and not directed toward corroborating the accomplice's testimony." *Martin v. State*, 57 S.W.3d. 136, 202 (Ark. 2001). Such evidence is sufficient where, "if the testimony of the accomplice were totally eliminated from the case, the other evidence independently establishes the crime and tends to connect the accused with its commission." *Id*. at 203.

> Mr. Lee's jury was specifically instructed by the court that
>
> Cheyne Kehoe and Gloria Kehoe, according to their own testimony, were, with respect to some of the Racketeering Acts charged [i.e. the murder and robbery of the Muellers], what are known as accomplices…You cannot, therefore convict a defendant of the Racketeering Acts involving Arkansas law – that's Four A, Four B, Five and Six upon the testimony of those witnesses unless that testimony is corroborated by other evidence tending to connect the defendants with the commission of the offenses.

Tr. at 7038.

Considered alongside all that has since been learned about Mr. Lee's case, it is doubtful the jury would have found sufficient corroboration to credit the accomplice testimony of Cheyne and Gloria Kehoe. Indeed, if the jurors had discounted Mr. Wanker's testimony, there is no remaining non-accomplice evidence that independently establishes the crime and connects Mr. Lee with its commission.

This point also emerges clearly when one compares the Eighth Circuit's analysis of the issue in Chevie Kehoe's case to the contrasting evidence against Danny Lee. The evidence the Court of Appeals relied upon in Mr. Kehoe's direct appeal to find sufficient corroboration as to Kehoe is wholly absent as to Mr. Lee. *See United States v. Kehoe¸* 310 F.3d 579, 591-92 (8th Cir. 2002). For example, the Court noted that Mr. Kehoe and Mr. Lee had no money while in Oklahoma and a few days later "they were comparatively wealthy." *Id*. at 592. The evidence at

26

July 3 2020 p101
Appellate Case: 20-2351    Page: 101    Date Filed: 07/04/2020 Entry ID: 4930235

trial, however, was that it was *Mr. Kehoe*, not Mr. Lee, who was spending lavishly in a way that suggested newfound wealth. *See, e.g.,* Tr. 2898-99; 4814; 4971; 4976; 5303. Likewise, paint chips recovered with the victims' bodies that were similar to the paint on Mr. Kehoe's vehicle, *id.*, is evidence that tends to connect *the Kehoes* to the Mueller murders but does nothing to corroborate the accomplice testimony as to Mr. Lee. Moreover, the fact that Mr. Lee may have possessed or sold stolen firearms shortly after the murders, *id.*, also fails to connect Mr. Lee with commission of the crime. Multiple persons, including Government witnesses Travis Brake and Sean Haines, *see infra* note 41, possessed and sold firearms stolen from the Muellers. There is nothing unique or compelling in such evidence that would lead a reasonable juror to find it sufficient to corroborate the accomplice witness testimony as to Daniel Lee.

The only evidence the Court of Appeals found to have been specific to Mr. Lee also fails to provide the necessary corroboration. *Kehoe*, 310 F.3d at 591. As noted above, *see supra* note 13, Mr. Lee's fingerprint taken from a display case stored in the area where he was living in Washington State shows only that Mr. Lee touched an item located in the room where he slept. It does not connect Mr. Lee to the crime scene.

**B.      The conviction of Mr. Lee was dependent on the validity of a deeply problematic timeline.**

The Kehoes' account—and thus the prosecution's case—setting out Mr. Lee's involvement in the Mueller murders hinged on a very precise timeline that can no longer withstand scrutiny.

Although the Kehoes did not say that the murders were committed on January 11, that was the only date that could accommodate their narrative. As previously noted, the murders could not have happened prior to the 11th because both William and Nancy Mueller had contact with others on that day. And, as is explained in more detail below, the murders could not have

July 3 2020 p102

Appellate Case: 20-2351     Page: 102     Date Filed: 07/04/2020 Entry ID: 4930235

happened after the 11th because that would not have allowed enough time for Mr. Lee to have returned to Spokane by the 13th. As the Government itself has acknowledged: "Had the jury not accepted the government's timeline, Lee could not have been convicted."[29]

There were two major problems with that timeline. The first was that, according to the Government's theory, the crime had to have occurred in Tilly, Arkansas on January 11, yet Mr. Lee was in Spokane, Washington at least as early as January 13.[30] It would have been extraordinarily difficult to complete such a long and difficult drive—"2,000 miles non-stop through the high altitudes of the West in the dead of winter"[31]—on that timeline. This was clearly a concern for the jury, too: During the second day of deliberations, it sent out a note indicating it had questions about whether the requisite cross-country drive was possible in that narrow time frame.[32]

The second problem with the Government's tight timeline was at its front end: numerous disinterested witnesses from the community reported seeing the Muellers alive *after* January 11.

The Government accounted for these obstacles by arguing that: a) Mr. Kehoe and Mr. Lee took turns at the wheel and made the 2,000 mile trip without ever stopping to rest, eat, use a

---

[29] *See* Doc No. 1126-1 at 33.

[30] According to the Government's own evidence, a non-stop drive back to Spokane would have taken between 35 to 43 hours, depending on the route. Tr. 6449-52.

[31] *See* Exh. F, "But Here's A Dissenting Opinion," The Courier News (Russellville, AR), May 6, 1999.

[32] Tr. 7100 ("We want to know if there was any road problems—snow—on trip back to Washington from Tilly, Arkansas, on January 10, 11, 12, 13[.] [S]igned Juror 100."). The Court instructed the jury that it had to decide the issues on the basis of the evidence already presented, and that it could not reopen the record to receive additional evidence. Tr. 7100.

restroom, refuel or sleep, Tr. 6986-87; and b) the multiple witnesses who had seen the Muellers after January 11 were all either confused about the dates or mistaken about who they had in fact seen. While the jury might have been willing to indulge these assumptions in light of persuasive evidence corroborating the Kehoes' account—namely, scientific evidence (a matching hair) and testimony from an unbiased witness about a bona fide confession (Mr. Wanker)—absent such external validators, there is at least a reasonable probability the jury would not have given the Government the benefit of the doubt on this central element of its case.

### 1.     The Kehoes' timeline depends on a series of dubious assumptions.

In January of 1996, Mr. Lee lived in an apartment in Spokane with Sean Haines. Mr. Haines was in a relationship with Joy Campbell, with whom he was about to have a baby. At 8 p.m. on January 13, Joy's mother, Vada Campbell, came to the apartment to pick up Mr. Haines and Mr. Lee answered the door. Tr. 5953-54. Vada Campbell is certain of the date because the following day (the 14th) her daughter was admitted to the hospital, and then the day after that, January 15, her daughter gave birth. *Id.*[33] The prosecution was not able to impeach or discredit her testimony; indeed, it did not even cross-examine her. Tr. 5955.

In order for the Kehoes' account to be true, the Mueller murders had to have taken place on January 11. Both Cheyne and Gloria stated in respective pre-trial statements that the crime occurred after nightfall.[34] Even if Mr. Lee and Mr. Kehoe left Russellville around midnight on

---

[33] The birth certificate, showing a birth date of January 15, 1996, was entered into evidence at trial. Tr. 5953.

[34] *See* Exh. I (Gloria Kehoe pre-trial statement that "it was late" when the victims' bodies were disposed in the river); Exh. P at 94 (Cheyne Kehoe pre-trial statement that the Jeep was abandoned "at night"). *See also* Tr. 2289 (UPS driver came to Mueller home on the afternoon of the 11th and saw nothing amiss).

29

the 11th – an assumption which the Government agreed was plausible[35] – that allowed just 46 hours for them to make it back to Spokane by 8 p.m. on the 13th.[36]

According to a Government trial witness, it would take between 35 to 43 hours to drive non-stop from Russellville to Spokane, depending on the route taken. Tr. 6449-52. Although that was technically possible, accepting that timeline required the jurors to indulge a series of questionable assumptions.

First, the estimated driving times assumed perfect road conditions. But it was the middle of winter and the routes from Tilly to Spokane went through high altitudes where snow and ice were common. Indeed, the testimony at trial was that there had been a big snowfall in Pope County on January 3 and that it was snowy and icy in Tilly on the 11th. Tr. 2261; 6009. Such road conditions would have made it difficult to drive at full speed and would have added more time to the trip.

Second, the Government's timeframe assumed that Mr. Lee was a capable driver. But he had lost an eye only a few months prior, and the trial evidence established that he had poor depth

---

[35] Tr. at 6986. A juror would have been hard-pressed to find that the two men could have left for Spokane any earlier, even if viewing all of the prosecution's evidence in the most favorable light. Gloria and Cheyne testified that the crime occurred after nightfall, which was approximately 5:47 PM on the night of January 11, 1996. *See* Exh. Q (January 2006 Sunrise/Sunset Calendar, Russellville, AR). Their account of the murders involved substantial activity at three different crime scenes: the Mueller residence in Tilly; a site an hour away off of Highway 7; and a bridge near Lake Dardanelle. *See* Exh. R (GPS coordinates of Mueller crime scene locations) and Exh. S (FBI 302 report re: driving times between crime scene locations). Thus, even under the Government's theory, several hours had to have elapsed to account for all of this activity before Mr. Kehoe and Mr. Lee would have been able begin the 2,000-mile journey back to Spokane.

[36] When Mr. Lee was seen at 8 p.m. by Vada Campbell, he was not arriving into town at just that time in a car with Mr. Kehoe; rather, he was already at his own home, ready to answer the door when she knocked. Thus, Mr. Lee had actually arrived in Spokane sometime prior to 8 p.m.

perception that impaired his driving. Tr. 6263-64; 6269-70. Even under normal conditions, it would have been difficult for Mr. Lee to shoulder the burden of such a long drive. But here he would have also had to navigate inclement weather, fewer daylight hours, and poor road conditions that would have hampered even a driver with perfect eyesight.

Third, the estimated driving times did not account for any need to regularly stop for gas during a 2,000-mile trip.[37] Even assuming that they drove straight through the night, the available routes from Russellville to Spokane would have taken them through sparsely populated areas for long stretches at a time. Thus, the practical necessity of being able to find an open and available gas station each time it was necessary to re-fuel, and not risk running out of gas in a remote area, would have added further time to the trip.

Finally, as noted, *supra* note 35, the timeline had to account for what the prosecution maintained was activity at three different crime scenes:

> (1) The Muellers' home in Tilly, where the perpetrators abducted, interrogated, and murdered the Muellers in their home; cleaned the home so thoroughly that they left no fingerprints and removed even trace amounts of blood that had soaked into the carpet; and loaded the victims' bodies and the cache of stolen property into the Muellers' Jeep and attached trailer;
> (2) The area off Highway 7, roughly an hour drive from the Mueller home, where the Jeep was abandoned and the property and bodies of the family were transferred into the GMC truck; and
> (3) The Illinois Bayou bridge near Lake Dardanelle, another 20 miles from where the Jeep was abandoned, where the victims were fastened to large, heavy rocks and dropped into the water.

---

[37] Mr. Kehoe's car was a 1984 GMC C/K 2500 High Sierra (diesel). Tr. 3057. At best, it had a fuel economy of about 20 miles per gallon. *See* Fuel Economy Information, U.S. Department of Energy's Office of Energy Efficiency and Renewable Energy, available online at: https://www.fueleconomy.gov/feg/bymake/GMC1984.shtml (last visited on Jan. 28, 2020). Assuming it was equipped with a standard 16 gallon or 20-gallon tank for that make and model, one would have to stop to re-fuel between five to seven times for a 2,000-mile trip.

In other words, several hours had to have elapsed to account for all of the activity that occurred between when the crime began and when the drive to Spokane actually commenced.

Given all of these factors, the time frame within which Daniel Lee was said to have committed this offense was itself suspect.

> **2.      The evidence indicates that Mr. Lee was observed back in Spokane as early as January 12, 1996, which would render the Government's timeline—and the Kehoes' testimony—impossible to accept.**

The time frame advanced by the Government was problematic on its own terms. But taken together with other evidence in the case, it becomes impossible. Prosecution witness Sean Haines was interviewed by authorities in December of 1996 and was asked when Mr. Lee returned to Spokane. Although he could not remember the exact date, Mr. Haines said that he came home one day in mid-January of that year to find the light on in their apartment, Danny Lee's belongings, and a handwritten note from him letting Mr. Haines know he had returned. Mr. Haines did not see Mr. Lee that day—"[I]t was like hit and miss, he'd come and go while I was gone" (Exh. T)—but he knew Mr. Lee had arrived home; he remembered seeing him a day or so later. *See* Exh. T. The Government called Mr. Haines as a witness at trial, and he gave essentially the same account:

> Q: How did you know [Mr. Lee] had returned [to Spokane] from his trip?
>
> A: I had come home one day, and his duffel bag was in my living room.
>
> Q: Did you talk to him that day?
>
> A: I believe I talked to him the next day.

Tr. 2778-79.

The "next day" to which he referred was January 13: Vada Campbell testified that she saw both Mr. Lee and Mr. Haines at their apartment at the same time on January 13 when she

Appellate Case: 20-2351     Page: 107     Date Filed: 07/04/2020 Entry ID: 4930235

came to the door. Taking the testimony of these two witnesses together, Mr. Lee had to have first arrived in Spokane *the day before,* on January 12, in which case the Government's timeline was physically impossible. Gloria and Chevie Kehoe could not have been telling the truth about Danny Lee's participation in this offense.

> **3.    The jury would have evaluated the defense witnesses differently if it had known that the Kehoes' testimony was uncorroborated and that there was credible evidence implicating an alternate suspect.**

A number of witnesses reported seeing the Muellers alive after January 11, the date the prosecution claimed they had been murdered.[38] These included:

- Susan Weaver, a Walmart employee, remembered selling Mr. Mueller an unusually large quantity of water by the gallon. Tr. at 5832-36. Store records show this purchase was made on January 22, 1996—eleven days after the Government claimed the murders had occurred. Tr. at 6364-65.

- Mary Reid, a longtime friend of the Muellers, spoke with William and Nancy Mueller in the parking lot outside of her bank on January 18, 1996. Tr. 5856-57, 5886.[39] Authorities confirmed that Ms. Reid was at the bank on January 18 based on her bank transaction records and surveillance footage, Tr. 5870-71, 5885-87, 5889, 5891-92, and relied upon her statement that she had seen the Muellers with Paul Humphrey to secure a search warrant of Mr. Humphrey's residence as part of the murder investigation. Tr. 5888-90

- Janis Rowlands, a schoolteacher, contacted authorities to report she saw the Muellers at a Walmart in Russellville on February 2 or February 3. Tr. 5798-5800, 5802. Ms. Rowland remembered it was a day when her school was closed due to inclement weather, and records corroborated that her school district was closed on February 2, 1996, due to the weather. Tr. 6080-81.

- Lucy Carr, a manager at Leonard's Hardware Store in Russellville, called authorities to let them know she had a conversation with William Mueller in her store in early February. Tr. 5807-11. Ms. Carr testified that Mr. Mueller looked

---

[38] The Muellers' bodies were not found until June, several months after the Government's theory of when the crime occurred.

[39] As discussed in more detail below, the Muellers were in a car with several other men, including Paul Humphrey, an early suspect in the case because he was found in possession of the title to the Muellers' Jeep after they had gone missing. Tr. 5859, 5867-68, 5877, 5880-82.

33

like he was trying to disguise himself; he was unshaven and was wearing a large floppy hat. Tr. 5814.

• Sue Sullivan, an employee at Leonard's Hardware Store in Russellville, testified that she saw Mr. Mueller in the store around February 6 or 7, right before an article had been published in the local paper about the Muellers having gone missing. Tr. 5817.

• Ester Anderson, an acquaintance of the Muellers, testified that she had driven past the Muellers' home on January 17 with her husband and saw their Jeep and attached trailer parked outside. Tr. 5961, 5963. She was sure of the date because she was accompanying her husband to a job interview for which he subsequently filled out some paperwork dated January 22, and she knew from her own records that the 17th was the one day that week that she had not gone to work. Tr. 5962-63, 5966.

The testimony of these witnesses was obviously at odds with the Government's case, where the timeline hinged on the Kehoes' testimony. The prosecution thus worked to discredit the recollections of each of the witnesses. Had the jury known, however, about Gloria's mental instability and perception problems, and that the Kehoes' testimony lacked any independent corroboration, it would have tipped the balance in favor of crediting these witnesses. Similarly, had the jury known that there was credible evidence implicating an alternate suspect, Paul Humphrey, in the murders, and that evidence of his guilt was consistent with the timeline provided by these other witnesses (including that he lived in Russellville, obviating any need for a 2,000-mile journey in the dead of winter),[40] there is a reasonable probability that the jury would have evaluated the trial evidence differently and reached a different result.

---

[40] The defense's alternate timeline was also supported by testimony from one of the Government's own witnesses—Sean Haines—who placed Mr. Lee in Spokane as early as January 12, meaning he could not possibly have committed the Mueller murders in Tilly on the 11th.

III.   **The Government's Fraud, Misrepresentation, or Misconduct Precluded Mr. Lee from Fully and Fairly Presenting Viable Claims of Prosecutorial Misconduct in his Original § 2255 Proceedings.**

The Government's case against Mr. Lee was problematic from the start. With the passage of time, it has only gotten substantially weaker. The only unquestionably inculpatory evidence remaining implicating Mr. Lee in the Mueller murders is the uncorroborated testimony of Gloria and Cheyne Kehoe. Now, when the case is considered in its totality, with the newly discovered evidence of Government misconduct, it is clear that Mr. Lee's trial did not result "in a verdict worthy of confidence." *Kyles,* 514 U.S. at 434.

Due to the Government's suppression of *Brady* material and its presentation of false and misleading evidence, the jury that convicted Mr. Lee never learned two crucial facts: 1) Gloria Kehoe suffered from a mental condition that impaired her ability to properly perceive events and caused her to have visual and auditory hallucinations; and 2) the initial suspect in the case, Paul Edward Humphrey, had flunked a polygraph examination about whether he was involved in the Mueller murders. But for the Government's misconduct during the original § 2255 proceeding, Mr. Lee would have been able to raise the following claims.

A.   **First Ground for Relief: Mr. Lee's conviction was obtained in violation of *Brady v. Maryland* because the Government suppressed  material impeachment information about Gloria Kehoe's mental instability.**

According to the Supreme Court, "[t]here are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-282 (1999). In the context of a *Brady* violation, prejudice means that the suppressed evidence was

35

"material." *Id*. By withholding information that would have destroyed the credibility of its key witness against Mr. Lee, Gloria Kehoe, the Government violated *Brady*.

### 1.    The centrality of Gloria Kehoe's testimony to Mr. Lee's conviction

Prior to Cheyne's cooperation, there was no evidence connecting Daniel Lee to the murders of the Mueller family. Although authorities already suspected that one or more members of the Kehoe family might have been involved,[41] it was not until Cheyne came forward that the Government determined that Mr. Lee was one of the perpetrators. It was Cheyne's account that finally gave authorities a theory of the case as well as a detailed account of the crime that seemingly lined up with Mr. Kehoe's and Mr. Lee's whereabouts in Oklahoma in mid-January 1996. But as Cheyne himself admitted, he had no direct knowledge of Mr. Lee's involvement; he claimed that Chevie alone had confessed to him.

That all changed when Gloria started cooperating with authorities. Although in her first recorded statement to the authorities she said nothing about Mr. Lee speaking to her, in a subsequent statement she claimed that he had confessed his involvement in the crime. She then testified that Mr. Lee told her that Nancy Mueller had been fooled into believing the FBI raid was genuine, but that William Mueller fought back. Tr. 4975. She also testified that Mr. Lee told her about how the bodies were disposed in a "river," and that Mr. Kehoe had paid him after the murders. *Id*.

---

[41] In 1996, federal authorities provided local police with a potential lead that pointed to the Kehoes: they had recovered guns registered to the Muellers from two different individuals. The first, Travis Brake, had been arrested in Seattle in February of 1996. He told police he bought his gun from a man named Kirby Kehoe at a Seattle gun show. The second individual, Sean Haines, was arrested in South Dakota in December of 1996. He told police he got his gun from Kirby's son, Chevie Kehoe, in a private trade.

Because of her ability to testify to these inculpatory statements by Mr. Lee, Gloria was an indispensable prosecution witness.

Defense counsel attacked Gloria's credibility. As noted previously, they pointed out that at the time of her cooperation she was under indictment in a separate federal case, was implicated as well in the alleged Kehoe racketeering enterprise (and thus had an obvious incentive to curry favor with the Government), and was receiving thousands of dollars in payments every month in exchange for her cooperation. *See supra* Section II.A.1. But the Government possessed a separate kind of impeachment evidence that it did not disclose to defense counsel, and that the jury never heard, that would have been uniquely damaging to her credibility.

As detailed in the attached declaration of Cheyne Kehoe, *see* Exh. B, during the course of its dealings with Gloria, the Government came to suspect that she suffered from mental health problems. In fact, case agents approached Cheyne a number of times to ask him about his mother's "stability." Exh. B at ⁋ 35. He candidly told them she was "unstable." *Id.* As he put it,

> That's always been pretty obvious to me and the people who know her. As I told the agents, my mom has always been paranoid *and she sees and hears things that aren't there*, so much so that my dad took her for psychiatric treatment when they lived in North Carolina.

*Id.* (emphasis added)

Cheyne was not the only member of the Kehoe family to advise the prosecution that Gloria had psychiatric issues. Kirby Kehoe, who also cooperated with the Government, also told case agents that Gloria was mentally ill. *See* Exh. C at ⁋ 17. Like Cheyne, he advised them that Gloria suffered from hallucinations. *Id*. ("She sometimes had panic attacks and sometimes she had what she called dreams where she saw things happening to us, like seeing people (sometimes government agents) assaulting her.")

37

It is not clear what efforts if any the Government undertook to investigate Gloria's mental health problems after it learned of this information; there may in fact be additional impeachment evidence that it failed to disclose. What is indisputable, however, is that none of the information about her hallucinations and other problems provided to case agents by Cheyne and Kirby was ever disclosed to defense counsel. This is remarkably consistent with how the Government sanitized Mr. Wanker's statements in a way that misled jurors about the truth. But unlike the other evidence the jury heard relevant to Gloria's bias or her incentives to cooperate, this previously undisclosed evidence was in a class of its own: it fundamentally cast doubt on a star witness's ability to accurately perceive and recall events.

### 2.      The evidence was favorable to Mr. Lee.

As noted, evidence is favorable if it is exculpatory or impeaching. *Banks v. Dretke*, 540 U.S. 668, 691 (2004). Evidence that a witness suffers from mental health problems is "classic impeachment evidence." *Browning v. Trammel*, 717 F.3d 1092, 1106 (10th Cir. 2013); United States v. Love, 329 F.3d 981, 984-85 (8th Cir. 2003) (Confrontation Clause violation where witness's relevant mental health history not permitted for purposes of impeachment). *See also Gonzalez v. Wong*, 667 F.3d 965, 983-84 (9th Cir. 2011) (recognizing impeachment value of mental health evidence); *Fuentes v. T. Griffin*, 829 F.3d 233, 247 (2d Cir. 2016) (same); *United States v. Robinson*, 583 F.3d 1265, 1272 (10th Cir. 2009) (same); *Wilson v. Beard*, 589 F.3d 651, 666 (3d Cir. 2009) (same); *East v. Johnson*, 123 F.3d 235, 238 (5th Cir. 1997) (same); *United States v. Butt*, 955 F.2d 77, 82-83 (1st Cir. 1992) (same).

As stated in both Cheyne's and Kirby's declarations, Gloria was paranoid and was prone to visual and auditory hallucinations. This suppressed evidence could have been used to demonstrate Gloria's "impaired ability to perceive, remember and narrate perceptions accurately,

which is clearly relevant to [her] credibility as a witness." *Wilson*, 589 F.3d at 666 (citation and internal quotation marks omitted). It was thus unquestionably favorable to Mr. Lee's defense.

### 3. The evidence was suppressed.

Both Cheyne and Kirby have declared that they informed the Government about Gloria's mental health problems prior to trial. *See* Exh. B at ¶ 35 ("Prior to Chevie's trial, agents asked me several times about my mother's (Gloria's) stability. I advised them my mom was unstable."); Exh. C at ¶ 17 ("I told agents all of this prior to Chevie's trial, too."). Despite a standing order requiring the Government to turn over any exculpatory or impeachment evidence to the defense, *see* Dkt. 145 at 1, 3, and despite its own acknowledgement of its continuing obligation to do so, *see* Dkt. 55 at 2, the Government never disclosed this information about Gloria's mental health.

Indeed, after Mr. Kehoe's counsel moved to compel Gloria to undergo a psychiatric examination mid-trial to determine whether she suffered from any mental disorder "bearing on the witness' credibility," Dkt. 732 at 1, the Government did not take that opportunity to comply with its *Brady* obligation and disclose to the defendants and the Court what it knew about her mental health and perception impairments. Instead, it muddied the issue and argued that the only relevant question was whether Gloria was competent to testify under Federal Rule of Evidence 601. *See* Dkt. 736 at 2-3. It reframed the question entirely as one involving a judicial gatekeeping function, rather than the jury's ability to make credibility findings about the prosecution's key witness. *Id*. at 3. Despite clearly being on notice that the defense sought impeachment evidence concerning Gloria's mental health, the Government failed to make any disclosures that were otherwise called for under the circumstances.

**4.      The suppressed evidence was material.**

"[F]avorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). A showing of materiality "does not require demonstration by a preponderance that the disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Kyles*, 514 U.S. at 434. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial." *Id.* (quotations omitted). In addition, "it is not a sufficiency of the evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Id.* at 435.

The Government's case against Mr. Lee hinged on Gloria's credibility. Unlike Cheyne, she claimed that Mr. Lee directly confessed his involvement in the Mueller murders to her. Thus, the suppressed impeachment evidence was particularly material. *Bragan v. Morgan*, 791 F. Supp. 704, 714 (M.D. Tenn. 1992) (due process violation where misconduct concerned witness whose testified that defendant confessed to the murder; despite other circumstantial evidence, such a witness is "crucial to the prosecution's case"); *Kyles*, 514 U.S. at 441-45, 453-54 (concluding evidence was material when suppressed evidence could have undermined credibility of prosecution's key witnesses).

Moreover, the nature of the suppressed evidence made it especially prejudicial: evidence of mental instability is uniquely relevant to a witness's credibility because it "provide[s] some significant help to the jury in its efforts to evaluate the witness's ability to perceive or to recall events or to testify accurately." *United States v. Moore*, 923 F.2d 910, 913 (1st Cir. 1991). Here, Gloria's mental instability included, according to her own family members, confabulation, fabricating events that never happened (such as assaults by government agents), and a chronic history of experiencing auditory and visual hallucinations. This type of mental health evidence has been consistently found to be material because, as noted above, an impaired ability to perceive, remember and narrate perceptions accurately fundamentally undermines a witness's credibility. *See Wilson*, 589 F.3d at 666; *Gonzalez*, 667 F.3d at 983.

Additionally, the undisclosed evidence was not duplicative of the impeachment evidence actually presented, but rather "was of a different kind" and therefore "would have provided the defense with a new and different ground of impeachment." *Silva v. Brown*, 416 F.3d 980, 989 (9th Cir. 2005) (internal quotation marks and citation omitted). *See also Gonzalez*, 667 F.3d at 982, 983 (mental health evidence material because it "could have provided additional or alternative means of impeachment" that "would have raised serious questions in the factfinder's mind about [witness's] competency to perceive accurately and testify truthfully.").

The suppressed evidence also would have provided an opportunity to impeach Gloria by showing that the Government's own case agents had repeatedly expressed doubts about Gloria's credibility and mental stability. *See Silva*, 416 F.3d at 988 (noting "potentially devastating fact that the state itself doubted [the witness's] mental competency"); *Benn v. Lambert*, 283 F.3d 1040, 1055 (9th Cir. 2002) (information that police doubted veracity of informant because of past lies was material *Brady* evidence); *Gates v. District of Columbia*, 66 F. Supp. 3d 1, 22-24

July 3 2020 p116
Appellate Case: 20-2351   Page: 116   Date Filed: 07/04/2020   Entry ID: 4930235

(D.D.C. 2014) (in case where witness claimed defendant confessed to him, evidence that detective did not find witness credible constituted impeachment evidence encompassed by *Brady*)*; Ex parte Richardson*, 70 S.W.3d 865, 871-73 (Tex. Crim. App. 2002) (capital conviction and death sentence reversed based on prosecution's suppression of diary kept by police officer who was guarding state's eyewitness to crime; diary revealed officer's belief that witness was not a truthful person).

In addition, the damage the suppressed impeachment evidence could cause was "best understood by taking the word of the prosecutor." *Kyles*, 514 U.S. at 444, 115 S. Ct. 1555. The Government used its summations to discuss the importance of Gloria's testimony against Mr. Lee. Tr. 6799-6800, 6802, 6821, 6829. In fact, the Government told the jury that the "best proof" it had for its theory of the case was Gloria's testimony because "she, if she could have, would have a lot rather blamed this murder on her husband, Kirby, than her son Chevie. But I think she did what she had to do, which was come in here and tell you folks the truth." Tr. 6958. Additionally, the Government used its summations to counter the attempted impeachment of its witness. *See* Tr. 6808, 7006-07.

In a case that turned so much on Gloria's testimony, it cannot be said that Mr. Lee's trial resulted "in a verdict worthy of confidence," *Kyles*, 514 U.S. at 434, where the fact-finders were deprived of evidence central to her credibility. *See Horton v. Mayle*, 408 F.3d 570, 580 (9th Cir. 2005) ("The prosecutor's emphasis on the importance of [the witness's] testimony bolsters the conclusion that disclosure of the [impeachment evidence] may have significantly damaged the prosecution's case."). This is especially so given the weaknesses of the Government's evidence when viewed in its totality. Thus, there is a reasonable probability that, but for the Government's

42

misconduct, the jury would have evaluated the trial evidence differently and reached a different result.

**B.      Second Ground for Relief: Mr. Lee's conviction was obtained in violation of *Brady v. Maryland* because the Government suppressed material exculpatory and impeachment evidence concerning Paul Humphrey's involvement in the Mueller murders.**

In addition to evidence impugning the key witness's testimony, the defense and the jurors were deprived of damning evidence against original suspect Paul Humphrey also in the Government's possession. If disclosed, this evidence would have undermined both the prosecution's case against Daniel Lee and the soundness of its investigation.

**1.      Paul Humphrey was the Government's initial suspect in the Mueller case.**

Before Cheyne came forward in June of 1997 and fundamentally changed the course of the Mueller murder investigation, authorities were focused on Paul Edward Humphrey, who lived in Pope County, not far from the Muellers. He became a suspect after Nancy's brother, David Branch, informed Pope County authorities on February 22 that Humphrey had the title documents to the Muellers' abandoned Jeep and trailer.[42] Mr. Branch had previously seen those documents, unsigned, in the Mueller residence on February 2, after the family had already been reported as missing from their home. Although Mr. Humphrey initially agreed to cooperate with Pope County authorities when they contacted him on February 22, he spent the next several

---

[42] Details of the investigation into Mr. Humphrey are taken from the search warrant affidavit sworn to on August 27, 1996, by Aaron Duvall, an officer with the Pope County Sheriff's Office. *See* Exh. U (Humphrey search warrant affidavit). Many of the same facts are recounted in the Eighth Circuit's opinion denying Mr. Humphrey's suppression motion. *United States v. Humphrey*, 140 F.3d 762 (8th Cir. 1998). As noted in that opinion, Mr. Humphrey pled guilty to possession of firearms and marijuana that were seized pursuant to that search of his home, which was conditioned on his right to appeal the denial of his suppression motion. *Id.* at 763.

months dodging authorities and offering increasingly bizarre, and false, explanations for why he

couldn't turn over the titles:

- On March 1, Mr. Humphrey told authorities he'd been advised by his attorney in Russellville, Dale Braden, not to surrender the documents. Authorities contacted Mr. Braden a few days later and learned that Mr. Humphrey had lied to them: he had never retained Mr. Braden or otherwise consulted him about those titles.

- On March 15, Mr. Humphrey claimed he didn't have the documents because he'd given them to a friend in Little Rock. He refused to identify who this "friend" was, but agreed to get the documents and give them to authorities.

- After failing to keep his agreement, authorities contacted Mr. Humphrey again on March 26. This time, Mr. Humphrey told authorities that the documents were now with a *different* attorney he'd retained in Little Rock. When authorities contacted that lawyer to verify Mr. Humphrey's story, they found out they'd been lied to yet again: the attorney had no idea who Mr. Humphrey was, much less knew anything about the Mueller titles.

- On April 8, authorities met with Mr. Humphrey and confronted him with his most recent lie. Mr. Humphrey now claimed that he had never actually given the documents to the attorney in Little Rock, but that he only had considered doing so. Instead, he gave the documents to a friend, whom he again refused to name.

It wasn't until three months later, after the Muellers' bodies were recovered, that Pope

County authorities eventually followed up with Mr. Humphrey again and finally got the titles

from him.[43] When authorities submitted those documents for forensic examination along with

known writing samples of William and Nancy Mueller, they finally realized why Mr. Humphrey

had been evading them: the signatures on the titles were forged.[44]

---

[43] The Pope County officials' lack of urgency was especially baffling given that it knew in real-time that Mr. Humphrey was lying to them and obstructing their investigation. Presumably local authorities had given credence to rumors that William Mueller, who travelled in circles known for espousing anti-government views, had simply decided to "go sovereign" and take his family "off the grid" as many believed when they disappeared. Whatever the reason, Humphrey was left to his own devices for months after the crime was said to have occurred.

[44] *See* Exh. V (ATF Lab Report Handwriting Analysis).

After this belated discovery, local authorities spent the next several months steadily gathering evidence that implicated Mr. Humphrey in the Mueller murders, including the following:

- *Mr. Humphrey was seen with the Muellers after their disappearance.* Mary Reid, a friend of the Muellers, contacted authorities shortly after the bodies were recovered in late June of 1996. She told them that on January 18, 1996, she was exiting a bank in Russellville when she heard Nancy Mueller call her name. She turned and saw Ms. Mueller seated in the passenger side of a tan colored vehicle. She walked over to the car and engaged Ms. Mueller in conversation. She saw that Mr. Mueller was in the backseat, flanked by two other men. She also saw the driver of the vehicle, whom she later identified in a photo spread as being Mr. Humphrey. Ms. Reid's account was corroborated by bank records and surveillance camera footage that confirmed she was at the bank on that date. Bank records also corroborated Mr. Humphrey's presence in Russellville on that date. Ms. Reid also positively identified Mr. Humphrey's vehicle after driving in his neighborhood and seeing the car parked on the side of the street. Exh. U (Humphrey Search Warrant Affidavit) at ₱ 13; *United States v. Humphrey*, 140 F.3d 762, 764 (8th Cir. 1998).

- *Mr. Humphrey was in possession of Nancy Mueller's personal belongings.* Authorities conducted a search of Mr. Humphrey's home on August 30, 1996. They discovered a pamphlet belonging to Nancy Mueller with her signature and address written on it. Tr. 5893-94.[45]

- *Mr. Humphrey made inculpatory statements after the Muellers' disappearance.* In September of 1996, authorities interviewed Dr. Charles Turner and Roberta Turner, close friends of the Muellers, and learned that Mr. Humphrey had made several odd and incriminating comments to them after the Muellers disappeared. *See* Exh. W (Synopsis of ATF Interview of the Turners). He came by their home on January 25, 1996 and "tried to convince Dr. Turner that the Muellers were okay. He was trying extra hard to convince the Turners that the Muellers were fine." *Id.* at 2. He came by a second time a few weeks later in mid-February, but this time told Mrs. Turner: "Nancy and Bill was one thing but I really felt bad

---

[45] Notably, the Government pointed to similar evidence in its closing arguments—that a book belonging to Nancy Mueller was found at Mr. Kehoe's property—to claim that its theory of the case was correct. *See* Tr. 6826 ("One of the things, by the way, that came from Idaho was Nancy Mueller's book."); *id.* at 7005 ("And the whole concept that all of the proof that the government has is just from these two witnesses, Cheyne Kehoe and Gloria Kehoe, is wrong. They don't have anything to do with finding the book—Nancy Mueller's book 'August Celebration' on his property on the Priest River. They don't. They did that completely independent of these two- people. But that's great proof. He [Chevie Kehoe] stole her book.").

45

about Sarah." *Id*. When Mrs. Turner asked him to explain what he meant, Mr. Humphrey changed the subject. *Id.* On another visit to the Turners, Mr. Humphrey told them that there "wasn't any money at the Muellers' house when he [Humphrey] went there." *Id.* When Mrs. Turner asked him what money he was talking about, he changed the subject. *Id*.

- *Mr. Humphrey knew details only a perpetrator would know*. Mr. Humphrey claimed at trial that the last time he'd had any contact with the Muellers was by phone on the evening of January 10, 1996. Tr. 6148. But when he was interviewed by police after the Muellers went missing, he described the clothes they wore when he last saw them, which matched the clothes later found on their bodies. *Humphrey*, 140 F.3d at 764.

