IN THE
UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

———————————————————————————

No. 20-2351

———————————————————————————

DANIEL LEWIS LEE,
Appellant,

v.

UNITED STATES,
Appellee.

———————————————————————————

On Appeal from the United States District Court
Eastern District of Arkansas
No. 4:97-cr-00243-KGB-2

———————————————————————————

## APPLICATION FOR A CERTIFICATE OF APPEALABILITY OR IN THE ALTERNATIVE MOTION FOR AUTHORIZATION TO FILE SECOND OR SUCCESSIVE § 2255 MOTION

———————————————————————————

MORRIS H. MOON
Bar# 24032750 (TX)
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(713) 880-3556
Morris_Moon@fd.org

GEORGE G. KOUROS
Bar # 420813 (CT)
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 821-0855
George_Kouros@fd.org

Counsel for Appellant Daniel Lee

Dated: July 9, 2020

# TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………………….…ii

APPLICATION FOR A CERTIFICATE OF APPEALABILITY…………………1

STATEMENT OF THE CASE……………………………………………..……1

Procedural History………………………………………………………….…..5
1.  Trial……………………………………………………………….………5
2.  The Government's Case Unravels After Trial……………………………...16
3.  The Allegations Related to the Instant Rule 60 Motion Below……………..21
4.  District Court Disposition of the Rule 60 Motion…………………………33

ARGUMENT…………………………………………………………..…………34
I.  Legal Standard for a Certificate of Appealability……………………..…34

II.  The Court Should Certify an Appeal of the District Court's Denial
of Mr. Lee's Rule 60 Motion……………………………………..…….36

    A.  Reasonable jurists could debate the legal standard applied by
the District Court to conclude as a matter of law that Rule 60(b)(3)
did not permit relief…………………………………….…………36

    B.  Reasonable jurists could debate the District Court's conclusion
that Mr. Lee did not allege intentional misrepresentation sufficient
for Rule 60(b)(3) relief………...………………….……………..42

    C.  Reasonable jurists could debate the District Court's application of
the law of the case doctrine……...…………….…………………45

    D.  Reasonable jurists could debate the District Court's conclusion
that the Government's misrepresentation did not interfere with Mr.
Lee's ability to obtain meaningful review on his initial motion to
vacate his conviction under § 2255…………………………...……48

    E.  Reasonable jurists could debate whether the District Court
properly applied Rule 60(b)(6)………………………………..…..49

Appellate Case: 20-2351    Page: 2    Date Filed: 07/09/2020 Entry ID: 4932184

III. In the Alternative, this Court Should Grant Mr. Lee Authorization to File a Successive § 2255 Motion…………………………………………………...52

    A. Legal Standard………………………………………………….…………53

    B. Mr. Lee can make a prima facie showing that he meets the requirements of 28 U.S.C. § 2255(h)(1)…………………………………...54
        1. Mr. Lee's claim is based on newly discovered evidence……………54
        2. The newly discovered evidence establishes a material *Brady* violation………………………………………………………………..55
        3. The newly discovered evidence establishes material *Napue* and *Giglio* violations…………………………………………………….57
        4. Mr. Lee's allegations constitute a prima facie showing that no reasonable factfinder would have found him guilty of the underlying offense…………………………………………………...62

CONCLUSION……………………………………………………………...…64

Appellate Case: 20-2351    Page: 3    Date Filed: 07/09/2020 Entry ID: 4932184

# TABLE OF AUTHORITIES

**Cases**

*Alcorta v. Texas*, 355 U.S. 28 (1957)…………………………………………..58

*Banks v. Dretke*, 540 U.S. 668 (2004)………………………….….... 41, 42, 51

*Barefoot v. Estelle*, 463 U.S. 880 (1983)………………………………….34, 35

*Bennett v. United States*, 119 F.3d 468 (7th Cir. 1997)……………………….53

*Brady v. Maryland*, 373 U.S. 83 (1963)…………………………………*passim*

*Buck v. Davis*, 137 S. Ct. 759 (2017)…………………………………32, 50

*Buckeye Cellulose Corp. v. Braggs Elec. Const. Co.*, 569 F.2d 1036
  (8th Cir. 1978)……………………………………………………..49-50

*Carey v. Duckworth*, 738 F.2d 875 (7th Cir. 1984)………………………..44

*Chapman v. California*, 386 U.S. 18 (1967)………………………………….61

*Cooper v. Woodford*, 358 F.3d 1117 (9th Cir. 2004)…………………….......64

*Cornell v. Nix*, 119 F .3d 1329 (8th Cir. 1997)…………………………….49

*Crivens v. Roth*, 172 F.3d 991, 996 (7th Cir. 1999)………………………..44

*Dukes v. City of Minneapolis*, 339 Fed. App'x 665 (8th Cir. 2009)………..36, 38, 39

*E.F. Hutton & Co. v. Berns*, 757 F.2d 215 (8th Cir. 1985)………………...37, 38, 39

*Ford v. Hall*, 546 F.3d 1326 (11th Cir. 2008)…………………………………..61

*Giglio v. United States*, 405 U.S. 150 (1972)………………………………*passim*

*Goldblum v. Klem*, 510 F.3d 219 (3d Cir. 2007)………………………………54

*Hammond v. Hall*, 586 F.3d 1289 (11th Cir. 2009)…………………………….60

*In re Design Classics, Inc.*, 788 F.2d 1384 (8th Cir. 1986)………………..46

Appellate Case: 20-2351     Page: 4     Date Filed: 07/09/2020 Entry ID: 4932184

*In re Lott*, 366 F.3d 431 (6th Cir. 2004)…………………………………………………53

*In re McDonald*, 514 F.3d 539 (6th Cir. 2008)…………………………………...53, 63

*In re Morris*, 328 F.3d 739 (5th Cir. 2003)……………………………………53-54

*In re Pendleton*, 732 F.3d 280 (3d Cir. 2013)………………………………………...54

*In re Pickard,* 681 F.3d 1201 (10th Cir. 2012)……………………………………….31

*In re Williams*, 330 F.3d 277 (4th Cir. 2003)……………………………………………64

*Jimerson v. Payne*, 957 F.3d 916, 927 (8th Cir. 2020)………………………………41

*Johnson v. United States*, 720 F.3d 720 (8th Cir. 2013)…………………….............53

*Jordan v. Paccar, Inc.*, 97 F.3d 1452 (6th Cir. 1996)……………………………..40

*Klapprott v. United States*, 335 U.S. 601 (1949)………………………………….49-50

*Kyles v. Whitley,* 514 U.S. 419 (1995)………………………….………30, 43, 60

*Lee v. United States*, No. 19-2432 (8th Cir. Nov. 4, 2019)…………….20-21, 46, 47

*Lee v. United States*, No. 19-3576 (8th Cir. Jan. 7, 2020)……………………….51

*Liddell by Liddell v. Bd. Of Educ. Of the City of St. Louis*, 121 F.3d 1201
   (8th Cir. 1997)………………………………………………………………45

*Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847 (1988)……………32, 50

*Little Earth of the United Tribes, Inc. v. U.S. Dep't of Hous. & Urban
   Dev.*, 807 F.2d 1433 (8th Cir. 1986)………………………………………...46

*Miller-El v. Cockrell*, 537 U.S. 322 (2003)……………………………...34, 35, 47

*Mohammed v. Sullivan*, 866 F.2d 258 (8th Cir. 1989)……………………………49

*Napue v. Illinois*, 360 U.S. 264 (1959)……………………………………….*passim*

iv

*Schlup v. Delo*, 513 U.S. 298 (1995)……………………………………........63-64

*Scott v. United States*, 81 F. Supp. 3d 1326 (M.D. Fla. 2015),
    *aff'd*, 890 F.3d 1239 (11th Cir. 2018)……………………………….........32

*Slack v. McDaniel*, 529 U.S. 473 (2000)………………………………….34, 35

*Smith v. Clarke*, 458 F.3d 720 (8th Cir. 2006)………………………...36, 37, 38, 39

*Smith v. Dept. of Corrections*, 572 F.3d 1327 (11th Cir. 2009)…………………...58

*Strickler v. Greene*, 527 U.S. 263 (1999)…………………………………....41, 55

*United States v. Antone*, 603 F.2d 566 (5th Cir. 1979)……………………………60

*United States v. Agurs*, 427 U.S. 97 (1976)…………………………………60, 62

*United States v. Bigelesein*, 625 F.2d 203 (8th Cir. 1980)…………………………61

*United States ex rel. Dowd v. Lane*, 574 F. Supp. 972 (N.D. Ill.1 983),
    *aff'd*, 762 F.2d 1015 (7th Cir. 1985)………………………………………...61

*United States v. Foster*, 874 F.2d 491 (8th Cir. 1988)……………………………..61

*United States v. Galbreath*, 908 F. Supp. 877 (D. N.M. 1995)……………………57

*United States v. Humphrey*, 140 F.3d 762 (8th Cir. 1998)…………………22, 24, 25

*United States v. Lee*, 374 F.3d 637 (8th Cir. 2004)………………………...6, 9, 16

*United States v. Long*, 870 F.3d 741 (8th Cir. 2017)………………………………43

*United States v. Morris*, 80 F.3d 1151 (7th Cir. 1996)……………………………44

*United States v. Montgomery*, 635 F.3d 1074 (8th Cir. 2011)…………………….57

*United States v. Nelson*, 970 F.2d 439 (8th Cir. 1992)…………………...4, 55, 56 57

*United States v. Padilla*, 908 F. Supp. 923 (S.D. Fla. 1995)………………………57

v

Appellate Case: 20-2351    Page: 6    Date Filed: 07/09/2020 Entry ID: 4932184

*United States v. Piccinona*, 885 F.2d 1529 (11th Cir. 1989)……………………….57

*United States v. Robinson*, 809 F. 3d 991 (8th Cir. 2016)…………………………43

*United States v. Rouse*, 329 F.Supp.2d 1077 (D. S.D. 2004)………………………57

*United States v. Sanfilippo*, 564 F.2d 176 (5th Cir. 1977)………………………….61

*United States v. Tyndall*, 521 F.3d 877 (8th Cir. 2008)…………………………...43-44

*United States v. Williams*, 753 Fed. Appx. 176 (4th Cir. 2019)……………………31

*Watkins v. Miller*, 92 F. Supp. 2d 824 (S.D. Ind. 2000)…………………………..56

*Woods v. United States*, 805 F.3d 1152 (8th Cir. 2015)…………………………..62

**Statutes**
18 U.S.C. § 3………………………………………………………………………11

18 U.S.C. § 1959……………………………………………………………………...1

18 U.S.C. § 1962……………………………………………………………………1

28 U.S.C. § 2253……………………………………………………………..1, 34

28 U.S.C. § 2244……………………………………………………………63, 64

28 U.S.C. § 2255…………………………………………………………..*passim*

28 U.S.C. § 7203…………………………………………………………..11

42 U.S.C. § 408(a)(7)(B)…………………………………………………..11

**Rules**
Fed. R. of Civ. P. 60(b)…………………………………………………*passim*

Appellate Case: 20-2351    Page: 7    Date Filed: 07/09/2020 Entry ID: 4932184

# APPLICATION FOR A CERTIFICATE OF APPEALABILITY

Appellant Daniel Lee respectfully moves this Court to grant a certificate of appealability ("COA") pursuant to 28 U.S.C. § 2253(c)(1)(b). The certificate is sought to appeal an order entered by the United States District Court for the Eastern District of Arkansas, Hon. Kristine G. Baker, U.S.D.J., denying Mr. Lee's motion for relief from judgment filed pursuant to Federal Rule of Civil Procedure 60. In the alternative, Mr. Lee respectfully moves that the Court construe this request as a motion for authorization to file a second or successive § 2255 motion pursuant to 28 U.S.C. § 2255(h)(1).

## STATEMENT OF THE CASE

Mr. Lee is a federal death row inmate. In a 1999 trial over which the Honorable G. Thomas Eisele presided, Mr. Lee and a co-defendant, Chevie Kehoe, were convicted of conspiring to violate and violating the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c)-(d), and of three murders in aid of racketeering in violation of 18 U.S.C. § 1959—that of William Mueller, Nancy Mueller, and her eight-year old daughter, Sarah Powell. Despite the Government's express acknowledgment that Mr. Kehoe was the more culpable offender, the jury sentenced him to life imprisonment and then, separately, sentenced Mr. Lee to death.

Mr. Lee was not the original suspect in this case. Before the federal

1

government took over the prosecution, local authorities were focused on Paul

Edward Humphrey—and with good reason:

- Mr. Humphrey was seen with the Muellers in his car on January 18, 1996, a week after they had reportedly gone missing.

- He had forged titles to the Muellers' vehicles (that were previously seen unsigned in the Mueller home immediately after they had reportedly disappeared).

- Nancy Mueller's personal belongings were found in his home, and the Muellers' abandoned vehicles were found on property that belonged to him.

- He made incriminatory remarks to friends of the Muellers a few weeks after they went missing, suggesting that he knew the Muellers had been murdered. He also said he had searched the Mueller home for money.

- He knew details that only someone involved in the crime would know, such as what clothes the Muellers were wearing when they were killed.

- He was an experienced skin diver intimately familiar with the murky waters of Lake Dardanelle where the bodies were disposed.

