IN THE
UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

_____

No. 20-2351
_____

DANIEL LEWIS LEE,
Appellant,

v.

UNITED STATES,
Appellee.

_____

On Appeal from the United States District Court
Eastern District of Arkansas
No. 4:97-cr-00243-KGB-2

_____

**APPENDIX**
_____

MORRIS H. MOON
Bar# 24032750 (TX)
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(713) 880-3556
Morris_Moon@fd.org

GEORGE G. KOUROS
Bar # 420813 (CT)
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 821-0855
George_Kouros@fd.org

Counsel for Appellant Daniel Lewis Lee

## Appendix Index

*United States v. Daniel Lee*, No. 4:97-cr-243 (E.D. Ark. Feb. 26, 2019), Dkt. 1401 (Order denying Rule 60(b) motion)………….…..…………..APP.1

Humphrey Interview and Polygraph Examination Report (1/21/97)……..…..APP.23

Serological Research Institute Mitochondrial DNA Report………………….APP.32

FBI letters thanking Arkansas State Police (9/20/99)……………………..APP.46

FBI memo re: cooperation with Arkansas State Police (6/3/97)…………….APP.50

ATF report, Mueller investigation with Arkansas State Police (7/3/96)…….APP.62

Excerpt, 10/26/96 joint interview of Jeff Brown (Page 1)…………………..APP.65

Excerpt, 10/30/96 joint interview of Jeff Brown (Page 1)……………………APP.66

Excerpt, 11/18/96 joint interview of Bobby Hausy (Page 1)………………....APP.67

Arkansas State Police Mueller Investigation Case File Log Sheet…………...APP.68

FBI memo re: obtaining Arkansas State Police investigative reports (9/10/97)………………………………………………………APP.69

*Smith v. Clark*, No. 4:03CV3253 (D. Neb. June 21, 2005), Dkt. 57…………..APP.70

USA discovery letter to trial counsel (2/19/98)…………………………….APP.73

**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

**CAPITAL CASE**

**UNITED STATES OF AMERICA**                                                               **PLAINTIFF**

**v.**                                      **Case No. 4:97-cr-00243-02 KGB**

**DANIEL LEWIS LEE**                                                                        **DEFENDANT**

**OPINION AND ORDER**

Before the Court is a motion for relief from judgment or order pursuant to Federal Rule of Civil Procedure 60 filed by defendant Daniel Lewis Lee (Dkt. No. 1363). The government responded in opposition to the motion (Dkt. No. 1367). Mr. Lee replied (Dkt. No. 1374). For the following reasons, the Court denies the motion (Dkt. No. 1363).

**I.      Overview**

Mr. Lee is a federal death row inmate. In a 1999 trial over which the Honorable G. Thomas Eisele presided, Mr. Lee and co-defendant, Chevie Kehoe, were convicted of conspiring to violate and violating the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c)-(d), and of three murders in aid of racketeering in violation of 18 U.S.C. § 1959(a)(2) (Dkt. No. 810). The victims were William Mueller, Nancy Mueller, and Nancy Mueller's minor daughter Sarah Powell. During the penalty phase, the jury first decided that Mr. Chevie Kehoe should be sentenced to life imprisonment and then, separately, that Mr. Lee should be sentenced to death (Minutes: Jury Trial May 10, 1999 (Chevie Kehoe); Dkt. Nos. 807, 816 (Danny Lee)). The Eighth Circuit affirmed Mr. Lee's conviction and death sentence. *United States v. Lee*, 374 F.3d 637 (8th Cir. 2004), *cert. denied*, 545 U.S. 1141 (2005). Before filing his current motion, Mr. Lee has

**APP.1**

Appellate Case: 20-2351      Page: 3      Date Filed: 07/09/2020 Entry ID: 4932184

raised, and courts including this Court have examined, several challenges to his conviction and sentence.

In his current motion, Mr. Lee argues that he is entitled to set aside the prior 28 U.S.C. § 2255 Order (Dkt. No. 1163), pursuant to Federal Rule of Civil Procedure 60. Mr. Lee contends that, during the § 2255 proceedings, the government engaged in misconduct and made misrepresentations by failing to disclose two pieces of evidence: (1) the results from a polygraph test administered early in the investigation to a third-party suspect, Paul Humphrey; and (2) the mental instability of government witness, Gloria Kehoe, mother of co-defendant Mr. Chevie Kehoe. In support of his current motion, Mr. Lee asserts that he made a direct request for the new evidence. Mr. Lee argues that the government's alleged misconduct and misrepresentations prevented him from raising § 2255 claims based on these two pieces of evidence that his convictions were obtained in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), *Napue v. Illinois*, 360 U.S. 264 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972) (Dkt. No. 1363, at 1, 38-64). Further, Mr. Lee contends for the first time in his reply that the government's failure to disclose this evidence also affected the Court's adjudication of two raised ineffective assistance of counsel claims (Dkt. No. 1374, at 18-20).

The Court acknowledges that a threshold question in resolving the pending motion is whether Mr. Lee's current motion, although titled a Rule 60 motion, is in fact a successive § 2255 motion within the meaning of 28 U.S.C. § 2255(h)—which would subject his current motion to the requirement of prior authorization by the Court of Appeals for the Eighth Circuit. 28 U.S.C. § 2255(h); 28 U.S.C. § 2244(b)(3)(A). This Court concludes that, if it is, Mr. Lee has not properly obtained authorization from the Eighth Circuit to file a successive § 2255 motion and that, regardless, Mr. Lee is not entitled to the relief he seeks under Federal Rule of Civil Procedure 60.

**APP.2**

For these reasons, the Court denies Mr. Lee's motion and denies the relief he seeks (Dkt. No. 1363).

## II.       Analysis

### A.       Evidence And Alleged Conduct

Two pieces of evidence are at issue in Mr. Lee's current motion.  To support his motion, Mr. Lee attaches the polygraph questions and examiner's opinion from a test administered to Mr. Humphrey in January 1997 by the Arkansas State Police.  According to those papers, Mr. Humphrey's physiological responses indicated that Mr. Humphrey was untruthful in answering questions about his involvement in the Mueller murders, the murders for which Mr. Chevie Kehoe and Mr. Lee were convicted.  The examiner's opinion was that Mr. Humphrey was involved in the Muellers' deaths (Dkt. No. 1363-2).  Mr. Lee maintains that he obtained the polygraph evidence from the Arkansas State Police through an Arkansas Freedom of Information Act request.

Mr. Lee states that, after Mr. Humphrey failed the polygraph exam administered by the Arkansas State Police, the government "took over the investigation of the case from local authorities," "hid[] this report from the defense," permitted Mr. Humphrey to testify that he was not involved in the crimes, and told the jury during closing argument that its investigation did not reveal any evidence connecting Mr. Humphrey to the murders (Dkt. No. 1363, at 6, 15, 49, 50). Mr. Lee refers to the trial transcript (*Id.*, at 15, 50).

Mr. Lee points out that, at trial, defense lawyers asked Mr. Humphrey why he had the Muellers' forged vehicle titles and about his familiarity as a skin diver with Lake Dardanelle, where the Muellers' bodies were discovered (Trial Tr. 6169, 6174-76, 6191-92, 6201).  Mr. Humphrey testified that he and William Mueller had a plan to exchange vehicle titles to take their vehicles "from the state out of its hands" (Trial Tr. 6154-62).  Mr. Humphrey said that, after the

Appellate Case: 20-2351     Page: 5     Date Filed: 07/09/2020 Entry ID: 4932184

Muellers' disappearance, he convinced their landlord to send him their titles (Trial Tr. 5717, 6153-55, 6161-62, 6176).  On cross-examination, Mr. Humphrey responded that he was not involved in the Muellers' deaths (Trial Tr. 6204).  The government argued in closing that "[t]here's no evidence against Mr. Humphrey." (Trial Tr. 6959-60).

Also in support of his motion, Mr. Lee argues that the government concealed evidence related to Ms. Gloria Kehoe's mental instability.  Mr. Lee maintains that Ms. Gloria Kehoe's son and husband repeatedly told federal case agents about her condition and that this evidence would have "destroyed her credibility." (Dkt. No. 1363, at 6).  As to the government's alleged awareness of Ms. Gloria Kehoe's mental instability, Mr. Lee attaches affidavits from two of her family members, dated November 1 and 3, 2019.  Ms. Gloria Kehoe's son, Cheyne Kehoe, attests that he told federal agents before trial that Ms. Gloria Kehoe was "unstable," "paranoid," and "sees and hears things that aren't there, so much so that my dad took her for psychiatric treatment." (Dkt. No. 1363-3, at 9).  Ms. Gloria Kehoe's husband, Kirby Kehoe, attests that he told federal agents before trial that Ms. Gloria Kehoe "sometimes had panic attacks and sometimes she had what she called dreams where she saw things happening to us, like seeing people (sometimes government agents) assaulting her." (Dkt. No. 1363-4, at 5).

In further support of his motion, Mr. Lee refers to the trial court's denial of a trial motion to compel Ms. Gloria Kehoe to undergo a psychiatric examination, filed by Mr. Chevie Kehoe's lawyer, and a bench conference during Ms. Gloria Kehoe's testimony where Mr. Chevie Kehoe's lawyer asked if there was any outstanding material the government had not provided (Dkt. No. 1363, at 13).  Mr. Lee argues that evidence of Ms. Gloria Kehoe's mental condition was particularly significant because she was a key witness who testified that Mr. Lee confessed to her regarding his involvement in the murders.

**APP.4**

To understand whether, and if so how, this evidence and related allegations have been addressed previously in this matter, the Court examines this case's relevant procedural history.

### B.        Relevant Procedural History

In a previous motion, Mr. Lee made similar arguments based on two other pieces of evidence (Dkt. No. 1297).  When ruling on that prior motion, Judge J. Leon Holmes denied relief pursuant to Rule 60(b)(3) and (d)(3) (Dkt. No. 1313).[1]  Judge Holmes examined the prior procedural history of Mr. Lee's case to that point, and the Court does not repeat that history here (*Id.*, at 2-5).  Instead, the Court focuses on prior treatment of the evidence or issues related to the two pieces of evidence upon which Mr. Lee bases his current challenge.

In 2006, Mr. Lee filed his first motion to vacate his conviction and sentence under 28 U.S.C. § 2255 (Dkt. No. 1118).  Judge Eisele denied the post-conviction motion without a hearing (Dkt. No. 1163).  *United States v. Lee*, No. 4:97-CR-00243-(2) GTE, 2008 WL 4079315 (E.D. Ark. 2008).   Relevant here, Mr. Lee, as part of an actual-innocence argument, listed "disturbing" issues raising "new questions." (Dkt. No. 1118, at 6).  He included in that list a general, unsupported *Brady* allegation:  "Newly-discovered evidence, or evidence withheld in violation of the government's *Brady* obligations, that others carried out the murders of the Mueller family." (*Id.*, at 7).

Mr. Lee added this footnote:

> With regard to the Government's constitutional *Brady* obligations, Movant's counsel requests that the Government review its files and the files of its investigating agencies for any information favorable to the defense bearing on guilt or punishment, including—but not limited to—any evidence that other members of white supremacist or Christian Identity groups, or other like groups, were responsible for the murders of the Mueller family or otherwise played a role in the crimes charged in, or related to, this case.  Should additional *Brady* evidence be

---

[1] Judge G. Thomas Eisele presided over this case when the indictment was handed down in 1997 (Dkt. No. 1).  In 2012, the case was reassigned to Judge J. Leon Holmes (Dkt. No. 1212). In 2019, the case was reassigned to the undersigned (Dkt. Nos. 1325; 1326).

discovered, Movant will amend the petition and seek relief appropriate to the nature of the material newly-disclosed or uncovered.

(*Id.*, at 7 n.3 (internal citations omitted)).

The government did not respond to the *Brady* footnote. The government responded to Mr. Lee's actual-innocence argument by noting his § 2255 motion consisted of "barebones claim allegations without discussion of supporting legal principles or, for that matter, much factual context." (Dkt. No. 1126, at 26 n.13). The government argued that, even if a freestanding claim of actual innocence was recognized, the guilt evidence was overwhelming and that Mr. Lee failed to cast doubt on his conviction (*Id.*, at 30). Judge Eisele did not specifically address Mr. Lee's actual-innocence arguments or general *Brady* allegation. He did track the evidence supporting the conviction and found that the jury's guilty verdict was "well-founded." (Dkt. No. 1163, at 5-18). *Lee*, 2008 WL 4079315, at *2-7.

In an ineffective assistance of counsel claim also potentially relevant to the pending motion, Mr. Lee argued that his trial lawyers should have objected to the government's pretrial motion seeking to bar him from access to discovery (Dkt. No. 1118, at 18-19). The government responded that Mr. Lee "distort[ed] what occurred at trial." (Dkt. No. 1126, at 45). The government explained that it turned over a "huge amount of 'discovery' materials" before trial, and Mr. Lee "sent copies of [some] material to his associates in an effort to have witnesses harmed." (*Id.*, at 45, 45 n.16). The government maintained that "[t]he vast majority of the material [was] *Jencks* material" and only a "small amount of the material was Rule 16 discovery and *Brady* material." (*Id.,* at 45 n. 16). The government challenged the ineffectiveness claim on the ground that, because "[a]s practically all the materials were *Jencks* materials, had Lee's trial attorney objected to any limitations on providing Lee copies, the government could have provided *Jencks* material at the time the statute directs, *i.e.,* after the witness completed his direct examination,"

and "[t]his would have crippled the ability of defense attorneys to timely prepare for trial." (*Id.*, at 45).  Judge Eisele denied the ineffectiveness claim, finding that there was no dispute that Mr. Lee used the *Jencks* materials in a threatening manner and that, if Mr. Lee's lawyers had objected, the government would have stopped providing the *Jencks* materials in advance (Dkt. No. 1163, at 43-45).  *Lee*, 2008 WL 4079315, at *21-22.

Also in Mr. Lee's § 2255 motion, he raised two other possibly relevant ineffective assistance of counsel claims:  (1) trial lawyers failed to call witnesses in support of a third-party culpability defense, including three individuals who Mr. Lee maintains could have testified about Mr. Humphrey's possible involvement in the murders:  (a) David Hill, who Mr. Lee contends would have testified that he saw Mr. Humphrey and another man throwing something off the bridge over the Illinois Bayou, where the Muellers' bodies were found; (b) Glen Hinson, who Mr. Lee argues would have testified that, after Mr. Humphrey obtained the Muellers' vehicle title, he was nervous and scared and that Nancy Mueller was frightened of Mr. Humphrey; and (c) Eldon King, who Mr. Lee represents would have testified that Mr. Humphrey began acting strangely after the Muellers disappeared (Dkt. No. 1118, at 15); and (2) trial lawyers were remiss in not asking Ms. Gloria Kehoe on cross-examination about her interview statement that Mr. Chevie Kehoe told her that he and Mr. Lee had remained in Arkansas after the murder, given that Mr. Lee asserts that, if Mr. Chevie Kehoe and he had stayed over in Arkansas, they could not have returned to Washington per the timeline proposed by the government (*Id.*, at 13).

