IN THE
UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

———————————————————————————

No. 20-2351

———————————————————————————

DANIEL LEWIS LEE,
Appellant,

v.

UNITED STATES,
Appellee.

———————————————————————————

On Appeal from the United States District Court
Eastern District of Arkansas
No. 4:97-cr-00243-KGB-2

———————————————————————————

**APPELLANT'S REPLY TO UNITED STATES' OPPOSITION TO
APPLICATION FOR A CERTIFICATE OF APPEALABILITY
OR AUTHORIZATION TO FILE SUCCESSIVE § 2255 MOTION**

———————————————————————————

MORRIS H. MOON
Bar# 24032750 (TX)
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(713) 880-3556
Morris_Moon@fd.org

GEORGE G. KOUROS
Bar # 420813 (CT)
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 821-0855
George_Kouros@fd.org

Counsel for Appellant Daniel Lee

Dated: July 11, 2020

# TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………………….…ii

INTRODUCTION…………………………………………………………………1

I.    Jurists of reason could find debatable whether the Government's misconduct constituted a defect in the integrity of the § 2255 proceedings…………………………………………………………3

II.    Mr. Lee has made a "prima facie" showing that he meets the requirements of § 2255(h)(1)…………………………………………7

    A.    Viewed in its totality, the evidence against Mr. Lee is far from "overwhelming"……………………………………………………8
        1. The Timeline……………………………………………...11
        2. Cash and property belonging to the Muellers………………………14
        3. Statements to the Wankers………………………………………..15
        4. Confession to Gloria Kehoe…………………………………………16
        5. The Humphrey polygraph report………………………………18

    B.    There is no "due diligence" requirement under § 2255(h)(1)……….20

CONCLUSION……………………………………………………………...…21

i

Appellate Case: 20-2351    Page: 2    Date Filed: 07/11/2020 Entry ID: 4932678

**TABLE OF AUTHORITIES**

**Cases**

*Banks v. Dretke*, 540 U.S. 668 (2004)……………………………….....................21

*Bennett v. United States*, 119 F.3d 468 (7th Cir. 1997)………………………..7, 8

*Brady v. Maryland*, 373 U.S. 83 (1963)……………………………………*passim*

*Cooper v. Woodford*, 358 F.3d 1117 (9th Cir. 2004)………………………..........8

*Crouch v. Norris*, 251 F.3d 720 (8th Cir. 2001)…..........................................7

*Felker v. Turpin*, 518 U.S. 651 (2000)…………………………………………7

*Herrera-Gomez v. United States*, 755 F.3d 142 (2d Cir. 2014) (*per curiam*)……..20

*In re Johnson*, 322 F.3d 881 (5th Cir. 2003)………………………………...7

*In re Lott*, 366 F.3d 431 (6th Cir. 2004)…………………………………………8

*In re McDonald*, 514 F.3d 539 (6th Cir. 2008)…………………………..........8

*In re Pickard,* 681 F.3d 1201 (10th Cir. 2012)………………………………...3, 6, 7

*In re Williams*, 330 F.3d 277 (4th Cir. 2003)…………………………………..7-8

*Jimerson v. Payne*, 957 F.3d 916 (8th Cir. 2020)………………………………..21

*Napue v. Illinois*, 360 U.S. 264 (1959)…………………………………….*passim*

*Scott v. United States*, 81 F. Supp. 3d 1326 (M.D. Fla. 2015),
 *aff'd*, 890 F.3d 1239 (11th Cir. 2018)…………………………………..........6

*Strickler v. Greene*, 527 U.S. 263 (1999)…………………………………..........21

*United States v. Nelson*, 970 F.2d 439 (8th Cir. 1992)………………...................4

*United States v. Vialva*, 904 F.3d 356 (5th Cir. 2018)………………………….7

Appellate Case: 20-2351    Page: 3    Date Filed: 07/11/2020 Entry ID: 4932678

*United States v. Williams*, 753 Fed. Appx. 176 (4th Cir. 2019)……………………..6

**Statutes**
28 U.S.C. § 2244……………………………………………………………..20

28 U.S.C. § 2255………………………………………………………..*passim*

**Rules**
Fed. R. of Civ. P. 60(b)……………………………………………………*passim*

Appellate Case: 20-2351    Page: 4    Date Filed: 07/11/2020 Entry ID: 4932678

# INTRODUCTION

Jurists of reason could disagree with the district court's resolution of Mr.

Lee's Rule 60 motion on at least five grounds:

• The district court ruled that it is the law of this Circuit that only intentional misrepresentation qualifies under Rule 60(b)(3), even though the case law it relied on does not establish that.

