DANIEL LEWIS LEE,

        Petitioner-Appellant,        Case No. 20-2351

v.

                                    CAPITAL CASE
                                    EXECUTION SCHEDULED FOR
UNITED STATES OF AMERICA      JULY 13, 2020

        Respondent-Appellee.

## MOTION FOR STAY OF EXECUTION
## PENDING CONSIDERATION AND DISPOSITION OF APPEAL

Petitioner Daniel Lee respectfully requests a stay of execution pending the

Court's consideration of his appeal.

## I.    INTRODUCTION

Mr. Lee is a federal death row inmate. In a 1999 trial over which the

Honorable G. Thomas Eisele presided, Mr. Lee and a co-defendant, Chevie Kehoe,

were convicted of conspiring to violate and violating the Racketeer Influenced and

Corrupt Organizations Act, 18 U.S.C. § 1962(c)-(d), and of three murders in aid of

racketeering in violation of 18 U.S.C. § 1959—that of William Mueller, Nancy

Mueller, and her eight-year old daughter, Sarah Powell. Despite the Government's

express acknowledgment that Mr. Kehoe was the more culpable offender, the jury

sentenced him to life imprisonment and then, separately, sentenced Mr. Lee to

death.

Mr. Lee was not the original suspect in this case. Before the federal

government took over the prosecution, local authorities were focused on Paul Edward Humphrey—and with good reason:

- Humphrey was seen with the Muellers in his car on January 18, 1996, a week after they had reportedly gone missing.

- He had forged titles to the Muellers' vehicles (that were previously seen unsigned in the Mueller home immediately after they had reportedly disappeared).

- Nancy Mueller's personal belongings were found in his home, and the Muellers' abandoned vehicles were found on property that belonged to him.

- He made incriminatory remarks to friends of the Muellers a few weeks after they went missing, suggesting that he knew the Muellers had been murdered. He also said he had searched the Mueller home for money.

- He knew details that only someone involved in the crime would know, such as what clothes the Muellers were wearing when they were killed.

- He was an experienced skin diver intimately familiar with the murky waters of Lake Dardanelle where the bodies were disposed.

Mr. Lee pointed to these issues at trial in support of a third-party culpability defense. In fact, the defense called Mr. Humphrey as a witness and questioned him about some of these matters. In an effort to blunt defense counsel's examination, the Government asked Mr. Humphrey point blank whether he was involved in the Mueller murders, which he denied. And in closing arguments, the Government did not just attempt to explain away the incriminating facts implicating Mr. Humphrey in the crime, it affirmatively told the jury that he had been thoroughly investigated by both local and federal law enforcement and that "[t]here's no evidence against

2

Appellate Case: 20-2351     Page: 2     Date Filed: 07/11/2020 Entry ID: 4932684

Paul Humphrey." Tr. 6959-60.[1]

This wasn't true.

Pursuant to independent open records requests, Mr. Lee recently discovered that the Government has been concealing an explosive piece of evidence for over twenty years. On January 21, 1997, Mr. Humphrey submitted to a polygraph examination administered by a trained examiner of the Arkansas State Police ("ASP"). The stated purpose of the examination was to was "to determine his knowledge or involvement in the reported homicide of BILL and NANCY MUELLER." APP. 30. Mr. Humphrey was specifically asked whether he was present during the murders, whether he helped dispose of the bodies, and whether he knew that the titles in his possession were forged. *Id.* As the ASP polygraph examiner concluded in his report, Mr. Humphrey had lied in his responses to these questions and he was, in fact, involved in the murders:

---

[1] Citations to "Tr." refer to the consecutively-paginated trial transcript. Citations to "Dkt." refer to the district court docket entries in *United States v. Mr. Lee*, No. 4:97-CR-0243-KGB-2 (E.D. Ark.). Citations to "COA" refer to Mr. Lee's Application for Certificate of Appealability, filed on July 9, 2020. Citations to "APP." refer to Appellant's Appendix, attached to Application for a Certificate of Appealability and filed on July 9, 2020. Citations to "Exh." refer to attached exhibits.

3

FINDINGS

The physiological responses noted on this subject's polygraph charts are in such a pattern as to indicate that the subject, Mr. PAUL EDWARD HUMPHREY, was essentially untruthful in answering the above questions.

Based on the evaluation of the subject's polygraph charts, it is the opinion of this examiner that Mr. HUMPHREY was involved in the death of the MUELLERS.