- *Mr. Humphrey was intimately familiar with the location where the bodies were recovered*. Authorities learned that Mr. Humphrey was a proficient skin diver with experience diving in Lake Dardanelle where the Muellers' bodies were recovered. He tried to deny this when examined on the stand, but quickly back-pedaled after he was confronted with his prior inconsistent statement to law enforcement. Tr. 6191-92.[46]

Federal authorities took the case over from local law enforcement shortly after Cheyne Kehoe began his cooperation. Despite the substantial evidence that had already been gathered by that point implicating Mr. Humphrey, the Government nevertheless shifted gears and concentrated its efforts on proving the theory of the case provided by Cheyne, and later Gloria: that Mr. Lee was involved in the murders. Yet the Government was never actually able to rule out Mr. Humphrey's involvement in the crime. It continued to collect evidence from him for analysis,[47] and still listed him as a suspect on various requests for forensic testing, *as late as March 2, 1999*—after jury selection had already commenced and nearly a week before opening statements. *See* Exh. Y (3/2/99 Arkansas State Crime Lab Report).

---

[46] Mr. Humphrey testified that "on a good day" the visibility in Lake Dardanelle "might be six inches." Tr. 6192. He implausibly claimed that this was not based on his own experience, but that he only knew this because he "had studied." *Id*.

[47] For example, on October 10, 1997, the Government sought to obtain a hair sample from Mr. Humphrey. *See* Exh. X.

46

### 2.      The undisclosed evidence about suspect Paul Humphrey.

One of the main defense themes at trial was that the murders had been committed by a third party, but that authorities had botched the investigation because they continued to treat this as a "missing persons" case for way too long, losing time and crucial evidence in the process; after the bodies were recovered and authorities realized their mistake, months went by with no discernible progress. When Cheyne came forward with his story, the defense contended, authorities latched onto it because it gave them a convenient way to close the case, not because it fit all the available evidence. In support of this argument, the defense presented much of the aforementioned evidence pointing to Mr. Humphrey's involvement in the murders. As noted previously, Mr. Kehoe's counsel even called Mr. Humphrey as a witness. Under questioning by Mr. Lee's trial counsel, he denied knowing that the Muellers' signatures on the titles to their vehicles were forged and denied that he had forged the signatures himself, Tr. 6201;[48] he also denied ever having skin dived in Lake Dardanelle, but then conceded he had previously admitted that fact to authorities. Tr. 6191-92. In an effort to negate the implications of defense counsel's questions, the Government point-blank asked Mr. Humphrey:

> Q.      Were you in any way involved in the death of Bill Mueller, or Nancy Mueller or Sarah Powell?
>
> A.      No.

Tr. 6204.

Unbeknownst to the defense, however, the Government was concealing devastating impeachment evidence about Mr. Humphrey's testimony. Although it had turned over a number of materials pertaining to its investigation into Mr. Humphrey prior to trial, there was at least one

---

[48] *See also* Tr. 6169, 6174-76.

47

damning document the Government withheld: a report of a polygraph examination conducted on January 21, 1997. *See* Exh. A. The purpose of the exam was "to determine his knowledge or involvement in the reported homicide of BILL and NANCY MUELLER." *Id.* Mr. Humphrey was examined using the Modified General Question Technique, in which relevant questions about the crime are asked along with irrelevant and control questions. *Id.* He was asked the following about the Mueller murders:

> Q-3:   Did you ever meet SYLVIA MASER[49] prior to the MUELLERS disappearing?
>
> A:   No.
>
> Q-5:   Were you present when the MUELLERS were killed?
>
> A:   No.
>
> Q-8:   Did you participate in disposing of the bodies of the MUELLERS?
>
> A:   No.
>
> Q-10:   Did you know that the title was forged when you took it to the sheriff?
>
> A:   No.

*Id.* As the Arkansas State Police polygraph examiner concluded in his report, Mr. Humphrey had lied in his responses to these questions and he was, in fact, involved in the murders:

---

[49] This appears to be a typographical error. Sylvia Mason was the Muellers' landlord. After initially telling police that he did not remember who had mailed him the title documents, Mr. Humphrey later claimed that it was Ms. Mason who sent them. She, however, did not corroborate Mr. Humphrey's story.

48

FINDINGS

The physiological responses noted on this subject's polygraph charts are in such a pattern as to indicate that the subject, Mr. PAUL EDWARD HUMPHREY, was essentially untruthful in answering the above questions.

Based on the evaluation of the subject's polygraph charts, it is the opinion of this examiner that Mr. HUMPHREY was involved in the death of the MUELLERS.

Respectfully submitted,

*Brett Pritchard /lw*

BRETT PRITCHARD, Investigator
Polygraph Examiner
Criminal Investigation Division

*Id.* Because this material was never disclosed to the defense, Mr. Lee was precluded from introducing it into evidence or impeaching Mr. Humphrey on the stand, and the jury therefore never learned of this powerful evidence.

### 3.      The evidence was favorable to Mr. Lee.

Evidence that another suspect has taken and failed a polygraph test about whether he was involved in a murder that the defendant was charged with is "plainly exculpatory." *Watkins v. Miller*, 92 F. Supp. 2d 824, 842 (S.D. IN 2000). That was clearly the case here: Mr. Lee's defense was that he was not guilty, and that there were other likely suspects, such as Mr. Humphrey, that the Government failed to adequately investigate. The polygraph evidence was unmistakably relevant to his defense because it established that Mr. Humphrey was at the very least present during the Mueller murders and helped dispose of their bodies. If credited by the jury, then Mr. Lee could not have been convicted because this evidence contradicted the account of the murders provided by Gloria and Cheyne, which was the only theory offered by the Government concerning Mr. Lee's alleged involvement in the crime.

Such evidence would have been admissible at Mr. Lee's trial. There is no *per se* ban on the use of polygraph evidence in this Circuit. *United States v. Montgomery*, 635 F.3d 1074, 1094

(8th Cir. 2011); *United States v. Rouse*, 329 F. Supp. 2d 1077, 1083 (D. S.D. 2004) (polygraph evidence no longer *per se* inadmissible in the Eighth Circuit). "To be admissible, polygraph evidence must be relevant, and its probative value must not be substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Montgomery,* 635 F.3d at 1094 (citations and internal quotation marks omitted).[50] *See also Rouse*, 329 F. Supp. 2d at 1083 ("polygraph evidence could be admitted in the absence of a stipulation from the government, and even over its objection, if the evidence meets *Daubert* [*v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 570 (1993)] standards.") Here, however, the Government's failure to disclose this information precluded Mr. Lee from being allowed to make the requisite showing of admissibility. But for the Government's misconduct, there is a reasonable probability that Mr. Humphrey's polygraph report would have been admitted into evidence. *See United States v. Galbreath*, 908 F. Supp. 877 (D. N.M. 1995) (finding that polygraph examination based on control question technique satisfies *Daubert* standards).

The polygraph evidence was also admissible to impeach Mr. Humphrey's testimony. *See United States v. Piccinona*, 885 F.2d 1529, 1536 (11th Cir. 1989) (polygraph evidence admissible to impeach witness); *United States v. Nelson*, 970 F.2d 439, 442 (8th Cir. 1992) (noting that polygraph report "should have been disclosed" as *Brady* evidence, but denying relief

---

[50] In *Montgomery*, the polygraph report was excluded because it was commissioned by the defense without notice to the Government and without its participation. As the Eighth Court noted, under such circumstances, a polygraph examination has minimal probative value because there is "no adverse interest at stake"—the report "won't see the light of day if the defendant flunks." 635 F.3d at 1094 (citation and internal quotation marks omitted). Moreover, the questions asked were "vague" and the physiological reactions were ambiguous. *Id.* By contrast, Mr. Humphrey's polygraph was commissioned by law enforcement authorities, and he therefore faced the possibility of "suffer[ing] negative consequences from a failed examination." *Id.* Additionally, the questions posed to him were clear and direct, and his physiological responses clearly indicated that he lied.

because information contained in the report was "fully elicited and developed" by defense counsel); *United States v. Padilla*, 908 F. Supp. 923, 929-31 (S.D. Fla. 1995). Here, Mr. Humphrey unequivocally testified that he was not involved in the Mueller murders, and that he had no knowledge that the signatures on the titles were forged. The polygraph report plainly indicated otherwise, and thus was clearly relevant impeachment, and certainly not cumulative. But for the Government's suppression, the defense could have confronted Mr. Humphrey on the stand with his polygraph report and impeached his testimony on both of these issues.

### 4. The evidence was suppressed.

As part of its pre-trial *Brady* disclosures to the defense,[51] the Government turned over a number of reports by local law enforcement authorities documenting their interviews with Mr. Humphrey. Among those was a January 21, 1997 interview between Mr. Humphrey and the Pope County Sherriff's Office that was conducted at 3:55 p.m. at the law offices of Mr. Humphrey's attorney. *See* Exh. Z. However, earlier that same day at that same office, Mr. Humphrey also met with Investigator Brett Pritchard of the Arkansas State Police and submitted to a polygraph examination. *See* Exh. A (noting that pre-interview was conducted at 1:20 p.m.) Even though it took place on the same day, the Government withheld all information related to this earlier meeting, including the Arkansas State Police report documenting the polygraph examination and the finding that Mr. Humphrey had flunked the exam.

---

[51] *See* Dkt. 33 at 2. As noted earlier, Mr. Lee renewed his *Brady* request in his initial § 2255 proceeding and specifically requested that the Government review its files and the files of investigating agencies for any information favorable to the defense relating, *inter alia*, to others potentially responsible for the murders of the Mueller family or who otherwise played a role in the crimes charged in, or related to, the case. Dkt. 1118-1 at 7, n.3. The Government did not disclose the Humphrey polygraph report at that time, either.

51

July 3 2020 p126
Appellate Case: 20-2351   Page: 126   Date Filed: 07/04/2020 Entry ID: 4930235

Undersigned counsel obtained the Humphrey polygraph pursuant to an Arkansas Freedom of Information Act request made to the Arkansas State Police. For purposes of a *Brady* suppression analysis, the fact that the document was obtained from the state police files rather than the federal prosecutor's files is immaterial: Under *Brady*, the prosecution's obligation extends to information known to investigating agencies and officers. *See United States v. Robinson*, 809 F. 3d 991, 996 (8th Cir. 2016) ("This duty extends not only to evidence of which a prosecutor is aware, but also to material 'favorable evidence known to the others acting on the government's behalf in the case, including the police.'") (quoting *Kyles*, 514 U.S. at 419); *United States v. Long*, 870 F.3d 741, 747 (8th Cir. 2017); *United States v. Tyndall*, 521 F.3d 877, 882 (8th Cir. 2008) ("A prosecutor has a duty to disclose evidence known by police officers, even if not known by the prosecutor, because a prosecutor has a duty to learn of such information."); *Crivens v. Roth*, 172 F.3d 991, 996 (7th Cir. 1999) (reversing denial of habeas relief based on *Brady* violation); *United States v. Morris*, 80 F.3d 1151, 1169 (7th Cir. 1996); *Carey v. Duckworth*, 738 F.2d 875, 877–78 (7th Cir. 1984) ("a prosecutor's office cannot get around *Brady* by keeping itself in ignorance, or compartmentalizing information about different aspects of a case").

### 5.    The suppressed evidence was material.

Given the myriad problems with the trial evidence against Mr. Lee, the information the prosecution suppressed about Mr. Humphrey's failed polygraph is enough by itself to undermine confidence in the verdict and to require relief under *Brady*—evidence that someone else committed the crime is in a category by itself, and its import to trial counsel's "third party guilt" defense is unmistakable. And yet, a properly conducted materiality assessment requires that this

July 3 2020 p127

Appellate Case: 20-2351     Page: 127     Date Filed: 07/04/2020 Entry ID: 4930235

Court not examine the suppressed Humphrey evidence in isolation, but rather in light of the totality of the evidence.

The Supreme Court has explained that it is error to simply determine whether the piece of suppressed evidence, standing alone, would have resulted in a different verdict. *See e.g. Kyles*, 514 U.S. at 436 ("[for materiality purposes], suppressed evidence [must be] be considered collectively, not item by item"); *id*. at 436 n.10 ("We evaluate [the] cumulative effect [of undisclosed evidence] for purposes of materiality separately and at the end of the discussion[.]"); *id*. at 441 ("The result . . . is incompatible with a series of independent materiality evaluations, rather than the cumulative evaluation required by [precedent]."). Most recently in *Wearry v. Cain*, 136 S. Ct. 1002 (2016), the Supreme Court again rejected a prejudice determination that focused solely on the effect of evidence in isolation. *See id*. at 1007 ("[T]he state postconviction court improperly evaluated the materiality of each piece of evidence in isolation rather than cumulatively….")

Following *Kyles*, the Eighth Circuit has also insisted on a holistic prejudice analysis. *See*, *e.g*., *Amrine v. Bowersox*, 128 F.3d 1222, 1230 (8th Cir. 1997) ("When determining the impact of evidence unavailable at trial, a court must make its final decision based on the likely cumulative effect of the new evidence had it been presented at trial."); *Battle v. Delo*, 64 F.3d 347, n.11 (8th Cir. 1995) (same).

The analysis of prejudice in this case therefore is not whether a single piece of newly discovered evidence is enough on its own to overcome the trial evidence of guilt; *Brady* materiality determination "is not a sufficiency of the evidence test." *Kyles*, 514 U.S. at 435. Nor is the relevant question whether "after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict"; or even "whether the

53

defendant would have more likely than not have received a different verdict" but for the suppressed evidence. *Id.* at 434-35. Rather, the question is *what the whole trial would have looked like to the jury* absent constitutional violations. In Mr. Lee's case, the cumulative effect of the totality of the evidence would have undoubtedly strengthened the materiality of the suppressed evidence of "third party guilt." *See Smith v. Secretary of New Mexico Dep't of Corrections*, 50 F.3d 801, 829-35 (10th Cir. 1995) (ordering habeas relief based on *Brady* violations in murder case; prosecution failed to disclose information that had cumulative effect of casting strong suspicion on another suspect); *Bowen v. Maynard*, 799 F.2d 593, 612-13 (10th Cir. 1986) (affirming habeas relief based on *Brady* violations in murder case; defendant had "creditable" alibi defense and prosecution failed to disclose information that had strong cumulative effect implicating another suspect).

Furthermore as *Kyles* clarified, a cumulative materiality analysis must account not only for the direct impact of the suppressed evidence, but also the collateral effects of the jury learning about the questionable practices in which the prosecution engaged in building its case. *See Kyles* at 445-46 (evidence of prosecutorial misconduct would have allowed jury to also question the integrity and reliability of investigation). In Mr. Lee's case, consideration of such collateral effects includes the possible impact on the jury if it had learned that Mr. Wanker had been instructed by authorities to limit his testimony on the stand; that the hair connecting him to the crime was misidentified and was not in fact his; that law enforcement reports of his previous statements had been crafted to exclude exculpatory evidence; that his grand jury testimony was manipulated to omit information that was not consistent with the Government's theory of the case; that case agents had doubts about Gloria's mental stability; that prosecutors suppressed information that Gloria had a long history of suffering from visual and auditory hallucinations

and was prone to making up events that never occurred; that the Government's theory of the crime relied on a tenuous timeframe already questioned by the jurors; and that the Government buried a damning report documenting that the earliest suspect in the murders flunked a polygraph, indicating that he had in fact committed the Mueller murders. As the Supreme Court noted in *Kyles*, jurors' exposure to these types of tactics can do profound damage to the prosecution's case because they call into question "the thoroughness and even the good faith of the investigation" upon which the case was built. *Kyles*, 514 U.S. at 445. *See also id*. at 449 (disclosure of *Brady* material "could have been used to cap an attack on the integrity of the investigation and on the reliability of [the lead detective]"). Indeed, here it functions to explain why there were so many holes in the case against Mr. Lee in the first place. In the Government's zeal to prove Mr. Lee's guilt it engaged in classic confirmation bias: it sought out any evidence that fit with Cheyne's and Gloria's story, no matter its weakness, and ignored any evidence that did not, no matter its strength.[52]

When this previously undisclosed evidence is considered alongside all the other undisclosed or problematic evidence, it cannot be said that Mr. Lee's trial resulted "in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434.

---

[52] *See* Fred Klein, A View from Inside the Ropes: A Prosecutor's Viewpoint on Disclosing Exculpatory Evidence, 38 Hofstra L. Rev. 867, 880 (2010) ("As one scholar (and former prosecutor) has thoughtfully proposed, psychological factors such as confirmatory bias, selective information processing, and resistance to cognitive dissonance inherently lead to *Brady* violations even by the most ethical of prosecutors."); Alafair S. Burke, Improving Prosecutorial Decision Making: Some Lessons of Cognitive Science, 47 Wm. & Mary L. Rev. 1587, 1593-1601 (2006).

**C.      Third Ground for Relief: Mr. Lee's conviction was obtained in violation of *Napue v. Illinois* and *Giglio v. United States* because the Government presented false and misleading testimony about Mr. Humphrey's involvement in the Mueller murders.**

Prosecutors violate due process by presenting material testimony that is false or that creates a false impression, or by allowing such testimony to stand uncorrected. *Giglio v. United States*, 405 U.S. 150 (1972) (failing to correct false testimony violates due process); *Napue v. Illinois*, 360 U.S. 264 (1959) (failing to correct testimony that creates a false impression, though not perjured, violates due process). Due process is equally offended by direct statements that are untrue and the eliciting of testimony which "taken as a whole" gives the jury a "false impression." *Alcorta v. Texas*, 355 U.S. 28, 31 (1957); *Smith v Dept. of Corrections*, 572 F.3d 1327, 1333-34 (11th Cir. 2009) ("The *Giglio* rule applies to explicit factual representations by the prosecutor at a side bar and implicit factual representations to the jury while questioning a witness."). This is so even where the particular prosecutor does not know that the testimony being presented is false or misleading but when a member of the team either knew or should have known. *See Giglio*, 405 U.S. at 154. It is the truthfulness of the process that is of utmost importance, even when the prosecutor acts in good faith and there is no intent to deceive. *Id.* at 153. Under *Napue v. Illinois*, 360 U.S. 264 (1959), and its progeny, a violation is established if: (1) the testimony in question was misleading; (2) the Government knew or should have known the testimony was misleading; and (3) the testimony was material. As set forth below, Mr. Lee is able to meet these three elements.

The Government stood by silently as Mr. Humphrey testified at trial that he had no idea that the Muellers' signatures on the titles were forged, and then, most critically, when he denied any involvement in the murders. It never acted to correct the testimony or otherwise notify defense counsel of material impeachment evidence. Indeed, it was the Government that elicited

56

Mr. Humphrey's testimony that he had nothing to do with the crimes. Its misconduct violated the basic tenet of *Napue v. Illinois*, which prohibits "soliciting false evidence," and requires the prosecutor to not "allow[ ] it to go uncorrected when it appears." 360 U.S. 264, 269 (1959).

### 1.   Paul Humphrey's testimony was false and misleading.

The polygraph examination establishes that Mr. Humphrey's testimony was false and misleading. That deceit was compounded by the Government in closing arguments. It told the jury that Mr. Humphrey had been thoroughly investigated and cleared by both local and federal law enforcement agencies:

> Then they spent a bunch of time during the trial trying to convince everybody that Paul Humphrey did it. Again you saw Mr. Humphrey testify. Now, Mr. Humphrey got in some trouble with the police. He got in that trouble because of those car titles. He had the Bill Mueller car titles. And Aaron Duvall [of the Pope County Sheriff's Office] did what a good officer would do. He wanted to get to the bottom of why Paul Humphrey had those car titles. So what does he do? He gets a search warrant. He goes out. He searches Humphrey's house. And they submit all these items for examination. [ATF Case Agent] Glen Jordan told you they traced those 40 firearms they found to see if one of them was Bill Mueller's. It wasn't. They sent off all this stuff to be examined. They didn't find anything. What did they find? They found one pamphlet that had Nancy Mueller's name on it. When Mr. Humphrey testified, what did he say? Yeah, I had that pamphlet. Nancy gave it to me. She wanted me to get into the product, whatever it was, and start using it. *There's no evidence against Mr. Humphrey.*

Tr. 6959-60 (emphasis added).[53] The prosecution did not want to leave any door open as to Humphrey's involvement. Not only did the Government fail to correct the false testimony, but it reinforced it and capitalized on it in its closing argument.

---

[53] *See also supra* note 45.

## 2.   The **Government knew or should have known Mr. Humphrey's testimony was false and misleading.**

For the same reasons articulated above, the Government knew or should have known that Paul Humphrey's testimony was false or misleading. Here, the polygraph examination was conducted by the Arkansas State Police, which cooperated and coordinated with both the Pope County Sheriff's Office and federal authorities in the investigation of the Mueller murders. Any knowledge by the Arkansas State Police regarding Mr. Humphrey's polygraph examination must be imputed to the Government. *Kyles*, 514 U.S. at 437 ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police."). *See also United States v. Antone*, 603 F.2d 566, 569-70 (5th Cir. 1979) (imputing knowledge in state hands to federal prosecutors because of degree of cooperation and interaction among the various authorities during the general course of the investigation).

As the Supreme Court has made clear, the *Brady* rule encompasses evidence "known only to police investigators and not to the prosecutor." *Kyles*, 514 U.S. at 438. Under *Brady* and *Napue*, the "prosecution team" includes "both investigative and prosecutorial personnel." *Antone*, 603 F.2d at 569. Thus, any exculpatory information that investigative personnel learned must be imputed to the Government, too. *See United States v. Bin Laden*, 397 F. Supp. 2d 465, 481 (2d. Cir. 2005) ("[I]t is clear that the investigating case agents on a particular prosecution are part of the prosecution team; their possession of producible material is imputed to the prosecutor regardless of his actual knowledge."); *U.S. ex rel. Smith v. Fairman*, 769 F.2d 386, 391 (7th Cir. 1985) (recognizing duty to search files maintained by branches of government "closely aligned with the prosecution"). Nor is it a defense if law enforcement officers hid exculpatory information from the prosecutors. *See Barbee v. Warden*, 331 F.2d 842, 846 (4th Cir. 1964)

58

("The duty to disclose is that of the state, which ordinarily acts through the prosecuting attorney; but if he too is the victim of police suppression of the material information, the state's failure is not on that account excused.").

### 3.      Mr. Humphrey's testimony was material.

"Claims arising under *Giglio v. United States* [] are a type of *Brady* claim that have a different and more defense friendly measure of materiality." *Hammond v. Hall*, 586 F.3d 1289, 1306-07 (11th Cir. 2009). Under this type of claim, the defendant is entitled to a new trial "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976). The "could have" standard requires a new trial unless the prosecution persuades the court that the misleading testimony was harmless beyond a reasonable doubt. *Ford v. Hall*, 546 F.3d 1326, 1332 (11th Cir. 2008) (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)). "This standard favors granting relief. It is shaped by the realization that 'deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice.'" *Id.* at 1333-34 (quoting *Giglio*, 405 U.S. at 153).

All of the reasons articulated above to show that the suppressed evidence was material to Mr. Lee's defense under *Brady* apply with even greater force to show why the *Napue*/*Giglio* violation was not harmless beyond a reasonable doubt. The fact that the Government not only solicited the false evidence, but also then capitalized on it in closing arguments, is enough to warrant reversal. *See United States v. Sanfilippo*, 564 F.2d 176, 179 (5th Cir. 1977) (where prosecutor failed to correct false testimony that witness did not receive a plea deal in exchange for his cooperation, and then argued that it was a relevant matter for jury to consider in evaluating witness's credibility, combined prejudice warranted reversal); *United States v.*

59

*Bigelesein*, 625 F.2d 203, 208-09 (8th Cir. 1980) (granting habeas relief where "combined effect" of prosecutor's failure to correct false testimony and misleading closing argument violated due process); *United States v. Foster*, 874 F.2d 491, 495 (8th Cir. 1988); *United States ex rel. Dowd v. Lane*, 574 F. Supp. 972, 974–75 (N.D.Ill.1983), *aff'd*, 762 F.2d 1015 (7th Cir.1985) (failure of prosecutor to correct testimony he knew was "likely to convey a false impression to the jury" and "deliberately emphasized the testimony by repeating it").

The Government's blunt elicitation of Mr. Humphrey's testimony denying his involvement in the murders, as well as its arguments in summation indicating that Mr. Humphrey had been properly investigated and ruled out as a suspect, carried the imprimatur of the Department of Justice, as well as every investigative agency that participated in the case. The jury would have felt entitled to believe with confidence that the Government had thoroughly investigated Mr. Humphrey and cleared him of any wrongdoing. The newly disclosed evidence would have shaken any trust the jury had in the Government's representation, particularly if it had learned that prosecutors had buried such explosive information. There is thus "any reasonable likelihood that the false testimony could have affected the judgment of the jury," *Agurs*, 427 U.S. at 103, and the Government cannot prove that it was harmless beyond a reasonable doubt.

**D.      The materiality of the *Giglio/Napue* violation must also be considered *in toto* as well as collectively with the *Brady* violations.**

The Supreme Court's insistence that a *Brady* materiality analysis must examine the whole trial in light of the new evidence applies with equal force to *Giglio/Napue* claims. As with *Brady* claims, a court should not isolate the *Napue* violation when evaluating prejudice. *See e.g. United States v. McCullah,* 136 Fed. Appx. 189, 199-200 (10th Cir. 2005) (evaluating materiality of

July 3 2020 p135
Appellate Case: 20-2351      Page: 135      Date Filed: 07/04/2020 Entry ID: 4930235

*Napue* violation "in the context of the entire record"); *Campbell v. Reed,* 594 F.2d 4, 8 (4th Cir. 1979) (finding *Napue* violation after "[v]iewing the record as a whole.").

Additionally, despite the distinct tests for materiality, *Napue* and *Brady* violations must be analyzed collectively. Thus even where the *Napue* errors standing alone are not material, the collective nature of the government misconduct may be sufficient to show that trial did not result in a verdict worthy of confidence. *Reis-Campos v. Biter,* 832 F.3d 968, 977 (9th Cir. 2016); *Phillips v. Ornoski*, 673 F.3d 1168, 1189 (9th Cir. 2012).

Here, each of the errors provides a basis for relief: a key prosecution witness suffered from regular visual and auditory hallucinations; the initial suspect in the murders had never been definitively cleared, and had actually flunked a polygraph indicating his involvement in the murders; that the disinterested witness who ostensibly corroborated the Kehoes' account of Mr. Lee's involvement in the Mueller murders had actually repeatedly warned authorities that Mr. Lee's admission was neither credible or trustworthy; and the hair found on the clothing worn by one of the perpetrators was not, in fact, Mr. Lee's. When combined with the serious reservations the jury demonstrated about convicting on the basis of Cheyne's and Gloria's word alone, as well as the concerns it showed about the plausibility of the Government's timeline, there can be little if any confidence in the resulting verdict.

**IV.    The Original § 2255 Proceeding Should be Reopened Pursuant to Fed. R. Civ. P. 60 Due to the Government's Fraud, Misrepresentation, or Misconduct.**

Mr. Lee's § 2255 proceeding was tainted by the Government's misconduct, but not irreparably so. The Government's failure to disclose *Brady* material in response to a direct request for such evidence prevented Mr. Lee from obtaining discovery to establish the preceding claims that the prosecution had withheld exculpatory and impeachment evidence at his trial and presented false and misleading evidence. This defect in the integrity of his § 2255 proceedings

61

Appellate Case: 20-2351     Page: 136     Date Filed: 07/04/2020 Entry ID: 4930235

can be remedied pursuant to several different provisions of Fed. R. Civ. P. 60.[54] "The decision to grant relief[55] [pursuant to Rule 60] lies with the district court and may be reviewed only for abuse of discretion." *United States v. Young*, 806 F.2d 805, 806 (8th Cir. 1986).

### A.     Rule 60(b)(3)

Rule 60(b)(3) provides that "[o]n motion and just terms, the court may relieve a party or its legal representative from a final judgment, order or proceeding for the following reasons… (3) fraud … misrepresentation, or misconduct by an opposing party."  Numerous courts have held that, when the Government makes misrepresentations during a § 2255 proceeding that prevent a federal prisoner from fully and fairly presenting his collateral claims, there is a defect in the integrity of the proceedings that warrants relief under Rule 60(b)(3).

For example, in *In re Pickard*, 681 F.3d 1201 (10th Cir. 2012), the movants alleged in a § 2255 motion that the Government had failed to disclose impeachment information about a key cooperating witness. The Government had released Drug Enforcement Agency (DEA) records about the witness, but the movants claimed that other agencies also had relevant records about this witness that should have been turned over. In response, the Government asserted that no agency other than the DEA was involved in the investigation against the movants, and that it was not aware of the witness' involvement with any agency besides the DEA. *Id*. at 1203. The district court denied *Brady* claim for lack of proof. *Id*. After the § 2255 proceeding had concluded, the

---

[54] The Supreme Court has held that Rule 60(b) motions can properly be applied to habeas proceedings when they attack "not the substance of the federal court's resolution of a claim on the merits, but some defect in the integrity of the [previous] federal habeas proceedings." *Gonzalez v. Crosby*, 545 U.S 524, 532 (2005). "Fraud on the federal habeas court is one example of such a defect." *Id*., n.5.

[55] "Relief" refers to the re-opening of the judgment itself, not to whether the court ultimately sides with the moving party after ordering discovery or conducting whatever proceedings may be necessary for assessing the merits of the claims.

movants obtained documents via a Freedom of Information Act (FOIA) request that showed that, in fact, agencies other than the DEA were involved in the investigation and had records related to the cooperating witness. They then sought to reopen the § 2255 proceeding pursuant to Rule 60(b)(3). They alleged that "the prosecution made a false statement in the § 2255 proceedings that forestalled the discovery from which they could have established that there had been a *Brady/Giglio* violation at trial." *Id*. at 1202-03.

The Tenth Circuit agreed. It held that the movants' "claims that prosecutorial misconduct in the § 2255 proceedings affected the integrity of those proceedings are proper Rule 60(b) claims." *Id*. at 1203. *See also id.* at 1206 ("[T]he claim in the Rule 60(b) motion is that the prosecutor committed fraud in the § 2255 proceedings that prevented Defendants from obtaining discovery to establish their § 2255 claims. If we assume the truth of Defendants' allegations, as we must at this juncture, then Defendants have stated a proper Rule 60(b) motion.").[56] As the court observed, the Rule 60(b) motion was not a second or successive motion because it did not seek to raise new claims attacking the original conviction. Rather, the movants were "simply asserting" they did not "get a fair shot in the original § 2255 proceeding because its integrity was marred by a flaw that must be repaired in further proceedings." *Id*. at 1206.

---

[56] "Fraud" within the meaning of Rule 60 does not necessarily entail any intent to deceive. As is true with *Brady* violations, the effect on the proceedings is the same whether a prosecutor acted in good faith or bad, and it is the effect on the "integrity of the proceedings" which is at issue here. *See Lonsdorf v. Seefeldt*, 47 F.3d 893, 897 (7th Cir. 1995); *Schultz v. Butcher*, 24 F.3 626, 630 (4th Cir. 1994); *Anderson v. Cryovac, Inc*., 862 F.2d 910, 923 (1st Cir. 1988); *Complaint of Edwards*, 809 F.2d 1403, 1405 (9th Cir. 1987); *United States v. One (1) Douglas A-26B Aircraft*, 662 F.3d 1372, 1375 n.6 (11th Cir. 1981).

As the Tenth Circuit further held, failing to allow the movants to reopen the proceeding under these circumstances would result in a "substantial injustice" and allow the Government to profit off its own misconduct:

> We cannot accept the proposition that the government has a free pass to deceive a habeas court into denying discovery just because it similarly deceived the trial court. If Defendants' claim of prosecutorial deceit during the § 2255 proceedings must be treated as a second-or-successive § 2255 motion, then the government's alleged misconduct during that proceeding could compound a substantial injustice to Defendants. In a second-or-successive proceeding Defendants must show that their FOIA evidence (which allegedly contradicts the prosecutor's statement in the § 2255 proceedings) would suffice "to establish by clear and convincing evidence that no reasonable factfinder would have found the movant[s] guilty of the offense." 28 U.S.C. § 2255(h)(1). This is a far heavier burden than the burden under Rule 60(b) of showing only that the false statement had improperly forestalled discovery in the § 2255 proceedings. … To treat [the defendants'] *Brady* claim as a second or successive request for habeas relief, subject to the almost insurmountable obstacles erected by 28 U.S.C. § 2244(b)(2) (B), would be to allow the government to profit from its own egregious conduct.

*Id.* at 1207 (internal quotation marks and citations omitted).

Similarly, in *United States v. Williams*, 753 Fed. Appx. 176 (4th Cir. 2019), the movant filed a motion pursuant to Rule 60(b)(3) alleging that the Government made several material misrepresentations during the original § 2255 proceedings that prevented him from fully and fairly presenting certain ineffective assistance of counsel claims. Specifically, the Government stated in its responses opposing the § 2255 motion that there was no evidence suggesting the DNA analysis, which tied the defendant to a crime scene, was unreliable. Mr. Williams claimed he had discovered documents proving that the DNA analyst was not credible and that the Government knew about these documents before he filed his § 2255 motion. He argued that the Government's material misrepresentations caused the district court to deny his § 2255 motion and asked that the proceeding be reopened. *Id.* at 177. The district construed the Rule 60(b)(3) motion as an unauthorized, successive § 2255 motion and dismissed for lack of jurisdiction. *Id.*

On appeal, the Fourth Circuit reversed. It held that claims of prosecutorial misconduct in the § 2255 proceeding are properly cognizable under Rule 60(b)(3): Williams "did not seek to raise a new claim but contended that the Government's purported misrepresentations during the § 2255 proceedings prevented him from fully and fairly presenting certain ineffective assistance of counsel claims." *Id.* at 177-78.[57] It vacated the order denying the Rule 60 motion as successive and remanded for further proceedings.

In *Scott v. United States*, 81 F. Supp. 3d 1326 (M.D. Fla. 2015), *aff'd*, 890 F.3d 1239 (11th Cir. 2018), Scott alleged in his § 2255 motion that his trial counsel was ineffective for failing to investigate and uncover additional impeachment evidence about one of the key cooperating witnesses. *Scott,* 81 F. Supp. 2d at 1328. The Government responded that no prejudice resulted from trial counsel's abridged investigation because there was no further impeachment evidence that counsel could have uncovered. *Id*. Three years after Mr. Scott's § 2255 motion was denied, an AUSA in a different office who planned to use the same cooperating witness in a different federal prosecution uncovered *Brady* evidence that the witness had lied to investigators on a number of occasions. *Id.* at 1329-30. After Mr. Scott was notified of this *Brady* evidence, he filed a Rule 60(b)(3) motion to reopen his § 2255 proceeding.

The district court found that this was a "true" Rule 60(b) motion and granted it:

> [Petitioner] does not attempt to add a new claim for relief, nor does he challenge the Court's reasoning for its decision on the initial motion to vacate. Instead, Petitioner asserts that the government's argument in the initial § 2255 proceeding that there was no further *Brady* material Petitioner's trial counsel could have uncovered, when in fact there was, corrupted the Court's judgment on the

---

[57] The Fourth Circuit also rejected the district court's ruling that the Rule 60(b)(3) motion was untimely because it was not filed within one year of the order denying § 2255 relief: "We decline to affirm the court's jurisdictional ruling on timeliness grounds because the Rule 60(b) one-year filing deadline is an affirmative defense, not a jurisdictional bar, and Williams must be given the opportunity to make a case for timely filing." *Id*. at 178 (internal quotation marks and citation omitted).

ineffective assistance of counsel claim. In other words, Petitioner's Rule 60 motion does not attempt to vacate the underlying conviction by adding a new *Brady* or *Giglio* claim, but instead seeks to vacate the court's previous order denying post-conviction relief based on the government withholding evidence relevant to the prejudice prong of Petitioner's *Strickland* claim. Because Petitioner has so narrowly tailored his argument, the Court is satisfied it is a proper Rule 60(b) claim rather than a disguised successive motion to vacate. Therefore, the Court has jurisdiction to rule on the motion.

*Id.* at 1336-37.[58]

The Government's misconduct in the Lee case is similarly cognizable under Rule 60(b)(3). Despite Mr. Lee's clear request for any information that would support a *Brady* claim, the Government simply noted that it had previously provided a "huge amount" of discovery to trial counsel. Dkt. 1126-1 at 45 n.16. It made no additional disclosures, and Mr. Lee had no basis to believe any *Brady* material existed given the Government's representations. (This was especially so given the specific representations that the Government had previously made in connection with Chevie Kehoe's § 2255 proceedings.)

We now know that the Government's representations were false. Its failure to produce the requested discovery during the § 2255 proceedings deprived Mr. Lee of the ability to raise *Brady* claims concerning Gloria's mental instability and Paul Humphrey's failed polygraph examination. Thus, Mr. Lee did not "get a fair shot in the original § 2255 proceeding" because the Government "committed fraud in the § 2255 proceedings that prevented [him] from obtaining discovery to establish [his] § 2255 claims." *In re Pickard*, 681 F.3d at 1206.

---

[58] The district court also declined to deny the motion as untimely, noting that the Government "made it impossible for Petitioner to timely file a Rule 60(b)(3) motion because it failed to disclose potentially impeaching evidence about [the witness] until three years after Petitioner's initial § 2255 motion was resolved. … Only unfairness would result to Petitioner were the Court, under these circumstances, to dismiss the motion on its own initiative." *Id.* at 1338.