Mr. Lee pointed to these issues at trial in support of a third-party culpability

defense. In fact, the defense called Mr. Humphrey as a witness and questioned him

about some of these matters. In an effort to blunt defense counsel's examination,

the Government asked Mr. Humphrey point blank whether he was involved in the

Mueller murders, which he denied. And in closing arguments, the Government did

not just attempt to explain away the incriminating facts implicating Mr. Humphrey

in the crime, it affirmatively told the jury that he had been thoroughly investigated

by both local and federal law enforcement and that "[t]here's no evidence against

2

Paul Humphrey." Tr. 6959-60.[1]

This wasn't true.

Pursuant to independent open records requests, Mr. Lee recently discovered that the Government has been concealing an explosive piece of evidence for over twenty years. On January 21, 1997, Mr. Humphrey submitted to a polygraph examination administered by a trained examiner of the Arkansas State Police ("ASP"). The stated purpose of the examination was to was "to determine his knowledge or involvement in the reported homicide of BILL and NANCY MUELLER." APP. 30. Mr. Humphrey was specifically asked whether he was present during the murders, whether he helped dispose of the bodies, and whether he knew that the titles in his possession were forged. *Id.* As the ASP polygraph examiner concluded in his report, Mr. Humphrey had lied in his responses to these questions and he was, in fact, involved in the murders:

---

[1] Citations to "Tr." refer to the consecutively-paginated trial transcript. Citations to "Dkt." refer to the district court docket entries in *United States v. Lee*, No. 4:97-CR-0243-KGB-2 (E.D. Ark.). Citations to "APP." refer to Appellant's attached Appendix.

3

FINDINGS

The physiological responses noted on this subject's polygraph charts are in such a pattern as to indicate that the subject, Mr. PAUL EDWARD HUMPHREY, was essentially untruthful in answering the above questions.

Based on the evaluation of the subject's polygraph charts, it is the opinion of this examiner that Mr. HUMPHREY was involved in the death of the MUELLERS.

Respectfully submitted,

BRETT PRITCHARD, Investigator
Polygraph Examiner
Criminal Investigation Division

APP. 31.

Under Eighth Circuit law, that polygraph report should have been disclosed to defense counsel. *United States v. Nelson*, 970 F.2d 439, 442 (8th Cir. 1992). But not only did the Government fail to disclose it at the time of trial, it also withheld this evidence throughout Mr. Lee's subsequent post-conviction proceedings pursuant to 28 U.S.C. § 2255. And it withheld it despite the fact that Mr. Lee had renewed his request for any exculpatory or impeachment information concerning third-party involvement in the murders that would support a claim that his trial right to due process were violated under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. In fact, just a few months before Mr. Lee filed his § 2255 motion, the Government affirmatively represented—in writing, on the same docket as Mr. Lee's, and to the same district judge who would preside over Mr. Lee's § 2255 proceedings—that "[a]ll documents relating to Mr. Humphrey were provided to

4

trial counsel." Dkt. 1087 at 32.

Mr. Lee reasonably relied on the Government's pre-trial representations, as well as its specific representation prior to the filing of his § 2255 motion, that it had turned over all *Brady* material in its possession, including any concerning Mr. Humphrey. As a result of that reliance, however, Mr. Lee was prevented from fully and fairly litigating cognizable claims that his due process rights had been violated. The question presented by this case is whether Rule 60(b) provides a remedy in situations like this. Numerous courts have found that it does, and have allowed similarly-situated litigants to use Rule 60(b) to reopen the § 2255 judgment. As is detailed below, this question is, at the very least, debatable by jurists of reason, and thus the issues presented in this Application should be certified for appeal to this Court.

**Procedural History**

**1.    Trial**

Shortly after their appointment, trial counsel for Mr. Lee filed several pre-trial motions requesting that the Government reveal all information and material favorable to Mr. Lee pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. Dkt. 28, 31, 33, 35. The Government responded that it "recognize[d] its obligation under *Brady v. Maryland*," and would "provide all *Brady* material as required by law." Dkt. 55 at 2. The prosecutors further stated that they would "treat

5

this motion as continuing." *Id.*

During a pretrial conference on April 9, 1998, the prosecution represented that the "bulk" of the *Brady* material had already been disclosed to the defense. 4/9/98 Tr. at 32. The Court thereafter entered an order dismissing Mr. Lee's *Brady* motion as moot "[f]or the reasons set forth on the record and in open court" at the hearing, while also directing the Government to provide defense counsel with any discovery to which Mr. Lee was entitled "on a continuing basis as it is received." Dkt. 145 at 1, 3.

The Government's trial presentation largely focused on Chevie Kehoe. It alleged he was the leader of a racketeering enterprise, whose members included his father (Kirby Kehoe) and brother (Cheyne Kehoe), that engaged in a variety of criminal activities to promote and fund a white supremacist organization. *See United States v. Lee*, 374 F.3d 637, 641 (8th Cir. 2004). According to the Government, Mr. Kehoe recruited Mr. Lee to join the group some time in 1995. Although the jury acquitted both codefendants of numerous alleged racketeering acts—including the bombing of the Spokane City Hall in 1996, the 1995 murder of Jeremy Scott in Idaho, and the 1996 murder of John Cox in Idaho—it convicted them of the 1996 robbery and murders of William Mueller, Nancy Mueller, and Sarah Powell in Tilly, Arkansas. In separate penalty phase hearings, the jury sentenced Mr. Kehoe to life without possibility of release and sentenced Mr. Lee to

6

death for each of the three murders, despite the fact that the Government's own evidence was that Mr. Lee was the less culpable actor.[2]

The Kehoes first met William Mueller on the gun show circuit where they bonded over their shared extremist beliefs. Mr. Mueller was a federally licensed gun dealer who frequently traveled the circuit selling firearms, ammunition, and various books and materials about "survivalist" practices. He was known to espouse antigovernment views similar to the Kehoes, and he often talked about going "sovereign" and getting "off paper"—that is, renouncing his United States citizenship, exchanging his currency for gold and silver coins, and amassing a stockpile of food, weapons, and supplies to allow him and his family to live "off the grid" and unconnected to the rest of society.[3] Tr. 1977-81, 2027-29, 2228-31, 2235-37, 2497, 5910. He also kept a large collection of weapons, ammunition, and valuable coins at his home in Tilly, Arkansas. Chevie Kehoe and his father Kirby had previously burglarized the Mueller residence in February 1995; they broke in and stole weapons and cash. According to the Government, Mr. Kehoe believed

---

[2] After Mr. Kehoe received a life verdict, the prosecutors attempted to deauthorize the death notification as to Mr. Lee, since all the parties agreed that Mr. Kehoe was the patently more culpable defendant. But their decision was overruled by Main Justice, which directed the local prosecutors to proceed with a penalty phase and to seek a death sentence. Dkt. 824 (Tr. May 10, 1999); Dkt. 827 (Tr. June 29, 1999).

[3] Mr. Mueller had, similar to Kirby Kehoe, adopted Christian Identity teachings and "believed that the white race was superior and all others were there for the purpose of serving the white race." Tr. 2232-33.

7

there was additional valuable property at the Mueller home and convinced Mr. Lee to join him in a plan to steal these goods.

The bodies of the Muellers were recovered from Lake Dardanelle in Russellville, Arkansas in June 1996. The Government alleged that Mr. Kehoe and Mr. Lee carried out the murders on the evening of January 11, 1996, a point in time it had difficulty establishing.[4] According to the prosecution's theory, the Muellers were not home when Mr. Kehoe and Mr. Lee arrived. Rather than burglarize the house and leave, as Chevie and Kirby Kehoe had done in 1995, the Government contended that Mr. Kehoe and Mr. Lee dressed in FBI raid gear, broke into the home, and laid in wait for the Muellers to return. The prosecution's theory was that when the family arrived, Mr. Kehoe and Mr. Lee pretended that they were FBI agents conducting a raid. After finding $50,000 in cash, guns, and ammunition, they were alleged to have incapacitated the Muellers with a stun gun, placed sealed plastic bags over their heads, killed the family,[5] driven nearly 50 miles to abandon

---

[4] According to the prosecution, the last time the Muellers were ever seen or heard from was on January 11, 1996. Mr. Mueller did some electrical work at the home of a friend that morning and then went to an electronics store that same day. Tr. 1794-95; 1802-04; 1810. Another witness testified to receiving a phone call from Mrs. Mueller the morning of the 11th, Tr. 2139, and phone records showed that the last outgoing call made from the Mueller home was on January 11. Tr. 1837. The Government's timeline was nevertheless problematic, both because multiple witnesses saw the Muellers alive after January 11, and Mr. Lee was seen in Spokane at least as early as January 13. *See* Dkt. 1363 at 27–34.

[5] The Government's account, which was based on the testimony of Gloria Kehoe and Cheyne Kehoe, has always been that Chevie Kehoe alone was

Appellate Case: 20-2351    Page: 15    Date Filed: 07/09/2020 Entry ID: 4932184

the Muellers' Jeep and trailer,  then another 20 miles to dispose the victims' bodies over a bridge into Lake Dardanelle, before taking off with the stolen property and driving another 2,000 miles non-stop to Spokane, Washington.

This narrative of what happened came solely from two cooperating witnesses: Cheyne and Gloria Kehoe. They claimed that they learned about the Mueller murders from Chevie Kehoe. Gloria also eventually claimed that Mr. Lee confessed his involvement to her, *Lee*, 374 F.3d at 642, although she gave various inconsistent statements about this over the course of her cooperation.[6] Their credibility was suspect, however; they were each looking at lengthy prison sentences for a variety of crimes they had committed and had substantial incentives to curry favor with the Government in order to buy their freedom.

When Cheyne came forward to cooperate, he was at that time a fugitive

---

responsible for killing the child, 8-year-old Sarah Powell. Although part of their own case, this is a fact the Government tends to ignore in current proceedings, especially as it maintains it chose Daniel Lee for execution over others because he killed a child. *Federal Government to Resume Capital Punishment after Nearly Two Decade Lapse*, Office of Public Affairs, Dept. of Justice (July 25, 2019).

[6] In her initial statement to the ATF, Gloria said that Mr. Kehoe confessed to her but did not say the same of Mr. Lee. Two weeks later, Gloria was once again interviewed by the ATF; this time she claimed that Mr. Lee had made inculpatory statements, but she could not recall *any* details of what he said. By the time of trial a year later, she purportedly had a clearer memory of what he had said (that Mr. Mueller had fought back, and that Mrs. Mueller had put a bag over her own head because she believed it was a legitimate FBI raid.) But when she was first interviewed by the ATF, she said she had been told all these details by her son, Chevie. *See* Dkt. 1363 at 20.

from the attempted murder of two Ohio police officers in a brazen daylight shoot-out that had been nationally televised and that had landed him onto the FBI's "most wanted" list.[7] As is clear from his earliest interviews with authorities, he knew that his only hope of reducing the prison time he was facing was to cut a deal in exchange for information about an even bigger crime, the Mueller murders. (His agreement with federal prosecutors included notifying the Ohio authorities about his cooperation. Tr. 5281. In fact, after Cheyne testified at Mr. Lee's trial, his 24-year Ohio sentence was reduced by more than half.[8]) But that was not the only benefit he received. As a member of Mr. Kehoe's racketeering enterprise, Cheyne was exposed to federal charges that carried a potential life sentence. As part of his cooperation agreement, he received a grant of immunity and escaped liability for any of the charged activities of the enterprise.

Gloria Kehoe also received substantial benefits in exchange for her testimony. In addition to immunity from prosecution for any offenses related to the racketeering counts, as well as for various tax and Social Security offenses,[9] which

---

[7] *White supremacists arrests conjure memories of Kehoe shooting rampage, Dayton Daily News*, Oct. 16, 2013, https://www.daytondailynews.com/news/crime--law/white-supremacists-arrest-conjure-memories-kehoe-shooting-rampage/gGMyTxJv1Dz5s7El3ExwlK/ (last visited July 5, 2020).

[8] In December 2000, a year after Mr. Lee was sentenced to death, Cheyne's sentence was reduced to 11 years. *Id.*; Tr. 5283. He was released in June 2008.

[9] See Tr. 4949, 4987-89. Gloria admitted on the stand that she assisted Mr. Kehoe in fleeing from Ohio after his shootout with police officers, that she had not

10

potentially exposed her to 30 years' imprisonment,[10] Gloria received large cash

payments during the course of her cooperation with authorities—$2,250 per

month, totaling roughly $27,000 by the time of her testimony. Tr. 3522-23. As a

single mother[11] with no job and six children to feed, clothe and shelter,[12] she had

every incentive to stay in the Government's good graces to stay out of prison and

provide for her family.

The reliability of the Kehoes' testimony was suspect for another reason:

there were discrepancies between their story and the physical evidence. For

example, Cheyne repeatedly told authorities that he had a detail about how the

---

filed federal income taxes in at least 10 years, and that she used a fake Social
Security Number during a real estate transaction. Criminal charges had been filed
against her in the Western District of Arkansas with respect to the use of the false
Social Security Number, and those charges were dismissed as a result of her
cooperation in this case.

[10] *See* 42 U.S.C. § 408(a)(7)(B) (maximum 5 years' imprisonment for use of
false Social Security Number); 18 U.S.C. § 3 (maximum 15 years' imprisonment
for being an accessory after the fact to a crime punishable by life imprisonment);
28 U.S.C. § 7203 (maximum 1 year imprisonment for each instance of willful
failure to file tax return).