The government responded to Mr. Lee's claims by arguing that Ms. Gloria Kehoe did not make any statement about Mr. Chevie Kehoe and Mr. Lee remaining in Arkansas (Dkt. No. 1126, at 37).  The government argued that Mr. Lee's lawyer was aware of Mr. Hill's potential testimony and made a reasonable decision that testimony would not be helpful.  The government also argued

Appellate Case: 20-2351     Page: 9     Date Filed: 07/09/2020 Entry ID: 4932184

that Mr. Hinson's testimony would not have benefitted Mr. Lee, given the jury's opportunity to consider Mr. Humphrey's testimony.  The government also argued that Nancy Mueller's alleged statement about being fearful of Mr. Humphrey was inadmissible.  Further, the government argued that Mr. King's testimony would have been that Mr. Humphrey "began acting strangely long before the Muellers disappeared," and that Mr. Lee "fail[ed] to explain how this evidence could possibly have benefitted him" (*Id.*, at 38-39).

The Court determined that the trial lawyers' decision not to call Mr. Hill as a witness was a "legitimate trial strategy" and that "there [wa]s no indication that such testimony would have altered the outcome of the trial." (Dkt. No. 1163, at 26).  *Lee*, 2008 WL 4079315, at *12.  The Court found that the ineffectiveness claim stemming from the failure to call Mr. Hinson and Mr. King as witnesses did not satisfy *Strickland* performance or prejudice.  "Petitioner's trial counsel attempted, but failed, to establish a link between Humphrey and the death of the Muellers. Humphrey was questioned in detail about the circumstances under which he acquired the title to William Mueller's vehicle and the fact that he attempted to have the title transferred to himself." (Dkt. No. 1163, at 26-27).  *Lee*, 2008 WL 4079315, at *12.

To determine what Ms. Gloria Kehoe said in the pretrial interview about Mr. Chevie Kehoe and Mr. Lee staying in Arkansas, the Court ordered the defendants to produce a transcript of the interview (Dkt. No. 1154).  The Court quoted the interview excerpt in the Order (Dkt. No. 1163, at 37).  Ms. Gloria Kehoe stated that Mr. Chevie Kehoe told her that, after murdering the Muellers, he and Mr. Lee "rode around" to see "how the media would handle it." (*Id.*).  When pressed, Ms. Gloria Kehoe was less sure:  "That's why I'm, that's what I believe he said," and "I'm not sure if it was that area or the outside of that area.  I can't be quoted on that." (*Id.*).  Then, she testified:

> AD (Deputy Sheriff):  Did he tell you where he and Danny went right after they disposed of the bodies?  Where did they go?

GK:  You know, I was in shock by then.

AD:  Mm mh (Affirmative).

GK:  I'll be very honest with you.  I believe they just headed straight back to Spokane.  I just remember him saying that they hung around for a few days.  That could have been at Danny's mother's house [in Oklahoma] and then they came back to Spokane.

(*Id.* at 38).

The Court determined:

The Government replies that Gloria[2] was momentarily confused about the Spokane City Hall bombing and the Mueller murders, and that the follow-up questions establish that she was aware of this confusion.  Additionally, she made it clear that she was unsure about Kehoe's remarks, and ultimately stated that she believed "they just headed straight back to Spokane."  Thus, it appears to the Court that even if trial counsel had questioned Gloria about the statement, she would have been easily rehabilitated by the Government.

Finally, even if it could be said that counsel's cross-examination of Gloria was constitutionally deficient, Petitioner suffered no prejudice because it would not have altered the result.  Defense counsel effectively used what they had to work with in an effort to create reasonable doubt.  They were, of course, limited by the facts.  Admittedly, Gloria was an important Government witness.  She was a difficult witness to cross-examine because of the fact that she testified convincingly, consistently with her prior statements, and against her own son [Chevie Kehoe].

(*Id.*).

Judge Eisele also denied Mr. Lee's Federal Rule of Civil Procedure 59(e) motion.  *United States v. Lee*, 2010 WL 5347174 (E.D. Ark. 2010).  The Eighth Circuit affirmed the denial of the § 2255 petition and the denial of the Rule 59(e) motion.  *United States v. Lee*, 715 F.3d 215 (8th Cir. 2013).

---

[2]  The Court recognizes that the government alleged in the § 2255 responsive brief that Mr. Chevie Kehoe and Mr. Lee told Ms. Gloria Kehoe that they lingered after bombing the Spokane City Hall, not after murdering the Muellers; the government's argument therefore was that Mr. Lee, not Ms. Gloria Kehoe, was confusing the Spokane City Hall incident with the Mueller murders (Dkt. No. 1126, at 37).

In September 2018, Mr. Lee filed a motion to vacate his conviction and sentence under § 2255, or, in the alternative, for relief under Federal Rule of Civil Procedure 60 (Dkt. No. 1297). In this § 2255 motion, Mr. Lee first argued that newly discovered evidence demonstrated *Brady* and *Napue-Giglio* violations at trial. Government witness James Wanker testified during the guilt phase that Mr. Lee confessed to him that Mr. Lee committed the murders. Mr. Lee argued that his conviction should be vacated because new evidence demonstrated that Mr. Wanker told the government before trial that he did not believe Mr. Lee's confession. The government introduced penalty-phase evidence that Mr. Lee was convicted of robbery; the government also argued that Mr. Lee committed murder in connection with the robbery but that Oklahoma prosecutors gave him a "gift" by not charging him with murder. Mr. Lee argued that his sentence should be vacated because the government suppressed an Oklahoma state-court document reflecting that Mr. Lee was not charged with murder due to a lack of evidence. Judge Holmes determined the *Brady* and *Napue-Giglio* claims constituted a second or successive habeas application requiring authorization from the Eighth Circuit.

Mr. Lee alternatively asked the Court to consider his application pursuant to Rule 60 and to reopen his § 2255 proceedings, arguing that the government violated its duties under *Brady* and *Napue-Giglio* to disclose that same evidence during those proceedings. Mr. Lee argued that the government made misrepresentations in its habeas responsive brief. Judge  Holmes found that, "[a]ssuming that Lee ha[d] properly asserted a Rule 60 motion as opposed to a second or successive habeas petition, he [wa]s not entitled to relief under either Rule 60(b)(3) or (d)(3)." (Dkt. No. 1313, at 18). Relevant here, the Court considered Mr. Lee's arguments that: (1) the government made a misrepresentation in Footnote 16 of the government's § 2255 responsive brief by stating "[a] huge amount of 'discovery' materials were provided" (*Id.*, at 17-18 (quoting Dkt. No. 1126, at 45

**APP.10**

n.16)); and (2) the general *Brady* allegation in the § 2255 petition would have been viable if the government had disclosed supporting material.

In his analysis, Judge Holmes recognized that Footnote 16 was not a response to a discovery request:

> Lee refers to Footnote 16 as being part of the Government's response to his general, unsupported *Brady* allegation.  Document #1118 at 7.  Footnote 16, however, was in the response to Lee's ineffectiveness claim challenging his trial lawyers' failure to oppose the Government's motion seeking restrictions on his personal discovery access. Document #1126 at 45, n. 16.

(Dkt. No. 1313, at 18 n.5).

Judge Holmes determined that Mr. Lee's request for relief under Rule 60(b)(3) was untimely and, alternatively, that Mr. Lee had not demonstrated the "exceptional circumstances" required for Rule 60 relief (*Id.*, at 18-19 (citing *Atkinson v. Prudential Prop. Co., Inc.,* 43 F.3d 367, 371 (8th Cir. 1994)).   Specifically, Judge Holmes explained that:

> For Rule 60(b)(3) relief, Lee must show by clear and convincing evidence that the Government "engaged in fraud or other misconduct and that this conduct prevented [him] from fully and fairly presenting his case." *Cook v. City of Bella Villa,* 582 F.3d 840, 855 (8th Cir. 2009) (quotations omitted).  Lee has not met this burden. While failure to produce evidence requested in discovery may under some circumstances be grounds for vacating a judgment, the moving party must show that the failure was due to misconduct by the party that should have produced the evidence.  *Atkinson*, 43 F.3d at 373.  Lee has not alleged facts to show that the omission of any evidence during his § 2255 proceeding was due to the Government's misconduct or that the Government intentionally misrepresented any facts.  Nor has he demonstrated that any failure to disclose Wanker's opinions or the Oklahoma judicial finding prevented him from fully and fairly litigating his initial § 2255 claim.  "This is not a case in which [the Government] withheld information that they alone possessed." *Id.*  Lee could have interviewed Wanker before filing his first habeas petition; and the Oklahoma court record upon which he now relies is public information.

 (Dkt. No. 1313, at 19).

Judge Holmes also found that Mr. Lee's allegations did not meet the standard for fraud on the court under Rule 60(d)(3), determining that:

> Fraud on the court is narrowly defined as "fraud which is directed to the judicial machinery itself and is not fraud between the parties or fraudulent documents, false statements or perjury." *Superior Seafoods, Inc. v. Tyson Foods, Inc.*, 620 F.3d 873, 878 (8th Cir. 2010) (quoting *United States v. Smiley,* 553 F.3d 1137, 1144–45 (8th Cir. 2009) (quotations omitted)). "A finding of fraud on the court is justified only by the most egregious misconduct directed to the court itself, such as bribery of a judge or jury or fabrication of evidence by counsel." *Greiner v. City of Champlin*, 152 F.3d 787, 789 (8th Cir. 1998) (quotations omitted). "[I]t is necessary to show a deliberately planned scheme designed to improperly influence the court in its decision." *Heim v. Comm'r of Internal Revenue*, 872 F.2d 245, 249 (8th Cir. 1989). Lee's allegations do not clear this high bar. *See Tyler v. Purkett*, 413 F.3d 696, 700–01 n.7 (8th Cir. 2005) ("Claims that a party did not disclose to a court certain facts allegedly pertinent to the matter before it, however, do not normally constitute fraud on the court.").

(Dkt. No. 1313, at 19-20).

Judge Holmes denied a certificate of appealability.  The Eighth Circuit also denied Mr. Lee's application for a certificate (Dkt. No. 1351).  *Lee v. United States*, No. 19-2432 (8th Cir. Nov. 4, 2019).[3]  Mr. Lee's execution currently is set for July 13, 2020.

---

[3]  With respect to the procedural history of Mr. Lee's case, the Court also recognizes that, in July 2019, Mr. Lee's execution was scheduled for December 9, 2019.  In September 2019, Mr. Lee filed a habeas petition under 28 U.S.C. § 2241—based on claimed new evidence related to the Oklahoma murder charge—in the Southern District of Indiana, where Mr. Lee is confined.  That district court stayed Mr. Lee's execution to allow time to consider the petition.  The Seventh Circuit vacated the stay.  *Lee v. T.J. Watson*, No. 19-3399 (7th Cir. 2019).  The district court thereafter denied the habeas petition, finding that Mr. Lee's claims were barred by the Savings Clause, 28 U.S.C. § 2255(e).  *Lee v. Warden USP Terre Haute et al,* No. 2:19-cv-468, 2020 WL 1317449 (S.D. Ind. Mar. 20, 2020).

Mr. Lee filed in the Eastern District of Arkansas a motion for relief from the Order denying his Federal Rule of Civil Procedure 59(e) motion (Dkt. No. 1189) and a motion to stay his execution (Dkt. Nos. 1352, 1353).  He argued that his Rule 59(e) motion should not have been characterized as a second or successive habeas petition requiring authorization from the Circuit. This Court granted the stay (Dkt. No. 1356).  The Eighth Circuit vacated the stay on June 1, 2020. *United States v. Lee*, No. 19-3618 (8th Cir. June 1, 2020).  Mr. Lee's motion for relief from judgment remains pending and will be addressed by this Court in a separate Order (Dkt. No. 1352).

On December 4, 2019, Mr. Lee filed an original proceeding in the Eighth Circuit, seeking permission to file a successive habeas petition.  He alleged a *Brady* violation claiming that witnesses told law enforcement officers during the investigation of the case that there was no "enterprise," an element of the federal crime for which Mr. Chevie Kehoe and Mr. Lee were convicted.  The Eighth Circuit summarily denied the motion.  *Lee v. United States*, No. 19-3576 (8th Cir. Jan. 7, 2020)*.*  Mr. Lee also has or had legal proceedings pending in the District of Columbia regarding the method of execution, *see In re Fed. Bureau of Prisons' Execution Protocol*

**APP.12**

### C.       Successive § 2255 Motion

The Court acknowledges that a preliminary issue is whether Mr. Lee's current Rule 60 motion is a second or successive § 2255 petition requiring authorization from the Eighth Circuit. 28 U.S.C. § 2255(h); 28 U.S.C. § 2244(b)(3)(A).  Mr. Lee's motion must be treated as a second or successive habeas petition if it advances a claim for relief.  *Gonzales v. Crosby*, 545 U.S. 524, 530-32 (2005).  A motion raises a "claim" when it "seeks to add a new ground for relief" or "attacks the federal court's previous resolution of the claim *on the merits*."  *Id.* at 532 (emphasis in original). A motion, however, is properly brought under Rule 60 when it "attacks, not the substance of the federal court's resolution of a claim on the merits, but some defect in the integrity of the federal habeas proceedings."  *Id.* (footnote omitted).

This Court concludes that, if Mr. Lee's current motion is considered a successive § 2255 motion, Mr. Lee has not properly obtained authorization from the Eighth Circuit to file a successive § 2255 motion and that, regardless, for reasons explained in this Order Mr. Lee is not entitled to the relief he seeks under Federal Rule of Civil Procedure 60.

### D.       Rule 60 Claims

To set aside the prior § 2255 Order, Mr. Lee must demonstrate:  (1) that his motion is attacking the § 2255 proceeding, not raising a *Brady* or *Napue-Giglio* claim, and (2) that reopening the § 2255 proceeding is warranted based on Rule 60 requirements.

#### 1.       Allegations Of Misconduct Or Misrepresentation

In support of his current motion, Mr. Lee alleges misconduct or misrepresentation in the § 2255 proceedings.  The Court examines his allegations.

*Cases*, No. 19-5322 (D.C. Cir. Apr. 7, 2020), and the adequacy of his clemency proceedings, *see Lee v. Barr*, No. 1:19-cv-3611 (D.D.C.).