• The district court ruled that Mr. Lee's Rule 60 motion did not allege intentional misrepresentation sufficient to satisfy Rule 60(b)(3), even though his showing included a specific statement made on the record by the Government falsely stating that it had turned over all documents relating to Paul Humphrey; incontrovertible evidence that the Government continued to suppress the Humphrey polygraph report during the §2255 proceeding despite Mr. Lee's renewed *Brady* request for any materials that would inculpate a third party; and FBI memoranda demonstrating that the Government likely obtained the Humphrey polygraph report from the Arkansas State Police before Mr. Lee was even arrested, and at the very least knew or should have known about the polygraph report before it elicited false and misleading testimony from Mr. Humphrey at the trial.

• The district court ruled that the "law of the case" doctrine applied here, even though Mr. Lee did not acquiesce to the prior ruling, sought a certificate of appealability, and was denied one over the dissent of one member of the panel.

• The district court ruled that the Government's misrepresentations did not interfere with Mr. Lee's ability to raise due process violations about the suppressed Humphrey material, even though Mr. Lee reasonably relied on those representations, and therefore did not have a basis to raise any claims based on that material in his § 2255 motion; and the Government's continued suppression of the Humphrey polygraph report during the § 2255 proceedings prevented Mr. Lee from amending his motion to include such claims.

• The district court ruled that Mr. Lee could not demonstrate extraordinary circumstances under Rule 60(b)(6), but based that decision solely on his purported inability to meet the standard for Rule 60(b)(3), rather than

1

address Mr. Lee's arguments concerning the risk of injustice to the parties and the risk of undermining the public's confidence in the judicial system, which are the relevant factors in a 60(b)(6) analysis.

The Government did not address any of these grounds. Instead, it claims that Mr. Lee never alleged that the Government's misconduct during the § 2255 proceedings constituted a defect in the integrity of those proceedings. GR 23. Even a cursory review of Mr. Lee's Rule 60 motion reveals that the Government's position is demonstrably false.[1]

More importantly, the Government does not grapple with the central issue in this case: It hid favorable evidence prior to the trial, ran out the clock until the § 2255 proceeding was complete, and then invoked procedural and jurisdictional arguments to block the court from substantively reviewing any of its misconduct.

---

[1] *See* Dkt. 1363 at 5 ("the Government made misrepresentations that resulted in a defect in the integrity of Mr. Lee's § 2255 proceedings"); *id.* at 6-7 (describing Government misconduct and urging that the judgment be reopened pursuant to Rule 60 "so that he can remedy this defect in the integrity of the proceedings and fully and fairly present his claims for this Court's review"); *id.* at 61-62 ("The Government's failure to disclose *Brady* material in response to a direct request for such evidence prevented Mr. Lee from obtaining discovery to establish the preceding claims that the prosecution had withheld exculpatory and impeachment evidence at his trial and presented false and misleading evidence. This defect in the integrity of his § 2255 proceedings can be remedied pursuant to several different provisions of Fed. R. Civ. P. 60."); *id.* at 62 ("Numerous courts have held that, when the Government makes misrepresentations during a § 2255 proceeding that prevent a federal prisoner from fully and fairly presenting his collateral claims, there is a defect in the integrity of the proceedings that warrants relief under Rule 60(b)(3).")

2

This "playbook" is an abuse of both *Brady* jurisprudence and the AEDPA. On the front end, the Government relied on the inherent asymmetry of information between the parties to get away with falsely claiming it has complied with its *Brady* obligations; on the back end, the Government relied on the strictures of the AEDPA to evade judicial review after its misconduct came to light. This strategy is especially offensive here because the Government does not deny it committed any of the aforementioned misconduct. Even now, its response is not "We didn't do anything wrong," but rather "What took you so long to catch us?"

The Government should not be allowed to "profit from its own egregious conduct." *In re Pickard*, 681 F.3d 1201, 1207 (10th Cir. 2012). At the very least, jurists of reason could find debatable whether Rule 60 provides an avenue to remedy this situation.

I.      **Jurists of reason could find debatable whether the Government's misconduct constituted a defect in the integrity of the § 2255 proceedings.**

Just months before Mr. Lee's § 2255 motion was due, the Government made the following representation in writing and filed it on Mr. Lee's docket:

> The allegations themselves are meritless on their face. Trial counsel knew of Paul Humphrey whom they called to testify. (Tr. 6141-6214) ==All documents relating to Mr. Humphrey were provided trial counsel.== Mr. Humphrey testified for over two hours. Practically

*See* Dkt. 1087 at 32.

3

In fact, the Government had not disclosed "all documents relating to Mr. Humphrey" to trial counsel. It had withheld a damning Arkansas State Police report about Mr. Humphrey implicating him in the Mueller murders—a report it was specifically required to disclose as *Brady* material under Eighth Circuit law.[2] It then compounded that violation when it failed to disclose the report in response to Mr. Lee's specific request during his § 2255 proceedings that it turn over any *Brady* material that might implicate a third party in the Mueller murders.