Respectfully submitted,

Brett Pritchard /lw

BRETT PRITCHARD, Investigator
Polygraph Examiner
Criminal Investigation Division

APP. 31.

Under Eighth Circuit law, that polygraph report should have been disclosed to defense counsel. *United States v. Nelson*, 970 F.2d 439, 442 (8th Cir. 1992). But not only did the Government fail to disclose it at the time of trial, it also withheld this evidence throughout Mr. Lee's subsequent post-conviction proceedings pursuant to 28 U.S.C. § 2255. And it withheld it despite the fact that Mr. Lee had renewed his request for any exculpatory or impeachment information concerning third-party involvement in the murders that would support a claim that his trial right to due process were violated under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.

Indeed, just a few months before Mr. Lee filed his § 2255 motion, the Government affirmatively represented—in writing, on the same docket as Mr. Lee's, and to the same district judge who would preside over Mr. Lee's § 2255

4

proceedings—the following:

> The allegations themselves are meritless on their face. Trial counsel knew of Paul Humphrey whom they called to testify. (Tr. 6141-6214) ==All documents relating to Mr. Humphrey were provided trial counsel.== Mr. Humphrey testified for over two hours. Practically

Dkt. 1087 at 32.

In fact, the Government had not disclosed "all documents relating to Humphrey" to trial counsel. And it then compounded that violation when it failed to disclose the report in response to Mr. Lee's specific request during his § 2255 proceedings that it turn over any *Brady* material that might implicate a third party in the Mueller murders.

If the Government had disclosed the Humphrey polygraph report at that time, Mr. Lee would have "amend[ed] the petition and seek relief appropriate to the nature of the material newly-disclosed or uncovered," Dkt. 1118 at 7, n.3, and his *Brady* and *Napue* claims would have been squarely presented for review. But Mr. Lee never got that opportunity. Given the Government's specific representation about the Humphrey materials, he had no basis to allege due process violations on those grounds. And the Court did not even see fit to make any ruling on Mr. Lee's renewed request for *Brady* materials or his broadly-alleged *Brady* claim in the original §2255 motion.

5

A number of courts have found, on similar facts, that this type of misconduct by the Government qualifies as a defect in the integrity of the proceedings, and that a Rule 60(b) motion brought on such grounds constitutes a "true" 60(b) motion. *See In re Pickard*, 681 F.3d 1201, 1204 (10th Cir. 2012); *United States v. Williams*, 753 Fed. Appx. 176, 177 (4th Cir. 2019); *Scott v. United States*, 81 F. Supp. 3d 1326, 1336-37 (M.D. Fla. 2015), *aff'd*, 890 F.3d 1239 (11th Cir. 2018).

Accordingly, Mr. Lee filed a Rule 60 motion alleging that this misconduct—the misleading representation that it had already turned over all materials concerning Mr. Humphrey, combined with its continued suppression of the polygraph report—resulted in a defect in the integrity of his § 2255 proceedings. Mr. Lee was entitled to rely on the word of the Government. But the Government lied. As a result, Mr. Lee was denied a fair shot at litigating cognizable *Brady* and *Napue* claims in his § 2255 proceedings.

The district court denied Mr. Lee's Rule 60 motion on July 2, 2020, construing it as an improper successive motion, and declined to issue a Certificate of Appealability (COA). Mr. Lee filed a Notice of Appeal on July 3, 2020. He filed his application for a COA, and alternatively, a motion for authorization to file a successive § 2255 motion six days later, on July 9. The Government filed its opposition on July 10. Mr. Lee filed his reply today.

6

Appellate Case: 20-2351    Page: 6    Date Filed: 07/11/2020 Entry ID: 4932684

As discussed below, granting Mr. Lee's request for a stay poses minimal harm to the Government and none at all to the public. The words of another court faced with a looming execution date and important unresolved questions are on point here: "[N]o significant harm to the public interest could arise from the proper, informed, deliberate adjudication" of Mr. Lee's allegations. *See Harris v. Johnson*, 323 F. Supp. 2d 797, 810 (S.D. Tex. 2004). Rather, in a case like his, where the local prosecutors who tried the case, the respected federal judge who presided over the trial, and the family members of the victims have all voiced their belief that a death sentence is not the just punishment for him, the equities weigh heavily in Mr. Lee's favor. In light of the imminent, irrevocable harm to Mr. Lee that would result from his unjust execution and for the additional reasons discussed below, Mr. Lee believes issuance of a stay of execution pending the consideration and disposition of the weighty issues involved in an appeal is warranted.