### B.   Rule 60(b)(6)

Rule 60(b)(6) provides that a court may reopen a judgment for "any other reason that justifies relief." Rule 60(b)(6) is "properly invoked where there are extraordinary circumstances, or where the judgment may work an extreme and undue hardship, and should be liberally construed when substantial justice will thus be served." *Cornell v. Nix*, 119 F .3d 1329, 1332 (8th Cir. 1997) (citing *Mohammed v. Sullivan*, 866 F.2d 258, 260 (8th Cir. 1989)).

Mr. Lee's allegations about the Government's misconduct are cognizable under Rule 60(b)(6). *See United States v. Pelullo*, Crim. No. 94–276(DRD), Civ. No. 01–124(DRD), 2010 WL 2629080 at *15 (D. N.J. June 25, 2010) (finding grounds for jurisdiction under Rule 60(b)(6) to consider movant's claim that the Government had falsely denied the involvement of a federal agency in his prosecution, thereby resulting in his inability to obtain discovery from the agency to support his § 2255 claims concerning *Brady* violations). There is no question that the prior judgment "may work an extreme and undue hardship" on Mr. Lee absent this remedy—he may go to the death chamber despite credible allegations that the Government suppressed material *Brady* evidence, and without ever having received a full and fair opportunity to have those constitutional violations reviewed in his § 2255 proceedings. Considering that the defect in the prior judgment is directly attributable to the same Government misconduct that infected Mr. Lee's trial, "substantial justice" would be served by reopening the judgment. Conversely, allowing the Government to get away with concealing exculpatory and impeachment evidence at trial, and then again in the § 2255 proceedings, would allow the Government to effectively evade any judicial review of its misconduct and would "compound a substantial injustice" to Mr. Lee. *In re Pickard*, 681 F.3d at 1201. Rule 60(b)(6) relief is most appropriate where, as here, the full merits of the case were not previously examined. *See Seven Elves v. Eskanazi*, 635 F.2d 396,

402, 403 (5th Cir. 1981) (If full merits not reviewed, "the equities in such cases will militate strongly in favor of relief" and "where denial of relief precludes examination of the full merits of the cause, even a slight abuse may justify reversal.'").

Mr. Lee's case presents the extraordinary circumstances supporting 60(b) relief including "'the risk of injustice to the parties' and 'the risk of undermining the public's confidence in the judicial process.'" *Buck v. Davis*, 137 S. Ct. 759, 778 (2017) (quoting *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863–64 (1988)). First, the judicial process, and *Brady* jurisprudence in particular, are predicated on the Government being an honest broker. But here, not only did the Government misrepresent whether it had disclosed all the exculpatory and impeachment material in its possession at the time of Mr. Lee's trial, it maintained that falsehood for as long as it would take to try to shut the courthouse doors on Mr. Lee. In fact, the Government repeated the lie during Mr. Lee's § 2255 proceedings, thus frustrating the one and only post-conviction review process that the judicial system affords federal prisoners. But for the fact that an Arkansas state agency happened to retain a copy of a 23-year old record and decided to release it pursuant to a state FOIA request, we might not have ever learned the truth about the Government's misconduct, and neither Mr. Lee nor this Court would have been the wiser. Indeed, when Mr. Lee is able to finally get his day in this Court and have his *Brady* claims considered, it will not be because "the system worked"—it will be because of the serendipity of state record-keeping and disclosure. There could hardly be a more compelling situation that could risk undermining the public's confidence in the judicial process.

The Government's actions turn the criminal justice process on its head, forcing Mr. Lee to play the game "prosecutor may hide, defendant must seek" decried by the Supreme Court. *Banks v. Dretke*, 540 U.S. 668, 696 (2004). The fact that Mr. Lee fortuitously learned of

July 3 2020 p143
Appellate Case: 20-2351   Page: 143   Date Filed: 07/04/2020 Entry ID: 4930235

exculpatory evidence from a witness like Cheyne Kehoe so long after trial heightens the extraordinary nature of his case and the egregiousness of the Government's conduct. Mr. Lee was entitled to rely on the prosecution's assurances during trial and post-conviction and presume that public officials are acting with the integrity of their station. He is not required to "scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed." *Id.*   60(b) relief is appropriate under these circumstances.  *See Landano v. Rafferty*, 126 F.R.D. 627, 638 (D.N.J. 1989), *rev'd on other grounds*, 897 F.2d 661 (3d Cir. 1990) ("The court cannot conceive of circumstances more 'extraordinary' than those presented here, where a prisoner presents evidence that he was convicted without the benefit of exculpatory evidence and that such evidence was not available to him until the time of his motion for relief under Rule 60(b) because of the failure of the State to meet its obligation to turn over such evidence. Landano should not be deprived of the opportunity to present evidence of the suppression of exculpatory materials simply because the State successfully suppressed such evidence until after his habeas corpus application was heard and decided by this court.").

The extraordinary nature of this case is also demonstrated by the fact that the Government's misconduct is not an isolated incident; it is part of a broader pattern of suppression of exculpatory information and the presentation of false and misleading evidence during both phases of Mr. Lee's trial. Although the Government has thus far succeeded in precluding the courts from reviewing its misdeeds, it is quite extraordinary that it has never—not once—unequivocally denied the factual allegations undergirding any of Mr. Lee's prior *Brady* claims. (As Judge Kelly recently observed, the Government did not even *respond* to allegations that it buried evidence that undermined its federal charges against Mr. Lee. *See* Exh. D.) The

69

Appellate Case: 20-2351   Page: 144   Date Filed: 07/04/2020 Entry ID: 4930235

public can hardly have confidence in a judicial process that sanctions the deprivation of any remedy even in the face of *uncontested* allegations of prosecutorial misconduct.

### C.      Rule 60(d)(1)

Rule 60(d)(1) provides that Rule 60 does not limit a court's power to entertain an independent action to set aside a judgment. 11 Wright & Miller, Federal Practice & Procedure: Civil § 2868 (3d ed. 2012). An "independent action" sounds in equity. *United States v. Beggerly*, 524 U.S. 38, 45 (1998). It is "available only to prevent a grave miscarriage of justice." *Id*. at 47.

Mr. Lee's allegations about the Government's misconduct are cognizable under Rule 60(d)(1). *See Pelullo*, 2010 WL 2629080 at *15 (finding jurisdiction under Rule 60(d)(1) to consider movant's claim that the Government had falsely denied the involvement of a federal agency in his prosecution, thereby resulting in his inability to obtain discovery from the agency to support his § 2255 claims concerning *Brady* violations). Allowing "a court to proceed in a criminal case on the basis of government misrepresentations is such a fundamental departure from principles of justice that it must be addressed in one manner or another to preserve the integrity of the Court." *Id*.

That concern is particularly present here. The Government has committed a number of other *Brady* violations that have escaped review because it managed to successfully conceal its misconduct until after the § 2255 proceedings were concluded.

Take, for example, the allegations raised in Mr. Lee's second-in-time § 2255 motion about James Wanker. Dkt. 1297 at 30-51. Mr. Lee alleged that the Government omitted exculpatory evidence about an alleged confession from all official government reports of its interviews with Mr. Wanker; instructed Mr. Wanker to avoid disclosing that information while on the stand; allowed his substantially misleading testimony to stand uncorrected; and even

70

eliminated facts unfavorable to its theory of the case when it prepared Mr. Wanker's written

testimony to the grand jury. Remarkably, the Government did not deny any of these allegations.

Rather, its position was that because Mr. Lee did not discover its misconduct until after the initial

§ 2255 proceeding had concluded, its constitutional violations were unreviewable as a matter of

law in a second § 2255. *See Lee v. United States*, No. 19-2432, Government Response in

Opposition to Application for COA at 16 (filed Oct. 7, 2019). This is so, said the Government,

even if it is reasonably probable that its misconduct as to Mr. Wanker changed the outcome of

the trial.[59]

Or consider Mr. Lee's prior claims about *Brady* and *Napue* violations the Government

committed during the penalty phase proceedings of his trial. Dkt. 1297 at 52-62. Mr. Lee alleged

that the prosecution presented false evidence that Mr. Lee was legally responsible for a previous

murder when he was a juvenile, but that the local Oklahoma prosecutor in that case inexplicably

allowed Mr. Lee to get off with a sweetheart plea deal to a lesser charge. In fact, Mr. Lee

uncovered evidence suggesting that the plea deal was the result of a judicial determination; a

state court judge found that there was insufficient evidence to even find probable cause to charge

Mr. Lee with murder. Once again, the Government did not contest any of the underlying facts of

Mr. Lee's *Brady* claim; rather, it argued that the violation was discovered too late to be

cognizable. (Judge Holmes ruled that he was without jurisdiction to grant relief, despite the fact

---

[59] *Id.* ("[A] defendant seeking to raise a *Brady* claim in a second-in-time § 2255 motion based on newly discovered evidence may do so, but only if he can demonstrate to the court of appeals that the evidence, if accepted as true, provides compelling proof of his innocence. … It is not enough to show merely that there is a reasonable probability that the evidence would have changed the outcome of the trial, which is the less onerous standard for materiality under *Brady*.").  The Eighth Circuit denied Mr. Lee's application for a COA on this issue, over a dissent by Judge Kelly. *See* Exh. D.

71

July 3 2020 p146
Appellate Case: 20-2351   Page: 146   Date Filed: 07/04/2020 Entry ID: 4930235

that he agreed that but for the Government's misconduct, "the outcome at sentencing would have been different." Dkt. 1313 at 14.).[60]

Or, more recently, consider Mr. Lee's newly discovered evidence presented to the Eighth Circuit as part of a motion requesting permission to file a second or successive § 2255 motion. *See Lee v. United States*, No. 19-3576. Mr. Lee uncovered information establishing that the Government suppressed evidence that would have undermined two key elements of the VICAR offenses for which Mr. Lee was convicted and sentenced to death: namely, that there was no "enterprise" in existence at the time of the Mueller murders, and that Mr. Lee was not paid by an enterprise in exchange for commission of the offense. Once again, the Government did not deny that it had suppressed this favorable information. Rather, it argued that the claims could not be heard now because Mr. Lee could have uncovered the misconduct sooner. *See id.*, Government Response to Application for Permission to File Second or Successive § 2255 Motion at 17 (filed Dec. 7, 2019). And once again, it has been able to "profit from its own egregious conduct." *In re Pickard*, at 1207. A panel of the Eighth Circuit denied his request for permission to file the motion, over the dissenting opinion of Judge Kelly, who highlighted the fact that the Government failed to respond to Mr. Lee's *Brady* allegations.[61] *See* Exh. D.

---

[60] Mr. Lee is now pursuing this claim in the District Court for the Southern District of Indiana pursuant to a petition for a writ of habeas corpus under 28 U.S.C. § 2241. *See supra* note 15. Notably, it appears that the Government continues to be less than candid with the courts about the extent of its misconduct. Although it claimed in its pleadings that it had no reason to know about the exculpatory facts surrounding Mr. Lee's plea in his juvenile case, Mr. Lee uncovered documents as a result of a FOIA request that indicate the Government had extensive contact with local Oklahoma authorities about the case, including sending case agents to Oklahoma to review the local prosecutor's case file. *See Lee v. Warden, et al*, No. 2:19-cv-00468-JPH-DLP (S.D. IN.), Dkt. 18.

[61] Mr. Lee notes the other litigation to make the Court aware of the number of the Government's misrepresentations and the extent of its concealment in this capital case. The proceedings in those actions, some of which are ongoing, arose in a legal and procedural posture

72

With respect to each *Brady* violation, the Government has followed the same playbook: hide favorable evidence prior to the trial, run out the clock until the § 2255 proceeding is complete, and then invoke procedural and jurisdictional arguments to block the courts from substantively reviewing any of its misconduct. This "playbook" is an abuse of both *Brady* jurisprudence and the AEDPA. On the front end, the Government relies on the inherent asymmetry of information between the parties to get away with falsely claiming it has complied with its *Brady* obligations; on the back end, the Government relies on the strictures of the AEDPA to evade judicial review after its misconduct has come to light. This strategy is especially offensive where the Government does not deny it committed any of the aforementioned misconduct, and its response in each instance is not "We didn't do anything wrong," but rather "What took you so long to catch us?"

Allowing the Government to, yet again, manipulate the legal system to avoid any accountability for its misconduct would be a grave miscarriage of justice. Respectfully, this Court should invoke its equitable power under Rule 60(d)(1) to reopen the § 2255 judgment and allow Mr. Lee to fully and fairly present his *Brady* claims.

### D.      Rule 60(d)(3)

Rule 60(d)(3) recognizes this Court's "power to … set aside a judgment for fraud on the court." Fraud under Rule 60(d)(3) "is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication." *Kerwit Medical Products, Inc. v. N & H Instruments, Inc.*, 616

---

different from that at issue here. The sole question before this Court is whether the suppression of the Humphrey failed polygraph and Gloria Kehoe's history of hallucinations, when considered in the context of all the facts and violations now known, warrant this Court's reopening of the judgment for serious scrutiny.

F.2d 833, 837 (5th Cir. 1980) (quoting 7 Moore, Federal Practice ¶ 60.33 at 511 (1971 ed.)). *See also Kupferman v. Consolidated Research & Mfg. Corp.*, 459 F.2d 1072, 1078 (2d Cir. 1972) (an attorney's "loyalty to the court, as an officer thereof, demands integrity and honest dealing with the court. And when he departs from that standard in the conduct of a case he perpetrates a fraud upon the court.").

Where, as here, the withheld evidence was critical to Mr. Lee's ability to fully and fairly present his § 2255 claims, it is clear that "the judicial machinery [could not] perform in the usual manner its impartial task of adjudging cases that [were] presented for adjudication," and thus there has been a fraud on the court. Indeed, numerous courts have found that allegations of Government misconduct during § 2255 proceeding are cognizable under Rule 60(d)(3). *See*, *e.g.*, *United States v. Hall*, 737 Fed. Appx. 889 (10th Cir. 2018) (allegations that prosecutor presented false evidence during § 2255 proceeding constituted fraud on the habeas court cognizable under Rule 60(d)(3)); *In re Wax*, No. 99-3550, 1999 U.S. App. LEXIS 38883 (3d Cir. Nov. 12, 1999) (motion for permission to file second or successive § 2255 motion unnecessary where applicant's motion in the district court alleged "fraud on the court" based on prosecutor's fraudulent representation during § 2255 proceeding that prevented him from fully and fairly presenting his § 2255 claims); *Pelullo*, 2010 WL 2629080 at *15 (finding jurisdiction under Rule 60(d)(3) to consider movant's claim that the Government had falsely denied the involvement of a federal agency in his prosecution, thereby resulting in his inability to obtain discovery from the agency to support his § 2255 claims concerning *Brady* violations).

The mere fact that misrepresentations here were made by officers of the court brings Mr. Lee's allegations within the ambit of Rule 60(d)(3). *See Kupferman*, 459 F.2d at 1078 (2d Cir. 1972) (an attorney's "loyalty to the court, as an officer thereof, demands integrity and honest

dealing with the court. And when he departs from that standard in the conduct of a case he perpetrates a fraud upon the court."); *In re Intermagnetics America, Inc.,* 926 F.2d 912, 916 (9th Cir. 1991) ("fraud upon the court includes both attempts to subvert the integrity of the court and fraud by an officer of the court.").

## CONCLUSION

The Government's material misrepresentations during the § 2255 proceedings prevented Mr. Lee from fully and fairly presenting his *Brady* and *Napue/Giglio* claims that he was deprived—on account of the Government's misconduct—of access to evidence material to his defense at trial and central to the jury's determination of guilt. In the interests of justice, this Court should reopen the prior judgment denying § 2255 relief to allow Mr. Lee a fair shot at litigating these claims.

Respectfully submitted this 29th day of January, 2020.

/s/ *Morris H. Moon*
MORRIS H. MOON
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(713) 880-3556
Morris_Moon@fd.org

/s/ *George G. Kouros*
GEORGE G. KOUROS
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 821-0855
George_Kouros@fd.org

Counsel for Daniel Lee

July 3 2020 p150
Appellate Case: 20-2351   Page: 150   Date Filed: 07/04/2020 Entry ID: 4930235

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Eastern District of Arkansas using the CM/ECF system on January 29, 2020. This motion was served via this court's CM/ECF electronic case filing system upon:

JOHN M. PELLETTIERI
Attorney, U.S. Department of Justice
Criminal Division, Appellate Section
950 Pennsylvania Ave., N.W., Rm. 1264
Washington, D.C. 20530
(202) 307-3766
john.pellettieri@usdoj.gov

MICHAEL GORDON
Chief, Criminal Division
U. S. Attorney's Office
Eastern District of Arkansas
Post Office Box 1229
Little Rock, AR 72203-1229
(501) 340-2600
michael.gordon@usdoj.gov

/s/ *George G. Kouros*
GEORGE G. KOUROS
Bar # 420813 (CT)
Attorney for Daniel Lee
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
Telephone: (301) 821-0855
Email: George_Kouros@fd.org

DANIEL LEWIS LEE v. UNITED STATES
INDEX OF EXHIBITS[1]

Exhibit A:    1/21/97 Humphrey Interview and Polygraph Examination Report
Exhibit B:    Declaration of Cheyne Kehoe
Exhibit C:    Declaration of Kirby Kehoe
Exhibit D:    Judgment, *United States v. Lee,* No. 19-3576 (8th Cir. Jan. 7, 2020) (Kelly, J., dissenting)
Exhibit E:    Judgment, *United States v. Lee*, No. 19-2432 (8th Cir. Nov. 4, 2019) (Kelly, J., dissenting)
Exhibit F:    Courier News Article (May 6, 1999)
Exhibit G:    3/19/98 Arkansas State Crime Laboratory Report
Exhibit H:    Excerpt of 3/31/98 Gloria Kehoe Interview (Pages 105-106)
Exhibit I:    Excerpt of 3/31/98 Gloria Kehoe Interview (Pages 80-95)
Exhibit J:    Excerpt of 4/16/98 Gloria Kehoe Interview (Pages 7-8)
Exhibit K:    ATF Report from Confidential Informant (4/29/97)
Exhibit L:    Serological Research Institute Mitochondrial DNA Report
Exhibit M:    Declaration of James Wanker
Exhibit N:    Wanker Statement to Pope County Sheriff's Office
Exhibit O:    Wanker Statement to ATF
Exhibit P:    Excerpt of 6/21/97 Cheyne Kehoe interview (Page 119)
Exhibit Q:    January 1996 Sunrise/Sunset Calendar, Russellville, AR
Exhibit R:    GPS coordinates of Mueller crime scene locations
Exhibit S:    FBI 302 report re: driving times between crime scene locations
Exhibit T:    Excerpt of 12/20/96 Sean Haines Interview (Page 26)
Exhibit U:    Humphrey Search Warrant Affidavit
Exhibit V:    ATF handwriting analysis report of Mueller title documents
Exhibit W:    ATF summary of interviews with the Turners
Exhibit X:    Reports re: receipt and submission of Humphrey hair samples
Exhibit Y:    3/2/99 Arkansas State Crime Laboratory Report
Exhibit Z:    1/21/97 Paul Humphrey Interview

---

[1] In compliance with the privacy policies of the Judicial Conference of the United States and in accordance with Eighth Circuit Local Rule 25A(i), personal data identifiers have been redacted where necessary.

# EXHIBIT A

July 3 2020 p153
Appellate Case: 20-2351     Page: 153     Date Filed: 07/04/2020 Entry ID: 4930235

CRIMINAL INVESTIGATION DIVISION

ASP-3-A

DATE:              01/29/97
DICTATED BY:       INV. BRETT PRITCHARD
DATE TYPED:        02/24/97 LW
COPIES TO:         INV. BRETT PRITCHARD
                   SGT. H.D. LUTER, ASP COMPANY "D"
                   PROSECUTING ATTORNEY DAVID GIBBONS

INTERVIEW OF SUSPECT

PAUL EDWARD HUMPHREY
W/M, DOB █████/53
████████████
RUSSELLVILLE, AR  72801
SELF EMPLOYED
HOME PHONE ██████

PAUL HUMPHREY was interviewed by Inv. BRETT PRITCHARD of the Arkansas State
Police on 01/21/97, beginning at 1:20 P.M. at the Braden Law Office in
Russellville, Arkansas.

An ASP-6, Description of Subject, was completed on HUMPHREY.  HUMPHREY was
advised of his rights as set out on the ASP-116 and his responses were
recorded on that form, with each of the responses initialled by HUMPHREY after
he had reviewed the form.  The form was then signed by HUMPHREY.  Copies of
the ASP-6 and ASP-116 have been forwarded to the Little Rock office.  After
being advised of his rights, HUMPHREY made the following statement:

"I met BILL two or three years ago at a gun show.  The gun show at
Russellville at the Armory.  During the gun show BILL had a booth.  We visited
about twenty or thirty minutes on that date.  I don't remember if I bought
anything from him.  We talked about .45 caliber parts.  I saw him at other
gun shows after that.  At first I would just bump into him on the job.  Then
he would call me and tell me he was coming to town.  I helped him on several
jobs. We ran lights at Pizza Hut in the summer of 1995.  I ran into him a few
times at Wal-Mart while he was working, but I really didn't help him with that
job.  BILL and I were studying Constitutional Law.  He wanted to pull his
title out of the state's hands.  He had read in one of his books how we could
pull it out of the state's hands by selling it to one another.  With $21.00
in silver, I bought the Jeep from him at the gun show in Little Rock in
December, 1995.  The title came to me through the mail.  I don't remember when
the title came to my house.  The title was completely filled out.  SYLVIA
MASON gave me a phone call and told me to expect something in the mail.  This
was during the morning hours.  Either that day or the next day I got the
title. I don't know SYLVIA MASON that well.  I met her up at BILL and NANCY'S
house.  This was after they were missing.

FILE NUMBER: 04-020-96        CRIME: CAPITAL MURDER

July 3 2020 p154
Appellate Case: 20-2351     Page: 154     Date Filed: 07/04/2020 Entry ID: 4930235

ASP-3
PAGE NO.   2

BOBBY HULL (EY) took me to BILL'S house.  He said they called a meeting of all of BILL'S friends to try to figure out what happened.  SYLVIA MASON, BOBBY HULSEY, me, and about six others met at BILL'S house to try to figure out what happened.  This was the second week they were missing.  SYLVIA was BILL'S landlord.  SYLVIA is married, but her husband was not at the meeting.  I have never met him.  I brought up that BILL and I were studying on buying and selling the Jeep.  He was going to buy my vehicle for twenty-one silver dollars and when the titles came from the state we would sell them back at a ten percent profit.

The day the titles came into the post office box, the envelope was a manila envelope with no return address.  The envelope had a title to the Jeep and a cargo trailer.  It also contained two bills of sale.  I had paid twenty-one silver dollars for the trailer at the same gun show that I bought the Jeep.

I just held onto the titles when I got them.  I talked to BOBBY HULSEY and he wanted me to hurry and go to the Revenue Department with the bills of sale and the titles.  I took them to the Revenue Office about one week after I got them.  The lady told what to do and gave me a form.  The form was to be completed by BILL.  I never got the title changed over.  I talked to BOBBY HULSEY about the title.  I came and asked DALE BRADEN about it.

I told PAUL STATEN and JOHN WRIGHT, and I don't know who else.  I read in the paper that the Jeep was found up in Dover.  I was confused.  I did not know what happened to BILL and  NANCY.  JAY WINTERS called me and said he heard I had the title.  I said yes.  I put him off for a while (several days).  BOBBY was telling me not to turn it in or go down there.  He was trying to take me to an attorney in Little Rock.  I lost the envelope.  I took the title and receipts to the S.O. a few days later.  The weekend they were abducted, RICHARD McDONALD came in from California.  He was talking about the Fourteenth Amendment.  This was in North Little Rock.  Just about or under the CHECKMATE CLUB.  I think it was in LEGION HALL.  DREW MALONE RAINES put on the class.  HART REALTY COMPANY in Little Rock also had something to do with it.

This was a two-day class, and I drove home between classes.  The bodies were found in the Illinois Bayou.  I know the area.  I have never fished or anything out there.  I never swam or anything out there."

FILE NUMBER:   04-020-96          CRIME:  CAPITAL MURDER

ASP-116
REV. 9-94

## YOUR RIGHTS

NAME: _Paul Edward Humphrey_    PLACE _Braden Law Office Russville_

DATE _1-21-97_ Paul Edward, Hn

TIME _1:20am_ Paul Edward, Humph

Before we ask you any questions, you must understand your rights.

1.  Do you understand that you have the right to remain silent?

    Response _yes_   Paul Edward; Humphrey

2.  Do you understand that anything you say can and will be used against you in court?

    Response _Yes_   Paul Edward; Humphrey

3.  Do you understand that you have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning?

    Response _Yes_   Paul Edward; Humphrey

4.  Do you understand that if you cannot afford a lawyer, one will be appointed for you before any questioning if you wish, at no cost to you?

    Response _Yes_   Paul Edward; Humphrey

5.  Do you understand that if you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time? You also have the right to stop answering at any time until you talk to an attorney.

    Response _Yes_   Paul Edward; Humphrey

## WAIVER OF RIGHTS

I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.   SIGNED _Paul Edward; Humphrey_

WITNESS _Britt Pritty #48_

WITNESS _____

PRITCHARD

FILE NO. _____ DATE _1-21-97_ TIME _1:20 pm_

APPLICANT: _Humphrey_     _Paul_     _Edward_
            (LAST)        (FIRST)    (MIDDLE)

I, _Paul Edward Humphrey_ , voluntarily, without threat, duress, coercion, undue influence, force promise of immunity or reward — agree and stipulate to submit to a polygraph (truth verification) examination to be conducted by officers of the Arkansas State Police.

I understand that: I am not required to take this examination, I have the right to remain silent and anything I say can and will be used against me in court. I have the right to talk to a lawyer before answering any questions and to have a lawyer present. I have a right to the advice and presence of a lawyer even if I cannot afford to hire one. (The Arkansas State Police cannot furnish you a lawyer). I further understand and know that I have the right to stop answering questions at any time.

## WAIVER

I have read, or had read to me, the above statement of my rights and understand what my rights are. I am willing to answer questions and/or make a statement. I am taking this examination of my own free will and that no force, duress or undue influence was exercised to require me to submit to the examination. I also agree to fully and completely release and absolve the Arkansas State Police from any liability connected in any way with this examination.

I attest that I am in good mental and physical condition and that I know of no mental or physical ailment or treatment plan which may impair or be impaired by the polygraph examination.

Without Prejudice UCC-1-207

SIGNED: _Paul Edward T Humphrey_
TIME: _1:22 PM_

WITNESS: _Britt Pritt #48_     WITNESS: _____

This interview/polygraph examination was concluded at _____ on the above date. I completely re-affirm in its entirety my above agreement. In addition, I knowingly and intelligently continued to waive all my rights, including those listed in the second paragraph above, and I willingly made all the statements that I did make.

I also certify that during the entire time I was here I have been well-treated, submitted myself freely to the interview/polygraph examination knowing that I could stop any time I so desired by merely saying I wished to stop or that I wished to consult an attorney or any other person. I remained here of my own free will knowing that I could leave this room at any time I so desired, and that there were no threats, promises, or any harm whatsoever done to me during the entire period I have been here, either in connection with the interview/polygraph examination or my again signing this agreement, stipulation, and release form.

_____    _____                    _____
(WITNESS)               (SIGNED)                                (TIME)

0 4 - 0 2 0 - 9 6

PRITCHARD
July 3 2020 p157
Appellate Case: 20-2351     Page: 157     Date Filed: 07/04/2020 Entry ID: 4930235



ARKANSAS STATE POLICE

ASP-6
(Rev. 1/9(

## Criminal Investigation Division
## Description of Subject Form

Name _Paul Edward Humphrey_   Race/Sex _W/M_   DOB ▮▮-53
Month/Day/Year

Alias(es) _N/A_

Address ▮▮▮▮▮▮   City _Russellville_   State _Ar_

Height _6-0_   Weight _160_   Complexion _med_   Hair _Brown/grey_   Eyes _Blue_

SSN _would not give_   DL# ▮▮▮▮▮▮   State _Ar_

SID#/State _____   FBI# _____   Where Born _Russellville, A_

Telephone Number ( _50l_ )▮▮▮▮▮▮   Tracking Number _____

Scars/Marks/Tattoos (location of each) _N/A_

Relatives (name/address/relationship) _Joe Vinson (uncle)_
▮▮▮▮▮▮
_Russellville, AR_

Peculiarities _Right Handed   Glasses_

Occupation & Employer _Saddlemaker   Self Employed_

Education (include trade schools) _12_

Vehicle Make _1985 Toyota_   Model _Pick up_   Color _Cream_   LPN _unk_

Arrested? (Y/N) _y_   Charge/Code# _____

City/County Arrested _____

Fingerprinted? (Y/N) _y_   Date _____   Agency _____
Month/Day/Year

Photographed? (Y/N) _y_   Date _____   Agency _____
Month/Day/Year

Investigator _Cpl JB Pritchard #44_   File# **04-020-96**
Rank/Name/Badge#

July 3 2020 p158
Appellate Case: 20-2351   Page: 158   Date Filed: 07/04/2020 Entry ID: 4930235

Appellate Case: 20-2351   Page: 159   Date Filed: 07/04/2020   Entry ID: 4930235

July 3 2020 p159

Time of Exam: 1:20pm

Termination of Exam: _____

Specific Issue: Forgery

Interview Date: 1-21-97

Interview Location: Bradlaw Law Offices

DOB: [redacted] 53

POB: Russellville A

Name: Paul   Edward   Humphrey   Age: 43

(First)   (Mid)   (Last)

Ht: 6-0   Wt: 160   Hr: Brown/Gry   Es: Blue   Sex: M

Address: [redacted]   Russville AR

SS#: _____

Martial: (S)   (D)   (M)   (SEP)   (WID)

Dependents: 0   Boy(s) _____   Girl(s) _____

Trade School _____

Education: highest grade completed: 12   Other Tng: Votec _____   College _____

Military Service: National Guard   6 years   Spec -4   Honorable   Spec -4

(Branch)   (ETS)   (Rank)   (Type Discharge)   (Rank at Discharge)

Arrest Record: N/A

(Date)   (Place)   (Charge)   (Disposition)

(Date)   (Place)   (Charge)   (Disposition)

9-96   SAME   NOE

(Date)   (Reason)   (Outcome)

Prior Polygraph Exam: Gary Harp

(Given by)

Previous Employment: Electrician   Russville, A   8 years

(Name)   (Location)   (How Long)   (Reason for Leaving)

Present Employment: Saddlemaker   [redacted] Russellville, AR   6-7 years

(Name)   (How Long)

What is normal for you?: 8

Hours of sleep past 24 hours?: 7-8

Last time you've seen a doctor?: 1980

For what reason?: Food Poisoning

Have you taken any medication in the last 24 hours?: N/A

Drugs?: N/A   What type?: _____

Drivers Liscense: [redacted]   AR

(Number)   (State)

Alcohol Last 24 hours: N/A

Mental/Psychological Treatment: N/A

(When)   (Where)   (Reason)

Chronic Illnesses:   Heart Problem ☐   Breathing Disorder ☐   High/Low Blood Pressure ☐

Are you pregnant?: Yes ☐   No ☐

MODIFIED GENERAL QUESTION TECHNIQUE

Name _Paul Edward Humphrey_

Date _1-21-97_

1   Is your first name _Paul_ ?

2   Is today _Tuesday_ ?

3   (secondary relevant) _Did you ever meet Sylvia Mason prior to the Muellers Disappeary?_ ?

4   Are you now in _Russellville_ ?

5   (Strong relevant) _Were you present when the Muellers were killed?_ ?

6   (con) _During the First 21 years of your life do you ever Remember lying to get out of Trouble?_ ?

7   Is your last name _Humphries_ ?

8   (EC relevant) _Did you participate in Disposing of the Bodies of the Mueller's_ ?

9   (Know relevant) _Did you know the Bill of Sale was Forged when you took it to redeu Sheriff._ ?

10  (con) _During the First 40 years of your life do you ever Remember lying to get out of Trouble_ ?

3rd chart _4-1-9-6-2-3-10-5-6-8-10_

File number _04-020-96_ officer _PRITCHARD_

Appellate Case: 20-2351    Page: 160    Date Filed: 07/04/2020 Entry ID: 4930235



# State of Arkansas

# ARKANSAS STATE POLICE

Post Office Box 5901  •  Little Rock, Arkansas 72215

Mike Huckabee • Governor    Colonel John R. Bailey • Director    Lt. Col. Richard C. Rail • Ass't Director

January 21, 1997

CONFIDENTIAL

Sergeant H.D. LUTER
Arkansas State Police
CID Company "D"
16143 Highway 64 East
Atkins, AR  72823

ARRANGEMENTS

At your request, Mr. PAUL EDWARD HUMPHREY was administered a polygraph examination at the BRADEN LAW FIRM in Russellville, Arkansas.  The examination was administered on January 21, 1997 by Investigator BRETT PRITCHARD.

Mr. HUMPHREY was being examined to determine his knowledge or involvement in the reported homicide of BILL and NANCY MUELLER.

PRETEST INTERVIEW

The interview with Mr. HUMPHREY, which was conducted prior to the polygraph examination being administered, will be forwarded to you when it has been typed.  The interview will be contained on an ASP-3A form, under the heading of "Interview of Suspect".

EXAMINATION

Mr. HUMPHREY was administered three polygrams, all of which were of the Modified General Question Technique Series Type, in which the following questions were asked, along with other irrelevant and control questions.

Q-3:    Did you ever meet SYLVIA MASER prior to the MUELLERS disappearing?

A:      No.

Q-5:    Were you present when the MUELLERS were killed?

A:      No.

Q-8:    Did you participate in disposing of the bodies of the MUELLERS?

A:      No.

Q-10:   Did you know that the title was forged when you took it to the sheriff?

A:      No.

Appellate Case: 20-2351    Page: 161    Date Filed: 07/04/2020 Entry ID: 4930235

PAGE 2
P. HUMPHREY


FINDINGS

The physiological responses noted on this subject's polygraph charts are in such a pattern as to indicate that the subject, Mr. PAUL EDWARD HUMPHREY, was essentially untruthful in answering the above questions.

Based on the evaluation of the subject's polygraph charts, it is the opinion of this examiner that Mr. HUMPHREY was involved in the death of the MUELLERS.


Respectfully submitted,

BRETT PRITCHARD, Investigator
Polygraph Examiner
Criminal Investigation Division


JBP/lw


cc:   04-020-96
      Inv. BRETT PRITCHARD

# EXHIBIT B

July 3 2020 p163

Appellate Case: 20-2351     Page: 163     Date Filed: 07/04/2020 Entry ID: 4930235

## Declaration of Cheyne Kehoe

1.     My name is Cheyne Kehoe.  I am the second eldest son of Gloria and Kirby Kehoe and younger brother of Chevie Kehoe.  I was born on May 29, 1976.

2.     My family moved from Colville, Washington, to a rural area outside Harrison, Arkansas, in 1993.  I was 16 or 17 years old at that time.

3.     My brother Chevie didn't move to Arkansas with our family.  Chevie was already married to his first wife, Karena.

4.     Chevie hadn't lived with us much even before we moved.  He had moved out when he was in high school and lived with one of his teachers. He and our father had a difficult relationship.

5.     I got a job, working at a sawmill in Arkansas.  During the summer, I was working 12 and 14 hour days. I lived next to the sawmill, not with my family, so I wouldn't have to spend time traveling to and from work.

6.     Once the season was over at the sawmill, I moved to a community called Elohim City which was located on the Arkansas-Oklahoma border.  The people who lived there were members of the Christian Identity movement. That was in the late fall of 1994.

1

July 3 2020 p164
Appellate Case: 20-2351     Page: 164     Date Filed: 07/04/2020 Entry ID: 4930235

7.     I was only 16 or 17 when I moved to Elohim City and I feel like I was really misled about their beliefs.  I didn't believe in all the white supremacy stuff they talked about.  They expressed really hateful beliefs and, once I realized what they were, I didn't share them.

8.     After I had been at Elohim City for a couple of months, my brother Chevie came through.  This was some time in January or February, 1995. Chevie had a trailer at the time, which he told me he had bought from a guy in Arkansas. Chevie stayed for 2 or 3 days and I had dinner with him one night but otherwise didn't spend much time with him.  Chevie had his wife, Karena, with him and their two children.

9.     During that visit, Chevie met a guy who was staying at Elohim City named Faron Lovelace. Faron was really weird and not in a good way.  I didn't like or trust him at all. I was surprised that when Chevie left Elohim City, Faron left with him. Faron was not mentally stable. He did not connect with reality.

10.    In late spring or early summer, 1995, my dad came through Elohim City and asked if I wanted to go back west with the family.  I was ready to leave so I left with my dad.

11.    When we got back to Spokane, my parents and younger brothers and I initially moved into the Shadows motel. We then moved to Colville, Washington.

2                                                    CK

Appellate Case: 20-2351     Page: 165     Date Filed: 07/04/2020 Entry ID: 4930235

12.     Sometime in June, 1995, when we were still living at the Shadows motel, Chevie ~~came by~~. was living there at that time/CK While he was there, he got a phone call, and then asked me if I wanted to drive with him to Idaho. He told me he had to drop Faron Lovelace off there. He didn't tell me anything more than that. I agreed to go with him.