[11] Gloria's husband Kirby Kehoe was indicted and arrested in connection
with this case. He was charged in Count One as a principal of the racketeering
enterprise, in Count Two as a RICO co-conspirator, and in Count Six as a co-
conspirator in the Hobbs Act robbery of the Muellers. He faced a potential life
sentence on these charges. He entered a plea of guilty to the first count of the
indictment (RICO) on February 8, 1999, prior to the start of Mr. Lee's trial. He
was sentenced to 44 ½ months' imprisonment, to run consecutively to a 51-month
prison sentence he was already serving on federal weapons violations, leaving
Gloria alone to take care of their six youngest children, which at that time included
an infant and a toddler.

[12] Tr. 5205.

11

Appellate Case: 20-2351     Page: 18     Date Filed: 07/09/2020 Entry ID: 4932184

murders occurred that would independently corroborate his account—namely, that Mr. Mueller's skull was fractured during the incident. Tr. 5328, 5442, 6876. According to Cheyne, his brother struck Mr. Mueller in the head with the butt of his rifle with a blow so forceful that it broke the walnut stock and Chevie saw the skull cave in. *Id.* This corroborative detail was horribly gruesome, but also a fabrication. The medical examiner testified there was no evidence of a skull fracture, hemorrhage or other injury to Mr. Mueller's skull. Tr. 3563, 3579-80, 3587-88.

Similarly, both Gloria and Cheyne claimed that Mr. Kehoe told them that Mr. Mueller bled onto the carpet after being struck in the head. Tr. 5422; 5188-89. This was another grisly "fact" contradicted by the physical evidence. The Arkansas State Police conducted a luminol examination of the carpet and sent multiple samples to the Serology Section of the Arkansas State Crime laboratory for further analysis. Every single sample tested negative for the presence of blood. Dkt. 1363 at 19.

Their stories were also inconsistent with each other. Take, for example, the issue of when Cheyne first learned about Chevie Kehoe's involvement in the Mueller murders. Dkt. 1363 at 20. Cheyne claimed it was not until he had been on the run with Mr. Kehoe for several months; but Gloria Kehoe claimed she told Cheyne about it before he left with Chevie, in a desperate attempt to convince him

12

Appellate Case: 20-2351     Page: 19     Date Filed: 07/09/2020 Entry ID: 4932184

not to leave with his brother. *Id*. This was not a minor discrepancy—it is difficult to believe that a person would have forgotten that his own mother begged him to stay away from his brother because that brother had confessed to a triple homicide.

To shore up the Kehoes' unreliable narratives, the Government relied on two pieces of corroborative evidence. The first was the testimony of James Wanker, a resident of the Shadows Motel in Spokane where Mr. Lee and the Kehoes occasionally stayed. According to Mr. Wanker, sometime between July and September of 1996, Danny Lee told him that he committed a crime that involved facts somewhat similar to those of the Mueller murders.[13] Tr. 4082-83. The Government emphasized in its argument to the jury that Mr. Wanker was an unbiased witness who received nothing in exchange for his testimony, and that his only incentive for coming forward was to tell the truth:

> Nobody has paid Mr. Wanker anything. There is no reason for him to come in here and tell you that story unless it's the truth. And it's the truth because Danny Lee told him that. And there he told what happened. It's not detailed and it's not involved, but it's real and that's what they did.

---

[13] The Government also introduced testimony from Dalvine Wanker, James Wanker's then-wife, that sometime in August of 1996, she told Danny Lee that she was concerned about a new tenant at the Shadows Motel, and that in response Mr. Lee "went into [his] trailer and came out and he had a firearm and said that he wasn't afraid to use it and that when he had gone down south and that some people had fucked with him, and that he had taken care of it." Tr. 4093. As even the Government conceded at trial, this "isn't a detailed statement," Tr. 7003, and provided no connection to the Muellers or even to Arkansas. The Government needed James Wanker's testimony.

13

Appellate Case: 20-2351    Page: 20    Date Filed: 07/09/2020 Entry ID: 4932184

Tr. 7002.

The second source of corroboration was a piece of physical evidence. During a search of one of Mr. Kehoe's vehicles, the Government seized the FBI raid gear that it alleged the two wore during the Mueller murders. A hair was recovered from one of the caps, and according to an expert from the Arkansas State Crime Laboratory, this hair was microscopically "similar" to Mr. Lee's hair. Tr. 4722. In its closing argument, the Government forcefully (but misleadingly) told the jury that "the evidence establishes that *that was Danny Lee's hair*."[14] Tr. 7000-01 (emphasis added).

The defense theory was that Cheyne's and Gloria's account of the murders was false and motivated by a desire to curry favor with the Government and avoid lengthy prison sentences. Tr. 6937, 6941-42. Trial counsel argued that the Government's timeline was implausible, Tr. 6948-55, and that other individuals had a motive and opportunity to kill the Muellers, especially Paul Humphrey. Tr.

---

[14] As is discussed below, DNA testing has conclusively excluded Mr. Lee as the source of that hair. *See* Dkt. 1363-13; APP. 32-35. The prosecution also attempted to link Mr. Lee to the crime via a fingerprint lifted from a display case belonging to the Muellers that was recovered in a storage unit at the Shadows Motel. Tr. 7001. But as was pointed out at trial, Mr. Lee frequently slept in that storage unit and had multiple opportunities to come into contact with the display case. Tr. 2856-57; 2915; 4815; 5312; 6878; 6946-47. The Government's own fingerprint expert testified there was no way to determine the age of a print or when it might have been left. Tr. 3716. This evidence therefore had no probative value as to whether Mr. Lee was at the crime scene.

14

6948.

Mr. Kehoe's counsel, in fact, called Mr. Humphrey as a witness. After defense counsel for both defendants questioned him about evidence that implicated him in the crime—such as his possession of forged titles to the Muellers' vehicles and his familiarity as a skin diver in the lake where the victims' bodies were recovered—the Government stepped in and elicited testimony from him that he was not "in any way involved in the death of Bill Mueller, Nancy Mueller or Sarah Powell[.]" Tr. 6204. In closing arguments, the Government took pains to assure the jury that there were innocent explanations for why Mr. Humphrey had the forged titles to the Muellers' vehicles, as well as why Nancy Muellers' belongings were found in his home, Tr. 6959, and pressed the point that both local and federal authorities thoroughly investigated Mr. Humphrey and turned up no evidence connecting him to the crime. Tr. 6959-60 ("[The defense] spent a bunch of time during the trial trying to convince everybody that Paul Humphrey did it. . . . There's no evidence against Mr. Humphrey.")

Although the jury convicted Mr. Lee and Mr. Kehoe of the three racketeering acts concerning the Mueller murders, it acquitted them of three other serious charges:

- Racketeering Act 3, which alleged that Mr. Kehoe committed the murder of Jeremy Scott;

- Racketeering Act 7, which alleged that Mr. Lee and Mr. Kehoe set off a bomb

15

at the Spokane City Hall;

- Racketeering Act 8, which alleged that Mr. Kehoe committed the murder of Jon Cox.

Notably, the only evidence for these racketeering acts was the testimony of Chyene and Gloria Kehoe. Clearly, the jury had doubts about their credibility and was reluctant to convict based solely on their word. What distinguished the counts concerning the Mueller murders, however, was that the Kehoes' account was seemingly corroborated by two pieces of independent evidence: the matching hair and James Wanker's testimony. Developments post-trial would undermine both.

**2.      The Government's Case Unravels After Trial**

Mr. Lee's conviction and sentence were affirmed on direct appeal. *United States v. Lee*, 374 F.3d 637 (8th Cir. 2004), *cert. denied*, 545 U.S. 1141 (2005).

On May 17, 2004, Mr. Lee's codefendant Chevie Kehoe filed a motion to vacate his judgment pursuant to 28 U.S.C. § 2255. Mr. Kehoe alleged, *inter alia*, that the Government had improperly withheld exculpatory evidence implicating Paul Humphrey in the Mueller murders. Dkt. 1039 at 40 (Kehoe § 2255 motion); Dkt. 1067 at 34-35, 39-40, 45 (amended Kehoe § 2255 motion).

On December 20, 2005, the Government filed a response to Mr. Kehoe's motion. Dkt. 1087. It unambiguously stated, "All documents relating to Mr. Humphrey were provided to trial counsel." Dkt. 1087 at 32. It further stated, "Despite trial counsel's best efforts, no tie was ever made between Paul Humphrey

16

and the named individuals [who were alternate suspects] which could establish that Paul Humphrey or one of the named individuals was in fact responsible for the Mueller deaths. In his argument Movant identifies no connection. Even should the Court review the issue, Movant's allegations are meritless on their face." *Id*. at 32-33.

On June 26, 2006, Mr. Lee filed his motion to vacate his judgment pursuant to 28 U.S.C. § 2255, on the same docket as Mr. Kehoe. Notwithstanding that the Government had just denied on the record that any favorable information related to Paul Humphrey existed, Mr. Lee's motion alleged, *inter alia*, that the Government had improperly withheld information favorable to the defense in violation of its constitutional *Brady* obligations. Dkt. 1118-1 at 7. The motion requested "that the Government review its files and the files of its investigating agencies for any information favorable to the defense bearing on guilt or punishment, including—but not limited to—any evidence that other members of white supremacist or Christian Identity groups, or other like groups, were responsible for the murders of the Mueller family or otherwise played a role in the crimes charged in, or related to, this case." *Id*. at 7, n.3. Mr. Lee further noted that in the event the Government turned over such *Brady* material, he would "amend the petition and seek relief appropriate to the nature of the material newly-disclosed or uncovered." *Id*.

The Government filed its response on December 6, 2006. It did not disclose

17

the existence of any information related to the possible culpability of third parties for the deaths of the Muellers. Consequently, Mr. Lee made no amendments to his § 2255 motion related to undisclosed favorable information. During the proceeding, however, DNA testing was conducted on the hair recovered from the FBI raid cap that the Government told the jury during closing was definitively Mr. Lee's hair; the results conclusively excluded Mr. Lee as a possible source. Thus, the Government's only physical evidence purporting to connect Mr. Lee to the actual homicides was proven false. Despite this, the district court denied the motion to vacate on August 28, 2008. Dkt. 1163. And although *Brady* allegations had been raised, the order denying the motion did not address whether the Government had failed to disclose favorable, material information to Mr. Lee.

Mr. Lee initiated other collateral litigation as information about the Government's failure to disclose favorable information came to light. On September 10, 2018, he filed a second-in-time § 2255 motion alleging, in pertinent part, that the Government had failed to disclose favorable evidence concerning Mr. Wanker's testimony about Mr. Lee's purported confession, as well as for presenting substantially misleading and false testimony about the same. Dkt. 1297. The jury was given the impression that James Wanker decided to alert authorities because he believed he had important evidence about Mr. Lee's guilt. The motion, supported by a proffer of a declaration from Mr. Wanker, alleged that this was not

18

true. In fact, Mr. Wanker's testimony was choreographed to omit the facts and circumstances that would have led jurors to question the veracity or credibility of Mr. Lee's purported admission. Mr. Wanker in reality had a well-founded basis to discount the statement Mr. Lee made to him—and he continued to do so even after Mr. Lee was charged and prosecuted.

Mr. Wanker provided a declaration stating that Mr. Lee routinely made up stories to make himself seem tough and fit in with those around him, including the Kehoes:

> Danny was a follower who tried to sound like a big guy. He was always trying to blow smoke up my ass; trying to impress me by sounding tough. He would spout off about different fights and crazy situations that were not true just to look tough and try to fit in.

Dkt. 1363-14 at ¶ 6. As Mr. Wanker explained, Mr. Lee's purported "confession" was of a piece with the empty bragging that Mr. Wanker had seen him exhibit in the past:

> When Danny made these comments about this trip, I didn't believe him. I knew him to be a braggart and that he would try to claim responsibility for criminal actions in order to fit in with the Kehoes. It still cracks me up that Danny was trying to be a tough guy.

*Id*. at ¶ 7.

Mr. Wanker was interviewed several times by law enforcement, and each time he told them that Mr. Lee's comments about being involved in an unspecified murder were not trustworthy and just phony boasts; Mr. Lee had a known history

19

of claiming "credit" for misdeeds that were not his. Dkt. 1363-14 at ¶ 11. However, when the agents memorialized their interviews, they did not include any of the context or warnings Mr. Wanker had given them.[15] *See* Dkts. 1363-15 & 1363-16. And the jury never learned that, even at the time of trial, Mr. Wanker didn't believe that there was any truth to what Mr. Lee had said.

The district court did not address the allegations. Instead, it dismissed the motion for failing to obtain pre-authorization and denied a certificate of appealability ("COA"). Dkt. 1313. Mr. Lee's COA application to the Eighth Circuit was denied on November 4, 2019, over the dissent of the Hon. Jane L. Kelly. Although the district court had made a threshold determination that the *Brady* claim concerning Mr. Wanker was not material, Judge Kelly stated that she would have granted a COA on that issue because "jurists of reason could disagree

---

[15] The Government used a similar tactic with Mr. Wanker at the grand jury proceeding. It instructed him to omit certain details from his written statement that undermined the trustworthiness of Mr. Lee's alleged statement against penal interest. Dkt. 1363-14 at ¶12. In his July 2, 1997 statement to ATF Agent Sprenger, Mr. Wanker stated that Mr. Lee said there was a third individual who had accompanied him and Mr. Kehoe to Arkansas: Sean Haines. Dkt. 1363-16 at 2. But as the Government knew, Mr. Haines was in Spokane throughout January 1996 when the alleged trip to Arkansas took place. The fact that Mr. Lee's story contained a demonstrably false detail lends credence to Mr. Wanker's warning to law enforcement that the story was made up and not to be believed. The fact that the Government instructed Mr. Wanker to omit that detail about Mr. Haines from his written statement to the grand jury is also telling. It is consistent with a pattern of behavior to suppress any information that undermined the credibility of Mr. Lee's alleged confession, and, in turn, the corroborative value of Mr. Wanker's testimony.