**APP.13**

Relying on Footnote 3 in his § 2255 motion, Mr. Lee argues that he made a "formal request" during his § 2255 proceedings that the government turn over any *Brady* material. He points to the general *Brady* allegation in his "Case for Actual Innocence" and the footnote statement that he reserved the right to amend his motion with more specific *Brady* claims based on any information the government produced. Mr. Lee argues that, based on that "demand" in Footnote 3, the government was obligated to disclose evidence of Mr. Humphrey's polygraph test results and Ms. Gloria Kehoe's mental condition. He contends that, if the government had done so, he would have amended his petition and that this Court could have adjudicated the related *Brady* claims (Dkt. No. 1363, at 7). Mr. Lee also argues for the first time in his reply that, had the Government disclosed this evidence, the Court may have resolved differently two raised ineffective assistance of counsel claims. Mr. Lee asserts that the government instead "misled" his lawyers and the Court "into believing that it had already fully complied with its *Brady* obligations at the time of trial, and it made no additional disclosures." (*Id.*). He points to the government's Footnote 16 in response to the ineffective assistance of counsel claim related to discovery: "The Government did not come forward with any *Brady* material but simply noted that it had previously provided a 'huge amount' of discovery to trial counsel." (*Id.*, at 16 (quoting Dkt. No. 1126, at 45 n.6)).

Mr. Lee also refers to the government's representations during Mr. Chevie Kehoe's § 2255 proceeding, which was on the same docket as Mr. Lee's. Mr. Chevie Kehoe argued that his trial lawyers were ineffective for failing to investigate adequately third parties, including Mr. Humphrey, and that the government improperly withheld related evidence (Dkt. No. 1363, at 16-17 (citing Dkt. No. 1039, at 40 (§ 2255 petition); Dkt. No. 1067-2 at 13-14, 18-19 (Amended § 2255 petition pt. 2); Dkt. No. 1067-3 at 2 (Amended § 2255 petition, pt. 3))). In responding to Mr.

**APP.14**

Chevie Kehoe's ineffective assistance of counsel claim, the government stated that "[a]ll documents relating to Mr. Humphrey were provided to trial counsel." (Dkt. No. 1363, at 17 (citing Dkt. No. 1087, at 32)).  The government also stated that, "[d]espite trial counsel's best efforts, no tie was ever made between Paul Humphrey and the named individuals [who were alternate suspects] which could establish that Paul Humphrey or one of the named individuals was in fact responsible for the Mueller deaths.  In his argument Movant identifies no connection.  Even should the Court review the issue, Movant's allegations are meritless on their face." (Dkt. No. 1363, at 17 (quoting Dkt. No. 1087, at 32-33)).  In Mr. Lee's pending Rule 60 motion, he argues that "[a]ny such evidence disclosed to Mr. Kehoe could also have benefitted Mr. Lee, but the Government asserted there was none." (Dkt. No. 1363, at 17).

Mr. Lee correctly notes that the Court denied his and Mr. Chevie Kehoe's § 2255 petitions on the same day, finding in both cases that counsel had ample opportunity to question Mr. Humphrey and were unable to establish a link between Mr. Humphrey and the death of the Muellers (Dkt. No. 1374, at 18 (citing *Lee*, 2008 WL 4079315, at *12, and *United States v. Kehoe*, No. 4:97-CR-00243(1) GTE, 2008 WL 4079316, at *19 (E.D. Ark. Aug. 28, 2008)).

### 2.     Rule 60(b)(3)

Mr. Lee first seeks to set aside the § 2255 Order based on Rule 60(b)(3), which provides relief from judgment for "fraud . . . , misrepresentation, or misconduct by an opposing party." Rule 60(b) provides "extraordinary relief" and "may be granted only upon an adequate showing of exceptional circumstances." *Atkinson*, 43 F.3d at 371 (quotations omitted).  For relief pursuant to Rule 60(b)(3), Mr. Lee must demonstrate with clear and convincing evidence that the government "engaged in fraud or other misconduct and that this conduct prevented [him] from fully and fairly presenting his case." *Cook*, 582 F.3d at 855.  "While failure to produce evidence requested in

discovery may under some circumstances be grounds for vacating judgment," Mr. Lee must submit evidence that the failure to do so was due to the government's misconduct. *Atkinson*, 43 F.3d at 373.

At the outset, the government argues that Mr. Lee's request for relief is untimely under the one-year limitations period. Federal Rule of Civil Procedure Rule 60(c)(1) requires that a Rule 60(b)(3) motion must be filed no more than a year from the order or judgment that it seeks to set aside; Judge Holmes found no authority to extend that deadline (Dkt. No. 1313, at 18-19). The parties dispute whether equitable tolling applies. Regardless of whether equitable tolling applies, for the following reasons, Mr. Lee is not entitled to relief on the merits of his Rule 60(b)(3) claim.

Mr. Lee is correct that other Circuits—including the First, Fourth, Fifth, Seventh, and Ninth Circuits—recognize an unintentional misrepresentation as a basis for Rule 60(b)(3) relief. *Scott v. United States,* 81 F. Supp. 3d 1326, 1339 (M.D. Fla. 2015), *aff'd*, 890 F.3d 1239 (11th Cir. 2018) (citing Circuit opinions). The Eleventh and Federal Circuits have held the same. *United States v. One Douglas A-26B Aircraft,* 662 F.2d 1372, 1374 n.6 (11th Cir. 1981); *Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care, Inc.*, 818 F.3d 1320, 1328 (Fed. Cir. 2016). The Eighth Circuit, however, requires Mr. Lee to demonstrate that any misrepresentation was intentional and that any fraud was deliberate. *Dukes v. City of Minneapolis*, 339 Fed. App'x 665, 668 (8th Cir. 2009) (per curiam); *Smith v. Clarke*, 458 F.3d 720, 724-25 (8th Cir. 2006). The Sixth Circuit agrees. *Jordan v. Paccar, Inc.*, 97 F.3d 1452, at *6-7 (6th Cir. 1996) (per curiam) (unpublished opinion).

In support of his motion, Mr. Lee cites *In re Pickard,* 681 F.3d 1201 (10th Cir. 2012); *United States v. Williams*, 753 Fed. App'x 176 (4th Cir. 2019); and *Scott*, 81 F. Supp. 3d at 1326. In each of those cases, the courts granted Rule 60(b)(3) relief after finding that the government

**APP.16**

made false statements during § 2255 proceedings that directly impacted adjudication of a raised claim. Mr. Lee compares the misrepresentations in those underlying § 2255 proceedings to his Footnote 3 "demand" for *Brady* material to support his general allegation coupled with the government's Footnote 16 "response" and alternatively the government's silence as to his "demand." Mr. Lee also relies on the government's affirmative representation in Mr. Chevie Kehoe's § 2255 proceedings that "[a]ll documents relating to Mr. Humphrey were provided to trial counsel." (Dkt. No. 1374, at 11).

In his Rule 60(b) motion filed in September 2018 (Dkt. No. 1297), Mr. Lee argued as he does here that the government's non-disclosure of *Brady* material created a defect in the integrity of the § 2255 proceedings based on his general *Brady* allegation. As discussed, Judge Holmes, citing *Atkinson,* previously found that Mr. Lee was not entitled to Rule 60(b)(3) relief because Mr. Lee had not "alleged facts to show that the omission of any evidence during his § 2255 proceeding was due to the Government's misconduct or that the Government intentionally misrepresented any facts." (Dkt. No. 1313, at 19). Judge Holmes also found that Mr. Lee failed to demonstrate that any failure to disclose evidence prevented him from fully and fairly litigating his claims because the allegedly suppressed evidence was available by other means (*Id.*).

Under the doctrine of the law of the case, "when a court decides a rule of law, that decision should govern the same issues in subsequent stages in the same case." *Unigroup, Inc. v. Winokur*, 45 F.3d 1208, 1211 (8th Cir. 1995) (citations omitted). The doctrine "precludes litigation of matters that are decided implicitly, as well as those decided explicitly." *Id.* District court decisions that "either have not been appealed or have been appealed and affirmed[] are the law of the case and need not be revisited." *Liddell by Liddell v. Bd. Of Educ. Of the City of St. Louis*, 121 F.3d 1201, 1216 (8th Cir. 1997). Mr. Lee argues that the same factual and legal issues were not before

the Court in the prior proceeding; the Court rejects his argument with respect to two issues relevant to resolving his currently pending motion.

This Court determines that the law of the case sets out the legal framework for this Court's review of Mr. Lee's argument under Rule 60(b)(3) regarding, at a minimum, two issues relevant to Mr. Lee's current pending motion: (1) the government's Footnote 16 was not in response to Mr. Lee's general *Brady* allegation, and (2) for Rule 60(b)(3) relief, Mr. Lee must allege facts demonstrating that the government engaged in misconduct or intentional misrepresentation of the facts (Dkt. No. 1313, at 18 n.5, 19). Applying this legal framework, the Court determines that Mr. Lee is not entitled to relief pursuant to Rule 60(b)(3). Mr. Lee does not allege facts demonstrating that the government engaged in misconduct or intentionally misrepresented facts during his § 2255 proceedings related to Mr. Humphrey's polygraph test or Ms. Gloria Kehoe's mental health.

The Court acknowledges that Mr. Lee argues that whether the "prosecution" possessed the new evidence remains a factual determination that could be decided at a hearing. He notes that, in *Atkinson,* the respondents submitted unrebutted affidavits that they did not possess the undisclosed evidence and were not aware of its existence. Here, the government did not make any representations in Mr. Lee's § 2255 proceedings related to the purportedly new evidence; Mr. Lee does not offer any evidence that the omission of any evidence was due to the government's misconduct or that the government intentionally misrepresented any facts. Also, the Court determines that the alleged omission of any evidence did not prevent Mr. Lee from fully and fairly litigating his § 2255 petition.

Mr. Lee argues for the first time in his reply that the government's withholding of evidence also affected adjudication of his ineffective assistance of counsel clam, alleging a failure to call available witnesses in support of the third-party culpability defense. Mr. Lee argues the denial of

this ineffective assistance of counsel claim was based on the government's misrepresentation in Mr. Chevie Kehoe's § 2255 case that no materials concerning Mr. Humphrey had been withheld and on the non-disclosure of the polygraph report.  Mr. Lee points to the Court's finding in his § 2255 proceeding that no evidence established a "link" between Mr. Humphrey and the murders (Dkt. No. 1374, at 18-19*).*  Mr. Lee's arguments on this point fail under the law of the case and Eighth Circuit precedent; Mr. Lee does not offer any evidence that the government engaged in misconduct or made intentional misrepresentations in his § 2255 proceeding.

Mr. Lee also argues for the first time in his reply that new evidence of Ms. Gloria Kehoe's mental condition would have altered the Court's evaluation of another § 2255 ineffective assistance of counsel claim:  trial counsel failed to ask Ms. Gloria Kehoe on cross-examination about her statement that Mr. Chevie Kehoe and Mr. Lee lingered in Arkansas after the Mueller murders (Dkt. No. 1374, at 19-20*).*  Mr. Lee's arguments fail under the law of the case and Eighth Circuit precedent; he does not demonstrate that the government engaged in any misconduct or made intentional misrepresentations in his § 2255 proceeding.  Further, in the § 2255 proceeding, the Court found that Mr. Lee's lawyers were not ineffective partly because, even if they had explored this point, the government could have "rehabilitated" Ms. Gloria Kehoe on re-direct examination by, in part, highlighting Ms. Gloria Kehoe's confusion about whether Mr. Chevie Kehoe and Mr. Lee lingered in Arkansas.

For these reasons, the Court determines Mr. Lee is not entitled to relief under Rule 60(b)(3).

### 3.      Rule 60(b)(6)

Mr. Lee also contends that relief is warranted pursuant to Rule 60(b)(6), which permits a court to reopen a judgment for "any other reason that justifies relief."  Fed. R. Civ. P. 60(b)(6).  "Extraordinary circumstances" are required for relief pursuant to this "catchall category," and

**APP.19**

"[s]uch circumstances will rarely occur in the habeas context." *Buck v. Davis*, 137 S. Ct. 759, 772 (2017) (quotations and citation omitted). To determine whether the requisite circumstances exist, a court may consider a wide range of factors, including, "in an appropriate case, 'the risk of injustice to the parties' and 'the risk of undermining the public's confidence in the judicial process.'" *Id.* (quoting *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863-64 (1988)). Mr. Lee contends that justice requires reopening the § 2255 Order because his *Brady* claims were never examined due to the government's alleged misconduct. Mr. Lee argues that the continued concealment of evidence constitutes "extraordinary circumstances."

Again, the government challenges the timeliness of Mr. Lee's seeking relief pursuant to Rule 60(b)(6) and whether Rule 60(b)(6) relief is available maintaining that Mr. Lee's motion is in effect a Rule 60(b)(3) motion. This Court concludes, based on the analysis in this Order, that Mr. Lee has not demonstrated the extraordinary circumstances required for relief. He has not alleged any facts to support his allegation that the government engaged in misconduct during the § 2255 proceeding.

For these reasons, the Court determines that Mr. Lee is not entitled to relief under Rule 60(b)(6).

### 4.      Rule 60(d)(1)

Mr. Lee next argues that he is entitled to relief pursuant to Rule 60(d)(1) based on the government's alleged misconduct and what he claims is a pattern of *Brady* violations. That Rule provides that a court retains the power to "entertain an independent action to relieve a party from a judgment, order, or proceeding." Fed. R. Civ. P. 60(d)(1). Such relief sounds in equity and is "available only to prevent a grave miscarriage of justice." *United States v. Beggerly*, 524 U.S. 38, 47 (1998). A party may obtain relief through an independent action if a judgment against the party

Appellate Case: 20-2351     Page: 22     Date Filed: 07/09/2020 Entry ID: 4932184

was obtained fraudulently with forged evidence, but not if there was merely "a failure to furnish relevant information that would at best form the basis for a Rule 60(b)(3) motion." *Id.* at 46. The parties dispute whether a demonstration of actual innocence is required and whether, under these circumstances, Mr. Lee's allegations are even cognizable under Rule 60(b)(3). Regardless of whether a demonstration of actual innocence is required or Mr. Lee's allegations are cognizable under Rule 60(b)(3), the Court determines that Mr. Lee has not alleged or presented evidence sufficient to support his argument that the government has engaged in a "pattern" of misconduct and continues to do so based on this Court's review of Mr. Lee's filings and the record in this case.

For these reasons, the Court determines that Mr. Lee is not entitled to relief under Rule 60(d)(1).

### 5.  Rule 60(d)(3)

Mr. Lee also seeks relief pursuant to Rule 60(d)(3) because he maintains that the government's misrepresentation amounted to "fraud on the court." Judge Holmes found Mr. Lee's prior allegations of misrepresentation did not amount to fraud on the court based on controlling precedent:

> Fraud on the court is narrowly defined as "fraud which is directed to the judicial machinery itself and is not fraud between the parties or fraudulent documents, false statements or perjury." *Superior Seafoods, Inc. v. Tyson Foods, Inc.*, 620 F.3d 873, 878 (8th Cir. 2010) (quoting *United States v. Smiley*, 553 F.3d 1137, 1144–45 (8th Cir. 2009) (quotations omitted)). "A finding of fraud on the court is justified only by the most egregious misconduct directed to the court itself, such as bribery of a judge or jury or fabrication of evidence by counsel." *Greiner v. City of Champlin*, 152 F.3d 787, 789 (8th Cir. 1989). Lee's allegations do not clear this high bar. *See Tyler v. Purkett*, 413 F.3d 696, 700–01 (8th Cir. 2005) ("Claims that a party did not disclose to a court certain facts allegedly pertinent to the matter before it, however, do not normally constitute fraud on the court.").