If the Government had disclosed the Humphrey polygraph report at that time, he would have "amend[ed] the petition and seek relief appropriate to the nature of the material newly-disclosed or uncovered," Dkt. 1118 at 7, n.3, as was his right to do under the applicable rules governing amendment of § 2255 motions, and his *Brady* and *Napue* claims would have been squarely presented for review. But Mr. Lee never got that opportunity. Given the Government's specific

---

[2] *See United States v. Nelson*, 970 F.2d 439, 442 (8th Cir. 1992) (police report regarding witness's polygraph examination "should have been disclosed" pursuant to *Brady* request).

Although the *Nelson* court ultimately denied relief because the suppressed polygraph report was cumulative to information trial counsel elicited during cross-examination, this Court recognized its value as impeachment evidence and made clear that the Government should not interpret the ruling as license to withhold such evidence moving forward:

> [W]e hasten to warn the government that any lack of straightforwardness in the non-disclosure of information to which the defense is clearly entitled will not be tolerated.

*Id.*

4

representation about its disclosure of Humphrey materials, he had no basis to allege due process violations on those grounds. And, moreover, the Court did not even see fit to make any ruling on Mr. Lee's renewed request for *Brady* materials or his broadly-alleged *Brady* claim in the original §2255 motion.

Mr. Lee alleged that this misconduct—the misleading representation that it had already turned over all materials concerning Mr. Humphrey, combined with its continued suppression of the polygraph report—resulted in a defect in the integrity of his § 2255 proceedings. Mr. Lee was entitled to rely on the word of the Government. But the Government lied. And as a result, Mr. Lee was denied a fair shot at litigating cognizable *Brady* and *Napue* claims in his § 2255 proceedings.

The Government's response ignores these facts. Indeed, there isn't a single mention, much less a defense, of the representation it made—on the record—that it had provided counsel with "all documents relating to Mr. Humphrey." This omission is telling (but not surprising).

Indeed, one of the central reasons why the district court's order below is debatable by jurists of reason is because its opinion doesn't adequately address this specific misrepresentation, either. Although it acknowledged that this was one of two specific representations on which Mr. Lee's Rule 60 motion was based, Dkt. 1403 at 17, it focused its analysis on a different ground—whether the

5

Government's statements in Footnote 16 of its response to the § 2255 motion constituted representations about its compliance with its *Brady* obligations.

But even if the district court was correct on that score (which Mr. Lee does not concede), that does not resolve whether *the other* statement the Government made about its purported disclosure of all Humphrey materials constituted an intentional misrepresentation. Jurists of reason could surely find that point debatable. Indeed, a number of courts have found, on similar facts, that this type of misconduct by the Government qualifies as a defect in the integrity of the proceedings, and that a Rule 60(b) motion brought on such grounds constitutes a "true" 60(b) motion. *See In re Pickard*, 681 F.3d at 1204 ("the claim of prosecutorial misconduct in the § 2255 proceedings is a proper Rule 60(b) claim that should be addressed in the first instance by the district court"); *United States v. Williams*, 753 Fed. Appx. 176, 177 (4th Cir. 2019) (claim that Government's misrepresentations during original §2255 proceeding prevented movant from fully and fairly litigating his claims "was properly raised under Rule 60(b)(3) and did not amount to a second-or-successive claim for postconviction relief"); *Scott v. United States*, 81 F. Supp. 3d 1326, 1336-37 (M.D. Fla. 2015), *aff'd*, 890 F.3d 1239 (11th Cir. 2018).

The Government's claim that Mr. Lee's Rule 60 motion cannot be considered a "true" 60(b) motion because its ultimate aim is to obtain review of his

Appellate Case: 20-2351     Page: 10     Date Filed: 07/11/2020 Entry ID: 4932678

*Brady* and *Napue* claims is a flawed, circular argument. If the Government's view were correct, no 60(b) motion could ever succeed; any effort to correct a procedural ruling precluding merits review is—ultimately—always concerned with reaching the merits. *See United States v. Vialva*, 904 F.3d 356, 361 (5th Cir. 2018) ("Rule 60(b) motions can legitimately ask a court to reevaluate already-decided claims—as long as the motion credibly alleges a non-merits defect in the prior habeas proceedings."); *In re Pickard*, 681 F.3d at 1206 (Rule 60(b) motion not improper "if success on the motion would ultimately lead to a claim for relief under § 2255. What else could be the purpose of a 60(b) motion? The movant is always seeking in the end to obtain § 2255 relief.")