## II.     The Court Should Grant a Stay Pending Appeal

A stay of execution pending appeal is an equitable remedy. To obtain a stay pending appeal in this Circuit, a movant must make (1) a strong showing that he is likely to succeed on the merits of the appeal; (2) a showing that, unless a stay is granted, he will suffer irreparable injury; (3) a showing that no substantial harm will come to other interested parties; and (4) a showing that a stay will do no harm to the public interest. *Reserve Mining Co. v. United States*, 498 F.2d 1073, 1076–

7

77 (8th Cir. 1974). These factors favor staying Mr. Lee's execution while this Court resolves his appeal.

### A. Mr. Lee is likely to succeed on his appeal of the district court's denial of his Rule 60 Motion.

Mr. Lee is likely to succeed on appeal in proving that the district court erred in construing his Rule 60 Motion as a successive motion.

First, the district court denied Mr. Lee's motion under Rule 60(b)(3) on the grounds that only intentional misrepresentation and deliberate fraud are cognizable pursuant to that provision under Circuit law. The district court relied on two cases (one of which is unpublished) for that proposition—*Dukes v. City of Minneapolis*, 339 Fed. App'x 665 (8th Cir. 2009) (*per curiam*), and *Smith v. Clarke*, 458 F.3d 720 (8th Cir. 2006)—but neither of these cases stand for that proposition. Simply put, it is not the law of this Circuit that only intentional misrepresentation qualifies under Rule 60(b)(3). *See* COA at 36-42. (Indeed, the district court identified only one other Circuit that it claimed imposes the same requirement under Rule 60(b)(3), and even that seems doubtful. *See id.* at 40 n.31.)

Second, the district court denied Mr. Lee's Rule 60 motion on the basis that it did not allege intentional misrepresentation sufficient to satisfy Rule 60(b)(3). This was also incorrect. Mr. Lee alleged that the Government made a specific written misrepresentation, on the record, falsely stating that it had turned over all documents relating to Paul Humphrey; that the Government continued to suppress

8

the Humphrey polygraph report during the §2255 proceeding despite Mr. Lee's renewed *Brady* request for any materials that would inculpate a third party; and Mr. Lee proffered FBI memoranda demonstrating that the Government likely obtained the Humphrey polygraph report from the Arkansas State Police before Mr. Lee was even arrested, and at the very least knew or should have known about the polygraph report before it elicited false and misleading testimony from Mr. Humphrey at the trial. He also specifically described this misconduct in terms that alleged it was intentional. The district court's ruling was therefore both factually and legally erroneous. *See* COA at 42-45.

Third, the district court misapplied the "law of the case" doctrine. It held that it was constrained by Judge Leon Holmes's disposition of a prior Rule 60 motion. But that doctrine only applies in circumstances where a party either fails to appeal, or the lower court's ruling is affirmed on appeal. Neither happened previously. Mr. Lee did not acquiesce to Judge Holmes's ruling; he sought a COA, but was denied, over the dissent of one panel member. A denial of COA is not equivalent to a decision that has been affirmed on appeal. Thus, the court's application of the doctrine here was clearly erroneous. *See* COA at 45-47.

9

Fourth, the district court ruled that the Government's misrepresentations did not prevent Mr. Lee from raising due process violations based on the suppressed Humphrey evidence in his initial § 2255 proceeding. But given the Government's specific representation about its disclosure of Humphrey materials—which it made in writing on Mr. Lee's docket at the same time that he was preparing his § 2255 motion—he had no basis to allege due process violations on those grounds. Indeed, under Supreme Court and Circuit law, he was entitled to rely on those representations. Moreover, the Government continued to suppress the Humphrey material during the § 2255 proceedings, despite Mr. Lee's specific request for any *Brady* material that implicated any third parties in the crime, so Mr. Lee was also precluded from amending his motion to include claims based on that suppressed evidence. The district court did not address this misconduct by the Government in its opinion, and its failure to do so was error.[2] *See* COA at 48.[3]

---

[2] Mr. Lee's motion also alleged a second misrepresentation by the Government, which concerned statements it made in its response to the § 2255 motion at Footnote 16 of its pleading. The district court focused almost exclusively on this allegation, but it made scant mention of the Government's specific misrepresentation about the Humphrey materials. The Government's response to Mr. Lee's COA application, filed on July 10, also makes no mention of the false statement it made, on the record, that it had previously disclosed to trial counsel all materials relevant to Mr. Humphrey.