13.     Faron joined us and when we stopped for groceries showed us a bag he had full of money. I had no idea at the time where it had come from. I still didn't like or trust Faron. I thought he was crazy and stayed away from him as much as I could. We left Faron in Idaho and drove back to Washington. Chevie had no use for Faron any longer. Chevie manipulated Faron to be a laborer in Idaho because he didn't want to do any work himself. He was always looking for a shortcut and having Faron work on the land was one of those shortcuts. This had nothing to do with any kind of white supremacy activity.

14.     I didn't learn where Faron's money had come from until at least a year or so later when Chevie told me ~~Faron~~ had robbed someone. My father never They/CK mentioned a word to me about it, either. Eventually, Chevie dumped Faron like a dog ~~in~~ the road because Chevie didn't need him. anymore/CK along side/CK

15.     I was never involved in any planning of that robbery, I had no idea what any of them were up to, this wasn't a group plan in any way. It seemed to me

3

CK

Appellate Case: 20-2351     Page: 166     Date Filed: 07/04/2020 Entry ID: 4930235

Faron had his own motivations, like that he needed fast money and this robbery would get him some. Chevie manipulated Faron by holding his money for him. Then Chevie had control of it and would spend it all on himself and ~~dole~~ out small amounts.

*doled /CK*

16. As far as I could tell, any money Chevie ever got went straight into his own pocket for his own personal use. Chevie just liked to commit crimes for his own personal gain, and sometimes he could get Faron to do things because Faron had nowhere else to go.

17. I met my wife, Tanna, in July or August, 1995. We got married on October 1, 1995, about six weeks after we met. I was 19 years old. Tanna was 18, the oldest of a bunch of sisters. We moved in with Tanna's family – her parents and grandparents -- and continued to live with Tanna's family for about a year. We had our first child on July 23, 1996.

18. During the year I spent with Tanna's family, I had very little contact with Chevie. I saw him only a couple of times. The first time was during the summer or fall of 1995, before we got married. I took Tanna to the Shadows motel to meet my family. Chevie was there.

19. Tanna and I stayed at the Shadows for three or four days but after the first two days, Chevie and I got into a fight, and we parted on bad terms.

4

*CK*

20. It's possible Chevie might have stopped by where we were staying for a few minutes here or there, but the next time I saw Chevie to have any conversation was late January or February, 1996, at a pizza place. At that time, Chevie showed me a roll of gold coins he had. I had no idea where he got the coins and he didn't talk to me about it until much much later.

21. I didn't see Chevie again until the spring of 1996. That was the first time I met Danny Lee. Tanna was noticeably pregnant with our son at the time. At trial, I misspoke and said this happened in spring of 1995, but that was definitely wrong. I was still living in Arkansas in the spring of '95, and hadn't even met Tanna yet.

22. After our son Christopher was born, Tanna, the baby and I joined Chevie and his family, traveling with them to the southwest, the east, and eventually through Ohio. Chevie and I exchanged gunfire with some Ohio state troopers when we were out by ourselves, coming back from a gun show. Our wives and children were waiting for us, back at a campground.

23. I made my way back to Tanna and Karena, we packed up the camper, and we drove out of there to Wyoming. Chevie met back up with us, too, in Wyoming. We got some help from my dad when the camper collapsed.

5

*CJL*

24.     Tanna, the baby and I headed out again with Chevie, Karena and their kids.  We were nearly out of money, we were trying to escape the cold weather, and we were pretty much out of food.  We drove south, first to Las Vegas, then to Arizona, and eventually we wound up in Utah, where we camped on land owned by the Bureau of Land Management.

25.     Things were pretty bad.  We were given some food and jobs by a man named Mr. Levitt we met down there who had a nearby alfalfa farm.  Chevie kept getting more and more abusive to Karena and to me.  Tanna and I wanted to leave but Chevie had the car keys and controlled all the money Mr. Levitt paid us.

26.     One night, Chevie beat me up pretty badly and Tanna and I decided we needed to leave.  About that time, Mr. Levitt gave me some money of my own and Tanna and I took the baby and made a break for it.  We headed back up north, and she and I decided I needed to turn myself in to law enforcement for the sake of my family.

27.     I testified at Chevie's trial about a lot of the things I've said above but the way the prosecution jumped around, the timeline of events was probably pretty jumbled-sounding.

28.     Also, I was interviewed by a lot of law enforcement people, both police and prosecutors, before Chevie's trial and I explained to them that I had

6

Appellate Case: 20-2351     Page: 169     Date Filed: 07/04/2020   Entry ID: 4930235

never had any discussion with Chevie or anyone else about killing the Mueller family before it happened. I knew nothing about it.

29. I never shared Chevie's beliefs and I had no idea until I was traveling with Chevie in the trailer that he had committed any crimes. I told the agents that. I also told them I never would have taken part in those crimes and didn't share the beliefs of the Christian Identity or the Aryan Nation or any other white supremacy group. I knew about them, I heard talk about them, but that wasn't my belief system. I would never have committed crimes to support those beliefs.

30. I also didn't believe in polygamy. I had no interest in populating the country with Aryan babies. I never had a second wife the way Chevie did. I told the agents that, too.

31. I didn't believe in killing police, either. I felt trapped when Chevie and I got stopped by the police in Ohio, and I panicked. What I did was wrong but it wasn't part of a bigger plot to kill police. I just wanted to get back to Tanna and Christopher. I told the police that, too.

32. Most important, I told the agents repeatedly I would never have gone along with the idea of killing the Muellers and I would have done everything I could to discourage Chevie from doing it if I'd known he was planning it.

7

33. APR was a pipe dream of Chevie's. In his mind only, he fantasized of creating his own area. He liked to talk about it because it *was* a fantasy. But, as I kept telling every law enforcement person I spoke to, Chevie committed his crimes so that he could just get things for himself.

34. I really had no choice but to testify at Chevie's trial. [Felt I/CK] The government threatened me that I'd be indicted along with Chevie, Danny and my dad if I didn't [Informed/CK] cooperate. But the government completely twisted my words about everything [misrepresented/CK] [Events'/CK] having to do with connections between Danny, my dad, Chevie, me, and the APR. I can't stress enough, as I stressed during my interviews with the government, that there was no "organization." Chevie committed his crimes for himself. None of the rest of us had any relationship with each other, except that I was Chevie's brother and Kirby was my dad. Danny wasn't some member of any organization with us; neither was Faron. They were both people Chevie could manipulate because they had nothing else and nowhere else to go.

35. Prior to Chevie's trial, agents asked me several times about my mother's (Gloria's) stability. I told them my mom is and always was seriously [advised/CK] [was unstable/CK] mentally ill. That's always been pretty obvious to me and the people who know her. As I told the agents, my mom has always been paranoid and she sees and hears things that aren't there, so much so that my dad took her for psychiatric treatment when they lived in North Carolina.

8

CK

July 3 2020 p171

Appellate Case: 20-2351   Page: 171   Date Filed: 07/04/2020 Entry ID: 4930235

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 11/1/19

_____
Cheyne Kehoe

9

July 3 2020 p172

# EXHIBIT C

July 3 2020 p173

Appellate Case: 20-2351    Page: 173    Date Filed: 07/04/2020 Entry ID: 4930235

## Declaration for Kirby Kehoe

1. My name is Kirby Keith Kehoe.  I am currently incarcerated at FCI Lompoc.  I am 71 years old and have had a chronic form of cancer for many years.

2. I am Chevie Kehoe's father.  I am also Cheyne Kehoe's father.  I no longer have any relationship with either of those sons and I haven't in many years.

3. I was interviewed by federal agents on a number of occasions. One meeting was in Troy, Montana, in 1997 and at that meeting the agents wanted to discuss my sons' activities.

4. I told them that my wife Gloria, Cheyne, the younger boys and I used to live in Arkansas as a family and at one time our family was friends with the Muellers.  Gloria, Cheyne, and I had been over to their house for dinner.

5. I also told them that I lived in Arizona in a trailer park from the fall of 1995 until late January or early February, 1996.  I was living with my wife Gloria *Kehoe* and several of our younger sons.

6. Cheyne was not living with us at the time.  He had gotten married in October and was living in rural eastern Washington with his wife, Tanna, and

1

July 3 2020 p174

Appellate Case: 20-2351     Page: 174     Date Filed: 07/04/2020 Entry ID: 4930235

Tanna's family.  I met Tanna a few weeks before she and Cheyne got married, but otherwise had little contact with Cheyne at that time. Once I moved to Arizona, I had had no contact with him at all until I moved back to the Northwest in late January or early February, 1996.

7.    Chevie wasn't living with us in Arizona, either. I think he was living in Spokane, Washington, most of the time we were in Arizona, but I wasn't keeping in touch with him.

8.    In early January, 1996, Chevie unexpectedly showed up at our trailer park in Arizona.  He was with another young man I had never met before.

9.    I later learned that Chevie's travel companion was Daniel Lee but I didn't even know Lee's name at the time.  Chevie referred to him as "D-Man." *KK*

*not associate*

10.    I never trusted strangers and I didn't trust Lee.  I told Chevie to ~~ditch~~ *KK* *with* him. He wasn't family, I didn't know him, I didn't approve of Chevie being with *and leave him alone* him.

11.    I did not want Chevie traveling with Lee or telling Lee anything about any members of our family or working with him in any way. I have never approved of including people from outside the family in any kind of business, and I particularly did not trust Chevie's ability to judge people.

2

*KK*

Appellate Case: 20-2351   Page: 175   Date Filed: 07/04/2020 Entry ID: 4930235

12.    I made all of this clear to the people who interviewed me in Montana and in subsequent interviews.

13.    The agents in Troy wanted to discuss the Ohio shootout and whether I had seen my sons. They also asked if I knew if they were involved in an organization named Aryan Nations in Northern Idaho. They wanted to know if I had heard of it and whether I or my sons were associated with them or with any other group.

14.    I told them none of us were part of any group. My kids were never *KK* part of any organization. When Cheyne ~~was about 17~~, *a teenager* he ~~lived~~ *visited* at Elohim City *with his family* for a while which was a Christian Identity community, but he left there after a few ~~months~~ *weeks KK* and never went back. Chevie talked a lot and he was sort of trying to find himself and he wanted to do exciting things but he never actually acted as part of any organization or group.

15.    I had a meeting – one of many – with the prosecution prior to Chevie's trial.  The prosecutors wanted me to testify to the structure and my involvement in an organization, "APR." I kept telling them there was no such organization or any other. I never did things as part of an organized group or on any kind of ongoing basis  I told them (as I had *numerous times KK* before) that Chevie was a kid who was wild, acting on a lark, that his crimes were something to do in the moment, *KK* *for financial gain*

3

KK

Appellate Case: 20-2351    Page: 176    Date Filed: 07/04/2020 Entry ID: 4930235

not something planned out.  I told them that Chevie had fantasies to do this or that, but he committed crimes of opportunity to get money for himself, have cars and other things. Chevie committed crimes because he was too lazy to work.  He was good at convincing people to do work for him and then getting paid for what they did.

16.     The prosecutors were extremely angry *and frustrated (KK)* that I wouldn't testify that we were part of an organization or that Chevie operated in or with a group or "enterprise."

17.     Gloria and I had been together since she was 17 years old and she had some struggles in life. She sometimes had panic attacks and sometimes she had what she called dreams where she saw things happening to us, like seeing people (sometimes government agents) assaulting her. I did what I could to help and care for Gloria but it was difficult sometimes because of her mental illness. I told agents all of this prior to Chevie's trial, too.

18.     When I pleaded guilty in 1999, I agreed to things in my plea agreement that were not true.  The government prosecutors threatened to give me 30 years in prison if I did not agree in my plea that an enterprise existed, and to plead guilty to the racketeering.

*KK*

4

19.     My attorney told me that I had to do the plea admitting that APR was real even if it wasn't because it was the only way to get my sentence reduced.  I felt trapped because I didn't want to spend the rest of my life in prison.  I was up in years, 50 already, and ill with my chronic cancer condition.  I gave the government the plea and factual agreement they wanted.

I declare under penalty of perjury that the foregoing is true and accurate.

Executed on: *11, 3, 2019*

_Kirby K. Kehoe_  11/3/2019
Kirby Keith Kehoe

5

# EXHIBIT D

Appellate Case: 20-2351      Page: 179      Date Filed: 07/04/2020 Entry ID: 4930235

# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

_____

No:  19-3576
_____

Daniel Lewis Lee

Petitioner

v.

United States of America

Respondent

_____

Appeal from U.S. District Court for the Eastern District of Arkansas - Little Rock
_____

## JUDGMENT

Before COLLOTON, KELLY and ERICKSON, Circuit Judges.

Lee's motion for authorization to file a successive motion under 28 U.S.C. § 2255 has been considered by the court and is denied.

KELLY, Circuit Judge, dissenting.

Lee seeks leave to file a successive motion to vacate his conviction under 28 U.S.C. § 2255(h)(1) based on an alleged Brady violation.  At trial, the government argued Lee had committed his crimes as part of an enterprise in violation of the Violent Crimes in Aid of Racketeering Act, 18 U.S.C. § 1959.  Lee's newly discovered evidence indicates that a key government witness now describes the nature of the enterprise differently than he did at trial. Standing alone, this might seem insufficient to warrant a finding that Lee has made a prima facie showing that "newly discovered evidence, that if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder could have found [him] guilty of the [underlying] offense."  28 U.S.C. § 2255(h)(1). But Lee also alleges that this witness, along with another alleged participant, told law enforcement officers during the investigation of this case the same information they now provide in their affidavits.  Lee argues this is a Brady violation, as the government withheld exculpatory evidence on a key element of the offense.

The government does not respond to this allegation in its Response to Lee's motion for leave.  In my view, if this information was available at the time of trial and withheld from Lee, the witnesses' affidavits carry significantly more weight.  We also must be cognizant that this is a case in which the government sought, and the jury returned, a sentence of death.  For these reasons, and based on the parties' filings, I conclude Lee has met his burden of making a prima facie case that warrants "a fuller exploration in the district court."  Johnson v. United States, 720 F.3d 720, 720–21 (8th Cir. 2013) (emphasizing that a decision in favor of the movant is "tentative" because "the district court must dismiss the motion that we have allowed the applicant to file, without reaching the merits of the motion, if the court finds that the movant has not satisfied the requirements for the filing of such a motion").  I would grant the motion for authorization.

January 07, 2020

Order Entered at the Direction of the Court:
Clerk, U.S. Court of Appeals, Eighth Circuit.

_____
            /s/ Michael E. Gans

# EXHIBIT E

Appellate Case: 20-2351     Page: 182     Date Filed: 07/04/2020 Entry ID: 4930235

# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

_____

No:  19-2432

_____

Daniel Lewis Lee

Petitioner - Appellant

v.

United States of America

Respondent - Appellee

_____

Appeal from U.S. District Court for the Eastern District of Arkansas - Little Rock
(4:18-cv-00649-JLH)

_____

**JUDGMENT**

Before COLLOTON, KELLY, and ERICKSON, Circuit Judges.

The application for a certificate of appealability has been considered by the court and is denied.

November 04, 2019

KELLY, Circuit Judge, dissenting.

I would grant a certificate of appealability.  I believe jurists of reason could disagree about whether Lee's newly discovered evidence is material for purposes of Brady.  See United States v. Kehoe, 310 F.3d 579, 591 (8th Cir. 2002); Martin v. State, 57 S.W.3d 136, 139–40 (Ark. 2001).  I also believe jurists of reason could disagree about whether a material Brady claim in a second habeas motion qualifies as a "second or successive motion" subject to the gatekeeping requirements of 28 U.S.C. § 2255(h).  See Panetti v. Quarterman, 551 U.S. 930, 942–47 (2007); Scott v. United States, 890 F.3d 1239, 1243 (11th Cir. 2018); Crawford v. Minnesota, 698 F.3d

July 3 2020 p183

1086, 1090 (8th Cir. 2012); see also Barefoot v. Estelle, 463 U.S. 880, 893 (1983) (explaining that

in a death-penalty case, "the nature of the penalty is a proper consideration" in deciding whether

to certify an issue for appeal).

_____

Order Entered at the Direction of the Court:
Clerk, U.S. Court of Appeals, Eighth Circuit.
_____
          /s/ Michael E. Gans

# EXHIBIT F

Appellate Case: 20-2351     Page: 185     Date Filed: 07/04/2020 Entry ID: 4930235

# But here's a dissenting opinion

Covering a trial, it's easy for a journalist to think about which side he or she believes more. Knowing how the system works, journalists probably seldom believe everything they hear from law enforcement, and we certainly take what defense attorneys tell us with a grain of salt.

As the federal trial of two alleged white separatists began in Little Rock two months ago, the case against Chevie Kehoe of Colville, Wash., and Daniel Lee of Yukon, Okla., seemed cut and dried. The government accused the pair of killing a Tilly family, conspiring to set up a whites-only nation and committing a series of crimes — racketeering by definition — to advance their scheme.

After 10 weeks of testimony, a mostly black jury convicted Kehoe and Lee on all counts. They face a possible death penalty in sentencing.

As I sat in the jury box March 1, marshals marched Kehoe and Lee into the courtroom. I remembered the first time I saw a picture of Kehoe, with his bushy, scraggly beard and then on videotape with his brother, Cheyne, in a shootout with Ohio police. I thought back to the first time I saw Lee, with his barroom brawl-injured eye and menacing tattoo on his neck. I figured these ol' boys had surely done something wrong, and I didn't really doubt that they had done what the government said they had.

But a funny thing happened on the way to a verdict.

I came to the judicial table with a heavy skepticism for defense attorneys. That must come from watch-



**On the other hand**

**By Rick Fahr**
Courier city editor

ing them defend the lowest scum on the pond of life. For example, attorneys represented Charles Manson, John Wayne Gacy, R. Gene Simmons. I suppose I've thought that if defense attorneys will defend those dregs, they'll defend any criminal. And guilt or innocence matters not. At least that's what I've felt from time to time.

So I've not run into many defenses that I believed, but Kehoe's and Lee's attorneys surprised me. By the time the jury got the case, Mark Hampton and Jack Lassiter had me thinking their clients may not have committed the crimes.

I thought the defense raised several credible issues.

■ The prosecution's star witnesses all benefitted from testifying. They either got reduced sentences or cash or both. Gloria Kehoe, for example, receives more than $20,000 a year from taxpayers. Kirby Kehoe, the patriarch of the clan and a heckuva nice fellow to boot, pleaded guilty to one charge in exchange for the government not indicting him for murder. Cheyne Kehoe testified against his brother for leniency as well.

■ The time frame that prosecutors said the Mueller murders occurred in does not neatly allow Chevie Kehoe and Lee enough time to get back to Spokane before witnesses placed

them there. To do what prosecutors said they did, the pair would have had to drive 2,000 miles non-stop through the high altitudes of the West in the dead of winter.

■ Prosecutors said the defendants killed William Mueller inside his home, busting a shotgun stock on his head. Yet investigators found no physical evidence at the home. Not one single solitary hair or blood spot, even though the man "fought for his life." Prosecutors said Kehoe caved in the man's skull, although the defense said the state medical examiner did not find a recent skull fracture during his autopsy of William Mueller.

■ Authorities recovered the bodies in a remote, deep area of the bayou. The man who wound up with the title to a Mueller vehicle just days after prosecutors said the family disappeared, Paul Edward Humphrey, is an accomplished diver who knows the Illinois Bayou well. Chevie Kehoe is from Washington, and Lee is from Oklahoma. No testimony indicated they are divers or were familiar with the Illinois Bayou at all.

As I watched jurors sitting in the jury box last week, I thought back to how I believed early on that prosecutors would wrap up the case with a nice big bow on top, and jurors would take less time to convict the defendants than the judge did in reading jury instructions. Then, I thought about how I would vote were I sitting in that jury box again.

Could I convict Chevie Kehoe and Daniel Lee of capital murder? No, I couldn't.

July 3 2020 p186

Appellate Case: 20-2351    Page: 186    Date Filed: 07/04/2020 Entry ID: 4930235

# EXHIBIT G

July 3 2020 p187

Appellate Case: 20-2351     Page: 187     Date Filed: 07/04/2020 Entry ID: 4930235

| DEPARTMENT OF THE TRESURY -- BUREAU OF ALCOHOL, TOBACCO, AND FIREARMS | 1. INVESTIGATION IS: | | |
|---|---|---|---|
| **REPORT OF INVESTIGATION (Law Enforcement)** | ○ ROUTINE<br>○ SENSITIVE    ○ SIGNIFICANT | Page 1 of<br>1 pages | |

| 2. TO: | 3. MONITORED INVESTIGATION INFOMATION *(Number and Bran* |
|---|---|
| Special Agent in Charge<br>111 Veterans Highway, Suite 1050<br>New Orleans, Louisiana | CIP:   745700<br>VIOLENT CRIME<br>Report: 466 |

| 4. TITLE OF INVESTIGATION | 5. INVESTIGATION NUMBER |
|---|---|
| WILLIAM MUELLER | 53430-96-0110K |

COPY

| 6. TYPE OF REPORT (Check applicable boxes) | | | 7. BUREAU PROGRAM | | 8. PROJECT(S) | |
|---|---|---|---|---|---|---|
| ☐ PRELIMINARY | ☐ COLLATERAL (Request) | ☒ TITLE I | | ☐ TARGETED OFFENDER | |
| | | ☐ TITLE II | FIREARMS | ☒ TERRORIST/EXTREMIST | |
| ☒ STATUS | ☐ COLLATERAL (Reply) | ☐ TITLE VII | | ☐ OCD | |
| | | ☐ TITLE II | EXPLOSIVES | ☐ ITAR | |
| ☐ FINAL | ☐ INTELLIGENCE | ☐ TITLE XI | | ☐ SEAR | |
| | | | | ☐ OMO | |
| ☐ SUPPLEMENTAL | ☐ REFERRAL | ☐ TOBACCO | | ☐ OTHER | |
| | | ☐ ALCOHOL | | | |

9. DETAILS

DESCRIPTION OF ACTIVITY:

Laboratory Report dated March 19, 1998 from the Arkansas State Crime Laboratory related to swabs samples from carpet in the MUELLER residence.

SYNOPSIS:

This report relates to the burglary of firearms from former Federal firearms dealer WILLIAM MUELLER and the murder of WILLIAM MUELLER, NANCY MUELLER and SARAH POWELL.

NARRATIVE:

1)  On March 19, 1998, the Arkansas State Crime Laboratory issued a report which stated that no blood was found during the examination of swabs and debris taken during a search of the MUELLER residence.  The items examined was obtained by Arkansas State Police Investigator BILL BASKIN during a luminol examination of carpet in the MUELLER residence.

Attachment:

Laboratory Report

| 10. SUBMITTED BY *(Name)*<br>Glen Jordan | 11. TITLE AND OFFICE<br>SA, Little Rock, AR | 12. DATE<br>04./27/96 |
|---|---|---|
| 13. REVIEWED BY *(Name)*<br>J. William Buford | 14. TITLE AND OFFICE<br>RAC, Little Rock, AR | 15. DATE |
| 16. APPROVED BY *(Name)*<br>Guy K. Hummel | 17. TITLE AND OFFICE<br>Special Agent in Charge | 18. DATE |

Appellate Case: 20-2351    Page: 188    Date Filed: 07/04/2020 Entry ID: 4930235

# STATE CRIME LABORATORY

P.O. BOX 5274
Number 3 Natural Resources Drive
Little Rock, Arkansas 72215

Laboratory Services
227-5747

Medical Examiner
227-5936

*REPORT OF LABORATORY ANALYSIS*

Investigating Officer/Agency/Address

Sgt. Aaron Duvall
Pope County Sheriff's Office
3 Emergency Lane
Russellville, AR 72801

Laboratory Case Number: 1996-WVS-09666  Page 1 of 1

Date Received in Lab: 03/17/98

How Evidence Received: H C Duvall

Agency Case Number: 96-1003

Suspect(s):
Paul Edward Humphrey
Kirby K Kehoe
Chevie Kehoe
Daniel Lee Graham

Victim(s):
William Mueller
Nancy Mueller
Sarah Powell

Date of Report: 03/19/98

I do hereby attest and confirm as specified by A.C.A. 12-12-313, that the information listed below is a true and accurate report of the results of analysis performed by me of evidence received in a sealed condition at the Arkansas State Crime Laboratory.

ITEMS SUBMITTED MARCH 17, 1998 BY SGT. AARON DUVALL, POPE COUNTY SHERIFF'S OFFICE:

Q24  Swab    (WBB-E1A)
Q25  Swab    (WBB-E1B)
Q26  Swab    (WBB-E1C)
Q27  Swab    (WBB-E1D)
Q28  Swab    (WBB-E1E)
Q29  Debris  (WBB-E1F)

RESULTS OF EXAMINATIONS:

This report is supplemental to the reports from the Serology Section submitted under this case number dated August 2, 1996, October 15, 1996, December 18, 1996, July 3, 1997, January 15, 1998 and February 12, 1998.

No blood was found on Q24 through Q29.

*Edward Vollman*

Edward Vollman,
Chief Forensic Chemist

EV/af

State of Arkansas
County of Pulaski
Subscribed and sworn to before me, the undersigned Notary Public on this 23 day of March, 1998.

My Commission Expires 12/7/06

006423

# EXHIBIT H

Appellate Case: 20-2351     Page: 190     Date Filed: 07/04/2020 Entry ID: 4930235

MS. KEHOE: No. I'm sure that he needed money, he sold them.

MR. JORDAN: Did he tell -- did Chevy tell you how they attached the rocks to the bodies when they disposed of them?

MS. KEHOE: They just tied rope around them and tied the rocks to the rope, so it could be real firm for the body to hold them down.

MR. JORDAN: Did he tell you how long they were in close to the Muellers' house before they actually took them down? Were they there for a day or two?

MS. KEHOE: No.

MR. JORDAN: Did they scope things out?

MS. KEHOE: No. From what I understood, he said that the job was done and they took them. And then they rode around in the Wagoneer for the -- to see what came in the paper, see if the Muellers would come up missing or -- in other words, how the media would handle it.

MR. JORDAN: They rode around

Appellate Case: 20-2351    Page: 191    Date Filed: 07/04/2020 Entry ID: 4930235

106

in the Wagoneer?

MS. KEHOE:  That's what I'm -- that's what I'm believing he said.

MR. JORDAN:  So they stayed in that area for a while?

MS. KEHOE:  I'm not sure if it was that area or the outside of that area. I can't be quoted on that.

MR. JORDAN:  Did he tell you where he and Danny went right after they disposed of the bodies, where did they go?

MS. KEHOE:  You know, I was in shock by then.  I'll be very honest with you.

I believe they just headed straight back to Spokane.  I just remember him saying that they hung around for a few days.  That could have been at Danny's mother's house.  And then they came back to Spokane.

MR. JORDAN:  Now, I want to talk about this truck.  The truck was still blue when you -- when he told you about this in February.

Appellate Case: 20-2351     Page: 192     Date Filed: 07/04/2020 Entry ID: 4930235

# EXHIBIT I

Appellate Case: 20-2351     Page: 193     Date Filed: 07/04/2020 Entry ID: 4930235

family up, this murder.  It's ruined the whole family.  I asked him over and over, did you know that they were going to kill those people, did you know this.  And he denies it.

MR. JORDAN:  Did he have knowledge that they were going there, though?

MS. KEHOE:  Yes.  And Chevy wanted his father to go, and he wouldn't go.

MR. JORDAN:  Why not?

MS. KEHOE:  Because it involved Danny.  People talk, mouths run.

MR. JORDAN:  Did Kirby tell you exactly what happened at the Mueller residence?

MS. KEHOE:  No.

MR. JORDAN:  Do you know what happened at the time of the homicide?

MS. KEHOE:  I didn't know about it till afterwards.

MR. JORDAN:  And who told you?

MS. KEHOE:  Chevy.

MR. JORDAN:  What did Chevy

Appellate Case: 20-2351     Page: 194     Date Filed: 07/04/2020 Entry ID: 4930235

81

tell you?  First of all, when did Chevy tell you?

MS. KEHOE:  When Danny and Chevy came through -- they went to Reno to a gun show, came back.  And I was told that they were going to Danny's to take Danny home to his mother, to see his mother and sister.

Oh, it was just a little short time, maybe a week or two, maybe thereafter, I left Kirby.

MR. JORDAN:  And where did you go?

MS. KEHOE:  I went to Shadows Motel.

MR. JORDAN:  How did you get there?

MS. KEHOE:  I took the crew cab with Casey, Luke, Noah and Levy.  Kirby kept Kelvy, because Kelvy wanted to stay with his father.  And I went straight back to Shadows.  Washington, I felt, was my home.

And he gave me $800 and told me I could have -- he gave me a choice, the

Appellate Case: 20-2351    Page: 195    Date Filed: 07/04/2020  Entry ID: 4930235

82

motor home or dually.  Well, it was winter back home.  I knew a four-wheel drive -- I had enough experience with selling rigs, I knew I could get rid of the four-wheel drive crew cab to be able --

MR. JORDAN:  So you were at the Shadows when Chevy told you about the homicide?

MS. KEHOE:  Yeah.

MR. JORDAN:  In person?

MS. KEHOE:  Yeah.

MR. JORDAN:  Do you remember exactly when this was?

MS. KEHOE:  Some time in February.

MR. JORDAN:  In February?

MS. KEHOE:  February, first of March.

MR. JORDAN:  How did Chevy bring this up to you?

MS. KEHOE:  Started off, we -- I had pulled in.  I was upset, of course.  I had driven through some torrentious weather.  I was very upset about his father

July 3 2020 p196

Appellate Case: 20-2351     Page: 196     Date Filed: 07/04/2020 Entry ID: 4930235

83

and I split.  I was just tired of the whole situation.

And I had to go get food for the children.  And there's a Safeway right down from Shadows.  I know you're not familiar with it.  Mike and Steve Gunderson is.  And you, too?  Oh, and you, too?  Okay.  All right. You know about it, then.

And so we were going to -- we went.  And he had things.  And I couldn't put two and two together.  And I said, this isn't right.

MR. JORDAN:  What kind of things?

MS. KEHOE:  Guns, jewelry, (inaudible).  He was going to be taking airplane lessons, the handbooks.  And I knew something had happened.  He had ran into some money somehow, and Mom wanted to know how.

MR. JORDAN:  Money that you did not give him?

MS. KEHOE:  No.  I did not give him.  No.  That we did not give him.  No.

Appellate Case: 20-2351     Page: 197     Date Filed: 07/04/2020 Entry ID: 4930235

84

MR. JORDAN:  Now, he took you to Safeway?

MS. KEHOE:  Yes, he did.

MR. JORDAN:  What were you in?

MS. KEHOE:  We were in Shelby's truck.

MR. JORDAN:  His?

MS. KEHOE:  Yes.

MR. JORDAN:  Okay.  So you asked him how he came into possession of all this stuff.

MS. KEHOE:  Yes.

MR. JORDAN:  And what was his answer?

MS. KEHOE:  He didn't want to tell me at first, but you know how persistent mothers can be, and you know when a child's lying.  And he said that he put Bill and Nancy on a liquid diet.  How sick is that?

MR. JORDAN:  He said he put Bill and Nancy on a liquid diet?

MS. KEHOE:  Yes.

MR. JORDAN:  What for?

Appellate Case: 20-2351     Page: 198     Date Filed: 07/04/2020 Entry ID: 4930235

MS. KEHOE: Because they were dead. And what did he do with them? He threw the bodies in the river. That's a liquid diet. You have to understand skin. That talk -- I guess that's skin head talk. It's sick any way you look at it, to be told.

And I said, what are you talking about, a liquid diet? And that's when the guy and (inaudible) put me on (inaudible).

MR. JORDAN: And what -- tell us exactly what he told you, the details.

Okay. Gloria, we had to just take a second here. I was asking you the information that Chevy passed on to you while y'all were in his truck, this blue pickup truck that he had, concerning the Muellers and what happened to them. And he mentioned to you that he gave them a liquid diet.

MS. KEHOE: Yes.

MR. JORDAN: Which means they were thrown into a river.

Appellate Case: 20-2351   Page: 199   Date Filed: 07/04/2020 Entry ID: 4930235

July 3 2020 p199

86

MS. KEHOE:  They were disposed of in a river.

MR. JORDAN:  Okay.  What specifically did he tell you occurred with the Muellers?

MS. KEHOE:  Him and Danny -- I can't remember if they had waited for a gun show.  They had parked down the road, and they went in to investigate the situation, check the grounds out.  They -- I can't exactly remember how Chevy said they got in.

Chevy had masks.  They both wore black masks.  They had ATF FBI jackets that they had on.

Danny hid behind the couch, and Chevy hid -- when you first walked in, to the left, there was like washing machines.  Or maybe Chevy was behind the couch and Danny was there.

And as they were coming in, they hollered bust, ATF.  And they made them sit down on the couch.  And they talked to them.  And they said, well, we've got to go

Appellate Case: 20-2351   Page: 200   Date Filed: 07/04/2020   Entry ID: 4930235

87

secure upstairs.  And Chevy acted like he was running up and down the stairs like there was a bunch of people.  And he hollered, you know, for the -- for them to answer upstairs and that type of situation. I'm sure it was trying to confuse them.

They separated them.  They put ties on the -- on their hands.  Not the feet at that time, just the hands.  Asked them questions to make them think it was an ATF bust or FBI.  He had the badge and the jackets all in black.

I want to say they took Bill out first.  Bill created a really big fight.  I'm a little bit confused.  Because in the paper, they said that they were shot in the head, but that's not what happened. Bill was hit -- Bill fought like hell for his life.  He fought like hell.  They said that he broke the ties once, and they had to redo them.

So then they took a shotgun, I believe it was a shotgun, and hit him on the back of his head, because he was just

Appellate Case: 20-2351    Page: 201    Date Filed: 07/04/2020 Entry ID: 4930235

88

getting out of hand, and they both were having a hard time controlling him, and that -- and I did see the butt end of the rifle or shotgun. I was in such shock. When I went back to the motel, he showed me what he had done to it.

There was a little bit of blood, he said, but they cleaned it up. I freaked, and I said, my God, that's evidence. And he said, no, they'll never find it, we cleaned it up too good.

The way that it was done, there was -- the bathroom where they stored food -- I'm a little bit sketchy on this, so -- they took one at a time back there. What they did was -- there's a shocker. And he held it -- you can hold it right here somewhere.

MR. JORDAN: On your neck?

MS. KEHOE: Uh-huh (affirmative response). It will knock them out. And then the plastic bags were put over their heads and tagged. And they were knocked out, and they would suffocate to death.

July 3 2020 p202

Appellate Case: 20-2351    Page: 202    Date Filed: 07/04/2020 Entry ID: 4930235

Nancy -- and all Bill could say was, don't take my money that my father gave me, don't take my money that my father gave me. Chevy said it really upset him, because he wasn't even concerned about his wife and his daughter. He was only concerned about the money, not Nancy or Nancy's daughter. And he said it made him sick.

And then Nancy -- Nancy helped put the damned bag over her head.

MR. JORDAN: Nancy helped put the bag over whose head?

MS. KEHOE: Her head. Because she thought it was real.

MR. JORDAN: She thought what?

MS. KEHOE: It was a real bust. Bill knew it wasn't. Bill knew. His instincts kicked in. And then the little girl was left.

MR. JORDAN: Pardon me? Okay. Gloria, we took just a short break here so you could compose yourself. We're at Sarah. What did Chevy say about Sarah?

MS. KEHOE: Well, first off --

Appellate Case: 20-2351   Page: 203   Date Filed: 07/04/2020 Entry ID: 4930235

90

well, they didn't cuff Sarah at first, because she was just a child.  And Nancy -- Danny had Bill in the back room.  And Nancy kept trying to get Sarah to get the pin to -- you know, they always had a key.

It was really strange.  They always carried their gun wherever they went.  They got out of the rig, they had it. It just so happened that night, they didn't carry their guns with them inside of the home.  Because if they had, it would have been a different situation, I personally felt.

And Nancy kept wanting Sarah to -- did they have them in handcuffs at first?  Because Chevy made a comment that Nancy kept wanting Sarah to go and get her special little key or straight winder to where you could pick your own handcuff.  And they wouldn't let her.  And Sarah is the one who told them where everything was, the little girl.

And then they took Nancy out, and then Sarah was the last to go.  And all

Appellate Case: 20-2351     Page: 204     Date Filed: 07/04/2020 Entry ID: 4930235

of them were executed that way, with the shocking on the neck so many times to where they -- you hit a main nerve.  I was -- I was so numb, I just -- it was like a dream when I walked into Safeway that night.

MR. JORDAN:  Did Chevy tell you as they took the bodies out, what they placed them in, what vehicle?

MS. KEHOE:  From what I understood, they were put...

MR. JORDAN:  Or did Chevy tell you that?

MS. KEHOE:  I know he said that they loaded up the trailer.  They took the trailer.  They had not unloaded it.

MR. JORDAN:  You're talking about Bill's trailer.

MS. KEHOE:  Yes.  The one that he had just got.

MR. JORDAN:  Okay.