Appellate Case: 20-2351     Page: 27     Date Filed: 07/09/2020 Entry ID: 4932184

about whether Lee's newly discovered evidence is material for purposes of *Brady*."
*See* Judgment, *Lee v. United States*, No. 19-2432 (8th Cir. Nov. 4, 2019) (Kelly, J., dissenting).

**3.      The Allegations Related to the Instant Rule 60 Motion Below**

On January 29, 2020, Mr. Lee filed a motion for relief from a judgment or order pursuant to Federal Rule of Civil Procedure 60. Dkt. 1363. The motion alleged, *inter alia*, that relief from the order denying the initial § 2255 motion should be granted because: (1) the Government failed to disclose a polygraph report in the possession of the prosecution team concluding that Paul Humphrey was not being truthful when he denied being involved in the Mueller deaths; and (2) the Government's affirmative misrepresentations about its compliance with *Brady* made in the proceeding thwarted Mr. Lee's ability to fully and fairly plead his *Brady* allegations and deprived him of a meaningful opportunity to litigate these due process violations under § 2255.

Specifically, Mr. Lee alleged that he discovered through a state FOIA request a report of the aforementioned polygraph examination of Mr. Humphrey conducted on January 21, 1997, by the ASP. He further alleged that, before Cheyne came forward in June of 1997 and fundamentally changed the course of the Mueller murder investigation, Mr. Humphrey was the prime suspect. (Indeed, before Gloria and Cheyne decided to cooperate, the Government had no evidence

21

connecting Mr. Lee to the Mueller murders; at best, he was a person of interest solely because he was a "known associate" of Chevie Kehoe.)

Authorities began focusing on Mr. Humphrey after Nancy's brother, David Branch, informed Pope County law enforcement officials on February 22, 1996, that Mr. Humphrey was in possession of the title documents to the Muellers' abandoned Jeep and trailer.[16] (The Muellers' vehicles were found on property that belonged to Mr. Humphrey.[17]) Mr. Branch had previously seen those documents, unsigned, in the Mueller residence on February 2, after the family had already been reported as missing from their home. Although Mr. Humphrey initially agreed to cooperate with Pope County law enforcement when they contacted him on February 22, he spent the next several months dodging authorities and offering increasingly bizarre, and false, explanations for why he could not turn over the titles:

- On March 1, Mr. Humphrey told authorities he had been advised by his attorney in Russellville, Dale Braden, not to surrender the documents. Authorities contacted Mr. Braden a few days later and learned that Mr. Humphrey had lied to them: he had never retained Mr. Braden or otherwise

---

[16] Details of the investigation into Mr. Humphrey are taken from the search warrant affidavit sworn to on August 27, 1996, by Aaron Duvall, an officer with the Pope County Sheriff's Office. *See* Dkt. 1363-22; APP. 36-45. Many of the same facts are recounted in the Eighth Circuit's opinion denying Mr. Humphrey's suppression motion. *United States v. Humphrey*, 140 F.3d 762 (8th Cir. 1998).

[17] Dkt. 1387-4. Mr. Humphrey made incriminating remarks to several witnesses about his familiarity with the backroads that led from the Mueller home to the precise location in Dover, off Highway 7, where the Muellers' vehicles were found. Dkts. 1387-5 & 1387-6.

22

consulted him about those titles.

- On March 15, Mr. Humphrey claimed he did not have the documents because he had given them to a friend in Little Rock. He refused to identify who this "friend" was, but he agreed to get the documents and give them to authorities.

- After he failed to keep his agreement, authorities contacted Mr. Humphrey again on March 26. This time, he told authorities that the documents were now with a different attorney he had retained in Little Rock. When authorities contacted that lawyer to verify his story, they found out they had been lied to yet again: the attorney had no idea who Mr. Humphrey was, much less knew anything about the Mueller titles.

- On April 8, authorities met with Mr. Humphrey and confronted him with his most recent lie. Mr. Humphrey now claimed that he had never actually given the documents to the attorney in Little Rock, but that he only had considered doing so. Instead, he gave the documents to a friend, whom he again refused to name.

It would not be until three months later, after the Muellers' bodies were recovered, that Pope County authorities eventually followed up with Mr. Humphrey again and finally got the titles from him. When authorities submitted those documents for forensic examination along with known writing samples of William and Nancy Mueller, they finally realized why Mr. Humphrey had been evading them: the signatures on the titles were forged.[18]

After this belated discovery, local authorities steadily gathered additional evidence implicating Mr. Humphrey in the Mueller murders, including:

- *Mr. Humphrey was seen with the Muellers after their disappearance.* Mary Reid, a friend of the Muellers, contacted authorities shortly after the bodies

---

[18] *See* Dkt. 1363-23 (ATF Lab Report Handwriting Analysis).

23

Appellate Case: 20-2351    Page: 30    Date Filed: 07/09/2020 Entry ID: 4932184

were recovered in late June of 1996. She told them that on January 18, 1996, she was exiting a bank in Russellville when she heard Nancy Mueller call her name. She turned and saw Ms. Mueller seated in the passenger side of a tan colored vehicle. She walked over to the car and engaged Ms. Mueller in conversation. She saw that Mr. Mueller was in the backseat, flanked by two other men. She also saw the driver of the vehicle, whom she later identified in a photo spread as being Mr. Humphrey. Ms. Reid's account was corroborated by bank records and surveillance camera footage that confirmed she was at the bank on that date. Bank records also corroborated Mr. Humphrey's presence in Russellville on that date. Ms. Reid also positively identified Mr. Humphrey's vehicle after driving in his neighborhood and seeing the car parked on the side of the street. Dkt. 1363-22 (Humphrey Search Warrant Affidavit) at ⁋ 13; *United States v. Humphrey*, 140 F.3d 762, 764 (8th Cir. 1998).

- *Mr. Humphrey was in possession of Nancy Mueller's personal belongings.* Authorities conducted a search of Mr. Humphrey's home on August 30, 1996. They discovered a pamphlet belonging to Nancy Mueller with her signature and address written on it.[19] Tr. 5893-94.45.

- *Mr. Humphrey made inculpatory statements after the Muellers' disappearance.* In September of 1996, authorities interviewed Dr. Charles Turner and Roberta Turner, close friends of the Muellers, and learned that Mr. Humphrey had made several odd and incriminating comments to them after the Muellers disappeared. *See* Dkt. 1363-24 (Synopsis of ATF Interview of the Turners). He came by their home on January 25, 1996 and "tried to convince Dr. Turner that the Muellers were okay. He was trying extra hard to convince the Turners that the Muellers were fine." *Id.* at 2. He came by a second time a few weeks later in mid-February, but this time told

---

[19] Notably, the Government pointed to similar evidence in its closing arguments—that a book belonging to Nancy Mueller was found at Mr. Kehoe's property—to claim that its theory of the case was correct. *See* Tr. 6826 ("One of the things, by the way, that came from Idaho was Nancy Mueller's book."); *id.* at 7005 ("And the whole concept that all of the proof that the government has is just from these two witnesses, Cheyne Kehoe and Gloria Kehoe, is wrong. They don't have anything to do with finding the book -- Nancy Mueller's book 'August Celebration' on his property on the Priest River. They don't. They did that completely independent of these two people. But that's great proof. He [Chevie Kehoe] stole her book.").

24

Appellate Case: 20-2351     Page: 31     Date Filed: 07/09/2020 Entry ID: 4932184

Mrs. Turner: "Nancy and Bill was one thing but I really felt bad about Sarah."[20] *Id*. When Mrs. Turner asked him to explain what he meant, Mr. Humphrey changed the subject. *Id*. On another visit to the Turners, Mr. Humphrey told them that there "wasn't any money at the Muellers' house when he [Humphrey] went there." *Id*. When Mrs. Turner asked him what money he was talking about, he changed the subject. *Id*.

- *Mr. Humphrey knew details only a perpetrator would know.* Mr. Humphrey claimed at trial that the last time he had had any contact with the Muellers was by phone on the evening of January 10, 1996. Tr. 6148. But when he was interviewed by police after the Muellers went missing, he described the clothes they wore when he last saw them, which matched the clothes later found on their bodies. *Humphrey*, 140 F.3d at 764.

- *Mr. Humphrey was intimately familiar with the location where the bodies were recovered.* Authorities learned that Mr. Humphrey was a proficient skin diver with experience diving in Lake Dardanelle where the Muellers' bodies were recovered. He tried to deny this when examined on the stand, but quickly back-pedaled after he was confronted with his prior inconsistent statement to law enforcement.[21] Tr. 6191-92.

Federal authorities took the case over from local law enforcement shortly after Cheyne Kehoe began his cooperation in June 1997. Despite the substantial evidence that had already been gathered by that point implicating Mr. Humphrey, the Government nevertheless shifted gears and concentrated its efforts on proving the theory of the case provided to it by Cheyne, and later Gloria Kehoe: that Mr.

---

[20] At that point in time the Mueller family was missing and not presumed dead: many believed Bill Mueller had taken his wife and step-daughter "off the grid." Mr. Humphrey did not clarify why he would have felt "bad about Sarah."

[21] Mr. Humphrey testified that "on a good day" the visibility in Lake Dardanelle "might be six inches." Tr. 6192. He implausibly claimed that this was not based on his own experience, but that he only knew this because he "had studied." *Id*.

25

Lee was involved in the murders. Yet the Government was never actually able to rule out Mr. Humphrey's involvement in the crime. It continued to collect evidence from him for analysis,[22] and still listed him as a suspect on various requests for forensic testing, as late as March 2, 1999—after jury selection had already commenced and nearly a week before opening statements. *See* Dkt. 1363-26 (3/2/99 Arkansas State Crime Lab Report).

One of the main defense themes at Mr. Lee's trial was that the murders had been committed by a third party, but that authorities had botched the investigation because they treated the disappearance as a "missing persons" case for too long; after the bodies were recovered and authorities realized their mistake, months went by with no discernible progress. When Cheyne came forward with his story, the defense contended, authorities latched onto it because it gave them a convenient way to close the case, not because it fit all the available evidence.

In support of this argument, the defense presented much of the aforementioned evidence pointing to Mr. Humphrey's involvement in the murders. Mr. Kehoe's counsel even called Mr. Humphrey as a witness. Under questioning by Mr. Lee's trial counsel, Mr. Humphrey denied knowing that the Muellers' signatures on the titles to their vehicles were forged and denied that he had forged

---

[22] For example, on October 10, 1997, the Government sought to obtain a hair sample from Mr. Humphrey. *See* Dkt. 1363-25.

Appellate Case: 20-2351     Page: 33     Date Filed: 07/09/2020 Entry ID: 4932184

the signatures himself,[23] Tr. 6201; he also denied ever having skin dived in Lake Dardanelle, but then conceded he had previously admitted that fact to authorities. Tr. 6191-92. In an effort to negate the implications of defense counsel's questions, the Government point-blank asked Mr. Humphrey:

> Q. Were you in any way involved in the death of Bill Mueller, or Nancy Mueller or Sarah Powell?
>
> A. No.

Tr. 6204.

Unbeknownst to the defense, however, the prosecution team possessed devastating impeachment evidence that it never disclosed: a report of a polygraph examination conducted on January 21, 1997, reflecting that Mr. Humphrey had lied when denying involvement in the Mueller's deaths. APP. 23-31. The polygraph was arranged by Arkansas State Police Sergeant Harold Dwane Luter. The purpose of the exam was "to determine [Mr. Humphrey's] knowledge or involvement in the reported homicide of BILL and NANCY MUELLER." APP. 30. Mr. Humphrey was examined using the Modified General Question Technique, in which relevant questions about the crime are asked along with irrelevant and control questions. *Id*. He was asked the following about the Mueller murders:

---

[23] *See also* Tr. 6169, 6174-76.

27

> Q-3: Did you ever meet SYLVIA MASER[24] [sic] prior to the MUELLERS disappearing?
>
> A: No.
>
> Q-5: Were you present when the MUELLERS were killed?
>
> A: No.
>
> Q-8: Did you participate in disposing of the bodies of the MUELLERS?
>
> A: No.
>
> Q-10: Did you know that the title was forged when you took it to the sheriff?
>
> A: No.

*Id.* As the polygraph examiner concluded in his report, Mr. Humphrey had lied in his responses to these questions and he was, in fact, involved in the murders. APP. 31.

The Government alleged in the Rule 60(b) proceedings below that Mr. Humphrey's polygraph report, and any knowledge about it, should not be attributed to the Government because there was no evidence that the ASP cooperated with the federal prosecution team as part of its investigation. The Government's position did not appear to be accurate. In fact, Mr. Lee responded by proffering additional records, obtained pursuant to Freedom of Information Act requests to the FBI, documenting the many contacts between the ASP and the

---

[24] This appears to be a typographical error. Sylvia Mason was the Muellers' landlord. After initially telling police that he did not remember who had mailed him the title documents, Mr. Humphrey later claimed that it was Ms. Mason who sent them. She, however, did not corroborate Mr. Humphrey's story.