(Dkt. No. 1313, at 19-20).

**APP.21**

In his reply, Mr. Lee argues that Judge Holmes's Order is not the law of the case because, in that proceeding, neither the government's representations during Mr. Chevie Kehoe's § 2255 case nor the alleged pattern of misconduct were at issue. Whether controlled by law of the case or not, Mr. Lee has not sufficiently alleged or demonstrated fraud on the court in his § 2255 proceeding based on this Court's review of Mr. Lee's filings and the record in this case.

For these reasons, the Court determines that Mr. Lee is not entitled to relief under Rule 60(d)(3).

### III.   Conclusion

Mr. Lee's claims in his present motion constitute a successive habeas petition under 28 U.S.C. § 2255 for which Eighth Circuit authorization is required. Mr. Lee is not entitled to relief under Federal Rule of Civil Procedure 60. Therefore, Mr. Lee's motion is denied without prejudice. No certificate of appealability will be issued.

It is so ordered this 2nd day of July, 2020.

_____
Kristine G. Baker
United States District Judge

**APP.22**

CRIMINAL INVESTIGATION DIVISION

ASP-3-A

DATE:            01/29/97
DICTATED BY:     INV. BRETT PRITCHARD
DATE TYPED:      02/24/97 LW
COPIES TO:       INV. BRETT PRITCHARD
                 SGT. H.D. LUTER, ASP COMPANY "D"
                 PROSECUTING ATTORNEY DAVID GIBBONS

INTERVIEW OF SUSPECT

PAUL EDWARD HUMPHREY
W/M, DOB ███/53
███████
RUSSELLVILLE, AR  72801
SELF EMPLOYED
HOME PHONE ██████

PAUL HUMPHREY was interviewed by Inv. BRETT PRITCHARD of the Arkansas State
Police on 01/21/97, beginning at 1:20 P.M. at the Braden Law Office in
Russellville, Arkansas.

An ASP-6, Description of Subject, was completed on HUMPHREY.  HUMPHREY was
advised of his rights as set out on the ASP-116 and his responses were
recorded on that form, with each of the responses initialled by HUMPHREY after
he had reviewed the form.  The form was then signed by HUMPHREY.  Copies of
the ASP-6 and ASP-116 have been forwarded to the Little Rock office.  After
being advised of his rights, HUMPHREY made the following statement:

"I met BILL two or three years ago at a gun show.  The gun show at
Russellville at the Armory.  During the gun show BILL had a booth.  We visited
about twenty or thirty minutes on that date.  I don't remember if I bought
anything from him.  We talked about .45 caliber parts.  I saw him at other
gun shows after that.  At first I would just bump into him on the job.  Then
he would call me and tell me he was coming to town.  I helped him on several
jobs. We ran lights at Pizza Hut in the summer of 1995.  I ran into him a few
times at Wal-Mart while he was working, but I really didn't help him with that
job.  BILL and I were studying Constitutional Law.  He wanted to pull his
title out of the state's hands.  He had read in one of his books how we could
pull it out of the state's hands by selling it to one another.  With $21.00
in silver, I bought the Jeep from him at the gun show in Little Rock in
December, 1995.  The title came to me through the mail.  I don't remember when
the title came to my house.  The title was completely filled out.  SYLVIA
MASON gave me a phone call and told me to expect something in the mail.  This
was during the morning hours.  Either that day or the next day I got the
title. I don't know SYLVIA MASON that well.  I met her up at BILL and NANCY'S
house.  This was after they were missing.

FILE NUMBER: 04-020-96        CRIME: CAPITAL MURDER

**APP.23**

ASP-3
PAGE NO. __2__

BOBBY HULL (EY) took me to BILL'S house.  He said they called a meeting of all of BILL'S friends to try to figure out what happened.  SYLVIA MASON, BOBBY HULSEY, me, and about six others met at BILL'S house to try to figure out what happened.  This was the second week they were missing.  SYLVIA was BILL'S landlord.  SYLVIA is married, but her husband was not at the meeting.  I have never met him.  I brought up that BILL and I were studying on buying and selling the Jeep.  He was going to buy my vehicle for twenty-one silver dollars and when the titles came from the state we would sell them back at a ten percent profit.

The day the titles came into the post office box, the envelope was a manila envelope with no return address.  The envelope had a title to the Jeep and a cargo trailer.  It also contained two bills of sale.  I had paid twenty-one silver dollars for the trailer at the same gun show that I bought the Jeep.

I just held onto the titles when I got them.  I talked to BOBBY HULSEY and he wanted me to hurry and go to the Revenue Department with the bills of sale and the titles.  I took them to the Revenue Office about one week after I got them.  The lady told what to do and gave me a form.  The form was to be completed by BILL.  I never got the title changed over.  I talked to BOBBY HULSEY about the title.  I came and asked DALE BRADEN about it.

I told PAUL STATEN and JOHN WRIGHT, and I don't know who else.  I read in the paper that the Jeep was found up in Dover.  I was confused.  I did not know what happened to BILL and  NANCY.  JAY WINTERS called me and said he heard I had the title.  I said yes.  I put him off for a while (several days).  BOBBY was telling me not to turn it in or go down there.  He was trying to take me to an attorney in Little Rock.  I lost the envelope.  I took the title and receipts to the S.O. a few days later.  The weekend they were abducted, RICHARD McDONALD came in from California.  He was talking about the Fourteenth Amendment.  This was in North Little Rock.  Just about or under the CHECKMATE CLUB.  I think it was in LEGION HALL.  DREW MALONE RAINES put on the class.  HART REALTY COMPANY in Little Rock also had something to do with it.

This was a two-day class, and I drove home between classes.  The bodies were found in the Illinois Bayou.  I know the area.  I have never fished or anything out there.  I never swam or anything out there."

FILE NUMBER:   04-020-96              CRIME: CAPITAL MURDER

**APP.24**

Appellate Case: 20-2351    Page: 26    Date Filed: 07/09/2020 Entry ID: 4932184

ASP-116
REV. 9-94

## YOUR RIGHTS

NAME: *Paul Edward Humphrey*      PLACE *Braden Law Office Russ/16*

DATE *1-21-97* *Paul Edward, Hm*

TIME *1.20m Paul Edward, Hmp*

Before we ask you any questions, you must understand your rights.

1. Do you understand that you have the right to remain silent?

   Response *yes Paul Edward, Humphrey*

2. Do you understand that anything you say can and will be used against you in court?

   Response *Yes Paul Edward, Humphrey*

3. Do you understand that you have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning?

   Response *Yes Paul Edward, Humphrey*

4. Do you understand that if you cannot afford a lawyer, one will be appointed for you before any questioning if you wish, at no cost to you?

   Response *Ye Paul Edward, Humphrey*

5. Do you understand that if you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time? You also have the right to stop answering at any time until you talk to an attorney.

   Response *Yes Paul Edward, Humphrey*

## WAIVER OF RIGHTS

I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.   SIGNED *Paul Edward, Humphrey*

WITNESS *Britt Pritch #48*

WITNESS _____

PRITCHARD
**APP.25**

FILE NO. _____ DATE _1-21-97_ TIME _1:20 pm_

APPLICANT: _Humphrey_ _Paul_ _Edward_
              (LAST)           (FIRST)        (MIDDLE)

I, _Paul Edward Humphrey_, voluntarily, without threat, duress, coercion, undue influence, force promise of immunity or reward — agree and stipulate to submit to a polygraph (truth verification) examination to be conducted by officers of the Arkansas State Police.

I understand that: I am not required to take this examination, I have the right to remain silent and anything I say can and will be used against me in court. I have the right to talk to a lawyer before answering any questions and to have a lawyer present. I have a right to the advice and presence of a lawyer even if I cannot afford to hire one. (The Arkansas State Police cannot furnish you a lawyer). I further understand and know that I have the right to stop answering questions at any time.

## WAIVER

I have read, or had read to me, the above statement of my rights and understand what my rights are. I am willing to answer questions and/or make a statement. I am taking this examination of my own free will and that no force, duress or undue influence was exercised to require me to submit to the examination. I also agree to fully and completely release and absolve the Arkansas State Police from any liability connected in any way with this examination.

I attest that I am in good mental and physical condition and that I know of no mental or physical ailment or treatment plan which may impair or be impaired by the polygraph examination.

                                  _Without Prejudice UCC-1-207_

SIGNED: _Paul Edward Humphrey_

TIME: _1:22 PM_

WITNESS: _Britt Pruitt #48_     WITNESS: _____

This interview/polygraph examination was concluded at _____ on the above date. I completely re-affirm in its entirety my above agreement. In addition, I knowingly and intelligently continued to waive all my rights, including those listed in the second paragraph above, and I willingly made all the statements that I did make.

I also certify that during the entire time I was here I have been well-treated, submitted myself freely to the interview/polygraph examination knowing that I could stop any time I so desired by merely saying I wished to stop or that I wished to consult an attorney or any other person. I remained here of my own free will knowing that I could leave this room at any time I so desired, and that there were no threats, promises, or any harm whatsoever done to me during the entire period I have been here, either in connection with the interview/polygraph examination or my again signing this agreement, stipulation, and release form.

_____  _____  _____
(WITNESS)             (SIGNED)             (TIME)

PRITCHARD
APP.26

04-020-96



# ARKANSAS STATE POLICE

ASP-6
(Rev. 1/90)

## Criminal Investigation Division
## Description of Subject Form

Name _Paul Edward Humphrey_     Race/Sex _W/M_     DOB ███ _-53_
                                                      Month/Day/Year

Alias(es) _N/A_

Address ███████████     City _Russellville_     State _AR_

Height _6-0_   Weight _160_   Complexion _med_   Hair _Brown/Gray_ Eyes _Blue_

SSN _would not give_     DL# ███████████     State _AR_

SID#/State _____     FBI# _____     Where Born _Russellville, A_

Telephone Number ( 501 ) ███████     Tracking Number _____

Scars/Marks/Tattoos (location of each) _N/A_

Relatives (name/address/relationship) _Joe Vinson (uncle)_
███████████
_Russellville, AR_

Peculiarities _Right Handed   Glasses_

Occupation & Employer _Saddlemaker     Self Employed_

Education (include trade schools) _12_

Vehicle Make _1985 Toyota_ Model _Pickup_     Color _Cream_   LPN _Unk_

Arrested? (Y/N) _Y_   Charge/Code# _____

City/County Arrested _____

Fingerprinted? (Y/N) _Y_   Date _____   Agency _____
                              Month/Day/Year

Photographed? (Y/N) _Y_   Date _____   Agency _____
                              Month/Day/Year

Investigator _Cpl JB Pritchard #44_     File# **0 4 - 0 2 0 - 9 0**
              Rank/Name/Badge#

**APP.27**

Time of Exam: 1:20pm                Termination of Exam: _____        Specific Issue: Forgery

Interview Date: 1-21-97             Interview Location: Beavers Law Offices

DOB: ▮ 53         POB: Russellville A

Name: Paul Edward Humphrey  Age: 43
(First)  (Mid)  (Last)

Address: ▮ Russville, AR     Ht: 6-0   Wt: 160   Hr: Brown/Gray   Es: Blue   Sex: M

Martial: (S) (D) (M) (SEP) (WID)   Dependents: 0  Boy(s) _____ Girl(s) _____   SS#: _____

Education: highest grade completed: 12   Other Tng: Votec _____ College _____ Trade School _____

Military Service: National Guard  6 years  Spec-4  Honorable  Spec-4
(Branch)              (ETS)   (Rank)   (Type Discharge)   (Rank at Discharge)

Arrest Record: N/A
(Date)        (Place)          (Charge)          (Disposition)

_____
(Date)        (Place)          (Charge)          (Disposition)

Prior Polygraph Exam: Gary Harp   9-96   Same   Not
(Given by)        (Date)   (Reason)   (Outcome)

Previous Employment: Electrician   Russville, AR   8 years
(Name)              (Location)        (How Long)   (Reason for Leaving)

Present Employment: Spellemaker   ▮ Russellville, AR   6-7 years
(Name)              (Location)        (How Long)

What is normal for you?: 8

Hours of sleep past 24 hours?: 7-8

Last time you've seen a doctor?: 1980   For what reason?: Food Poisoning

Have you taken any medication in the last 24 hours?: N/A   Drugs?: N/A   What type?: _____

Drivers License: ▮   AR
(Number)   (State)

Alcohol Last 24 hours: N/A

Mental/Psychological Treatment: N/A
(When)          (Where)          (Reason)

Chronic Illnesses:   Heart Problem ☐      Breathing Disorder ☐   High/Low Blood Pressure ☐

Are you pregnant?: Yes ☐      No ☐

MODIFIED GENERAL QUESTION TECHNIQUE

Name _Paul Edward Humphrey_

Date _1-21-97_

1   Is your first name _Paul_ ?

2   Is today _Tuesday_ ?

3   (secondary relevant) _Did you ever meet Sylvia Mason prior to the Muellers Disappearing?_ ?

4   Are you now in _Russellville_ ?

5   (Strong relevant) _Were you present when the Muellers were killed?_ ?

6   (con) _During the first 21 years of your life do you ever remember lying to get out of Trouble?_ ?

7   Is your last name _Humphries_ ?

8   (EC relevant) _Did you participate in Disposing of the Bodies of the ~~stolen~~ Mueller's_ ?

9   (Know relevant) _Did you know the ~~Bill of Sale~~ Title was Forged when you Took it to ~~the~~ Sheriff._ ?

10   (con) _During the first 40 years of your life do you ever remember lying to get out of Trouble_ ?

3rd chart _4-1-9-6-2-3-10-5-6-8-10_

File number _04-020-96_ officer _____

PRITCHARD



# State of Arkansas

# ARKANSAS STATE POLICE

Post Office Box 5901 • Little Rock, Arkansas 72215

Mike Huckabee • Governor     Colonel John R. Bailey • Director     Lt. Col. Richard C. Rail • Ass't Director

January 21, 1997

CONFIDENTIAL

Sergeant H.D. LUTER
Arkansas State Police
CID Company "D"
16143 Highway 64 East
Atkins, AR  72823

## ARRANGEMENTS

At your request, Mr. PAUL EDWARD HUMPHREY was administered a polygraph examination at the BRADEN LAW FIRM in Russellville, Arkansas. The examination was administered on January 21, 1997 by Investigator BRETT PRITCHARD.