## II. Mr. Lee has made a "prima facie" showing that he meets the requirements of § 2255(h)(1).

The Government relies on a selective presentation of the trial evidence to suggest that Mr. Lee's *Brady* and *Napue* claims are meritless. But the final determination as to whether the applicant's claims in fact satisfy the requirements of 28 U.S.C. § 2255(h)(1) is made by the district court. The role of this Court, in contrast, is one of "gatekeeper." *Felker v. Turpin*, 518 U.S. 651, 657 (2000); *Crouch v. Norris*, 251 F.3d 720, 721 (8th Cir. 2001). The Court must decide only whether the applicant has made "a sufficient showing of possible merit to warrant a fuller exploration by the district court." *Bennett v. United States*, 119 F.3d 468, 469 (7th Cir. 1997). *See also In re Johnson*, 322 F.3d 881, 882 (5th Cir. 2003); *In re*

7

*Williams*, 330 F.3d 277, 281 (4th Cir. 2003); *Cooper v. Woodford*, 358 F.3d 1117, 1119 (9th Cir. 2004); *In re Lott*, 366 F.3d 431, 432-33 (6th Cir. 2004). If "it appears reasonably likely" that the application satisfies the requirements of § 2255(h)(1), the motion for permission to file in the district court should be granted. *Bennett*, 119 F.3d at 469-70. This is "not a difficult standard to meet." *Lott,* 366 F.3d at 432.

The Government doesn't address this standard. Nor does it address whether there are "sufficient allegations"—concerning the *Brady* and *Napue/Giglio* violations—together with "some documentation"—the newly discovered 1997 report of the Humphrey polygraph examination—to warrant further exploration in the district court. *In re McDonald*, 514 F.3d 539, 546-47 (6th Cir. 2008). Mr. Lee has plainly made the requisite "prima facie" showing under § 2255(h)(1).

### A. Viewed in its totality, the evidence against Mr. Lee is far from "overwhelming"

The Government heavily leans on a decision made by Judge G. Thomas Eisele in 2008 denying Mr. Lee's § 2255 motion. But that opinion can't bear the full weight of all the developments and changed circumstances that have accrued since then. When that decision was written, Judge Eisele did not know that:

- Cheyne Kehoe and Kirby Kehoe repeatedly told case agents during the course of their pre-trial cooperation that the "APR," which was the alleged racketeering enterprise giving rise to federal jurisdiction, *did not exist*; Chevie Kehoe committed crimes to line his own pockets, not to

8

finance a fictitious white separatist group.[3] (In fact, at a different federal proceeding in 2014, the Government backpedaled significantly from its 1999 description of the APR, now characterizing it as "not a specific organized group, but it was a fledgling."[4])

- Case agents supervising Gloria Kehoe developed concerns that she was mentally unstable and approached Cheyne (Gloria's son) and Kirby (Gloria's husband) about it. They confirmed that she had long-standing mental health problems, including auditory and visual hallucinations, paranoia, panic attacks, and had even once sought psychiatric treatment.[5] None of this significant impeachment information was disclosed to the defense.

- James Wanker repeatedly warned the Government that Mr. Lee's purported "confession" was not trustworthy; he had a history of lying about criminal activity to make himself seem "tough." The Government omitted these warnings from its official reports, and the jury never learned that even at the time of trial—and to this day—Mr. Wanker

---

[3] *See* Dkt. 1363-3 (Declaration of Cheyne Kehoe); Dkt. 1363-4 (Declaration of Kirby Kehoe). As confirmed in their respective declarations, both men received substantial benefits for going along with the Government's story: Cheyne avoided charges in this case, and Kirby received the benefit of a lenient plea deal. Judge Eisele expressed his shock that the plea deal only exposed Kirby to a 44 ½ month sentence, describing him as "the substantial beneficiary of the entire prosecutorial process," and rejected the recommendation that the sentence run concurrently to an existing sentence because it was "so minimal" given "the nature of the crime charged here[.]" *See Lee v. United States*, No. 19-3576 (8th Cir. Dec. 4, 2019), Exh D (Sentencing Hearing Transcript Excerpt, *United States v. Kirby Kehoe*, No. 97-CR-243 (E.D. Ark. Aug. 24, 1999)).

[4] *See Lee v. United States*, No. 19-3576 (8th Cir. Dec. 4, 2019), Exh. C (Sentencing Hearing Transcript, *United States v. Kirby Kehoe*, No. CR 13-8223-PCT-GMS (D. Ariz. June 23, 2014)). At a 1997 state court proceeding in Idaho, Faron Lovelace—who was initially indicted in this case, and was later unindicted pursuant to a superseding indictment—stated that he, too, told investigators that there was no such racketeering enterprise. *See id.*, Exh. F (Transcript Excerpt, *State of Idaho v. Faron E. Lovelace*, No. CRF 96-1506 (1st Jud. Dist. Ida., Sep. 8, 1997)).

[5] *See* Dkt. 1363-3 (Declaration of Cheyne Kehoe); Dkt. 1363-4 (Declaration of Kirby Kehoe).