[3] The Government filed today what it purports to be a "28j letter," but it has no bearing on Mr. Lee's COA application. After Judge Kristine Baker denied Mr. Lee Rule 60 motion as successive, she recused herself from the case, and Judge Lee Rudofsky was reassigned. This morning, Judge Rudofsky issued an order on an outstanding motion concerning DNA testing, Dkt. 1428, and in a footnote,

Appellate Case: 20-2351     Page: 10     Date Filed: 07/11/2020 Entry ID: 4932684

Fifth, the district court ruled that Mr. Lee could not demonstrate extraordinary circumstances under Rule 60(b)(6), but it based that decision solely on his purported inability to demonstrate intentional misrepresentation under 60(b)(3). The court effectively created and applied a legal rule that extraordinary circumstances cannot exist as a matter of law where no party is alleged to have committed an intentional misrepresentation. But that is not the standard under Rule 60(b)(6). Rather, the relevant factors to be considered under Eighth Circuit law are (1) the risk of injustice to the parties, and (2) the risk of undermining the public's confidence in the judicial system. The district court's failure to conduct the requisite analysis using those factors was erroneous. *See* COA at 49-52. Indeed, the extraordinary nature of this case is also demonstrated by the fact that the Government's misconduct with respect to the polygraph report is not an isolated incident; it is part of a broader pattern of non-disclosure of exculpatory information during both phases of Mr. Lee's trial. Although the Government has thus far succeeded in precluding the courts from reviewing its conduct, it is quite extraordinary that it has never—not once—unequivocally denied the factual

stated that he did not believe the Humphrey polygraph evidence would have overcome the other evidence in the case. Respectfully, this *dicta* has no bearing on the reasons that Judge Baker denied Mr. Lee's Rule 60 motion.

11

allegations undergirding any of Mr. Lee's previous allegations of prosecutorial misconduct.[4]

**B.      Mr. Lee Has No Adequate Remedy at Law.**

This Court has recognized that "'a stay of execution is an equitable remedy,'" and Mr. Lee has "no adequate remedy at law." *See Davis v. Kelley*, 855 F.3d 833, 834 (8th Cir. 2017) (quoting *Johnson v. Lombardi*, 809 F.3d 388, 390 (8th Cir. 2015)). This factor weighs in Mr. Lee's favor.

**C.      Mr. Lee Will Suffer Irreparable Injury Without a Stay.**

Mr. Lee would suffer irreparable injury if the Court were to deny his motion for a stay of execution. In the absence of a stay, Mr. Lee would face the

---

[4] *See, e.g., Mr. Lee v. United States*, No. 19-3576 (8th Cir. Jan. 7, 2020) (Order denying motion for authorization to file successive § 2255 motion) (Kelly, J., dissenting) (noting that the "government does not respond to [the] allegation" that it withheld exculpatory information from the defense contained in Cheyne's and Kirby's declarations about the non-existence of a racketeering enterprise); Dkt. 1367 at 71-74 (Government response to Gloria Kehoe allegations; not denying that Mrs. Kehoe was mentally unstable, that case agents discussed their concerns about this with Cheyne and Kirby Kehoe (who provided additional information substantiating the case agents' concerns), and that the prosecution withheld this information from the defense); Dkt. 1307 at 31-37 (Government response to Wanker allegations; not denying that Mr. Wanker repeatedly warned authorities that Mr. Lee's statements were not trustworthy, that the Government omitted these warnings from its witness interview reports, and also omitted information from Mr. Wanker's written statement to the grand jury that was inconsistent with the prosecution theory); Dkt. 1367 at 80 (Government response to Paul Humphrey allegations; not responding to claim based on *Napue v. Illinois* and *Giglio v. United States* that the Government knew or should have known that Humphrey gave false or misleading testimony about his knowledge of the forged car titles and involvement in the murders).

12

irreversible taking of his life by the Government, without having had a meaningful opportunity to remedy the defects that infected the integrity of both his trial and initial § 2255 proceeding, including those Mr. Lee alleges were perpetrated by the Government itself. *See, e.g., Wainright v. Booker*, 473 U.S. 935, 935 n.1 (1985) (Powell, J., concurring in decision to vacate stay of execution) ("The third requirement—that irreparable harm will result if a stay is not granted—is necessarily present in capital cases."); *Evans v. Bennett*, 440 U.S. 1301, 1306 (1979) (granting stay of execution in light of the "obviously irreversible nature of the death penalty"). Mr. Lee's harm is imminent and would be beyond remediation if a stay did not issue.