MS. KEHOE:  Because they just gotten home from a gun show, keep this in mind.  And I asked him -- and this is probably bizarre to you.  I said, my God,

Appellate Case: 20-2351   Page: 205   Date Filed: 07/04/2020 Entry ID: 4930235

92

what possessed -- then he told me that they put them -- I want to say their Wagoneer, and they took them -- and then they took and tied rocks to them so that they wouldn't float or they -- so they wouldn't float up or they wouldn't go down.

And I asked them, I said why didn't you bury them?  What -- first of all, I was in total shock.  And he said, Mom, I panicked, I panicked at the end.

MR. JORDAN:  Did he tell you specifically who killed who?  He did?  Who killed Bill?

MS. KEHOE:  Danny.

MR. JORDAN:  Danny Lee?  I know this is tough, Gloria.  I'm going to have to ask you to just speak up, because I don't want it to sound like I'm putting words in your mouth.

MS. KEHOE:  You're not putting words in my mouth.

MR. JORDAN:  Danny Lee killed Bill?

MS. KEHOE:  And Nancy.

July 3 2020 p206

Appellate Case: 20-2351    Page: 206    Date Filed: 07/04/2020 Entry ID: 4930235

MR. JORDAN:  And Nancy?

MS. KEHOE:  And he came in, and he said I couldn't take the little girl out.

MR. JORDAN:  So Chevy killed Sarah.  You're shaking your head yes.

Did he tell you who drove the jeek -- Jeep Wagoneer and the trailer and who drove the pickup truck away from the residence?  He did not?

MS. KEHOE:  No.

MR. JORDAN:  Did he tell you where they took the Jeep and the trailer at?

MS. KEHOE:  Parked it down the road somewhere.

MR. JORDAN:  Did he tell you how the bodies got to the river or water they threw them in?

MS. KEHOE:  Him and Danny took them together.

MR. JORDAN:  In what vehicle?

MS. KEHOE:  I want to say the truck.  I keep thinking that it was the Wagoneer, but --

Appellate Case: 20-2351     Page: 207     Date Filed: 07/04/2020 Entry ID: 4930235

94

MR. JORDAN:  The blue pickup truck?

MS. KEHOE:  Yeah.  Blue pickup.

MR. JORDAN:  Did he tell you where at, the specific location that they disposed of the bodies?

MS. KEHOE:  It was some -- some river -- some river way out, in other words.  And it was late.

MR. JORDAN:  Did he tell you how they picked this spot?

MS. KEHOE:  No.  He didn't tell me that.

MR. JORDAN:  Gloria, if I showed you a picture of an individual, would you tell me if you had ever met this man before?

MS. KEHOE:  Yes.

MR. JORDAN:  Have you ever seen this gentleman?

MS. KEHOE:  I'm not sure I have.

MR. JORDAN:  I'm showing you a picture of Paul Edward Humphrey.  You do not

Appellate Case: 20-2351   Page: 208   Date Filed: 07/04/2020 Entry ID: 4930235

95

know this man?

MS. KEHOE:  No.  I don't know him.

MR. JORDAN:  Did Chevy ever tell you that they had help in Arkansas on setting up Bill or disposing of the bodies?

MS. KEHOE:  No.  It was just him and Danny.

MR. JORDAN:  No one else?

MS. KEHOE:  No one else.

MR. JORDAN:  I want to go back and touch on some things that you -- you said.  Now, this was told to you by Chevy.  Is that correct?

MS. KEHOE:  Yes, it was.

MR. JORDAN:  Was anybody with you and Chevy when he told you this?

MS. KEHOE:  No.  It was just Chevy and I.  The children stayed there at the motel with Karena.

MR. JORDAN:  Okay.

MS. KEHOE:  I saw the shotgun. I want to say shotgun and rifle.  I was just so shocked.  The barrel where they had to

Appellate Case: 20-2351   Page: 209   Date Filed: 07/04/2020 Entry ID: 4930235

# EXHIBIT J

July 3 2020 p210

Appellate Case: 20-2351     Page: 210     Date Filed: 07/04/2020 Entry ID: 4930235

MS:   And they…and him and Danny Lee had gone on to Arkansas.

GK:   Yes

MS:   At that point did Kirby tell you what they were going to do in Arkansas?

GK:   Yes, Kirby said that they were going to do a break-in at the Muellers.

MS:   O.K.  Did he at that point indicate that…..anything to you about that he was going to get some of the proceeds from the ah….burglary?

GK:   No, he never mentioned that.

MS:   O.K.  Alright, the next question will relate to ah…ah….what you have direct knowledge of concerning what Danny Lee told you about the Mueller homicides. In an earlier interview you indicted that Danny Lee had indicated to you some statement that he had made at the Shadow's Motel to you about these murders. To the best of your knowledge can you remember the circumstances of when you were told this and what exactly was said to you by Danny Lee?

GK:   As I told you before, we didn't really get into deep discussions of them just in certain times it would be mentioned and discussed and that would be the end of it.

MS:   Now…your….you said it would me mentioned.  Your talking about Danny Lee would say something to you.

GK:   Yes

MS:   And what kind of…..

GK:   It wasn't that often……

MS:   Yes, occasionally….

GK:   It's not something……

MS:   So occasionally he would say this to you?

GK:   It was only brought up in discussion it wasn't something that was a casual conversation.

MS:   What can you recall anything he said about these homicides that stuck in your mind?  Did he ever admit to you that he had killed these people?

GK:   Yes

7

July 3 2020 p211

Appellate Case: 20-2351   Page: 211   Date Filed: 07/04/2020 Entry ID: 4930235

MS: Do you recall the words he used ah... to describe this to you?

GK: No, not at this point.

MS: Did he make statement like "I did it" or "We did it" or something like that?

GK: Yes, but more......it was just described more in their lingo. The skinhead lingo.

MS: O.K. So they used phrases to describe this crime committed to you that ah.... might be unknown to the general public but you understood what they were talking about. It that correct?

GK: Yes

MS: O.K. The last question deals with ah...any knowledge you have of Danny Lee trading ah.....firearms for tattoos that were done on himself by a tattoo artist. Do you have any knowledge of this?

GK: No

MS: O.K. So you have no knowledge of the fact that maybe Danny Lee had traded a firearm to a tattoo person?

GK: No

MS: O.K. This will conclude this interview. The time now is 2:00 P.M.

8

Appellate Case: 20-2351     Page: 212     Date Filed: 07/04/2020 Entry ID: 4930235

# EXHIBIT K

| DEPARTMENT OF THE TREASURY- BUREAU OF ALCOHOL, TOBACCO AND FIREARMS | | 1. INVESTIGATION IS | Page 1 of |
|---|---|---|---|
| REPORT OF INVESTIGATION (Law Enforcement) | | ☒ ROUTINE<br>☐ SENSITIVE   ☐ SIGNIFICANT | 3 pages |

| 2. TO:<br>Special Agent in Charge<br>Seattle Field Division<br>Seattle, Washington | 3. MONITORED INVESTIGATION INFORMATION(Number and Branch)<br>CIP: 746000 93397-01   FY-97<br>VIOLENT CRIME<br>REPORT 027 |
|---|---|

| 4. TITLE OF INVESTIGATION<br>Kehoe, Chevie | 5. INVESTIGATION No. (Include Suspect No.)<br>746010-97-0033 |
|---|---|

| 6. TYPE OF REPORT(Check applicable boxes) | | | | 7. BUREAU PROGRAM | | | 8. PROJECT(S) | |
|---|---|---|---|---|---|---|---|---|
| | PRELIMINARY | | COLLATERAL (Request). | X | TITLE I | | | TARGETED OFFENDER |
| | | | | | TITLE II | FIREARMS | | TERRORIST/EXTREMIST |
| X | STATUS | | COLLATERAL (Reply) | | TITLE VII | | | OCD |
| | | | | | TITLE II | EXPLOSIVES | | ITAR |
| | FINAL | | INTELLIGENCE | | TITLE XI | | | SEAR |
| | | | | | TOBACCO | | | OMO |
| | SUPPLEMENTAL | | REFERRAL (Internal) | | ALCOHOL | | X | OTHER (Specify)<br>TRAFFICKING |

9. DETAILS:

DESCRIPTION OF ACTIVITY:

CI allegation of illegal firearms Trafficking by Kirby Kehoe.

SYNOPSIS:

On April 29, 1997 S/A Gunderson and Sprenger interviewed CI-128.   The CI described from personal knowledge the illegal possession of firearms by Kirby Kehoe (DOB082648).

NARRATIVE:

1. In January 1996 CI-128 was the manager of the Shadows Motel and RV Park located at 9025 North Division Street in Spokane, Washington. During the CI's tenure at this business it became a haven for Skinheads, White Separatists and Anti-government types.  During the above related time period, Kirby Kehoe and his son Chevie Kehoe showed up at the business, with a large firearms collection.  The CI states that the two had been out of Washington State prior to their arrival. The CI was told by Kirby Kehoe's wife (Gloria), that the father and son had been to the State of Arkansas.

2. The CI described how the Kehoe's had used the CI's storage garage at the Shadows complex to store this large firearms collection.  The CI recalled that Chevie Kehoe displayed several semi-auto pistols

| 10. SUBMITTED BY (Name)<br>Steve Gunderson | 11. TITLE AND OFFICE<br>Special Agent, Spokane F.O. | 12. DATE<br>04/30/97 |
|---|---|---|
| 13. REVIEWED BY (Name)<br>Robert L. Harper | 14. TITLE AND OFFICE<br>RAC, Spokane Field Office | 15. DATE<br>/ / |
| 16. APPROVED BY (Name)<br>Margaret M. Moore | 17. TITLE AND OFFICE<br>Special Agent in Charge | 18. DATE<br>/ / |

ATF EF 3270.2 (5-90)

Appellate Case: 20-2351   Page: 214   Date Filed: 07/04/2020 Entry ID: 4930235

DEPARTMENT OF THE TREASURY
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS

REPORT OF INVESTIGATION - CONTINUATION SHEET
(Law Enforcement)

PAGE __2__

OF __3__ PAGES

| TITLE OF INVESTIGATION | INVESTIGATION NO. |
|---|---|
| Kehoe, Chevie | 746010-97-0033 |

DETAILS (Continued)

contained in glass cases.  The CI recalled that one of these pistols was a Colt, .45 caliber, series 80, Officers Model with many unique after-market accessories added to the firearm after manufacture. Chevie Kehoe advised the CI that they were going to go through all the items in the collection and decide prices.

3. The CI states that a short time after the Kehoe's arrived back in Spokane the CI indicated an interest in the above Colt pistol.  Chevie Kehoe advised the CI that he and his dad (Kirby) had divided the firearms and that pistol was in possession of Kirby Kehoe.

4. The CI related how in late January or early February 1996, Kirby Kehoe walked into the Shadows Office where the CI worked and offered the above Colt pistol for sale to the CI.  Kirby Kehoe stated to the CI that he would sell the customized Colt pistol along with four or five Wilson brand combat magazines for approximately $650.00.  The CI asked Kirby Kehoe who had customized the pistol and Kehoe stated he didn't know.  Kirby Kehoe could only inform the CI that the custom work was done "by someone back east".  The CI chose not to purchase the pistol.

5. The CI recalls that in late January or early February Chevie and Kirby Kehoe stated that they had gone to the Seattle, Washington gun show where they had sold several handguns.

6. The CI states that in Late February or early March he asked Kirby Kehoe if he still had the custom Colt pistol for sale, Kirby replied that he had gotten rid of it.

7.  The CI stated that the above firearm is unique due to the custom after market items added to the firearm.  The CI stated that the pistol had a VinDickey trigger, Wilson or VinDickey hammer, a Smith Alexander magazine well and a Wilson or Brownell beavertail safety. The CI further stated that in the large firearms collection taken to his garage by the Kehoe's in January 1996 were aftermarket pistol accessories with the above brand names.

8. S/A Gunderson showed a picture of a Colt pistol, series 80, S/N LF03504E, to CI-128.  The CI positively identified this pistol as the same described above, due to the custom features.

9.  The above firearm picture was a pistol sold to Travis Brake at the Seattle Gun Show on February 11, 1996 by a subject Mr. Brake has identified as Kirby Kehoe.

10.  The above described Colt pistol had originally been entered into the National Crime Information Computer by the Pope County Arkansas Police as it was related to the Burglary and Murder of a family of

ATF EF 3270.3 (5-90)

Appellate Case: 20-2351     Page: 215     Date Filed: 07/04/2020 Entry ID: 4930235

DEPARTMENT OF THE TREASURY
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS

REPORT OF INVESTIGATION - CONTINUATION SHEET
(Law Enforcement)

PAGE ___3___

OF ___3___ PAGES

| TITLE OF INVESTIGATION | INVESTIGATION NO. |
|---|---|
| Kehoe, Chevie | 746010-97-0033 |

DETAILS (Continued )

three, in that state, in January 1996.

Attachments: ATF F 5000.1 - Sworn Affidavit by ATF CI-128

ATF EF 3270.3 (5-90)

Appellate Case: 20-2351     Page: 216     Date Filed: 07/04/2020 Entry ID: 4930235

# EXHIBIT L



**SEROLOGICAL   RESEARCH   INSTITUTE**

June 8, 2007

David A. Ruhnke                          SERI Case No. M'7094'06
Ruhnke & Barrett, Attorneys at Law       Agency Case No. 4:97-CR-00243(02)
47 Park Street                                              GTE
Montclair, NJ 07042                      Suspect:  Daniel Lewis Lee

## ANALYTICAL REPORT

On October 31st 2006, two items of evidence were received at the Serological Research Institute (SERI) from Glen Jordan from the Bureau of ATF, via FedEx #798031584151. Mitochondrial DNA analysis utilizing the Polymerase Chain Reaction (PCR) method was requested.

### ITEM 1   KNOWN HAIRS DANNY GRAHAM (Exh. 535)

This item consisted of a folded piece of paper containing two brown hairs (~1-2cm long) with no roots, and two white hairs (~2-3 cm long) with root sheaths. The hairs were examined microscopically. One entire white hair was sampled, washed, and extracted. The DNA extract was amplified by PCR using mitochondrial primers, and then subsequently sequenced. The results are tabulated below.

### ITEM 2   HAIR – BASEBALL CAP (Exh. 1037)

This item consisted of a slide containing one brown hair, approximately 11mm long, with no root. The entire hair was examined microscopically, sampled, washed, and extracted. The DNA extract was amplified by PCR using mitochondrial primers, and then subsequently sequenced. The results are tabulated below.

3053  RESEARCH  DRIVE  •  RICHMOND, CA  94806  •  (510) 223-7374  (SERI)  •  FAX  (510)  222-8887

Appellate Case: 20-2351     Page: 218     Date Filed: 07/04/2020 Entry ID: 4930235

David A. Ruhnke
SERI Case No. M'7094'06
June 8, 2007
Page 2 of 4

## TABLE OF RESULTS

| Item # | Description | HVI CRS | 16291 | 16298 | 16311 | | | HVII CRS | 72 | 263 | 309.1 | 315.1 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | CRS | C | T | T | | | CRS | T | A | : | : | |
| 1 | Known Hair Danny Graham #535 | | T | | | | | | | G | C | C | |
| B/C | Extraction Blank | | No activity | | | | | | No activity | | | | |
| 2 | Hair – Baseball Cap #1037 | | | C | C | | | | C | G | C | C | |
| B/C | Extraction Blank | | No activity | | | | | | No activity | | | | |

Hypervariable Region 1 (HVI) includes base positions 16018-16374.          Hypervariable Region 2 (HVII) includes base positions 71-365.

Legend
CRS=CAMBRIDGE REFERENCE SEQUENCE PUBLISHED BY ANDERSON ET.AL.
: =INSERTION (NO NUCLEOTIDE PRESENT IN THIS POSITION IN THE CRS)
BLANK=NUCLEOTIDE IS THE SAME AS CRS AT THIS POSITION

Appellate Case: 20-2351     Page: 219     Date Filed: 07/04/2020 Entry ID: 4930235

David A. Ruhnke
SERI Case No. M'7094'06
June 8, 2007
Page 3 of 4

## EXPLANATION

Human DNA consists of a number of genetic marker systems. Nuclear DNA is found in the nucleus of the cell, and is inherited from both the mother and father. Analysis methods utilizing nuclear DNA rely on identifying small specific sections or repetitive sections of DNA wherein there are recognizable differences between people. Alternatively, analysis of mitochondrial DNA relies on determining the specific order or sequence of the thousands of individual nucleotide bases that serve as the building blocks of a person's mitochondrial DNA. Unlike nuclear DNA, mitochondrial DNA is located in the mitochondria of the cell, and is inherited maternally. In other words, both males and females have mitochondrial DNA, but only females can pass it on to their offspring. The mitochondrial genome is passed on in its entirety; therefore every individual in the same maternal lineage should have the identical mitochondrial DNA sequence.

When an organic extraction is performed on a biological sample, all genomic DNA will be extracted, including both nuclear and mitochondrial DNA. Therefore, DNA used for mitochondrial sequencing analysis can be extracted using the same procedures as those intended for nuclear DNA.

Thousands of copies of mitochondrial DNA are present in each cell, making mitochondrial DNA analysis possible from samples which are highly degraded or have very limited quantities of DNA. Samples such as skeletal remains, teeth and hair shafts frequently yield mitochondrial DNA results when nuclear DNA analysis is not possible.

The part of the mitochondrial genome significant to forensic science is known as the Control Region, and is made up of two hypervariable regions (HVI and HV2). The forensic community generally recognizes the HV1 and HV2 regions as consisting of base positions 16024-16365 and 73-340, respectively. An adenine (A), cytosine (C), guanine (G) or thymine (T) nucleotide is designated at every position, and base designations are numbered according to the Cambridge Reference Sequence, also referred to as the Anderson Sequence. Although the entire HV1 and HV2 regions are sequenced, only differences (polymorphisms) from the Anderson Sequence are noted when reporting a sample's mitochondrial DNA type.

Because the amplification of mitochondrial DNA is so sensitive, an extraction blank control to which no DNA is added is extracted, amplified, and sequenced along with the evidence samples. As anticipated, the extraction blanks employed in this case yielded no amplified mitochondrial DNA or sequencing data.

David A. Ruhnke
SERI Case No. M'7094'06
June 8, 2007
Page 4 of 4

## CONCLUSIONS

The mitochondrial DNA sequence data from the hair from the Baseball Cap (item 2) differs from that of the hair from Danny Graham at a number of base positions and is therefore excluded as originating from the same person or maternal lineage.

## EVIDENCE DISPOSITION

The remaining unconsumed submitted evidence will be returned to Glen Jordon at the Bureau of Alcohol, Tobacco and Firearms in Little Rock, Arkansas. Portions of submitted reference samples along with any unconsumed evidentiary extracts will be retained at SERI.

SEROLOGICAL RESEARCH INSTITUTE

Vee Garcillano
Forensic Serologist I

Brian Wraxall
Chief Forensic Serologist

SERI1\CaseFiles\M'7094'06\Rpt1

A9

# EXHIBIT M

July 3 2020 p222
Appellate Case: 20-2351     Page: 222     Date Filed: 07/04/2020 Entry ID: 4930235

Declaration of James Wanker

1. My name is James Wanker. I currently reside in Spokane, Washington where I have lived most of my life.

2. In 1999, I was a witness for the Government at the murder trial of Danny Lee and Chevie Kehoe. At trial, the Government asked me about comments that Danny Lee made to me indicating that he had been involved with Chevie Kehoe in the murders in Arkansas.

3. I am providing this declaration to explain the context of those statements, what I thought about the statements, and all of the information I passed on to law enforcement and the prosecutors. I have recently had the opportunity to review my trial testimony, my grand jury statement, and the reports about my conversations with law enforcement and I was very surprised that the reports did not include all of what I said.

4. In May of 1996, my wife and I moved to the RV park at the Shadows Motel. In September of that year, I became the manager of the Shadows Motel. The Kehoe family and Danny Lee were living at the Shadows when we moved there and I also had contact with them as manager of the property.

5. The Kehoes were very secretive and stuck closely together. Danny Lee was somewhat reserved but he was friendlier than the Kehoes. It really seemed like he was just looking for somewhere to belong. He wanted to look badass like the Kehoes but you could tell he didn't really fit in with them.

6. Danny was a follower who tried to sound like a big guy. He was always trying to blow smoke up my ass; trying to impress me by sounding tough. He would spout off about different fights and crazy situations that were not true just to look tough and try to fit in.

July 3 2020 p223

Appellate Case: 20-2351     Page: 223     Date Filed: 07/04/2020 Entry ID: 4930235

7. When Danny made these comments about this trip, I didn't believe him. I knew him to be a braggart and that he would try to claim responsibility for criminal actions in order to fit in with the Kehoes. It still cracks me up that Danny was trying to be a tough guy.

8. In the spring of 1997, an officer from the Spokane Sheriff's office just happened by the Shadows Motel sometime after we had heard about the Kehoes' Ohio shootout. While we were chatting I mentioned what Danny had said to me. I told the officer that I didn't believe Danny's claims. At some point, I told ATF agent Sprenger about it too but he also didn't pay it any attention.

9. In the summer of 1997, law enforcement suddenly began to be interested. An officer in Arkansas called me on the phone to ask me questions and I told them the story Danny had relayed to me. I also told him at the time that I did not believe what Danny had told me about his involvement in the murders in Arkansas.

10. In early July, Agent Sprenger visited and interviewed me and my wife, Delvine. I told him the whole story and again said that I did not believe what Danny had said. Agent Sprenger was very dismissive and it seemed like he didn't believe the story or us. He was abrupt and did not appear to take many notes. It seemed like he was not interested in talking to us but someone had sent him out to do the interview. It was clear to me that he didn't believe either Danny's story or us.

11. Prior to the trial I was in contact with other government officials including Agent Jordan and the prosecutor Stripling. When we discussed my testimony, I told each of them that I didn't believe that what Danny had told me was true. I was recently shown written reports of my interviews with the Arkansas officer and Agent Sprenger and I was surprised this information was not included in the reports.

12. Prior to trial, I was told to limit my testimony to only what was asked and not to give personal opinions. They made me feel like my testimony was very important and told me that I should just answer their questions and not go into other areas. I followed their instructions and

July 3 2020 p224

answered just what they asked me without providing additional details. Even in my grand jury testimony, for example, what I heard about Sean Haines going to Arkansas with Chevie was left out.

13. During the trial, I testified that the reason I hadn't called the police when I first heard Danny make those comments was because I thought he was just talking to hear himself talk. If anyone had asked me, I would have told them that I'd never changed my opinion about that, and that even at the time of trial I still didn't believe that Danny's story was anything more than just empty bragging.

14. When the Kehoes left the Shadows they just left Danny Lee behind. It was like he was dead weight. I got the sense they didn't think he was important enough to go with them. He was like a throw-away.

I declare pursuant to 18 U.S.C. §1746 that the foregoing is true and correct.

Dated: September 11, 2017.

_____

James Wanker

# EXHIBIT N

Appellate Case: 20-2351     Page: 226     Date Filed: 07/04/2020 Entry ID: 4930235

RCS ATF R 3270.1

DEPARTMENT OF THE TREASURY- BUREAU O...  :OHOL, TOBACCO AND FIREARMS

**REPORT OF INVESTIGATION (Law Enforcement)**

1. INV... :ATION IS

☐ I.. .TINE
☐ SENSITIVE  ☒ SIGNIFICANT

Page 1 of
1 pages

| 2. TO: | 3. MONITORED INVESTIGATION INFORMATION *(Number and Branch )* | |
|---|---|---|
| )ecial Agent in Charge<br>..1 Veterans Highway, Suite 1050<br>New Orleans, Louisiania | CIP: 745700<br>VIOLENT CRIME<br>REPORT 258 | FY-97 |

| 4. TITLE OF INVESTIGATION | 5. INVESTIGATION No. *(Include Suspect No.)* |
|---|---|
| William Mueller      COPY | 53430-96-0110-K |

**6. TYPE OF REPORT** *(Check applicable boxes )*

| | | | | | 7. BUREAU PROGRAM | | 8. PROJECT(S) | |
|---|---|---|---|---|---|---|---|---|
| | PRELIMINARY | | COLLATERAL *(Request )*. | X | TITLE I | FIREARMS | | TARGETED OFFENDER |
| | | | | | TITLE II | | X | TERRORIST/EXTREMIST |
| X | STATUS | : | COLLATERAL *(Reply )* | | TITLE VII | | | OCD |
| | | | | | TITLE II | EXPLOSIVES | | ITAR |
| | FINAL | | INTELLIGENCE | | TITLE XI | | | SEAR |
| | | | | | TOBACCO | | | OMO |
| | SUPPLEMENTAL | | REFERRAL *(Internal )* | | ALCOHOL | | | OTHER *(Specify )* |

**9. DETAILS:**

DESCRIPTION OF ACTIVITY:

Interview of JAMES WANKER.

SYNOPSIS:

This report relates to the burglary of firearms from former Federal
   irearm dealer WILLIAM MUELLER and the murder of WILLIAM MUELLER,
NANCY MUELLER and SARAH POWELL.

NARRATIVE:

1)  On June 26, 1997, JAMES WANKER was interviewed by INVESTIGATOR
AARON DUVALL, Pope County Sheriff's Department.  The results of the
interview are attached.

ATTACHMENT:

Interview with JAMES WANKER

| 10. SUBMITTED BY *(Name )* | 11. TITLE AND OFFICE | 12. DATE |
|---|---|---|
| len Jordan *[signature]* | SA, Little Rock, AR | 07/11/97 |
| :VIEWED BY *(Name )* | 14. TITLE AND OFFICE | 15. DATE |
| J. William Buford | RAC, Little Rock, AR | /  / |
| 16. APPROVED BY *(Name )* | 17. TITLE AND OFFICE | 18. DATE |
| Robert A. Stellingworth | Special Agent in Charge | /  / |

ATF EF 3270.2 (5-90)

Appellate Case: 20-2351     Page: 227     Date Filed: 07/04/2020 Entry ID: 4930235

CRIMINAL INVESTIGATION DIVISION

POPE COUNTY SHERIFF'S OFFICE

CASE NO:      96-1003
CRIME:        Homicide
DATE:         6/26/97
DICTATED BY:  Sgt. Aaron Duvall
COPIES TO:

## INTERVIEW

Subject interviewed is JAMES "JIM" WANKER, W/M, 35 YOA, DOB ███/62, ████ ██, Spokane, WA 99205.  Spouse is DALVINE WANKER.  Pager number is 509-███████.  Message telephone is 509-███████.

On Thursday, 6/26/97, at approximately 2:50 p.m. this officer interviewed MR. WANKER by telephone.  The interview was witnessed by SHERIFF JAY WINTERS.

WANKER advised that in late July or early August of 1996 he was at the Shadows Motel in Spokane, Washington, along with numerous other people including DANNY LEE (GRAHAM) and CHEVIE KEHOE.

WANKER stated they were standing around talking in the late afternoon when DANNY LEE (GRAHAM) started talking about different things he had done.  LEE was talking directly to WANKER.  LEE made the statement that he "waxed" somebody in Arkansas.  LEE went on to say, "We wrapped them up and threw them in a swamp."

WANKER advised CHEVIE KEHOE was not that far away when LEE made the statement.  WANKER said that SEAN HAINES was at the motel but probably didn't hear LEE say this because Haines was approximately 60 to 80 feet away.  WANKER stated that JAKE SETTLES was there close by and might have heard LEE's statement.

WANKER described LEE as a "skin head" and had lost his eye when he was hit with a billiard ball.

WANKER advised he was manager of the Shadows Motel up to September of 1996.

WANKER stated he last saw LEE around November of 1996 in Spokane, Washington.

WANKER stated he saw no firearms at the Shadows Motel during this period of time but CHEVIE KEHOE made statements that "they were well armed".

DANNY LEE showed WANKER'S wife, DALVINE, a rifle or shotgun.  She doesn't know which one.

WANKER stated he found firearms and ammo in a storage building

Appellate Case: 20-2351     Page: 228     Date Filed: 07/04/2020   Entry ID: 4930235

Interview with James Wanker
6/26/97
Continued
Page Two


on a later date.  He stated he had been working with MIKE SPRINGER with ATF in Spokane, Washington.

WANKER has seen JOE SONDUCK, a white supremist, at Deer Lake in an Executive Motorhome with an Arizona license plate.  This location is approximately 20 miles north Spokane, Washington.

July 3 2020 p229

Appellate Case: 20-2351   Page: 229   Date Filed: 07/04/2020 Entry ID: 4930235

# EXHIBIT O

July 3 2020 p230

Appellate Case: 20-2351     Page: 230     Date Filed: 07/04/2020 Entry ID: 4930235

RCS ATF R 3270.1

| DEPARTMENT OF THE TREASURY- BUREAU OF ALCOHOL, TOBACCO AND FIREARMS<br><br>REPORT OF INVESTIGATION (Law Enforcement) | 1. INVESTIGATION IS<br>☐ ROUTINE<br>☐ SENSITIVE   ☒ SIGNIFICANT | Page 1 of<br>1 pages |
|---|---|---|

| 2. TO:<br>Special Agent in Charge<br>111 Veterans Highway, Suite 1050<br>New Orleans, Louisiana | 3. MONITORED INVESTIGATION INFORMATION(*Number and Branch*)<br><br>CIP: 745700                      FY-97<br>VIOLENT CRIME<br>REPORT 237 |
|---|---|

| 4. TITLE OF INVESTIGATION<br>William Mueller | 5. INVESTIGATION No. (*Include Suspect No.*)<br>53430-96-0110-K |
|---|---|

COPY

**6. TYPE OF REPORT**(*Check applicable boxes*)

|   | PRELIMINARY |   | COLLATERAL (*Request*). |
|---|---|---|---|
| X | STATUS |   | COLLATERAL (*Reply*) |
|   | FINAL |   | INTELLIGENCE |
|   | SUPPLEMENTAL |   | REFERRAL (*Internal*) |

**7. BUREAU PROGRAM**

| X | TITLE I | FIREARMS |
|---|---|---|
|   | TITLE II | |
|   | TITLE VII | |
|   | TITLE II | EXPLOSIVES |
|   | TITLE XI | |
|   | TOBACCO | |
|   | ALCOHOL | |

**8. PROJECT(S)**

|   | TARGETED OFFENDER |
|---|---|
| X | TERRORIST/EXTREMIST |
|   | OCD |
|   | ITAR |
|   | SEAR |
|   | OMO |
|   | OTHER (*Specify*) |

**9. DETAILS:**

DESCRIPTION OF ACTIVITY:

Interviews of JAMES W. WANKER and DEE WANKER.

SYNOPSIS:

This report relates to the burglary of firearms from former Federal firearm dealer WILLIAM MUELLER and the murder of WILLIAM MUELLER, NANCY MUELLER and SARAH POWELL.

NARRATIVE:

1) On July 2, 1997, JAMES W. WANKER and DEE WANKER were interviewed by SPECIAL AGENT MICHAEL SPRENGER, Spokane Field Office regarding information concerning DANNY LEE and CHEVIE KEHOE.  The results of the interviews are attached.

ATTACHMENT:

Interviews of JAMES and DEE WANKER.

| 10. SUBMITTED BY (*Name*)<br>Len Jordan | 11. TITLE AND OFFICE<br>SA, Little Rock, AR | 12. DATE<br>07/03/97 |
|---|---|---|
| 13. REVIEWED BY (*Name*)<br>J. William Buford | 14. TITLE AND OFFICE<br>RAC, Little Rock, AR | 15. DATE<br>/   / |
| 16. APPROVED BY (*Name*)<br>Robert A. Stellingworth | 17. TITLE AND OFFICE<br>Special Agent in Charge | 18. DATE<br>/   / |

ATF EF 3270.2 (5-90)

| DEPARTMENT OF THE TREASURY- BUREAU OF ALCOHOL, TOBACCO AND FIREARMS | 1. INVESTIGATION IS | Page 1 of |
| --- | --- | --- |
| **REPORT OF INVESTIGATION** (Law Enforcement) | ☒ ROUTINE<br>☐ SENSITIVE   ☐ SIGNIFICANT | **2** pages |

| | 3. MONITORED INVESTIGATION INFORMATION(*Number and Branch*) |
| --- | --- |
| Special Agent in Charge<br>Seattle Field Division<br>Seattle, Washington | CIP: 746000 93397-01     FY-97<br>VIOLENT CRIME<br>REPORT 032 |

| 4. TITLE OF INVESTIGATION | 5. INVESTIGATION No. (*Include Suspect No.*) |
| --- | --- |
| Kehoe, Chevie | 746010-97-0033 |

| 6. TYPE OF REPORT(*Check applicable boxes*) | | 7. BUREAU PROGRAM | | 8. PROJECT(S) | |
| --- | --- | --- | --- | --- | --- |
| | PRELIMINARY | COLLATERAL (*Request*). | X | TITLE I | | | TARGETED OFFENDER |
| | | | | TITLE II | FIREARMS | | TERRORIST/EXTREMIST |
| X | STATUS | COLLATERAL (*Reply*) | | TITLE VII | | | OCD |
| | | | | TITLE II | EXPLOSIVES | | ITAR |
| | FINAL | INTELLIGENCE | | TITLE XI | | | SEAR |
| | | | | TOBACCO | | | OMO |
| | SUPPLEMENTAL | REFERRAL (*Internal*) | | ALCOHOL | | X | OTHER (*Specify*)<br>TRAFFICKING |

9. DETAILS:

DESCRIPTION OF ACTIVITY:

Interview of former managers of the Shadows Motel, Spokane, Washington.

SYNOPSIS:

James and Dee Wanker were interviewed on 07/02/97 by SA Sprenger regarding information concerning Chevie Kehoe and Danny Lee.

NARRATIVE:

1. James Warren Wanker, ███████████ ███ █, Spokane, WA 99218, DOB ███/62, (509)██████, can testify to the following facts.

2. James and his wife, Dee, moved into the Shadows Motel and RV Park at ███████████, Spokane, WA in May of 1996. They resided in a trailer at the park. Jim first met Danny Lee and Chevie Kehoe at this time. Chevie Kehoe was living with his wife, Karina, and children in a motorhome in the RV section. Danny Lee was also living with the Kehoes. Jake and Sue Settle and Chevie's parents were also living at the Shadows. The conversation between Jim Wanker and Danny Lee were casual in nature. During one conversation Danny Lee discussed white supremist beliefs and asked Jim to go to the Aryan Nation Congress meeting in July, 1996. Danny also bragged about doing "hate crimes" to Jim on various occasions. Lee did not reveal any details of these

| 10. SUBMITTED BY (*Name*) | 11. TITLE AND OFFICE | 12. DATE |
| --- | --- | --- |
| Michael Sprenger | Special Agent, Spokane F.O. | 07/02/97 |
| 13. REVIEWED BY (*Name*) | 14. TITLE AND OFFICE | 15. DATE |
| Robert L. Harper | RAC, Spokane Field Office | 7/02/97 |
| 16. APPROVED BY (*Name*) | 17. TITLE AND OFFICE | 18. DATE |
| Margaret M. Moore | Special Agent in Charge | |

ATF EF 3370.2 (6-90)

DEPARTMENT OF THE TREASURY
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS

REPORT OF INVESTIGATION - CONTINUATION SHEET
(Law Enforcement)

PAGE __2__

OF __2__ PAGES

TLE OF INVESTIGATION

Kehoe, Chevie

INVESTIGATION NO.
746010-97-0033

DETAILS (Continued)

alleged crimes. At one point, Danny Lee told Wanker he, Sean Haynes, and Chevie Kehoe had gone to Arkansas on a trip. Again Lee did not reveal any details of the trip or when the trip took place.

3. In July or August, 1996, Wanker stated he had a conversation with Danny Lee when Lee told him when they were on the trip somebody had messed with them. Wanker assumed the trip was to Arkansas from previous conversation he had with Lee. Lee further stated they had killed them, duct taped the bodies and thrown them in a swamp. Lee revealed no other details. Wanker stated Lee had been drinking but was not drunk or impaired.

4. Wanker stated he observed Chevie Kehoe driving a white suburban, a blue Suburban, an old faded green Toyota Land Cruiser, a white GMC pickup, a green Chevrolet full size pickup with a camper, and a blue Jeep while Kehoe stayed at the Shadows Motel. Wanker stated these vehicles had various license plates, predominately Idaho.

5. Wanker and his wife became managers of the Shadows Motel and RV Park in mid-September, 1996. Prior to this Jeff Brown had been the manager. Wanker stated Brown was "buddies" with Chevie Kehoe and his dad. They often worked on vehicles in a blue storage building at the Shadows.

6.  Dalvine Ann Wanker, same address as husband, DOB 06/16/56, nickname of Dee, was also interviewed this same date. Dee Wanker can testify as to living at and later managing the Shadows during the same time frame as her husband and meeting Danny Lee and Chevie Kehoe.

7. Dee Wanker stated on one occasion she observed Danny Lee holding a rifle or a shotgun in the doorway of a small travel trailer where he lived. This was after Lee had stayed in the motorhome with Chevie Kehoe and his family. They were having a conversation about some people who had recently moved into the park. Dee expressed concern to Lee about these people. Lee told her not to worry as he would take care of it like we did on our trip. Lee further said he was not afraid to use it (referring to the firearm he was holding).