28

Government during the course of the investigation. Indeed, one such record was a formal letter from the FBI to two different ASP officers thanking them for their contributions to the "multi-agency investigation and prosecution" of Daniel Lee and Chevie Kehoe. *See* Dkt. 1374-2; APP. 46; APP. 48.

A June 1997 FBI memo explicitly stated the investigation would "be coordinated with Little Rock BATF, the Arkansas State Police, and the Pope County Sheriff's Office." *See* Dkt. 1374-3; APP. 59. The lead ATF case agent in the federal prosecution, Glen Jordan, had been conducting a joint investigation with the ASP into the Muellers' disappearance as early March 1996. *See* Dkt. 1374-4; APP. 62. Mr. Jordan specifically worked with ASP Sergeant Harold Dwane Luter.[25] *See* Dkt. 1374-5, 1374-6, 1374-7; APP. 65-67. This is the same Sergeant Luter who arranged the Humphrey polygraph examination. See Dkt. 1363-2.

State FOIA records confirmed that Mr. Jordan received a hand-delivered copy of the ASP's Mueller case file on April 14, 1997—several months after the ASP conducted and memorialized the Humphrey polygraph results. *See* Dkt. 1374-8; APP. 68. Federal FOIA records further confirmed that FBI case agents separately obtained a copy of the ASP's investigative file by September 1997. *See* Dkt. 1374-9; APP. 70. Moreover, the Government clearly had access to the ASP

---

[25] Mr. Luter's name is sometimes spelled as "Dewayne" in documents.

Appellate Case: 20-2351     Page: 36     Date Filed: 07/09/2020 Entry ID: 4932184

case file because it released a number of records from that file to the defense as part of its pre-trial disclosures. Dkt. 1363-27.

Mr. Lee argued below that the undisclosed impeachment evidence was material to the outcome of his trial. *See* Dkt. 1363 at 52–55; Dkt. 1374 at 29–31. He argued that, given the myriad problems with the trial evidence against Mr. Lee, the information the prosecution suppressed about Mr. Humphrey's failed polygraph undermines confidence in the verdict because evidence that someone else committed the crime is in a category by itself, and its import to trial counsel's "third party guilt" defense is unmistakable.

Mr. Lee also argued that any materiality analysis also had to account for the collateral effects of the jury learning about the questionable practices in which the prosecution engaged in building its case. *See Kyles v. Whitley*, 514 U.S. 419, 445-6, 449 (1995) (evidence of prosecutorial misconduct would have allowed jury to also question the integrity and reliability of investigation).

Here, that included the possible impact on the jury if it had learned that law enforcement reports of Wanker's previous statements had been crafted to exclude exculpatory evidence; that Mr. Wanker's grand jury testimony was manipulated to omit information that was not consistent with the Government's theory of the case; that case agents had doubts about Gloria's mental stability;[26] that prosecutors failed

---

[26] *See* Dkt. 1363 at 37; Dkt. 1363-3 at ⁋ 35

30

to disclose information that Gloria had a long history of suffering from visual and auditory hallucinations and was prone to making up events that never occurred;[27] that the Government's theory of the crime relied on a tenuous timeframe that was already concerning for the jurors;[28] that the hair connecting Mr. Lee to the crime was not in fact his; and that the Government buried a damning report documenting that the earliest suspect in the murders flunked a polygraph, indicating that he had in fact committed the Mueller murders.

Mr. Lee argued that the Government's concealment of this evidence, and its affirmative misrepresentations that it had disclosed all materials pertaining to Mr. Humphrey to trial counsel, prevented him from fully and fairly litigating claims in his § 2255 proceeding concerning the violation of his due process rights. He offered, *inter alia*, two theories by which the judgment could be reopened to Fed. R. Civ. P. 60(b).

First, pursuant to Rule 60(b)(3), relief was warranted due to "fraud … misrepresentation, or misconduct by an opposing party." Indeed, as Mr. Lee pointed out, a number of courts have found that this is a proper use of Rule 60(b)(3) under similar facts. Dkt. 1363 at 62-66. *See also In re Pickard,* 681 F.3d 1201 (10th Cir. 2012); *United States v. Williams*, 753 Fed. Appx. 176 (4th Cir.

---

[27] *See* Dkt. 1363 at 39.
[28] *See* Dkt. 1363 at 27–34.

Appellate Case: 20-2351     Page: 38     Date Filed: 07/09/2020 Entry ID: 4932184

2019); *Scott v. United States*, 81 F. Supp. 3d 1326 (M.D. Fla. 2015), *aff'd*, 890 F.3d 1239 (11th Cir. 2018).

Second, reopening the judgment was warranted under Rule 60(b)(6). His case presents the extraordinary circumstances supporting 60(b) relief including "'the risk of injustice to the parties' and 'the risk of undermining the public's confidence in the judicial process.'" *Buck v. Davis*, 137 S. Ct. 759, 778 (2017) (quoting *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863–64 (1988)). The judicial process, and *Brady* jurisprudence in particular, are predicated on the Government honestly complying with its duties under the law. But here, not only did the Government misrepresent whether it had disclosed all the exculpatory and impeachment material in its possession at the time of Mr. Lee's trial, it maintained that falsehood for as long as it would take to try to shut the courthouse doors on Mr. Lee. In fact, the Government repeated the lie during Mr. Lee's § 2255 proceedings, thus frustrating the one and only post-conviction review process that the judicial system affords federal prisoners.

But for the fact that an Arkansas state agency happened to retain a copy of a 23-year old record and decided to release it pursuant to a state FOIA request, the truth about the Government's misconduct might never have been uncovered, and neither Mr. Lee nor the public would have been the wiser. Indeed, if Mr. Lee is able to finally get his day in this Court and have his *Brady* claims considered, it

32

will not be because "the system worked"—it will be because of the serendipity of state record-keeping and disclosure. There could hardly be a more compelling situation that could risk undermining the public's confidence in the judicial process.

**4.      District Court Disposition of the Rule 60 Motion**

The district court denied the motion. Dkt. 1403; APP. 1-22. With respect to affording relief under Rule 60(b)(3), the district court held that the legal standard for obtaining this relief in the Eighth Circuit required allegations that the Government engaged in deliberate misconduct or intentional misrepresentation of the facts, as opposed only to unintentional misrepresentation, and that Mr. Lee had made no such allegations. *Id.* at 16. It also held that the law of the case foreclosed relief pursuant to Rule 60(b)(3). *Id.* at 18. It additionally held that any failure to disclose information "did not prevent Mr. Lee from fully and fairly litigating his § 2255 petition." *Id.*

With respect to the Rule 60(b)(6) allegations, the district court held simply that Mr. Lee had not demonstrated the extraordinary circumstances required for relief because "[h]e ha[d] not alleged any facts to support his allegation that the government engaged in misconduct during the § 2255 proceeding."[29]

---

[29] At the end of its order, the district court purported to hold that "Mr. Lee's claims in his present motion constitute a successive habeas petition under 28 U.S.C. § 2255 for which Eighth Circuit authorization is required." Dkt. 1403 at 22.

33

Mr. Lee filed a notice of appeal on July 3, 2020.

## ARGUMENT

### I.    Legal Standard for a Certificate of Appealability

The Antiterrorism and Effective Death Penalty Act ("AEDPA") requires, as a pre-condition to appellate review of the denial of a motion brought pursuant to 28 U.S.C. § 2255, that a COA issue upon a showing that the applicant has made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(C)(2). The Supreme Court has determined that this standard is a low bar. Proof of ultimate success is not required and the grant of a COA is especially favored in a capital case.

The leading cases on this issue are *Miller-El v. Cockrell*, 537 U.S. 322 (2003) and *Slack v. McDaniel*, 529 U.S. 473 (2000). A review of these cases reveals that the Supreme Court has simply adapted to the AEDPA the standards that were formerly applied to the issuance of a certificate of probable cause in pre-AEDPA habeas litigation. *See Barefoot v. Estelle*, 463 U.S. 880 (1983). In elaborating on the "substantial showing" language of the statute, *Miller-El* explained that the standard is met if "jurists of reason could disagree with the

---

This ruling, however, seems to flow directly from its conclusion that Mr. Lee's allegations did not satisfy the requirements of either Rule 60(b)(3) or Rule 60(b)(6). Accordingly, to the extent that reasonable jurists could debate those latter rulings, the district court's seeming conclusion that the motion is a successive habeas petition is also debatable.

Appellate Case: 20-2351     Page: 41     Date Filed: 07/09/2020 Entry ID: 4932184

district court's resolution" of the claim or that "the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327. The determination of whether the standard is met is a "threshold inquiry" that "does not require full consideration of the factual or legal bases adduced in support of the claims. In fact, the statute forbids it." *Id*. at 336. In *Slack*, the Court noted than an applicant met the standard if it was "debatable" whether the district court's assessment of the constitutional claim was correct. *Slack*, 529 U.S. at 484.

The Supreme Court has also been clear that a COA application does not have to show "entitlement to relief." *Miller-El*, 537 U.S. at 337. "The holding in *Slack* would mean very little if appellate review were denied because the prisoner did not convince a judge, or, for that matter, three judges, that he or she would prevail." *Id*. A COA should issue even if it is unclear that relief will ultimately be obtained. *Id*. at 337-38 (holding that the COA standard "does not require a showing that the appeal will succeed," but merely "something more than the absence of frivolity or the existence of mere good faith on his or her part.").

The fact that this is a death penalty case further counsels in favor of granting a COA. In *Barefoot*, the Court emphasized that "in a capital case, the nature of the penalty is a proper consideration" in determining whether to certify and issue for appeal. *Barefoot*, 463 U.S. at 893.

Appellate Case: 20-2351     Page: 42     Date Filed: 07/09/2020 Entry ID: 4932184

## II. The Court Should Certify an Appeal of the District Court's Denial of Mr. Lee's Rule 60 Motion

Reasonable jurists could debate the grounds upon which the district court disposed of Mr. Lee's Rule 60 motion. First, reasonable jurists could debate whether the court below applied the appropriate legal standard for Rule 60(b)(3). Second, and notwithstanding the first, reasonable jurists could debate the district court's conclusion that Mr. Lee did not allege the Government committed any intentional misrepresentation in the proceeding. Finally, reasonable jurists could debate the manner by which the district court evaluated whether extraordinary circumstances existed, and its conclusion that extraordinary circumstances did not exist based only on its view that Mr. Lee did not allege intentional misrepresentation by the Government.

### A. Reasonable jurists could debate the legal standard applied by the District Court to conclude as a matter of law that Rule 60(b)(3) did not permit relief

The district court concluded that the law of this Circuit was settled that Federal Rule of Civil Procedure 60(b)(3) "requires Mr. Lee to demonstrate that any misrepresentation was intentional and that any fraud was deliberate." Dkt. 1403 at 16. The court below relied upon *Dukes v. City of Minneapolis*, 339 Fed. App'x 665 (8th Cir. 2009) (*per curiam*), and *Smith v. Clarke*, 458 F.3d 720 (8th Cir. 2006). Reasonable jurists could conclude that these cases do not stand for such a proposition, and that, in fact, the law of this Circuit does not require that

36

misrepresentations be intentional in order to be cognizable under Rule 60(b)(3).

*First*, in *Smith*—the only published case the district court relied upon—it was the plaintiff's *own* admission that caused the defect that led to the adverse judgment. Due to the circumstances of the case, the plaintiff was required to file a complaint with a particular state agency before bringing his federal action. The defendant, a state agent, filed a summary judgment motion asserting the plaintiff had not filed the complaint. The plaintiff, in response to the motion, did not provide any evidence that he had filed the complaint, and the district court granted summary judgment. Post-judgment, the plaintiff remembered that he had filed the complaint and sought to reopen under Rule 60(b), which the district court denied. On appeal, this Court affirmed, finding no abuse of discretion.

Although the information about the filing was clearly available to the plaintiff himself before judgment, he nevertheless complained that the state should have been aware of the filing and that it should not have been allowed to prevail on the strength of an incorrect assertion made in their summary judgment motion. *Smith*, 458 F.3d at 724. This Court reasoned that, on these facts, "the district court *had no obligation* to grant the motion." *Id.* at 725 (citing *E.F. Hutton & Co. v. Berns*, 757 F.2d 215, 216–17 (8th Cir. 1985)). It was the plaintiff's burden to get the facts right, and the defendant could hardly be faulted for making the same mistake the plaintiff did. The holding in this case was not that intentional

37

Appellate Case: 20-2351     Page: 44     Date Filed: 07/09/2020 Entry ID: 4932184

misrepresentation is a requirement of Rule 60(b)(3), but rather that misconduct should not be attributed to a defendant on facts such as these. 458 F.3d at 725. By conflating this holding with a rule that intentional misrepresentation is *required* for relief under Rule 60(b)(3), reasonable jurists could debate whether the district court appropriately considered Mr. Lee's motion.[30]

Reasonable jurists could also debate the district court's extension of *Smith* from a situation where both parties were or should have been aware of the information, to a situation in which indisputably only one party possessed the information *and* had a constitutional obligation to disclose it.