Mr. HUMPHREY was being examined to determine his knowledge or involvement in the reported homicide of BILL and NANCY MUELLER.

## PRETEST INTERVIEW

The interview with Mr. HUMPHREY, which was conducted prior to the polygraph examination being administered, will be forwarded to you when it has been typed. The interview will be contained on an ASP-3A form, under the heading of "Interview of Suspect".

## EXAMINATION

Mr. HUMPHREY was administered three polygrams, all of which were of the Modified General Question Technique Series Type, in which the following questions were asked, along with other irrelevant and control questions.

Q-3:    Did you ever meet SYLVIA MASER prior to the MUELLERS disappearing?

A:    No.

Q-5:    Were you present when the MUELLERS were killed?

A:    No.

Q-8:    Did you participate in disposing of the bodies of the MUELLERS?

A:    No.

Q-10:    Did you know that the title was forged when you took it to the sheriff?

A:    No.

*04-02*

**APP.306**

Appellate Case: 20-2351     Page: 32     Date Filed: 07/09/2020 Entry ID: 4932184

PAGE 2
P. HUMPHREY


FINDINGS

The physiological responses noted on this subject's polygraph charts are in such a pattern as to indicate that the subject, Mr. PAUL EDWARD HUMPHREY, was essentially untruthful in answering the above questions.

Based on the evaluation of the subject's polygraph charts, it is the opinion of this examiner that Mr. HUMPHREY was involved in the death of the MUELLERS.



                                        Respectfully submitted,

                                        BRETT PRITCHARD, Investigator
                                        Polygraph Examiner
                                        Criminal Investigation Division



JBP/lw



cc:    04-020-96
       Inv. BRETT PRITCHARD

 **SEROLOGICAL   RESEARCH   INSTITUTE**

June 8, 2007

David A. Ruhnke
Ruhnke & Barrett, Attorneys at Law
47 Park Street
Montclair, NJ 07042

SERI Case No. M'7094'06
Agency Case No. 4:97-CR-00243(02)
GTE
Suspect: Daniel Lewis Lee

## ANALYTICAL REPORT

On October 31st 2006, two items of evidence were received at the Serological Research Institute (SERI) from Glen Jordan from the Bureau of ATF, via FedEx #798031584151. Mitochondrial DNA analysis utilizing the Polymerase Chain Reaction (PCR) method was requested.

### ITEM 1   KNOWN HAIRS DANNY GRAHAM (Exh. 535)

This item consisted of a folded piece of paper containing two brown hairs (~1-2cm long) with no roots, and two white hairs (~2-3 cm long) with root sheaths. The hairs were examined microscopically. One entire white hair was sampled, washed, and extracted. The DNA extract was amplified by PCR using mitochondrial primers, and then subsequently sequenced. The results are tabulated below.

### ITEM 2   HAIR – BASEBALL CAP (Exh. 1037)

This item consisted of a slide containing one brown hair, approximately 11mm long, with no root. The entire hair was examined microscopically, sampled, washed, and extracted. The DNA extract was amplified by PCR using mitochondrial primers, and then subsequently sequenced. The results are tabulated below.

3053 RESEARCH DRIVE • RICHMOND, CA 94806 • (510) 223-7374 (SERI) • FAX (510) 222-8887

A6

**APP.32**

David A. Ruhnke
SERI Case No. M'7094'06
June 8, 2007
Page 2 of 4

Appellate Case: 20-2351     Page: 35     Date Filed: 07/09/2020 Entry ID: 4932184

## TABLE OF RESULTS

| Item # | Description | HVI CRS | 16291 | 16298 | 16311 | | | HVII CRS | 72 | 263 | 309.1 | 315.1 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | C | T | T | | | | T | A | : | : | |
| 1 | Known Hair Danny Graham #535 | | T | | | | | | | G | C | C | |
| B/C | Extraction Blank | | No activity | | | | | | No activity | | | | |
| 2 | Hair – Baseball Cap #1037 | | | C | C | | | | C | G | C | C | |
| B/C | Extraction Blank | | No activity | | | | | | No activity | | | | |

Hypervariable Region 1 (HVI) includes base positions 16018-16374.    Hypervariable Region 2 (HVII) includes base positions 71-365.

Legend
CRS=CAMBRIDGE REFERENCE SEQUENCE PUBLISHED BY ANDERSON ET.AL.
: =INSERTION (NO NUCLEOTIDE PRESENT IN THIS POSITION IN THE CRS)
BLANK=NUCLEOTIDE IS THE SAME AS CRS AT THIS POSITION

APP.33

APP.33

David A. Ruhnke
SERI Case No. M'7094'06
June 8, 2007
Page 3 of 4

## EXPLANATION

Human DNA consists of a number of genetic marker systems. Nuclear DNA is found in the nucleus of the cell, and is inherited from both the mother and father. Analysis methods utilizing nuclear DNA rely on identifying small specific sections or repetitive sections of DNA wherein there are recognizable differences between people. Alternatively, analysis of mitochondrial DNA relies on determining the specific order or sequence of the thousands of individual nucleotide bases that serve as the building blocks of a person's mitochondrial DNA. Unlike nuclear DNA, mitochondrial DNA is located in the mitochondria of the cell, and is inherited maternally. In other words, both males and females have mitochondrial DNA, but only females can pass it on to their offspring. The mitochondrial genome is passed on in its entirety; therefore every individual in the same maternal lineage should have the identical mitochondrial DNA sequence.

When an organic extraction is performed on a biological sample, all genomic DNA will be extracted, including both nuclear and mitochondrial DNA. Therefore, DNA used for mitochondrial sequencing analysis can be extracted using the same procedures as those intended for nuclear DNA.

Thousands of copies of mitochondrial DNA are present in each cell, making mitochondrial DNA analysis possible from samples which are highly degraded or have very limited quantities of DNA. Samples such as skeletal remains, teeth and hair shafts frequently yield mitochondrial DNA results when nuclear DNA analysis is not possible.

The part of the mitochondrial genome significant to forensic science is known as the Control Region, and is made up of two hypervariable regions (HVI and HV2). The forensic community generally recognizes the HV1 and HV2 regions as consisting of base positions 16024-16365 and 73-340, respectively. An adenine (A), cytosine (C), guanine (G) or thymine (T) nucleotide is designated at every position, and base designations are numbered according to the Cambridge Reference Sequence, also referred to as the Anderson Sequence. Although the entire HV1 and HV2 regions are sequenced, only differences (polymorphisms) from the Anderson Sequence are noted when reporting a sample's mitochondrial DNA type.

Because the amplification of mitochondrial DNA is so sensitive, an extraction blank control to which no DNA is added is extracted, amplified, and sequenced along with the evidence samples. As anticipated, the extraction blanks employed in this case yielded no amplified mitochondrial DNA or sequencing data.

Appellate Case: 20-2351     Page: 36     Date Filed: 07/09/2020 Entry ID: 4932184

David A. Ruhnke
SERI Case No. M'7094'06
June 8, 2007
Page 4 of 4

## CONCLUSIONS

The mitochondrial DNA sequence data from the hair from the Baseball Cap (item 2) differs from that of the hair from Danny Graham at a number of base positions and is therefore excluded as originating from the same person or maternal lineage.

## EVIDENCE DISPOSITION

The remaining unconsumed submitted evidence will be returned to Glen Jordon at the Bureau of Alcohol, Tobacco and Firearms in Little Rock, Arkansas.   Portions of submitted reference samples along with any unconsumed evidentiary extracts will be retained at SERI.

SEROLOGICAL RESEARCH INSTITUTE

Vee Garcillano
Forensic Serologist I

Brian Wraxall
Chief Forensic Serologist

SERI1\CaseFiles\M'7094'06\Rpt1

A9

APP.35



## AFFIDAVIT FOR SEARCH WARRANT

IN THE MUNICIPAL COURT OF THE CITY OF RUSSELLVILLE, ARKANSAS

STATE OF ARKANSAS
COUNTY OF POPE

BEFORE THE HONORABLE DENNIS SUTTERFIELD, MUNICIPAL JUDGE

The undersigned being duly sworn, states:

The undersigned has reason to believe and upon reasonable cause does believe that on the premises located at: The PAUL EDWARD HUMPHREY residence, ███████████ Street, Russellville, Arkansas including all vehicles, outbuildings, and appurtenances thereto, there is now being concealed certain property, namely evidence of the homicide of WILLIAM MUELLER, NANCY MUELLER, and SARAH POWELL.  This evidence sought is to include trace evidence including carpet fibers, clothing fibers, blood spots, hair, samples of duct tape and plastic trash bags.  The warrant should also include documents relating to the victims to include an envelope which HUMPHREY claimed to have received a title to the victims vehicle, the certificate of origin to the victims utility trailer and two bills of sale for the victims vehicle and trailer.  Also sought is evidence of items stolen from the victims to include firearms, firearms parts, silver coins, gold coins, silver bars, and U.S. currency.  Also sought is evidence of the forgery of the title of the victims vehicle, the certificate of origin for the victims trailer and the two bills of sale to include tracings, signatures and other related evidence.  Also sought is evidence to include telephone records, address books and other documents which link HUMPHREY to suspects in this case who are either known or unknown.

FILED BY *Jay abuthel*

AUG 3 0 1996

CLERK, POPE COUNTY
MUNICIPAL COURT



**APP.36**

WHICH IS/ARE  held and possessed in violation of the laws of the State of Arkansas. to wit: A.C.A. 5-10-101. A.C.A. 5-37-201. 5-36-103. and 5-12-103. The facts tending to establish the foregoing grounds for issuance of a Search Warrant are. to wit:

1) My name is Sergeant Aaron Duvall. I am an investigator for the Pope County Sheriff's Department and have been so employed for the past 13 years.  I have attended numerous schools involving the investigation of homicides, crimes against persons, and property including but not limited to thefts and forgeries.

2) On or about January 11, 1996, WILLIAM MUELLER, NANCY MUELLER and SARAH POWELL were substantiated to have been in Russellville, Arkansas. None of the MUELLER'S relatives or close associates saw them after this date.

3)  On February 2, 1996, DAVID BRANCH, the brother of NANCY MUELLER, was at the MUELLER residence located at ███████████. Tilley, Arkansas.  While in the residence, BRANCH observed the title to WILLIAM MUELLER'S 1989 jeep, the certificate of origin for the MUELLER'S utility trailer, and blank bills of sale ( referred to as the MUELLER documents) on the kitchen table of the MUELLER residence.  The title to the jeep, the certificate of origin for the utility trailer, and the bills of sale were unsigned.

4) On February 11, 1996, the WILLIAM MUELLER vehicle, a 1989 jeep cherokee with attached utility trailer was taken into custody by the Pope County Sheriff's Department.  The vehicle had been observed abandoned for approximately three weeks on Arkansas state highway 7 in rural Pope County, Arkansas.  An examination of the interior of the vehicle and trailer revealed ██████████████ue present.

AUG 30 1996

CLERK, POPE COUNTY



**APP.37**

Appellate Case: 20-2351     Page: 39     Date Filed: 07/09/2020  Entry ID: 4932184

affiant further states that this is inconsistent with WILLIAM MUELLER'S habits and characteristics in that the investigation has revealed MUELLER often carried items of value such as firearms, ammunition, gold and silver.   It was also suspected that the MUELLERS were on their way to a gun show when they disappeared, this being inconsistent with no items of value being found in the jeep.

5)  On or about February 22, 1996, DAVID BRANCH contacted SHERIFF JAY WINTERS, Pope County Sheriff's Department, and stated he had received information that PAUL EDWARD HUMPHREY had possession of the title to the MUELLERS' jeep and the certificate of origin to the MUELLERS' utility trailer.  SHERIFF WINTERS contacted HUMPHREY by telephone and HUMPHREY admitted that he had the documents for the vehicles.   SHERIFF WINTERS asked HUMPHREY to come to the Sheriff's office the following day and bring the documents.

6)   On or about February 23, 1996, HUMPHREY met with SHERIFF WINTERS at the Pope County Sheriff's Department.  HUMPHREY did not bring the documents and stated he would answer any questions regarding the documents.   HUMPHREY stated he had received the documents in the mail and that it was an agreed arrangement between he and WILLIAM MUELLER for MUELLER to sell him his vehicles for 21 pieces of silver.  SHERIFF WINTERS asked HUMPHREY to surrender the documents and HUMPHREY stated he would deliver the documents to SHERIFF WINTERS.

7)  On or about March 1, 1996, SHERIFF WINTERS contacted HUMPHREY by telephone regarding the documents. HUMPHREY stated his attorney, DALE BRADEN, of Russellville, Arkansas, had advised him not to

FILED BY

AUG 3 0 1996

CLERK, PO-----
MUNICIPAL COURT

**APP.38**

surrender the documents to SHERIFF WINTERS at this time.   HUMPHREY stated he would be in contact with the Sheriff at a later date regarding the documents

8)   On or about March 1 1996  SHERIFF WINTERS contacted attorney DALE BRADEN who stated he had not been retained or contacted by PAUL EDWARD HUMPHREY to do any work relating to the MUELLER documents thus giving rise to the suspicion that HUMPHREY was being untruthful about said documents.   It should be further noted that HUMPHREY was trying to keep law enforcement from examining said documents despite his previous assertion of February 22, 1996, that he would turn them over.

9)   On or about March 15 ,1996, SHERIFF WINTERS again contacted HUMPHREY about the MUELLER documents.   HUMPHREY stated that he did not have the documents and that they were with a friend in Little Rock, Arkansas.   HUMPHREY was asked if he planned on getting the titles back and he once again stated he would obtain the titles and bring them to SHERIFF WINTERS.

10) On or about March 26, 1996, SHERIFF WINTERS contacted HUMPHREY for the sixth time about the MUELLER documents.   HUMPHREY stated that his attorney in Little Rock, Arkansas had the documents. SHERIFF WINTERS contacted the attorney in Little Rock and the attorney stated that he did not have any documents pertaining to HUMPHREY nor was he performing any work for HUMPHREY.   He further stated he did not know a PAUL EDWARD HUMPHREY.   This again gives rise the likelihood that HUMPHREY was being untruthful about and had reason to prevent, the examination of said documents

11)   On or about April 3, 1996, SHERIFF WINTERS met with HUMPHREY

AUG 3 0 1996

CLERK, POPE COUNTY
MUNICIPAL COURT

APP.39

at the Hughs Community Center in Russellville Arkansas. SHERIFF WINTERS confronted HUMPHREY and told him the attorney in Little Rock knew nothing about any documents and stated he did not know him. HUMPHREY stated he was unsure as to what to do about the documents and some of his friends had told him to take the documents to the attorney however he did not take the documents to the attorney, despite him having previously said he did, but instead that the documents were on a friends property. SHERIFF WINTERS again told HUMPHREY, for the seventh time to surrender the documents.