9

considered the statements to be "empty bragging," unworthy of belief.[6]

- The Government withheld a polygraph report about Paul Humphrey's involvement in the Mueller murders. And after allowing Mr. Humphrey to give false or misleading testimony on these matters, the prosecution misled the jury by telling it that Mr. Humphrey had been thoroughly investigated by state and federal authorities, and they didn't find any evidence against him.

What's even more remarkable—and also not accounted for in the 2008 opinion—is that after being confronted with all of these allegations, *the Government has refused to unequivocally deny them*. In fact, the only substantive response the Government has ever offered is an artfully worded denial that the prosecution was unaware of the Humphrey polygraph report because the Arkansas State Police (ASP) was not part of the prosecution team.[7] However, even this was not true: independent FOIA requests yielded page after page of contemporaneous FBI memoranda documenting that case agents from both the FBI and the ATF obtained the ASP's case file, and that the ASP provided so much assistance to federal investigators that two of its officers received formal letters from the FBI thanking them for their "contribution to the multi-agency investigation and prosecution."

---

[6] *See* Dkt. 1363-14 (Declaration of James Wanker).
[7] *See* Dkt. 1367 at 74-77.

10

Appellate Case: 20-2351    Page: 14    Date Filed: 07/11/2020 Entry ID: 4932678

Simply put, this case looks very different now than it did in 2008—and certainly much different than it did in 1999. The Government's selective presentation of the trial evidence does not withstand scrutiny.

### 1. The Timeline.

The prosecution's timeline has never been able to account for the numerous sightings of the Muellers days and weeks after January 11 at various locations. In addition to Mary Reid, who saw the Muellers with Paul Humphrey in his car on January 18, 1996—over a week after they had allegedly disappeared—there were also the following:

- Susan Weaver, a Walmart employee, remembered selling Mr. Mueller an unusually large quantity of water by the gallon. Tr. at 5832-36. Store records show this purchase was made on January 22, 1996— eleven days after the Government claimed the murders had occurred. Tr. at 6364-65.

- Janis Rowlands, a schoolteacher, contacted authorities to report she saw the Muellers at a Walmart in Russellville on February 2 or February 3. Tr. 5798-5800, 5802. Ms. Rowland remembered it was a day when her school was closed due to inclement weather, and records corroborated that her school district was closed on February 2, 1996, due to the weather. Tr. 6080-81.

- Lucy Carr, a manager at Leonard's Hardware Store in Russellville, called authorities to let them know she had a conversation with Mr. Mueller in her store in early February. Tr. 5807-11. Ms. Carr testified that Mr. Mueller looked like he was trying to disguise himself; he was unshaven and was wearing a large floppy hat. Tr. 5814.

- Sue Sullivan, an employee at Leonard's Hardware Store in Russellville, testified that she saw Mr. Mueller in the store around February 6 or 7, right before an article had been published in the local

Appellate Case: 20-2351     Page: 15     Date Filed: 07/11/2020 Entry ID: 4932678

paper about the Muellers having gone missing. Tr. 5817.

- Ester Anderson, an acquaintance of the Muellers, testified that she had driven past the Muellers' home on January 17 with her husband and saw their Jeep and attached trailer parked outside. Tr. 5961, 5963. She was sure of the date because she was accompanying her husband to a job interview for which he subsequently filled out some paperwork dated January 22, and she knew from her own records that the 17th was the one day that week that she had not gone to work. Tr. 5962-63, 5966.

As the Government's case has gotten weaker over time, it lends further credence to the notion that these witnesses were correct and that Gloria and Cheyne Kehoe's account of the murders—which hinged on an inflexible timeline—is not reliable.

The theory as to how Mr. Lee could have committed the crimes in Tilly, Arkansas close to midnight on January 11, and be back in Spokane, Washington by sometime before 8 PM on January 13, has always been problematic. It relied on implausible assumptions—non-stop travel under ideal conditions (clear roads and weather, never refueling or resting, two capable drivers) that we know did not exist: in fact, the trip would have required driving at high altitudes with low visibility and icy weather conditions, in a car with poor fuel economy, and with one driver—Mr. Lee—who had just lost an eye months before, which affected his depth perception and impaired his driving. *See* Dkt. 1363 at 30-22.[8]

---

[8] The jury, in fact, sent out a note on the second day of deliberations indicating it had questions about whether the requisite cross-country drive was possible in that narrow time frame. *See* Tr. 7100 ("We want to know if there was

Appellate Case: 20-2351     Page: 16     Date Filed: 07/11/2020 Entry ID: 4932678

But the timeline is even more compromised. Vada Campbell–a defense witness whom the Government not long ago referred to as having "the clearest memory of seeing Lee after January 11[9]–gave uncontested testimony that she saw Mr. Lee at his apartment in Spokane at 8 PM on January 13, when she came to pick up his roommate, Sean Haines. (Mr. Haines was the father of her grandchild, who was born two days later.) Tr. 5953-55. Mr. Haines, in turn, had testified (as well as given a prior consistent statement) that when Mr. Lee returned to Spokane, Mr. Haines didn't see him until the following day, but he knew Mr. Lee had come back to their apartment because his duffel bag was there. Tr. 2778-79; Dkt. 1363 at 32.