### D. The Balance of Harms Weighs in Mr. Lee's Favor.

On the other hand, the Government's interest in carrying out the execution of Mr. Lee on July 13, 2020, before he has a fair opportunity for full appellate review of the district court's denial of his motion relating to its own conduct, does not, as explained below, constitute "substantial harm."

As an initial matter it should be noted that Mr. Lee is not requesting a permanent injunction. *See, e.g. Harris*, 323 F. Supp. 2d at 809 (finding "little potential for injury" as a result of a delayed execution date). He is merely requesting that the Court stay his execution so that his substantial grounds for appeal may be meaningfully considered.

13

Mr. Lee has diligently pursued relief. He made repeated requests pre-trial and during the § 2255 proceedings for *Brady* material. As this Court recently noted in *Jimerson v. Payne*, 957 F.3d 916, 927 (8th Cir. 2020):

> [D]ue diligence does not require a defendant to root out information that the State has kept hidden. The State cannot play "hide and seek" with information it was required to disclose and then accuse defense counsel of lacking due diligence. Due diligence does not require defense counsel to possess psychic abilities and discover potentially favorable evidence during trial that the State chose to conceal, particularly when defense counsel specifically requested disclosure of the evidence now at issue.

Indeed, it is the *Government's* dilatoriness and clear failure to observe its constitutional duties under *Brady* that is responsible for any delay. Had the Government exercised due diligence before making its representation in the case that it had turned over all favorable information related to Paul Humphrey, Mr. Lee could have presented the issue in his initial § 2255 motion and obtained meaningful review of it at that time. Moreover, Mr. Lee filed his Rule 60 motion within six months of discovering the Humphrey polygraph report. The Government can hardly fault Mr. Lee for carefully preparing his Rule 60 motion in that amount of time when it spent *20 years* suppressing the evidence that gave rise to the motion.

**E.     The Public Interest Weighs in Favor of a Stay.**

The public interest also weighs in favor of a stay of Mr. Lee's execution. There is no public interest in an unconstitutional execution: a stay would vindicate

14

the public's interest in making sure that the federal government does not violate the U.S. Constitution. Mr. Lee seeks a stay to have a meaningful opportunity to have this Court consider the serious allegations concerning the Government's failure to comply with its duties under *Brady* and the ramifications that has had on Mr. Lee's trial and ability to vacate his sentence under § 2255. A short delay of the hastily-set execution for this purpose would not disserve the public interest. *See e.g., Harris*, 323 F. Supp. 2d at 810.

In Mr. Lee's case, however, the actual interests of the public in going forward with an execution now are well-documented and starkly different from the abstract interests the Government may try to assert, despite knowing better. The Eastern District of Arkansas Judge who presided at trial has always been opposed to Mr. Lee's execution. Long before the new evidence in this appeal came to light, he had written:

> That Petitioner's death sentence is not redressable under existing legal principles does not mean that it constitutes a fair and rational result under the peculiar and special circumstances of this particular case….the end result leaves me with the firm conviction that justice was not served in this particular case, solely with regard to the sentence of death imposed on Daniel Lewis Mr. Lee.

Exh. A (Letter from Mr. Lee's trial and initial §2255 Judge Eisele to A.G. Holder et al.).

Former Assistant United States Attorney and lead prosecutor in Mr. Lee's case, Dan Stripling, also opposes Mr. Lee's execution. He is convinced that the

15

disparate sentencing outcomes in this case—Mr. Lee's death sentence, compared with his more culpable co-defendant's life-without-parole sentence—were the result of arbitrary factors given the evidence against the two men:

> There is simply no knowing why, under the facts before the jury, Mr. Lee was given a death sentence and Kehoe not. Kehoe is intelligent, appeared clean cut, and had support of convincing witnesses who genuinely supported him. Mr. Lee had none of those benefits. If this was the reason for the jury's decision, life should not be taken because of these disparities.

Exh. B (Letter from Former AUSA Dan Stripling to A.G. Holder).

Although in its execution notice, Defendants unthinkingly invoked the interests of "the families left behind" when setting Mr. Lee's execution date, the actual family members of the victims, including Earlene Branch Peterson, mother of Nancy Mueller and grandmother of Sarah Elizabeth Powell, do not want Mr. Lee executed and has made her views known publicly. See Sadie Gurman, "First federal execution since 2003 is set for Monday," Wall Street Journal, July 9, 2020. (https://www.wsj.com/articles/first-federal-execution-since-2003-is-set-for-monday-11594292401) ("A conservative Trump supporter, Ms. Peterson sent the president a videotaped plea begging him to commute Mr. Lee's sentence to life in prison, the same punishment Mr. Kehoe received. 'We were hopeful that they had heard us and maybe listened to us, but that's not what they have done,' Ms.