8. Dee Wanker can further testify she saw the same vehicles used by Chevie Kehoe as her husband.

9.  Additionally, Dee Wanker can testify Chevie Kehoe and his dad were friends with Jeff Brown and would work on vehicles in the blue storage building located on the Shadows property. Dee Wanker stated she had a conversation with Karina Kehoe one day when Karina said she had cleaned Jeff Brown's apartment at the Shadows.

Appellate Case: 20-2351     Page: 233     Date Filed: 07/04/2020 Entry ID: 4930235

# EXHIBIT P

July 3 2020 p234
Appellate Case: 20-2351     Page: 234     Date Filed: 07/04/2020 Entry ID: 4930235

Interview with CHEYNE KEHOE
6/21/97
Continued
Page One Hundred Nineteen

CK: hauled it to the woods and unloaded it into his truck.  And
that was all that he ever told me about that instance.  He
said he didn't want to be seen with the, he did it at night.
He said he didn't want to be seen with the, the uh, truck,
or the, or the Cherokee or the trailer.

GJ: Mm mh (affirmative).

CK: And he said he just put it, just drove it into the woods
and abandoned it.

GJ: Mm, did he say if it was night or day when these bodies were
dumped?

CK: No sir, he didn't.

GJ: Okay.  Uh, did he say whether or not that they brought the,
the duct tape and bags and other items with them?

CK: Yes sir, they did bring the duct tape and, he, I know that he
brought the duct tape with him, he sa..he said, "Yeah, we
brought the duct tape and the bags."  And then I guess some
of the other bags they had gotten from the house.  He said
that they, um, I'm tryin to remember exactly what ... I know
he brought duct tape and bags with him, I'm not sure ho...
what the quantity was or how much or if he used anything from
the house.  That I'm not sure of.

GJ: Okay.  And you told us earlier that they brought these cheap
handcuffs and these nylon ties.

CK: Mm mh (affirmative), yes.

GJ: Okay.  Now, think if, think of any other details that he
may have told you about the actual crime that ...

CK: Uh, that ...

GJ: That, that, that you may not think is, is important to us
but ...

CK: Important, yeah ... um, oh, there's, there's one that may

Appellate Case: 20-2351   Page: 235   Date Filed: 07/04/2020 Entry ID: 4930235

# EXHIBIT Q

July 3 2020 p236
Appellate Case: 20-2351     Page: 236     Date Filed: 07/04/2020 Entry ID: 4930235

Case 4:97-cr-00243-KGB   Document 1305-18   Filed 01/29/20   Page 2 of 3

# January 2006

## Russellville, Arkansas, USA

| Su | Mo | Tu | We | Th | Fr | Sa |
|---|---|---|---|---|---|---|
| **1**<br>Twi A: 5:50am<br>Twi: 6:53am<br>Sunrise: 7:21am<br>Sunset: 5:11pm<br>Twi: 5:39pm<br>Twi A: 6:41pm | **2**<br>Twi A: 5:51am<br>Twi: 6:53am<br>Sunrise: 7:21am<br>Sunset: 5:11pm<br>Twi: 5:39pm<br>Twi A: 6:42pm | **3**<br>Twi A: 5:51am<br>Twi: 6:53am<br>Sunrise: 7:22am<br>Sunset: 5:12pm<br>Twi: 5:40pm<br>Twi A: 6:43pm | **4**<br>Twi A: 5:51am<br>Twi: 6:54am<br>Sunrise: 7:22am<br>Sunset: 5:13pm<br>Twi: 5:41pm<br>Twi A: 6:43pm | **5**<br>Twi A: 5:51am<br>Twi: 6:54am<br>Sunrise: 7:22am<br>Sunset: 5:14pm<br>Twi: 5:42pm<br>Twi A: 6:44pm | **6**<br>Twi A: 5:51am<br>Twi: 6:54am<br>Sunrise: 7:22am<br>Sunset: 5:14pm<br>Twi: 5:43pm<br>Twi A: 6:45pm | **7**<br>Twi A: 5:52am<br>Twi: 6:54am<br>Sunrise: 7:22am<br>Sunset: 5:15pm<br>Twi: 5:43pm<br>Twi A: 6:46pm |
| **8**<br>Twi A: 5:52am<br>Twi: 6:54am<br>Sunrise: 7:22am<br>Sunset: 5:16pm<br>Twi: 5:44pm<br>Twi A: 6:46pm | **9**<br>Twi A: 5:52am<br>Twi: 6:54am<br>Sunrise: 7:22am<br>Sunset: 5:17pm<br>Twi: 5:45pm<br>Twi A: 6:47pm | **10**<br>Twi A: 5:52am<br>Twi: 6:54am<br>Sunrise: 7:22am<br>Sunset: 5:18pm<br>Twi: 5:46pm<br>Twi A: 6:48pm | **11**<br>Twi A: 5:52am<br>Twi: 6:54am<br>Sunrise: 7:22am<br>Sunset: 5:19pm<br>Twi: 5:47pm<br>Twi A: 6:49pm | **12**<br>Twi A: 5:52am<br>Twi: 6:54am<br>Sunrise: 7:22am<br>Sunset: 5:20pm<br>Twi: 5:48pm<br>Twi A: 6:50pm | **13**<br>Twi A: 5:52am<br>Twi: 6:54am<br>Sunrise: 7:21am<br>Sunset: 5:21pm<br>Twi: 5:49pm<br>Twi A: 6:50pm | **14**<br>Twi A: 5:52am<br>Twi: 6:53am<br>Sunrise: 7:21am<br>Sunset: 5:22pm<br>Twi: 5:49pm<br>Twi A: 6:51pm |
| **15**<br>Twi A: 5:52am<br>Twi: 6:53am<br>Sunrise: 7:21am<br>Sunset: 5:23pm<br>Twi: 5:50pm<br>Twi A: 6:52pm | **16**<br>Twi A: 5:51am<br>Twi: 6:53am<br>Sunrise: 7:21am<br>Sunset: 5:24pm<br>Twi: 5:51pm<br>Twi A: 6:53pm | **17**<br>Twi A: 5:51am<br>Twi: 6:53am<br>Sunrise: 7:20am<br>Sunset: 5:25pm<br>Twi: 5:52pm<br>Twi A: 6:54pm | **18**<br>Twi A: 5:51am<br>Twi: 6:53am<br>Sunrise: 7:20am<br>Sunset: 5:26pm<br>Twi: 5:53pm<br>Twi A: 6:55pm | **19**<br>Twi A: 5:51am<br>Twi: 6:52am<br>Sunrise: 7:20am<br>Sunset: 5:27pm<br>Twi: 5:54pm<br>Twi A: 6:55pm | **20**<br>Twi A: 5:51am<br>Twi: 6:52am<br>Sunrise: 7:19am<br>Sunset: 5:28pm<br>Twi: 5:55pm<br>Twi A: 6:56pm | **21**<br>Twi A: 5:50am<br>Twi: 6:52am<br>Sunrise: 7:19am<br>Sunset: 5:29pm<br>Twi: 5:56pm<br>Twi A: 6:57pm |
| **22**<br>Twi A: 5:50am<br>Twi: 6:51am | **23**<br>Twi A: 5:50am<br>Twi: 6:51am | **24**<br>Twi A: 5:49am<br>Twi: 6:50am | **25**<br>Twi A: 5:49am<br>Twi: 6:50am | **26**<br>Twi A: 5:48am<br>Twi: 6:49am | **27**<br>Twi A: 5:48am<br>Twi: 6:49am | **28**<br>Twi A: 5:47am<br>Twi: 6:48am |

July 3 2020 p237

Appellate Case: 20-2551   Page: 237   Date Filed: 07/04/2020 Entry ID: 4930235

| Sunrise: 7:18am Sunset: 5:30pm Twi: 5:57pm Twi A: 6:58pm | Sunrise: 7:18am Sunset: 5:31pm Twi: 5:58pm Twi A: 6:59pm | Sunrise: 7:17am Sunset: 5:32pm Twi: 5:59pm Twi A: 7:00pm | Sunrise: 7:17am Sunset: 5:33pm Twi: 6:00pm Twi A: 7:01pm | Sunrise: 7:16am Sunset: 5:34pm Twi: 6:01pm Twi A: 7:02pm | Sunrise: 7:16am Sunset: 5:35pm Twi: 6:02pm Twi A: 7:02pm | Sunrise: 7:15am Sunset: 5:36pm Twi: 6:03pm Twi A: 7:03pm |
|---|---|---|---|---|---|---|
| **29** Twi A: 5:47am Twi: 6:48am Sunrise: 7:14am Sunset: 5:37pm Twi: 6:04pm Twi A: 7:04pm | **30** Twi A: 5:46am Twi: 6:47am Sunrise: 7:14am Sunset: 5:38pm Twi: 6:05pm Twi A: 7:05pm | **31** Twi A: 5:46am Twi: 6:46am Sunrise: 7:13am Sunset: 5:39pm Twi: 6:06pm Twi A: 7:06pm | | | | |

Standard/Winter Time for entire month.

© 2018 Edwards Apps, Inc. — SunriseSunset.com

# EXHIBIT R

183C-LR-38261
JES:jes
(2)

On 10/24/97, [                    ] Pope County Sheriff's   b6
Office, Russellville, Arkansas, provided the following longitude   b7C
and latitude coordinates for significant activity relative to the
Mueller burglary and murders:

1.   Weekend of 2/12/95 - Mueller residence burglary.
1/11/96 - Mueller homicides.  Location 1 and 1/2 miles west of
Tilly, Searcy County, Arkansas.

North 35 degrees, 43 minutes, 42.5 seconds
West 092 degrees, 50 minutes, 22.6 seconds

2.   1/11-13/96 (discovered on 1/13/96) - Mueller White Jeep
Cherokee and trailer observed abandoned on Old Highway 7, Pope
County, Arkansas.

North 35 degrees, 32 minutes, 19.7 seconds
West 093 degrees, 05 minutes, 54.1 seconds

3.   1/11-12/96 ( discovered 6/28/96) - Mueller bodies dump
site in Arkansas bayou in North Russellville, Pope County,
Arkansas.

North 35 degrees, 19 minutes, 16.3 seconds
West 093 degrees, 08 minutes, 51.5 seconds

183C - LL - 38__1 -53

W/ TEXT ___ W/O TEXT ___          Searched _____
LEADS SET _____               Serialized _____
                               Indexed _____
BY _____ DATE _____            Filed _____

# EXHIBIT S

Appellate Case: 20-2351     Page: 241     Date Filed: 07/04/2020 Entry ID: 4930235

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription 06/25/1998

On June 17, 1998, a videotape recording was conducted of three crime scenes and the travel route between the crime scenes relative to the investigation into the triple homicides of the MUELLER family in 1996. Present were RON EVANS and RICARDO VILLANUEVA, of the Special Photographic Unit, FBI Headquarters, Washington, D. C., NOLAND MC COY, photographer, AARON DUVALL, Investigator, Pope County Sheriff's Office, and SA JAMES E. SCHANANDORE.

The video tape recording began at the MUELLER residence in Tilly, Searcy County, Arkansas. The recording continued as the group traveled approximately 45 miles to the location where the MUELLERS' Jeep Cherokee was found abandoned. The recording continued as the group proceeded an additional 19 miles to the bridge of the Illinois bayou where the remains of the MUELLERS were recovered.

Photographs were also taken at the three crime scenes described above.

The following log outlines the videotaping activities:

| | |
|---|---|
| 10:25 a.m. | Arrived at MUELLER residence, HC 33, SR 16, Tilly, Searcy Co., Arkansas. |
| 1:05 p.m. | Departed MUELLER residence in a westerly direction on Highway 16, mileage - 0 |
| 1:12 p.m. | Arrived at Witts Springs, Searcy County, Arkansas, mileage - 4.5 |
| 1:45 p.m. | 5-minute break on Highway 16 |
| 1:59 p.m. | Arrived at Pelsor, Pope County, Arkansas, intersection of Highway 16 and Highway 7, mileage - 29.5, proceeded south on Highway 7 |

Investigation on __06/17/1998__ at __Pope County and Searcy County, Arkansas__

File # __183C-LR-38261__ Date dictated __06/19/1998__

by __SA JAMES E. SCHANANDORE/rab__

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

July 3 2020 p242

Appellate Case: 20-2351   Page: 242   Date Filed: 07/04/2020 Entry ID: 4930235

FD-302a (Rev. 10-6-95)

183C-LR-38261

Continuation of FD-302 of _____, On 06/17/1998 , Page    2

| | |
|---|---|
| 2:19 p.m. | Arrived where MUELLER Jeep Cherokee found abandoned, located in a wooded area approximately 75 yards south of Old Highway 7 (Forest Road, 1801) mileage 45.5 |
| 2:54 p.m. | Departed location where Jeep Cherokee abandoned and proceeded south on Highway 7 |
| 3:08 p.m. | Arrived at Dover, Arkansas, mileage 57.5 |
| 3:17 p.m. | Arrived at intersection of Highway 7 and Pleasant View Road, Russellville, Arkansas, mileage - 63.4 |
| 3:19 p.m. | Arrived at bridge over the Illinois bayou where the remains of the MUELLERS were recovered mileage - 64.1 |

Appellate Case: 20-2351     Page: 243     Date Filed: 07/04/2020 Entry ID: 4930235

# EXHIBIT T

July 3 2020 p244

Appellate Case: 20-2351     Page: 244     Date Filed: 07/04/2020 Entry ID: 4930235

Interview with Sean Haines
12/20/96
Continued
Page Twenty Six


GJ:    Chevie?

SH:    No, they didn't.

GJ:    Okay.  Okay, so, Chevie and Daniel was gone two or three
       weeks around the first, middle, January '96, is that correct?

SH:    Yeah.

GJ:    Okay, what was Chevie driving at that time?

SH:    By that time he was driving uh, the diesel, the blue
       diesel truck, and uh, I think he was occasionally driving
       the uh, the Subaru wagon.  That was, the truck was suppose
       to be his, the wagon, the Subaru was suppose to be Kirby's.

GJ:    Uh, do you, do you remember the circumstances when Daniel
       returned from this trip.  Were you just at home when he
       showed up one day, or exactly how did the return occur?

SH:    Well I came home one day and uh, there was a note, you know,
       "I got back.", and his stuff was there, the light was on.
       Um, uh, and then, I missed, it was like hit and miss, he'd
       come and go while I was gone, um...

GJ:    When was the first time you had a discussion with him about
       this trip that he had just gotten back from.  Do you remember
       the, the discussion that, that you all had about this trip,
       first uh real meeting that ya'll set down and talked about
       it?

SH:    Yeah, it was probably about a, maybe three or four days
       after, you know, I found the initial note and stuff, I then
       Chevie stopped by, and he was uh, I think he was pickin up
       clothes to go do laundry at the Shadows Motel, and said that
       uh, you know, I'm might of said uh, uh, you know, "Where you
       been?", 'cause he said he was gonna be gone two weeks and it
       turned out to be almost three.  He's was like, "Well, you
       know, threw up a pole barn in Idaho,"  and uh, he went, he
       went into real detail about it, sayin that, "Well it wasn't
       really a pole barn, it was actually ...?...we went out there

006130

# EXHIBIT U

Appellate Case: 20-2351     Page: 246     Date Filed: 07/04/2020 Entry ID: 4930235



## AFFIDAVIT FOR SEARCH WARRANT

IN THE MUNICIPAL COURT OF THE CITY OF RUSSELLVILLE, ARKANSAS

STATE OF ARKANSAS
COUNTY OF POPE

BEFORE THE HONORABLE DENNIS SUTTERFIELD, MUNICIPAL JUDGE

The undersigned being duly sworn, states:

The undersigned has reason to believe and upon reasonable cause does believe that on the premises located at: The PAUL EDWARD HUMPHREY residence, ██████████ Street, Russellville, Arkansas including all vehicles, outbuildings, and appurtenances thereto, there is now being concealed certain property, namely evidence of the homicide of WILLIAM MUELLER, NANCY MUELLER, and SARAH POWELL. This evidence sought is to include trace evidence including carpet fibers, clothing fibers, blood spots, hair, samples of duct tape and plastic trash bags. The warrant should also include documents relating to the victims to include an envelope which HUMPHREY claimed to have received a title to the victims vehicle, the certificate of origin to the victims utility trailer and two bills of sale for the victims vehicle and trailer. Also sought is evidence of items stolen from the victims to include firearms, firearms parts, silver coins, gold coins, silver bars, and U.S. currency. Also sought is evidence of the forgery of the title of the victims vehicle, the certificate of origin for the victims trailer and the two bills of sale to include tracings, signatures and other related evidence. Also sought is evidence to include telephone records, address books and other documents which link HUMPHREY to suspects in this case who are either known or unknown.

FILED BY *Judy Mitchell*

AUG 30 1996

CLERK, POPE COUNTY
MUNICIPAL COURT



WHICH IS/ARE held and possessed in violation of the laws of the State of Arkansas, to wit: A.C.A. 5-10-101, A.C.A. 5-37-201, 5-36-103, and 5-12-103. The facts tending to establish the foregoing grounds for issuance of a Search Warrant are, to wit:

1) My name is Sergeant Aaron Duvall. I am an investigator for the Pope County Sheriff's Department and have been so employed for the past 13 years. I have attended numerous schools involving the investigation of homicides, crimes against persons, and property including but not limited to thefts and forgeries.

2) On or about January 11, 1996, WILLIAM MUELLER, NANCY MUELLER and SARAH POWELL were substantiated to have been in Russellville, Arkansas. None of the MUELLER'S relatives or close associates saw them after this date.

3) On February 2, 1996, DAVID BRANCH, the brother of NANCY MUELLER, was at the MUELLER residence located at ███████████ Tilley, Arkansas. While in the residence, BRANCH observed the title to WILLIAM MUELLER'S 1989 jeep, the certificate of origin for the MUELLER'S utility trailer, and blank bills of sale ( referred to as the MUELLER documents) on the kitchen table of the MUELLER residence. The title to the jeep, the certificate of origin for the utility trailer, and the bills of sale were unsigned.

4) On February 11, 1996, the WILLIAM MUELLER vehicle, a 1989 jeep cherokee with attached utility trailer was taken into custody by the Pope County Sheriff's Department. The vehicle had been observed abandoned for approximately three weeks on Arkansas state highway 7 in rural Pope County, Arkansas. An examination of the interior of the vehicle and trailer revealed ███ ██████████ue present.

AUG 30 1996

CLERK, POPE COUNTY



Appellate Case: 20-2351    Page: 248    Date Filed: 07/04/2020 Entry ID: 4930235



affiant further states that this is inconsistent with WILLIAM MUELLER'S habits and characteristics in that the investigation has revealed MUELLER often carried items of value such as firearms, ammunition, gold and silver. It was also suspected that the MUELLERS were on their way to a gun show when they disappeared, this being inconsistent with no items of value being found in the jeep.

5) On or about February 22, 1996, DAVID BRANCH contacted SHERIFF JAY WINTERS, Pope County Sheriff's Department, and stated he had received information that PAUL EDWARD HUMPHREY had possession of the title to the MUELLERS' jeep and the certificate of origin to the MUELLERS' utility trailer. SHERIFF WINTERS contacted HUMPHREY by telephone and HUMPHREY admitted that he had the documents for the vehicles. SHERIFF WINTERS asked HUMPHREY to come to the Sheriff's office the following day and bring the documents.

6) On or about February 23, 1996, HUMPHREY met with SHERIFF WINTERS at the Pope County Sheriff's Department. HUMPHREY did not bring the documents and stated he would answer any questions regarding the documents. HUMPHREY stated he had received the documents in the mail and that it was an agreed arrangement between he and WILLIAM MUELLER for MUELLER to sell him his vehicles for 21 pieces of silver. SHERIFF WINTERS asked HUMPHREY to surrender the documents and HUMPHREY stated he would deliver the documents to SHERIFF WINTERS.

7) On or about March 1, 1996, SHERIFF WINTERS contacted HUMPHREY by telephone regarding the documents. HUMPHREY stated his attorney, DALE BRADEN, of Russellville, Arkansas, had advised him not to

FILED BY *[signature]*

AUG 30 1996

CLERK, PO[...]
MUNICIPAL COURT

surrender the documents to SHERIFF WINTERS at this time. HUMPHREY stated he would be in contact with the Sheriff at a later date regarding the documents.

8) On or about March 5 1996 SHERIFF WINTERS contacted attorney DALE BRADEN who stated he had not been retained or contacted by PAUL EDWARD HUMPHREY to do any work relating to the MUELLER documents thus giving rise to the suspicion that HUMPHREY was being untruthful about said documents. It should be further noted that HUMPHREY was trying to keep law enforcement from examining said documents despite his previous assertion of February 22, 1996, that he would turn them over.

9) On or about March 15 ,1996, SHERIFF WINTERS again contacted HUMPHREY about the MUELLER documents. HUMPHREY stated that he did not have the documents and that they were with a friend in Little Rock, Arkansas. HUMPHREY was asked if he planned on getting the titles back and he once again stated he would obtain the titles and bring them to SHERIFF WINTERS.

10) On or about March 26, 1996, SHERIFF WINTERS contacted HUMPHREY for the sixth time about the MUELLER documents. HUMPHREY stated that his attorney in Little Rock, Arkansas had the documents. SHERIFF WINTERS contacted the attorney in Little Rock and the attorney stated that he did not have any documents pertaining to HUMPHREY nor was he performing any work for HUMPHREY. He further stated he did not know a PAUL EDWARD HUMPHREY. This again gives rise the likelihood that HUMPHREY was being untruthful about and had reason to prevent, the examination of said documents

11) On or about April 3, 1996, SHERIFF WINTERS met with HUMPHREY

AUG 30 1996

CLERK, POPE COUNTY
MUNICIPAL COURT

Appellate Case: 20-2351   Page: 250   Date Filed: 07/04/2020 Entry ID: 4930235

at the Hughs Community Center in Russellville Arkansas. SHERIFF WINTERS confronted HUMPHREY and told him the attorney in Little Rock knew nothing about any documents and stated he did not know him. HUMPHREY stated he was unsure as to what to do about the documents and some of his friends had told him to take the documents to the attorney however he did not take the documents to the attorney, despite his having previously said he did. but instead that the documents were on a friends property. SHERIFF WINTERS again told HUMPHREY, for the seventh time to surrender the documents.

12) On June 28. 1996. the bodies of WILLIAM MUELLER. NANCY MUELLER and SARAH POWELL were discovered in the Illinois Bayou near Russellville. Arkansas. the three having been victims of a triple homicide. WILLIAM MUELLER was wearing a camouflage jacket and blue jeans. PAUL HUMPHREY, in a statement to authorities. indicated the last time he saw WILLIAM MUELLER he was wearing a camouflage jacket and blue jeans.

13) On July 12. 1996, Affiant interviewed a cooperating witness (CW) who stated that on or about the 18th day of January. 1996 he/she observed WILLIAM MUELLER and NANCY MUELLER at the First Bank of Arkansas located on North Arkansas Avenue in Russellville. Arkansas. The (CW) stated that as he/she was exiting the bank, NANCY MUELLER yelled. He/she turned and noticed NANCY MUELLER seated in the front seat of a large tan colored car. He/she stated that NANCY was seated in the front seat of the car near or in the middle. The (CW) stated he/she walked over to the car and engaged NANCY MUELLER in conversation. The (CW) noticed a white male

FILED BY

AUG 3 0 1996

CLERK, ...

seated behind the wheel of the vehicle.  The (CW) also noticed that WILLIAM MUELLER was seated in the back seat of the vehicle in the middle of the seat.  A white male was seated on WILLIAM MUELLERS left and at least one white male seated on WILLIAM MUELLERS' right The (CW) was shown a series of photographs of persons suspected in the MUELLER homicide.  The (CW) positively identified PAUL EDWARD HUMPHREY as the person driving the vehicle.  The (CW) positively identified a photograph of TIMOTHY COOMBS AKA JAMES WILSON seated on the left of WILLIAM MUELLER. COOMBS is currently a fugitive for shooting a Missouri State Trooper. The (CW) did not identify any other photographs.  The (CW) did state that the other person(s) in the car were "rough looking".  It should be noted that this date (January 18, 1996) was corroborated by bank records and this date of January 18, 1996 was one week after the last known date the MUELLERS were seen by relatives or any other known associates.  The (CW) positively identified a vehicle owned by HUMPHREY as the vehicle she saw WILLIAM AND NANCY MUELLER in on that date.

14)   On July 9, 1996. BOBBY HULSE, a gun show associate of the MUELLERS, met with DAVID BRANCH to discuss the murder of the MUELLERS.   HULSE told BRANCH that he and HUMPHREY went to the Arkansas state revenue office in Little Rock, Arkansas prior to the MUELLERS' bodies being discovered and attempted to get the MUELLER documents transferred into HUMPHREY'S name.   The attempt was unsuccessful.

15) On July 1, 1996 Detective David Davis and Detective Robert McKinney of the Russellville Police Department, at the request of Sheriff Winters. went to the residence of PAUL HUMPHREY at ███████

FILED BY *[illegible]*

AUG 30 1996

CLERK, POPE ___[illegible]
MUNICIPAL COURT

Appellate Case: 20-2351     Page: 252     Date Filed: 07/04/2020 Entry ID: 4930235

██████████  Russellville, Arkansas and asked PAUL HUMPHREY if he would accompany them to the Sheriff's Office to talk to Sheriff Winters concerning the deaths of WILLIAM MUELLER, NANCY MUELLER and SARAH POWELL. When PAUL HUMPHREY was asked to step outside and talk to the officers he removed from the back of his waistband a .45 caliber semi-automatic pistol which he laid on a table near the door. When asked by Detective Davis if he (PAUL HUMPHREY) usually answered the door with a gun, he stated no that he was "expecting them."

15) On July 1, 1996, The MUELLER Jeep and utility trailer were transported to the State Crime Laboratory Trace evidence unit for processing. It was subsequently reported by Shartel Bequette of the trace evidence unit of the Arkansas State Crime Lab that there were some fibers found in the vehicle which were inconsistent with fibers taken from the MUELLER residence and vehicle. This group of fibers, of unknown origin, are consistent with known colors in HUMPHREY'S vehicle and residence. Affiant specifically requests that pursuant to this search warrant, officers be allowed to remove, for testing, fiber from HUMPHREY'S vehicle and residence in order to have it examined by the Arkansas State Crime Lab.

17) On July 1, 1996, HUMPHREY was interviewed by SHERIFF WINTERS and INVESTIGATOR STEVE BROWN of the 5th Judicial District Drug Task Force concerning any information he had concerning the death of the MUELLERS. HUMPHREY admitted having the MUELLER documents and stated he would be in the following day to surrender the documents. HUMPHREY stated he had received the titles in the mail after the MUELLERS were reported missing. HUMPHREY stated the documents were

AUG 3 0 1996

MUNICIPAL COURT

Appellate Case: 20-2351   Page: 253   Date Filed: 07/04/2020 Entry ID: 4930235

signed when he received them. When asked by INVESTIGATOR BROWN if he usually answered the door with a gun PAUL HUMPHREY stated no. When asked why he did on this occasion he stated that it was because of the MUELLER murders. When asked why the discovery of this incident obviously several months after it was commited caused him to be in such a heightened state of awareness. PAUL HUMPHREY could not or would not answer

19) On July 2, 1996, HUMPHREY was interviewed by SERGEANT DUVALL at the Pope County Sheriff's Department. HUMPHREY surrendered the MUELLER documents to SERGEANT DUVALL. An examination of the documents revealed that the title to the jeep was signed by WILLIAM MUELLER with an accompanying bill of sale signed by WILLIAM MUELLER. The certificate of origin for the utility trailer was signed by NANCY MUELLER and also had an accompanying bill of sale signed by NANCY MUELLER. HUMPHREY stated the last time he spoke to WILLIAM AND NANCY MUELLER was on January 8 and January 9, 1996 at a restaurant in Russellville, Arkansas. HUMPHREY also stated that WILLIAM MUELLER was wearing a camouflage jacket and blue jeans. HUMPHREY stated he did not bring the envelope the documents were received in but would see if he could find it. said envelope has not been provided to law enforcement and given HUMPHREYS untruthfulness and lack of cooperation on the documents, affiant has reason to believe and does believe that if said envelope exists, HUMPHREYS will not provide the same. Affiant further states that if said envelope exists, it is reasonable to assume it would be at the HUMPHREY residence, in his residence or other buildings under his control.

FILED BY _____

AUG 30 1996

CLERK, POPE COUNTY
MUNICIPAL COURT

19). On or about July 3, 1996, a package of documents were examined by SERGEANT DUVALL. said documents were received from DOUG WILLIAMS of the Arkansas State Police.  The documents were received by WILLIAMS from DAVID MASON, the landlord of WILLIAM MUELLER.  MASON had retrieved the documents from MUELLERS personal effects from his residence.  Contained in the documents was a telephone bill which reflected that a telephone call was made from WILLIAM MUELLER residence to PAUL HUMPHREY's residence at 8:37 PM on January 13, 1996.  This is the day after HUMPHREY stated he last spoke to the MUELLERS.  On the same date (July 9, 1996) the MUELLER documents obtained from HUMPHREY were compared with the documents received from Doug Williams.  It appeared that the WILLIAM MUELLER signature on the jeep title and bill of sale was consistent with the signature of WILLIAM MUELLER'S deceased father, William Mueller, Sr.  It should be noted WILLIAM MUELLER SR died on or about August 1, 1995.  It should further be noted that signature was inconsistent with that of WILLIAM MUELLER JR, the victim of the homicide and owner of the Jeep.

20) On August 13, 1996, SPECIAL AGENT GLEN JORDAN, Bureau of Alcohol, Tobacco, and Firearms (ATF) submitted the MUELLER documents along with known signature and handwriting for WILLIAM FREDERICK MUELLER JR. (victim), NANCY MUELLER (victim) and WILLIAM FREDERICK MUELLER SR. (deceased father) to determine if the MUELLER documents had forged signatures of WILLIAM MUELLER (victim) and NANCY MUELLER to the ATF forensic science laboratory, Atlanta Georgia for examination.

21) On August 22, 1996, Nancy Davis, ATF document examiner, issued

FILED BY CLERK, whom

AUG 30 1996

MUNICIPAL COURT

a report which stated "Both sets of signatures were prepared with thick fiber-tip type pen making examination of 'line detail' difficult. However the subtle differences noted between the questioned and known signatures in addition to the apparent slow careful manner in which they were written indicated they may be simulations/tracings." Nancy Davis is prepared to testify that the signatures are inconsistent with known signatures of WILLIAM WRIGHT TO (victim)

22) It is, therefore, prayed by the affiant(s) herein that a Warrant to Search said premises be issued for the hereinabove described items.

_____
SIGNATURE OF AFFIANT

_____
OFFICIAL TITLE, if any

Sworn to before me and subscribed in my presence, at _8:31 A.M._
_Russll. Ark_ this _27_ day of _Aug._ 19 _96_.

_Dennis C. Sutterfield_
JUDGE

AUG 3 0 1996



Appellate Case: 20-2351     Page: 256     Date Filed: 07/04/2020 Entry ID: 4930235

# EXHIBIT V

Appellate Case: 20-2351     Page: 257     Date Filed: 07/04/2020 Entry ID: 4930235



*JEEP TITLES*

Atlanta    sic Science Laboratory

**BUREAU OF ALCOHOL, TOBACCO AND FIREARMS**

2600 Century Parkway
Atlanta, GA 30345-3100
(404) 679-5100
FAX (404) 679-5112

DEPARTMENT OF THE TREASURY

# Laboratory Report

|  |  |
|---|---|
| **Date of Report:** | August 22, 1996 |

**To:** Special Agent Glen Jordan
Bureau of Alcohol, Tobacco and Firearms
425 West Capitol Avenue
Room 775
Little Rock, AR 72201

**Lab Number:** 96A0329 (1)

**Reference:** 53430960110K

**Type of Exam:** Document

The exhibits described below were received on August 14, 1996 via Federal Express #2562731533.

## QUESTIONED

Q1 -   One "Certificate of Origin for a Vehicle" Duplicate Certificate #P0025351 from J&J Trailers, dated June 1995, Invoice #27525
Q2 -   One "Certificate of Title" State of Arkansas Title #9133021115, dated 12/2/91
Q3 -   One typewritten "Bill of Sale" dated 1/2/96, signed Nancy Mueller and dated 2-2-96
Q4 -   One typewritten "Bill of Sale" dated 1/2/96, signed William Mueller

## KNOWN WRITING OF KIRBY KEITH KEHOE

K1 -   One machine copy of a fingerprint card dated 9/29/65

## KNOWN WRITING OF WILLIAM FREDRICK MUELLER JR.

K2 -   One machine copy of a fingerprint card dated 7/12/67
K9 -   Machine copies of eight "Ace Hardware" receipts
K10-   One sheet of lined yellow paper bearing handwritten message
K11-   One carbon copy of a "Chemical Bank" deposit ticket dated 8/4/95
K12-   One Warranty Deed dated 1/27/89
K13-   One "Joint Industry Board of the Electrical Industry" check #410532 endorsement
K14-   One "Joint Industry Board of the Electrical Industry" check #410252 endorsement

## KNOWN WRITING OF PAUL EDWARD HUMPHERY

K3 -   One machine copy of a fingerprint card dated 2/3/72

Page 1 of 3

Accredited by The American Society of Crime Laboratory Directors



Appellate Case: 20-2351   Page: 258   Date Filed: 07/04/2020 Entry ID: 4930235

96A0329 (1)

## KNOWN WRITING OF TIMOTHY COOMBS

K4 -        One machine copy of a fingerprint card dated 6/27/92


## KNOWN WRITING OF NANCY MUELLER

K5 -        One four-page letter dated 10/5/95
K6 -        Two "Tupperware" Invoices dated 7/31/90 and 9/14/90
K7 -        One envelope addressed to Teresa Ann
K8 -        Machine copies of three "Ace Hardware" receipts


## KNOWN WRITING OF WILLIAM FREDRICK MUELLER SR.

K15-        One "Macy's" credit card
K16-        One "JC Penney" credit card
K17-        One white envelope addressed to William Mueller, postmarked 6/24/91


## RESULTS OF EXAMINATION

The known writers submitted cannot be identified or eliminated as the writers of the questioned signatures on Exhibits Q1 through Q4.

Pictorial similarities were noted when comparing K5-K8 (Nancy Mueller) with the Nancy Mueller signatures on Exhibits Q1 and Q3.

Pictorial similarities were noted when comparing K15-K17 (William Mueller, Sr.) with the William Mueller signatures on Exhibits Q2 and Q4.

Both sets of signatures were prepared with a thick, fibertip type pen, making examination of line detail difficult.  However, the subtle differences noted between the questioned and known signatures, in addition to the apparent slow careful manner in which they were written, indicate they may be simulations/tracings.


## DISPOSITION OF EVIDENCE

Photographs have not been made.  Should this matter require additional attention, please resubmit all evidence promptly.  Allow at least two weeks for chart preparation for court presentation.

Appellate Case: 20-2351     Page: 259     Date Filed: 07/04/2020 Entry ID: 4930235

96A0329 (1)

All exhibits will be returned upon completion of fingerprint examination.

Nancy A. Davis
Document Examiner

REVIEWED BY:

Marvin G. Rennert, Chief
Atlanta Forensic Science Laboratory

Page 3 of 3

# EXHIBIT W

July 3 2020 p261

Appellate Case: 20-2351     Page: 261     Date Filed: 07/04/2020 Entry ID: 4930235



COPY

CASE NO: 96-1003
CRIME: Homicide
DATE: 9/27/96
DICTATED BY: A. Duvall
DATE TYPED: 9/27/96
COPIES:

**488 D**

SUBJECTS INTERVIEWED: DR. & MRS. CHARLES TURNER



Hector, AR

On Tuesday, 09/24/96, at approximately 1:00 p.m., this officer along with Special Agent, Glen Jordan, ATF, interviewed Dr. & Mrs. Turner. The following is a synopsis of that interview:

MRS. ROBERTA TURNER, W/F:

*Muellers had Christmas dinner with the Turners in 1995. Also present, was Angela Holderman and a family by the last name of Garcias. This family lives at Hector in the Turners' rent house. This rent house is located behind a teacher's house on Oak Street. The Muellers stayed late.

*Last saw the Muellers on Tuesday, 01/09/96, between 8:00 and 9:00 p.m., at the Turners. The weather was bad and she asked the Muellers to stay. Bill said, "Nancy, have you forgotten what we are to do tonight?" Nancy answered, "Yes, I forgot." Bill was nervous about someone he was going to see.

*Randy Vincent told Mrs. Turner that he had last seen the Muellers at Witt Springs store on Wednesday, 01/10/96.

*Main reason the Muellers came by the Turner's on 01//9/96, was to know if Dr. Turner wanted to buy the Jeep for $5,000.00. Mueller stated he needed to sell it tonight.

*Humphrey showed up at the Turners' on February or March of 1996, with the registration to Jeep and trailer and made the statement that Muellers were okay.