Reasonable jurists could also debate whether Rule 60(b)(3) was even at issue in *Smith*. The opinion does not specially address that provision of Rule 60, nor did the underlying Rule 60 motion that was filed in the district court invoke it or even allege intentional misrepresentation. *See Smith v. Clark*, No. 4:03CV3253 (D. Neb. June 21, 2005), Dkt. 57; APP. 71.

*Second*, *Dukes* is an unpublished case and is not precedent. Additionally, it does not hold that Rule 60(b)(3) requires that misrepresentations be intentional as a matter of law. The decision simply affirms the denial of a Rule 60 motion on the

---

[30] Moreover, *E.F. Hutton & Co.*, upon which *Smith* relied, does not hold that knowing and intentional misrepresentation is required to obtain Rule 60(b)(3) relief. It holds only that the alleged misrepresentations did not occur and that a misleading statement outside the presence of the jury did not prejudice the movants.

Appellate Case: 20-2351     Page: 45     Date Filed: 07/09/2020 Entry ID: 4932184

ground that the party complaining post-judgment that information was not turned over in discovery despite a request for it was obligated to pursue that matter during discovery and *before* summary judgment, not after. 339 Fed. App'x at 668. In short, *Dukes* is a case about a belated request for discovery. (By contrast, Mr. Lee repeatedly requested that *Brady* material be disclosed prior to his trial and renewed his request in his § 2255 proceeding.) Reasonable jurists could accordingly debate the district court's reliance on it to fashion a rule that allegations of intentional misrepresentation are required before a movant may satisfy Rule 60(b)(3).

Ultimately, there is no rule in this Circuit that Rule 60(b)(3) is limited to circumstances where a party has alleged that the opposing party engaged in intentional misrepresentation. Rather, with respect to representations, the touchstone appears to be whether any misrepresentation—intentional or not— prejudiced the presentation of the movant's case in the proceeding. *See E.F. Hutton & Co.*, 757 F.2d at 217 (affirming denial because misleading statement did not prejudice case). Whether the movant independently had access to the same information, *Smith*, 458 F.3d at 724, or whether the movant could have received the information through normal discovery mechanisms, *Dukes*, 339 Fed. App'x at 668, are relevant considerations in determining whether a misrepresentation prejudiced a party's ability to litigate his or her case. This rule is consistent with

Appellate Case: 20-2351     Page: 46     Date Filed: 07/09/2020 Entry ID: 4932184

the rule of almost all the circuits who have addressed it.[31] The decisions of other

circuits demonstrates, if nothing else, that reasonable jurists do disagree that Rule

60(b)(3) requires allegations of intentional misrepresentation.

In this case, reasonable jurists could believe that the Government's

misrepresentation concerning the existence of favorable information in its

possession relevant to Mr. Humphrey—both at trial and just before Mr. Lee filed

his initial § 2255 motion—prejudiced his ability to raise constitutional claims that:

(1) the Government improperly withheld *Brady* material, and (2) that his

conviction was obtained in violation of *Napue v. Illinois*, 360 U.S. 264 (1959) and

*Giglio v. United States*, 405 U.S. 150 (1972), because the Government presented

false and misleading testimony about Mr. Humphrey's involvement in the Mueller

---

[31] As the district court recognized, the First, Fourth, Fifth, Seventh, Ninth and Eleventh Circuit Courts of Appeals interpret Rule 60(b)(3) in a manner that does not require a misrepresentation be intentional. Dkt.1403 at 16. Only the Sixth Circuit arguably does not. *Id.* (citing *Jordan v. Paccar, Inc.*, 97 F.3d 1452 (6th Cir. 1996) (per curiam) (unpublished opinion)). Even *Jordan*, however, does not hold what the district court construed it to hold, i.e., that Rule 60(b)(3) requires allegations of an intentional misrepresentation. Rather, Jordan held only that the rule requires proof "of some questionable conduct of some sort on the part of the non-moving party." *Jordan*, 1996 WL 528950, at *8. More specifically, it expressly permits "reckless" conduct to meet the standard of Rule 60(b)(3), and this includes any "affirmative misrepresentation"—as distinguished from an omission. *Id.* at *6 ("'Misrepresentation' can be interpreted as an affirmative misstatement."); *id.* at *8 (the "proper standard" requires the movant to demonstrate that the non-moving party "engaged in deliberate *or reckless* misbehavior"). Moreover, *Jordan* held that, once this is shown, relief is automatic unless the non-moving party shows that the conduct had no prejudicial effect on the outcome of the litigation. *Id.* at *8.

40

Appellate Case: 20-2351     Page: 47     Date Filed: 07/09/2020 Entry ID: 4932184

murders. The information was solely in the possession of the Government, and Mr. Lee had no independent access to it. More importantly, in the face of the Government's representations to the Court, he had no basis for asking for it.

Finally, because the Government had a constitutional duty to disclose the favorable information, Mr. Lee was entitled to rely on its representations that it complied with its constitutional obligation, including during his initial § 2255 proceeding. *Strickler v. Greene*, 527 U.S. 263, 284 (1999) (reasonable for both trial counsel and post-conviction to rely on representations of compliance made at trial); *Banks v. Dretke*, 540 U.S. 668, 693–94 (2004) (post-conviction litigant "cannot be faulted" for relying on representation made by the Government that all *Brady* disclosures have been made). Mr. Lee had no duty—at all—to conduct any independent investigation of the Government's representations about its compliance with its constitutional duties. Indeed, as this Court recently noted in *Jimerson v. Payne*, 957 F.3d 916, 927 (8th Cir. 2020):

> [D]ue diligence does not require a defendant to root out information that the State has kept hidden. The State cannot play "hide and seek" with information it was required to disclose and then accuse defense counsel of lacking due diligence. Due diligence does not require defense counsel to possess psychic abilities and discover potentially favorable evidence during trial that the State chose to conceal, particularly when defense counsel specifically requested disclosure of the evidence now at issue.

Moreover, interpreting Rule 60(b)(3) in a manner that imposes such an obligation on him violates due process and the principles recognized in *Strickler*

41

and *Banks*. Reasonable jurists would conclude that the trial and post-conviction misrepresentations made by the Government that it had already turned over all materials related to Paul Humphrey necessarily prevented him from presenting a *Brady* claim premised on Mr. Humphrey's polygraph results in his initial § 2255 motion.

**B.      Reasonable jurists could debate the District Court's conclusion that Mr. Lee did not allege intentional misrepresentation sufficient for Rule 60(b)(3) relief**

Even if reasonable jurists would not debate whether Rule 60(b)(3) in this Circuit requires a movant to allege intentional misrepresentation by an opposing party in a proceeding, reasonable jurists could nevertheless debate the district court's conclusion that such allegations were not made by Mr. Lee. Mr. Lee variously alleged that the Government "hid" the polygraph report, Dkt. 1363 at 3; that it "suppressed" the report, *id*.; that it "misled counsel and the Court," *id*. at 4; that it went "to great lengths to insulate its transgressions," *id*. at 5–6; that it committed "prosecutorial misconduct," *id*. at 6; that it had "used procedural and jurisdictional roadblocks to keep that evidence concealed," *id*.; that it "buried" the evidence, *id*.; that it "hid[] evidence of its misconduct," *id*. In short, reasonable jurists could believe the motion alleged intentional—and at least reckless—misrepresentations.

The Government's response did not deny any intentional or reckless

42

misconduct. Instead, the Government simply would "not concede" that the Humphrey polygraph report was in the Government's possession, "either at the time of trial or later during the § 2255 proceedings, let alone that the government knew the material was in its possession and intentionally failed to turn it over." Dkt. 1367 at 35. The Government represented that it had "reviewed its trial files" and had not located the polygraph report. *Id*. The Government denied that the ASP was part of the prosecution team. Dkt.1367 at 76. All this did, at best, was create a factual dispute about the nature of the misrepresentation the Government made and whether the ASP was, in fact, part of the prosecution team.

*Brady* does not require the Government only to disclose information within the prosecution file. It places affirmative duties on the Government lawyers to seek out all favorable information within law enforcement that work with the prosecuting lawyers. *See United States v. Robinson*, 809 F. 3d 991, 996 (8th Cir. 2016) ("This duty extends not only to evidence of which a prosecutor is aware, but also to material 'favorable evidence known to the others acting on the government's behalf in the case, including the police.'") (quoting *Kyles,* 514 U.S. 419); *United States v. Long*, 870 F.3d 741, 747 (8th Cir. 2017); *United States v. Tyndall*, 521 F.3d 877, 882 (8th Cir. 2008) ("A prosecutor has a duty to disclose evidence known by police officers, even if not known by the prosecutor, because a

43

prosecutor has a duty to learn of such information.").[32] A representation made by a Government lawyer that "[a]ll documents relating to Mr. Humphrey were provided to trial counsel" is not made in good faith if the lawyer has not fulfilled the lawyer's duty to seek all such information out first. Implicit in such a representation is that the duty has been fully complied with. At worst, this is an intentional misrepresentation when it is made without having diligently sought the information out. At best, it is a reckless misrepresentation.

Mr. Lee alleged in his reply that, regardless of whether the ASP was itself considered part of the prosecution team, the lead ATF agent who indisputably was a part of that team obtained the ASP file after the polygraph report had been created. Dkt. 1374 at 28. Mr. Lee attached records as evidentiary proffers to his reply showing the records had been obtained by the federal agency. Dkt. 1374-1– 1374-12. Regardless, to whatever extent any intentional or reckless misrepresentation depends upon who had the report and when, or whether the representation by the Government was made in the absence of a diligent search, this is a fact issue that requires adjudication and that cannot be resolved as a matter of law. The record is clear that Mr. Lee *alleged* intentional (and necessarily

<hr/>

[32] *See also Crivens v. Roth*, 172 F.3d 991, 996 (7th Cir. 1999) (reversing denial of habeas relief based on *Brady* violation); *United States v. Morris*, 80 F.3d 1151, 1169 (7th Cir. 1996); *Carey v. Duckworth*, 738 F.2d 875, 877–78 (7th Cir. 1984) ("a prosecutor's office cannot get around Brady by keeping itself in ignorance, or compartmentalizing information about different aspects of a case").

Appellate Case: 20-2351     Page: 51     Date Filed: 07/09/2020 Entry ID: 4932184

reckless) misrepresentation. For that reason, reasonable jurists could debate the district court's holding to the contrary.

### C. Reasonable jurists could debate the District Court's application of the law of the case doctrine

The district court held that this Court's law requires allegations of intentional misrepresentation to fall within the ambit of Rule 60(b)(3). Dkt. 1403 at 16. It separately held, in addition to this, that because it had applied that same rule to dispose of Mr. Lee's prior rule 60 motion, the law of the case doctrine required it to hold the same for purposes of the instant Rule 60 motion.[33] Reasonable jurists would debate this application of the law of the case doctrine.

To reach its conclusion that the law of the case doctrine constrained it, the district court relied on *Liddell by Liddell v. Bd. Of Educ. Of the City of St. Louis*, 121 F.3d 1201, 1216 (8th Cir. 1997), for the proposition that decisions that "either

---

[33] In his second-in-time § 2255 motion, Mr. Lee sought, in the alternative, relief under Rule 60(b)(3) for the suppression of the Wanker material. Dkt. 1297. He alleged that the Government's reference to its *Brady* disclosures in footnote 16 of its response to Mr. Lee's initial § 2255 motion misrepresented the Government's compliance with its *Brady* obligations. The district court, ruled that the Government's statements in that footnote were not made in response to Mr. Lee's renewed *Brady* requests, and therefore did not purport to be representations as to whether it had fulfilled its *Brady* obligations. Dkt. 1313 at 18 n.5. Although Mr. Lee does not concede that this ruling was "law of the case" that precluded the district court from revisiting this issue, it should be noted that his present Rule 60(b) motion raised an allegation of intentional misrepresentation that was not at issue in the prior litigation: the Government's written representation during the Kehoe § 2255 proceedings that all materials relevant to Mr. Humphrey had been disclosed to trial counsel.

45

Appellate Case: 20-2351    Page: 52    Date Filed: 07/09/2020 Entry ID: 4932184

have not been appealed or have been appealed and affirmed[] are the law of the case and need not be revisited." Dkt. 1403 at 17. Reasonable jurists could debate, however, whether this rule should apply in circumstances where a party has no right of appeal, attempted to appeal, but was denied an appeal for unknown reasons that could have nothing to do with the correctness of the legal ruling being urged. Mr. Lee tried to appeal the district court's prior denial of his Rule 60 motion, but the Eighth Circuit denied him the opportunity, over the dissent of Judge Kelly, providing no reasons why. *See Lee v. United States*, No. 19-2432 (8th Cir. Nov. 4, 2019) (order denying COA).

Judge Arnold's opinion in *In re Design Classics, Inc.*, 788 F.2d 1384 (8th Cir. 1986), has been cited as providing the rationale for this rule. *See Little Earth of the United Tribes, Inc. v. U.S. Dep't of Hous. & Urban Dev.*, 807 F.2d 1433, 1441 (8th Cir. 1986). In *In re Design Classics, Inc.*, Judge Arnold wrote,

> When an error of law is alleged, *the proper vehicle for attack on that error is the direct appeal*, filed either at once or after denial of a timely motion under Rule 59. *Upon expiration of the time allowed for appeal*, the judgment or order becomes the law of the case as to the parties. Such a judgment will be set aside only upon a showing that it was void from the beginning or that other extraordinary circumstances exist, for example, some good reason that precluded the moving party from advancing his contentions at an earlier, timely stage of the case.