12) On June 28, 1996, the bodies of WILLIAM MUELLER, NANCY MUELLER and SARAH POWELL were discovered in the Illinois Bayou near Russellville, Arkansas, the three having been victims of a triple homicide. WILLIAM MUELLER was wearing a camouflage jacket and blue jeans. PAUL HUMPHREY, in a statement to authorities, indicated the last time he saw WILLIAM MUELLER he was wearing a camouflage jacket and blue jeans.

13) On July 12, 1996, Affiant interviewed a cooperating witness (CW) who stated that on or about the 18th day of January, 1996 he/she observed WILLIAM MUELLER and NANCY MUELLER at the First Bank of Arkansas located on North Arkansas Avenue in Russellville, Arkansas. The (CW) stated that as he/she was exiting the bank, NANCY MUELLER yelled. He/she turned and noticed NANCY MUELLER seated in the front seat of a large tan colored car. He/she stated that NANCY was seated in the front seat of the car near or in the middle. The (CW) stated he/she walked over to the car and engaged NANCY MUELLER in conversation. The (CW) noticed a white male

FILED BY *[illegible]*

AUG 3 0 1996

CLERK, *[illegible]*

**APP.40**

Appellate Case: 20-2351     Page: 42     Date Filed: 07/09/2020 Entry ID: 4932184

seated behind the wheel of the vehicle. The (CW) also noticed that WILLIAM MUELLER was seated in the back seat of the vehicle in the middle of the seat. A white male was seated on WILLIAM MUELLERS left and at least one white male seated on WILLIAM MUELLERS' right. The (CW) was shown a series of photographs of persons suspected in the MUELLER homicide. The (CW) positively identified PAUL EDWARD HUMPHREY as the person driving the vehicle. The (CW) positively identified a photograph of TIMOTHY COOMBS AKA JAMES WILSON seated on the left of WILLIAM MUELLER. COOMBS is currently a fugitive for shooting a Missouri State Trooper. The (CW) did not identify any other photographs. The (CW) did state that the other person(s) in the car were "rough looking". It should be noted that this date (January 18, 1996) was corroborated by bank records and this date of January 18, 1996 was one week after the last known date the MUELLERS were seen by relatives or any other known associates. The (CW) positively identified a vehicle owned by HUMPHREY as the vehicle she saw WILLIAM AND NANCY MUELLER in on that date.

14) On July 9, 1996. BOBBY HULSE, a gun show associate of the MUELLERS, met with DAVID BRANCH to discuss the murder of the MUELLERS. HULSE told BRANCH that he and HUMPHREY went to the Arkansas state revenue office in Little Rock, Arkansas prior to the MUELLERS' bodies being discovered and attempted to get the MUELLER documents transferred into HUMPHREY'S name. The attempt was unsuccessful.

15) On July 1, 1996 Detective David Davis and Detective Robert McKinney of the Russellville Police Department, at the request of Sheriff Winters. went to the residence of PAUL HUMPHREY at ███████

FILED BY *[signature]*

AUG 3 0 1996

CLERK, POPE ██████
MUNICIPAL COURT

Appellate Case: 20-2351    Page: 43    Date Filed: 07/09/2020 Entry ID: 4932184

███████ Russellville  Arkansas and asked PAUL HUMPHREY if he would accompany them to the Sheriff's Office to talk to Sheriff Winters concerning the deaths of WILLIAM MUELLER, NANCY MUELLER and SARAH POWELL. When PAUL HUMPHREY was asked to step outside and talk to the officers he removed from the back of his waistband a .45 caliber semi-automatic pistol which he laid on a table near the door. When asked by Detective Davis if he (PAUL HUMPHREY) usually answered the door with a gun, he stated no that he was "expecting them."

16) On July 1, 1996. The MUELLER Jeep and utility trailer were transported to the State Crime Laboratory Trace evidence unit for processing. It was subsequently reported by Shartel Bequette of the trace evidence unit of the Arkansas State Crime Lab that there were some fibers found in the vehicle which were inconsistent with fibers taken from the MUELLER residence and vehicle. This group of fibers, of unknown origin, are consistent with known colors in HUMPHREY'S vehicle and residence. Affiant specifically requests that pursuant to this search warrant, officers be allowed to remove, for testing, fiber from HUMPHREY'S vehicle and residence in order to have it examined by the Arkansas State Crime Lab.

17) On July 1, 1996, HUMPHREY was interviewed by SHERIFF WINTERS and INVESTIGATOR STEVE BROWN of the 5th Judicial District Drug Task Force concerning any information he had concerning the death of the MUELLERS. HUMPHREY admitted having the MUELLER documents and stated he would be in the following day to surrender the documents. HUMPHREY stated he had received the titles in the mail after the MUELLERS were reported missing. HUMPHREY stated the documents were

AUG 30 1996

MUNICIPAL COURT

Appellate Case: 20-2351     Page: 44     Date Filed: 07/09/2020 Entry ID: 4932184

signed when he received them. When asked by INVESTIGATOR BROWN if he usually answered the door with a gun PAUL HUMPHREY stated no. When asked why he did on this occasion he stated that it was because of the MUELLER murders. When asked why the discovery of this incident obviously several months after it was committed caused him to be in such a heightened state of awareness. PAUL HUMPHREY could not or would not answer

18) On July 2, 1996, HUMPHREY was interviewed by SERGEANT DUVALL at the Pope County Sheriff's Department HUMPHREY surrendered the MUELLER documents to SERGEANT DUVALL. An examination of the documents revealed that the title to the jeep was signed by WILLIAM MUELLER with an accompanying bill of sale signed by WILLIAM MUELLER. The certificate of origin for the utility trailer was signed by NANCY MUELLER and also had an accompanying bill of sale signed by NANCY MUELLER. HUMPHREY stated the last time he spoke to WILLIAM AND NANCY MUELLER was on January 8 and January 9, 1996 at a restaurant in Russellville, Arkansas. HUMPHREY also stated that WILLIAM MUELLER was wearing a camouflage jacket and blue jeans. HUMPHREY stated he did not bring the envelope the documents were received in but would see if he could find it. said envelope has not been provided to law enforcement and given HUMPHREYS untruthfulness and lack of cooperation on the documents, affiant has reason to believe and does believe that if said envelope exists, HUMPHREYS will not provide the same. Affiant further states that if said envelope exists, it is reasonable to assume it would be at the HUMPHREY residence, in FILED BY _____ or other buildings under his control.

AUG 3 0 1996

CLERK, POPE COUNTY
MUNICIPAL COURT

19) On or about July 8, 1996, a package of documents were examined by SERGEANT DUVALL. Said documents were received from DOUG WILLIAMS of the Arkansas State Police. The documents were received by WILLIAMS from DAVID MASON, the landlord of WILLIAM MUELLER. MASON had retrieved the documents from MUELLERS personal effects from his residence. Contained in the documents was a telephone bill which reflected that a telephone call was made from WILLIAM MUELLER residence to PAUL HUMPHREY's residence at 9:33 PM on January 12 1996. This is the day after HUMPHREY stated he last spoke to the MUELLERS. On the same date (July 8, 1996) the MUELLER documents obtained from HUMPHREY were compared with the documents received from Doug Williams. It appeared that the WILLIAM MUELLER signature on the jeep title and bill of sale was consistent with the signature of WILLIAM MUELLER'S deceased father, William Mueller, Sr. It should be noted WILLIAM MUELLER SR died on or about August 1, 1995. It should further be noted that signature was inconsistent with that of WILLIAM MUELLER JR, the victim of the homicide and owner of the Jeep.

20) On August 13, 1996, SPECIAL AGENT GLEN JORDAN, Bureau of Alcohol, Tobacco, and Firearms (ATF) submitted the MUELLER documents along with known signature and handwriting for WILLIAM FREDERICK MUELLER JR. (victim), NANCY MUELLER (victim) and WILLIAM FREDERICK MUELLER SR. (deceased father) to determine if the MUELLER documents had forged signatures of WILLIAM MUELLER (victim) and NANCY MUELLER to the ATF forensic science laboratory, Atlanta Georgia for examination.

21) On August 22, 1996, Nancy Davis, ATF document examiner, issued

AUG 30 1996

MUNICIPAL COURT

**APP.44**

a report which stated "Both sets of signatures were prepared with thick fiber-tip type pen making examination of line detail difficult. However, the subtle differences noted between the questioned and known signatures in addition to the apparent slow careful manner in which they were written indicated they may be simulations/tracings." Nancy Davis is prepared to testify that the signatures are inconsistent with known signatures of WILLIAM _____ to (victim).

22) It is, therefore, prayed by the affiant(s) herein that a Warrant to Search said premises be issued for the hereinabove described items.

_____
SIGNATURE OF AFFIANT

_____
OFFICIAL TITLE, if any

Sworn to before me  and subscribed in my presence, at _8:31 A.M._ _Russel. AR_ this _Ø27_ day of _Aug._  19_96_.

_Dennis C. Sutterfield_
JUDGE

AUG 30 1996



APP.45

Appellate Case: 20-2351     Page: 47     Date Filed: 07/09/2020 Entry ID: 4932184



**U.S. Department of Justice**

Federal Bureau of Investigation

In Reply, Please Refer to
File No.

10825 Financial Centre Pkwy
Suite 200
Little Rock, Arkansas  72211

September 20, 1999

b6
b7C

Arkansas State Police
1 State Police Plaza Drive
Little Rock, Arkansas  72209

Re: [                    ]
Et Al;
Racketeer Influenced and
Corrupt Organizations - Terrorism

Dear [            ]

b6
b7C

  I would like to take this opportunity to express my
appreciation and to commend you for your contribution to the
multi-agency investigation and prosecution of members of the
Aryan People's Republic for violent criminal acts in furtherance
of their plans to create an independent Aryan Nation within the
United States.

  You worked diligently in the early stages of the
investigation against Aryan People's Republic members [        ]
[        ] Daniel Lee, and [            ] who were charged with various
crimes ranging from burglary to murder, including the attempted
murder of two Ohio law enforcement officers.  Your efforts paid
off with a guilty plea elicited from [          ] and the
convictions of the other two defendants at the conclusion of an
11-week trial, leading to a life sentence for [          ] and
the death penalty for Daniel Lee.

b6
b7C

1 - Addressee
2 - Little Rock (183C-LR-38261)(SQ 2)(P)
JES/sso
(3)

b6
b7C

APP.47

I would like to thank you for your investigative efforts and to commend you for your all-out commitment to bringing to justice those responsible for the racketeering acts.

Sincerely yours,

Charles S. Prouty
Special Agent in Charge
FBI, State of Arkansas

2



**U.S. Department of Justice**

Federal Bureau of Investigation

In Reply, Please Refer to
File No.

10825 Financial Centre Pkwy
Suite 200
Little Rock, Arkansas   72211

September 20, 1999

       b6
       b7C

Arkansas State Police
1 State Police Plaza Drive
Little Rock, Arkansas  72209

Re: [                    ]
    Et Al;
    Racketeer Influenced and
    Corrupt Organizations - Terrorism

Dear [          ]

       b6
       b7C

       I would like to take this opportunity to express my appreciation and to commend you for your contribution to the multi-agency investigation and prosecution of members of the Aryan People's Republic for violent criminal acts in furtherance of their plans to create an independent Aryan Nation within the United States.

       You worked diligently in the early stages of the investigation against Aryan People's Republic members [          ] [          ] Daniel Lee, and [            ] who were charged with various crimes ranging from burglary to murder, including the attempted murder of two Ohio law enforcement officers. Your efforts paid off with a guilty plea elicited from [          ] and the convictions of the other two defendants at the conclusion of an 11-week trial, leading to a life sentence for [          ] and the death penalty for Daniel Lee.

       b6
       b7C

1 - Addressee
② - Little Rock (183C-LR-38261)(SQ 2)(P)
JES/sso
(3) sso

Appellate Case: 20-2351    Page: 50    Date Filed: 07/09/2020  Entry ID: 4932184

**APP.48**

       b6
       b7C

APP.49

I would like to thank you for your investigative efforts and to commend you for your all-out commitment to bringing to justice those responsible for the racketeering acts.

Sincerely yours,

Charles S. Prouty
Special Agent in Charge
FBI, State of Arkansas

2

(12/31/1995)

# FEDERAL BUREAU OF INVESTIGATION

Precedence:   PRIORITY                              Date:   06/03/1997

To:   NSD                          Attn:   DTOU
      CIRG
      Cincinnati
      Denver
      Jacksonville
      Kansas City
      Oklahoma City
      Salt Lake City
      Seattle
      St. Louis
      Tampa

From:   Little Rock
        Sq 2
        Contact:   SA [                    ]          b6
                                                       b7C

Approved By:   [                    ]

Drafted By:    [                    ] bkw

Case ID #:   266E-CI-66739   (Pending)
             [              ]   (Pending)

Title:   CHEVIE O'BRIEN KEHOE, aka
         Bud Gumm - FUGITIVE (A);
         AOT-DT
         (266E-CI-66739)

[                                              ]          b6
                                                          b7C

## ARMED AND EXTREMELY DANGEROUS.
## SUBJECT HAS FIRED UPON POLICE OFFICERS.

Synopsis:   To report sighting of individuals believed to be
Chevie Kehoe [                                              ] at a          b6
White Supremacist compound in Pope County, Arkansas, by a          b7C
confidential source on [                                    ]          b7D
[                                          ] Source initially
[                                                        ]
[                                          ] as Chevie
Kehoe.          b6
                b7C

Appellate Case: 20-2391   Page: 52   Date Filed: 07/09/2020 Entry ID: 4932184

To: NSD   From: Little Rock
Re:  266E-CI-66739, 06/03/1997

b6
b7C
b7D
b7E

**Administrative:**  Re telcal between Little Rock SAC Ivian C. Smith and Section Chief Robert Blitzer on 6/2/97.

**Enclosures:**  Enclosed for the Bureau, Cincinnati, and Oklahoma City are Pope County Sheriff's Office reports regarding sightings of Chevie Kehoe in Pope County, Arkansas, and interview of [ ] concerning sightings of fugitives at Elohim City, Oklahoma.

b6
b7C

**Details:**  For information of the Bureau and receiving offices, on 5/27/97, SAC, Little Rock, met with representatives of the Pope County Sheriff's Office concerning captioned investigation. During the meeting, Sheriff Jay Winters advised that a confidential source previously known to the sheriff's office [ ] had contacted their office and reported a possible sighting of [ ] (later determined to be Chevie Kehoe [ ] at a compound in rural Pope County.  A subsequent meeting was held on 5/30/97 to discuss the Federal fugitive investigation and the progress of the local homicide investigation surrounding the murders of the Mueller family in 1996.

b6
b7C
b7D

The Pope County Sheriff's Office advised that, on [ ] the source, [ ] .(PROTECT IDENTITY), contacted [ ] of their office and reported [ ]

b6
b7C
b7D

Following the meeting, [ ] was interviewed by FBI Special Agents and investigators of the Pope County Sheriff's Office. [ ]

b6
b7C
b7D

2

**APP.51**

Appellate Case: 20-2351    Page: 53    Date Filed: 07/09/2020 Entry ID: 4932184

To:  NSD  From:  Little Rock
Re:  266E-CI-66739, 06/03/1997

b6
b7C
b7D

b6
b7C
b7D

b6
b7C
b7D

3

**APP.52**

To:   NSD   From:   Little Rock
Re:   266E-CI-66739, 06/03/1997

b6
b7C
b7D

b6
b7C
b7D

b6
b7C
b7D

b6
b7C
b7D

- 4 -

**APP.53**

To:  NSD   From:  Little Rock
Re:  266E-CI-66739, 06/03/1997

b6
b7C
b7D

b6
b7C
b7D

b6
b7C
b7D

b6
b7C
b7D

5

**APP.54**

To:  NSD  From:  Little Rock
Re:  266E-CI-66739, 06/03/1997

advised [                         ] Pope County Sheriff's Office, [confidential source            ] and has provided information and operational assistance to the Pope County Sheriff's Office, a state drug task force, and the Arkansas State Police.