Looking at the testimony of Ms. Campbell and Mr. Haines together, if Mr. Lee and Mr. Haines were both at the apartment when Ms. Campbell arrived on January 13, then the date on which Mr. Haines first saw Mr. Lee's belongings back in the apartment—but not Mr. Lee himself—had to have been January 12 at the latest. It would have been impossible for Mr. Lee to commit the murders in Tilly the night of January 11 and be back in Spokane the next day; the Government's

---

any road problems—snow—on trip back to Washington from Tilly, Arkansas, on January 10, 11, 12, 13[.] [S]igned Juror 100."). The Court instructed the jury that it had to decide the issues on the basis of the evidence already presented, and that it could not reopen the record to receive additional evidence. Tr. 7100.

[9] The Government conceded as much about Ms. Campbell because the date Mr. Lee was in Spokane "corresponded to the birth of her grandchild." Dkt. 1307 at 38.

13

own trial evidence established it would have taken between 35 to 43 hours—under ideal driving conditions, without ever stopping—to make that cross-country drive. Tr. 6449-52.

### 2. Cash and property belonging to the Muellers

Throughout its pleading, the Government treats Mr. Kehoe and Mr. Lee as a single entity, even though the trial evidence proves otherwise.[10] They were not, in fact, both "flush with cash" and stolen Mueller property; the Government's evidence was that *Mr. Kehoe* was.

In fact, it's notable that of the dozens and dozens of pieces of Mueller property that were recovered from Mr. Kehoe and processed for fingerprints, somehow Mr. Lee's prints weren't on any of them but one: a display case, kept in the same storage area in Spokane where Mr. Lee frequently slept. The

---

[10] For example, the Government claims that both Mr. Lee and Mr. Kehoe "panicked and fled" Spokane after Sean Haines was arrested while in possession of a Mueller firearm. GR 6. But Mr. Lee's behavior at the time proves otherwise. Unlike the Kehoe brothers—who went on the run, used aliases, and even engaged in a shootout with police to avoid being identified—Mr. Lee moved back to Oklahoma to live with his mother, and never hid from authorities or lied about his identity. (In fact, this whole "panic" story is based solely on Gloria Kehoe's uncorroborated testimony—no other witness said it happened—and even that was equivocal; her testimony suggests Mr. Lee might have already made plans to travel back to Oklahoma *before* receiving Mr. Haines's call about being arrested. Tr. 4980.) Furthermore, Mr. Haines himself testified that when he called Mr. Lee after his arrest, Mr. Lee's reaction was to advise him to cooperate with authorities. Tr. 2846, 2850-51, 2854. Those are not the actions of a person in a panic or demonstrating consciousness of guilt.

14

Government's own fingerprint expert agreed there was no way to determine the age of a print, and therefore could not rule out the possibility that the print got on the display case as a result of the multiple opportunities Mr. Lee had to come in contact with it while living out of that storage area. *See* Tr. 3716. *See also* Tr. 2856-57; 2915; 4815; 5312; 6878; 6946-47.

The Government also overstates the evidence about Mr. Lee having a customized Mueller shotgun. The trial evidence established that these supposed "specific modifications" were not, in fact, unique. Tr. 2562. And Mr. Lee's roommate, Mr. Haines, testified that the shotgun he saw Mr. Lee with was different than the replica Mueller shotgun that was introduced at trial. Tr. 2850.

Finally, none of the Mueller property in *Mr. Kehoe's* possession implicated Mr. Lee in the murders. (In fact, several of the prosecution's witnesses, including Mr. Haines, were also in possession of the Muellers' firearms.) The Government's argument on this score amounts to little more than guilt by association.

### 3. Statements to the Wankers.

Although the Government now claims that Mr. Wanker's trial testimony was a key piece of its "overwhelming" case, just months ago it represented that it was not "a central part of the government's case," it "occupies only six pages of the trial transcript," and that the prosecution "mentioned Wanker's testimony only in passing during its closing argument." Dkt. 1307 at 35. Of course at that time, the

15

Appellate Case: 20-2351     Page: 19     Date Filed: 07/11/2020 Entry ID: 4932678

Government was responding to Mr. Wanker's declaration detailing why Mr. Lee's purportedly incriminating statement to him was not trustworthy, and attesting that, to this day, he still believes it was just empty bragging with no basis in reality.[11] Neither the jury nor Judge Eisele were privy to this information. Nor were they aware that the Government omitted Mr. Wanker's warnings from its official reports, or manipulated his written grand jury testimony to remove facts inconsistent with its theory of the case. Clearly, Mr. Wanker's declaration puts his trial testimony in a much different light.