16

Peterson said in an interview. 'Putting Daniel Mr. Lee to death would dishonor my whole family. That's not how we live our lives.'").[5]

Given the concern voiced by members of the public who would usually be supporting a given sentence, it is fair to ask who in the public would be well served by executing Mr. Lee now, before he has had meaningful review of the issues for which he presently seeks review. The rare opposition of the lead prosecutor and trial judge—one sought the death penalty and the other presided over both the trial and post-conviction proceedings—should give pause. Given the lack of expected support for executing Daniel Mr. Lee in this case, it is difficult to see in whose interest suddenly rushing this execution truly might be.

Under these circumstances, where it benefits the public for Mr. Lee's constitutional rights to be fully considered, and where the trial judge, the trial prosecutors, and the family of the victims who attended the trial daily all oppose this execution, the public interest clearly weighs in favor of a stay.

---

[5] Mrs. Peterson's request to the President was shared in a video that can be viewed at https://vimeo.com/user104267544 and is embedded in the article Max Brantley, "Murder victim's family urge Donald Trump to spare life of man facing execution," Arkansas Times, June 25, 2020 (https://arktimes.com/arkansasblog/2020/06/25/murder-victims-family-urge-donald-trump-to-spare-life-of-manfacing-execution).

17

## CONCLUSION

Mr. Lee has demonstrated that all of the relevant factors weigh in favor of this Court issuing a stay of execution pending appeal in this Court.

Respectfully submitted,

/s/ Morris H. Moon
Morris H. Moon
Bar# 24032750 (TX)
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(713) 880-3556
Morris_Moon@fd.org

/s/ George G. Kouros
George G. Kouros
Bar # 420813 (CT)
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 821-0855
George_Kouros@fd.org

Counsel for Daniel Lee

18

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), the undersigned hereby certifies that this motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A).

1.      Exclusive of the exempted portions of the motion, as provided in Fed. R. App. P. 32(f), the motion contains 4,068 words.

2.      The motion has been prepared in proportionally spaced typeface using Microsoft Word for Office Professional Plus 2016 in 14-point Times New Roman font. As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied on the word count feature of this word processing system in preparing this certificate.

/s/ George G. Kouros
GEORGE G. KOUROS
July 11, 2020

Appellate Case: 20-2351    Page: 19    Date Filed: 07/11/2020 Entry ID: 4932684

# CERTIFICATE OF SERVICE

This will certify that, on July 11, 2020, Appellant's counsel served this motion

upon the United States by filing the document via this Court's ECF system.

/s/  George G. Kouros
George G. Kouros
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 821-0855
George_ Kouros@fd.org

Counsel for Daniel Lee

Appellate Case: 20-2351     Page: 20     Date Filed: 07/11/2020 Entry ID: 4932684

<u>Index of Exhibits</u>

Exh. A:  Letter from Mr. Lee's trial and initial §2255 Judge Eisele to A.G. Holder et al.

Exh. B:  Letter from Former AUSA Dan Stripling to A.G. Holder

Appellate Case: 20-2351    Page: 21    Date Filed: 07/11/2020 Entry ID: 4932684

# EXHIBIT A

Appellate Case: 20-2351     Page: 22     Date Filed: 07/11/2020 Entry ID: 4932684

# G. THOMAS EISELE



**Little Rock, AR**

November 7, 2014

Eric H. Holder, Jr.
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530-0001

Christopher R. Thyer
United States Attorney
Eastern District of Arkansas
P.O. Box 1229
Little Rock, Arkansas 72203

Re:    *United States v. Daniel Lewis Lee,*
       Eastern District of Arkansas, Court Case No. 4:97-cr-000243

Attorney General Holder and U.S. Attorney Thyer:

I am the federal judge who presided over the criminal trial of Daniel Lee ("Lee") back in 1999, the result of which was a penalty of death being imposed upon Lee, but not on the ringleader Chevie Kehoe ("Kehoe"). I am 91 years old, and I have not had an active docket for several years.