NOTE: The following information is from Dr. Charles Turner, W/M, and also Mrs. Turner:

*Muellers came to Turner's on Tuesday, 01/09/96, and stayed approximately thirty minutes. They left Sarah in the Jeep but she eventually came to use the bathroom. This was around approximately 7:30 p.m. Bill wanted to sell the Jeep only to Dr. Turner for $5,000.00. The Turners had asked them to stay for supper but Bill grabbed Nancy by the arm and led her into the den and stated, "Have you forgotten what we have to do?" Nancy said, "Okay." Bill acted nervous and worried about something. Dr. Turner told Bill he couldn't buy the jeep, that he had no monies available. Bill stated that he had found a pickup a week and they were going to deliver it to him. The Muellers were not pulling the trailer.

*First met the Muellers approximately 1992. Nancy was a patient of Dr. Turner for a period of time. They have babysat Sarah numerous times and Bill had done electrical and air conditioning for the Turners.

*Muellers mentioned who burglarized their residence in 1995, but they did bring by a list of missing items to the Turners for them to look at.

007120

Appellate Case: 20-2351    Page: 262    Date Filed: 07/04/2020 Entry ID: 4930235

COPY

NOTE:   Tony Matlock is from Marshall, AR.  He talked with the Turners about the Muellers missing.  He was wanting to know if the Turners had heard first if they were missing and asked specifically, Dr. Turner, what he thought had happened.

*Humphrey first came to the Turners on 01/25/96, at approximately 3:00 p.m., looking for Angela Holderman.  Humphrey had gone to the Hector Post Office looking for the directions to Angela's residence.  Humphrey tried to convince Dr. Turner that the Muellers were okay.  He was trying extra hard to convince the Turners that the Muellers were fine.  (Mrs. Turner)

*Jim Clayton told the Turners they had found Bill's beeper and rifle on the table at the residence.

*Humphrey came to the Turners the second time in mid-February.  He talked with Mrs. Turner, only.  During the conversation, Humphrey made the statement, "Nancy and Bill was one thing but I really felt bad about Sarah."  When Mrs. Turner asked him to explain his statement, he changed the subject.  Humphrey stayed approximately one hour.

*Humphrey came to the Turners the third time approximately one month later, sometimes in March.  He met with Dr. and Mrs. Turner and stated that he had the registration to the Jeep.  Humphrey stated that the Sheriff wouldn't let him have the Jeep or the trailer.  He also stated that he had gotten this through the mail in Little Rock but he did not know where it came from.

*Humphrey never came to the Turners with Bobby Hulsey, Jim Clayton, in fact, Humphrey made the statement that he did not know who Jim Clayton was.

*Hulsey came to the Turners on July 28, 1996, which was a Sunday by himself.  Hulsey showed four pictures he had gotten in the mail approximately six weeks before then.  One of the pictures was that of Kirby Kehoe standing outside next to a retaining wall.  Hulse stated that Bill had told him that he was fearful for his life.

*Jim Clayton brought a Ferguson man to visit the Turners, believe first name was, Harold.

*Dr. Turner stated that he was told that Bill had received $65,000.00 from an inheritance and paid a man 10% of that to cash the check.

*Dr. Turner stated that on December 1, 1995, he assisted Bill in cashing a $50,000.00 inheritance check.  He stated that he went to the bank, got $5,000.00 in cash and two $20,000.00 cashier's checks and a $5,000.00 cashier check.  He stated he then went to the Russellville bank and cashed one cashier check, got $5,000.00 cash, put $10,000.00 in a cashier's check and the other $5,000.00 in a cashier's check.  Dr. Turner stated that on 12/23/95, he took a $5,000.00 cashier's check and cashed it at Hector.  He stated all this was done over a two to three week period.

*Humphrey stated that to the Turners at one of his visits that there wasn't any money at the Muellers' house when he went there.  Mrs. Turner asked Humphrey what monies he was talking about and Humphrey changed the subject.

*Dr. & Mrs. Turner stated that the Muellers went to Missouri occasionally.  He stated that he believed they were gone at least three to five times in December of 1995 to Missouri and he had no knowledge of what the reason was.

007121

Appellate Case: 20-2351     Page: 263     Date Filed: 07/04/2020 Entry ID: 4930235

Mueller Homicide
Dr. & Mrs. Charles Turner memo
Page 3



*On January 9, 1996, Nancy asked Angela is she was going with them to a gun show. Angela state, yes. Bill stated that there won't be room because Paul was going.

007122

# EXHIBIT X

| DEPARTMENT OF THE TREASURY- BUREAU OF ALCOHOL, TOBACCO AND FIREARMS | 1. INVESTIGATION IS | Page 1 of |
|---|---|---|
| REPORT OF INVESTIGATION (Law Enforcement) | ☐ ROUTINE<br>☐ SENSITIVE  ☒ SIGNIFICANT | 1 pages |

| 2. TO: | 3. MONITORED INVESTIGATION INFORMATION(*Number and Branch*) |
|---|---|
| Special Agent in Charge<br>111 Veterans Highway, Suite 1050<br>New Orleans, Louisiana | CIP: 745700                    FY-97<br>VIOLENT CRIME<br>REPORT 360 |

| 4. TITLE OF INVESTIGATION | 5. INVESTIGATION No. (*Include Suspect No.*) |
|---|---|
| William Mueller                   COPY | 53430-96-0110-K |

**6. TYPE OF REPORT**(*Check applicable boxes* )

|  | | | 7. BUREAU PROGRAM | | | 8. PROJECT(S) | |
|---|---|---|---|---|---|---|---|
|   | PRELIMINARY |   | COLLATERAL (*Request* ) | X | TITLE I | FIREARMS | | TARGETED OFFENDER |
|   | | | | | TITLE II | | X | TERRORIST/EXTREMIST |
| X | STATUS |   | COLLATERAL (*Reply* ) | | TITLE VII | | | OCD |
|   | | | | | TITLE II | EXPLOSIVES | | ITAR |
|   | FINAL |   | INTELLIGENCE | | TITLE XI | | | SEAR |
|   | | | | | TOBACCO | | | OMO |
|   | SUPPLEMENTAL |   | REFERRAL (*Internal* ) | | ALCOHOL | | | OTHER (*Specify* ) |

9. DETAILS:

DESCRIPTION OF ACTIVITY:

Receipt of hair samples from PAUL EDWARD HUMPHREY and submission to the Arkansas State Crime Laboratory.

SYNOPSIS:

This report relates to the burglary of firearms from former Federal Firearm dealer WILLIAM MUELLER and the murder of WILLIAM MUELLER, NANCY MUELLER and SARAH POWELL.

NARRATIVE:

1)   On October 10, 1997, INVESTIGATOR AARON DUVALL, Pope County Sheriff's Department obtained hair samples from PAUL EDWARD HUMPHREY.

2)   On October 14, 1997, these samples were submitted to the Arkansas State Crime Laboratory by INVESTIGATOR DUVALL.

ATTACHMENT:

Grand Jury Subpoena
Laboratory Submission

| 10. SUBMITTED BY (*Name* )<br>Glen Jordan | 11. TITLE AND OFFICE<br>SA, Little Rock, AR | 12. DATE<br>10/17/97 |
|---|---|---|
| REVIEWED BY (*Name* )<br>J. William Buford | 14. TITLE AND OFFICE<br>RAC, Little Rock, AR | 15. DATE<br>/ / |
| 16. APPROVED BY (*Name* )<br>Robert A. Stellingworth | 17. TITLE AND OFFICE<br>Special Agent in Charge | 18. DATE<br>/ / |

ATF EF 3270.2 (5-90)

Appellate Case: 20-2351     Page: 266     Date Filed: 07/04/2020 Entry ID: 4930235

P.O. BOX 5274
Number 3 Natural Resources Drive
Little Rock, Arkansas 72215

## EVIDENCE SUBMISSION FORM

AΣ

...ease complete entire form

**FOR LABORATORY USE ONLY**

| Inv. Officer: Sgt. Aaron Duvall | Agency Case #96-1003 | Lab Case #: |
|---|---|---|

**96-09666**

Agency: Pope County Sheriff's Department

Street Address: #3 Emergency Lane

City: Russellville

Zipcode: 72801

Telephone: 501-968-2558

Date of Offense: January, 1996

Type of Offense: Homicide

How Evidence Rec'd: **H/c**

| Suspect(s) | DOB | RACE | SEX | Victim(s) | DOB | RACE | SEX |
|---|---|---|---|---|---|---|---|
| Chevie Kehoe | ██/73 | W | M | Bill Mueller | | W | M |
| Daniel Lee Graham | ██/73 | W | M | Nancy Mueller | | W | F |
| | | | | Sarah Powell | | W | F |
| | | | | | | | |
| | | | | | | | |

Has any evidence been previously submitted to this lab on this case? Yes **X** No ____

Location (City, County)
Pope County

Circle as needed

Documents
Drug Analysis
Firearms/Toolmarks
Latent Prints
Medical Examiner
Serology
Toxicology
~~Trace Evidence~~ (circled)
Visual Communications

| Item # | List and describe all evidence being submitted in this area: |
|---|---|
| 1. | Random hair samples taken from the head of Paul Edward Humphrey. |

(continue on back)

Type of analysis Requested:

Compare hair samples listed above to unknown hair samples found in the victims' vehicle.

Summary of Crime:

Mueller family was murdered in Janaury of 1996.  Their bodies were located in Lake Dardanelle in June of 1996.

OCT 14 PM 2:22 RECEIVED CRIME LABORATORY

_ 002516

NAME (Please Print)     AARON. W. DuVALL

SIGNATURE

Appellate Case: 20-2351     Page: 267     Date Filed: 07/04/2020 Entry ID: 4930235

July 3 2020 p267

# United States District Court

### EASTERN        DISTRICT OF    ARKANSAS

TO: PAUL HUMPHREY
    Russellville, AR

**SUBPOENA TO TESTIFY
BEFORE GRAND JURY**

SUBPOENA FOR:
  x PERSON      _ DOCUMENT(S) OR OBJECT(S)

**YOU ARE HEREBY COMMANDED** to appear and testify before the Grand Jury of the United States District Court at the place, date, and time specified below.

| PLACE | COURTROOM |
|---|---|
| United States Attorney's Office<br>Room 114,  U.S. Courthouse Building<br>600 West Capitol Avenue<br>Little Rock, Arkansas 72201 | 114 |
| | **DATE AND TIME**<br>October 14, 1997<br>9:00 a.m. |

**YOU ARE ALSO COMMANDED** to bring with you the following document(s) or object(s):

Provide a sample of your hair

_ *Please see additional information on reverse*

This subpoena shall remain in effect until you are granted leave to depart by the court or by an officer acting on behalf of the court.

| CLERK | DATE |
|---|---|
| JAMES W. McCORMACK | September 16, 1997 |
| (BY DEPUTY CLERK) | |

This subpoena is issued on application of the United States of America.

NAME, ADDRESS AND PHONE NUMBER OF ASSISTANT U.S. ATTORNEY

DAN STRIPLING
Assistant U.S. Attorney
P. O. Box 1229
Little Rock, AR 72203
(501) 324-5342

002517

## RETURN OF SERVICE (1)

| RECEIVED BY SERVER | DATE 10-2-97 | PLACE U.S. Attorney's Office |
| --- | --- | --- |
| SERVED | DATE 10-10-97 | PLACE Pope Co |

| SERVED ON (PRINT NAME) Paul Humphrey | FEES AND MILEAGE TENDERED TO WITNESS(2) ☐YES   ☐NO   AMOUNT $ _____ |
| --- | --- |

| SERVED BY (PRINT NAME) Aaron Duvall | TITLE Crim. Investigator |
| --- | --- |

### STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
| --- | --- | --- |
|  |  |  |

### DECLARATION OF SERVER (2)

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on ___10-10-97___

Date

Signature of Server

Address of Server   Pope Co Sheriff Dept.

ADDITIONAL INFORMATION —

Agreement between Dan Stripling, Robert Irwin, & Dale Brooks that Paul Humphrey provide hair samples to Aaron Duvall, Inv. at the Pope County Sheriff's Dept.

(2)   As to who may serve a subpoena and the manner of its service see Rule 17(d), Federal Rules of Criminal Procedure, or Rule 45(c), Federal Rules of Civil Procedure.
"Fees and mileage need not be tendered to the deponent upon service of a subpoena issued on behalf of the United States or an officer of agency thereof (Rule 45(c), Federal Rules of Civil Procedure: Rule 17(d), Federal Rules of Criminal Procedure) or on behalf of certain indigent parties and criminal defendants who are unable to pay such costs (28 U.S.C. 1825, Rule 17(b) Federal Rules of Criminal Procedure)".

# EXHIBIT Y

# STATE CRIME LABORATORY

P.O. BOX 8500
Number 3 Natural Resources Drive
Little Rock, Arkansas 72215

Laboratory Services
227-5747

*REPORT OF LABORATORY ANALYSIS*

Medical Examiner
227-5936

Investigating Officer/Agency/Address

Inv. Aaron Duvall
Pope County Sheriff's Office
3 Emergency Lane
Russellville, AR   72801

| | |
|---|---|
| Laboratory Case Number: | 1996-WVS-09666   Page 1 of 2 |
| Date Received in Lab: | 02/16/99 |
| How Evidence Received: | H C Duvall |
| Agency Case Number: | 96-1003 |

Suspect(s):
Paul Edward Humphrey
Kirby K Kehoe
Chevie Kehoe

Suspect(s):
Daniel Lee Graham
Faron Lovelace
Daniel Lee

Victim(s):
William Mueller
Nancy Mueller
Sarah Powell

Date of Report:   03/02/99

I do hereby attest and confirm as specified by A.C.A. 12-12-313, that the information listed below is a true and accurate report of the results of analysis performed by me of evidence received in a sealed condition at the Arkansas State Crime Laboratory.

Please refer to report dated 08/02/96 and 02/12/98 for previously submitted items and results.

## EVIDENCE SUBMITTED:

| | |
|---|---|
| Q21 | Cutting from carpet (MH WBB E-2) |
| Q24 thru Q28 | Cotton swabs (E-0084-98) |
| Q29 | Scrapings (E-0084-98) |
| Q42 | Cotton swabs (E-0098-98) |

## RESULTS OF ANALYSIS:

STR types as listed below were analyzed for the following specimens:

| Item | CSF1PO | TPOX | THO1 | vWA | AMELOGENIN |
|---|---|---|---|---|---|
| 276-DG | 11,11 | 8,8 | 9,9.3 | 16,16 | X,Y |
| 278-CK | 11,11 | 8,10 | 9,9.3 | 15,18 | X,Y |
| Q24/28/42 | 10,12 | 8,11 | 8,9.3 | 17,18 | X,Y |
| Q22-23S | 10,12 | 8,9 | 9.3,9.3 | 17,17 | X,Y |
| Q22-5S | Inc. | 8,9 | 9.3,9.3 | 17,17 | X,Y |

| Item | D16S539 | D7S820 | D13S317 | D5S818 |
|---|---|---|---|---|
| 276-DG | 12,12 | 8,10 | 11,12 | 9,12 |
| 278-CK | 11,12 | 9,10 | 11,13 | 11,12 |
| Q24/28/42 | 9,10 | Inconclusive | | |
| Q22-23S | 12,12 | 10,11 | 8,9 | 11,12 |
| Q22-5S | 12,12 | 10,11 | 8,9 | 11,12 |

DG = Danny Graham          CK = Chevie Kehoe          Inc = Inconclusive

MAR  2 '99 13:59          501 2270713  PAGE.002

# STATE CRIME LABORATORY

P.O. BOX 8500
Number 3 Natural Resources Drive
Little Rock, Arkansas 72215

| Laboratory Services<br>227-5747 | *REPORT OF LABORATORY ANALYSIS* | Medical Examiner<br>227-5936 |

---

Investigating Officer/Agency/Address

|  |  |
|---|---|
| | Laboratory Case Number: **1996-WVS-09666**     Page 2 of 2 |
| Inv. Aaron Duvall | Date Received in Lab: **02/16/99** |
| Pope County Sheriff's Office | How Evidence Received: **H C Duvall** |
| 3 Emergency Lane | |
| Russellville, AR 72801 | Agency Case Number: **96-1003** |

| Suspect(s): | Suspect(s): | Victim(s): |
|---|---|---|
| Paul Edward Humphrey | Daniel Lee Graham | William Mueller |
| Kirby K Kehoe | Faron Lovelace | Nancy Mueller |
| Chevie Kehoe | Daniel Lee | Sarah Powell |

---

Date of Report:     03/02/99

I do hereby attest and confirm as specified by A.C.A. 12-12-313, that the information listed below is a true and accurate report of the results of analysis performed by me of evidence received in a sealed condition at the Arkansas State Crime Laboratory.

## CONCLUSION:

Based on the above results, the sources of the DNA extracted from 276, Danny Graham, and 278, Chevie Kehoe, are excluded as being contributors to the DNA extracted from Q22-23S and Q22-5S.

Danny Graham and Chevie Kehoe are also excluded as being contributors to the human DNA identified on Q24/28 and Q42.

No DNA was identified on Q21.

Kermit B. Channell II, Chief Forensic Biologist
KBC/me

State of Arkansas
County of

Subscribed and sworn to before me, the undersigned Notary Public on this ____ day of _____, 1999.

My Commission Expires _____

MAR  2 '99 14:00                    501 2270713   PAGE.003

Appellate Case: 20-2351     Page: 272     Date Filed: 07/04/2020 Entry ID: 4930235

# EXHIBIT Z

July 3 2020 p273
Appellate Case: 20-2351     Page: 273     Date Filed: 07/04/2020 Entry ID: 4930235

RCS ATF R 3270.1

DEPARTMENT OF THE TREASURY BUREAU OF ALCOHOL, TOBACCO AND FIREARMS

## REPORT OF INVESTIGATION (Law Enforcement)

| INVESTIGATION IS | |
|---|---|
| X | ROUTINE |
| | SENSITIVE |
| | SIGNIFICANT |

Page 1 of __1__ pages

| 2. TO: | 3. MONITORED INVESTIGATION INFORMATION(*Number and Branch*) |
|---|---|
| Special Agent in Charge<br>11 Veterans Highway, Suite 1050<br>New Orleans, Louisiana | CIP: 745700          FY-97<br>VIOLENT CRIME<br>REPORT 112 |

| 4. TITLE OF INVESTIGATION | 5. INVESTIGATION No. (*Include Suspect No.*) |
|---|---|
| William Mueller | 53430-96-0110-K |

6. TYPE OF REPORT(*Check applicable boxes*)

| | | | |
|---|---|---|---|
| | PRELIMINARY | | COLLATERAL (*Request*). |
| X | STATUS | | COLLATERAL (*Reply*) |
| | FINAL | | INTELLIGENCE |
| | SUPPLEMENTAL | | REFERRAL (*Internal*) |

7. BUREAU PROGRAM

| | | | |
|---|---|---|---|
| X | TITLE I | FIREARMS | |
| | TITLE II | | |
| | TITLE VII | | |
| | TITLE II | EXPLOSIVES | |
| | TITLE XI | | |
| | TOBACCO | | |
| | ALCOHOL | | |

8. PROJECT(S)

| | |
|---|---|
| | TARGETED OFFENDER |
| X | TERRORIST/EXTREMIST |
| | OCD |
| | ITAR |
| | SEAR |
| | OMO |
| | OTHER (*Specify*) |

9. DETAILS:

DESCRIPTION OF ACTIVITY:

Interview of PAUL EDWARD HUMPHREY.

SYNOPSIS:

This report relates to the burglary of firearms from former Federal firearms dealer WILLIAM MUELLER and the murder of WILLIAM MUELLER, NANCY MUELLER and SARAH POWELL.

NARRATIVE:

1)  On January 21, 1997, PAUL EDWARD HUMPHREY was interviewed by INVESTIGATOR AARON DUVALL, Pope County Sheriff's Department.  The interview and rights waiver is attached.

ATTACHMENT:

Interview of PAUL EDWARD HUMPHREY.
Wavier of Rights.

| 10. SUBMITTED BY (*Name*)<br>Glen Jordan | 11. TITLE AND OFFICE<br>SA, Little Rock, AR | 12. DATE<br>02/27/97 |
|---|---|---|
| REVIEWED BY (*Name*)<br>J. William Buford | 14. TITLE AND OFFICE<br>RAC, Little Rock, AR | 15. DATE<br>/  / |
| 16. APPROVED BY (*Name*)<br>Robert A. Stellingworth | 17. TITLE AND OFFICE<br>Special Agent in Charge | 18. DATE<br>/  / |

ATF EF 3270.2 (5-90)

Appellate Case: 20-2351     Page: 274     Date Filed: 07/04/2020 Entry ID: 4930235

CRIMINAL INVESTIGATION DIVISION

POPE COUNTY SHERIFF'S OFFICE

CASE NO:      96-1003
CRIME:        Homicide
DATE:         1/22/97
DICTATED BY:  Sgt. Aaron Duvall
COPIES TO:

INTERVIEW

Subject interviewed is Paul Edward Humphrey.

On Tuesday, 1/21/97, at approximately 3:55 p.m. this officer read a statement of rights to Paul Edward Humphrey. Mr. Humphrey signed his name indicating that he understood those rights as was witnessed by Mr. Humphrey's attorney, Dale Braden. The interview was conducted at Mr. Braden's office. Mr. Humphrey was questioned concerning the Titles of the vehicles that belonged to the Muellers. Mr. Humphrey stated that early one morning Sylvia Mason called him at his residence and informed him that he needed to watch his mail. He stated that a few days later he received the Titles and the Bills of Sale in the mail and that there was nothing else with them. He stated that these were sent to his home address at ████ █ ████ ████ in Russellville. Mr. Humphrey stated that a few days later Sylvia Mason came to Russellville and called him at Massey Glass Company. Mr. Humphrey stated that Sylvia Mason stated to him that she would like to meet him, that she was at Good Deal Charlie's Furniture Store. Mr. Humphrey stated that she was driving a blue van and she had her daughter with her but that he did not see the daughter. He stated that Sylvia Mason showed him a stack of papers and the one on top was a phone bill belonging to Bill Mueller. She stated that Bill Mueller had called him on 1/10/96 at approximately 9:30 p.m. and Sylvia stated that, "She was going to help him." Mr. Humphrey stated that he did not understand how she was going to help him. He stated that he did not ask any questions concerning that and neither did Sylvia Mason ask him if he had received the Titles.

Mr. Humphrey admitted to this officer that he had put his name on the Titles and dated them February 12, 1996, the date that he had received the Titles in the mail.

Mr. Humphrey stated that a David Mason called him approximately three weeks after the meeting with Sylvia Mason. He stated that David Mason informed him that he had some papers and talked mainly about those papers. Mr. Humphrey stated that he could not remember exactly what David Mason stated but that the phone conversation lasted between five and ten minutes.

July 3 2020 p275

Interview with Paul Edward Humphrey
1/21/97
Continued
Page Two


When questioned if he had ever been to David Mason's residence, Mr. Humphrey stated no.

When questioned if he knew who the four people who lived in Missouri and were on his phone bill were, he stated that he did not know who they were and that he did not make the phone calls to Missouri.

When this officer showed Mr. Humphrey the picture of a female and himself in a "compromising position" and asked if he knew who the female was, he stated that her name was Marie York who lives in Little Rock.  He stated that she is a waitress at the Sherwood Waffle House.  He stated that these pictures were taken at her house at Whitman, Arkansas, which is close to Heber Springs.  He stated that this was either sometime in late 1995 or the Spring of 1996, he couldn't remember.

The interview was concluded at that time.

Appellate Case: 20-2351     Page: 276     Date Filed: 07/04/2020 Entry ID: 4930235



## STATEMENT OF RIGHTS

BEFORE WE ASK YOU ANY QUESTIONS, IT IS MY DUTY TO ADVISE YOU OF YOUR RIGHTS:

YOU HAVE THE RIGHT TO REMAIN SILENT:
RESPONSE: _____ *Yes Paul Edward; Humphrey* WP UCC-1-207

ANYTHING YOU SAY CAN BE USED AGAINST YOU IN COURT, OR OTHER PROCEEDINGS.
RESPONSE: _____ *Yes Paul Edward; Humphrey* WP UCC-1-207

YOU HAVE THE RIGHT TO CONSULT AN ATTORNEY, BEFORE MAKING ANY STATEMENT OR ANSWERING ANY QUESTIONS, AND YOU MAY HAVE HIM OR HER PRESENT WITH YOU DURING QUESTIONING.
RESPONSE: _____ *Yes Paul Edward; Humphrey* WP UCC-1-207

YOU MAY HAVE AN ATTORNEY APPOINTED BY THE COURT TO REPRESENT YOU, AT NO COST TO YOU, IF YOU CANNOT AFFORD ONE OR OTHERWISE OBTAIN ONE.
RESPONSE: _____ *Yes Paul Edward; Humphrey* WP WCC 0-7207

IF YOU DECIDE TO ANSWER QUESTIONS NOW, WITH OR WITHOUT A LAWYER, YOU STILL HAVE THE RIGHT TO STOP THE QUESTIONING AT ANY TIME, OR TO STOP THE QUESTIONING FOR THE PURPOSE OF CONSULTING A LAWYER.
RESPONSE: _____ *Yes Paul Edward; Humphrey* WP UCC-1-207

EVER....YOU MAY WAIVE THE RIGHT TO ADVICE OF COUNSEL AND YOUR RIGHT TO REMAIN SILENT, AND YOU MAY ANSWER QUESTIONS OR MAKE A STATEMENT WITHOUT CONSULTING A LAWYER, IF YOU SO DESIRE.
RESPONSE: _____ *(e) Paul Edward; Humphrey* WP UCC-1-207

SIGNED: (X) *Paul Edward; Humphrey* WP UCC-7-207

WITNESS: _____

WITNESS: _____

DATE AND TIME: _____ 1-21-97  3:55 pm

Appellate Case: 20-2351     Page: 277     Date Filed: 07/04/2020 Entry ID: 4930235

July 3 2020 p277

**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

**CAPITAL CASE**

**UNITED STATES OF AMERICA**                                      **PLAINTIFF**

**v.**                          **Case No. 4:97-cr-00243-02 KGB**

**DANIEL LEWIS LEE**                                               **DEFENDANT**

**OPINION AND ORDER**

Before the Court is a motion for relief from judgment or order pursuant to Federal Rule of Civil Procedure 60 filed by defendant Daniel Lewis Lee (Dkt. No. 1363).  The government responded in opposition to the motion (Dkt. No. 1367).  Mr. Lee replied (Dkt. No. 1374).  For the following reasons, the Court denies the motion (Dkt. No. 1363).

**I.      Overview**

Mr. Lee is a federal death row inmate.  In a 1999 trial over which the Honorable G. Thomas Eisele presided, Mr. Lee and co-defendant, Chevie Kehoe, were convicted of conspiring to violate and violating the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c)-(d), and of three murders in aid of racketeering in violation of 18 U.S.C. § 1959(a)(2) (Dkt. No. 810). The victims were William Mueller, Nancy Mueller, and Nancy Mueller's minor daughter Sarah Powell.  During the penalty phase, the jury first decided that Mr. Chevie Kehoe should be sentenced to life imprisonment and then, separately, that Mr. Lee should be sentenced to death (Minutes: Jury Trial May 10, 1999 (Chevie Kehoe); Dkt. Nos. 807, 816 (Danny Lee)).  The Eighth Circuit affirmed Mr. Lee's conviction and death sentence.  *United States v. Lee*, 374 F.3d 637 (8th Cir. 2004), *cert. denied*, 545 U.S. 1141 (2005).  Before filing his current motion, Mr. Lee has

Appellate Case: 20-2351   Page: 278   Date Filed: 07/04/2020 Entry ID: 4930235

raised, and courts including this Court have examined, several challenges to his conviction and sentence.

In his current motion, Mr. Lee argues that he is entitled to set aside the prior 28 U.S.C. § 2255 Order (Dkt. No. 1163), pursuant to Federal Rule of Civil Procedure 60.  Mr. Lee contends that, during the § 2255 proceedings, the government engaged in misconduct and made misrepresentations by failing to disclose two pieces of evidence:  (1) the results from a polygraph test administered early in the investigation to a third-party suspect, Paul Humphrey; and (2) the mental instability of government witness, Gloria Kehoe, mother of co-defendant Mr. Chevie Kehoe.  In support of his current motion, Mr. Lee asserts that he made a direct request for the new evidence.  Mr. Lee argues that the government's alleged misconduct and misrepresentations prevented him from raising § 2255 claims based on these two pieces of evidence that his convictions were obtained in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), *Napue v. Illinois*, 360 U.S. 264 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972) (Dkt. No. 1363, at 1, 38-64).  Further, Mr. Lee contends for the first time in his reply that the government's failure to disclose this evidence also affected the Court's adjudication of two raised ineffective assistance of counsel claims (Dkt. No. 1374, at 18-20).

The Court acknowledges that a threshold question in resolving the pending motion is whether Mr. Lee's current motion, although titled a Rule 60 motion, is in fact a successive § 2255 motion within the meaning of 28 U.S.C. § 2255(h)—which would subject his current motion to the requirement of prior authorization by the Court of Appeals for the Eighth Circuit.  28 U.S.C. § 2255(h); 28 U.S.C. § 2244(b)(3)(A).  This Court concludes that, if it is, Mr. Lee has not properly obtained authorization from the Eighth Circuit to file a successive § 2255 motion and that, regardless, Mr. Lee is not entitled to the relief he seeks under Federal Rule of Civil Procedure 60.

July 3 2020 p279
Appellate Case: 20-2351     Page: 279     Date Filed: 07/04/2020 Entry ID: 4930235

For these reasons, the Court denies Mr. Lee's motion and denies the relief he seeks (Dkt. No. 1363).

## II.      Analysis

### A.      Evidence And Alleged Conduct

Two pieces of evidence are at issue in Mr. Lee's current motion.  To support his motion, Mr. Lee attaches the polygraph questions and examiner's opinion from a test administered to Mr. Humphrey in January 1997 by the Arkansas State Police.  According to those papers, Mr. Humphrey's physiological responses indicated that Mr. Humphrey was untruthful in answering questions about his involvement in the Mueller murders, the murders for which Mr. Chevie Kehoe and Mr. Lee were convicted.  The examiner's opinion was that Mr. Humphrey was involved in the Muellers' deaths (Dkt. No. 1363-2).  Mr. Lee maintains that he obtained the polygraph evidence from the Arkansas State Police through an Arkansas Freedom of Information Act request.

Mr. Lee states that, after Mr. Humphrey failed the polygraph exam administered by the Arkansas State Police, the government "took over the investigation of the case from local authorities," "hid[] this report from the defense," permitted Mr. Humphrey to testify that he was not involved in the crimes, and told the jury during closing argument that its investigation did not reveal any evidence connecting Mr. Humphrey to the murders (Dkt. No. 1363, at 6, 15, 49, 50). Mr. Lee refers to the trial transcript (*Id.*, at 15, 50).

Mr. Lee points out that, at trial, defense lawyers asked Mr. Humphrey why he had the Muellers' forged vehicle titles and about his familiarity as a skin diver with Lake Dardanelle, where the Muellers' bodies were discovered (Trial Tr. 6169, 6174-76, 6191-92, 6201).  Mr. Humphrey testified that he and William Mueller had a plan to exchange vehicle titles to take their vehicles "from the state out of its hands" (Trial Tr. 6154-62).  Mr. Humphrey said that, after the

July 3 2020 p280
Appellate Case: 20-2351     Page: 280     Date Filed: 07/04/2020 Entry ID: 4930235

Muellers' disappearance, he convinced their landlord to send him their titles (Trial Tr. 5717, 6153-55, 6161-62, 6176).  On cross-examination, Mr. Humphrey responded that he was not involved in the Muellers' deaths (Trial Tr. 6204).  The government argued in closing that "[t]here's no evidence against Mr. Humphrey." (Trial Tr. 6959-60).

Also in support of his motion, Mr. Lee argues that the government concealed evidence related to Ms. Gloria Kehoe's mental instability.  Mr. Lee maintains that Ms. Gloria Kehoe's son and husband repeatedly told federal case agents about her condition and that this evidence would have "destroyed her credibility." (Dkt. No. 1363, at 6).  As to the government's alleged awareness of Ms. Gloria Kehoe's mental instability, Mr. Lee attaches affidavits from two of her family members, dated November 1 and 3, 2019.  Ms. Gloria Kehoe's son, Cheyne Kehoe, attests that he told federal agents before trial that Ms. Gloria Kehoe was "unstable," "paranoid," and "sees and hears things that aren't there, so much so that my dad took her for psychiatric treatment." (Dkt. No. 1363-3, at 9).  Ms. Gloria Kehoe's husband, Kirby Kehoe, attests that he told federal agents before trial that Ms. Gloria Kehoe "sometimes had panic attacks and sometimes she had what she called dreams where she saw things happening to us, like seeing people (sometimes government agents) assaulting her." (Dkt. No. 1363-4, at 5).

In further support of his motion, Mr. Lee refers to the trial court's denial of a trial motion to compel Ms. Gloria Kehoe to undergo a psychiatric examination, filed by Mr. Chevie Kehoe's lawyer, and a bench conference during Ms. Gloria Kehoe's testimony where Mr. Chevie Kehoe's lawyer asked if there was any outstanding material the government had not provided (Dkt. No. 1363, at 13).  Mr. Lee argues that evidence of Ms. Gloria Kehoe's mental condition was particularly significant because she was a key witness who testified that Mr. Lee confessed to her regarding his involvement in the murders.

4

July 3 2020 p281
Appellate Case: 20-2351   Page: 281   Date Filed: 07/04/2020 Entry ID: 4930235

To understand whether, and if so how, this evidence and related allegations have been addressed previously in this matter, the Court examines this case's relevant procedural history.

### B.       Relevant Procedural History

In a previous motion, Mr. Lee made similar arguments based on two other pieces of evidence (Dkt. No. 1297).  When ruling on that prior motion, Judge J. Leon Holmes denied relief pursuant to Rule 60(b)(3) and (d)(3) (Dkt. No. 1313).[1]  Judge Holmes examined the prior procedural history of Mr. Lee's case to that point, and the Court does not repeat that history here (*Id.*, at 2-5).  Instead, the Court focuses on prior treatment of the evidence or issues related to the two pieces of evidence upon which Mr. Lee bases his current challenge.

In 2006, Mr. Lee filed his first motion to vacate his conviction and sentence under 28 U.S.C. § 2255 (Dkt. No. 1118).  Judge Eisele denied the post-conviction motion without a hearing (Dkt. No. 1163).  *United States v. Lee*, No. 4:97-CR-00243-(2) GTE, 2008 WL 4079315 (E.D. Ark. 2008).   Relevant here, Mr. Lee, as part of an actual-innocence argument, listed "disturbing" issues raising "new questions." (Dkt. No. 1118, at 6).  He included in that list a general, unsupported *Brady* allegation:  "Newly-discovered evidence, or evidence withheld in violation of the government's *Brady* obligations, that others carried out the murders of the Mueller family." (*Id.*, at 7).

Mr. Lee added this footnote:

> With regard to the Government's constitutional *Brady* obligations, Movant's counsel requests that the Government review its files and the files of its investigating agencies for any information favorable to the defense bearing on guilt or punishment, including—but not limited to—any evidence that other members of white supremacist or Christian Identity groups, or other like groups, were responsible for the murders of the Mueller family or otherwise played a role in the crimes charged in, or related to, this case.  Should additional *Brady* evidence be

---

[1]  Judge G. Thomas Eisele presided over this case when the indictment was handed down in 1997 (Dkt. No. 1).  In 2012, the case was reassigned to Judge J. Leon Holmes (Dkt. No. 1212). In 2019, the case was reassigned to the undersigned (Dkt. Nos. 1325; 1326).

July 3 2020 p282
Appellate Case: 20-2351     Page: 282     Date Filed: 07/04/2020 Entry ID: 4930235

discovered, Movant will amend the petition and seek relief appropriate to the nature of the material newly-disclosed or uncovered.

(*Id.*, at 7 n.3 (internal citations omitted)).

The government did not respond to the *Brady* footnote. The government responded to Mr. Lee's actual-innocence argument by noting his § 2255 motion consisted of "barebones claim allegations without discussion of supporting legal principles or, for that matter, much factual context." (Dkt. No. 1126, at 26 n.13). The government argued that, even if a freestanding claim of actual innocence was recognized, the guilt evidence was overwhelming and that Mr. Lee failed to cast doubt on his conviction (*Id.*, at 30). Judge Eisele did not specifically address Mr. Lee's actual-innocence arguments or general *Brady* allegation. He did track the evidence supporting the conviction and found that the jury's guilty verdict was "well-founded." (Dkt. No. 1163, at 5-18). *Lee*, 2008 WL 4079315, at *2-7.