788 F.2d at 1386 (emphasis supplied). Judge Arnold's exposition makes clear that the basis for the rule that a ruling which is not appealed becomes law of the case is a party's acquiescence in it. Mr. Lee agrees that the proper vehicle for attack on

46

Appellate Case: 20-2351     Page: 53     Date Filed: 07/09/2020 Entry ID: 4932184

what he asserts is the legal error of holding that intentional misrepresentation is required to satisfy Rule 60(b)(3) would have been a direct appeal. But he had no appeal as of right to contest that error.

Moreover, the COA denial from the Eighth Circuit is not an affirmance of the district court's denial of Mr. Lee's first Rule 60 motion nor is it a decision on the merits of any legal question. Indeed, reaching the merits of an appellate question on a COA determination is strictly prohibited. An appellate court lacks the jurisdiction to do so. *Miller-El*, 537 U.S. at 336 ("[U]ntil a COA has been issued federal courts of appeals lack jurisdiction to rule on the merits of appeals from habeas petitioners."). In denying a COA to Mr. Lee to appeal the denial of his first Rule 60 motion, this Court gave no reasons. Judgment, *Lee v. United States*, No. 19-2432 (8th Cir. Nov. 4, 2019). Thus, as a legal matter, the denial could have been predicated on the non-debatability of any procedural or substantive rulings the district court made and could have nothing to do with the specific question of whether Rule 60(b)(3) requires a showing of intentional misrepresentation.

For this reason, reasonable jurists could debate whether it was improper under these circumstances for the district court to invoke the law of the case doctrine with respect to the legal standard for Rule 60(b)(3).

47

**D. Reasonable jurists could debate the District Court's conclusion that the Government's misrepresentation did not interfere with Mr. Lee's ability to obtain meaningful review on his initial motion to vacate his conviction under § 2255**

The district court also held that the "alleged omission of any evidence did not prevent Mr. Lee from fully and fairly litigating his § 2255 petition." Dkt. 1403 at 18. Reasonable jurists would debate this proposition.

The Government's failure to disclose the Humphrey polygraph report, and its representation to the Court in the case that "[a]ll documents relating to Mr. Humphrey were provided to trial counsel," Dkt. 1087 at 32, indisputably precluded Mr. Lee from pleading allegations about that non-disclosure in his initial § 2255 motion. Whether those allegations would ultimately prove meritorious is a different question. But reasonable jurists would have little doubt concluding that the Government's unambiguous statement that it had already disclosed all materials concerning Mr. Humphrey interfered with Mr. Lee's ability fully and fairly litigate any due process claims on that factual basis as part of his § 2255 motion. Indeed, as the district court acknowledged, the Government made those written representations about disclosure of "all documents relating to Mr. Humphrey" *on the same docket* as Mr. Lee's § 2255 proceeding, Dkt. 1403 at 14, and the Government never corrected that misrepresentation after Mr. Lee filed his § 2255 motion and renewed his request for *Brady* materials about third party involvement in the crimes.

48

## E. Reasonable jurists could debate whether the District Court properly applied Rule 60(b)(6)

The district court also held that Mr. Lee's motion failed to allege extraordinary circumstances. But the district court based this holding only on its prior conclusion that Mr. Lee did not allege any intentional misrepresentations by the Government. Dkt. 1403 at 20. As explained, *supra*, this conclusion is erroneous. Moreover, by so holding, the court effectively created and applied a legal rule that extraordinary circumstances cannot exist as a matter of law where no party is alleged to have committed an intentional misrepresentation. Reasonable jurists could agree that this is not and cannot be the rule. They can further agree that the court below simply did not engage in the weighing of equities that is required to ascertain whether relief should be granted.

Rule 60(b)(6) is "properly invoked where there are extraordinary circumstances, or where the judgment may work an extreme and undue hardship, and should be liberally construed when substantial justice will thus be served." *Cornell v. Nix*, 119 F .3d 1329, 1332 (8th Cir. 1997) (citing *Mohammed v. Sullivan*, 866 F.2d 258, 260 (8th Cir. 1989)). "In simple English, the language of the 'other reason' clause, for all reasons except the five particularly specified, vests power in courts adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice." *Klapprott v. United States*, 335 U.S. 601, 614 (1949). *See also Buckeye Cellulose Corp. v. Braggs Elec. Const. Co.*, 569 F.2d

49

1036, 1038 (8th Cir. 1978) (citing *Klapprott*).

While a final judgment should not be disturbed unless extraordinary circumstances are present, ultimately the rule exists to permit courts to do justice. Reasonable jurists could conclude that doing justice in this case requires relief from the district court's order denying Mr. Lee's initial § 2255 motion, and that extraordinary circumstances are present to permit it. First, the judicial process, and *Brady* jurisprudence in particular, are predicated on the Government being an honest broker. But here, not only did the Government fail in its duty to ascertain the existence of information favorable to a defendant at trial, it also misrepresented its compliance with that duty at the time of Mr. Lee's trial, causing the court to dismiss as "moot" Mr. Lee's *Brady* motion. Further, it continued misrepresenting its compliance through his initial § 2255 proceeding, thus (so far) fatally frustrating the one and only post-conviction review process that the judicial system affords federal prisoners. Reasonable jurists could believe this caused an injustice to Mr. Lee and risks "undermining the public's confidence in the judicial process." *Buck*, 137 S. Ct. at 778 (quoting *Liljeberg*, 486 U.S. at 863–64).

Moreover, if Mr. Lee's *Brady* allegations are meritorious and adequate to warrant a retrial, then it stands to reason that the Government's failure to comply with its constitutional obligations during Mr. Lee's only opportunity to raise that complaint must be an extraordinary circumstance. That the Government failed to

50

comply with its constitutional obligations in a capital case in which the Government has sought to end the life of one of its citizens makes the circumstances all the more extraordinary.

The Government's failure to comply with its constitutional obligations has turned the criminal justice process on its head, forcing Mr. Lee to play the game "prosecutor may hide, defendant must seek" decried by the Supreme Court. *Banks*, 540 U.S. at 696. The fact that Mr. Lee only fortuitously learned of the polygraph report so long after trial heightens the extraordinary nature of his case and the egregiousness of the Government's conduct.

Finally, the extraordinary nature of this case is also demonstrated by the fact that the Government's misconduct with respect to the polygraph report is not an isolated incident; it is part of a broader pattern of non-disclosure of exculpatory information during both phases of Mr. Lee's trial. Although the Government has thus far succeeded in precluding the courts from reviewing its conduct, it is quite extraordinary that it has never—not once—unequivocally denied the factual allegations undergirding any of Mr. Lee's previous allegations of prosecutorial misconduct.[34] Reasonable jurists could accordingly believe the public could lose

---

[34] *See*, *e.g.*, *Lee v. United States*, No. 19-3576 (8th Cir. Jan. 7, 2020) (Order denying motion for authorization to file successive § 2255 motion) (Kelly, J., dissenting) (noting that the "government does not respond to [the] allegation" that it withheld exculpatory information from the defense contained in Cheyne's and Kirby's declarations about the non-existence of a racketeering enterprise); Dkt.

51

confidence in a judicial process that sanctions the deprivation of any remedy even in the face of (essentially) uncontested allegations of Government misconduct.

### III. In the Alternative, this Court Should Grant Mr. Lee Authorization to File a Successive § 2255 Motion

In the event this Court concludes that Mr. Lee's Rule 60 motion was successive, he respectfully moves that this request be construed as a motion for authorization to file a second or successive motion pursuant to § 2255(h)(1).[35]

---

1367 at 71-74 (Government response to Gloria Kehoe allegations; not denying that Mrs. Kehoe was mentally unstable, that case agents discussed their concerns about this with Cheyne and Kirby Kehoe (who provided additional information substantiating the case agents' concerns), and that the prosecution withheld this information from the defense); Dkt. 1307 at 31-37 (Government response to Wanker allegations; not denying that Mr. Wanker repeatedly warned authorities that Mr. Lee's statements were not trustworthy, that the Government omitted these warnings from its witness interview reports, and also omitted information from Mr. Wanker's written statement to the grand jury that was inconsistent with the prosecution theory); Dkt. 1367 at 80 (Government response to Paul Humphrey allegations; not responding to claim based on *Napue v. Illinois* and *Giglio v. United States* that the Government knew or should have known that Mr. Humphrey gave false or misleading testimony about his knowledge of the forged car titles and involvement in the murders).

[35] Mr. Lee believes this a proper Rule 60 motion, and has been diligently litigating it as such since shortly after the suppressed evidence was discovered. His motion had been pending in the district court since January, and was only denied on July 2, just seven days ago. Because he believes Rule 60 relief is appropriate, he would not normally have filed a Motion for Authorization before this Court resolves his COA. However, because the Government set an execution date on June 15, with only 27 days' notice, this has forced Mr. Lee to make this simultaneous alternative request.

52

Appellate Case: 20-2351     Page: 59     Date Filed: 07/09/2020 Entry ID: 4932184

## A. Legal Standard

Mr. Lee's claims should be authorized to proceed in district court if they are based on "newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense." 28 U.S.C. § 2255(h)(1).

A grant of authorization by this Court to file a successive motion is a preliminary determination: it is considered "tentative" because it merely allows the district court to more fully consider whether the requirements for filing a second motion are met. *Johnson v. United States*, 720 F.3d 720, 720-21(8th Cir. 2013). As such a movant must make not a definitive showing of innocence, but rather a "prima facie showing." *Id.* (citing *Bennett v. United States*, 119 F.3d 468 (7th Cir. 1997)). "'Prima facie' in this context means simply sufficient allegations of fact together with some documentation that would 'warrant a fuller exploration in the district court.'" *In re McDonald*, 514 F.3d 539 (6th Cir. 2008) (quoting *Bennett*, 119 F.3d at 469). This is a "lenient" and "not a difficult standard to meet." *In re Lott*, 366 F.3d 431, 432-33 (6th Cir. 2004); *see also In re Morris*, 328 F.3d 739, 741 (5th Cir. 2003) (Higginbotham, J., concurring) (even while "dubitante" on merits, under *Bennett* judge should not "dissent from an order allowing the district court to make a more informed judgment than is available to us, as a second gate to

53

Appellate Case: 20-2351    Page: 60    Date Filed: 07/09/2020 Entry ID: 4932184

leave to file a successive writ.").

Furthermore, this Court's initial review of an authorization request does not consider whether the movant actually qualifies for relief on his claims of error. *See In re Pendleton*, 732 F.3d 280, n.1 (3d Cir. 2013) (quoting *Goldblum v. Klem*, 510 F.3d 219 (3d Cir. 2007) ("'[S]ufficient showing of possible merit' in this context does not refer to the merits of the claims asserted in the petition. Rather, it refers to the merits of a petitioner's showing with respect to the substantive requirements of [authorization].")).

Mr. Lee must therefore make a preliminary or prima facie showing that he meets the requirements of 28 U.S.C. § 2255(h)(1), namely that his motion contains "newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found [him] guilty of the offense." Mr. Lee's evidence clearly meets this standard.

### B. Mr. Lee can make a prima facie showing that he meets the requirements of 28 U.S.C. § 2255(h)(1)

#### 1. Mr. Lee's claim is based on newly discovered evidence

The 1997 ASP report regarding Mr. Humphrey's polygraph examination was never disclosed to Mr. Lee's trial counsel or initial § 2255 counsel. It was newly discovered pursuant to an open records request to the ASP, and was not received by undersigned counsel until August of 2019, mixed in among over 650

54

pages of documents.

### 2. The newly discovered evidence establishes a material *Brady* violation

According to the Supreme Court, "[t]here are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler,* 527 U.S. at 281-282. In the context of a *Brady* violation, prejudice means that the suppressed evidence was "material." Id.

As noted above, the 1997 polygraph report was suppressed. There is ample evidence in the record that demonstrates that Government's case agents had obtained the report and or knew, or should have known of its existence. At each stage in the previous litigation, the Government (and its agents) failed to disclose this information. And every prior defense request for exculpatory evidence was rebuffed.

The polygraph report was unquestionably *Brady* material subject to disclosure. *Nelson*, 970 F.2d at 442, the Eighth Circuit held that pursuant to *Brady*, a police report regarding a witness's polygraph examination "should have been disclosed." Although the *Nelson* court ultimately denied relief because the suppressed polygraph evidence was cumulative to the information trial counsel elicited during cross-examination, the Eighth Circuit recognized its value as

Appellate Case: 20-2351     Page: 62     Date Filed: 07/09/2020 Entry ID: 4932184

impeachment evidence and made clear that the Government should not interpret the ruling as license to withhold such evidence moving forward:

> [W]e hasten to warn the government that any lack of straightforwardness in the non-disclosure of information to which the defense is clearly entitled will not be tolerated.

*Id. Nelson* was (and still is) good law. And the Government was undoubtedly aware that such material should have been disclosed. After all, it managed to turn over the polygraph report of a *different* witness prior to trial, and even apologized in writing to defense counsel for inadvertently omitting it from a previous packet of disclosures. APP. 73.