6

**APP.55**

Appellate Case: 20-2351     Page: 57     Date Filed: 07/09/2020 Entry ID: 4932184

To:  NSD  From:  Little Rock
Re:  266E-CI-66739, 06/03/1997

b6
b7C
b7D

white male

b6
b7C
b7D

resides at                              Arkansas.
telephone number            He has been arrested

According to

b6
b7C
b7D

advised

b6
b7C
b7D

b6
b7C
b7D

telephone number

b6
b7C

Arkansas driver's license records reflect
date of birth                              Arkansas.
The property is surrounded by
                    where police recovered William Mueller's Jeep in
February 1996.                    adjacent to the compound are

NCIC check shows                    as a white male, date of birth

7

APP.56

To: NSD   From: Little Rock
Re: 266E-CI-66739, 06/03/1997

[redacted] Arkansas [redacted]   b6 b7C b7D

[redacted] advised investigation has determined that Chevie [redacted] Kehoe [redacted] resided [redacted] Arkansas for approximately one year from 1993 [redacted] lived in a [redacted] in Madison County, Arkansas. During this time, Chevie was known to travel extensively and was in and out of Arkansas various times. He has traveled to Elohim City, Oklahoma, and reportedly had been there during the Oklahoma City bombing. Chevie also became acquainted with firearms dealer William Mueller. [redacted] has interviewed [redacted] and their lifestyle when they resided in Arkansas. [redacted] was a member of the same religious group to which the [redacted] was unaware that [redacted] He advised that [redacted] previously interviewed by [redacted], had sold [redacted] to an unknown individual in Clearwater.   b6 b7C

Investigation has also determined that, while in Arkansas, [redacted] associated with [redacted] Arkansas. [redacted] rented a house from the [redacted] who lived nearby and within a close proximity of a house owned by William Mueller. Mueller may have purchased the property from an individual named [redacted] often accepted deliveries from United Parcel Service (UPS) for Mueller, presumably for ammunition and firearms parts. [redacted] supposedly paid cash on delivery in the amounts [redacted] per delivery every other day on behalf of Mueller. The UPS deliveries were made out of [redacted] Arkansas, until 1/11/96 when UPS changed its delivery function to Harrison, Arkansas.   b6 b7C

[redacted] Arkansas [redacted] home telephone [redacted] fax number [redacted]

[redacted] was a [redacted] address unknown, telephone number [redacted] has been described as a dangerous individual.   b6 b7C

[redacted] were also associated with fugitive [redacted] who is wanted in the September 1994 shooting of a Missouri State Highway Patrol Officer in Mc Donald County, Missouri. [redacted] had been living at a house he rented from [redacted] in 1994 when the shooting incident occurred. The Pope County Sheriff's Office is of the opinion that [redacted] may have been the passenger involved in the Ohio shootings rather than [redacted] in February of 1997.   b6 b7C

8

**APP.57**

To: NSD   From: Little Rock
Re:   266E-CI-66739, 06/03/1997

[REDACTED] had rental and business property near [REDACTED] and was a member of the same white supremacist group as the Mueller family. [REDACTED] was arrested in 1996 for being in possession of a vehicle owned by the Mueller's. He had forged the title for the vehicle and attempted to sell it when he was arrested.

On [REDACTED] advised that he received a telephone call from [REDACTED] stated he was not completely truthful with [REDACTED] and other investigators in other previous interviews [REDACTED] advised that [REDACTED] agreed to be interviewed by Special Agents of the Bureau of Alcohol, Tobacco, and Firearms (BATF) and the FBI and would submit to a polygraph examination. [REDACTED]

On [REDACTED] also received a call from [REDACTED]

A United States Forest Service Officer reported that [REDACTED] date of birth [REDACTED] is currently living at the compound. He is allegedly driving a vehicle bearing Louisiana license tag [REDACTED] and maintains a Florida driver's license. Little Rock records check conducted for Florida driver's license negative. NCIC check showed [REDACTED] born [REDACTED] FBI Number [REDACTED] with SSAN [REDACTED] He has several charges with the sheriff's office in [REDACTED] Louisiana, [REDACTED] License number [REDACTED] is registered on a 1988 Hyundai [REDACTED] date of birth [REDACTED] of [REDACTED] Louisiana. with previous arrest at [REDACTED] Louisiana, Sheriff's Office for

b6
b7C

b6
b7C
b7D

b6
b7C
b7D

b6
b7C

9

**APP.58**

Appellate Case: 20-2351     Page: 60     Date Filed: 07/09/2020 Entry ID: 4932184

To: NSD  From:  Little Rock
Re:  266E-CI-66739, 06/03/1997

On [                    ] advised that a U. S.    b6
Forest Service Officer had been driving near the compound and   b7C
came upon a vehicle stopped in the middle of the road.  The
officer approached the vehicle, which was occupied by a male and
female, and asked the driver for identification.  The man
identified himself as [                ] and stated he lived at the
location of the compound.  [                ] had no vehicle tag,
driver's license, or proof of insurance.  The officer stated that
he would see him at a later time (presumably to issue a
citation).

[                          ] provided a report of interview   b6
conducted of [                        ] Oklahoma, on 5/7/97, who   b7C
provided information regarding alleged sightings of [          ]
[                        ] advised he received information from a [      ]
[                                        ] that belong
to residents of Elohim City.  About three weeks prior to the
interview, [                ] among others, that [              ]
were at Elohim City.  [      ] made a similar statement the week after
[                      ] was recovered in Wyoming on 2/28/97.  [      ]
told [    ] he received this information about [          ] from
some of the Elohim City residents.

Little Rock will obtain court orders [            ]    b3
[                        ] regarding the compound and adjacent property   b6
[                          ] to include [            ]    b7C
[                ] Little Rock will also attempt to obtain records from   b7D
UPS regarding deliveries to William Mueller in an attempt to
identify UPS drivers.  Check will be conducted for real estate
and utility records relative to the compound.

Investigation will be coordinated with Little Rock
BATF, the Arkansas State Police, and the Pope County Sheriff's
Office.  The Little Rock point of contact is SA [          ]    b6
[                ] telephone [              ]    b7C

10

**APP.59**

Appellate Case: 20-2351     Page: 61     Date Filed: 07/09/2020 Entry ID: 4932184

To: NSD   From: Little Rock
Re: 266E-CI-66739, 06/03/1997


LEAD (s):

Set Lead 1:

TAMPA

AT [          ] FL

Attempt to identify [                    ]
[                    ] white male, date of birth [          ] FBI
[                    ] telephone number
[          ]

b6
b7C
b7D

Set Lead 2:

CINCINNATI

AT EATON, OH

Coordinate interview and polygraph of [          ]
with BATF and Pope County Sheriff's Office regarding his
knowledge with fugitives.

b6
b7C
b7D

Set Lead 3:

CIRG

AT QUANTICO, VA

Hostage Rescue Team (HRT) is requested to conduct site
survey and flyovers of compound to include aerial photographs.

Set Lead 4:

ST. LOUIS

AT ST. LOUIS, MO

At Military Personnel Records Center (MPRC) conduct
search to determine military background of [          ]
Also attempt to determine whether [          ] has been a
member of the armed forces and provide information.

b6
b7C

Set Lead 5:

SALT LAKE CITY

AT [     ] MT

11

**APP.60**

Appellate Case: 20-2351   Page: 62   Date Filed: 07/09/2020 Entry ID: 4932184

To:   NSD   From:  Little Rock
Re:   266E-CI-66739, 06/03/1997

Provide pertinent results, if any, ▭

▭ for any relation to Arkansas.

b3

**ARMED AND EXTREMELY DANGEROUS.
SUBJECT HAS FIRED UPON POLICE OFFICERS.**

◆◆

12

**APP.61**

Appellate Case: 20-2351   Page: 63   Date Filed: 07/09/2020 Entry ID: 4932184

DEPARTMENT OF THE TREASURY- BUREAU OF ALCOHOL, TOBACCO AND FIREARMS

**REPORT OF INVESTIGATION** (Law Enforcement)

| | | DATION IS |
|---|---|---|
| X | ROUTINE | Page 1 of |
| | SENSITIVE | SIGNIFICANT | **3** pages |

1. TO:
Special Agent in Charge
New Orleans Field Division

COPY

3. MONITORED INVESTIGATION INFORMATION (*Number and Branch*)
CIP: FY-96
VIOLENT CRIME
REPORT 001

| 4. TITLE OF INVESTIGATION | 5. INVESTIGATION No. (*Include Suspect No.*) |
|---|---|
| William Mueller | 53430-96-0110-K |

**6. TYPE OF REPORT** (*Check applicable boxes*)

| | | | | | 7. BUREAU PROGRAM | | 8. PROJECT(S) | |
|---|---|---|---|---|---|---|---|---|
| X | PRELIMINARY | | | COLLATERAL (*Request*) | X | TITLE I | FIREARMS | | TARGETED OFFENDER |
| | | | | | | TITLE II | | X | TERRORIST/EXTREMIST |
| | STATUS | | | COLLATERAL (*Reply*) | | TITLE VII | | | OCD |
| | | | | | | TITLE II | EXPLOSIVES | | ITAR |
| | FINAL | | | INTELLIGENCE | | TITLE XI | | | SBAR |
| | | | | | | TOBACCO | | | OMO |
| | SUPPLEMENTAL | | | REFERRAL (*Internal*) | | ALCOHOL | | X | OTHER (*Specify*) GENERAL |

9. DETAILS:

DESCRIPTION OF ACTIVITY:

Possible Burglary of Firearms from a Federal Firearms Licensee and Homicide of William Mueller, Nancy Mueller and Sarah Powell. Investigation of possible militia involvement and threat to ATF Agents.

SYNOPSIS:

This report relates to the investigation of a possible burglary from a Federal firearms dealer and the subsequent homicide of William Mueller, (Former Federal firearms dealer), Nancy Mueller (wife) and Sarah Powell (juvenile daughter). This report also relates to a possible threat to ATF Agents.

NARRATIVE:

1) On March 8, 1995, Bureau of Alcohol, Tobacco, and Firearms (ATF) SPECIAL AGENT GLEN JORDAN, Little Rock Field Officer was contacted by ARKANSAS STATE POLICE INVESTIGATOR TOM BROWN, Marshall, Arkansas. BROWN reported that WILLIAM FREDRICK MUELLER, white male, date of birth ███, 1943 who operates BILL'S GUN SHOP and resides at ███████ Tilly, Arkansas, 72697 had reported a large burglary of firearms from his residence. MUELLER was a Federal firearms licensee. BROWN stated that MUELLER reported while at a gun show the previous weekend an unknown person(s) forced entry to his residence and stole approximately $40,000 worth of firearms. BROWN believed the theft did not happen and believed that MUELLER was attempting to collect insurance. BROWN stated that MUELLER could only provide the serial number on one firearm which was

| 10. SUBMITTED BY (*Name*) Glen Jordan | 11. TITLE AND OFFICE SA, Little Rock, AR | 12. DATE 07/03/96 |
|---|---|---|
| 13. REVIEWED BY (*Name*) J. William Buford | 14. TITLE AND OFFICE RAC, Littl Rock, AR | 15 DATE 3, 96 |
| 16. APPROVED BY (*Name*) Robert A. Stellingworth | 17. TITLE AND OFFICE Special Agent in Charge | 18. DATE / / |

ATF EF 3270.2 (3-90)

APP 001
000001

DEPARTMENT OF THE TREASURY
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS

REPORT OF INVESTIGATION - CONTINUATION SHEET
(Law Enforcement)

PAGE 2
OF 3 PAGES

TITLE OF INVESTIGATION
William Mueller

INVESTIGATION NO.
53430-96-0110-K

DETAILS (Continued)

supposedly stolen.  The one firearm which MUELLER had the serial number on was a .45 caliber automatic pistol.  A sheriff's deputy with the SEARCY COUNTY SHERIFF'S DEPARTMENT told BROWN that MUELLER was afraid he was going to be inspected by ATF and may have faked the burglary to avoid an ATF inspection.

2)  On March 13, 1996, AGENT JORDAN was re-contacted by BROWN and told that he still believed insurance fraud was the motive for the reported burglary.  MUELLER reported that all his firearms were stolen except for a .44 caliber revolver which he had in his possession at the gun show.  BROWN reported that the UNITED PARCEL SERVICE had been delivering packages to MUELLER on a daily basis and the driver believed the packages contained firearms and ammunition.  BROWN believed that MUELLER is an associate of TIMOTHY THOMAS COOMBS, AKA WILLIAM PATTERSON, AKA JAMES WILSON, AKA CAL LIBERTY, white male, date of birth ████████ 1959.  COOMBS is currently wanted for the attempted murder of a Missouri State Trooper and is considered armed and dangerous.  BROWN also reported that MUELLER is associated with HOWARD LARNARD, white male, date of birth ████ 1951 who reloads ammunition for MUELLER.  MUELLER filed a claim on the burglary with USAA INSURANCE.  MUELLER, COOMBS AND LARNARD are all members or associates of right wing extremism and believe in the "New World Order" doctrine.

3)  On July 7, 1995, SPECIAL AGENT GLEN JORDAN and INVESTIGATOR BROWN, interviewed HOWARD LARNARD at the Searcy County Sheriff's Department regarding some suspected silencers which had been surrendered to DEPUTY JOEY PRUTT, Search County Sheriff's Department by LARNARD'S ex-wife CHRISTINE LARNARD.  During the interview LARNARD stated that the suspected silencers were left at his residence by COOMBS and he was not even aware they were at his residence.  LARNARD stated he moved out of the house on February 23, 1995 and has had no communication with CHRISTINE since.  LARNARD admitted being an associate of COOMBS.  LARNARD stated that HAROLD FURGUSON and JOHN LNU are also associates of COOMBS.  LARNARD stated that SYLVIA MASON was also an associate of COOMBS and that all the persons associated with COOMBS, including himself, held NEW WORLD ORDER beliefs.  An examination of the suspected silencers revealed some type of metal cylinder and a quantity of parts.  It was the agents option that the items were questionable as being silencers.