As for Dalvine Wanker, the Government now portrays her as a crucial witness, yet at trial it conceded her testimony was not "detailed." Tr. 7003. And her testimony—that Mr. Lee brandished a firearm and implied he had previously shot someone—did not even match the facts of the Mueller murders.

### 4. Confession to Gloria Kehoe

Although the Government claims that Judge Eisele found Gloria and Cheyne Kehoe wholly credible, GR 26, the jury clearly did not: it acquitted Mr. Lee and Mr. Kehoe of any count that relied solely on their uncorroborated testimony, including the bombing of Spokane City Hall, the murder of Jeremy Scott, and the

---

[11] As with the Government's about-face regarding the probative value of the hair evidence, this is yet another example of its confirmation bias; when evidence no longer confirms the prosecution theory of the case, the Government tosses out the evidence, rather than its theory.

16

Appellate Case: 20-2351    Page: 20    Date Filed: 07/11/2020 Entry ID: 4932678

murder of Jon Cox. In light of the many inaccuracies and inconsistencies in Mrs. Kehoe's story about the Mueller murders, *see* Dkt. 1363 at 16-21, as well as her substantial incentives to curry favor with the prosecution, the jury's decision to credit her testimony about Mr. Lee's alleged confession to the Arkansas crime must have been a close call. And it is highly questionable it would have made the same call knowing what we know today. DNA testing has debunked the only physical evidence corroborating Mrs. Kehoe's account that Mr. Lee carried out the crimes while dressed as an FBI agent; Mr. Wanker has undermined any evidence of a trustworthy confession to him; and newly discovered evidence establishes independent reasons why the jury would have doubted her credibility—she suffered from mental health issues that impaired her ability to accurately perceive, recall, and recount events.

The Government's reliance on Mr. Kehoe's alleged confessions to Gloria and Cheyne is problematic for the same reason. The jury's verdict on the Spokane City Hall bombing demonstrates it wasn't willing to credit their testimony about Mr. Kehoe's alleged confessions absent independent corroboration: as with the Mueller murders, Mrs. Kehoe claimed Mr. Lee confessed to her that he committed the bombing, and Cheyne claimed Mr. Kehoe's confession about the bombing implicated Mr. Lee—yet the jury believed neither of them. (It also rejected Cheyne's uncorroborated testimony that Mr. Kehoe confessed to the Jeremy Scott

17

Appellate Case: 20-2351    Page: 21    Date Filed: 07/11/2020 Entry ID: 4932678

and Jon Cox murders.) There is no reason to believe Mr. Kehoe's alleged confession implicating Mr. Lee in the Mueller murders would have fared any better with this jury after being stripped of any corroborative evidence.

### 5. The Humphrey polygraph report

The Government's asserts that the Humphrey polygraph report does not undermine its case against Mr. Lee. GR 25. This is plainly incorrect.

Mr. Lee has maintained since trial that the investigation of the Mueller murders was flawed. Despite ample evidence connecting Mr. Humphrey to the Muellers' disappearance, law enforcement failed to timely pursue available leads against him until months later when the Muellers' bodies were recovered.[12] Even after the federal government formally took over the prosecution, Mr. Humphrey was never ruled out as a suspect.[13] The Government simply adopted a different theory of the case, provided by its cooperating witnesses, Gloria and Cheyne Kehoe. That theory, however, did not tie up the various loose ends implicating Mr. Humphrey.[14] Indeed, as we now know, the Government not only ignored evidence

---

[12] Dkt. 1363 at 43-47, 49, 52-55, 59-60.

[13] *Id*. at 46.

[14] Mr. Humphrey led authorities on a wild goose chase before finally turning over the titles to the Muellers' vehicles. The Government cites to his self-serving trial testimony to explain why: because he and Mr. Mueller devised a secret plan to exchange the titles in a way that would remove the taint of the government and prevent it from claiming ownership over the vehicles. GR 5. This is no explanation at all, much less a good one. The titles were seen unsigned in the Mueller home on February 2, 1996, by Nancy Mueller's brother, David Branch, and Mr. Humphrey

Appellate Case: 20-2351    Page: 22    Date Filed: 07/11/2020 Entry ID: 4932678

that didn't fit its theory, it buried a polygraph examination administered by the Arkansas State Police that demonstrated Mr. Humphrey lied about his participation in the murders.[15]

The suppressed evidence was directly relevant to the third-party culpability defense Mr. Lee presented at trial. Moreover, it supports his contention that the testimony of Gloria and Cheyne Kehoe, on which the Government's case against him hinged, was false. For example, their account of the crime depended on a very precise timeline in order for Mr. Lee to have been involved: he was seen back in Spokane, Washington at least as early as January 13, 1996, so he could not have been in Tilly, Arkansas any later than January 11, 1996.[16] And as the Government has already conceded, if there was evidence the murders were committed later than January 11, or that Mr. Lee was in Spokane earlier than the 13th, Mr. Lee could not have been convicted.[17] The polygraph report does more than simply implicate Mr. Humphrey in the crime, it also undermines the Government's timeline: it bolsters

---

had the signed titles on February 22. Mr. Humphrey's claim that the Muellers' landlady, Sylvia Mason, sent him the signed titles in the mail was never corroborated by her. The simpler explanation, as confirmed by the ATF's handwriting analysis and the ASP's polygraph exam, is that he stole the titles, forged the Muellers' signatures, and dodged authorities because he didn't want to get caught.