I was informed by counsel for Daniel Lee ("Lee") in a letter dated October 6, 2014, that settlement discussions were ongoing between the Government and Lee's current counsel regarding whether a life sentence "best serves the interests of justice." I declined Lee's counsel's request for an in-person meeting, but took under advisement whether to write a letter. Since that time, I have given considerable thought to the matter.

I obtained copies of and reviewed the prior opinions in the case for the purpose of squaring my memories of the case with the legal record.[1] I feel compelled to write this letter, which I would not normally do, because I believe that requiring Lee to pay the ultimate penalty – death – is unjust under the peculiar circumstances of this case. Of course, this is nothing more than my view, entitled to no weight other than that which you in your official positions deem appropriate.

All who review the record will recognize the unequal and disparate roles that Kehoe and Lee played in their horrific crime spree, which Kehoe directed and Lee joined intermittently. Kehoe

---

[1] The facts and opinions expressed herein are consistent with the record in this case and the views expressed in my post-trial rulings and opinions.

recruited Lee. Kehoe was the charismatic leader; Lee the obedient follower. Lee "participated in the murder of the adults, but would have no part in the killing of [8-year-old] Sarah Powell so Kehoe had done it alone."[2] There was no question that Kehoe was the more culpable of the two with regard to the criminal acts charged in the indictment and proved at trial.

This clear disparity in culpability was recognized when "the Government announced *in camera* [while the jury was considering the penalty phase in Kehoe's case] that if the jury sentenced Defendant Kehoe to life imprisonment, it would not pursue the death penalty for Defendant Lee."[3] As I wrote in a letter to the parties shortly after the death verdict was returned:

> Before the jury determined that Mr. Lee should die, all of the attorneys in the case appeared to be of a mind that the death penalty would be inappropriate in the case of Mr. Lee because the jury had failed to sentence Mr. Kehoe to death. Everyone seemed to be in agreement that the death penalties for both defendants would have been a possible and appropriate outcome, and life without parole for both defendants would have been a possible and appropriate outcome, but no one believed that it would be appropriate to seek the death penalty for Lee if the death penalty had not been imposed upon Mr. Kehoe.[4]

Initially, I set aside the death penalty based on two issues, both of which are addressed briefly below. The Eighth Circuit set aside my opinion and reinstated the death penalty.

**Death Penalty Protocol:**

I set aside the death penalty after concluding that the United States failed to follow its own "Death Penalty Protocol."[5] While this issue ultimately became about whether Lee had "standing" to require the Attorney General to follow her Death Penalty Protocol, this technical framing of the issue does not capture adequately the events leading up to the holding or its impact.

When the jury handed down its life sentence for Kehoe, whose sentencing phase was first, I believed that Lee's sentence was resolved as well, as had been represented. It was surprising to learn that this was not the case and that formal permission to withdraw the death penalty as to Lee had to be received from Washington, D.C. It was even more surprising to learn that permission was being denied, in direct conflict with the recommendation of the local United States Attorney and her assistants in Little Rock, all of them very capable prosecutors.

The chain of events moved swiftly after the Court was advised that the effort to seek death for Lee would in fact go forward. At that point, the trial had been underway for over two months.

---

[2] 374 F.3d 637 (8th Cir. 2004).

[3] 89 F. Supp. 2d 1017, 1032 (E.D. Ark. 2000), rev'd, 274 F.3d 485 (8th Cir. 2001).

[4] No. 4:97CR00243, 2008 U.S. Dist. LEXIS 109771, at * 182 (E.D. Ark. Aug. 28, 2008) (quoting letter).

[5] 89 F.Supp. 2d at 1041.

All were weary. After the announcement of the life sentence for Kehoe, but before the jury had decided Lee's fate, I allowed the jurors to return to their homes. I have often wondered whether I made a mistake in not sequestering the jurors for the entire penalty phase.

**Future Dangerousness (Hare "Psychopathy" Tool):**

I set aside the death penalty after concluding that I erred in allowing the introduction of evidence regarding Lee's future dangerousness during the penalty phase of the trial.[6] In making this finding, I held that introduction of the psychopathy evidence improperly emphasized Lee's "future dangerousness" during sentencing even though Lee "chose neither to perform a risk assessment analysis nor to present rebuttal evidence on the future dangerousness aggravating factor" and "was therefore ill-equipped to handle the Government's discussion of psychopathy."[7] Fifteen years later, there is more reason than ever to question the use of the Hare Psychopathy instrument or prejudicial labeling relied upon at sentencing.[8]

I frequently have second-guessed my own decisions in this case and wondered what, if anything, I could have done differently that might have resulted in a more rational outcome. I have no doubt that all involved did the best they could at the time with the knowledge that they had. Still, the end result leaves me with the firm conviction that justice was not served in this particular case, solely with regard to the sentence of death imposed on Daniel Lewis Lee.