In an ineffective assistance of counsel claim also potentially relevant to the pending motion, Mr. Lee argued that his trial lawyers should have objected to the government's pretrial motion seeking to bar him from access to discovery (Dkt. No. 1118, at 18-19). The government responded that Mr. Lee "distort[ed] what occurred at trial." (Dkt. No. 1126, at 45). The government explained that it turned over a "huge amount of 'discovery' materials" before trial, and Mr. Lee "sent copies of [some] material to his associates in an effort to have witnesses harmed." (*Id.*, at 45, 45 n.16). The government maintained that "[t]he vast majority of the material [was] *Jencks* material" and only a "small amount of the material was Rule 16 discovery and *Brady* material." (*Id.,* at 45 n. 16). The government challenged the ineffectiveness claim on the ground that, because "[a]s practically all the materials were *Jencks* materials, had Lee's trial attorney objected to any limitations on providing Lee copies, the government could have provided *Jencks* material at the time the statute directs, *i.e.,* after the witness completed his direct examination,"

6

and "[t]his would have crippled the ability of defense attorneys to timely prepare for trial." (*Id.*, at 45). Judge Eisele denied the ineffectiveness claim, finding that there was no dispute that Mr. Lee used the *Jencks* materials in a threatening manner and that, if Mr. Lee's lawyers had objected, the government would have stopped providing the *Jencks* materials in advance (Dkt. No. 1163, at 43-45). *Lee*, 2008 WL 4079315, at *21-22.

Also in Mr. Lee's § 2255 motion, he raised two other possibly relevant ineffective assistance of counsel claims: (1) trial lawyers failed to call witnesses in support of a third-party culpability defense, including three individuals who Mr. Lee maintains could have testified about Mr. Humphrey's possible involvement in the murders: (a) David Hill, who Mr. Lee contends would have testified that he saw Mr. Humphrey and another man throwing something off the bridge over the Illinois Bayou, where the Muellers' bodies were found; (b) Glen Hinson, who Mr. Lee argues would have testified that, after Mr. Humphrey obtained the Muellers' vehicle title, he was nervous and scared and that Nancy Mueller was frightened of Mr. Humphrey; and (c) Eldon King, who Mr. Lee represents would have testified that Mr. Humphrey began acting strangely after the Muellers disappeared (Dkt. No. 1118, at 15); and (2) trial lawyers were remiss in not asking Ms. Gloria Kehoe on cross-examination about her interview statement that Mr. Chevie Kehoe told her that he and Mr. Lee had remained in Arkansas after the murder, given that Mr. Lee asserts that, if Mr. Chevie Kehoe and he had stayed over in Arkansas, they could not have returned to Washington per the timeline proposed by the government (*Id.*, at 13).

The government responded to Mr. Lee's claims by arguing that Ms. Gloria Kehoe did not make any statement about Mr. Chevie Kehoe and Mr. Lee remaining in Arkansas (Dkt. No. 1126, at 37). The government argued that Mr. Lee's lawyer was aware of Mr. Hill's potential testimony and made a reasonable decision that testimony would not be helpful. The government also argued

July 3 2020 p284
Appellate Case: 20-2351     Page: 284     Date Filed: 07/04/2020 Entry ID: 4930235

that Mr. Hinson's testimony would not have benefitted Mr. Lee, given the jury's opportunity to consider Mr. Humphrey's testimony.  The government also argued that Nancy Mueller's alleged statement about being fearful of Mr. Humphrey was inadmissible.  Further, the government argued that Mr. King's testimony would have been that Mr. Humphrey "began acting strangely long before the Muellers disappeared," and that Mr. Lee "fail[ed] to explain how this evidence could possibly have benefitted him" (*Id.*, at 38-39).

The Court determined that the trial lawyers' decision not to call Mr. Hill as a witness was a "legitimate trial strategy" and that "there [wa]s no indication that such testimony would have altered the outcome of the trial." (Dkt. No. 1163, at 26).  *Lee*, 2008 WL 4079315, at *12.  The Court found that the ineffectiveness claim stemming from the failure to call Mr. Hinson and Mr. King as witnesses did not satisfy *Strickland* performance or prejudice.  "Petitioner's trial counsel attempted, but failed, to establish a link between Humphrey and the death of the Muellers. Humphrey was questioned in detail about the circumstances under which he acquired the title to William Mueller's vehicle and the fact that he attempted to have the title transferred to himself." (Dkt. No. 1163, at 26-27).  *Lee*, 2008 WL 4079315, at *12.

To determine what Ms. Gloria Kehoe said in the pretrial interview about Mr. Chevie Kehoe and Mr. Lee staying in Arkansas, the Court ordered the defendants to produce a transcript of the interview (Dkt. No. 1154).  The Court quoted the interview excerpt in the Order (Dkt. No. 1163, at 37).  Ms. Gloria Kehoe stated that Mr. Chevie Kehoe told her that, after murdering the Muellers, he and Mr. Lee "rode around" to see "how the media would handle it." (*Id.*).  When pressed, Ms. Gloria Kehoe was less sure:  "That's why I'm, that's what I believe he said," and "I'm not sure if it was that area or the outside of that area.  I can't be quoted on that." (*Id.*).  Then, she testified:

> AD (Deputy Sheriff):  Did he tell you where he and Danny went right after they disposed of the bodies?  Where did they go?

GK:  You know, I was in shock by then.

AD:  Mm mh (Affirmative).

GK:  I'll be very honest with you.  I believe they just headed straight back to Spokane.  I just remember him saying that they hung around for a few days.  That could have been at Danny's mother's house [in Oklahoma] and then they came back to Spokane.

(*Id.* at 38).

The Court determined:

The Government replies that Gloria[2] was momentarily confused about the Spokane City Hall bombing and the Mueller murders, and that the follow-up questions establish that she was aware of this confusion.  Additionally, she made it clear that she was unsure about Kehoe's remarks, and ultimately stated that she believed "they just headed straight back to Spokane."  Thus, it appears to the Court that even if trial counsel had questioned Gloria about the statement, she would have been easily rehabilitated by the Government.

Finally, even if it could be said that counsel's cross-examination of Gloria was constitutionally deficient, Petitioner suffered no prejudice because it would not have altered the result.  Defense counsel effectively used what they had to work with in an effort to create reasonable doubt.  They were, of course, limited by the facts.  Admittedly, Gloria was an important Government witness.  She was a difficult witness to cross-examine because of the fact that she testified convincingly, consistently with her prior statements, and against her own son [Chevie Kehoe].

(*Id.*).

Judge Eisele also denied Mr. Lee's Federal Rule of Civil Procedure 59(e) motion.  *United States v. Lee*, 2010 WL 5347174 (E.D. Ark. 2010).  The Eighth Circuit affirmed the denial of the § 2255 petition and the denial of the Rule 59(e) motion.  *United States v. Lee*, 715 F.3d 215 (8th Cir. 2013).

---

[2]  The Court recognizes that the government alleged in the § 2255 responsive brief that Mr. Chevie Kehoe and Mr. Lee told Ms. Gloria Kehoe that they lingered after bombing the Spokane City Hall, not after murdering the Muellers; the government's argument therefore was that Mr. Lee, not Ms. Gloria Kehoe, was confusing the Spokane City Hall incident with the Mueller murders (Dkt. No. 1126, at 37).

9

In September 2018, Mr. Lee filed a motion to vacate his conviction and sentence under § 2255, or, in the alternative, for relief under Federal Rule of Civil Procedure 60 (Dkt. No. 1297). In this § 2255 motion, Mr. Lee first argued that newly discovered evidence demonstrated *Brady* and *Napue-Giglio* violations at trial. Government witness James Wanker testified during the guilt phase that Mr. Lee confessed to him that Mr. Lee committed the murders. Mr. Lee argued that his conviction should be vacated because new evidence demonstrated that Mr. Wanker told the government before trial that he did not believe Mr. Lee's confession. The government introduced penalty-phase evidence that Mr. Lee was convicted of robbery; the government also argued that Mr. Lee committed murder in connection with the robbery but that Oklahoma prosecutors gave him a "gift" by not charging him with murder. Mr. Lee argued that his sentence should be vacated because the government suppressed an Oklahoma state-court document reflecting that Mr. Lee was not charged with murder due to a lack of evidence. Judge Holmes determined the *Brady* and *Napue-Giglio* claims constituted a second or successive habeas application requiring authorization from the Eighth Circuit.

Mr. Lee alternatively asked the Court to consider his application pursuant to Rule 60 and to reopen his § 2255 proceedings, arguing that the government violated its duties under *Brady* and *Napue-Giglio* to disclose that same evidence during those proceedings. Mr. Lee argued that the government made misrepresentations in its habeas responsive brief. Judge Holmes found that, "[a]ssuming that Lee ha[d] properly asserted a Rule 60 motion as opposed to a second or successive habeas petition, he [wa]s not entitled to relief under either Rule 60(b)(3) or (d)(3)." (Dkt. No. 1313, at 18). Relevant here, the Court considered Mr. Lee's arguments that: (1) the government made a misrepresentation in Footnote 16 of the government's § 2255 responsive brief by stating "[a] huge amount of 'discovery' materials were provided" (*Id.*, at 17-18 (quoting Dkt. No. 1126, at 45

10

n.16)); and (2) the general *Brady* allegation in the § 2255 petition would have been viable if the government had disclosed supporting material.

In his analysis, Judge Holmes recognized that Footnote 16 was not a response to a discovery request:

> Lee refers to Footnote 16 as being part of the Government's response to his general, unsupported *Brady* allegation.  Document #1118 at 7.  Footnote 16, however, was in the response to Lee's ineffectiveness claim challenging his trial lawyers' failure to oppose the Government's motion seeking restrictions on his personal discovery access. Document #1126 at 45, n. 16.

(Dkt. No. 1313, at 18 n.5).

Judge Holmes determined that Mr. Lee's request for relief under Rule 60(b)(3) was untimely and, alternatively, that Mr. Lee had not demonstrated the "exceptional circumstances" required for Rule 60 relief (*Id.*, at 18-19 (citing *Atkinson v. Prudential Prop. Co., Inc.,* 43 F.3d 367, 371 (8th Cir. 1994)).   Specifically, Judge Holmes explained that:

> For Rule 60(b)(3) relief, Lee must show by clear and convincing evidence that the Government "engaged in fraud or other misconduct and that this conduct prevented [him] from fully and fairly presenting his case."  *Cook v. City of Bella Villa,* 582 F.3d 840, 855 (8th Cir. 2009) (quotations omitted).  Lee has not met this burden. While failure to produce evidence requested in discovery may under some circumstances be grounds for vacating a judgment, the moving party must show that the failure was due to misconduct by the party that should have produced the evidence.  *Atkinson*, 43 F.3d at 373.  Lee has not alleged facts to show that the omission of any evidence during his § 2255 proceeding was due to the Government's misconduct or that the Government intentionally misrepresented any facts.  Nor has he demonstrated that any failure to disclose Wanker's opinions or the Oklahoma judicial finding prevented him from fully and fairly litigating his initial § 2255 claim.  "This is not a case in which [the Government] withheld information that they alone possessed."  *Id.*  Lee could have interviewed Wanker before filing his first habeas petition; and the Oklahoma court record upon which he now relies is public information.

(Dkt. No. 1313, at 19).

Judge Holmes also found that Mr. Lee's allegations did not meet the standard for fraud on the court under Rule 60(d)(3), determining that:

11

> Fraud on the court is narrowly defined as "fraud which is directed to the judicial machinery itself and is not fraud between the parties or fraudulent documents, false statements or perjury." *Superior Seafoods, Inc. v. Tyson Foods, Inc.*, 620 F.3d 873, 878 (8th Cir. 2010) (quoting *United States v. Smiley,* 553 F.3d 1137, 1144–45 (8th Cir. 2009) (quotations omitted)). "A finding of fraud on the court is justified only by the most egregious misconduct directed to the court itself, such as bribery of a judge or jury or fabrication of evidence by counsel." *Greiner v. City of Champlin*, 152 F.3d 787, 789 (8th Cir. 1998) (quotations omitted). "[I]t is necessary to show a deliberately planned scheme designed to improperly influence the court in its decision." *Heim v. Comm'r of Internal Revenue*, 872 F.2d 245, 249 (8th Cir. 1989). Lee's allegations do not clear this high bar. *See Tyler v. Purkett*, 413 F.3d 696, 700–01 n.7 (8th Cir. 2005) ("Claims that a party did not disclose to a court certain facts allegedly pertinent to the matter before it, however, do not normally constitute fraud on the court.").

 (Dkt. No. 1313, at 19-20).

Judge Holmes denied a certificate of appealability. The Eighth Circuit also denied Mr. Lee's application for a certificate (Dkt. No. 1351). *Lee v. United States*, No. 19-2432 (8th Cir. Nov. 4, 2019).[3] Mr. Lee's execution currently is set for July 13, 2020.

---

[3] With respect to the procedural history of Mr. Lee's case, the Court also recognizes that, in July 2019, Mr. Lee's execution was scheduled for December 9, 2019. In September 2019, Mr. Lee filed a habeas petition under 28 U.S.C. § 2241—based on claimed new evidence related to the Oklahoma murder charge—in the Southern District of Indiana, where Mr. Lee is confined. That district court stayed Mr. Lee's execution to allow time to consider the petition. The Seventh Circuit vacated the stay. *Lee v. T.J. Watson*, No. 19-3399 (7th Cir. 2019). The district court thereafter denied the habeas petition, finding that Mr. Lee's claims were barred by the Savings Clause, 28 U.S.C. § 2255(e). *Lee v. Warden USP Terre Haute et al*, No. 2:19-cv-468, 2020 WL 1317449 (S.D. Ind. Mar. 20, 2020).

Mr. Lee filed in the Eastern District of Arkansas a motion for relief from the Order denying his Federal Rule of Civil Procedure 59(e) motion (Dkt. No. 1189) and a motion to stay his execution (Dkt. Nos. 1352, 1353). He argued that his Rule 59(e) motion should not have been characterized as a second or successive habeas petition requiring authorization from the Circuit. This Court granted the stay (Dkt. No. 1356). The Eighth Circuit vacated the stay on June 1, 2020. *United States v. Lee*, No. 19-3618 (8th Cir. June 1, 2020). Mr. Lee's motion for relief from judgment remains pending and will be addressed by this Court in a separate Order (Dkt. No. 1352).

On December 4, 2019, Mr. Lee filed an original proceeding in the Eighth Circuit, seeking permission to file a successive habeas petition. He alleged a *Brady* violation claiming that witnesses told law enforcement officers during the investigation of the case that there was no "enterprise," an element of the federal crime for which Mr. Chevie Kehoe and Mr. Lee were convicted. The Eighth Circuit summarily denied the motion. *Lee v. United States*, No. 19-3576 (8th Cir. Jan. 7, 2020)*.* Mr. Lee also has or had legal proceedings pending in the District of Columbia regarding the method of execution, *see In re Fed. Bureau of Prisons' Execution Protocol*

July 3 2020 p289
Appellate Case: 20-2351   Page: 289   Date Filed: 07/04/2020 Entry ID: 4930235

### C.    Successive § 2255 Motion

The Court acknowledges that a preliminary issue is whether Mr. Lee's current Rule 60 motion is a second or successive § 2255 petition requiring authorization from the Eighth Circuit. 28 U.S.C. § 2255(h); 28 U.S.C. § 2244(b)(3)(A). Mr. Lee's motion must be treated as a second or successive habeas petition if it advances a claim for relief. *Gonzales v. Crosby*, 545 U.S. 524, 530-32 (2005). A motion raises a "claim" when it "seeks to add a new ground for relief" or "attacks the federal court's previous resolution of the claim *on the merits*." *Id.* at 532 (emphasis in original). A motion, however, is properly brought under Rule 60 when it "attacks, not the substance of the federal court's resolution of a claim on the merits, but some defect in the integrity of the federal habeas proceedings." *Id.* (footnote omitted).

This Court concludes that, if Mr. Lee's current motion is considered a successive § 2255 motion, Mr. Lee has not properly obtained authorization from the Eighth Circuit to file a successive § 2255 motion and that, regardless, for reasons explained in this Order Mr. Lee is not entitled to the relief he seeks under Federal Rule of Civil Procedure 60.

### D.    Rule 60 Claims

To set aside the prior § 2255 Order, Mr. Lee must demonstrate:  (1) that his motion is attacking the § 2255 proceeding, not raising a *Brady* or *Napue-Giglio* claim, and (2) that reopening the § 2255 proceeding is warranted based on Rule 60 requirements.

#### 1.    Allegations Of Misconduct Or Misrepresentation

In support of his current motion, Mr. Lee alleges misconduct or misrepresentation in the § 2255 proceedings. The Court examines his allegations.

---

*Cases*, No. 19-5322 (D.C. Cir. Apr. 7, 2020), and the adequacy of his clemency proceedings, *see Lee v. Barr*, No. 1:19-cv-3611 (D.D.C.).

Relying on Footnote 3 in his § 2255 motion, Mr. Lee argues that he made a "formal request" during his § 2255 proceedings that the government turn over any *Brady* material.  He points to the general *Brady* allegation in his "Case for Actual Innocence" and the footnote statement that he reserved the right to amend his motion with more specific *Brady* claims based on any information the government produced.  Mr. Lee argues that, based on that "demand" in Footnote 3, the government was obligated to disclose evidence of Mr. Humphrey's polygraph test results and Ms. Gloria Kehoe's mental condition.  He contends that, if the government had done so, he would have amended his petition and that this Court could have adjudicated the related *Brady* claims (Dkt. No. 1363, at 7).  Mr. Lee also argues for the first time in his reply that, had the Government disclosed this evidence, the Court may have resolved differently two raised ineffective assistance of counsel claims.  Mr. Lee asserts that the government instead "misled" his lawyers and the Court "into believing that it had already fully complied with its *Brady* obligations at the time of trial, and it made no additional disclosures." (*Id.*).  He points to the government's Footnote 16 in response to the ineffective assistance of counsel claim related to discovery:  "The Government did not come forward with any *Brady* material but simply noted that it had previously provided a 'huge amount' of discovery to trial counsel." (*Id.*, at 16 (quoting Dkt. No. 1126, at 45 n.6)).

Mr. Lee also refers to the government's representations during Mr. Chevie Kehoe's § 2255 proceeding, which was on the same docket as Mr. Lee's.  Mr. Chevie Kehoe argued that his trial lawyers were ineffective for failing to investigate adequately third parties, including Mr. Humphrey, and that the government improperly withheld related evidence (Dkt. No. 1363, at 16-17 (citing Dkt. No. 1039, at 40 (§ 2255 petition); Dkt. No. 1067-2 at 13-14, 18-19 (Amended § 2255 petition pt. 2); Dkt. No. 1067-3 at 2 (Amended § 2255 petition, pt. 3))).  In responding to Mr.

July 3 2020 p291
Appellate Case: 20-2351   Page: 291   Date Filed: 07/04/2020 Entry ID: 4930235

Chevie Kehoe's ineffective assistance of counsel claim, the government stated that "[a]ll documents relating to Mr. Humphrey were provided to trial counsel." (Dkt. No. 1363, at 17 (citing Dkt. No. 1087, at 32)). The government also stated that, "[d]espite trial counsel's best efforts, no tie was ever made between Paul Humphrey and the named individuals [who were alternate suspects] which could establish that Paul Humphrey or one of the named individuals was in fact responsible for the Mueller deaths. In his argument Movant identifies no connection. Even should the Court review the issue, Movant's allegations are meritless on their face." (Dkt. No. 1363, at 17 (quoting Dkt. No. 1087, at 32-33)). In Mr. Lee's pending Rule 60 motion, he argues that "[a]ny such evidence disclosed to Mr. Kehoe could also have benefitted Mr. Lee, but the Government asserted there was none." (Dkt. No. 1363, at 17).

Mr. Lee correctly notes that the Court denied his and Mr. Chevie Kehoe's § 2255 petitions on the same day, finding in both cases that counsel had ample opportunity to question Mr. Humphrey and were unable to establish a link between Mr. Humphrey and the death of the Muellers (Dkt. No. 1374, at 18 (citing *Lee*, 2008 WL 4079315, at *12, and *United States v. Kehoe*, No. 4:97-CR-00243(1) GTE, 2008 WL 4079316, at *19 (E.D. Ark. Aug. 28, 2008)).

### 2.     Rule 60(b)(3)

Mr. Lee first seeks to set aside the § 2255 Order based on Rule 60(b)(3), which provides relief from judgment for "fraud . . . , misrepresentation, or misconduct by an opposing party." Rule 60(b) provides "extraordinary relief" and "may be granted only upon an adequate showing of exceptional circumstances." *Atkinson*, 43 F.3d at 371 (quotations omitted). For relief pursuant to Rule 60(b)(3), Mr. Lee must demonstrate with clear and convincing evidence that the government "engaged in fraud or other misconduct and that this conduct prevented [him] from fully and fairly presenting his case." *Cook*, 582 F.3d at 855. "While failure to produce evidence requested in

July 3 2020 p292
Appellate Case: 20-2351     Page: 292     Date Filed: 07/04/2020 Entry ID: 4930235

discovery may under some circumstances be grounds for vacating judgment," Mr. Lee must submit evidence that the failure to do so was due to the government's misconduct. *Atkinson*, 43 F.3d at 373.

At the outset, the government argues that Mr. Lee's request for relief is untimely under the one-year limitations period. Federal Rule of Civil Procedure Rule 60(c)(1) requires that a Rule 60(b)(3) motion must be filed no more than a year from the order or judgment that it seeks to set aside; Judge Holmes found no authority to extend that deadline (Dkt. No. 1313, at 18-19). The parties dispute whether equitable tolling applies. Regardless of whether equitable tolling applies, for the following reasons, Mr. Lee is not entitled to relief on the merits of his Rule 60(b)(3) claim.

Mr. Lee is correct that other Circuits—including the First, Fourth, Fifth, Seventh, and Ninth Circuits—recognize an unintentional misrepresentation as a basis for Rule 60(b)(3) relief. *Scott v. United States,* 81 F. Supp. 3d 1326, 1339 (M.D. Fla. 2015), *aff'd*, 890 F.3d 1239 (11th Cir. 2018) (citing Circuit opinions). The Eleventh and Federal Circuits have held the same. *United States v. One Douglas A-26B Aircraft,* 662 F.2d 1372, 1374 n.6 (11th Cir. 1981); *Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care, Inc.*, 818 F.3d 1320, 1328 (Fed. Cir. 2016). The Eighth Circuit, however, requires Mr. Lee to demonstrate that any misrepresentation was intentional and that any fraud was deliberate. *Dukes v. City of Minneapolis*, 339 Fed. App'x 665, 668 (8th Cir. 2009) (per curiam); *Smith v. Clarke*, 458 F.3d 720, 724-25 (8th Cir. 2006). The Sixth Circuit agrees. *Jordan v. Paccar, Inc.*, 97 F.3d 1452, at *6-7 (6th Cir. 1996) (per curiam) (unpublished opinion).

In support of his motion, Mr. Lee cites *In re Pickard,* 681 F.3d 1201 (10th Cir. 2012); *United States v. Williams*, 753 Fed. App'x 176 (4th Cir. 2019); and *Scott*, 81 F. Supp. 3d at 1326. In each of those cases, the courts granted Rule 60(b)(3) relief after finding that the government

16

Appellate Case: 20-2351   Page: 293   Date Filed: 07/04/2020   Entry ID: 4930235

made false statements during § 2255 proceedings that directly impacted adjudication of a raised claim.  Mr. Lee compares the misrepresentations in those underlying § 2255 proceedings to his Footnote 3 "demand" for *Brady* material to support his general allegation coupled with the government's Footnote 16 "response" and alternatively the government's silence as to his "demand."  Mr. Lee also relies on the government's affirmative representation in Mr. Chevie Kehoe's § 2255 proceedings that "[a]ll documents relating to Mr. Humphrey were provided to trial counsel." (Dkt. No. 1374, at 11).

In his Rule 60(b) motion filed in September 2018 (Dkt. No. 1297), Mr. Lee argued as he does here that the government's non-disclosure of *Brady* material created a defect in the integrity of the § 2255 proceedings based on his general *Brady* allegation.  As discussed, Judge Holmes, citing *Atkinson,* previously found that Mr. Lee was not entitled to Rule 60(b)(3) relief because Mr. Lee had not "alleged facts to show that the omission of any evidence during his § 2255 proceeding was due to the Government's misconduct or that the Government intentionally misrepresented any facts." (Dkt. No. 1313, at 19).  Judge Holmes also found that Mr. Lee failed to demonstrate that any failure to disclose evidence prevented him from fully and fairly litigating his claims because the allegedly suppressed evidence was available by other means (*Id.*).

Under the doctrine of the law of the case, "when a court decides a rule of law, that decision should govern the same issues in subsequent stages in the same case." *Unigroup, Inc. v. Winokur*, 45 F.3d 1208, 1211 (8th Cir. 1995) (citations omitted).  The doctrine "precludes litigation of matters that are decided implicitly, as well as those decided explicitly." *Id.*  District court decisions that "either have not been appealed or have been appealed and affirmed[] are the law of the case and need not be revisited." *Liddell by Liddell v. Bd. Of Educ. Of the City of St. Louis*, 121 F.3d 1201, 1216 (8th Cir. 1997).  Mr. Lee argues that the same factual and legal issues were not before

17

the Court in the prior proceeding; the Court rejects his argument with respect to two issues relevant to resolving his currently pending motion.

This Court determines that the law of the case sets out the legal framework for this Court's review of Mr. Lee's argument under Rule 60(b)(3) regarding, at a minimum, two issues relevant to Mr. Lee's current pending motion: (1) the government's Footnote 16 was not in response to Mr. Lee's general *Brady* allegation, and (2) for Rule 60(b)(3) relief, Mr. Lee must allege facts demonstrating that the government engaged in misconduct or intentional misrepresentation of the facts (Dkt. No. 1313, at 18 n.5, 19). Applying this legal framework, the Court determines that Mr. Lee is not entitled to relief pursuant to Rule 60(b)(3). Mr. Lee does not allege facts demonstrating that the government engaged in misconduct or intentionally misrepresented facts during his § 2255 proceedings related to Mr. Humphrey's polygraph test or Ms. Gloria Kehoe's mental health.

The Court acknowledges that Mr. Lee argues that whether the "prosecution" possessed the new evidence remains a factual determination that could be decided at a hearing. He notes that, in *Atkinson,* the respondents submitted unrebutted affidavits that they did not possess the undisclosed evidence and were not aware of its existence. Here, the government did not make any representations in Mr. Lee's § 2255 proceedings related to the purportedly new evidence; Mr. Lee does not offer any evidence that the omission of any evidence was due to the government's misconduct or that the government intentionally misrepresented any facts. Also, the Court determines that the alleged omission of any evidence did not prevent Mr. Lee from fully and fairly litigating his § 2255 petition.

Mr. Lee argues for the first time in his reply that the government's withholding of evidence also affected adjudication of his ineffective assistance of counsel clam, alleging a failure to call available witnesses in support of the third-party culpability defense. Mr. Lee argues the denial of

Appellate Case: 20-2351   Page: 295   Date Filed: 07/04/2020 Entry ID: 4930235

this ineffective assistance of counsel claim was based on the government's misrepresentation in Mr. Chevie Kehoe's § 2255 case that no materials concerning Mr. Humphrey had been withheld and on the non-disclosure of the polygraph report.  Mr. Lee points to the Court's finding in his § 2255 proceeding that no evidence established a "link" between Mr. Humphrey and the murders (Dkt. No. 1374, at 18-19).  Mr. Lee's arguments on this point fail under the law of the case and Eighth Circuit precedent; Mr. Lee does not offer any evidence that the government engaged in misconduct or made intentional misrepresentations in his § 2255 proceeding.

Mr. Lee also argues for the first time in his reply that new evidence of Ms. Gloria Kehoe's mental condition would have altered the Court's evaluation of another § 2255 ineffective assistance of counsel claim:  trial counsel failed to ask Ms. Gloria Kehoe on cross-examination about her statement that Mr. Chevie Kehoe and Mr. Lee lingered in Arkansas after the Mueller murders (Dkt. No. 1374, at 19-20).  Mr. Lee's arguments fail under the law of the case and Eighth Circuit precedent; he does not demonstrate that the government engaged in any misconduct or made intentional misrepresentations in his § 2255 proceeding.  Further, in the § 2255 proceeding, the Court found that Mr. Lee's lawyers were not ineffective partly because, even if they had explored this point, the government could have "rehabilitated" Ms. Gloria Kehoe on re-direct examination by, in part, highlighting Ms. Gloria Kehoe's confusion about whether Mr. Chevie Kehoe and Mr. Lee lingered in Arkansas.

For these reasons, the Court determines Mr. Lee is not entitled to relief under Rule 60(b)(3).

### 3.    Rule 60(b)(6)

Mr. Lee also contends that relief is warranted pursuant to Rule 60(b)(6), which permits a court to reopen a judgment for "any other reason that justifies relief."  Fed. R. Civ. P. 60(b)(6). "Extraordinary circumstances" are required for relief pursuant to this "catchall category," and

July 3 2020 p296

Appellate Case: 20-2351     Page: 296     Date Filed: 07/04/2020   Entry ID: 4930235

"[s]uch circumstances will rarely occur in the habeas context." *Buck v. Davis*, 137 S. Ct. 759, 772 (2017) (quotations and citation omitted).  To determine whether the requisite circumstances exist, a court may consider a wide range of factors, including, "in an appropriate case, 'the risk of injustice to the parties' and 'the risk of undermining the public's confidence in the judicial process.'" *Id.*  (quoting *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863-64 (1988)).  Mr. Lee contends that justice requires reopening the § 2255 Order because his *Brady* claims were never examined due to the government's alleged misconduct.  Mr. Lee argues that the continued concealment of evidence constitutes "extraordinary circumstances."

Again, the government challenges the timeliness of Mr. Lee's seeking relief pursuant to Rule 60(b)(6) and whether Rule 60(b)(6) relief is available maintaining that Mr. Lee's motion is in effect a Rule 60(b)(3) motion.  This Court concludes, based on the analysis in this Order, that Mr. Lee has not demonstrated the extraordinary circumstances required for relief.  He has not alleged any facts to support his allegation that the government engaged in misconduct during the § 2255 proceeding.

For these reasons, the Court determines that Mr. Lee is not entitled to relief under Rule 60(b)(6).

### 4.      Rule 60(d)(1)

Mr. Lee next argues that he is entitled to relief pursuant to Rule 60(d)(1) based on the government's alleged misconduct and what he claims is a pattern of *Brady* violations.  That Rule provides that a court retains the power to "entertain an independent action to relieve a party from a judgment, order, or proceeding."  Fed. R. Civ. P. 60(d)(1).  Such relief sounds in equity and is "available only to prevent a grave miscarriage of justice." *United States v. Beggerly*, 524 U.S. 38, 47 (1998).  A party may obtain relief through an independent action if a judgment against the party

20

was obtained fraudulently with forged evidence, but not if there was merely "a failure to furnish relevant information that would at best form the basis for a Rule 60(b)(3) motion." *Id.* at 46. The parties dispute whether a demonstration of actual innocence is required and whether, under these circumstances, Mr. Lee's allegations are even cognizable under Rule 60(b)(3). Regardless of whether a demonstration of actual innocence is required or Mr. Lee's allegations are cognizable under Rule 60(b)(3), the Court determines that Mr. Lee has not alleged or presented evidence sufficient to support his argument that the government has engaged in a "pattern" of misconduct and continues to do so based on this Court's review of Mr. Lee's filings and the record in this case.

For these reasons, the Court determines that Mr. Lee is not entitled to relief under Rule 60(d)(1).

### 5.     Rule 60(d)(3)

Mr. Lee also seeks relief pursuant to Rule 60(d)(3) because he maintains that the government's misrepresentation amounted to "fraud on the court." Judge Holmes found Mr. Lee's prior allegations of misrepresentation did not amount to fraud on the court based on controlling precedent:

> Fraud on the court is narrowly defined as "fraud which is directed to the judicial machinery itself and is not fraud between the parties or fraudulent documents, false statements or perjury." *Superior Seafoods, Inc. v. Tyson Foods, Inc.*, 620 F.3d 873, 878 (8th Cir. 2010) (quoting *United States v. Smiley*, 553 F.3d 1137, 1144–45 (8th Cir. 2009) (quotations omitted)). "A finding of fraud on the court is justified only by the most egregious misconduct directed to the court itself, such as bribery of a judge or jury or fabrication of evidence by counsel." *Greiner v. City of Champlin*, 152 F.3d 787, 789 (8th Cir. 1989). Lee's allegations do not clear this high bar. *See Tyler v. Purkett*, 413 F.3d 696, 700–01 (8th Cir. 2005) ("Claims that a party did not disclose to a court certain facts allegedly pertinent to the matter before it, however, do not normally constitute fraud on the court.").

(Dkt. No. 1313, at 19-20).

July 3 2020 p298
Appellate Case: 20-2351   Page: 298   Date Filed: 07/04/2020 Entry ID: 4930235

In his reply, Mr. Lee argues that Judge Holmes's Order is not the law of the case because, in that proceeding, neither the government's representations during Mr. Chevie Kehoe's § 2255 case nor the alleged pattern of misconduct were at issue.  Whether controlled by law of the case or not, Mr. Lee has not sufficiently alleged or demonstrated fraud on the court in his § 2255 proceeding based on this Court's review of Mr. Lee's filings and the record in this case.

For these reasons, the Court determines that Mr. Lee is not entitled to relief under Rule 60(d)(3).

### III.    Conclusion

Mr. Lee's claims in his present motion constitute a successive habeas petition under 28 U.S.C. § 2255 for which Eighth Circuit authorization is required.  Mr. Lee is not entitled to relief under Federal Rule of Civil Procedure 60.   Therefore, Mr. Lee's motion is denied without prejudice.  No certificate of appealability will be issued.

It is so ordered this 2nd day of July, 2020.

_____
Kristine G. Baker
United States District Judge

July 3 2020 p299
Appellate Case: 20-2351   Page: 299   Date Filed: 07/04/2020 Entry ID: 4930235

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**DANIEL LEWIS LEE,**
                    **Movant**

                                                  **Criminal Case No. 4:97-CR-00243-KGB-2**

**v.**                                            **CAPITAL CASE**


**UNITED STATES OF AMERICA**
                    **Respondent**


**NOTICE OF APPEAL**

PLEASE TAKE NOTICE that Movant, Daniel Lee, by his undersigned counsel, hereby appeals to the United States Court of Appeals for the Eighth Circuit from the Opinion and Order of the District Court, Hon. Kristine G. Baker, United States District Judge, denying Movant's *Motion for Relief from Judgment or Order Pursuant to Fed. R. Civ. P. 60*, entered on July 2, 2020 (Dkt. No. 1403).

Respectfully submitted this 3rd day of July, 2020.


MORRIS H. MOON                          GEORGE G. KOUROS
Bar Number 24032750 (TX)                Bar Number 420813 (CT)
Attorney for Daniel Lee                 Attorney for Daniel Lee
Assistant Federal Public Defender       Assistant Federal Public Defender
Federal Capital Habeas Project          Federal Capital Habeas Project
6411 Ivy Lane, Suite 710                6411 Ivy Lane, Suite 710
Greenbelt, MD 20770                     Greenbelt, MD 20770
Telephone: (713) 880-3556               Telephone: (301) 821-0855
Email: Morris_Moon@fd.org               Email: George_Kouros@fd.org

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Eastern District of Arkansas using the CM/ECF system on July 3, 2020. This motion was served via this court's CM/ECF electronic case filing system upon:

JOHN M. PELLETTIERI
Attorney, U.S. Department of Justice
Criminal Division, Appellate Section
950 Pennsylvania Ave., N.W., Rm. 1264
Washington, D.C. 20530
(202) 307-3766
john.pellettieri@usdoj.gov

MICHAEL GORDON
JONATHAN D. ROSS
SHANNON S. SMITH
U. S. Attorney's Office
Eastern District of Arkansas
Post Office Box 1229
Little Rock, AR 72203-1229
(501) 340-2600
michael.gordon@usdoj.gov
Jonathan.D.Ross@usdoj.gov
shannon.smith@usdoj.gov

GEORGE G. KOUROS
Bar # 420813 (CT)
Attorney for Daniel Lee
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
Telephone: (301) 821-0855
Email: George_Kouros@fd.org

(Post.3/25/13)

U. S. COURT OF APPEALS - EIGHTH CIRCUIT
NOA SUPPLEMENT

# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS

Please note any additions or deletions to the style of the case from the style listed on the docket sheet (or attach an amended docket sheet with the final style of case)

Date July 3, 2020

**Caption:** USA v. Daniel Lewis Lee

**Case No.:** 4:97-CR-00243-02 KGB

**Appellant:** Daniel Lewis Lee

**Appellant's Attorney(s):** George G. Kouros, Morris Moon, Jennifer Merrigan, Karl Schwartz

**Appellees:** USA

**Appellee's Attorney(s):** John M. Pelletieri, Jonathan D. Ross, Michael S. Gordon, Shannon Smith

**Court Reporter(s):** N/A

**Name of Person who prepared appeal:** Tammy Downs, Deputy Clerk

| Length of Trial (# of days) | Fee Paid? Y/N: | IFP Granted? Y/N | Pending IFP Motion Pending? Y/N |
|---|---|---|---|
| N/A | N/A | Y | N/A |

| Counsel Retained/Appointed/Pro Se | Pending Motions? Y/N |
|---|---|
| Appointed | Y |

**CRIMINAL CASES ONLY:**

**Is defendant incarcerated?** Yes.

**Where?** Bureau of Prisons, Terre Haute, Indiana
**Address of Defendant:** _____

**Please list all other defendants in this case if there were multiple defendants:**
Chevie O'Brien Kehoe, Faron Earl Lovelace, and Kirby Keith Kehoe ⊞

**Special Comments:** Capital Case.  Execution scheduled for July 13, 2020.