Additionally, there is no question that such evidence was favorable to the defense and material. Evidence that another suspect has taken and failed a polygraph test about whether he was involved in a murder that the defendant was charged with is "plainly exculpatory." *Watkins v. Miller*, 92 F. Supp. 2d 824, 842 (S.D. Ind. 2000). That was clearly the case here: Mr. Lee's defense was that he was not guilty, and that there were other likely suspects, such as Mr. Humphrey, that the Government failed to adequately investigate. The polygraph evidence was unmistakably relevant to his defense because it established that Mr. Humphrey was at the very least present during the Mueller murders and helped dispose of their bodies. If credited by the jury, then Mr. Lee could not have been convicted because this evidence contradicted the account of the murders provided by Gloria and

Appellate Case: 20-2351     Page: 63     Date Filed: 07/09/2020 Entry ID: 4932184

Cheyne, which was the only theory offered by the Government concerning Mr.

Lee's alleged involvement in the crime. [36]

### 3. The newly discovered evidence establishes material *Napue* and *Giglio* violations

Prosecutors violate due process by presenting material testimony that is false

or that creates a false impression, or by allowing such testimony to stand

---

[36] Such evidence would have been admissible at Mr. Lee's trial. There is no *per se* ban on the use of polygraph evidence in this Circuit. *United States v. Montgomery*, 635 F.3d 1074, 1094 (8th Cir. 2011); *United States v. Rouse*, 329 F.Supp.2d 1077, 1083 (D. S.D. 2004) (polygraph evidence no longer *per se* inadmissible in the Eighth Circuit). "To be admissible, polygraph evidence must be relevant, and its probative value must not be substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Montgomery,* 635 F.3d at 1094 (citations and internal quotation marks omitted). *See also Rouse*, 329 F. Supp. 2d at 1083 ("polygraph evidence could be admitted in the absence of a stipulation from the government, and even over its objection, if the evidence meets *Daubert* [*v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 570 (1993)] standards."). *See also United States v. Galbreath*, 908 F. Supp. 877 (D. N.M. 1995) (finding that polygraph examination based on control question technique satisfies *Daubert* standards).

The polygraph evidence was also admissible to impeach Mr. Humphrey's testimony. *See United States v. Piccinona*, 885 F.2d 1529, 1536 (11th Cir. 1989) (polygraph evidence admissible to impeach witness); *Nelson*, 970 F.2d at 442 (noting that polygraph report "should have been disclosed" as *Brady* evidence, but denying relief because information contained in the report was "fully elicited and developed" by defense counsel); *United States v. Padilla*, 908 F. Supp. 923, 929-31 (S.D. Fla. 1995). Here, Mr. Humphrey unequivocally testified that he was not involved in the Mueller murders, and that he had no knowledge that the signatures on the titles were forged. The polygraph report plainly indicated otherwise, and thus was clearly relevant impeachment, and certainly not cumulative. But for the Government's suppression, the defense could have confronted Mr. Humphrey on the stand with his polygraph report and impeached his testimony on both of these issues.

Appellate Case: 20-2351     Page: 64     Date Filed: 07/09/2020 Entry ID: 4932184

uncorrected. *Giglio v. United States*, 405 U.S. 150 (1972) (failing to correct false testimony violates due process); *Napue v. Illinois*, 360 U.S. 264 (1959) (failing to correct testimony that creates a false impression, though not perjured, violates due process). Due process is equally offended by direct statements that are untrue and the eliciting of testimony which "taken as a whole" gives the jury a "false impression." *Alcorta v. Texas*, 355 U.S. 28, 31 (1957); *Smith v. Dept. of Corrections*, 572 F.3d 1327, 1333-34 (11th Cir. 2009) ("The *Giglio* rule applies to explicit factual representations by the prosecutor at a side bar and implicit factual representations to the jury while questioning a witness."). This is so even where the particular prosecutor does not know that the testimony being presented is false or misleading but when a member of the team either knew or should have known. *See Giglio*, 405 U.S. at 154. It is the truthfulness of the process that is of utmost importance, even when the prosecutor acts in good faith and there is no intent to deceive. *Id*. at 153. Under *Napue v. Illinois*, 360 U.S. 264 (1959), and its progeny, a violation is established if: (1) the testimony in question was misleading; (2) the Government knew or should have known the testimony was misleading; and (3) the testimony was material.

The Government stood by silently as Mr. Humphrey testified at trial that he had no idea that the Muellers' signatures on the titles were forged, and then, most critically, when he denied any involvement in the murders. It never acted to correct

58

the testimony or otherwise notify defense counsel of material impeachment evidence. Indeed, it was the Government that elicited Mr. Humphrey's testimony that he had nothing to do with the crimes. Its misconduct violated the basic tenet of *Napue v. Illinois*, which prohibits "soliciting false evidence," and requires the prosecutor to not "allow[ ] it to go uncorrected when it appears." 360 U.S. at 269.

The polygraph examination establishes that Mr. Humphrey's testimony was false and misleading. That deceit was compounded by the Government in closing arguments. It told the jury that Mr. Humphrey had been thoroughly investigated and cleared by both local and federal law enforcement agencies:

> Then they spent a bunch of time during the trial trying to convince everybody that Paul Humphrey did it. Again you saw Mr. Humphrey testify. Now, Mr. Humphrey got in some trouble with the police. He got in that trouble because of those car titles. He had the Bill Mueller car titles. And Aaron Duvall [of the Pope County Sheriff's Office] did what a good officer would do. He wanted to get to the bottom of why Paul Humphrey had those car titles. So what does he do? He gets a search warrant. He goes out. He searches Humphrey's house. And they submit all these items for examination. [ATF Case Agent] Glen Jordan told you they traced those 40 firearms they found to see if one of them was Bill Mueller's. It wasn't. They sent off all this stuff to be examined. They didn't find anything. What did they find? They found one pamphlet that had Nancy Mueller's name on it. When Mr. Humphrey testified, what did he say? Yeah, I had that pamphlet. Nancy gave it to me. She wanted me to get into the product, whatever it was, and start using it. *There's no evidence against Mr. Humphrey.*

Tr. 6959-60 (emphasis added). The prosecution did not want to leave any door open as to Humphrey's involvement. Not only did the Government fail to correct the false testimony, but it reinforced it and capitalized on it in its closing argument.

59

Appellate Case: 20-2351     Page: 66     Date Filed: 07/09/2020 Entry ID: 4932184

For the same reasons articulated above, the Government knew or should have known that Mr. Humphrey's testimony was false or misleading. Here, the polygraph examination was conducted by the Arkansas State Police, which cooperated and coordinated with both the Pope County Sheriff's Office and federal authorities in the investigation of the Mueller murders. Any knowledge by the Arkansas State Police regarding Mr. Humphrey's polygraph examination must be imputed to the Government. *Kyles*, 514 U.S. at 437 ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police."). *See also United States v. Antone*, 603 F.2d 566, 569-70 (5th Cir. 1979) (imputing knowledge in state hands to federal prosecutors because of degree of cooperation and interaction among the various authorities during the general course of the investigation).

There is no question this violation was material. "Claims arising under *Giglio v. United States* [] are a type of *Brady* claim that have a different and more defense friendly measure of materiality." *Hammond v. Hall*, 586 F.3d 1289, 1306-07 (11th Cir. 2009). Under this type of claim, the defendant is entitled to a new trial "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976). The "could have" standard requires a new trial unless the prosecution persuades the court that the misleading testimony was harmless beyond a

60

reasonable doubt. *Ford v. Hall*, 546 F.3d 1326, 1332 (11th Cir. 2008) (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)). "This standard favors granting relief. It is shaped by the realization that 'deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice.'" *Id*. at 1333-34 (quoting *Giglio*, 405 U.S. at 153).

All of the reasons articulated above to show that the suppressed evidence was material to Mr. Lee's defense under *Brady* apply with even greater force to show why the *Napue*/*Giglio* violation was not harmless beyond a reasonable doubt. The fact that the Government not only solicited the false evidence, but also then capitalized on it in closing arguments, is enough to warrant reversal. *See United States v. Sanfilippo*, 564 F.2d 176, 179 (5th Cir. 1977) (where prosecutor failed to correct false testimony that witness did not receive a plea deal in exchange for his cooperation, and then argued that it was a relevant matter for jury to consider in evaluating witness's credibility, combined prejudice warranted reversal); *United States v. Bigelesein*, 625 F.2d 203, 208-09 (8th Cir. 1980) (granting habeas relief where "combined effect" of prosecutor's failure to correct false testimony and misleading closing argument violated due process); *United States v. Foster*, 874 F.2d 491, 495 (8th Cir. 1988); *United States ex rel. Dowd v. Lane*, 574 F. Supp. 972, 974–75 (N.D. Ill. 1983), *aff'd*, 762 F.2d 1015 (7th Cir. 1985) (failure of

61

prosecutor to correct testimony he knew was "likely to convey a false impression to the jury" and "deliberately emphasized the testimony by repeating it").

The Government's blunt elicitation of Mr. Humphrey's testimony denying his involvement in the murders, as well as its arguments in summation indicating that Mr. Humphrey had been properly investigated and ruled out as a suspect, carried the imprimatur of the Department of Justice, as well as every investigative agency that participated in the case. The jury would have felt entitled to believe with confidence that the Government had thoroughly investigated Mr. Humphrey and cleared him of any wrongdoing. The newly disclosed evidence would have shaken any trust the jury had in the Government's representation, particularly if it had learned that prosecutors had buried such explosive information. There is thus "any reasonable likelihood that the false testimony could have affected the judgment of the jury," *Agurs*, 427 U.S. at 103, and the Government cannot prove that it was harmless beyond a reasonable doubt.

### 4. Mr. Lee's allegations constitute a prima facie showing that no reasonable factfinder would have found him guilty of the underlying offense

To obtain authorization to file a second § 2255 motion, Mr. Lee must establish before this Court a prima facie case sufficient to warrant fuller exploration in the district court. *Woods v. United States*, 805 F.3d 1152, 1153 (8th Cir. 2015). The Court does "not need to find that given the alleged constitutional

Appellate Case: 20-2351     Page: 69     Date Filed: 07/09/2020 Entry ID: 4932184

violation no reasonable factfinder would have found [movant] guilty of the underlying offense; instead, [the Court] simply must determine whether there are 'sufficient allegations' together with 'some documentation' so as to require a district court to engage in additional analysis in order to ascertain whether but for the constitutional error, no reasonable factfinder would have found [movant] guilty of the underlying offense." *In re McDonald*, 514 F.3d at 546-47. Mr. Lee is able to do that here.

There are clearly "sufficient allegations"—concerning the *Brady* and *Napue*/*Giglio* violations—together with "some documentation"—the newly discovered 1997 report of the Humphrey polygraph examination—to warrant further exploration in the district court to ascertain whether, but for these due process violations, not reasonable factfinder would have found Mr. Lee guilty of the underlying offense.

Moreover, the Court is not limited to reviewing the facts underlying the due process claims simply in light of the evidence presented at trial. Rather, the Court must consider those facts "in light of the evidence as a whole," 28 U.S.C. § 2244(b)(2)(B)(ii), and thus against the backdrop of all of the new evidence Mr. Lee has uncovered to date. *Schlup v. Delo*, 513 U.S. 298, 328 (1995) (determination must be made "in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence

63

Appellate Case: 20-2351     Page: 70     Date Filed: 07/09/2020 Entry ID: 4932184

tenably claimed to have been wrongly excluded or to have become available only after the trial") (internal quotations omitted). *See also Cooper v. Woodford*, 358 F.3d 1117, 1122 (9th Cir. 2004) ("Once a *Brady* violation has been established, a federal habeas court is required to evaluate all information in the case, not just information relevant to the Brady violation").

Considered in light of the DNA evidence, Mr. Wanker's declaration, and newly discovered evidence concerning mental health issues that impaired Gloria Kehoe's ability to accurately perceive and recollect events (and the Government's concealment of the same),[37] the conclusion that Mr. Lee's due process claims satisfy the requirements of § 2244(b)(2)(B)(ii) is inescapable.[38]

## CONCLUSION

For the foregoing reasons, the Court should certify an appeal of the district court's denial of Mr. Lee's Rule 60 motion. In the alternative, the Court should grant Mr. Lee authorization to file a second or successive § 2255 motion.

---

[37] *See* Dkt. 1363 at 35-43; Dkt. 1363-3; Dkt. 1363-4.

[38] Such a showing with respect to even a single claim is sufficient to require the Court to authorize the filing of the entire application (which in this case is the previously. *See In re Williams*, 330 F.3d 277, 281 (4th Cir. 2003) (noting that, if any of the claims in the proposed application meet the statutory threshold, permission will be granted to file the application is its entirety); *Cooper*, 358 F.3d at 1123 (same).

Appellate Case: 20-2351     Page: 71     Date Filed: 07/09/2020 Entry ID: 4932184

Respectfully submitted,

/s/ Morris H. Moon
Morris H. Moon
Bar# 24032750 (TX)
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(713) 880-3556
Morris_Moon@fd.org

/s/ George G. Kouros
George G. Kouros
Bar # 420813 (CT)
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 821-0855
George_Kouros@fd.org

Counsel for Daniel Lee

65

# CERTIFICATE OF SERVICE

This will certify that, on July 9, 2020, Appellant's counsel served this

motion upon the United States by filing the document via this Court's ECF system.

/s/  George G. Kouros
George G. Kouros
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 821-0855
George_ Kouros@fd.org

Counsel for Daniel Lewis Lee

Appellate Case: 20-2351     Page: 73     Date Filed: 07/09/2020 Entry ID: 4932184