4)  On March 22, 1996, AGENT JORDAN attended a meeting at the Pope County Sheriff's Department regarding WILLIAM MUELLER, NANCY MUELLER AND SARAH POWELL'S disappearance.  The focus of the meeting was COOMBS and his association with the MUELLER'S.  WILLIAM MUELLER'S vehicle was found abandoned in rural Pope County on January 12, 1996.  During the meeting it was suspected that MUELLER may have cut his ties to society and joined some type of right wing group.  It was reported that MUELLER had been seen in Pope County in mid-January and said he was going out of state.  It was also reported that a white male, identified as PAUL HUMPHREY, date of

ATF EF 3270.3 (5-90)

APP.63

DEPARTMENT OF THE TREASURY
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS

## REPORT OF INVESTIGATION - CONTINUATION SHEET
(Law Enforcement)

| | | PAGE 3 OF 3 PAGES |
|---|---|---|

TITLE OF INVESTIGATION
William Mueller

INVESTIGATION NO.
53430-96-0110-K

DETAILS (Continued)

birth ███/53, had the title to MUELLER'S jeep. HUMPHREY is reported to be a FFL.

5) On June 29, 1996, the bodies of WILLIAM MUELLER, his wife NANCY MUELLER, and their 8 year-old daughter, SARAH POWELL, were found in a bayou which runs into LAKE DARDENELLE near Russellville, Arkansas in Pope County. It was obvious from the manner of death that the MUELLERS had been murdered and their bodies in the water for some time.

6) William MUELLER is a former Federal firearms dealer. His license number is 5-71-058-01-6E-14469. According to ATF Compliance, MUELLER surrendered his license and mailed his records to ATF Out of Business Records on August 22, 1995.

7) On July 1, 1996, ATF received information from MAJOR RICK RIGGS, Harrison Police Department that a militia group met on or about Sunday, June 30, 1996. A Harrison Police confidential informant attended the meeting and reported that the group believed that ATF was responsible for the death of WILLIAM MUELLER and his family. A discussion was held regarding possible retaliation and the specific target was the "ATF Agent with a limp." (Possibly RAC BILL BUFORD). More detailed information will ▉ forwarded to the New Orleans Field Division when received from the ▉rrison Police Department.

ATTACHMENTS:

Arkansas State Police Report

ATF EF 3270.3 (5-90)

**APP.64**

000003

CRIMINAL INVESTIGATION DIVISION

POPE COUNTY SHERIFF'S OFFICE

CASE NO:
CRIME:
DATE:          10/29/96
DICTATED BY:   Glen Jordan
COPIES TO:

INTERVIEW

This is a taped interview being conducted by Special Agent Glen Jordan at
10:40 a.m. on October 29, 1996, with Jeffrey Brown.  Also present in the
room is Investigator Dewayne Luter of the Arkansas State Police.

GJ:  Okay, uh, Mr. Brown, would you give us your full name?

JB:  Jeffrey Harold Brown

GJ:  What's your date of birth Mr. Brown?

JB:  ███████████ '63.

GJ:  Okay, where do you currently live?

JB:  Um, at █████████, Spokane, Washington.

GJ:  Okay, what's the zip code?

JB:  99204

GJ:  What's your date of birth?

JB:  ███ 63, ████████, '63.

GJ:  Okay, how long have you lived in Spokane?

JB:  Since '88.

GJ:  Okay, what is your social security number?

JB:  ███████

GJ:  Okay, would you uh, give me your uh, physical description?

JB:  Um, about 6'4", 280 pounds, um, brown hair, blue eyes.

GJ:  Okay, okay, do you have a Washington driver's license?

JB:  Yes I do.

GJ:  Okay, is it, the number the same as your social security?

JB:  No, it's, um,

#04-020-96

Appellate Case: 20-2351     Page: 67     Date Filed: 07/09/2020 Entry ID: 4932184

APP.65

CRIMINAL INVESTIGATION DIVISION

POPE COUNTY SHERIFF'S OFFICE


CASE NO:
CRIME:
DATE:          10/30/96
DICTATED BY: Glen Jordan
COPIES TO:


INTERVIEW

Interview is conducted by Special Agent Glen Jordan on October 30, 1996, at 10:16 a.m.  This is a taped statement with Jeffrey Brown at the ATF office in Spokane, Washington.  Present in the interview is Investigator Dewayne Luter, Arkansas State Police and Jeff Brown and Special Agent Glen Jordan.

GJ:   Okay, Mr. Brown, just for identification purposes, would you state your full name and date of birth?

JB:   Jeffrey H. Brown, ██████████ 1963.

GJ:   Okay, Mr. Brown, what we're gonna talk about is the arrival of Chevy Keo and another individual at your place of employment approximately a year and a half ago, uh, with an Airstream type trailer.  Uh, could you tell us about the circumstances surrounding the arrival of Mr. Keo with this trailer?

JB:   Um, what do you want me say, when he first showed up?

GJ:   Yeah, just, just start when he first showed up, uh, what he was driving, who was with him, uh, and that sort of thing.

JB:   Uh, it's been a while, but he had a, a Dan, uh, Love.., I can't make out his last na..., a Loveday?

GJ:   Lovelace?

JB:   Lovelace, um, kind of a quiet, mousey type guy, uh, was, I thought it was his cousin at first, that's the way it was explained to me.

GJ:   What, how long ago was it that they arrived at the, was it the Shadows Motel?

JB:   Yes.

GJ:   Okay, how long ago was it they arrived at the Shadows Motel with this Airstream trailer?

JB:   Year, almost two years ago.

GJ:   Okay, almost two years ago.  Uh, what did the trailer look like?

JB:   It was silver, um, aluminum, uh bullet nosed and back, um, like the

#04-028-96    Appellate Case: 20-2351    Page: 68    Date Filed: 07/09/2020 Entry ID: 4932184

**APP.66**

CRIMINAL INVESTIGATION DIVISION

POPE COUNTY SHERIFF'S OFFICE



CASE NO:      96-1003
CRIME:        Homicide
DATE:         11/18/96
DICTATED BY:  Sgt. Aaron Duvall
COPIES TO:

### INTERVIEW

Subject interviewed is Bobby Hausy, c/o Ye Ole Gun Shop, Sheridan, Arkansas.

On Thursday, November 7, 1996, this officer along with Glen Jordan, ATF and Sgt. Dewayne Luter of the Arkansas State Police, interviewed Bobby Hausy in Sheridan, Arkansas. Mr. Hausy advised that it was approximately 1993 when he first met Bill and Nancy Meuller at a gun show in Tulsa, Oklahoma. He stated that the last time that he talked with Bill was a Thursday morning by telephone. Nancy had called him to set up security at a gun show in Oklahoma. He stated that the last gun show that he attended with them was in December, the 29th, 30th and 31st of 1995 in Little Rock, Arkansas.

He stated that it was at this gun show that the Meullers first met a man by the name of John Morris who makes holsters and lives in Missouri. He stated that John Morris stayed at his residence, along with Bill and Nancy, at night during the gun show. The following is John Morris' address:

███████████████

Nevada, MO   64772

Telephone Number:  ████████████

Mr. Hausy stated that Bill Meuller had offered to sell him his Jeep at approximately $5,000.00. He stated that Bill wanted to buy an older pickup truck so he could pull the trailer with it.

He stated that he remembers Angela Holderman at the gun show in December of 1995 with the Meullers. He stated that he remembered at Bill's display, that he didn't have more than ten guns. He remembered one of them being a 308 caliber. He believes that Bill had traded three or four long guns during that gun show.

Mr. Hausy was shown a picture of Bill Meuller along with Mae Churchill that included his display and racks. He identified them as those being the ones that Bill used at the December, 1995, gun show. He stated that he doesn't remember seeing any pink cards on the table.

He does remember Nancy having a large calculator, brand unknown. He believes this possibly came from Sam's. He said it was a large calculator, but it did not have a receipt roller. He believes the calculator was around 4"x 7½".

CASE FILE NO# _01 - 222_

# C A S E   F I L E   L O G   S H E E T

COPIED FOR: _St. Cornett_      BY: _Oes_

AUTHORIZED BY: _Beach_

DELIVERED BY: _Mail_

DATE: _07-03-96_


COPIED FOR: _Glen Jordan_      BY: _Oes_

AUTHORIZED BY: _Rainbolt_

DELIVERED BY: _Hand_

DATE: _04-14-97_


COPIED FOR: _____      BY: _____

AUTHORIZED BY: _____

DELIVERED BY: _____

DATE: _____


COPIED FOR: _____      BY: _____

AUTHORIZED BY: _____

DELIVERED BY: _____

DATE: _____


COPIED FOR: _____      BY: _____

AUTHORIZED BY: _____

DELIVERED BY: _____

DATE: _____

**APP.68**

(12/31/1995)

# FEDERAL BUREAU OF INVESTIGATION

Precedence:  ROUTINE                                    Date:   09/10/1997

To:  National Security          Attn:   DTOU
     Cincinnati

From:  Little Rock
       Squad 2
       Contact:  SA [                                    ]      b6
                                                                b7C

Approved By:  [                            ]

Drafted By:  [                            ]

Case ID #:   266E-CI-66739 476 (Pending)                        b6
             [                            ]                     b7C
             183C-LR-38261 (Pending)

Title:   CHEVIE O'BRIEN KEHOE, aka
         Bud Gumm;
         AOT-DT
         (266E-CI-66739)

                                                                b6
         [                                    ]                 b7C

         CHEVIE O'BRIEN KEHOE, aka;
         ET AL;
         RICO – TERRORISM
         (183C-LR-38261)

                ARMED AND EXTREMELY DANGEROUS
            SUBJECT HAS FIRED UPON POLICE OFFICERS.

Synopsis:  Lead covered.

Administrative:  Re FBIHQ teletype to Little Rock dated March 21,
1997, and Little Rock telcal of SA [                            ]    b6
[          ] IOS, DTOU, on September 10, 1997.                       b7C

Details:  In referenced teletype, Chevie [          ] Kehoe were in   b6
a fugitive status, and FBIHQ set out leads to various field          b7C
offices in furtherance of the investigation.  Little Rock was
requested to obtain reports of the murder investigation into the
deaths of William and Nancy Mueller and their daughter, Sarah
Powell, in Pope County, Arkansas.

         Since that time, the [        ] have been apprehended, and   b6
Little Rock has initiated a spin-off RICO investigation which        b7C
encompasses the Mueller murders.  Several volumes of

                    AGENT COPY SENT

                                                              APP.69
Appellate Case: 20-2351    Page: 71    Date Filed: 07/09/2020 Entry ID: 4932184

To:   National Security   From:   Little Rock
Re:   266E-CI-66739, 09/10/1997

investigative reports have been accumulated from the Little Rock
Bureau of Alcohol, Tobacco and Firearms, Arkansas State Police,
and Pope County Sheriff's Office, as well as from various FBI
field offices.

     As a result, Little Rock will consider the lead set out
in referenced teletype covered.

     Investigation continuing.

          **ARMED AND EXTREMELY DANGEROUS**
       **SUBJECT HAS FIRED UPON POLICE OFFICERS.**

2

**APP.70**

Appellate Case: 20-2351     Page: 72     Date Filed: 07/09/2020 Entry ID: 4932184

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| OTHA SMITH, | ) | Case No. 4:03CV3253 |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| | ) | |
| vs. | ) | **MOTION FOR RELIEF OF** |
| | ) | **JUDGMENT** |
| | ) | |
| HAROLD CLARK, Director of the | ) | |
| Nebraska Department of Correctional | ) | |
| Services; and PATRICK COLERICK | ) | |
| | ) | |
| **Defendants.** | ) | |

**COMES NOW** the plaintiff by and through his attorney, Robert Wm. Chapin, Jr. and hereby moves the Court to set aside the Judgment (Filing #56) entered on or about May 23, 2005 as Plaintiff with the full knowledge of the Defendants had filed a State Tort Claim against the State and Patrick Colerick and that such information constitutes mistake and possible misrepresentation as to both the facts and the status of the case.

**WHEREFORE**, the Plaintiff prays that the Court grants his motion and reopens the above matter against defendants Harold Clarke and Patrick Colerick; and for such other and further relief as the Court deems just and equitable.

Dated this 21ST day of June, 2005.

**RESPECTFULLY SUBMITTED,**
**OTHA SMITH, Plaintiff,**

**BY: /s/ Robert Wm. Chapin, Jr.** _____
Robert Wm. Chapin, Jr. #16534
421 South 9th Street, Suite 245
Lincoln, NE 68508
(402) 441-5858

1

**APP.71**

(402) 441-5859 FAX

## CERTIFICATE OF SERVICE

I hereby certify that on June 21, 2005, I electronically filed, through my staff, the foregoing **MOTION FOR RELIEF OF JUDGMENT** with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following: Defendants' counsel of record, Ms. Stephanie Zeeb, Assistant Attorney General, 2115 State Capitol, Lincoln, NE 68509-8920.

BY: /s/ Robert Wm. Chapin, Jr.
Robert Wm. Chapin, Jr. #16534
421 South 9th Street, Suite 245
Lincoln, NE 68508
(402) 441-5858

2

**APP.72**

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of Arkansas*

---

Post Office Box 1229                                          501-324-5342
425 W. Capitol Avenue, Suite 500                     FTS 501-324-5342
Little Rock, Arkansas 72203                            FAX 501-324-5221

February 19, 1998

John Wesley Hall, Jr.                      Mark F. Hampton
Attorney at Law                            Attorney at Law
523 W. 3rd St.                             308 S. Louisiana St.
Little Rock, AR 72201                      Little Rock, AR 72201

Jack Lassiter                              Cathi V. Compton
Attorney at Law                            Attorney at Law
401 W. Capitol Ave., Ste. 502             212 Center St., Ste. 700
Little Rock, AR 72201                      Little Rock, AR 72201

Jenniffer Horan
Federal Public Defender
P. O. Box 3587
Little Rock, AR 72201

> Re:    US v. Chevie O'Brien Kehoe, et al.
>        No. LR-CR-97-243

Please find enclosed a copy of a polygraph report for Richard L. Coburn, Jr. This report was inadvertently omitted from item #23 in the last packet of discovery materials prepared on February 13, 1998.

We apologize for any inconvenience this has caused. Should you have any questions, please call.

Sincerely,

PAULA J. CASEY
United States Attorney

By DAN STRIPLING
Assistant U. S. Attorney

DS/man
Enclosure

**APP.73**