[15] Dkt. 1363 at 47-49. *See also* Dkt. 1374 at 27-29.

[16] Dkt. 1363 at 27-33.

[17] *See* Dkt. 1126-1 at 33 ("Had the jury not accepted the government's time line, Lee could not have been convicted.").

Appellate Case: 20-2351     Page: 23     Date Filed: 07/11/2020 Entry ID: 4932678

the testimony of a disinterested witness, Mary Reid, who saw Mr. Humphrey with the Muellers on *January 18*, 1996,[18] long after Mr. Lee had returned to the Pacific Northwest. Thus, Mr. Humphrey's guilt cannot be harmonized with the Kehoes' testimony or the Government's theory of the case.

**B. There is no "due diligence" requirement under § 2255(h)(1)**

The Government cites a *per curiam* opinion from the Second Circuit[19] for the proposition that "a defendant may not rely on new evidence that he could have discovered earlier with due diligence." GR 24. That case has never been cited by this Circuit. Nor has this Court ever imposed such a "due diligence" requirement on § 2255(h)(1). And for good reason—that language appears nowhere in that statutory provision.

Indeed, if Congress had wanted to impose such a requirement, it would have stated so. *Compare* 28 U.S.C. § 2244(b)(2)(B)(i) (requiring that state prisoners filing § 2254 petitions based on newly discovered evidence challenging their conviction establish that "the factual predicate for the claim could not have been discovered previously through the exercise of due diligence"). This difference between state and federal prisoners' use of newly discovered evidence may reflect the fact that § 2255 is the first and only opportunity for pursuing post-conviction

---

[18] Dkt. 1363 at 33, 45.

[19] *Herrera-Gomez v. United States*, 755 F.3d 142 (2d Cir. 2014) (*per curiam*).

relief for federal prisoners, as well as the lack of concerns about federal-state comity present in § 2254 cases. But whatever the reason, it is not at play here—there is no "due diligence" requirement under § 2255(h)(1).

And even if there were, it is hard to see how Mr. Lee could be lacking in diligence on the facts of this case. He made repeated demands for *Brady* material prior to trial, and renewed those requests in his § 2255 proceeding. Under the law of the Supreme Court and this Circuit, Mr. Lee was entitled to rely on the Government's repeated assurances that it had disclosed all *Brady* material in its possession. *See Strickler v. Greene*, 527 U.S. 263, 284 (1999); *Banks v. Dretke*, 540 U.S. 668, 693–94 (2004); *Jimerson v. Payne*, 957 F.3d 916, 927 (8th Cir. 2020). In any event, Mr. Lee filed his Rule 60 motion within six months of discovering the Humphrey polygraph report. Although the Government intimates that this is disqualifying, it does not point to a single case holding that this is an unreasonable amount of time within which to seek relief.[20]

## CONCLUSION

The Government has consistently benefited from its ability to exploit the asymmetry between the parties and control the flow of information about its own

---

[20] If the Government had not suppressed the report for twenty years, Mr. Lee could have raised these claims much sooner. In fact, if it had simply disclosed the report prior to his trial, as it was constitutionally obligated to do, there would be no need for Mr. Lee to litigate this claim in postconviction.

21

misconduct. Its willingness to play "hide and seek" with crucial facts in his case precluded Mr. Lee from fully and fairly litigating his § 2255 claims. He respectfully requests that this Court grant a COA to review the district court's denial of his Rule 60 motion, or in the alternative, authorize him to file a second or successive § 2255 motion.

Respectfully submitted,

/s/ Morris H. Moon
Morris H. Moon
Bar# 24032750 (TX)
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(713) 880-3556
Morris_Moon@fd.org

/s/ George G. Kouros
George G. Kouros
Bar # 420813 (CT)
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 821-0855
George_Kouros@fd.org

Counsel for Daniel Lee

22

# CERTIFICATE OF SERVICE

This will certify that, on July 11, 2020, Appellant's counsel served this

motion upon the United States by filing the document via this Court's ECF system.

/s/  George G. Kouros
George G. Kouros
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 821-0855
George_ Kouros@fd.org

Counsel for Daniel Lewis Lee

Appellate Case: 20-2351     Page: 27     Date Filed: 07/11/2020 Entry ID: 4932678