Suffice it to say that, now, more than ever, I agree with my following statement, made in concluding that I was unable to grant Lee post-conviction relief under existing law:

> That Petitioner's death sentence is not redressable under existing legal principles does not mean that it constitutes a fair and rational result under the peculiar and special circumstances of this particular case. Perhaps more than anything else, this case illustrates that the most carefully crafted capital punishment regime in the hands of the humans who must carry it out can never be completely free of arbitrariness in all of its implementations.[9]

I wish you both the best. I remain,

Yours truly,

*G. Thomas Eisele*
G. Thomas Eisele

cc:     Karl Schwartz [Attorney for Daniel Lee]

---

[6] *Id.* at 1032.
[7] 89 F. Supp. 2d at 1030.
[8] *See, e.g.*, Kathleen Wayland & Sean D. O'Brien, Deconstructing Antisocial Personality Disorder and Psychopathy: A Guidelines-Based Approach to Prejudicial Psychiatric Labels, 42 Hofstra L. Rev. 519, 521 (2013).
[9] 2008 U.S. Dist. LEXIS 109771 at *185.

# EXHIBIT B

Dan Stripling

████████

Little Rock, Arkansas ████
October 28, 2014

Eric H. Holder, Jr.
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530-0001

Christopher R. Thyer
United States Attorney
Eastern District of Arkansas
PO Box 1229
Little Rock, Arkansas 72203

General Holder and US Attorney Thyer:

      Re: Pending execution of Danny Lee

At the request of Danny Lee's representatives, I am writing you regarding my feelings about the pending execution of Danny Lee. I am pleased to honor their request.

As an Assistant United States Attorney, I was lead prosecutor in the investigation and trialof Chevie Kehoe, Danny Lee, and others who plotted to create an Aryan Nation free of other races or ethnic groups. In the course of numerous, varied criminal activities, the Muller family was killed. The investigation lasted two years, and the trial lasted many weeks. Kehoe was unquestionably the leader of the organization and plotter of the Muller murders. Lee's role was that of the "Aryan Hit Man." Evidence presented at trial established that Lee killed the two adults but was unable to execute the little girl. This Kehoe did after insulting Lee for his weakness.

The United States Attorney sought DOJ approval to seek the death penalty against both Kehoe and Lee. Certification was granted. At the time, and today, I thought this the correct decision. After conviction, the jury found that Kehoe should receive a life sentence rather than the death penalty. Following this jury decision, the United States Attorney sought DOJ decertification of Lee's death penalty request. This was denied. At the time, and today, I think decertification would have been the correct decision.

Kehoe was clearly the leader of the group. The robbery and murder of the Muller family were entirely his plan. Lee was the henchman Kehoe used to assist him in this ghastly undertaking.

The decision to seek DOJ approval to withdraw the capital designation in Lee's case was not lightly made. First Assistant Michael Johnson discussed the issue with the victim's family and those law enforcement officers and agents most involved in the investigation and prosecution. Prior to the return of the Kehoe penalty verdict, Johnson and United States Attorney Paula Casey had discussed the action to be taken should the jury not return a death verdict against Kehoe with line prosecutors. There was agreement that should Kehoe not receive a death sentence, none should be sought against Lee.

Prior to becoming an Assistant United States Attorney, I was a state prosecutor and, for fifteen years, in private practice defending most types of criminal cases. I was lead defense attorney in numerous cases in which a capital charge was a consideration and one that resulted in a capital charge, conviction, and defendant's execution. Over decades, my feelings about capital punishment have matured. I do not feel that capital punishment is inherently wrong or that death rows are teeming with innocent people. However, I find very disturbing the randomness with which defendants are charged, convicted, and sentenced in capital cases. This case perfectly illustrates this unexplainable randomness. It is this unpreventable disparity in outcomes that convinced me that the Lee capital designation should have been decertified. There is simply no knowing why, under the facts before the jury, Lee was given a death sentence and Kehoe not. Kehoe is intelligent, appeared clean cut, and had support of convincing witnesses who genuinely supported him. Lee had none of those benefits. If this was the reason for the jury's decision, life should not be taken because of these disparities.

May God bless you in your decision.

Sincerely,

Dan Stripling

cc: Karl Schwartz, Esq.